1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

    CORDANCE CORPORATION,

4                                    :      CIVIL ACTION
                 Plaintiff,          :

5       v                            :
                                     :

6    AMAZON.COM,                     :
                                     :      NO. 06-491 (MPT)

7                Defendant.
                              - - -

8

9                         Wilmington, Delaware
                  Tuesday, May 27, 2008 at 10:03 a.m.
                       **TELEPHONE CONFERENCE**

10

11                             - - -

    BEFORE:  HONORABLE **MARY PAT THYNGE**, U.S. MAGISTRATE JUDGE

12

13                             - - -

    APPEARANCES:

14

15              ASHBY & GEDDES, P.A.
                BY:  JOHN G. DAY, ESQ.

16                   and

17              WOLF GREENFIELD & SACKS, P.C.
                BY:  MICHAEL C. ALBERT, ESQ.,

18                   ROBERT M. ABRAHAMSEN, ESQ., and
                     JEFFREY C. O'NEILL, ESQ.

19                   (Boston, Massachusetts)

20                       Counsel for Cordance Corporation

21

22              POTTER ANDERSON & CORROON, LLP
                BY:  RICHARD L. HORWITZ, ESQ.

23                   and

24

25                            Brian P. Gaffigan
                              Registered Merit Reporter

```
 1    APPEARANCES: (Continued)

 2

 3                   FENWICK & WEST, LLP
                     BY:  RYAN J. MARTON, ESQ.,
 4                        LYNN PASAHOW, ESQ., and
                          DARREN E. DONNELLY, ESQ.
 5                        (Mountain View, California)

 6                        Counsel for Amazon.com

 7

 8

 9

10

11

12

13

14

15                        - oOo -

16                  P R O C E E D I N G S

17            (REPORTER'S NOTE:  The following telephone

18    conference was held in chambers, beginning at 10:03 a.m.)

19            THE COURT:  Good morning, this is Judge Thynge.

20            (The attorneys respond, "Good morning, Your

21    Honor.")

22            THE COURT:  All right.  Who do I have on the

23    line on behalf of Cordance, please?

24            MR. DAY:  Yes.  On behalf of Cordance, you have

25    John Day at Ashby & Geddes, locally.
```

1          With me on the phone, Michael Albert, Robert

2    Abrahamsen and Jeffrey O'Neill from Wolf Greenfield & Sacks

3    in Boston.

4          THE COURT:  All right.  Thank you.

5          Who is on the line on behalf of Amazon, please?

6          MR. HORWITZ:  Good morning, Your Honor.  It's

7    Rich Horwitz at Potter Anderson in Wilmington.  And with me

8    from Fenwick & West, Lynn Pasahow, Darren Donnelly and Ryan

9    Marton.

10          THE COURT:  All right.  I understand that there

11    are a couple of issues, a few issues, and that each side has

12    some dispute concerning them; not that I'm taking it in any

13    particular order, I'm just doing it on the docket entry

14    numbers.  I understand that docket entry number 148 and

15    docket entry I think 152 go together, and then docket entry

16    149 and 151 go together.  I'm just going to take them in

17    order as to how they're entered on the docket, 148 being the

18    claim by Cordance that Amazon is in contempt of my order of

19    April 1st.

20          MR. ABRAHAMSEN:  Yes, Your Honor.

21          THE COURT:  Please introduce yourself each time

22    you talk, counsel.

23          MR. ABRAHAMSEN:  This is Bob Abrahamsen.

24          THE COURT:  All right.  Thank you.

25          MR. ABRAHAMSEN:  In terms of the contempt

1    request, Your Honor, what we're talking about here is not

2    just a minor oversight.  We think it's a rather glaring

3    omission and failure to comply with the Court's earlier

4    order to provide discovery concerning the feedback system.

5            We have been trying for months to obtain

6    information about Amazon's system by allowing buyers to

7    leave feedback about sellers and vice-versa.  The Court

8    ordered that Amazon produce those documents by April 22nd.

9    And just on Friday, Your Honor, we received some documents

10   from Amazon indicating that there is a part of the system

11   that is called their feedback service which is a larger part

12   of the feedback pipeline at Amazon, and we just got these

13   documents, Your Honor.  No other production had been made

14   concerning this portion of the system before.

15           We took some depositions a week and-a-half ago

16   without the benefit of these documents.  And what we're

17   asking for at this time is that Amazon bring a witness to

18   Boston so we can take a deposition of a witness concerning

19   this portion of the system which is really central to our

20   claim.

21           MR. MARTON:  If I may respond?  This is Ryan

22   Marton for Amazon.

23           THE COURT:  Yes, Ryan.  Go ahead.

24           MR. MARTON:  The Court's April 1st, 2008, order

25   required that Cordance provide supplemental infringement

1    contentions relating to its feedback system within two weeks

2    of that order; and that following that, Amazon was to

3    provide documents related to the technology accused in those

4    infringement contentions.  Cordance supplied infringement

5    contentions that appeared to accuse the back end of the

6    feedback system, essentially storage and replication of what

7    the patents have called feedback data.  Amazon provided

8    documents and source code related to that system within

9    the time period provided by the Court's order and has

10    subsequently ruled less important documents out in further

11    productions.

12            Cordance had requested further documentation at

13    the beginning of last week related to this buyer and seller

14    feedback system which we subsequently provided as well as

15    provided or agreed to make a witness available for a

16    telephonic deposition, which is exactly what Cordance asked

17    for.  And then after providing everything that Cordance had

18    asked for, they filed this motion.  So we're not really sure

19    what we're doing here today on this issue, but we believe

20    we've complied with this Court's order and given Cordance

21    everything they have asked for.

22            MR. ABRAHAMSEN:  May I respond, Your Honor?

23            THE COURT:  Yes, go ahead.

24            MR. ABRAHAMSEN:  The position we were accusing

25    only their back end system, that is frankly incredible in

1    view of the fact our complaint identified the collection and

2    processing of feedback.  Our interrogatory responses

3    described in considerable detail the acquisition of feedback

4    information from their website.  That they now claim that we

5    were just accusing the data storage mechanism?  Again, it's

6    incredible, Your Honor.  It's just it's inconsistent with

7    what the record establishes.

