IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORDANCE CORPORATION,

            Plaintiff,

v.

AMAZON.COM, INC., and
AMAZON WEB SERVICES, L.L.C.

            Defendants.

Civil Action No. 06-491-MPT

## CORDANCE CORPORATION'S OPENING CLAIM CONSTRUCTION BRIEF

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*Cordance Corporation*

*Of Counsel:*

Michael A. Albert
Robert M. Abrahamsen
Jeffrey C. O'Neill
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, Massachusetts 02210
Tel.: 617-646-8000

Dated:  August 27, 2008

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................iii

I.      SUMMARY ...........................................................................................................1

II.     THE LAW OF CLAIM CONSTRUCTION ........................................................2

III.    CORDANCE AND ITS PATENTED INVENTIONS .........................................3

        A.      Cordance Corporation ...............................................................................3

        B.      Overview of Cordance's Inventions ..........................................................3

        C.      Background Technical Concepts .................................................................7

                1.      Hypertext Markup Language .........................................................7

                2.      Metadata...........................................................................................7

                3.      Objects .............................................................................................8

        D.      Construction of "metadata"........................................................................9

        E.      Online Purchase Transactions ...................................................................11

                1.      Overview of Claim 1.......................................................................11

                2.      Construction of Terms in Claim 1 of the '710 Patent....................14

                3.      Overview of Claim 7.......................................................................18

                4.      Construction of Terms in Claim 7 of the '710 Patent....................19

                5.      Amazon's Proposed Sixteenth Claim Term for Construction .........21

        F.      Communicating Updated Information and Feedback Information.........21

                1.      Overview of Claim 19 of the '205 Patent .......................................22

                2.      Overview of Claim 109 of the '325 Patent .....................................24

                3.      Construction of "control structure"................................................26

                4.      Construction of Terms in Claim 19 of the '205 Patent....................27

5.  Construction of Terms in Claim 109 of the '325 Patent.................................28

6.  Construction of Terms in Claim 50 of the '717 Patent.................................30

7.  Construction of Terms in Claim 20 of the '325 Patent.................................31

IV.  AMAZON'S PATENT ...............................................................................36

V.  CONCLUSION.........................................................................................40

## TABLE OF AUTHORITIES

**Cases**

Comark Commc'ns, Inc. v. Harris Corp.,
    156 F.3d 1182 (Fed. Cir. 1998)................................................................2

Gillespie v. Dywidag Sys.,
    501 F.3d 1285 (Fed. Cir. 2007)........................................................39, 40

Helmsderfer v. Bobrick Washroom Equip., Inc.,
    527 F.3d 1379 (Fed. Cir. 2008)................................................................3

Home Diagnostics, Inc. v. Lifescan, Inc.,
    381 F.3d 1352 (Fed. Cir. 2004)..........................................................2, 27

Intamin Ltd. v. Magnetar Technologies, Corp.,
    483 F.3d 1328 (Fed. Cir. 2007)..............................................................15

Jang v. Boston Sci. Corp.,
    532 F.3d 1330 (Fed. Cir. 2008)..............................................................37

Markman v. Westview Instruments, Inc.,
    517 U.S. 370 (1996).............................................................................1, 2

Markman v. Westview Instruments, Inc.,
    52 F.3d 967 (Fed. Cir. 1995)...............................................................2-3

Micro Chem., Inc. v. Great Plains Chem. Co.,
    194 F.3d 1250 (Fed. Cir. 1999)........................................................32, 33

Oatey Co. v. IPS Corp.,
    514 F.3d 1271 (Fed. Cir. 2008)..............................................................16

Phillips v. AWH Corp.,
    415 F.3d 1303 (Fed. Cir. 2005).............................................2, 10, 15, 20

Ruiz v. A.B. Chance Co.,
    234 F.3d 654 (Fed. Cir. 2000)................................................................16

**Statutes**

35 U.S.C. § 112....................................................................................2, 30, 32, 33

**Other**

IEEE Standard Dictionary of Electrical and Electronics Terms (6th Ed. 1997)............................10

J. Rumbaugh et al., Object-Oriented Modeling and Design (1991) ...............................................10

Webster's Third New Int'l Dictionary (1993) .............................................................................17

J. December and N. Randall, The World Wide Web Unleashed (2d ed. 1995) ...........................4

Pursuant to <u>Markman v. Westview Instruments, Inc.</u>, 517 U.S. 370 (1996), Plaintiff Cordance Corporation ("Plaintiff" or "Cordance") submits this memorandum to assist the Court in its task of interpreting disputed claim language in the asserted patents.

## I.    **SUMMARY**

Cordance has asserted four patents (collectively, "the Cordance Patents") against Amazon.com, Inc. and Amazon Web Services, LLC (collectively, "Defendant" or "Amazon"). The four Cordance Patents are in the same patent family – three of them have the same specification, and one has a shorter specification. The Cordance Patents relate generally to systems and methods for controlling and automating on-line communications.

Three aspects of Amazon's on-line business infringe the Cordance Patents. First, Amazon's "one-click" shopping system infringes U.S. Patent No. 6,757,710 ("'710 Patent"). Second, Amazon's Simple Storage Service infringes U.S. Patent No. 6,044,205 ("'205 Patent"). Third, Amazon's systems for collecting feedback – including feedback about items for sale, customers, sellers, and other feedback – infringe U.S. Patent No. 5,862,325 ("'325 Patent") and U.S. Patent No. 6,088,717 ("'717 Patent").[1]

Amazon's counterclaims do not allege patent infringement against Cordance, but seek a declaratory judgment that some future activity by Cordance may indirectly infringe Amazon's U.S. Patent No. 6,269,369 ("'369 Patent"). As Cordance has not – and will not – make any such product, Amazon's counterclaim is moot. In any event, absent any actual product, it is difficult to understand how the parties can meaningfully determine what terms – if any – of Amazon's '369 Patent may be in dispute and may thus require construction.

---

[1] The '710, '325, and '717 Patents all have the same specification. For ease of reference, therefore, Cordance will cite to the '710 Patent specification when discussing any of these three patents. Citations to patents will provide column and line numbers (e.g., '710 Patent at 3:10 – 4:20 would indicate column 3, line 10 through column 4, line 20).

1

## II.    THE LAW OF CLAIM CONSTRUCTION

In order to evaluate the core issues in a patent case (e.g., infringement and validity), the Court may need to resolve ambiguities in the meaning of the claims. Claim interpretation is a matter of law for the Court. Markman, 517 U.S. 370, 372 (1996).

Interpretation of a patent claim begins with the claim language itself. After examining the language of a claim, the Court looks to the "intrinsic" record – i.e., the patent specification, drawings and file history – to determine the meaning of the claim language in context. Phillips v. AWH Corp., 415 F.3d 1303, 1312-17 (Fed. Cir. 2005). Although claims are to be read in light of the patent specification, limitations may *not* be read from the specification into the claims. Comark Commc'ns, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("[W]hile claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims."); accord Phillips, 415 F.3d at 1323-24. Patent claim language is thus to be given the broadest scope its language allows, absent a contrary definition in the patent or prosecution history. See Home Diagnostics, Inc. v. Lifescan, Inc., 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.").

The Court may also compare the language of one claim to another, pursuant to the principle of "claim differentiation." Because dependent claims incorporate by reference the limitations of the independent claims from which they depend, an independent claim is presumed to be broader than a claim depending from it. See 35 U.S.C. § 112 ¶ 4; Phillips, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Although the Court may examine "extrinsic" evidence for background, extrinsic evidence may never be used to vary or contradict the words of a claim. Markman v. Westview

2

Instruments, Inc., 52 F.3d 967, 981 (Fed. Cir. 1995) ("Extrinsic evidence is to be used for the court's understanding of the patent, not for the purpose of varying or contradicting the terms of the claims."); Helmsderfer v. Bobrick Washroom Equip., Inc., 527 F.3d 1379, 1382 (Fed. Cir. 2008) ("A court may look to extrinsic evidence so long as the extrinsic evidence does not contradict the meaning otherwise apparent from the intrinsic record.").

## III.   CORDANCE AND ITS PATENTED INVENTIONS

### A.   Cordance Corporation

In 1993, prior to widespread use of the Internet and the World Wide Web, Drummond Reed invented a system for using computers and computer networks to automate and control communications.  Seeing how his invention could be used to improve the way people share information for a range of commercial (and other) purposes, Mr. Reed formed a company to develop and refine this technology.  He co-founded Intermind Corporation in 1994.  By 1995, the company had several software engineers on board to help turn the idea into a product and obtain intellectual property rights.  By 1996, Intermind had filed two patent applications, released its first product, called Intermind Communicator, and had nearly 50 employees.

Intermind – now known as Cordance Corporation – is focused on envisioning better ways to share information, and to developing corresponding technologies.  Cordance or its employees have played key roles in non-profit organizations dedicated to that field, including the International Security, Trust, and Privacy Alliance (ISTPA), the Organization for the Advancement of Structured Information Standards (OASIS), Identity Commons, and XDI.org, an international non-profit organization governing data interchange.

### B.   Overview of Cordance's Inventions

Cordance filed its first patent application on February 29, 1996 and its second – which is a continuation-in-part of the first – on September 27, 1996.  These two specifications provide considerable technical detail and identify numerous embodiments.  The patents in suit cover 146

3

columns and 47 figures.  Three more continuations followed, claiming different aspects of the inventions.  Together, the five Cordance patents describe systems and methods for automating and controlling communications between two or more computers, typically over the Internet.