8          THE COURT:  All right.  What about this

9    agreement to do a deposition by way of telephonic

10   deposition?

11         MR. ABRAHAMSEN:  That, Your Honor, the reason we

12   requested that is we have this May 30th deadline by which

13   we're supposed to identify claim terms we think are in need

14   of construction.  It necessarily means we have to identify

15   claims that we're going to assert.

16         Last week, after the deposition, a couple days

17   later, we actually identified a bunch of additional claims

18   that we decided we could assert based on those depositions;

19   but we really -- we wanted at least a telephone deposition

20   to give us the ability to figure out whether we're missing

21   any claims with respect to this entirely different part of

22   the system.

23         Since then, the parties have actually agreed

24   that we will have until mid-June to provide contentions with

25   respect to any newly asserted claims, and that the parties

1    will exchange proposed constructions at the end of June.  So

2    it's really, the need for this quick peek under the hood

3    telephone deposition is kind of obviated by this agreement

4    between the parties now.  But what we really need is a full

5    day with this witness to explore this new part of the

6    system, and we think it's only fair that Amazon bring a

7    witness out here because we could have done this a week

8    and-a-half ago when we were out in Seattle.

9            MR. MARTON:  Your Honor, if I may respond to

10   their contention that they could have done this a week

11   and-a-half ago had we provided all the documents?

12           They could have done this had they noticed a

13   30(b)(6) deposition, which they did not do.  What they did

14   do was notice a few individual depositions which happen to

15   not be people related to the buyer-and-seller feedback

16   system.

17           THE COURT:  Well, their argument there is that

18   they didn't have the documents for the buyer-and-seller

19   feedback system.

20           MR. MARTON:  Well, they did have the documents

21   related to the back end of that system, which is what we

22   thought they had accused; and even absent having those

23   documents, nothing would stop them from issuing a 30(b)(6)

24   deposition to get a witness knowledgeable on this system,

25   which they still, to this day, have not done.

1          THE COURT:  What else were you going to tell me?

2    Because I interrupted your thought process so I didn't know

3    whether there is another train of thought that you wished to

4    tell me.

5          MR. MARTON:  As to this telephonic deposition,

6    as of last week, that was all that Cordance had asked for as

7    well as certain documents which we provided.  As of today,

8    we have a lawyer up in Seattle with the witness who is

9    prepared and sitting and scheduled to have his deposition

10   taken regarding this system.  I think that should be enough.

11   That is exactly what Cordance asked for.  It was only after

12   we had agreed to provide that witness and after we had told

13   Cordance we were not withdrawing our own motion that they

14   proceeded with their current motion.  It doesn't seem that

15   they truly need a witness out in Boston to get the

16   information that they want.

17         THE COURT:  So you're saying they should only be

18   allowed to take a deposition by phone.  For how long?

19         MR. MARTON:  They asked for a two-to-three hour

20   deposition; and that is what we agreed to provide.  If they

21   need more time, they can have it.

22         MR. ABRAHAMSEN:  Your Honor?

23         THE COURT:  Yes.

24         MR. ABRAHAMSEN:  A telephone deposition is not

25   going to be adequate to allow us to fully explore this

1    system.   The telephone deposition was okay for us.

2                THE COURT:  Don't worry about this.  I'm not

3    going to require a telephonic deposition because I do think

4    it's a bit ridiculous to be able to expect to discuss

5    documents and have a witness to be able to understand it;

6    and I can't imagine the deposition just taking seven hours

7    with the circumstances by telephone.

8                The only question in my mind is where the

9    deposition will be taken, whether it's in Boston.  And where

10   is the witness?  Out in Seattle, Washington?

11               MR. MARTON:  Seattle, yes, that's correct, Your

12   Honor.

13               THE COURT:  That is only issue as far as I'm

14   concerned.  It will be a face-to-face deposition because I

15   can't imagine the complications that will happen during

16   this deposition with trying to identify documents and

17   make certain the witness is aware of what documents the

18   examiner is referencing at the time the question is made or

19   information on those documents.  So that really is it.

20   That's the only issue that I see.

21               And tell me why it should be in Boston over

22   having it out in Washington?  Did you have to go to

23   Washington for the original depositions?

24               MR. ABRAHAMSEN:  We did.  This is Bob Abrahamsen

25   again.

1           THE COURT:  So the deposition will be held in

2    Boston.  That's my ruling.

3           MR. MARTON:  Okay.

4           MR. ABRAHAMSEN:  And, Your Honor, according to

5    the parties agreement, right now, we have to provide

6    infringement contentions by June 15th or mid-June.  We would

7    ask that this take place ...

8           THE COURT:  Well, this deposition I certainly

9    would hope would take before mid-June.  That is my

10   expectation, that it is going to occur before the date in

11   which the contentions are due, and I'm not expecting it to

12   occur on June 15th or June 14th.

13          MR. ABRAHAMSEN:  Okay.

14          THE COURT:  So the parties better make

15   arrangements to make sure this witness is available out in

16   Boston and get the deposition done as soon as possible.

17          MR. ABRAHAMSEN:  Okay.

18          THE COURT:  Okay.  The second --

19          MR. MARTON:  Your Honor, this is Ryan Marton.

20   Can I say one more issue related to this?

21          THE COURT:  What is the other issue, Ryan?

22          MR. MARTON:  Last Thursday, Cordance identified

23   160 new claims that they contended they would be asserting

24   against Amazon.  Given the volume of claims, we would like

25   to confirm that we would be able to move out the date for

1   exchange of infringement contentions beyond the May 30th

2   deadline.

3           THE COURT:  Well, I thought you had already said

4   you were going to move it out to June 15th.

5           MR. MARTON:  We had.

6           THE COURT:  And I don't have a problem with that

7   as long as you don't change any of due dates that you have

8   with me.

9           MR. MARTON:  Okay.

10          THE COURT:  Okay?  Because your change of the

11  due dates for claim construction and for when the due dates

12  begin to run on case dispositive motions directly affect me.