The Internet is a global system of interconnected computer networks that interchange data using standardized protocols.  The World Wide Web ("the Web") is a system of hyperlinked documents that is accessed via the Internet.  The Internet has existed in some form since around the late 1960's, but the Web did not come into existence until about 1990.  While its relevance to commerce has become second nature to us today, in 1993 – when Mr. Reed invented the concepts in the Cordance patents – the Web was in its infancy and the Internet was primarily used by universities and research labs.  The Web began to experience explosive growth as a medium of commerce in the mid-1990s, following on the work done by Reed and many others both in non-profits and in for-profit ventures such as Cordance.[2]

As is abundantly clear today, the Web greatly increases the ability of people around the nation and around the world to communicate with one another – whether to read newspapers, to purchase items from sellers, or to communicate through blogs or social networking sites.  In 1993, however, the Web was used by a comparatively small group of people.  Nevertheless, Reed understood the Web's potential, predicted that it would grow to encompass a massive number of users, and anticipated that enabling communication among all these people would create not just new opportunities, but also new problems.

In particular, he foresaw that users would need the ability to **control** and **automate** communications.  With mass communication comes the need for some degree of control over

---

[2] Before the Web, the Internet was used for other systems, such as email, file transfer, and Usenet (an Internet bulletin-board system).  Even as late as 1995, the Internet was still primarily used by universities and research labs.  See J. December and N. Randall, The World Wide Web Unleashed 13 (2d ed. 1995) (incorporated by reference into the '710 Patent at 12:43-44) (attached as Ex. 8 to O'Neill Decl.).

4

how other Web users can communicate with you. He anticipated, for example, concerns relating to on-line security, privacy, and spam. A user may need to share personal information (such as an address or credit card number) with someone – for example, a seller – without wanting that personal information to be disclosed to others.

While control can be achieved through registration processes and other security and privacy restrictions on data exchange, those techniques can create different problems, including slowing communications down. Reed understood that for the full potential of Web-based commerce to be realized, many aspects of those communications would need to be **automated**. Internet users may want to shop at different stores to obtain the best price on an item, but their ability to do so is hampered if they must engage in a tedious registration process for each store. Someone who obtains a new email address or phone number may want to easily communicate that updated information to many people. Automation of these online processes can be valuable.

To address these problems, Reed envisaged a communications system that uses the Web but allows users to control and automate communications with one another. He and other Cordance inventors developed a number of new and useful techniques, some of which are claimed in the patents in suit. These techniques include technological advances such as the use of a control structure to control and automate communications, as well as more application-specific advances such as techniques to make purchase transactions, communicate updated information, and collect feedback from users. As discussed below, these inventions have helped facilitate aspects of e-commerce that have become highly popular and successful.

### The One-Click Invention in the '710 Patent

The invention claimed in the '710 Patent automates and controls purchase-transaction communications so that a purchase transaction can be both initiated and completed with a single click of a mouse. In the prior art, purchasing an item on a website was a lengthier, multi-step process that often resulted in lost sales. A customer was required to manually enter commonly

5

used personal information such as a credit card number, a billing address, a shipping address, etc. A mistake at any step could require the customer to start over. Some customers simply lost interest along the way. The '710 Patent's one-click purchasing invention automates two aspects of this process. First, the customer only needs to enter his or her personal information once, and it can be held and used for future purchases. Second, the steps of the process – from initiation of the purchase to its completion – are automated, condensing them into a single mouse click.

### The "Updating" Invention in the '205 Patent

The invention claimed in the '205 Patent automates and controls the communication of updated information. A person who obtains a new phone number may wish to communicate this update to numerous people; and its recipients may each need to manually update their records. The '205 Patent invention allows users to control who will receive their updated information, and to send it automatically. It also allows recipients to automatically update their records.

### The "Feedback" Invention in the '325 and '717 Patents

The invention claimed in the '325 and '717 Patents automates and controls the communication of feedback information. A seller operating on the Internet can use feedback from customers to improve its business and to inform and educate other customers. Manually sending a feedback request to a customer and manually responding to such requests is a tedious process. The claimed invention allows a seller to automatically send feedback requests to a customer along with information about an item the customer has purchased. The invention also allows the seller to control the type of feedback being requested (e.g., feedback on the item, the shipping, the seller) and to automatically associate the customer's information with the review. When a user provides feedback, it goes into a "feedback server," along with metadata that associates the feedback information with the identity of the user. Preserving that association serves a number of purposes, including indexing feedback based on the identity of its provider, and allowing others to rate the quality of the feedback. ('710 Patent at 126:19-25.)

6

C. **Background Technical Concepts**

Two concepts that appear throughout the Cordance Patents are "metadata" and "objects." Cordance will briefly introduce those concepts below; but first, it may be helpful to briefly describe one of the core features of how the Web operates – hypertext markup language.

1. **Hypertext Markup Language**

On the Web, a person uses a "web browser" to obtain web pages from web servers. The contents of a web page are generally in a specialized language called hypertext markup language ("HTML"). HTML allows for the presentation of a rich array of information including text, images, audio, video, and links to other information. For example, the District of Delaware has a web page at http://www.ded.uscourts.gov/Home-page.htm that includes the following:

```
<html>
. . .
<font face="Times New Roman" . . .><b>Welcome to the website of the U.S.
District Court - District of Delaware.</b></font>
. . .
</html>
```

This code causes the web page to display the text "Welcome to the website of the U.S. District Court - District of Delaware." HTML "tags" are presented between angle brackets. For example the very first tag in most web pages is "<html>." The HTML tags are **metadata** – a term whose meaning will be discussed in greater detail below – that describe how information in the web page is presented to the user via the user's web browser. Some of these metadata "tags" instruct the browser to start or end the use of a particular font, or to use (or stop using) bold type, etc.

2. **Metadata**

As the claimed communications system involves metadata, Cordance will give a brief explanation of this concept. Cordance did not invent metadata – that concept was well known at the time that Cordance filed its applications. Metadata is data about data – or, more precisely (as used in the Cordance Patents), "data that describes or associates other data."

7

To illustrate the concept of metadata, consider the following example. The contents of this brief are stored on a computer with a file name, such as "brief.doc." The words in this brief are data. But in addition to storing that data (the contents of the brief), the computer also stores certain information about the "brief.doc" file – for example, its author, creation date, and last modification date. Those pieces of information describe (tell us something about) the data and are therefore examples of metadata.

Whether a piece of data is also metadata depends on how it is used. For example, the word "created" alone is just a word (data). But used as part of the string "Created: July 20, 2008" it becomes metadata, as it <u>describes</u> the date that follows it as being a creation date. Similarly, the string as a whole "Created: July 20, 2008," standing alone, is data but not metadata. But if that string is associated with the file "brief.doc", the string becomes metadata about the file. Meantime, the ".doc" extension after the filename "brief" is an example of associative metadata – it is metadata that <u>associates</u> the filename "brief" with the application it was designed to operate in, namely Microsoft Word (which uses ".doc" to identify documents).

### 3.    <u>Objects</u>

The Cordance system can be implemented using any of a variety of computer programming techniques. One implementation described in the patents uses "objects," but the specification is explicit that the invention is not limited to using objects and that other programming techniques can be used. ('205 Patent at 12:59-63; '710 Patent at 16:59-63 ("[T]he following description of a preferred embodiment will discuss the use of objects. However, other methods for storing, transferring, and processing information, such as relational databases, binary files, or procedural programs, could be used."). Nevertheless, because the implementation employing objects is discussed in some of the sections below, Cordance provides a brief explanation of objects to facilitate the Court's understanding of those sections.

8

"Object-oriented" programming and databases may be contrasted with other types of computer programming techniques such as "procedural" programming and "relational" databases. The primary difference is that object-oriented programming and databases use a structure – called an "object" – that includes both data and methods (computer code) used to access and operate on the data. For example, an object representing a person could include not only data about the person (e.g., name, credit card number, address, etc) but also methods for processing that data. Thus, to obtain information about the person (e.g., his or her address), the object can be accessed and a method included therein will retrieve the requested data. This is in contrast to other programming techniques wherein data and methods for accessing or processing it are not maintained together in an integrated structure.

Cordance did not invent objects. They are merely one example of a computer programming technique that can be used to implement the Cordance system. The claims being construed are not limited to any one programming technique – indeed, none of the claim terms being construed recite the use of objects.

### D.     Construction of "metadata"

| Term | Cordance's Construction | Amazon's Construction |
|------|-------------------------|------------------------|
| metadata | data that describes or associates other data | information used to structure and automate the bidirectional exchange of data |

The term "metadata" appears in every independent claim that Cordance is asserting against Amazon. It is the only disputed term that appears in all asserted independent claims. The parties agree that the construction of metadata should be the same for all claims.

During prosecution, **Cordance explained to the PTO that "metadata" as used in the specification means "data describing or associating other data."** (See IDS[3] dated Sep. 18,

---

[3] During prosecution, a patentee may file an Information Disclosure Statement ("IDS") to inform the Examiner of prior art that may be relevant to patentability. An IDS is part of the file history

1998 in prosecution of '205 Patent at 11, App. Vol. III at AMZC121540; IDS dated May 6, 1998

in prosecution of '325 Patent at 11, App. Vol. IV-V Part 2 at AMZC121038; IDS dated Sep. 29,

1998 in prosecution of '717 Patent at 10, App. Vol. VI-VII Part 2 at AMZC122257).

Cordance's definition of the term "metadata" comports with the plain and ordinary

meaning of the term.  See IEEE Standard Dict. of Electrical and Electronics Terms 648 (6th Ed.