13  What happens between the two of you regarding those due

14  dates for when you do your exchange of information between

15  yourselves only affects you.  Now, if you need additional

16  time that affects my time, that may very well directly

17  affect whether you get a trial as it has been scheduled.

18          MR. MARTON:  Okay.  Again, Your Honor, the

19  parties reached an agreement on that so I think we're okay.

20          THE COURT:  That's fine with me.  If the concern

21  was that by reaching that agreement there was a change in

22  the schedule, my understanding is, what you conveyed to me

23  was that that was only a change in the schedule that was a

24  limited change in the schedule.  You weren't looking for any

25  additional time for when your Markman briefs would be due or

1    when your case dispositive motions would be due.

2                MR. MARTON:  That's correct, Your Honor.

3                MR. ABRAHAMSEN:  That's correct.

4                THE COURT:  That's fine.  Then that change is

5    fine.

6                MR. ABRAHAMSEN:  Again, this is Bob Abrahamsen.

7    The next issue in our letter was this protective order issue

8    which the parties have come close but still have a few areas

9    of disagreement.

10               THE COURT:  Yes.

11               MR. ABRAHAMSEN:  And there was actually a

12   red-lined version attached to our letter.

13               THE COURT:  Which exhibit number was that,

14   please?

15               MR. ABRAHAMSEN:  Exhibit either 2 or B.

16               THE COURT:  B.

17               MR. ABRAHAMSEN:  And it's centered around Pages

18   3 and 4.

19               THE COURT:  Yes.

20               MR. ABRAHAMSEN:  The issue with the prosecution

21   bar provision, keep in mind that Cordance doesn't have any

22   pending patent application.  This bar really just relates to

23   Cordance's lawyers, us, and whether we can do work for other

24   clients.

25               THE COURT:  Yes, I remember this issue came up

1    before.

2                    MR. ABRAHAMSEN:  Yes.  And the first issue, the

3    dispute between the parties is whether it's really one word.

4    We say something is "configured" for use in a particular

5    type of system or "applicable" for use.  And the problem we

6    see with "applicable" is that it's vague.  We don't know for

7    sure whether something would be applicable for use in this

8    particular type of system.  You know, how much

9    reconfiguration has to be done for it to be "applicable?"

10   We think "configured" for use is just an option for this

11   term to really focus on a particular field where we know

12   where we're allowed to do work and where we're not.

13                   THE COURT:  And what is the particular field

14   then?  How would you define this particular field if the

15   word "configured" is in there?

16                   MR. ABRAHAMSEN:  With configured?

17                   THE COURT:  Yes.

18                   MR. ABRAHAMSEN:  It's doing work on a system

19   that is configured for use in that type of environment.

20   Without that limitation, this issue, we're to strike

21   everything after applicable for use?  It's really saying we

22   can't do any work for anything that has anything to do with

23   feedback, and we can't live with that as patent attorneys.

24   We have to limit this to some particular field, some

25   particular environment, some particular technology for this

1    to make sense.

2            There are other provisions in the protective

3    order which preclude us from purposefully misusing

4    information we learned, and we're not certainly intending to

5    do that.  This is kind of an extra layer of protection,

6    excluding us entirely from the field; and we think that

7    field has to be well defined and narrow.

8            MR. MARTON:  Your Honor, if I may respond?  This

9    is Ryan Marton.

10           THE COURT:  Sure.

11           MR. MARTON:  The technology at issue here is

12   for -- this is for the feedback systems.  And we have a

13   well defined segment for saying you cannot prosecute patents

14   within this field of feedback systems.  And the issue of

15   whether or not something is configured for use in a

16   multi-tiered distributed online purchasing environment is

17   that if we require that something is expressly configured

18   for use in this online purchasing environment, it

19   essentially takes any force out of the prosecution bar away

20   by allowing someone to prosecute a patent for the relevant

21   technological field that is not expressly designed for use

22   in an online purchasing environment.

23           The issue over certainty is that the definition

24   of the feedback system in this bar provides the certainty

25   that we're looking for.  And what we're faced with here is

1   exactly the situation that has been raised in this case,

2   where a patent that doesn't really talk about storage

3   systems is asserted against a storage system.  And we have

4   this concern that a patent could be prosecuted for a

5   feedback system that is related or closely related to

6   Amazon's confidential information not be specifically

7   configured for use in an online purchasing environment

8   and then that patent being asserted against Amazon.

9          MR. ABRAHAMSEN:  Your Honor, what I heard there

10  is they're saying the limitation "collecting or processing

11  electronic feedback information" should be the scope of the

12  bar.  And I think that is far, far too broad.  We need to

13  limit it to a particular environment.

14         THE COURT:  And what environment are you

15  suggesting?  Because what you just said to me didn't provide

16  me any definition either.

17         MR. ABRAHAMSEN:  The environment I'm suggesting

18  is that in which Amazon actually uses this.  That is the

19  multi-tiered distributed online purchasing environment.

20         THE COURT:  Well, what the argument they're

21  making is that you can come up with a system that isn't

22  directed to that "configured for," that particular type

23  system, and have a broader application and end up

24  essentially taking what Amazon is doing or has done and

25  patenting something that isn't a broader term or a broader

1    usage and say, aha, now we can use it what against what

2    Amazon is doing without having it really "configured for."

3           MR. ABRAHAMSEN:  Your Honor, the protective

4    order already says that we're allowed to use the

5    confidential information we received only for the purpose of

6    this litigation.  This is a separate layer on top of that

7    which excludes us from a field entirely.

8           They have that protection.  We can't go and

9    draft claims with the idea of covering their system.  What

10   we're talking about is a broad exclusion of lawyers from

11   doing work in a particular field, and we think electronic

12   feedback is much too broad.  To say that we as patent

13   lawyers can't do anything with electronic feedback, that

14   covers a lot of stuff.

15          THE COURT:  Yes, I'm sure it does.  And that is

16   my problem with Amazon's definition.  I'm going to go back

17   to the same problem that has existed since the beginning of

18   this lawsuit, and that is the two of you can't come up with

19   any better definitions to someone who is, quite frankly,

20   relatively ignorant as to the import of the different terms

21   and what it actually means in the technology that we're

22   involved in; which causes me some pause, that if you, as

23   "experts" can't come up with it, how come I can come up with

24   anything better except for the fact that I have "judge" in

25   front of my name?