1997) (defining metadata as "data that describes other data") (attached as Ex. 1 to O'Neill Decl.);

J. Rumbaugh et al., Object-Oriented Modeling and Design 69 (1991) (defining metadata as "data

that describes other data") (incorporated by reference in the '710 Patent at 16:57-58) (attached as

Ex. 2 to O'Neill Decl.)).  Amazon's own current and former employees likewise either defined it

simply as "data about data" or added a further gloss similar to Cordance's own definition in the

IDS, indicating that metadata can associate as well as describe other data.[4]

In short, the term "metadata" should be construed precisely as the intrinsic record defines

it, namely as: "data that describes or associates other data."

Amazon's proposed construction is strikingly different from the plain and ordinary

meaning of the term, and nothing in the instrinsic evidence suggests such a wholesale deviation

from that ordinary meaning.  Amazon is evidently just seeking to narrow the claims.  Metadata

can be used for many purposes, and each of the claims includes other language that explicitly

describes how the metadata is used.  For example, claim 1 of the '710 Patent, discussed in detail

below, explicitly states that metadata is used to associate customer data with an online purchase

---

and is thus intrinsic evidence for purposes of claim construction.  See Phillips, 415 F.3d at 1317.

[4] See Peterson Dep. 157:24 – 158:5, May 14, 2008 ("Q. What does metadata mean to you?  A.
It's information aside from the actual data itself that's relevant to the transaction, data tagged
along for auditing purposes or for identification – passive identification of a component.")
(attached as Ex. 3 to O'Neill Decl.); Cormie Dep. 81:17-18, May 15, 2008 ("Q. Can you explain
what metadata is?  A. Data about data.") (attached as Ex. 4 to O'Neill Decl.); O'Neill Dep. 74:8-
11, May 16, 2008 ("Metadata is data about data.") (attached as Ex. 5 to O'Neill Decl.); Barth
Dep. 52:14-24, Feb. 8, 2008 ("'metadata' means data that in some way describes another piece
of data.") (attached as Ex. 6 to O'Neill Decl.).)

transaction. Nothing in that claim (or any of the others) requires the metadata to "structure and automate the bidirectional exchange of data," and such a limitation should not be imported into the claim by Amazon's artifice of reading it into the word "metadata."

### E.    Online Purchase Transactions

The claims of the '710 Patent are directed to automating and controlling online purchase transactions, so as to solve the problem in prior-art systems of customers having to engage in a multi-step process to enter commonly-used information about themselves (e.g. name, address, or credit card number). ('710 Patent at 2:47-63.) Cordance is asserting claims 1-3 and 5-9 against Amazon, of which claims 1 and 7 are independent. Cordance will first present an overview of claim 1 and then provide constructions for the disputed terms.

#### 1.    Overview of Claim 1

Claim 1 of the '710 Patent sets forth the "one-click" idea. Specifically, it claims a computer-implemented method for completing an online purchase of an item that automates both the use of stored customer information and the various steps of the purchasing process – from its initiation to its completion – into a single action. After the preamble ("A computer implemented method comprising"), the claim sets forth four steps. They are discussed in turn below, under subheadings [a] through [d]. The underlined words are those requiring construction.

> **[a] providing customer data storing information for a customer usable to automatically complete an on-line purchase of an item from a seller**

This limitation solves the problem in the prior art where the customer had to repeatedly enter common information, such as name, delivery address, etc., for each purchase. The '710 Patent describes a system whereby a customer enters such personal data only once, and the data is thereafter stored for use in automatically completing future transactions:

> For example, the consumer only needs to enter his/her name, addresses, telephone numbers, birthdate, and other personal data one time into the consumer database. From that point on all communications objects which need data of these types can

11

access these data type instances.   This saves the consumer data input time and also vastly reduces the potential for data input errors.

('710 Patent at 68:29-53.)

The '710 Patent further specifically describes making customer data available in the context of online purchase transactions.  (Id. at 119:26 – 123:28.)  In one embodiment, both buyers and sellers can create payment accounts where "commonly required items of data, such as the provider's name, contact data, financial account data, credit references, and so on" are stored in a database on a payment partner server.  (Id. at 119:65 – 120:3, 121:42-48.)  Once a customer has created a payment account, the customer receives a "customer account certificate" that the customer may use to identify him or herself in a purchase transaction.  (Id. at 122:2-5.)

### [b] providing the customer with information from the seller with respect to an item

This limitation relates to the seller providing the customer with information about items for sale. As with any shopping experience, whether online or in a store, the customer must be able to receive information about an item, such as the price, before making a decision to purchase it.  One embodiment of the Patent describes an online classified ad listing service.  (Id. at 114:50 – 117:60.)  A seller using such a service can list one or more items for sale, and these listings may include contact information for the seller and also information about how to pay the seller, e.g., by using a payment partner server.  (Id. at 114:64 – 115:54.)

Customers using the classified ad server can specify the types of items they are interested in, and the server provides the customer with information about items that match the specified criteria.  (Id. at 115:55 – 116:62.)  The server sends the customer one or more messages[5] that contain information about the seller, about the item, and about how to purchase the item.  (Id. at

---

[5] In this embodiment, a "message object" is used by way of illustration; but the patent makes clear that the invention does not require messages to be in the form of objects.  Indeed, it expressly includes other types of messages, such as email messages, CORBA messages, and remote procedure calls, that are not in the form of objects.  ('710 Patent at 42:58-61.)

116:36-48.) These messages "enable the buyer and seller to immediately establish their own communications relationship to consummate the sale." (Id. at 116:45-48.)

> **[c] receiving from the customer an indication to initiate a purchase transaction for purchasing the item including <u>metadata associating said customer data with said transaction</u>**

In the classified ad server embodiment, a seller can use the features of the payment partner server (together with the ad server) to facilitate the automatic completion of a purchase transaction with the customer. (Id. at 116:61-62.) First, the seller and the customer must have each registered with the payment partner server. (Id. at 119:41 – 120:54, 121:42-48.) The customer will then have a customer account certificate, and the seller will have a merchant account certificate. (Id.) The certificates are used to facilitate the transfer of data needed for the transaction, along with "the names or logos of the appropriate credit cards, debit cards, and so on in a product ordering input form, for example." (Id. at 121:21-33.) To purchase an item displayed by the ad server, the customer simply chooses one of the payment options shown. The customer's computer then automatically uses a "data exchange input form"[6] to send an indication to the payment partner server to initiate a purchase transaction for the item. (Id. at 121:27-33, Fig. 38.)

This indication to initiate the purchase transaction includes the customer account certificate described above. (Id. at 122:9-13.) The customer account certificate is metadata as it associates particular customer data stored at the payment partner server with the transaction. For example, if the customer has selected a Visa card as the payment option, the customer account certificate signals to the payment partner server <u>which customer's</u> Visa card is to be charged.

---

[6] As with objects, a data exchange input form is not required, and other user interface options could be used instead. Id. at 68:12-18 (noting that, besides input forms, "[a]lternatively, user input can be obtained through other user interface options including standard operating system functions such as dialog boxes and menus").

13

Once the payment partner server processes the received indication to verify the data, it "can carry out the purchase order transaction using the verified purchase order data, the verified customer account certificate, and the verified merchant account certificate." (Id. at 122:27-31.) It uses these certificates to retrieve information about the customer and merchant that is required to complete the transaction. (Id. at 119:65 – 120:3, 121:42-48, 122:31-35.)

> [d] **in response to the received indication, automatically completing the purchase of an item from the seller by** <u>**processing said metadata associating said customer data so as to complete the purchase transaction**</u>

As described above, the customer account certificate in the indication to initiate is metadata, and this metadata is used to identify the stored customer data as data to be used in completing the transaction. The payment partner server uses the customer account certificate and merchant account certificate to retrieve information about the customer (e.g. a credit card number), and about the seller, that is required to complete the transaction. (Id. at 119:65 – 120:3, 121:42-48, 122:31-35.) Since the payment partner server has all of the information needed to complete the transaction beyond that contained in the indication to initiate the transaction, it can automatically complete the transaction without any further action by the customer. Thus, **the purchase transaction is both initiated and completed with the customer sending only one indication – in response to** <u>**one click**</u> **of a mouse – to the payment partner server.**

### 2.    <u>Construction of Terms in Claim 1 of the '710 Patent</u>

| Term | Cordance's Construction | Amazon's Construction |
|------|------------------------|----------------------|
| providing customer data storing information for a customer | making available for use data about a customer that is stored in a data storage medium | supplying information about a customer from the customer's computers |

As described above, the payment partner server stores a customer's data and allows the customer to complete a purchase transaction using the stored data. In this embodiment, the payment partner server is a separate entity from the seller and the customer, but the '710 Patent specifically describes alternatively combining the services of partner servers with a provider or a

consumer.  (Id. at 128:47 – 129:6.)  The function of the payment partner server can thus be performed by the seller, and the customer data can be stored on a computer of a seller.

While Cordance's and Amazon's constructions are similar, there are three important differences.  First, the phrase being construed  – "customer data storing information" – expressly requires that the customer data be stored.  Storing data necessarily requires use of a data storage medium, such as a database.  Amazon seeks to eliminate any requirement that the customer data be stored.  In that respect, its proposed construction is too broad.

Second, in a different respect, Amazon's construction is too narrow.  Amazon would require that the "customer data" be provided from the customer's computer.  There is no factual support for such a construction in the patent, and it is contrary to binding canons of claim construction.  The plain and ordinary meaning of this claim limitation does not require the customer data to be stored on the customer's computer:  Just because the data is about a customer does not mean it comes from the customer's computer.  Likewise, the doctrine of claim differentiation requires a broader construction than Amazon suggests.  Dependent claim 4 – which depends from claim 1 – recites that "the customer data is retrieved from a computer of the customer."  Claim 1 (the independent claim at issue here) must therefore be presumed not to require the customer data to be retrieved from the customer's computer.  See Phillips, 415 F.3d at 1315 ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.").