1           One of the requirements that I think that Amazon

2    had suggested was that it would agree to the change but have

3    a mechanism in place to be able to resolve any disputes that

4    could arise in the future, that is, some type of mechanism

5    to keep a generalized understanding of what documents had

6    been reviewed or used I think was what Amazon was

7    suggesting.  Correct?  Or am I missing --

8           MR. ABRAHAMSEN:  What they're asking for is if

9    someone looks at documents relating to, say, the S3 system,

10   I guess they want that person to catalog every single

11   document they look at simply to prove down the road that

12   they didn't look at something else.  And this information

13   that is easily segregated into one of these three

14   categories.  I think the idea of requiring someone to

15   catalog everything is too burdensome and unnecessary in this

16   case, just to prove a negative.

17           THE COURT:  Then what you are saying is to

18   catalog and say you reviewed documents that deal with

19   whatever system you are talking about, the XY&Z system you

20   think should be enough.  I have no idea how many documents

21   have necessarily been produced or are involved in this.  I

22   have no idea.  I have no idea the import of the size of each

23   category, general category of documents.  Are we talking

24   about 1,000 pages?  Are we talking about 50,000 pages?  Are

25   we talking 100,000 pages?  Or are we talking about 1,000,000

1    pages?

2             MR. MARTON:  We're probably talking --

3             MR. ABRAHAMSEN:  Go ahead.

4             THE COURT:  Okay.  Ryan.

5             MR. MARTON:  We're probably talking about

6    100,000 pages.

7             THE COURT:  For each category?

8             MR. MARTON:  No, 30,000 for each category,

9    35,000 for each category.

10            THE COURT:  So are you requesting that they have

11   to write down every document that they actually looked at

12   within a particular category?

13            MR. MARTON:  No, they could provide some

14   contemporaneous documentation that would be sufficient to

15   show that they hadn't seen documents in a particular

16   category.  There are probably a couple ways that this

17   could be done.

18            THE COURT:  Well, have you got an agreement on

19   what the categories are?

20            MR. MARTON:  Whether or not a particular

21   document falls into a category, have we come to agreement on

22   that?

23            THE COURT:  My question probably had two parts

24   to it:  One, have you agreed to the general categories in

25   which all documents fall into?  And have you come do an

1    agreement as to, in general, what types of documents would

2    fall in each of those categories?  Do you understand what

3    I asked?

4              MR. MARTON:  I think I do.  And I'm not -- I

5    think that it's fairly self-evident from the face of any

6    given document whether it falls into the categories for the

7    prosecution bar as the parties have not debated that.

8              THE COURT:  Okay.  So you do have an agreement

9    in general?

10             MR. MARTON:  I believe so.

11             THE COURT:  All right.  So what were you

12   proposing then about what type of documentation you were

13   asking them to maintain?

14             MR. MARTON:  Contemporaneously created

15   documentation indicating what any person subject to the bar

16   had looked at.  This could be done as far as writing down

17   the Bates numbers or it could be Bates ranges.  It could be

18   done by saying I didn't look at anything in this Bates

19   range.  It could be any one of those things.

20             THE COURT:  So you were asking them to keep a

21   record of every document that they looked at rather than a

22   record, a general record of categories of documents.

23             MR. MARTON:  Because the manner of production is

24   such that documents that fall into the different categories

25   are produced on, say, the same CD or DVD, yes, they have to

1    do it this way, I think.

2            THE COURT:  And the purpose of having this

3    record maintained is for what?

4            MR. MARTON:  To show that there had been no

5    exposure to the documents that they claim they had not seen.

6            Let me step back on this issue.  This is a

7    separate issue from the "configured" vs. "applicable" issue.

8            THE COURT:  It is?

9            MR. MARTON:  It really stems from the fact what

10   Cordance has requested is something different than what the

11   normal prosecution bar provides for.  What they're asking

12   for is that it be applied on a category-by-category level

13   so that a particular lawyer could review only stuff about

14   feedback and S3 but then prosecute patents related to an

15   online purchasing environment.  That is not the normal

16   approach for a prosecution bar.

17           Amazon is fine with this category-by-category

18   approach as long as there is some mechanism to protect

19   Amazon in the future, should a lawyer from Cordance

20   prosecute a patent that is within the scope of the bar but

21   not within the scope of what they claim they had access to.

22           THE COURT:  Well, what if you had, instead of

23   "configured" or "applicable," the words "which have use" or

24   "has use in a multi-tiered distributed online purchasing

25   environment?"

1          MR. ABRAHAMSEN:  "Use" in such an environment

2    would be fine with Cordance, Your Honor.

3          MR. MARTON:  So instead of "configured," it

4    would say "used."

5          THE COURT:  Or "which has use."

6          MR. MARTON:  "Which it has used."

7          THE COURT:  "Which has use."  I think it's a

8    single.  It's either plural or single.  I didn't sit there

9    and check.  It's either "which have" or "which has."

10          MR. MARTON:  That seems fine.

11          MR. ABRAHAMSEN:  I think that is pretty similar

12    to "applicable," Your Honor.  How do we know whether it has

13    use in such an environment?  Because you could look at any

14    electronic feedback system and say, well, you could

15    reconfigure that to have use.  So I think we're a little

16    reluctant to go with that.

17          THE COURT:  Well, I think "configured" is too

18    narrow.  I really do.  Because "configured" implies that it

19    was intended to be for that particular type system.  And I

20    think it takes the guts out of the patent prosecution bar.

21    I really do.

22          MR. ABRAHAMSEN:  How about "are used?"  A

23    system that is used in that sort of environment.  Because

24    what we're talking about here is that Amazon doesn't want

25    us to do patent work for Barnes & Noble, a competitor with

1    a similar environment.  And that is kind of what this

2    prosecution bar is going to protect them from.  So we need

3    to focus either on a particular technology that is used at

4    Amazon or a particular environment that is used at Amazon;

5    and we would be okay with either, focusing on the

6    technology that they think is their secret sauce or in

7    their environment to keep us outside those areas, but just

8    to say any feedback, that is not going to work for us.