Amazon's construction also has other problems.  It would render dependent claim 5 – in which "the customer data is retrieved from a computer of the seller" – inconsistent with claim 1.  See Intamin Ltd. v. Magnetar Technologies, Corp., 483 F.3d 1328, 1337 (Fed. Cir. 2007) (construction causing inconsistency disfavored).  Finally, Amazon is improperly construing claim 1 to exclude a disclosed embodiment, which the Federal Circuit has repeatedly – including very recently – held to be error.  The payment partner server embodiment of the '710 Patent

expressly discloses storing customer data on the payment partner server. Claim 1 must be construed to include this embodiment. See Oatey Co. v. IPS Corp., 514 F.3d 1271, 1277 (Fed. Cir. 2008) ("[W]here claims can reasonably [be] interpreted to include a specific embodiment, it is incorrect to construe the claims to exclude that embodiment.").[7]

The phrase "providing customer data storing information for a customer" should thus be construed as "making available for use data about a customer that is stored in a data storage medium."

| Term | Cordance's Construction | Amazon's Construction |
|------|------------------------|----------------------|
| metadata associating said customer data with said transaction | data that is used to identify the stored customer data as data to be used in completing the transaction | metadata defining the relationship between customer information stored at the customer computer and a purchase transaction |

In the payment partner server embodiment, that server stores information about a customer, and gives him or her a customer account certificate that is associated with the customer's data. (Id. at 119:41 – 120:54, 121:42-48.) To buy an item, the customer includes that certificate with the indication to initiate the purchase transaction. (Id. at 122:9-13.) When the server receives this indication, it uses the customer account certificate to retrieve the customer's data and complete the transaction. (Id. at 119:65 – 120:3, 121:42-48, 122:31-35.)

---

[7] A further problem with Amazon's construction is its implication that the customer data must actually be transferred from one entity to another. The claim does not so require – it is enough if the data is made available for use by a single entity (such as the seller). The Federal Circuit has explained that, in patent law, the term "providing" simply means making "available for use." See Ruiz v. A.B. Chance Co., 234 F.3d 654, 669 (Fed. Cir. 2000) ("[B]ecause metal brackets are in existence and available for use by the installer, they are 'provided.'"). Claim 1 encompasses situations in which the seller makes the customer's data available for the seller's own use. Indeed, dependent claim 5 describes such an embodiment of claim 1 (in which the customer data is "retrieved from a computer **of the seller**").

16

In the payment partner server, metadata (the customer account certificate) is used to associate (connect)[8] the customer data with the transaction. Cordance's proposed construction thus reflects the term's plain and ordinary meaning and also covers the disclosed embodiment.

Amazon's proposed construction seeks to import a limitation into this term, namely that the "customer information [is] stored at the customer computer." As discussed above, there is no factual basis for such a limitation, and indeed it is contrary to law.[9]

| Term | Cordance's Construction | Amazon's Construction |
| --- | --- | --- |
| processing said metadata associating said customer data so as to complete the purchase transaction | using the metadata to retrieve the stored customer data and using the retrieved customer data to complete the purchase transaction | executing instructions contained in the metadata to complete the purchase transaction |

As described above, the customer sends the payment partner server an indication to initiate a purchase transaction. The indication to initiate includes metadata in the form of a customer account certificate that associates the customer's data with the transaction. In response to receiving this one indication, the payment partner server automatically completes the purchase. (Id. at 119:65 – 120:3, 121:42-48, 122:27-35.) Specifically, the payment partner server processes the customer account certificate to retrieve the customer data that is associated with the customer account certificate, and uses that data to complete the transaction. (Id.)

In this claim term, the metadata is being "processed,"[10] i.e., subjected to a method to effect the result of completing the purchase transaction as described above. Cordance's proposed

---

[8] The verb "to associate" means "to join (things) together or to connect (one thing) with another." Webster's Third New Int'l Dictionary 132 (1993) (attached as Ex. 9 to O'Neill Decl.).

[9] Amazon's construction is also confusing as the phrase "defining the relationship" is vague and unclear, potentially requiring the Court or the jury to construe the construction.

[10] The verb "to process" means "to subject to a particular method, system, or technique of preparation, handling, or other treatment designed to effect a particular result." Webster's Third New Int'l Dictionary 1808 (1993) (attached as Ex. 9 to O'Neill Decl.).

construction thus reflects the plain and ordinary meaning of the claim term and also accurately describes the payment partner server embodiment.

The basis (if any) for Amazon's proposed construction is unclear. If Amazon proposes support for it, Cordance will respond in its answering brief.

### 3.    Overview of Claim 7

Claim 7 of the '710 Patent also recites a computer-implemented method for automating an online purchase of an item:

> 7. A computer implemented method comprising:
>
> [a] providing information provider data storing information for an information provider usable to automatically complete a proposed on-line transaction, including metadata associating said information with said transaction;
>
> [b] providing the information provider with information from an information consumer with respect to a proposed transaction;
>
> [c] receiving from the information provider an indication to complete the proposed transaction;
>
> [d] in response to the received indication, automatically completing the purchase of an item from the information consumer by accessing the information provider data to retrieve the information and process the retrieved information by processing said metadata associating said information with the proposed transaction so as to complete the proposed transaction.

The underlined terms are those that require construction.

Claim 7 is in many ways similar to claim 1. Claims 1 and 7 each relate to an online purchase transaction between two entities. In claim 1, a customer is purchasing an item from a seller, and in claim 7, an "information provider" is purchasing an item from an "information consumer."[11] For present purposes, the term "information provider" is interchangeable with "customer" (as the Patent explains, certain information – namely, an indication to complete the

---

[11] There are several other differences between claims 1 and 7, but those differences are not germane to any disputed constructions.

18

proposed transaction – is provided from the customer to the seller.) Likewise the "information

consumer" is simply the "seller."

### 4.    Construction of Terms in Claim 7 of the '710 Patent

| Term | Cordance's Construction | Amazon's Construction |
|---|---|---|
| providing information provider data storing information for an information provider | Stipulated, see below. | |
| metadata associating said information with said transaction | Stipulated, see below. | |
| information provider | a customer in an on-line transaction | provider of information |
| information consumer | a seller in an on-line transaction | user of information |

Cordance and Amazon agree that two phrases in claim 7 are so similar to phrases in claim

1, that the corresponding phrases between claims 1 and 7 should be construed jointly. For

clarity, the two pairs of phrases are presented in the following table, where the differences

between each pair are italicized:

| Pair | Claim 1 | Claim 7 |
|---|---|---|
| 1 | providing *customer* data storing information for a *customer* | providing *information provider* data storing information for an *information provider* |
| 2 | metadata associating said *customer data* with said transaction | metadata associating said *information* with said transaction |

For the first pair, the only difference between claim 1 and claim 7 is that "customer" is

replaced with "information provider." As the customer of claim 1 is purchasing an item and the

information provider of claim 7 is also purchasing an item, these two phrases have the same

meaning. The parties have agreed to stipulate that the construction for "providing information

provider data storing information for an information provider" of claim 7 will be the same as the

Court's construction of "providing customer data storing information for a customer" of claim 1,

except that Amazon apparently seeks some (as yet unstated) modification, while Cordance

believes that no modifications are appropriate.

For the second pair, the only difference between claim 1 and claim 7 is that "customer data" is replaced with "information." Since in claim 1, the **customer data** stores **information**, and in claim 7, the **information provider data** stores **information**, these two phrases have the same meaning and should be construed jointly. The parties have agreed to stipulate that the construction for "metadata associating said information with said transaction" of claim 7 will be the same as the Court's construction of "metadata associating said customer data with said transaction" of claim 1 (again with the exception that Amazon is apparently seeking some unstated modification, while Cordance does not consider modification necessary).

In claim 7, the information provider is purchasing an item via an online transaction, and so must necessarily be a customer. Also in claim 7, the information consumer is selling an item via an online transaction so must necessarily be a seller. While "information provider" and "information consumer" do not ordinarily mean "customer" and "seller," the context of claim 7 shows that "information provider" and "information consumer" are simply labels for the two entities in the described online transaction, namely the customer and the seller. See Phillips, 415 F.3d at 1314 ("'[T]he context of the surrounding words of the claim also must be considered in determining the ordinary and customary meaning of those terms.'").

The phrase "information provider" should thus be construed as "a customer in an online transaction," and the phrase "information consumer" as "a seller in an online transaction."

Amazon proposes constructions for information provider and consumer that provide no clarification whatsoever, and that ignore the context of the terms in the claims. As indicated by Amazon's agreement to stipulate that certain phrases in claims 1 and 7 be construed jointly, Amazon concedes that both claims 1 and 7 relate to a customer purchasing an item from a seller. Amazon's generic constructions for "information provider" and "information consumer" create a risk of confusing the jury who would not necessarily realize (without reading claim 7 in full) that these terms simply denote the customer and seller. As there is no real dispute that in claim 7 the

"information provider" is a customer and the "information consumer" is a seller, the constructions of these terms should clarify these claims and not obfuscate them.