9            THE COURT:  I recognize that.  I recognize there

10   is a problem there.

11           How about "are used," from Amazon's viewpoint?

12           MR. ABRAHAMSEN:  I think that's --

13           THE COURT:  Well, that is my question to Amazon.

14           MR. MARTON:  That might be okay except it's a

15   little vague as to "are used" by who?  Obviously, if they're

16   going to assert the patent, it would be used by the person

17   who had allegedly infringed, and then it would be subject to

18   the bar.

19           THE COURT:  Well, let me put it this way.

20   "Configured" for use or "applicable" have the same problem.

21   So if you have a problem with who the subject matter is, it

22   existed previous to this discussion.

23           MR. MARTON:  I think as far as -- "which are" --

24   so is it --

25           THE COURT:  The question is, instead of

1    "configured," "which are used."

2            MR. MARTON:  Okay.  "Which are used in a

3    multi-tiered distributed online purchasing environment."

4    "Are used" in the patent or by people outside of the patent?

5            THE COURT:  Okay.  Do you want to diagram a

6    sentence?  Doesn't "are used" go back to "confidential

7    systems and techniques?"  Isn't that the subject of the

8    sentence?

9            MR. MARTON:  Yes.

10            THE COURT:  And the rest of it is all either

11    prepositions or phrases that would come off of "confidential

12    systems and techniques," if you have remember your

13    diagramming from Primary Grade English?  So it would go back

14    to "confidential systems and techniques which are used."

15            MR. ABRAHAMSEN:  I guess I'm a little confused

16    as well, Your Honor, regarding the technology field from

17    which we're excluded.

18            THE COURT:  Yes.

19            MR. ABRAHAMSEN:  I think the technology field is

20    really anything that uses electronic feedback in this

21    particular environment.

22            THE COURT:  And what is the particular

23    environment?

24            MR. ABRAHAMSEN:  That's the multi-tiered

25    distributed purchasing environment.  So if we're doing

1    work for a client that uses feedback in a multi-tiered

2    distributed environment, then we need to take this bar into

3    consideration.  But if we're doing general feedback work for

4    some other client, then we have the other portion of the

5    protective order which is going to stop us from thinking

6    about Amazon's system and drafting claims together.

7            THE COURT:  Well, why don't we go with "which

8    are used," that language, instead of "configured" or

9    "applicable for use," in the sentence that you are concerned

10   about, that is Subsection 2 of Subsection little I of

11   Subsection A under 4?  And we'll just go that route.

12           MR. MARTON:  Okay.

13           MR. ABRAHAMSEN:  Your Honor, the cataloging of

14   information?

15           THE COURT:  Yes.

16           MR. ABRAHAMSEN:  Amazon acknowledges everybody

17   looking at this information is going to know whether it's S3

18   feedback or 1-click.  I don't see the point of having a

19   person reviewing just 1-click documents, keeping a record of

20   every 1-click document that they look at.

21           THE COURT:  Well, the way I look at it is

22   if your person looked at every 1-click document and

23   categorized it as 1-click, then it's going to be, if they do

24   it generally under that, then it would be 1-click.  If it

25   turns out that they only looked at certain documents under

1   1-click, they certainly can indicate the Bates numbers that

2   they looked at and be inclusive -- not list every Bates

3   number but be inclusive, like Bates number, whatever it is,

4   067 to 100.  But if they're saying they looked at 1-click

5   documents in that category, they can just sit there and say

6   we looked at all the 1-click documents or just say the only

7   documents we reviewed were 1-click and it will be assumed

8   they reviewed all of them.

9          MR. ABRAHAMSEN:  That's fine.  A representation

10  of the person that they only looked at 1-click documents is

11  enough?

12         THE COURT:  Yes, I think that should be enough.

13  And if it turns out they only looked at a portion of the

14  1-click documents, then it will be their responsibility to

15  know what portion they looked at, if they're going to

16  dispute that.

17         So it works this way:  If somebody who has the

18  right to look at the 1-click documents says, as part of

19  their record keeping, reviewed 1-click documents, they can't

20  later come along and say, well, I only reviewed a portion of

21  it.  If they're saying they only reviewed a portion, they

22  are going to be responsible for putting down that portion;

23  and it can be done by Bates ranges, for example.

24         MR. ABRAHAMSEN:  But, Your Honor, if a person

25  reviews only a portion of the 1-click documents, they have

1    to worry about this bar anyway.  So cataloging whether they

2    looked at a portion or all of them is really -- it's --

3              THE COURT:  Listen to what I said.  If they want

4    to argue about what documents they looked at or didn't look

5    at, it's going to be up to them to keep a record of it.  If

6    they say that they looked at 1-click documents and then

7    later on wanted to debate they only looked at a portion of

8    it, then it's going to be up to them to show how they looked

9    at a portion of it and that can be done by general Bates

10   numbers, that is, a range of Bates numbers.

11             MR. ABRAHAMSEN:  I understand now, Your Honor.

12             THE COURT:  That's what I was saying.

13             MR. ABRAHAMSEN:  Okay.

14             THE COURT:  But once they put down they looked

15   at 1-click documents without that limitation, it's going to

16   be an assumption they looked at all of them.

17             MR. ABRAHAMSEN:  Okay.

18             MR. MARTON:  That's great.  Thank you, Your

19   Honor.  As long as that is contemporaneously maintained.

20             THE COURT:  Well, it should be contemporaneously

21   maintained.  I don't know how you will prove otherwise, but

22   hopefully it should be contemporaneously maintained, not

23   something after the fact.  Otherwise, it's worthless.

24             MR. MARTON:  Thank you.

25             THE COURT:  Okay.  We are now at the i-names,

1    XRI and XDI names of technology.  And that is an issue I

2    think brought up by Amazon.

3              MR. MARTON:  Yes.  XRI and XDI and i-names,

4    we're not asking for all documents that say XRI, XDI and

5    i-names; rather, this document was either used as search

6    terms to collect documents related both to Cordance's claims

7    as well as Amazon's counterclaim.