### 5.     Amazon's Proposed Sixteenth Claim Term for Construction

The Court ordered the parties to come to an agreement as to fifteen terms from the Cordance Patents to be presented to the Court for construction. The parties did so; but Amazon has insisted on bringing a sixteenth term before the Court.[12]  Cordance requests that the Court deny Amazon's effort to add a sixteenth term. Lines must be drawn somewhere, and the Court's Order resolved the issue. Should the Court choose to proceed with construction of this sixteenth term, however, Cordance would propose the following construction.

| Term | Cordance's Construction | Amazon's Construction |
|---|---|---|
| processing said metadata associating said information with the proposed transaction so as to complete the proposed transaction | using the metadata to retrieve the stored information and using the retrieved information to complete the proposed transaction | Construe jointly with "processing said metadata associating said customer data so as to complete the purchase transaction" of claim 1. |

Cordance's construction follows from the plain and ordinary meaning of the claim term and is supported by the payment partner server embodiment while Amazon's is not.

### F.     Communicating Updated Information and Feedback Information

The asserted claims of the '205 Patent are directed to methods that facilitate communicating updated information (e.g., when a person changes phone numbers and needs to send the new number to a large group of contacts, see '205 Patent at 10:7-28). Cordance is asserting claim 19 of the '205 Patent, which provides a computer-based method for communicating updated information.

---

[12] The scheduling order required the parties to identify terms in need of construction and provide preliminary constructions on May 30, 2008. On August 6, 2008, Amazon for the first time proposed that the parties construe the additional phrase "processing said metadata associating said information with the proposed transaction so as to complete the proposed transaction" from claim 7 of the '710 Patent. With less than 48 hours to file the joint claim construction chart, Amazon demanded that Cordance produce a construction for this phrase.

The asserted claims of the '325 and '717 Patents are directed to communicating feedback information, which Cordance realized could be valuable in online purchasing.  See '710 Patent at 93:46-53; 124:64-125:9; 125:53-62 (giving example of purchaser of minivan leaving feedback about the seller and about the product purchased).  Cordance is asserting claims 20, 109, 111-113, 119, and 124 of the '325 Patent (of which claims 20 and 109 are independent claims), and claims 50, 74, 96, and 97 of the '717 Patent (of which claim 50 is an independent claim).

The update claims and feedback claims all contain the term "control structure."  The parties agree this term's construction should be the same for all claims.  Cordance will first present an overview of an exemplary update claim (claim 19 of the '205 Patent), and of an exemplary feedback claim (claim 109 of the '325 Patent), before discussing its claim constructions.  As all of the terms requiring construction appear in the independent claims, Cordance will refer to only the independent claims in construing the terms.

### 1.    Overview of Claim 19 of the '205 Patent

Claim 19 recites a computer-based method for communicating updated information:

19. A computer-based method for communicating updated information comprising the steps of:

creating metadata defining a <u>control structure</u> in a provider memory, said <u>control structure</u> including associations with portions of said information in a provider memory, said <u>control structure</u> defining a process to transfer an associated portion of said information associated with said <u>control structure</u> to a consumer memory; and

transferring a copy of the associated portion of said information, and said <u>control structure,</u> from the provider memory to the consumer memory; and

determining when the associated portion of said information in said provider memory has been updated based upon <u>processing of said control structure</u>; and

processing said information, including said <u>control structure</u> at least at said consumer memory, to transfer a copy of said associated portion of said information from said provider memory to said consumer memory when the associated portion of information in said provider memory has been determined to have been updated.

22

The underlined terms in claim 19 are those that require construction. The term metadata is not underlined as it has been construed above.

Claim 19 describes a method for communicating updated information between an information provider and an information consumer. The specification makes clear that the "terms 'provider' and 'consumer' are used to designate separate functions in information transfers [and that] at various times, operate[] as both a provider and a consumer in any communication relationship." ('205 Patent at 1:18-21.) In claim 19, the information provider is providing the updated information and the information consumer is receiving it.

Figure 1 from the '205 Patent, shown below, illustrates possible relationships between an information provider and an information consumer:



**Fig. 1**

As shown in Figure 1, the provider and consumer may communicate directly with one another, or the two may communicate through a third party, such as the "distribution server" shown in Figure 1. The information consumer can receive updates using different techniques. For example, the information consumer could receive updates through a "push" process where the

information provider determines when it has an update and sends it to the information consumer. ('205 Patent at 9:6-16.) In another example, the information consumer could receive updates through a "pull" process where the information consumer will contact the information provider to determine if it has an update and then transfer the update. (Id. at 9:17-31.)

The information provider and consumer of claim 19 use what is called a "control structure" to communicate updated information from the provider to the consumer. The control structure facilitates the transfer of updated information by including associations with the information that is to be updated and also defining a process to be used to transfer the updated information. (Id. at 37:63 – 39:4.) The term "control structure" is a general term – it can be implemented using different techniques. One example is a "communications object," and many of the embodiments of the Cordance Patents are described using communications objects, including the embodiments shown in Figure 1 above. (Id. at 12:39-63.)

In claim 19, a copy of the control structure and the information to be updated is transferred from the provider to the consumer. (Id. at 20:5 – 21:6, 24:54 – 27:8.) For example, the information to be updated could be the provider's phone number and the control structure could control updates of that phone number. (Id. at 10:7-28, 18:13-43.) Once the copy of the control structure has been transferred, the control structure can be processed to determine if the provider's information has been updated. (Id. at 37:63 – 39:4.) This processing can be done by the consumer, the provider, or a third party. (Id.) When it is determined that the information has been updated, the updated information is transferred from the provider to the consumer. (Id.)

## 2.    Overview of Claim 109 of the '325 Patent

Claim 109 of the '325 Patent recites a computer-based communication method that includes a step of communicating feedback information:

109. A computer-based communication method, comprising operating one or more computers to communicate by performing the steps of:

in a provider memory, storing information including provider information;

in a consumer memory, storing information including consumer information;

creating metadata describing associations with portions of said information and defining a <u>control structure</u> which is processed at least at said consumer memory to associate one or more processes for controlling communications of said associated information, said metadata including data exchange metadata associating a process for controlling the transfer of <u>feedback information</u>, said feedback information including at least a portion of said consumer information, to said provider memory;

transferring said information, including said metadata defining said control structure, from said provider memory to said consumer memory;

<u>processing said metadata to execute instructions external to said control structure</u> to perform said processes; and

communicating said feedback information from said consumer memory to said provider memory.

The underlined terms are those that require construction. As the term "control structure" must also be construed for claim 19, the only new terms to be construed are "feedback information" and "processing said metadata to execute instructions external to said control structure."

Claim 109 has many similarities with claim 19 – both claims have a provider memory, a consumer memory, and a control structure that is transferred from the provider memory to the consumer memory. Claim 109 also includes a step relating to the transfer of feedback information from the consumer to the provider.

The control structure that is transferred from the provider to the consumer includes what is called "data exchange metadata." This data exchange metadata associates a process for controlling the transfer of feedback information from the consumer to the provider. ('710 Patent at 124:63 – 125:1, 125:47-65.) A provider collecting feedback from a consumer can specify the types of feedback information that are to be collected, and the data exchange metadata allows the provider to associate a process that collects the feedback desired by the provider. For example, where the feedback corresponds to a purchase of a minivan on a classified ad server, the

25

feedback information "might include attributes for dealer satisfaction, fit and finish, gas mileage, maintenance costs, repurchase plans, and so on." (Id. at 125:55-60.) The provider can associate this process for collecting feedback information with the data exchange metadata.

The process for controlling the transfer of feedback information consists of instructions that are to be executed to transfer the feedback. This process is associated with the metadata, but the instructions that make up the process are external to the control structure. (Id. at 125:10-47.) The metadata provides a "link" to the instructions that allows the instructions to be executed even though the instructions themselves are not contained within the control structure. (Id.)

### 3.   Construction of "control structure"

| Term | Cordance's Construction | Amazon's Construction |
|------|------------------------|----------------------|
| control structure | a set of data that specifies how information is to be processed or transferred | a combination of data, metadata, and instructions used to control the origination of outgoing communications and the processing of incoming communications between provider and consumer |

The Cordance Patents describe a control structure as a data structure for automating and controlling communications between a provider and a consumer. ('710 Patent at 8:10-23 ("The disadvantages of existing communications control systems are significantly overcome by the present invention in which software programs being executed by a provider computer and consumer computer communicate directly in order to maintain a communications control structure.").) Although a communications object is one example of a control structure, the term control structure is broader in that a control structure need not be in the form of an object. ('205 Patent at 12:39-63; '710 Patent at 16:39-63.)

As described above, the types of communications that a control structure can be used to control and automate include updated information and feedback information; but the Cordance Patents also describe other such communications, including, for example, software registration and classified ads. ('710 Patent at 114:11-63.) More generally, the control structure is used to

specify how information is to be processed or transferred.  ('205 Patent at 6:6 – 7:39 (describing numerous examples of processing and transferring information); '710 Patent at 8:10 – 10:7 (same); see also '205 Patent at 12:39-63 (describing how control structures are generally useful for "storing, transferring, and processing information"); '710 Patent at 16:39-63 (same).)

The phrase "control structure" should thus be construed as "a set of data that specifies how information is to be processed or transferred."

Amazon proposes to construe "control structure" as "a combination of data, metadata, and instructions used to control the origination of outgoing communications and the processing of incoming communications between provider and consumer."  While the specification does state that a control structure can be used to "control the origination of outgoing communications and the processing of incoming communications," this part of the specification is merely describing one use of a control structure.  The patent does not limit a control structure to those operations.  See Home Diagnostics, 381 F.3d at 1358 ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language.").[13]

### 4.    Construction of Terms in Claim 19 of the '205 Patent

| Term | Cordance's Construction | Amazon's Construction |
|------|-------------------------|-----------------------|
| processing of said control structure | using the control structure to perform one or more operations | executing computer instructions defined in the control structure |

As described above, a control structure is "a set of data that specifies how information is to be processed or transferred."  Processing the control structure involves using the control structure to determine how information is to be processed or transferred.  The specification makes clear that the control structure can specify how information is to be processed or

---

[13] Amazon's construction is also confusing as it is not clear what is meant by "control the origination of outgoing communications," and the Court or jury might later have to then construe the construction.

transferred by including instructions that perform the processing or by referring to instructions outside of the control structure that perform the processing. ('205 Patent at 16:41-51, 38:1-5; '710 Patent at 21:18-35, 59:18-22.) The specific nature of the processing or transferring may be determined by the context of the claim. For example, in claim 19, the control structure is processed to determine when information in the provider memory has been updated.