8              THE COURT:  Well, how do you propose that they

9    be used as search terms if you are suggesting they should be

10   plug in i-names, XRI and XDI?  How are you proposing they be

11   used as search terms?  You seem to be suggesting that they

12   be used as search terms without a limitation.

13             MR. MARTON:  That is correct.

14             THE COURT:  So you end up getting every document

15   that has XRI, XDI and i-names in it.  Potentially every

16   document that has an XRI reference, any document that has an

17   XDI reference or any document that has an i-names reference.

18   So explain to me how you are not asking for every document

19   which contains every one of those three items in it.

20             MR. MARTON:  I'm requesting Cordance pull those

21   documents for review for relevance and that they make a

22   relevance determination and produce only those that are

23   relevant and responsive to document requests.  But you are

24   absolutely correct, we are asking that they search for and

25   retrieve and look at or produce every document that has

1    XRI or XDI or i-names in it.

2                THE COURT:  And how is this relevant to the

3    case?

4                MR. MARTON:  We'll start with Cordance's claims.

5    They've asserted four patents.  These four patents; at least

6    in the past, Cordance as well as the inventors on the patent

7    have made representations; are embodied in the XRI, XDI

8    standard as well as the i-names technology.  So as the

9    potential embodiment of the asserted patents, these are

10   relevant to the scope of prior art as well as to the value

11   of the asserted patents.

12               And then with regard to Amazon's counterclaim,

13   XRI and XDI are the technology that underlies the i-names

14   product or service.  And Amazon's counterclaim asserts

15   that i-names, in conjunction with other i-services, are

16   potentially infringing its '369 patent.  And so this is the

17   accused technology, in essence, or a component of the

18   accused technology.  That is the relevance.  It's of

19   critical relevance.

20               And it's probably worth mentioning that we

21   requested that these terms be run in June of 2007, at which

22   time Cordance had a motion to dismiss pending.  It objected

23   to several of these terms on the ground that they were

24   relevant only to Amazon's counterclaim.  After the Court,

25   in November of 2007, denied that motion to dismiss, we

1   requested that Cordance provide the discovery sought related

2   to the counterclaim and assume that they were running these

3   terms.  It wasn't until April of this year that we received

4   an e-mail from Cordance's lawyers indicating that they were

5   going to run just a handful of terms which didn't include

6   XDI or XRI or i-names in isolation, which is what we had

7   previously contemplated.  And at that point, we engaged in a

8   negotiation that has resulted in us being here today.

9            THE COURT:  Okay.  All right.

10           MR. ABRAHAMSEN:  Shall I respond, Your Honor?

11           THE COURT:  Sure.  Go right ahead.

12           MR. ABRAHAMSEN:  We have, over and over again,

13  suggested that we conduct a search for relevant search

14  terms.  Doing a search for i-names and making us look at

15  every document that has i-names in it is practically going

16  to make us look at most of the documents created by the

17  company because i-names is its business.

18           We proposed search terms that will capture

19  relevant things:  basically i-names in conjunction with

20  other i-services.  We offered to do a search for the other

21  i-services.  We just don't want to have to run a search and

22  look for every single document that has i-names in it.  It's

23  unnecessary.  It's too burdensome.

24           THE COURT:  Well, let me just ask you, what if

25  you did a combined search where it had to have all three of

1    them?  Can that be done?

2                MR. ABRAHAMSEN:  Yes.  We suggested that.

3                THE COURT:  Well, let me ask you, i-names in

4    relationship to XDI, i-names with XRI.

5                MR. ABRAHAMSEN:  I think they're all portions of

6    Cordance's business, though, and they're not going to

7    capture the relevant stuff.  I mean we've offered to do

8    searches for the patent numbers.  We've offered to do

9    searches for the purported invention.  We've offered to do

10   searches for the i-services which they are accusing of

11   infringement.  And that should capture the information

12   they're looking for.

13               MR. MARTON:  Your Honor, this is Ryan Marton.

14   This is claiming that we're asking for every document in the

15   company and this is overly burdensome, but it's unclear as

16   to how burdensome this is.  There has been no representation

17   as to how many extra documents these terms call for.  During

18   the course of meeting and conferring over this, it was

19   represented that there were only 100,000 documents at play

20   here.  And Cordance has purported to produce or planned to

21   produce upwards of 50,000 documents, so, at worst, we're

22   talking about an additional 50,000 documents if that is the

23   case, but we should at least be contemplating the burden

24   here.

25               THE COURT:  Well, it's not just the burden of

1    plugging in these references or search terms.  It's the

2    burden of going through the documents.  That's where the

3    burden is.

4              MR. ABRAHAMSEN:  Yes.  Conducting a privilege

5    review of e-mails, Your Honor, is extremely burdensome.

6              THE COURT:  But then again, you also brought

7    this case.  And one argument that you haven't answered is

8    that the patents are embodied in XRI, XDI and i-names, and

9    if you have done it that broadly, then you might very well

10   be stuck with that.

11             MR. ABRAHAMSEN:  Your Honor, we had given them

12   all the information they could ask for and more.  That will

13   describe how i-names works, what i-names is, what XRI is,

14   what XDI is.  There is no question they have all that

15   information.  I'm a little confused why they need every

16   document that has the term "i-names" in it.

17             THE COURT:  Well, I think what they're saying

18   is that they want you to check every document that has the

19   term "i-names" in it to make certain that something isn't

20   lost in the shuffle by the limitation that you imposed by

21   the search terms that you imposed.

22             MR. MARTON:  Yes.  We've asked them to come up

23   with any additional search terms they want to try and

24   capture the relevant stuff.  The problem is that i-names,

25   XRI, XDI is going to capture most of the documents we're

1    talking about here.

2              THE COURT:  Well, the question I think also,

3    the other issue that was brought up and asked, and it is a

4    question I have, is just exactly what are we talking about

5    as far as what additional search is concerned?  How many

6    documents are we potentially talking about that you have to

7    look through?

8              MR. ABRAHAMSEN:  I think it's on the order of

9    25,000 to 30,000, roughly.  Is that right, Jeff?

10             MR. O'NEILL:  Yes.

11             MR. ABRAHAMSEN:  That is a lot of e-mails to

12   look at.