The phrase "processing of said control structure" should thus be construed as "using the control structure to perform one or more operations."

Amazon's proposed construction is ambiguous at best and unduly limiting at worst. The meaning of "computer instructions defined in the control structure" is not precise. The Court or a jury would be required to later determine the meaning of Amazon's construction. In particular, it isn't clear whether Amazon's construction is limited to executing instructions inside the control structure. If so, it is unduly limiting, as the specification explicitly describes referring to instructions that exist outside of the control structure. ('205 Patent at 16:41-51, 38:1-5; '710 Patent at 21:18-35, 59:18-22.)

### 5.    Construction of Terms in Claim 109 of the '325 Patent

| Term | Cordance's Construction | Amazon's Construction |
|------|------------------------|----------------------|
| feedback information | information that includes an evaluative review and may also include information related to the review such as its subject or the evaluator | evaluation attributes and corresponding value choices |

The Cordance Patents provide several examples of what is collected as feedback information. In one example, a person who buys a minivan using the classified ad server can leave feedback relating to the purchase of the minivan. ('710 Patent at 125:55-62.) In leaving feedback, the buyer can evaluate numerous aspects of the transaction such as "dealer satisfaction, fit and finish, gas mileage, maintenance costs, repurchase plans, and so on." (Id. at 125:58-60.) The invention is not limited to any particular type of feedback and can include "product and service rating services, political office ratings, employee performance feedback, discussion

28

group participation, personal references, and so on." (Id. at 128:39-42.)  The evaluative review

is combined with a unique ID of the subject of the review and a unique ID of the customer

providing the feedback and is sent to the feedback partner server.  (Id. at 126:1-5, 126:19-23.)

The phrase "feedback information" should thus be construed as "information that

includes an evaluative review and may also include information related to the review such as its

subject or the evaluator."

Amazon's proposed construction uses unclear language and would require the Court and

the jury to construe the construction.  For example, feedback can be in the form of written text

(e.g., "I liked the product.").  (See id. at 128:37-43.)  It is not clear if Amazon's construction

includes feedback in the form of written text.  Amazon's construction also does not include

information related to the review such as its subject or the evaluator, information which the '710

Patent explicitly allows as being part of the feedback information.

| Term | Cordance's Construction | Amazon's Construction |
|---|---|---|
| processing said metadata to execute instructions external to said control structure | using the metadata to cause instructions external to the control structure to be executed | processing instructions identified in said metadata |

As described above, the control structure can itself contain instructions to be executed or

the control structure can refer to instructions that are stored external to the control structure.

('205 Patent at 16:41-51, 38:1-5; '710 Patent at 21:18-35, 59:18-22.)  Claim 109 recites metadata

that "associat[es] a process for controlling the transfer of feedback information."  As described

above, the metadata provides a link between the control structure and the process for controlling

the transfer of feedback information.  In the phrase being construed, processing the metadata

comprises using the metadata to execute instructions that are external to the control structure.

The phrase "processing said metadata to execute instructions external to said control structure" should thus be construed as "using the metadata to cause instructions external to the control structure to be executed."

Amazon's proposed construction is faulty in two respects. First, Amazon's construction is vague as it is unclear what is meant by "instructions identified in said metadata." To the extent that Amazon's construction allows the instructions to be part of the control structure, Amazon's construction unduly broadens the claim by reading out the requirement that the instructions be external to the control structure.

### 6.     Construction of Terms in Claim 50 of the '717 Patent

Claim 50 of the '717 Patent recites a method that includes a step of communicating feedback information. The only phrase in claim 50 requiring construction that has not been construed above is "storage means for storing information." The following is an excerpt of claim 50 showing the phrase requiring construction:

> 50. A method for use at a node of a computer-based communications system which includes multiple nodes arranged and adapted to intercommunicate via a communications network, said method characterized by the steps of:
>
> (A) providing storage means for storing information;
>
> . . .

| Term | Structure Disclosed in the Patent |
|------|-----------------------------------|
| storage means for storing information | One or more data storage mediums disclosed in the '710 patent including a computer, server computer, database, hard disk, floppy disk, magnetic media, optical media, CD-ROM, or tape cartridge. |

The parties agree that the phrase "storage means for storing information" is to be construed as a § 112 ¶ 6 means-plus-function limitation, and the parties agree that the function "storing information" should be given its plain and ordinary meaning.

The structure disclosed in the specification for performing the function of "storing information" includes the following, which support Cordance's position as to structure:

30

- A computer. (<u>See, e.g.</u>, '710 Patent at 8:10-23, 16:38 – 17:13, 35:15-20, 70:25-42.)
- A database. (<u>See, e.g.</u>, <u>id.</u> at 12:3-17, 16:38 – 17:13.)
- A server computer. (<u>See, e.g.</u>, <u>id.</u> at 13:29-40, 95:14-38.)
- A hard disk, floppy disk, magnetic media, optical media, CD-ROM, or tape cartridge. (<u>See, e.g.</u>, <u>id.</u> at 54:22-25, 70:25-42, 74:48-52, 77:25-30.)

Amazon identifies a database as the only structure in the Cordance Patents that perform the function of storing information. Because the Cordance Patents disclose the other structures listed above that also perform this function, Amazon's proposed structure is unduly limiting.

### 7.    <u>Construction of Terms in Claim 20 of the '325 Patent</u>

Claim 20 of the '325 Patent recites a computer-based communication system that includes a step of communicating feedback information. In addition to the constructions provided above, claim 20 has four additional phrases in need of construction:

20. A computer-based communication system comprising:

a provider memory storing information including provider information;

a consumer memory storing information including consumer information;

<u>association means</u> for creating metadata associating portions of said information and defining a control structure for processing at least at said consumer memory to associate with said metadata processes for controlling the communication of said associated information, said metadata including data exchange metadata associating a process for controlling the transfer of feedback information, said feedback information including at least a portion of said consumer information, to said provider memory;

<u>transfer means</u> for transferring said information, including said metadata defining said control structure, from said provider memory to said consumer memory;

<u>feedback transfer means</u> for transferring said feedback information from said consumer memory to said provider memory; and

<u>processing means</u> for executing instructions external to said control structure to perform said processes to control communications of said information.

The underlined phrases in claim 20 are those that require construction. As the phrases "metadata," "control structure," and "feedback information" have already been construed above, these phrases are not underlined.

31

The parties agree that the limitations beginning with "association means," "transfer means," "feedback transfer means," and "processing means" are to be construed as § 112 ¶ 6 means-plus-function limitations. A claim limitation under § 112 ¶ 6 is construed by (1) construing the function(s) recited by the limitation and (2) identifying the structure disclosed in the specification as being necessary for performing the recited function and equivalent structures. See Micro Chem., Inc. v. Great Plains Chem. Co., 194 F.3d 1250, 1258 (Fed. Cir. 1999) (stating that the corresponding structure must be necessary to performing the function).

For all four limitations, the parties' constructions of the functions are essentially the plain and ordinary meaning of the recited functions and Cordance does not see any significant difference in the parties' constructions of the functions. There are significant differences, however, in the corresponding structures identified by the parties. The focus of Cordance's analysis below is thus on the structures disclosed in the specification that correspond to each of the § 112 ¶ 6 limitations.

Cordance's claims relating to the communication of feedback information, including claim 20 and the other feedback claims discussed above, cover at least two different types of transfers of feedback information. First, the Cordance Patents disclose the collection of feedback information -- i.e., the collection of new feedback, such as by a customer who recently purchased an item from a seller. ('710 Patent at 124:52 – 127:25.) The structures relating to the collection of feedback information are denoted with "(1)" in the tables below. Second, the Cordance Patents disclose the display or use of feedback information – e.g., when previously collected feedback is used by a customer considering a purchase. (Id. at 127:26 – 128:36.) The structures relating to the display or use of feedback information are denoted with "(2)" in the tables below.

As noted above, Cordance's applications use objects to illustrate one implementation of the various embodiments of its inventions, but objects are not necessary to any of Cordance's inventions. ('710 Patent at 16:59-63.) Thus, the structure disclosed in the patent is not limited to

32

objects as "other methods for storing, transferring, and processing information, such as relational databases, binary files, or procedural programs, could be used." (Id.)