13             MR. MARTON:  Your Honor, that is 10 bankers

14   boxes of documents.  Amazon.com, for any given technology

15   here, has gone through many multiples of that.  And as to

16   the contention that Mr. Abrahamsen has made that they're

17   pulling all the relevant stuff, it would be very valuable

18   and of interest to Amazon to see representations made by the

19   inventors as to the value of the technology which has been

20   asserted is embodied in the asserted patent.  Those would

21   not be necessarily captured by anything less than XRI, XDI

22   and i-names.

23             THE COURT:  Well, what about i-names and the

24   word "value?"  Or "value of patents?"

25             MR. MARTON:  I hear what you are saying.  I

1    think that that has the potential to capture some but

2    certainly not all.  The way "value" can be expressed is

3    certainly a nuanced issue.  Someone doesn't necessarily have

4    to say value.

5              THE COURT:  I understand that.  But the next

6    argument I'm going to hear is, gee, judge, how do we know

7    they produced all the relevant documents.

8              MR. ABRAHAMSEN:  Your Honor, if it helps?

9              THE COURT:  I can see that coming down the line,

10   since you are saying review every document that has the name

11   "i-names" in it, and then we'll leave it up to you to

12   determine whether it's relevant.  And if they give you a

13   handful of documents, let's say out of the 25-or-50,000

14   documents and they give you 100, you are going to be coming

15   back to me and saying, well, we know there have to be more

16   relevant documents than that.

17             MR. MARTON:  I can't predict the future on that,

18   but we anticipate that they would be forthcoming with the

19   documents that are responsive and relevant and haven't been

20   objected to.

21             THE COURT:  Or haven't been claimed as

22   privileged.

23             MR. MARTON:  Right.

24             MR. ABRAHAMSEN:  And, Your Honor, if it's

25   helpful?  Attached as Exhibit B to our reply letter --

1           THE COURT:  Well, let me look at --

2           MR. ABRAHAMSEN:  -- this is a list of the search

3    terms we actually used.  And you can see for yourself how

4    extensive that list really is and how willing we have been

5    to use search terms that will capture relevant information.

6           THE COURT:  Have you thought about XRI and XDI

7    with the same -- and I may be showing my complete

8    ignorance -- with the same terms that you did with i-names?

9    Because you used --

10          MR. ABRAHAMSEN:  XRI and XDI are the generic

11   platforms you can use for anything, so those by themselves

12   really wouldn't have any relevance to Amazon's counterclaim,

13   but it's virtually --

14          THE COURT:  Well, if they have relevance to your

15   claims, they're relevant.  Not just to their counterclaim,

16   it's to your claims as well as that you asserted in your

17   four patents.

18          MR. ABRAHAMSEN:  I don't know in what sense they

19   would be relevant.

20          THE COURT:  My understanding is, according to

21   Amazon, that your argument is that the four patents that are

22   embodied in any XRI, XDI and i-names platform from what I

23   understand are usage.

24          MR. ABRAHAMSEN:  We have not contended that,

25   Your Honor.  I guess there is some license document out

1    there that says something to that effect but we have not

2    contended that.

3            MR. MARTON:  Your Honor, that license document

4    is a license that Cordance has entered into with xdi.org,

5    and its CTO as well as other folks within its organization

6    are well aware of this license, and we have numerous

7    documents where they represent that XDI and XRI are

8    embodied -- are the embodiment of the asserted patents.

9            If you take a look at Exhibit A to our opening

10   letter, and look at Provision 22, it specifically says that

11   the patent rights, which are subsequently defined as the

12   patents that are asserted in this matter, have been embodied

13   in a set of technical specifications.  These technical

14   specifications include, but are not limited to, the XRI

15   specifications and the XDI specifications; which Cordance,

16   in its letter, imply were drafted by Oasis but at least per

17   documents as they have produced them in this matter were

18   actually prepared by Drummond Reed, their CGO.

19           MR. ABRAHAMSEN:  And, Your Honor, even assuming

20   that statement is accurate that he just quoted, I'm still

21   struggling to see how the relevance will play out here.  We

22   have already given them all documents to show how XDI and

23   XRI and i-names work.  Why would a search for additional

24   documents have any relevance to this case, using those

25   search terms?  They have the information they need.  I'm at

1   a loss to what they would want more stuff for.

2           MR. MARTON:  If I may respond?  Our primary

3   concern at this point is certainly not how these systems

4   operate.  It is the value of the embodiments of the patent

5   as well as commercial success of the embodiments of the

6   asserted patents and Cordance's licensing practices with

7   regard to this technology.

8           MR. ABRAHAMSEN:  And, Your Honor, we've offered

9   to do search terms that will focus on such things.  What we

10  don't want to do is look at -- I'm repeating myself, but

11  every document that has "i-names" in it to figure this out.

12  If it's like asking Amazon to do a search for "Amazon" or

13  "books" and then have them look at every document to see if

14  they're relevant or not.

15          MR. MARTON:  That's actually -- that's not a

16  fair analogy.  I think an appropriate analogy it would be

17  it's like asking Amazon to search for "1-click" which we

18  have done or it's like having Amazon search for "PlanetAll."

19          MR. ABRAHAMSEN:  For "PlanetAll?"

20          MR. MARTON:  That's the technology underlying

21  our asserted patent.

22          THE COURT:  Well, have you done a search with

23  "i-names" and "licensing?"  Or have you done a search

24  even -- have you done one?

25          MR. O'NEILL:  Your Honor, this is Jeff O'Neill.

1    We have done searches on a "click patent" and "license" and

2    "intellectual property" and "license," "invention" and

3    "license."  We can do "i-names" and "license."

4            MR. ABRAHAMSEN:  We can do any combination of

5    license that Amazon would like.

6            THE COURT:  Well, why don't you do "i-names" and

7    "license," and why don't you do "i-names" and "value" and

8    "i-names" and "commercial."  Check that out.  You may turn

9    out to get the same documents.