For each of the four § 112 ¶ 6 limitations, Amazon seeks to limit the structure to one embodiment (using objects), despite the explicit statements in the patent that the invention is not so limited. The Court should find that the structure corresponding to these four limitations embraces all of the embodiments and is not limited to one particular embodiment. See Micro Chemical, 194 F.3d at 1258 ("When multiple embodiments in the specification correspond to the claimed function, proper application of § 112, ¶ 6 generally reads the claim element to embrace each of those embodiments.").

| Term | Structure Disclosed in the Patent |
|---|---|
| association means | (1) The feedback partner server 1302 creates metadata defining a control structure (e.g., a feedback service object 1310) that is processed by the consumer program 22 to generate a feedback input form. ('710 Patent at 16:38-63, 22:6-36, 32:12 – 34:56, 95:14 – 99:60, 125:45-62, and figures referenced therein.)<br><br>(2) The consumer program 22 executed by the consumer computer 2 creates metadata defining a control structure (e.g., a message object 110) containing a query that is processed by the feedback partner server 1302. ('710 Patent at 16:38-63, 22:6-36, 32:12 – 34:56, 42:49 – 44:23, 116:29-33, 127:26 – 128:7, and figures referenced therein.) |

With respect to the collection of new feedback information, the specification discloses a feedback partner server that creates a control structure (e.g., a feedback service object) for collecting new feedback. (Id. at 125:45-62.) The metadata in the control structure associates with it information about the customer providing the feedback and information about the subject of the review. (Id. at 125:67 – 126:3, 126:19-21.) The metadata in the control structure also associates with it a process for controlling the transfer of feedback information. (Id. at 125:47-49.)

With respect to the display or use of feedback information, the specification discloses a customer "accessing and monitoring feedback." (Id. at 127:26-30 (stating that the process is

33

"identical to those of a classified ad buyer accessing and monitoring classified ad listings.").) To

access or monitor feedback, the customer sends a control structure (e.g., a message object) to the

feedback partner server. (Id. at 116:27-33, 127:30-35, 127:52 – 128:7.) This control structure

contains a query that specifies the type of feedback the customer would like to access. (Id. at

116:27-33, 127:54-62.) The metadata in the control structure associates with it information

about the customer and information about the type of feedback the consumer would like to

access. (Id. at 116:7-18, 116:36-40, 127:54 – 128:7.) The metadata in the control structure also

associates with it a process for controlling the transfer of feedback information. (Id. at 116:36-

40, 127:54 – 128:7.)

      Amazon's proposed structure misses the mark in several respects. First, Amazon

includes structure that is not necessary to perform the recited function. The claim relates to a

single control structure, yet Amazon's proposed structure includes three different types of

objects (a feedback category object, a communications object, and a link component object).

Second, Amazon does not provide any structure corresponding to the embodiments relating to

the display or use of feedback information.

| Term | Structure Disclosed in the Patent |
|---|---|
| transfer means | (1) The feedback partner server 1302 transfers a control structure (e.g., a feedback service object 1310) to the consumer program 22. ('710 Patent at 12:54-13:14, 16:38-63, 23:63 – 24:28, 32:12 – 34:56, 125:45-62, and figures referenced therein.)<br><br>(2) The consumer program 22 executed by the consumer computer 2 transfers a control structure (e.g., a message object 110) containing a query to the feedback partner server 1302. ('710 Patent at 12:54-13:14, 16:38-63, 23:63 – 24:28, 32:12 – 34:56, 42:49 – 44:23, 116:29-33, 127:26 – 128:7, and figures referenced therein.) |

      The specification generally discloses a computer associated with a provider memory that

transfers information to a computer associated with a consumer memory. (Id. at 12:54-13:14.)

With respect to the collection of new feedback information, the feedback partner server is the

provider, and the specification discloses the feedback partner server transferring a control

structure (e.g., a feedback service object) to a customer. (Id. at 125:42-65.) With respect to the display or use of feedback information, the customer is the provider, and the specification discloses a customer transferring a control structure (e.g., a message object) to a feedback partner server. (Id. at 116:27-33, 127:30-35, 127:52 – 128:7.)

Amazon proposes structure that is not necessary to perform the recited function. The recited function relates to transferring information yet Amazon inexplicably proposes structure that includes "creating a communications object."

| Term | Structure Disclosed in the Patent |
|---|---|
| feedback transfer means | (1) The consumer program 22 executed by the consumer computer 2 transfers a data structure (e.g., a message object 110) containing the feedback data from the input form and the UID of a data structure (e.g,. a communications object) representing a subject about which the feedback relates from the consumer program 22 to the feedback partner server 1302. ('710 Patent at 12:54-13:14, 16:33-63, 32:12 – 34:56, 38:6 – 40:51, 42:49 – 44:23, 125:62 – 126:5, and figures referenced therein.)<br><br>(2) The feedback partner server 1302 transfers a data structure (e.g., a message object 110) containing feedback information satisfying the query to the consumer program 22. ('710 Patent at 12:54-13:14, 32:12 – 34:56, 42:49 – 44:23, 116:42-48, 127:26 – 128:7, and figures referenced therein.) |

As discussed above in connection with the transfer means, the specification makes clear that it is a computer that transfers information. (See, e.g., id. at 12:54-13:14.) Depending on the direction in which the feedback information is transferred, that computer is the feedback partner server or the customer's computer. (Id. at 125:45-62, 127:26 – 128:7.)

As above, Amazon proposes structure that is not necessary to perform the recited function. The reciting function relates to transferring feedback information yet Amazon inexplicably proposes structure that includes "creating a communications object."

| Term | Structure Disclosed in the Patent |
|---|---|
| processing means | (1) The consumer program 22 executed by the consumer computer 2 includes a Web browser that executes instructions external to the received control structure to control the acquisition and transfer of the feedback information to the feedback partner server 1302. ('710 Patent at 16:38-63, 28:48 – 29:20, 38:6 – 40:51, 42:49 – 44:23, 67:63 – 68:9, 73:40 – 74:22, 115:2-23, 125:47-53, and figures referenced |

|  | therein.) |
|---|---|
|  | (2) The feedback partner server 1302 executes instructions external to the received control structure to process the specified query and transfer responsive feedback information. ('710 Patent at 16:38-63, 32:12 – 34:56, 42:49 – 44:23, 116:33-48, 127:26 – 128:7, and figures referenced therein.) |

The function performed by the processing means is to execute instructions external to the control structure to perform "said processes" to control communications of said information. The phrase "said processes" refers to the two processes previously recited in the claim: "processes for controlling the communication of said associated information" and "a process for controlling the transfer of feedback information."

As discussed above in connection with the transfer means and the feedback transfer means, the specification makes clear that it is a computer that acquires and transfers the information. (See, e.g., id. at 12:54-13:14, 125:45-62, 127:26 – 128:7). For the collection of feedback information from a customer, a web browser on the customer's computer performs the acquisition and transfer of feedback information. (Id. at 115:55 – 116:20, 125:47-65.) For the display or use of feedback information, a server computer at the feedback partner server processes the request and transfers the feedback information. (Id. at 116:33-48; 127:26 – 128:7.)

Amazon proposes structure that goes far beyond what is necessary to perform the recited function. The reciting function relates to executing instructions, yet Amazon proposes a lengthy and elaborate structure that includes four different types of objects (a feedback category object, a communications object, a feedback service object, and a message object) and two entities (a consumer computer and a feedback partner server).

## IV.  **AMAZON'S PATENT**

Amazon has not asserted any patent infringement counterclaim against Cordance, but has sought a declaratory judgment that some future activity by Cordance may indirectly infringe

Amazon's '369 Patent. Amazon's theory is based on the fact that at one point a non-party (CeLiberate) indicated an intent to produce a "Uniform Address Book" that Amazon claims would infringe. No such product exists, and CeLiberate apparently no longer intends to make one; but even if it did, Cordance has not, does not, and will not make, use, or sell any such product at any time. Indeed, in the two years since Amazon asserted this counterclaim, Amazon has produced no evidence of any such product.[14]

The Federal Circuit has recently held that courts are prohibited from providing a claim construction ruling in the absence of an infringement controversy, as the ruling would be an advisory opinion in violation of Article III. Jang v. Boston Sci. Corp., 532 F.3d 1330, 1336 (Fed. Cir. 2008). In Jang, the record on appeal was inadequate to explain how the claim construction issues would affect the infringement controversy between the parties. Id. To avoid rendering an advisory opinion, the Federal Circuit vacated the lower court's judgment and remanded for further proceedings. Id. at 1338. Here, the situation is even more egregious as Amazon has no evidence at all of any current or future infringement of its patent. The Court should thus decline to address any claim construction for the '369 Patent.

Although the Court previously denied a motion to dismiss the counterclaim, the Court more recently told Amazon that it is "not supposed to get an advisory opinion from the Court as to what could infringe in the future" and advised Amazon that it was "put up or shut up time" on this issue. (See Teleconference Tr. (Jul. 28, 2008) (attached as Ex. 7 to O'Neill Decl.).)

In any event, absent any actual (or even intended) product, it is difficult to understand how the parties can meaningfully determine what terms – if any – of Amazon's '369 Patent will be in genuine dispute so as to require construction. Should Amazon ever identify such a product, Cordance may need to seek construction of relevant '369 Patent claims at that point.

---

[14] Subpoenas served by Amazon on CeLiberate and a related person resulted in no evidence of any such Uniform Address Book or any effort by CeLiberate or anyone else to develop one.

Should the Court nonetheless wish to proceed with claim construction as to the '369

Patent at this time, the parties have proposed constructions for the following terms in claim 9.

9. A networked personal contact management system, comprising:

a database which contains personal data records of a plurality of users, at least
some of the data records including contact information of respective users; and

a server system which provides restricted access to the database through an
interface that provides functions for each user to at least (a) <u>directly modify the</u>
<u>user's own repective [sic] personal data record within the database,</u> (b) select
other users from the database to add to a <u>virtual personal address book</u> of the user,
and (c) specify, on a user-by-user basis, permissions for other users to view the
personal data record of the user through virtual virtual [sic] personal address
books of such other users;

wherein users <u>directly view the data records</u> of other users through the virtual
address books according to said permissions, so that updates by users to their own
respective personal records are reflected automatically within the virtual personal
address books of other users.