10           MR. ABRAHAMSEN:  Okay.  We can do that, Your

11   Honor.

12           THE COURT:  Do that and see.

13           MR. MARTON:  How about with XRI and XDI?

14           THE COURT:  Well, let me ask you this:  I don't

15   understand.  I'm having a hard time figuring out what you

16   need for XRI and XDI.  How much more would that entail for

17   XDI and XRI?  What do you think would be captured in that if

18   you included those terms that I just gave you with XRI and

19   XDI?  Like "license" and "XRI" and "XDI?"

20           MR. O'NEILL:  Your Honor, this is Jeff O'Neill

21   again.  Here is a little explanation of what XRI and XDI are

22   in case it will help clarify things.  XRI and XDI are open

23   standards that are sponsored by a nonprofit organization

24   called Oasis, and Cordance is involved with these open

25   standards.  But these are open standards that any company

1    who wishes to could choose to implement.  And Cordance is a

2    company that has implemented these open standards XDI and

3    XRI, or they implemented XRI anyway.  And i-names is

4    Cordance's implementation of the standard called XRI.  So

5    I'm not sure if it makes sense to do additional searches

6    relating to XRI and XDI.  They're just open standards.

7    There is no license, there is no value to them.  It's just

8    something anybody can use.

9              THE COURT:  Okay.  Are you saying to me that you

10   don't intend to say that your four patents cover XRI and XDI

11   and that you can base infringement solely upon those two

12   standards?

13             MR. ABRAHAMSEN:  I'm not following.

14             THE COURT:  Well, you are saying to me that

15   XRI and XDI are open standards; right?  That's what I just

16   heard.  That anybody can use.  You are not claiming then

17   that your four patents that you have raised, although they

18   embody XRI and XDI, that if all anybody does is use the XRI,

19   XDI standards, you are not going to sit there and say your

20   four patents, that they would automatically infringe your

21   four patents.  Are you saying that?

22             MR. O'NEILL:  Not automatically.

23             MR. ABRAHAMSEN:  Correct, Your Honor.

24             THE COURT:  They'd have to do something else to

25   be able to infringe your patents; is that correct?

1          MR. O'NEILL:  It's fair to say that certain

2    implementations of XRI and XDI may infringe the Cordance

3    patents and others may not.

4          THE COURT:  All right.  And what are the

5    relevant terms regarding the implementation of XRI and XDI

6    that could infringe your patents?  What you are saying to me

7    is I don't want to go through XRI and XDI because it's going

8    to get a whole host of stuff that is unrelated to what we're

9    claiming could be infringement of our patents.  But there

10   has got to be something in there that says the

11   implementation, a certain type of implementation or areas of

12   implementation of XDI and XRI could infringe your patents.

13   So what is the terminology for those implementations?

14         MR. ABRAHAMSEN:  Amazon's counterclaim has

15   focused on the address book implementation.

16         THE COURT:  Well, I understand that.  We're

17   going to be doing this in two separate sets.  First of all,

18   I'm looking at Cordance's four patents and then Amazon's

19   patent.

20         MR. ABRAHAMSEN:  Okay.

21         THE COURT:  And this is how I'm thinking to try

22   to narrow this, so you are not just looking up XRI and XDI

23   and then you end up with 50,000 pages of documents you have

24   to go through.

25         MR. ABRAHAMSEN:  I-names again is Cordance's

1    implementation of XRI.

2              THE COURT:  Okay.

3              MR. ABRAHAMSEN:  Our commercial practice, that

4    is going to cover it:  i-names.

5              THE COURT:  All right.  What about Amazon?  I'm

6    looking at Amazon's comments.  I'm looking directly from

7    Amazon.

8              MR. MARTON:  Okay.  Your Honor, if I can step

9    back on this a bit.  We're just talking about 25,000

10   documents or 30,000 documents, 10 boxes of material.  I

11   think that this narrowing exercise is just not justified.

12             THE COURT:  Well, I happen to think it is.  So

13   please entertain me with that.

14             MR. MARTON:  Okay.  And the pending question is?

15             THE COURT:  What about XRI and XDI in

16   relationship to your patents, in relationship to your

17   counterclaim?

18             MR. MARTON:  Oh.  It's that XRI and XDI, which

19   are the technology underlying i-names, to the extent there

20   are discussions as to the operation and value of it,

21   i-names is accused of being used in conjunction with other

22   i-services as infringing the '369 patent.  To the extent

23   there is discussions of the operation and/or value of XRI

24   and XDI, all of that would be relevant.

25             THE COURT:  Okay.  There were three terms that I

1    told you to use with i-names for your patents they're

2    claiming now.  What is your argument against using those

3    three terms with XRI and XDI?

4                MR. ABRAHAMSEN:  I don't know how many documents

5    those are going to capture.  If a volume is small enough, I

6    guess we could do that.  The thing is --

7                THE COURT:  Why don't you do this?  Why don't

8    you go through and find out if we're making a mountain out

9    after molehill and just find out how many documents we're

10   talking about and if the documents are huge, get back to me?

11               MR. ABRAHAMSEN:  Okay.

12               THE COURT:  Okay?

13               MR. ABRAHAMSEN:  Yes.

14               THE COURT:  Do it that way.  That would seem to

15   me because it could be we're talking about, you know, what,

16   4,000, 3,000, 2000 documents, maybe even less.  And it might

17   not be that much that we're really arguing about as far as

18   XRI and XDI are concerned.

19               MR. ABRAHAMSEN:  Okay.  We can do that, Your

20   Honor.

21               THE COURT:  Yes, check it out.  Because if it

22   turns out you end up getting all 50,000, then we obviously

23   have a problem, or 25 or whatever.  Okay?  So why don't do

24   you that and just run that search and see what it actually

25   spits out.  It may not spit out that much.

1              MR. MARTON:  Okay.  Understood.

2              THE COURT:  Was there another issue connected to

3    this or are we completed with the discovery matters?

4              MR. ABRAHAMSEN:  I think that's it.

5              MR. MARTON:  That is it.  Thank you.

6              THE COURT:  Thank you, all.  Take care now and

7    have a good week.

8              (The attorneys respond, "Thank you, Your

9    Honor.")

10              THE COURT:  Good-bye now.

11              (Telephone conference ends at 11:01 a.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25