Construction of the underlined terms in claim 9 is discussed below.

| Term | Cordance's Construction | Amazon's Construction |
|---|---|---|
| directly modify the user's own repective [sic] personal data record within the database | users modify their respective records themselves and do not do so indirectly through a system administrator | modify user's own respective personal data records himself/herself |

During prosecution, Amazon[15] modified this limitation to add the word "directly" to

overcome prior art: "the term directly has been added to Claims 18, 26, and 31 to clarify that the

users edit their own personal data, in contrast to systems in which edits are made 'indirectly' by a

system administrator."  (Amendment dated Oct. 27, 1999 at 5, App. Vol. XII at AMZC120189).

As expressly stated by Amazon during prosecution, this limitation indicates that a user does not

need any assistance or approval from a system administrator or other authority to modify his or

her data record.

---

[15] Amazon was not the assignee during prosecution, but since Amazon is the current owner of
the patent, actions during prosecution are imputed to Amazon.

Amazon's construction reads the word "directly" out of the claim, allowing a user to modify his or her data record indirectly, via a system administrator. Amazon must be held to what it declared during prosecution. See Gillespie v. Dywidag Sys., 501 F.3d 1285, 1291 (Fed. Cir. 2007) ("The patentee is held to what he declares during the prosecution of his patent.").

| Term | Cordance's Construction | Amazon's Construction |
|------|------------------------|----------------------|
| virtual personal address book | a web site on a server system and available to a user that stores a collection of links to personal data records previously selected by the user, displays a web page to the user with an alphabetically-ordered index of the personal data records selected by the user, and that allows a user to select a link to a personal data record and retrieve a web page that presents the contents of the personal data record | a network-computer-based personal address book comprising permissions to view personal data records of the associated users |

The specification of the '369 Patent does not explain what a virtual address book is, but Amazon defined the term during prosecution: "Figure 10 of the application shows a (virtual) personal address book as displayed to a user according to a preferred embodiment of the invention." (Amendment dated Nov. 29, 2000 at 5, App. Vol. XII at AMZC120236.) Figure 10 shows a web page with an alphabetically-ordered index of the personal data records contained in a user's personal address book and allows the user to select a link to view another page with the contents of a personal data record.

Amazon further emphasized, both in the specification and during prosecution, that the claimed personal contact manager system includes all of the described operations, including the operations in Figure 10: "It should be assumed, unless a statement to the contrary is made, that all of the operations described herein which are aspects of the present invention are embodied by the personal contact manager 343." ('369 Patent at 6:54-57; Amendment dated Nov. 29, 2000 at 3, App. Vol. XII at AMZC120234.)

As other terms in this same limitation relate to permissions ("specify, on a user-by-user basis, permissions for other users to view the personal data record of the user") Amazon's construction reads this limitation out of the claim.

| Term | Cordance's Construction | Amazon's Construction |
|------|------------------------|----------------------|
| directly view the data records | view the data records from the database and not from a personal copy of the data record | no construction is necessary |

During prosecution Amazon explained the meaning of this phrase:

> In addition, all of the claims have been amended to recite that when a user updates the user's own personal data, the update is automatically reflected within the (virtual) address books of other users without the need to propagate the update. This is in contrast to the method asserted by the Examiner to be obvious, in which updates to (non-virtual) address books are made by … propagating these updates to clients that maintain copies of such data.

(Amendment dated May 22, 2000 at 6, App. Vol. XII at AMZC120212.)  Amazon later clarified that this limitation was necessary to overcome prior art:

> An important benefit of this feature is that there is no need to store duplicate copies of contact information for each address book in which such contact information appears. …  In contrast, the combination [of prior art] proposed by the Examiner … would … require that a duplicate copy of User_A's contact information be stored for each address book in which User_A appears.  Further, with the Examiner's proposed combination, when User_A updates his or her own contact information, it would apparently be necessary to notify other software applications of this update so that the update may be incorporated into the duplicate copies of the data.

(Amendment dated Nov. 29, 2000 at 7, App. Vol. XII at AMZC120238.)  Amazon's claim thus does not cover a system where contact information is stored at the server and also copied to a personal copy of an address book on a user's computer.  See Gillespie, 501 F.3d at 1291.

## V.    CONCLUSION

For the stated reasons, Cordance respectfully requests that the Court adopt the above claim interpretations, which are summarized in the attached Exhibit A.

ASHBY & GEDDES

/s/ Tiffany Geyer Lydon

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

*Attorneys for Plaintiff*
*Cordance Corporation*

*Of Counsel:*

Michael A. Albert
Robert M. Abrahamsen
Jeffrey C. O'Neill
WOLF, GREENFIELD & SACKS, P.C.
600 Atlantic Avenue
Boston, Massachusetts 02210
(617) 646-8000

Dated:  August 27, 2008

## EXHIBIT A

### Cordance's Proposed Constructions for the Cordance Patents

| | Claim Term | Independent Claims in which Term Appears | Cordance's Proposed Construction/Structure |
|---|---|---|---|
| 1 | metadata | Claim 1 of the '710 Patent<br>Claim 7 of the '710 Patent<br>Claim 19 of the '205 Patent<br>Claim 109 of the '325 Patent<br>Claim 50 of the '717 Patent<br>Claim 20 of the '325 Patent | data that describes or associates other data |
| 2 | providing customer data storing information for a customer | Claim 1 of the '710 Patent | making available for use data about a customer that is stored in a data storage medium |
| | providing information provider data storing information for an information provider | Claim 7 of the '710 Patent | making available for use data about a customer that is stored in a data storage medium |
| 3 | metadata associating said customer data with said transaction | Claim 1 of the '710 Patent | data that is used to identify the stored customer data as data to be used in completing the transaction |
| | metadata associating said information with said transaction | Claim 7 of the '710 Patent | data that is used to identify the stored customer data as data to be used in completing the transaction |
| 4 | processing said metadata associating said customer data so as to complete the purchase transaction | Claim 1 of the '710 Patent | using the metadata to retrieve the stored customer data and using the retrieved customer data to complete the purchase transaction |
| 5 | information provider | Claim 7 of the '710 Patent | a customer in an on-line transaction |

| | **Claim Term** | **Independent Claims in which Term Appears** | **Cordance's Proposed Construction/Structure** |
|---|---|---|---|
| 6 | information consumer | Claim 7 of the '710 Patent | a seller in an on-line transaction |
| 7 | control structure | Claim 19 of the '205 Patent<br>Claim 109 of the '325 Patent<br>Claim 50 of the '717 Patent<br>Claim 20 of the '325 Patent | a set of data that specifies how information is to be processed or transferred |
| 8 | processing of said control structure | Claim 19 of the '205 Patent | using the control structure to perform one or more operations |
| 9 | feedback information | Claim 109 of the '325 Patent | information that includes an evaluative review and may also include information related to the review such as its subject or the evaluator |
| 10 | processing said metadata to execute instructions external to said control structure | Claim 109 of the '325 Patent | using the metadata to cause instructions external to the control structure to be executed |
| 11 | storage means | Claim 50 of the '717 Patent | One or more data storage mediums disclosed in the '710 patent including a computer, server computer, database, hard disk, floppy disk, magnetic media, optical media, CD-ROM, or tape cartridge. |
| 12 | association means | Claim 20 of the '325 Patent | (1) The feedback partner server 1302 creates metadata defining a control structure (e.g., a feedback service object 1310) that is processed by the consumer program 22 to generate a feedback input form.<br><br>(2) The consumer program 22 executed by the consumer computer 2 creates metadata defining a control structure (e.g., a message object 110) containing a query that is processed by the feedback partner server 1302. |

| | Claim Term | Independent Claims in which Term Appears | Cordance's Proposed Construction/Structure |
|---|---|---|---|
| 13 | transfer means | Claim 20 of the '325 Patent | (1) The feedback partner server 1302 transfers a control structure (e.g., a feedback service object 1310) to the consumer program 22.<br><br>(2) The consumer program 22 executed by the consumer computer 2 transfers a control structure (e.g., a message object 110) containing a query to the feedback partner server 1302. |
| 14 | feedback transfer means | Claim 20 of the '325 Patent | (1) The consumer program 22 executed by the consumer computer 2 transfers a data structure (e.g., a message object 110) containing the feedback data from the input form and the UID of a data structure (e.g,. a communications object) representing a subject about which the feedback relates from the consumer program 22 to the feedback partner server 1302.<br><br>(2) The feedback partner server 1302 transfers a data structure (e.g., a message object 110) containing feedback information satisfying the query to the consumer program 22. |
| 15 | processing means | Claim 20 of the '325 Patent | (1) The consumer program 22 executed by the consumer computer 2 includes a Web browser that executes instructions external to the received control structure to control the acquisition and transfer of the feedback information to the feedback partner server 1302.<br><br>(2) The feedback partner server 1302 executes instructions external to the received control structure to process the specified query and transfer responsive feedback information. |

**Cordance's Proposed Constructions for Amazon's '369 Patent**

|   | Claim Term | Independent Claim in which Term Appears | Cordance's Proposed Construction |
|---|---|---|---|
| 1 | directly modify the user's own repective [sic] personal data record within the database | Claim 9 of the '369 Patent | users modify their respective records themselves and do not do so indirectly through a system administrator |
| 2 | virtual personal address book | Claim 9 of the '369 Patent | a web site on a server system and available to a user that stores a collection of links to personal data records previously selected by the user, displays a web page to the user with an alphabetically-ordered index of the personal data records selected by the user, and that allows a user to select a link to a personal data record and retrieve a web page that presents the contents of the personal data record |
| 3 | directly view the data records | Claim 9 of the '369 Patent | view the data records from the database and not from a personal copy of the data record |