## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CORDANCE CORPORATION,              )
                                   )
      Plaintiff,                  )    C.A. No. 06-491-MPT
                                   )
     v.                          )    **JURY TRIAL DEMANDED**
                                   )
AMAZON.COM, INC. and               )    **PUBLIC VERSION**
AMAZON WEB SERVICES, LLC,          )
                                   )
      Defendant.                  )

## <u>DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF</u>

<table>
<tr>
<td></td>
<td>Richard L. Horwitz (#2246)<br>David E. Moore (#3983)<br>POTTER ANDERSON & CORROON LLP<br>Hercules Plaza, 6th Floor</td>
</tr>
<tr>
<td>OF COUNSEL:</td>
<td>1313 N. Market Street<br>Wilmington, DE 19801<br>Tel: (302) 984-6000</td>
</tr>
<tr>
<td>Lynn H. Pasahow<br>J. David Hadden<br>Darren E. Donnelly</td>
<td>rhorwitz@potteranderson.com<br>dmoore@potteranderson.com</td>
</tr>
<tr>
<td>Saina S. Shamilov<br>Ryan Marton<br>FENWICK & WEST LLP<br>801 California Street<br>Mountain View, CA 94041<br>Tel: (650) 988-8500</td>
<td><i>Attorneys for Defendants<br>Amazon.com, Inc. and<br>Amazon Web Services, LLC</i></td>
</tr>
</table>

Dated: August 27, 2008
Public Version Dated: September 3, 2008
880299 / 30763

**TABLE OF CONTENTS**

Page(s)

I.    NATURE AND STAGE OF PROCEEDINGS ................................................................. 1

II.   SUMMARY OF ARGUMENT ....................................................................................... 1

III.  STATEMENT OF FACTS AND TECHNOLOGY BACKGROUND ............................. 2

      A.   The Patented "Hypercommunications" Technology Automates
           Communications Using Instructions in Replicated "Communications
           Objects" In Ways Client-Server Systems Like the Web Could Not..................... 4

      B.   The Invention Automates Communications By Replicating
           Communications Objects With Instructions Controlling Future
           Communications ................................................................................................... 7

      C.   Metadata Creates the Instructions For Controlling Future Communications ........ 8

      D.   Prosecution History Of The Accused Patents ....................................................... 9

           1.   The '205 Patent "Communications System for Transferring
                Information Between Memories According to Processes
                Transferred With the Information ................................................................ 9

           2.   The '325 Patent and the '717 Patent ......................................................... 10

           3.   The '710 Patent ......................................................................................... 11

      E.   To Obtain Patents On Its "Hypercommunications" Technology, Cordance
           Distinguished And Disclaimed the Standard Web Technology That It Now
           Accuses ............................................................................................................... 12

           1.   HTTP ......................................................................................................... 12

           2.   HTML Forms/Tags/Scripts ....................................................................... 13

           3.   Web Cookies ............................................................................................. 13

IV.   AMAZON'S ASSERTED PATENT ............................................................................ 14

V.    ARGUMENT ............................................................................................................... 15

      A.   The Law of Claim Construction .......................................................................... 15

           1.   General Claim Construction Principles ..................................................... 15

           2.   Construction of Means-Plus-Function Claim Limitations ......................... 16

      B.   Amazon.com's Proposed Claim Constructions For Disputed Terms in
           Cordance's Patents ............................................................................................. 17

           1.   Metadata ................................................................................................... 17

           2.   Control structure ....................................................................................... 20

           3.   Processing of said control structure .......................................................... 21

4.  Means-Plus-Function Terms in U.S. Patent No. 5,862,325 ...................... 22

    a.  Association means for creating metadata associating portions ................................................................................. 25

    b.  Transfer means for transferring said information, including said metadata defining said control structure from said provider memory to said consumer memory .............................. 26

    c.  Feedback transfer means for transferring said feedback information from said consumer memory to said provider memory ............................................................................................. 27

    d.  Processing means for executing instructions external to said control structure to perform said processes to control communication of said information ............................................ 28

5.  Feedback information ..................................................................... 29

6.  Processing said metadata to execute instructions external to said control structure .......................................................................... 31

7.  Storage means for storing information ...................................... 31

8.  Providing customer data storing information for a customer ................. 32

9.  Metadata associating said customer data with said transaction .............. 35

10. Processing said metadata associating said customer data so as to complete the purchase transaction .......................................... 36

11. "information provider" and "information consumer" .............................. 37

C.  Amazon.com's Proposed Claim Constructions For Disputed Terms in Amazon.com's Patent ........................................................................ 38

    1.  Directly modify the user's own respective personal data record within the database ................................................................... 38

    2.  Virtual personal address book ................................................... 39

    3.  Directly view the data records ................................................. 40

VI. CONCLUSION .......................................................................................... 40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alloc, Inc. v. ITC,*
   342 F.3d 1361 (Fed. Cir. 2003)............................................................................. 15

*Aristocrat Techs. Austl. Pty v. Int'l Game Tech.,*
   521 F.3d 1328 (Fed. Cir. Mar. 28, 2008).............................................. 17, 25, 28, 29

*Asyst Techs., Inc. v. Empak, Inc.,*
   268 F.3d 1364 (Fed. Cir. 2001)............................................................................. 16

*B. Braun Med., Inc. v. Abbott Labs.,*
   124 F.3d 1419 (Fed. Cir. 1997)............................................................................. 16

*Bd. of Regents v. BenQ Am. Corp.,*
   533 F.3d 1362 (Fed. Cir. 2008)............................................................................. 16

*Bell Atl. Network Servs. v. Covad Commc'ns Group, Inc.,*
   262 F.3d 1258 (Fed. Cir. 2001)............................................................................. 16

*Chimie v. PPG Indus., Inc.,*
   402 F.3d 1371 (Fed. Cir. 2005)............................................................................. 15

*Computer Docking Station Corp. v. Dell, Inc.,*
   519 F.3d 1366 (Fed. Cir. 2008)............................................................................. 15

*Ekchian v. Home Depot, Inc.,*
   104 F.3d 1299 (Fed. Cir. 1997)............................................................................. 16

*Finisar Corp. v. DirecTV Group, Inc.,*
   523 F.3d 1323 (Fed. Cir. 2008)...................................................................... 17, 25

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.,*
   324 F.3d 1308 (Fed. Cir. 2003)............................................................................. 16

*Markman v. Westview Instruments, Inc.,*
   517 U.S. 370, 116 S. Ct. 1384 (1996).................................................................... 15

*Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.,*
   248 F.3d 1303 (Fed. Cir. 2001)............................................................................. 16

*Microsoft Corp. v. Multi-Tech Sys., Inc.,*
   357 F.3d 1340 (Fed. Cir. 2004)............................................................................. 15

*Omega Engineering, Inc. v. Raytek Corp.,*
   334 F.3d 1314 (Fed. Cir. 2003)............................................................................. 15

*Ormco Corp. v. Align Tech., Inc.,*
   498 F.3d 1307 (Fed. Cir. 2007)............................................................................. 15

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005)............................................................................. 15

*Vitronics Corp. v. Conceptronic, Inc.,*
   90 F.3d 1576 (Fed. Cir. 1996)............................................................................... 15

*WMS Gaming, Inc. v. Int'l Game Tech.,*
   184 F.3d 1339 (Fed. Cir. 1999)...................................................................... 17, 25

**Statutes**

35 U.S.C. § 112.......................................................................................................................*passim*

## I.    NATURE AND STAGE OF PROCEEDINGS

Cordance Corporation sued Amazon.com, Inc. and Amazon Web Services, LLC (collectively "Amazon.com") for allegedly infringing four patents. Amazon.com denied infringement, challenged the validity of Cordance's asserted patents and counterclaimed, *inter alia*, for a declaration of infringement of one if its patents, U.S. Patent No. 6,269,369. Discovery is ongoing and a *Markman* hearing is scheduled for September 30, 2008. Trial is scheduled to commence August 3, 2009.

Pursuant to the Scheduling Order (D.I. 90) and subsequent Stipulation and Order (D.I. 170), Amazon.com submits this initial brief in support of Amazon.com's proposed construction of disputed claim terms.

## II.    SUMMARY OF ARGUMENT

Cordance's asserted patents are directed to what it touted as a new type of electronic information exchange – meant to replace static World Wide Web communications technologies with automated "communications objects" that Cordance hoped would eventually subsume the paradigms we currently know — web browsers/server systems, email client/server systems, and network file systems.   Amazon's constructions reflect the claimed invention as described in the patents, file histories, and extrinsic evidence.

Cordance, on the other hand, is now trying to read its patents on standard Web and other client/server technology that its predecessor, Intermind, consistently disclaimed as being outside the scope of its patents and inventions. The inventions that the specifications disclose, and distinctions Intermind drew between the invention and prior art technologies, do not allow the claims to be interpreted in a way to recapture those technologies.

## III.    STATEMENT OF FACTS AND TECHNOLOGY BACKGROUND

Cordance asserts four patents covering what the inventors called "hypercommunications" at Cordance's predecessor, Intermind Corporation (Cordance and Intermind are referred to hereinafter collectively as "Cordance").[1]  Central to the inventors' "hypercommunications" were software objects (called at various times "communications objects" "channel objects" "access objects" and "hyperconnectors") that were replicated from one entity (the "provider" or "publisher") to another (the "consumer" or "subscriber").  Thereafter, the replicated communications objects talk to each other to automatically control future communications between the provider and consumer, including retrieving updates to the communications objects and providing data on how the consumer used the communications objects.  *See* Appendix, Exhibit ("App. Exh.") 1 at 9-15 ("Introducing Hypercommunications").  In the Abstracts of the patent specifications, the inventors summarize the invention:

> An automated communications system operates to transfer data, metadata and methods from a provider computer to a consumer computer through a communications network. The transferred information controls the communications relationship, including responses by the consumer computer, updating of information, and processes for future communications. Information which changes in the provider computer is automatically updated in the consumer computer through the communications system in order to maintain continuity of the relationship.

*See* Vols. I-II[2] ('205, '325, '717, and '710 Patents) at Abstract.  In the parlance of "object

---

[1] All four patents belong to the same family of patents. U.S. Patent 6,044,205 (the "'205 patent") is the first-filed patent in the family to which all the other asserted patents claim priority. U.S. Patent 5,862,325 (the "'325 patent") was filed after the '205 patent and is a continuation-in-part of the '205 patent. It contains the same description as the specification of the '205 patent and additionally provides details about various applications of the core invention. The other asserted patents U.S. Patent No. 6,088,717 (the "'717 patent") and 6,757,710 (the "'710 patent") were filed subsequent to the filing of the '325 patent. The '325, '717 and '710 patents have identical specifications. The family of patents also includes U.S. Patent No. 6,345,288 (the "'288 patent"), which Cordance does not assert in this action. The specification of the '288 patent is identical to the specifications of the '325, '717 and '710 patents.

[2] Unless otherwise specified, all references to "Vol." pertain to documents contained within the Appendix to Docket Items 171-172 ("Joint Claim Construction Chart").

oriented" programming, an object includes data and methods which are the functions and instructions for operations on that data. *See also* Vol. I at 13:18–19 ('205 patent)[3]. The data, metadata, and methods noted above are "encapsulated" in the inventors' "communications object." Vol. I at 42:52–54; 16:55–57; 12:42–52; 6:52–54 ('205 patent).

To obtain its "hypercommunications" patents, Intermind distinguished the inventions from standard World Wide Web ("Web") technology (among others), arguing that the inventions provided capabilities beyond those that the Web could provide: "A communications object system as claimed inherently takes hypertext technologies to a higher level by using objects to define active, intelligent associations between databases rather than static links between documents." *See* App. Exh 2 at 12 (Statement Filed Pursuant to Duty of Disclosure). ▮



---

[3] Throughout this Statement of Facts and Background section portions of the '205 patent are cited. Although, for reasons of brevity, no citations are presented to the other related patents, as explained above, the related patents include disclosures of the '205 patent and purportedly disclose the same concepts as cited herein.

[4] HTML is a programming language used to create World Wide Web documents. HTTP is a standard method oft transferring data between a web browser and a web server.



Within a year of launching version 1.0 of its product, Intermind was shutting down operations, and later went bankrupt. App. Exh. 22.

Cordance is now trying to read its patents on standard Web and client/server technology that was consistently disclaimed as being outside the scope of its patents and inventions. The inventions that the specifications disclose, and distinctions Intermind drew between the invention and prior art technologies, do not allow the claims to be interpreted in a way to recapture those technologies.

A.    **The Patented "Hypercommunications" Technology Automates Communications Using Instructions in Replicated "Communications Objects" In Ways Client-Server Systems Like The Web Could Not**

Cordance explained its "hypercommunications" inventions by stressing that they enable an automated communications relationship not possible using conventional client-server technology like the Web. As the patents explain, the "Field" of the patented inventions is "an *automated* communications system which coordinates the transfer and content of data, metadata, and instructions between databases *in order to simplify, automate, and increase the intelligence of communication.*" Vol. I at 1:10-13 ('205 Patent) ("Field of the Invention") (emphasis added). And, as the title of the '205 Patent suggests, the invention transfers "Information Between Memories *According to Processes Transferred With The Information*" (emphasis added); *see also* Vol. I and Vol. II ( the '325, '717 and '710 patents) at Field of the Invention. Originally filed, the inventors titled their invention simply "Communication System." *See* Vol. III at

4

AMZC121274.  After the PTO Examiner objected to this title as not accurately indicating the

invention, the inventors amended it to the current title, stating that, as amended, it "is clearly

indicative of the claimed invention."  *Id.* at App. Exh. 5 at 2; App. Exh. 6 at 1; *id.* at 14.  The

new title highlights the key aspect of the invention:  code for processing and controlling

subsequent communications is transferred with the information.

　　　　In the inventions, special software programs in addition to a normal Web client (browser)

or server communicate to automatically exchange and process information, as the inventors

explain in the Summary of the Invention:

> The disadvantages of existing communications systems are significantly overcome by the
> present invention in which software programs being executing by a provider computer
> and consumer computer communicate directly in order to provide an automated transfer
> of information, including data, metadata and instructions.  The metadata and instructions
> control how the information should be processed by a program executing on the
> consumer computer and how responses to that information are processed on the provider
> computer.  The transfer of information is used to control and automate the
> communications relationship between the provider and consumer.  Vol. I at 6:6-16 ('205
> patent).

　　　　Central to the automated communications of the inventions is a "communications object"

which is explicated throughout the specifications.  *See generally* Vol. I and Vol. II discussions of

Figures 3, 7, 8, 11-13B and 16 (the '205, '325, '717 and '710 patents); *see also* Vol. I at 13:31-

34 ('205 patent) ("Communications objects are the core data structure transmitted from the

provider program to the consumer program to control communications between the provider and

consumer").

　　　　As Figure 1 of the patents shows, the information provider uses his or her special

provider program to create a communications object that initially resides in the provider database

11.  Creating a communications object is a relatively complex process depicted in Figure 12, and

described generally at 25:43-27:46 of the '205 patent.[5] After the communications object

"instance" is created, it can either be transferred from the provider directly to the consumer, e.g.,

by emailing it or by "pushing" it to a third-party server from which consumers could "pull."

Vol. I at 17:5-15 and 26:28-43 ('205 patent); see also Vol. I at 22:29-41 and 33:64-34:14 ('325

patent); 22:33-36 and 34:4-23 ('717 patent); Vol. II at 22:38-50 and 34:7-25 ('710 patent).

Intermind explained the problem with normal web browsing that its inventions sought to

solve:

> The problem is this: the reader's "connection" to the Web site lasts only as long as the
> reader follows links within the site. *When the reader leaves, the connection is broken.*
> *No permanent relationship is established. The Web publisher can add new*
> *information — or even change the entire Web site — and the reader has no way of*
> *knowing.*

*See* App. Exh. 1 at 10-11 ("Introducing Hypercommunications") (emphasis added). The

invention sought to solve the problem with communications objects ("hyperconnectors") as

shown in Figure 1 of the patents and as explained by Intermind:

> First, the publisher uses Intermind Communicator to create a new type of software object
> called a Hyperconnector. The publisher then posts the Hyperconnector to his or her Web
> site. . . [¶] As long as the reader has downloaded a copy of Intermind Communicator, the
> reader can explore a Hyperconnector just like any other Web page — by clicking on its
> link. [¶] The difference is that Hyperconnectors are not ordinary HTML pages that will
> disappear as soon as the reader is finished browsing. Instead they are software objects
> that can be stored on the reader's machine and relied upon to perform future
> communications tasks. . . . Once a reader obtains and activates a Hyperconnector — a
> process called "subscribing" — the Hyperconnector will begin updating the subscriber
> with new messages on the subscriber's selected topics. . . . . The result is a complete,
> automated communications channel from the publisher's desktop to the subscriber's
> desktop *Id.* at 11-14.[6]

---

[5]Figures 13A and 13B depict a variation on the approach and are generally described at
27:16-28:56 in the '205 patent (Vol. I).; see also Vol. I at Figure 19 and its description starting at
47:9 ('325 patent); Figure 19 and its description starting at 47:21 ('717 patent); Vol. II at Figure
19 and its description starting at 47:19 ('710 patent).
[6] ███████████████████████████████████████████████████████████

**B.** **The Invention Automates Communications By Replicating Communications Objects With Instructions Controlling Future Communications**

The automated communications channel of the inventions is implemented by replicating and transferring a copy of the communications object (and updates) from the database of the information provider to the information consumer. Vol. I at Figure 16, 6:15-31, 9:37-62, 24:54-57, 25:8-23 ('205 patent).



see also Vol. I at 5:20-61 ('205 Patent).

To obtain its patents, Cordance similarly distinguished prior art which did not automate and control communications by replicating and transferring communications objects between a provider and consumer programs:

> This art is easily confused with a communications object system of the present invention because a communications object system also performs automated replication of information described by a communications object (including the communications object itself). The difference, however, is that *a communications object system, as claimed, accomplishes this using a special type of control structure – a communications object — that is exchanged from the provider to the consumer to define and control the replication.* App. Exh. 2 at 4 (Statement Filed Pursuant to the Duty of Disclosure) (emphasis added). *See also* App. Exh. 10 at 4, App. Exh. 11 at 3.[7]

> A communications object system is a novel new approach to this problem by abstracting these details to a control object *that completely defines the communications relationship between any two nodes, in both directions*, via any network or protocol, using any

---

[7] Cordance filed identical Information Disclosure Statements during prosecution of the '205, '325 and '717 patents.

middleware.  App. Exh. 2 at 9 (emphasis added).

Thus Cordance conceded to the PTO, that the function of "automated replication of information . . . " was a prior art function to which they were not laying claim.  Rather, Cordance argued that its invention accomplished this function in a specific new way — using the claimed "control structure."  Significantly, Cordance indicated that this "control structure" in the claims (a term that appears nowhere in the '205 specification) is the "communications object" that the specification describes at length.

## C.    Metadata Creates the Instructions For Controlling Future Communications

To obtain its patents, Cordance distinguished the metadata of the invention that controls and automates communications from the prior uses of static metadata.  In distinguishing prior art "metadata for object and database management" that linked and managed objects and data of differing types, Cordance stressed that "none of this art *uses metadata to create a communications control structure* as is required in the claimed communications object system." App. Exh. 2 at 11 (emphasis added).  To overcome prior art rejections, Cordance stressed that its invention required metadata that defines a control structure with specific features:

> Furthermore, while they relate to metadata, they do not define a control structure which is processed to determine when an update has occurred and to transfer updated information to the consumer. App. Exh. 6 at 17 (Amendment mailed July 3, 1997).

The Examiner relied on this argument in allowing the patent.  *See* App. Exh. 9 at 2 (Notice of Allowability) (Reasons for Allowance).

**D.**     **Prosecution History Of the Asserted Patents**

1.     The '205 Patent "Communications System for Transferring Information Between Memories According to Processes Transferred With the Information"

Cordance filed the application for the '205 patent on February 29, 1996 with a single

claim. In April 1997, Cordance filed a preliminary Amendment cancelling its original claim and

adding 24 new claims. The PTO rejected all 24 claims as obvious over the Lyons 5,623,656

patent and Davies 5,586,311 patent. App. Exh. 5 at 3-6. The examiner also objected to the title

of the application, "Communication System" as not descriptive. App. Exh. 5 at 2. As noted

above, Cordance amended it to reflect the invention by adding that it transferred information

along with processes controlling communications.

In responding to the office action, Cordance distinguished its invention from prior art

systems that transferred information, but not processes for controlling subsequent

communications:

> As defined by the claims, the system allows a definition for control of a communications relationship to be transferred from a provider of information to a consumer of information. A copy of at least portions of the control is resident at both the provider and consumer where it is processed to control subsequent transfers of information between the provider and consumer. App. Exh. 6 at 15-16.

The Lyons patent described standard uses of HTML forms on the Web to collect and

process information from users and provide personalized response pages. Cordance specifically

distinguished Lyons' disclosure of submitting and processing Web forms from its automated

"hypercommunications" inventions:

> Lyons does not teach or suggest a control structure which is processed to control communications between a provider and consumer. In particular, it does not teach or suggest a structure which is processed to determine updates to information in the provider and transfer updated information to the consumer. . . . Furthermore, nothing in Lyons is processed to define a process for transferring information from the provider to the consumer. The only processing occurs with respect to information on forms. *This relates solely to content and not to the processes for transfer.*" *Id.* at 16 (emphasis added).

9

The Davies patent disclosed a system for managing and processing metadata for retrieving data from object databases. Cordance distinguished Davies' metadata objects because they do not provide the active links required by Cordance's "hypercommunications" invention: "They do not determine when information in the databases have been updated. Furthermore, while they relate to metadata, they do not define a control structure which is processed to determine when an update has occurred and to transfer updated information to the consumer." *Id.* at 17.

In December 1997, Cordance filed an Information Disclosure Statement ("IDS") in which it stated that its claims were patentable because

> Applicants' system includes an association means for creating association metadata which can be processed to control communication of information stored in a provider memory. The control structure thereby defined can be processed at least at the consumer memory to determine updates to information in the provider memory and transfer the information from the provider memory to the consumer memory when an update occurs . . . . The cited art does not . . . disclose or suggest such an independent control structure or operation. App. Exh. 23 at 2.

In a later IDS, Cordance categorized prior art patents based on the field of distributed software technology to which each pertained (e.g., "File, Data, and Object Consistency," or "Hypertext And Web Browser/Server Technology") and then distinguished each because it did not transfer the required control structure for automating future communications. Specifically, as is explained in more detail below, Cordance distinguished web-based technologies in which users using client computers (web browsers) communicate with servers of companies providing online services.

2.    The '325 Patent and the '717 Patent

Cordance later filed the '325 and '717 patents which included the specification of the '205 patent with additional details of various applications of communications objects. Cordance made the same arguments to distinguish its technology from prior art web-based-hypertext

systems as it did to obtain the '205 Patent: prior art systems lacked control structure transferred between provider and consumer computers and metadata defining those control structures. App. Exhs. 2, 10-11.

### 3.    The '710 Patent

Cordance filed the '710 patent as a continuation application in February 2002, six years after filing its original application and five years after the market rejected its "hypercommunications" technology. After the PTO rejected its single original claim for double patenting, Cordance changed the title to "Object-Based On-Line Transaction Infrastructure," cancelled the rejected claim and added three new claims each of which required using "objects" to retrieve and process information in an online transaction. App. Exh. 13 at 1-2. The PTO rejected these claims based on a patent to Chelliah titled "Computer System And Method For Electronic Commerce." App. Exh. 14 at 3.

On May 6, 2003, Cordance filed an Amendment to Request Correction of Inventorship, eliminating five inventors leaving only Drummond Reed, Cordance's Chief Technical Officer, as the sole inventor. App. Exh. 15. That same day—eight years after Amazon.com launched its highly successful ecommerce web site and six years after it launched its patented 1-Click ordering (which Mr. Reed learned of and discussed with his "co-inventors" at least five years earlier in 1998)—Cordance filed an amendment eliminating any reference to "objects" (the purportedly novel feature of its "hypercommunications" invention) from each independent claim. App. Exh. 16 at 1-2. With the amendment, inventor Reed filed a declaration swearing under oath that he alone conceived of the invention claimed in the patent prior to the date of the Chelliah patent, thus seeking to eliminate Chelliah as prior art. Mr. Reed attached to his declaration a document that, according to Mr. Reed, describes the elements of the claims in the '710 patent, to corroborate his claim of prior invention.

11

**E.     To Obtain Patents On Its "Hypercommunications" Technology, Cordance Distinguished And Disclaimed the Standard Web Technology That It Now Accuses**

In the patent specifications and prosecution histories, Cordance repeatedly distinguished

and disclaimed the standard web technology and infrastructure that it now seeks to recapture.

Specifically, Cordance distinguished its invention from HTTP, HTML, scripts and Web cookies.

     1.     HTTP

HTTP or hypertext transfer protocol is the standard language web browsers and web

servers use to communicate.  HTTP uses a simple request and response structure.  ██████

██████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████ Cordance disclaimed this standard hypertext

technology to the PTO because it did not provide the active, persistent and intelligent

connections required by its "hypercommunications" invention:

> This art is directed to adding more intelligent capabilities to hypertext browsers, servers, or authors.  A communications object system as claimed inherently takes hypertext technologies to a higher level by using objects to define active, intelligent associations between databases rather than static links between documents."  App. Exh. 2 at 12.

> [N]one of these access tools offers the three attributes of an access Object network, i.e., they cannot automate access to resources outside the Internet, they do not automate the bi-directional exchange of data."  App. Exh. 19 at AMZC122968-69.





2.    HTML Forms/Tags/Scripts

HTML forms and scripts are used by web sites to collect information from users. They

include fields that users fill out and associated tags that the web server uses to identify and

processes the information. To distinguish Web prior art, Cordance disclaimed the use of forms

to collect and process data from Web users, and for providing that information back to identified

users in subsequent customized Web pages as described in the Lyons patent (*see e.g.,* 5,623,656

at 3:14-49).

> None of the cited art suggests transferring a control structure from a provider to a
> consumer memory which defines processes for providing response information from the
> consumer memory to the provider memory. Lyons has a specific HTML form which is
> completed but does not transfer any structures to the client. App. Exh. 6 at 19.

> Furthermore, nothing in Lyons is processed to define a process for transferring
> information from the provider to the consumer. The only processing occurs with respect
> to information on forms. This relates solely to content and not to the process for transfer.
> *Id.* at 16.

3.    Web Cookies

Cookies are small files that a web server can cause to be saved on a user's computer that

will be returned to the server automatically in subsequent requests from the user's browser to the

same web server. Netscape invented them so that web servers could identify requests coming

from the same user (browser). Netscape's patent for using cookies in on-line shopping (Montulli

5,826,242) was cited as prior art by the examiner. In its patents, Cordance explicitly

distinguished and disclaimed cookies:

> Another approach to web content customization is commonly referred to as "cookies" . . .
> Unfortunately, cookies are not directly viewable or editable by the consumer, nor do

13

cookies give the consumer any control over the data collected or transmitted by the cookie. . . . A communications object system overcomes these limitations by replacing the cookie with a communications object 110 from the provider. . . . In contrast to cookies, the consumer can be completely in control of this process. The consumer can view the elements 143 of the relevant communications object; edit those elements 143 which involve consumer preferences; and apply rules 140 governing data access, data security, and data logging by the communications object. These improvements can bring rich, automated new forms of web content personalization with none of the disadvantages of cookies. Vol. II at 78:32-79:7 ('710 Patent).

## IV.   **AMAZON'S ASSERTED PATENT**

Amazon accuses Cordance of infringing U.S. Patent No. 6,269,369 (the "'369 patent").

The '369 patent generally describes an electronic address book system that allows users to

manage their personal contacts via a network, such as the Internet. The system stores a single

copy of contact information of each user in a centralized database. Users who want their contact

information in each other's virtual address books create links and set permissions for access to

their respective contact information stored in the database. By not maintaining copies of users'

contact information as part of their contacts' separate virtual address books, the system ensures

that updates to one user's contact information is automatically reflected in virtual personal

address books of his or her contacts that are permitted to view the user's contact information in

the centralized database.

The invention of the '369 patent solved several shortcomings of personal contact

management systems that were available at the time of filing of the patent that required users to

manually update information of their contacts and did not provide users with an ability to set

permissions for access of contact information on a user-by-user basis. The '369 patent teaches a

system that allows users to grant access to their contact information on an individual user-by-

user basis and automatically reflects updates to contact information in address books of users

with permissions to access the updated contact information.

## V.    ARGUMENT

### A.    The Law of Claim Construction

1.    General Claim Construction Principles

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S.

370, 116 S. Ct. 1384 (1996) ("*Markman II*"). Analyzing "how a person of ordinary skill in the

art understands a claim term" is the starting point of a proper claim construction. *Id.* at 1313. A

"person of ordinary skill in the art is deemed to read the claim term not only in context of the

particular claim in which the disputed term appears, but in the context of the entire patent,

including the specification." *Phillips v. AWH Corporation*, 415 F.3d 1303, 1313 (Fed. Cir.

2005).

"[T]he specification 'is always highly relevant to the claim construction analysis. Usually

it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d

at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)).

Like the specification, the prosecution history "can often inform the meaning of the claim

language by demonstrating how the inventor understood the invention and whether the inventor

limited the invention in the course of prosecution, making the claim scope narrower than it

would otherwise be." *Phillips*, 415 F.3d at 1317; *see also Chimie v. PPG Indus., Inc.*, 402 F.3d

1371, 1384 (Fed. Cir. 2005).

Disavowal of claim scope in one patent or its prosecution history may affect the scope of

not only its claims but the claims of all patents in the same family. *Microsoft Corp.*, 357 F.3d at

1350; *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003); *Ormco Corp.*

*v. Align Tech., Inc.*, 498 F.3d 1307, 1314 (Fed. Cir. 2007); *Computer Docking Station Corp. v.*

*Dell, Inc.*, 519 F.3d 1366, 1374-75 (Fed. Cir. 2008); *Alloc, Inc. v. ITC*, 342 F.3d 1361, 1372

15

(Fed. Cir. 2003); *Bell Atl. Network Servs. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001).

Arguments contained in Information Disclosure Statements submitted during prosecution which purport to distinguish the invention from the prior art indicating what the invention does not cover are a basis for a court to interpret the scope of the claims of a granted patent. *See Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1304 (Fed. Cir. 1997); *see also Bd. of Regents v. BenQ Am. Corp.*, 533 F.3d 1362 (Fed. Cir. 2008).

2.    Construction of Means-Plus-Function Claim Limitations

A means-plus-function claim limitation "recites a function to be performed rather than definite structure or materials for performing that function." *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318 (Fed. Cir. 2003).   Such claims are construed to cover the corresponding structure described in the specification and equivalents thereof. *See* 35 U.S.C. § 112, ¶ 6.  To analyze a means-plus-function claim, the court must first identify the function recited in the claim. *Lockheed Martin*, 324 F. 3d at 1319.

After the function is identified, the court must next look to the specification to identify the structure corresponding to the claimed function. *Id.*  To qualify as "corresponding structure" the structure must (1) actually perform the claimed function and (2) be clearly "linked" in the specification or prosecution history with performing that function. *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001); *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997); *see also Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001).

For computer-implemented means-plus-function claims where the disclosed structure is a computer programmed to implement an algorithm, "the disclosed structure is not the general purpose computer, but rather the special purpose computer programmed to perform the disclosed

16

algorithm." *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349 (Fed. Cir. 1999). Thus, recent authority requires that the patent must disclose, at least to the satisfaction of one of ordinary skill in the art, enough of an algorithm to provide the necessary structure under § 112, ¶ 6. *Finisar Corp. v. DirecTV Group, Inc.*, 523 F.3d 1323, 1341 (Fed. Cir. 2008). Simply reciting "software" without providing some detail about the means to accomplish the function is not enough. *See Aristocrat Techs., Austl. Pty LTD. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).

### B.   Amazon.com's Proposed Claim Constructions For Disputed Terms in Cordance's Patents

#### 1.    Metadata

| Amazon.com's Proposed Construction |
| --- |
| information used to structure and automate the bidirectional exchange of data |

The term "metadata" appears in all claims asserted by Cordance. The specification of the '205 patent—the patent to which all other asserted patents claim priority—defines the term "metdata" as follows:

> [C]ommunications objects transfer both data and metadata from provider to consumer. The data is the information of direct value to the consumer. *The metadata is the information used to structure and automate the communications relationship.* Vol. I at 34:25-29 (emphasis added) ('205 patent).

The other asserted patents confirm that "a unique feature of the communications object system is its ability to produce reports about *the metadata it uses to control communications.*" Vol. I at 93:62-65 ('325 patent), Vol. I at 94:5-7 ('717 patent), Vol. II at 94:5-7 ('710 patent).

As described in the asserted patents, metadata specifies instructions to be included in a communications object in order to structure and automate the transfer of data between providers and consumers—the core functionality of a communications object. *See e.g.,* Vol. I at 34:25-29

('205 patent); Vol I. ('325 and '717 patent) and Vol. II ('710 patent) at Abstracts. A communications relationship between a provider and a consumer is established once a copy of a communications object with data of interest to the consumer is transferred from a provider's database to the consumer and stored in the consumer's database. Once established, subsequent communications relating to the transferred data are structured and automated by metadata in those replicated communications objects. Vol. I at 42:40-48 ('325 patent); Vol. I at 42:50-58 ('717 patent), Vol. II at 42:50-58 ('710 patent). For example, metadata can define a set of computer instructions that automatically return an acknowledgement message to the provider when the consumer receives a communications object. Vol. I at 20:50-67 ('325 patent); Vol. I at 20:55-21:5 ('717 patent); Vol. II at 20:59-21:9 ('710 patent). Metadata can further specify computer instructions that structure and automate updates to the information previously provided to the consumer by the provider. Vol. I at 33:13-18 and 59:17-60:45 ('325 patent); Vol. I at 33:20-25 and 59:25-60:45; ('717 patent); Vol. II 33:23-28 and 59:25-60:45 ('710 patent). For example, metadata in a communications object stored at the consumer's computer can define instructions that execute to periodically to obtain a new version of the associated communication object from the provider's database. *Id.* The examiner that conducted prosecution of all the asserted patents understood that the metadata used here were instructions. App. Exh. 18 at 2 (Notice of Allowability).

The abstracts of the patents confirm that the metadata of the invention automates bidirectional communications between providers and consumers: "[t]ransfer of metadata and methods permits intelligent processing of information by the consumer computer and combined control by the provider and consumer of the types and content of information subsequently transferred" and "[t]he use of metadata and methods further allows for automating may [sic] of

18

the actions underlying the communications" between the providers and consumers.  Vol I. ('325 and '717 patent) and Vol. II ('710 patent) at Abstracts.



Cordance distinguished cited prior art by emphasizing that the metadata in the invention is information used to determine data updates and control communication of the updated data between providers and consumers.  App. Exh. 19 at 28.  Cordance specifically distinguished the metdata in its invention from the general concept of metadata as "data about data":

> "This art is directed at the problems of managing and linking objects and data of differing types and schemas in a database or on a network.  The common thread in all these examples is the use of metadata—*data describing or associating other data*—to create the associations necessary for automated, intelligent processing.  However *none of this art uses this metadata to create a communications control structure as is required in the claimed communications object system* and portions thereof."

App. Exh. 2 at 10 (emphasis added).  Cordance's proposed construction of "data describing or associating other data" describes metadata in the prior art references that Cordance specifically distinguished.

██████████████████████████████████

████████████████████████████████████████

█████████████████████████████████ Cookie data is not instructions and does not control communications between the user and the website. Indeed, the identical specification of the '325, '717 and '710 patent distinguishes and disclaims web cookies by explaining that the invention "replac[es] the cookie with a communications object." Vol. I at 78:43-45 ('325 patent), Vol. I at 78:50-52 ('717 patent), Vol. II at 78:32-79:7 ('710 patent). ████████████

████████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████████

███████████████████████

2.    Control structure

| Amazon.com's Proposed Construction |
| --- |
| a combination of data, metadata, and instructions used to control the origination of outgoing communications and the processing of incoming communications between provider and consumer |

Amazon's construction mirrors the definition of the term in the Summary of the Invention from the specifications of the '325, '717 and '710 patents:

> The communications control structure contains a combination of data, metadata, and instructions which are used by the respective programs to control the origination of outgoing communications and the processing of incoming communications between the provider and consumer.

Vol. I at 8:13-18 ('325 patent), Vol. I at 8:14-19 ('717 patent).

The term "control structure" appears in the asserted claims of the '205 patent, the '325 patent and the '717 patent. The term does not appear in the specification of the '205 patent. But, during prosecution of the '205 patent, Cordance equated the term "control structure" to the communications object described in the specification: "a communications object system, as

claimed [uses] as special type of control structure—a communications object." App. Exh. 2 at 4 (205 PH, Statement Filed Pursuant to the Duty of Disclosure). Cordance explained that "[c]ommunications objects are the primary data structures transmitted from the provider computer to the consumer computer to control communications between the provider and the consumer." Vol. I at 17:30-33 ('717 patent); see also Vol. I at 13:31-34 ('205 patent), Vol. I at 17:25-28 ('325 patent).

During prosecution of the patents Cordance identified four key features that define its invention and distinguish it over the prior art—all are based on the use of the control structure to control communications between a provider and a consumer:

- A control structure transferred from a provider to a consumer controls communications;
- A control structure controls updates to information previously submitted to the consumer;
- A control structure controls transfer of information between a provider and a consumer;
- A control structure controls transmission of feedback information from a consumer to a provider. App. Exh. 2 at 3.

Cordance's proposed construction, however, ignores that the specification and prosecution history require that the control structure actually *control* the transfer and processing of communications, and requests the Court to construe the term as merely *specifying how* information is to be processed or transferred. This is not the meaning the specification give to the term or the meaning used to overcome prior art.

3.    Processing of said control structure

| Amazon.com's Proposed Construction |
| --- |
| executing computer instructions defined in the control structure |

As explained above, the control structure includes data, instructions and metadata used to

control communications between providers and consumers.  The relevant source all indicate the construction Amazon proposes is correct.  The specifications describe the control structure as a software object that includes data of interest to the consumer, instructions specifying processing of the data at the consumer's computer and metadata which, as described above, includes instructions used to structure and automate communications between a provider and a consumer. Vol. I at 13:41-43 ('205 patent), Vol. I at 17:28-30, 42:40-48 ('325 patent), Vol. I at 17:33-35, 42:50-58 ('717 patent).  Processing the object means executing the instructions defined by the methods. Vol. I at 16:32-34, 28:41-53, 33:58-60, 37:14-17; 38:52-54, 39:32-37 ('205 patent).  In the prosecution history, Cordance retitled the invention to clarify that Processes [are] Transferred With The Information. App. Exh. 6 at 19.  Computer processes are defined by a set of instructions that are executed to perform the processes.



     4.     Means-Plus-Function Terms in U.S. Patent No. 5,862,325

Claim 20 of the '325 Patent generally involves transferring "feedback information" about

22

a communications object from a consumer to the provider of that object and recites four means-plus-function elements. "Feedback Service Objects and Partner Servers" provided the structure and mechanism for the transferring of feedback information. Vol. I at 124:22-26 ('325 patent). They are a special type of type of "service object" and "partner server" (which are more broadly discussed in the patents). *Id.* at 95:1-99:48.

Third parties act as "service partners" and their servers generally provide "service objects," which are a special type of communications object used to coordinate communications between providers and consumers. *Id.* at 95:1-8. Figure 28 shows the three entities involved in the use of a service object:



*Id.* at Fig. 28. The provider program 12, transfers a copy of the communications object 35 on which feedback will be provided to the consumer program 22. *See e.g.*, *Id.* at 95:14-20; 125:6-8. The service object partner server generates and provides the service object 1310 (here feedback service object) to the provider and consumer. *See e.g.*, *Id.* at 95:5-15, 95:27-30. Though the service partner is the source of the service object, the patents scrupulously refer to it always as a

third party and as neither "provider" nor "consumer" since it is not a party to the exchange of the underlying communications object. *See e.g.*, *Id.* at 95:13-20; 27-28; 38-42.

The feedback process requires specific categories on which feedback will be solicited and, for them, evaluation criteria and a rating scale, for assembling aggregated reports (akin to consumer reports). *See e.g.*, *Id.* at 124:21-26. The feedback partner creates the feedback category objects that include the applicable attributes and value choices for the categories of communications objects. *See e.g.*, *Id.* at 125:42-55. Communications object providers can then browse available feedback category objects and select those appropriate for acquiring feedback related to the provider's underlying communications object. *See e.g.*, *Id.* at 124:39-40; *id.* at 103:3-11 (describing a provider's browsing of category objects on the partner server to select category objects which the provider is interested in). After selecting the appropriate category object(s), the provider can download a copy of the feedback category object and link it to communications object(s) it generates for consumers. *See e.g., Id.* at 125:9-13; *id.* at 97:34-98:34.

Via the communications object, consumers receive a link to a feedback category object which includes a method for obtaining a copy of an associated feedback service object. Other methods then obtain the feedback data and transmit it with the target communications object's identifier to the feedback partner server for storage, processing and aggregation. *Id.* at 125:34-65. The provider (or any other feedback consumer) can then access the feedback information from the partner server by querying it for relevant feedback or via a link to the relevant feedback category object. *Id.* at 127:13-22.

All discussions of the communication of feedback information in the patents are within this partner server, provider and consumer context in which the following means plus function

24

elements from claim 20 must be understood as well.

> **a.**   **association means for creating metadata associating portions . . .**

The parties agree that this is a means-plus-function element governed by 35 U.S.C. § 112 ¶ 6 and related case law.

### Function

The detailed claim language stating the element's function, Amazon.com believes, needs no construction beyond that to be given to disputed terms within it, e.g. metadata and control structure.

Cordance's construction apparently is largely in the line with this but includes a modification that removes a key limitation. The claim refers to "a control structure for processing at least at said consumer memory." Cordance contends that such limitation should be construed as requiring a "control structure that *can be used by a computer having access to the consumer memory*." In a networked environment that could be any computer. Cordance has cited no support for such a construction. There is none and the clear language of the function should be adopted.

### Structure

There is no dispute that claim 20 recites a computer implemented system. Thus, as recent cases hold, any corresponding structure must be more than a general purpose computer or generic "software" and implement a specific algorithm that performs the claim function. *See Aristocrat Techs.,* 521 F.3d at 1337; *Finisar Corp.,* 523 F.3d at 1341; *WMS Gaming,* 184 F.3d at 1349.

As discussed above, it is the provider of the underlying communications object that creates metadata defining the control structure (the communications object) and creates the

25

association with the feedback category object which includes an association with a process for controlling the transfer of feedback information. The step by step process described in the specification for creating these associations and metadata involves the provider accessing the partner server, selecting and downloading feedback category objects, then creating an underlying communications object, and creating a link in that underlying object to the category object. The specification provides details of these steps at 103:3-11.

The process for creating the underlying communications object is illustrated in Figure 12 of the '325 patent. *Id.* at 32:65-33:34, steps 547-51. The process for linking the category object to the communications object is described in the service objects and service partner section of the specification. *See Id.* at 97:34-98:34.

Cordance's proposed construction omits the provider of the underlying communications object. It mistakenly equates "provider" with the feedback service partner despite the fact that the entire patent describes the provider as distinct from the service partner and partner server. *See e.g., id.* at Fig. 28. The provider throughout the specification is the provider of the target communications object (the underlying communications object) for which the service object and service partner facilitates a service, e.g. providing a mechanism for the provision of feedback. *See e.g., id.* at 95:13-20; 27-28; 38-42.

**b.    Transfer means for transferring said information . . .**

There is no dispute that this element is a means-plus-function element subject to 35 U.S.C § 112 ¶ 6 and related case law.

**Function**

Amazon.com proposes two clarifications to the claim language in addition to other disputed terms: "said information" should be construed as provider information and

26

Amazon.com proposes adding a parenthetical making clear that "said metadata" includes metadata associating a process for controlling the transfer of feedback information. These follow from the claim itself and specification.

Cordance's proposed construction is largely in line with this but creates ambiguity by changing "said information" to "associated information." This construction suggests that the information is not necessarily the information previously recited in the claim, contrary to the standard use of "said" in claim drafting.

### Structure

This element also involves a computer implemented system, the structure of which must include an algorithm or set of steps that outline how the function is implemented. As with the prior element, the primary dispute between the parties here is over the identification of the "provider" - the feedback service partner or the provider of the underlying target communication object about which feedback is given. As discussed above, a provider is the provider of the underlying communication object, the object of the feedback. *See e.g.*, Vol. I at 95:13-20; 27-28; 38-42 ('325 patent). Amazon's construction reflects that the structure must include the means to transfer the underlying communications object from the provider to the consumer.

Cordance's construction conflates the "provider" and third party "partner" and should be rejected for the reasons mentioned previously.

> **c.    feedback transfer means for transferring said feedback information . . .**

There is no dispute that this element is a means-plus-function element subject to 35 U.S.C § 112 ¶ 6 and related case law and there is no dispute as to the construction of the function. The only issue relates to the structure.

**Structure**

As with elements immediately above, the core dispute here is whether the "provider" is the provider or the service partner. Amazon.com's construction includes the structure for transferring feedback information from the consumer, through the partner server to the provider. Cordance, again, incorrectly interprets provider to be the partner server and leaves the provider out.

> **d.    processing means for executing instructions external to said control structure . . .**

There is no dispute that this element is a means-plus-function element subject to 35 U.S.C § 112 ¶ 6 and related case law.

**Function**

Amazon.com asserts that the language of the element is clear and needs no construction beyond control structure which has been construed generally for all the patents.

**Structure**

Amazon.com has identified the specific processes executed external to the underlying communications object (control structure) needed for controlling the communications described in the claim – including the communication of the feedback information. *See Aristocrat Techs.,* 521 F.3d at 1333. Starting with the consumer program receiving the communications object from the provider, Amazon.com has identified the processes described in Figure 15 (see Vol. I ('325 patent)) and the specific methods executed in the linked feedback category object and feedback service object which implement the communication of feedback from the consumer to the partner server. It also has identified the program and methods at the feedback partner server that process the received feedback. Lastly, Amazon.com has identified the processes by which the partner server processes queries from the provider computer and delivers feedback to the

28

provider computer.

Cordance, on the other hand, identifies a "web browser" and feedback partner server with broad references in the specification to any discussion of communications. It does not identify any specific algorithm or processes disclosed in the patent that describe how the communications described in the claim are to occur. In addition, it is not clearly linked with performing the claimed function. This is inadequate. As the Federal Circuit has made clear, the structure in this context must include "a specific algorithm ... or step by step process" that performs the claimed functions. *Aristocrat Techs.*, 521 F.3d at 1333. Cordance's proposed construction amounts to nothing more than pure functional claiming and is not allowed.

     5.    Feedback information

| Amazon.com's Proposed Construction |
| --- |
| evaluation attributes and corresponding value choices |

The parties dispute the meaning of the term "feedback information" that appears in the asserted claims of the '325 patent and the '717 patent.[8] As described above, the only feedback data described in the specification is entered via an input form that consists of predefined evaluation attributes and corresponding value choices:

> Now a data exchange method 141 in the feedback service object 1310 generates a feedback input form (step 4606). *This input form consists of the category attribute and value choices obtained from the feedback category object* 110. ... the feedback input form for a feedback category object 110 representing minivans might include attributes for dealer satisfaction, fit and finish, gas mileage, maintenance costs, repurchase plans, and so on. The appropriate value choices for each of these attribute would be displayed as drop-down lists, radio buttons, as so on.

Vol. I at 125:34-57 ('325 patent) (emphasis added); Vol. I at 125:47-126:3 ('717 patent)

---

[8] The phrase "feedback information" does not appear in the identical specifications of these patents. When referring to feedback information in the specification, the patentee uses the phrase "feedback data."

(emphasis added).

As explained above, the feedback service object is a communications object created by a feedback service partner. The feedback service partner defines attributes and value choices appropriate for each category of an object upon which feedback can be provided. The feedback information must be created using the predefined attributes and value choices so that it can be automatically aggregated and analyzed by the feedback service partner.

Cordance's proposed construction is not supported by the specification. Cordance proposes to construe "feedback information" as "information that includes an evaluative review … ." To support its construction, Cordance cites to the same section of the specifications as Amazon.com does. Vol. II at 124:34-128:36 ('710 patent), identical text appears in Vol. I at 124:21-128:22 (the' 325 patent) and Vol. I at 124:34-128:37 ('717 patent). But that section only refers to feedback information as a set of attributes and corresponding values. The phrase "evaluative review" appears nowhere in that section, or anywhere else in the specifications. Cordance is trying to rejigger the patent to cover product review features available on the Amazon.com website, that allow users to submit free form textual book reviews. But, that is not what Cordance's invention is about. Cordance's patents describe a very specific method of submitting feedback information via evaluation attributes and corresponding values which allow the system to aggregate results and generate statistical reports. Narrative book reviews that include customer's free-writing and have no predefined structure, attributes or values cannot be automatically aggregated and statistically analyzed as the feedback system of the patents requires.

6.    processing said metadata to execute instructions external to said control
structure

| Amazon.com's Proposed Construction |
|---|
| processing instructions identified in said metadata, the instructions are external to said control structure |

As described above, the asserted patents describe metadata as instructions constituting or

referencing methods to be included in the control structure. Vol. I at 16:22-51 ('205 patent);

Vol. I at 20:50-21:31 ('325 patent); Vol. I at 20:54-21:38 ('717 patent). In a communications

object, metdata can include actual computer instructions of methods to be executed to control

communications of data in the communications object or instructions invoking methods in other

communications objects. *Id.* The later are instructions external to the communications object to

which metadata belongs, but identified in it. In either case as the Examiner noted, metadata in

the invention are instructions (App. Exh. 18 at 2 (Notice of Allowability)) and to process

metadata is to process those instructions.

Cordance's proposed construction equates "processing" to "using." The word

"processing," however, requires performance of some actions on the target of processing.

Processing is not merely using. As with its construction of "metadata" Cordance attempts to

recapture what it disclaimed during prosecution of the asserted patents. The metadata described

in the specifications are computer instructions and not any data about data. And as described in

the specifications, processing metadata requires processing of computer instructions defined by

the metadata.

7.    storage means for storing information

| Amazon.com's Proposed Construction |
|---|
| *Function*: storing information<br>*Structure*: a database |

31

There is no dispute that this element is a means-plus-function element subject to 35 U.S.C § 112 ¶ 6 and related case law and there is no dispute as to the construction of the function. The only issue relates to the structure.

The specification consistently refers to provider and consumer databases to store the information called out in the claim. *See generally* Amazon.com's citations in Joint Claim Construction Statement, e.g., Vol. I at 13:17-19; 13:41-44; 16:36-38; 16:61-64 ('717 patent). These databases are the only structures clearly linked with performing the function in the context of the claim. They are a key part of the invention because the databases provide structured storage and access to communications objects.

Cordance attempts to broaden its claim by proposing that this element be construed to include "storage mediums" without limitation. However, careful review of Cordance's citations to the patent show that there is no support for such a construction. Indeed, all such citations either refer to storage of information in a database or have nothing to do with storage of information.

8.    providing customer data storing information for a customer

| Amazon.com's Proposed Construction |
| --- |
| supplying information about a customer from the customer's computer |

The parties dispute the construction of the term "providing customer data storing information for a customer." The term was not present in the original claims submitted to the Patent Office. It was added in May 2003 in response to a rejection by the Examiner of all claims over a prior art reference. App. Exh. 16 at 6. To overcome the rejection, in addition to amending the claims, Cordance submitted a declaration from Drummond Reed—the purported inventor of the '710 patent—to establish an earlier invention date than the date of the prior art

32

reference cited by the Examiner. *Id.*

In his declaration, Mr. Reed maps elements of claim 1 of the '710 patent to a description in a document attached to the declaration that, according to Mr. Reed, establishes a conception of the invention as claimed in the '710 patent. *Id.* The alleged conception document makes it clear that customer data is stored only at a customer's computer and provided to a seller when the customer places an order:

> *A global database of information pertaining to the user of the client program,* defined in the specification of all authoring and client programs, *maintained by the client program,* and available to all access objects. *Such data includes but is not limited to the client program user's name, shipping, billing and mailing address, telephone and fax numbers; electronic mail addresses; credit card or other transaction account numbers; usage preferences,* etc." *Id.* at 5.2.1 in the attachment to the declaration (emphasis added).

> Once the customer has made up their mind about which product to purchase, ordering the product would be as simple as clicking the product ordering button on the access object. The resulting screen would already include all necessary ordering information *from the client's global database (name, shipping address, credit card number, sales tax charges, etc.).* *Id.* at Section IV ¶ 1 in the attachment to the declaration (emphasis added).

The inventor declared under oath that the conception document describes "providing a database of information pertaining to a customer/user (e.g., name, shipping address, billing address, mailing address, telephone number, credit card number, etc.). Accordingly, said document describes providing customer data storing information for a customer, as described in step (a)." *Id.* at 2.

The specification of the '710 patent confirms the importance of storing customer information at the customer's computer. Indeed, the specification describes that storing customer's data at the consumer's computer and not at the provider's computer is a key feature of the invention. See Vol. II at 69:22-31 ('710 patent) (storing preferences in consumer database); *Id.* at 68:45-53 (data entered once in consumer database); *Id.* at 67:18-31 (data in consumer databases enables automated exchanges).

Thus, the specification and figures supports Mr. Reed's declaration that customer data is stored at the customer's computer. *Id.* at Figures 1, 5, 7, 8, 20, 21, 25, 28 (database storing consumer data is not located on provider or seller computers).

Cordance's proposed construction is contrary to the specification and declaration of the inventor submitted to convince the Examiner to allow the patent. The proposed construction attempts to expand the scope of the claims, as defined by the inventor during prosecution of the patent, to cover systems where customer information is stored at the seller's computer. ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮ Cordance specifically disclaimed systems that store customer information at web servers, as Amazon does, from the scope of the claims in the '710 patent. The specification of the' 710 patent explains that systems such as Amazon's system suffer from disadvantages that the invention of the' 710 patent overcomes:

> One existing approach is to have consumer establish an ID, choose a password, and enter personal preference data into input forms provided by the web server. This data is then stored at the web server or another remote location and used to present customized views of the web side ... To see new content, the consumer must then manually visit the web site, enter the necessary ID and password, and browse their customized content, which is only available online. Whenever the consumer's preference data changes, the consumer must manually change it on all such web sites. Vol. II at 78:1-11 ('710 patent).

> A communications object system overcomes all of these disadvantages .... The consumer is not required to give a password manually because the provider's communications object 110 can communications [sic] with the consumer program 22 to establish the consumer's identify (the consumer's own identification [sic] and preference elements 143 *stay safely within the consumers own computing environments*) .... Finally, any changes to identification or preference elements 143 are made once locally and are transmitted automatically to all such web provider relationships. Vol. II at 78:12-31 (emphasis added) ('710 patent)

Further, even portions of the specifications relied on by Cordance to support its construction describe that customer information is stored at the customer's computer. Cordance cites to a section in the specification that describes methods for completing financial transactions, such as credit card or debit card transactions, between customers and merchants. *Id.* at 119:25-123:21. Financial transactions are completed using payment communications objects associated with a customer and a merchant. *Id.* A payment object associated with a customer includes a method that creates a customer payment account. *Id.* The customer payment account is associated with a "customer certificate." *Id.* The "customer account certificate [is] stored in the consumer database" and provided to the payment partner server, which is a separate entity that handles financial transactions on behalf of the merchant, to complete a financial transaction between the customer and the merchant. *Id.* at 119:25-123:21 specifically at 121:46-48. No customer information is stored at the merchant's computer.

> 9.    metadata associating said customer data with said transaction

| Amazon.com's Proposed Construction |
|---|
| metadata defining the relationship between customer information stored at the customer computer and the purchase transaction |

As defined in a textbook incorporated by reference in the asserted patents, an association is a means for establishing a relationship among software objects. App. Exh. 24 at 27. Thus, metadata associating said customer data with said transaction establishes a relationship between the customer data object and the transaction object.

As explained above, this metadata is a set of instructions constituting or associating methods with a communications object. One of the communications objects described in the specification is a payment service object which is used to complete financial transactions between consumers and providers. Vol. I at 119:25-123:21 ('710 patent). When an order is

35

submitted by the customer, a message object is created containing the purchase order and the

customer account certificate. *Id.* at 122:9-11. The message object is metadata associating the

customer information and the purchase transaction. The message object is transmitted to the

payment partner server where it is processed to complete the transaction. *Id.* at 122:12-40.

> 10.     processing said metadata associating said customer data so as to complete
> the purchase transaction

| Amazon.com's Proposed Construction |
| --- |
| executing instructions defined in the metadata associating said customer data to complete the purchase transaction |

As explained above, the correct construction of "processing of said metadata" is

executing instructions defined in the metadata. Cordance's construction not only improperly

equates "processing" to "using," as explained above, but is also contrary to the specification and

prosecution history. Cordance's construction attempts to recapture the disclaimed prior art

approach of using a customer identifier to retrieving customer data from a seller web server.

███████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████    In

Amazon's system, user information such as name, shipping address, billing information for

repeat customers is stored at Amazon's web servers and is normally not sent from the customer's

computer during the ordering process. Amazon's system instead uses cookies. As described

above, Cordance disclaimed the use of cookies. Cordance further disclaimed systems where

customer information is stored at web servers and not the customer's computer.

As explained above, to overcome prior art rejection Mr. Reed explained that the claim

covers a system in which customer information is retrieved from customer computer and then

sent to a seller with an order to complete the purchase. As the conception document referred to

by Mr. Reed explains, the database from which ordering information is retrieved is the customer database and the screen with all necessary ordering information is displayed on the customer's computer. The inventor convinced the examiner to allow the '710 patent by swearing under oath that customer information is stored at customer's computer. Cordance's invention does not cover systems storing customer data at web servers and its construction of this disputed term cannot recapture what it explicitly disclaimed in the specification and during the prosecution of the patent.

        11.    "information provider" and "information consumer"

| Amazon.com's Proposed Constructions |
| --- |
| provider of information for "information provider" |
| user of information for "information consumer" |

The terms "information provider" and "information consumer" in claim 7 should be construed as "provider of information" and "user of information," respectively. Claim 1 uses the terms "customer" and "seller" when referring to participants to a transaction and claim 7 refers to the participants as "information provider" and "information consumer." Vol. II at 144:37-52 and 144:65-146:4 ('710 patent). Cordance's proposed construction attempts to rewrite the terms "information provider" and "information consumer" in claim 7 to the terms "customer" and "seller" used in claim 1. But, as evident by the language of claim 1, Cordance was aware that it can refer to the participants of purchasing transactions as customers and sellers, but chose to use the terms "information provider" and "information consumer" in claim 7.

The specification of the '710 patent describes that the terms "'provider' and 'consumer' are used to designate separate functions in information transfers." Vol. II at 1:24-25 ('710 patent). Providers provide information to consumers and consumers use the provided information. *Id*. at 9:1-31. The specification, in addition to using the terms "customer" and

"seller," also uses the terms "provider" and "consumer" when referring to purchasing transactions—the subject matter of claim 7. For example, providers provide information about items for sale and consumers use that information to initiate purchasing transactions. Hence, the use of the terms "information provider" and "information consumer" in the context of claim 7 is consistent with the specification as the specification refers to the participants of purchasing transactions as consumer and providers. *Id.* at 67:38-43; 95:39-61.

### C.    Amazon.com's Proposed Claim Constructions For Disputed Terms in Amazon.com's Patent

The parties dispute construction of three terms from the claims of the '369 patent asserted by Amazon.com in this action.

  1.    directly modify the user's own respective personal data record within the database

| Amazon.com's Proposed Construction |
| --- |
| modify user's own respective personal data records himself/herself |

During prosecution of Amazon's '369 patent, the applicants explained the meaning of the term "directly" that appears in the disputed phrase: "the term directly has been added to [the claims] to clarify that the users edit their own personal data, in contrast to systems in which edits are made 'indirectly' by a system administrator." App. Exh. 20 at 5 (Amendment received October 29, 1999). Thus, in light of this statement it is clear that the disputed term must be interpreted as "modify users' own respective personal data records himself/herself."

Cordance generally agrees with Amazon's proposed construction as it includes a nearly identical language in its proposed construction, but insists that the construction must also specify that modification is not done "indirectly through a system administrator." But Amazon's construction, as the first part of Cordance's proposed construction, already excludes situations where data records are modified through a system administrator, as it specifies that users modify

their own personal data records themselves. Thus, it is unnecessary to read Cordance's proposed

additional limitation into the claim.

> 2.    virtual personal address book

| Amazon.com's Proposed Construction |
| --- |
| a network-computer-based personal address book comprising permissions to view personal data records of the associated users |

The specification discloses that the personal address book of the invention is a "network-

computer-based." Vol. II at abstract (the '369 patent). Amazon's construction reflects this.

Moreover, the term "virtual" is clearly defined in the prosecution history of the '369 patent.

During prosecution, the applicants explained to the examiner that the modifier "virtual" is used

to "emphasize that an address book entry or 'listing' comprises a permission to view the personal

data record of the associated user." App. Exh. 21 at 5 ('369 Amendment After Final Action,

received December 4, 2000). Thus, in light of this intrinsic evidence, the correct construction for

the phrase "virtual personal address book" is "a network-computer-based personal address book

comprising permissions to view personal data records of the associated users."

Cordance's proposed construction, however, contradicts the specification. Although

figures of the patent illustrate graphical user interfaces (GUIs) with links and an alphabet, the

specification, states that the illustrated "GUIs might be different" and thus not limited to

displaying links and "alphabetically-ordered index" as proposed by Cordance. Vol. II at 15:59-

63 ('369 patent). The phrase "alphabetically-ordered index" does not even appear in the

specification or prosecution history. Cordance's proposed construction—nearly a paragraph

long for a four-word term—reads limitations into the claim and must be rejected.

3.    Directly view the data records

| Amazon.com's Proposed Construction |
|---|
| no construction is necessary as the rest of the claim language defines the phrase |

Cordance requests the Court to construe the phrase "directly view the data records." This phrase, however, requires no construction as the rest of the claim language clearly defines it: "users directly view the data records of other users through the virtual address books according to said permissions." Vol II at 22:9-11 ('369 patent). The claim is clear, and the specification supports it. To directly view the data records is to view them through the virtual address books according to the user's permissions.

Cordance's construction is contrary to the teachings of the specification and impermissibly excludes an alternative embodiment from the claim. The '369 patent describes that the invention may also operate with personal handheld devices (PDAs) through which users may view their address book entries. Vol. II at 15:35-16:21. The specification notes that the only difference between the preferred embodiment and the alternative PDA embodiment is that user's PDA "maintains its own database" with information synchronized to the information stored at the server database. *Id.* at 16:19-21. Thus, according to the specification, users view address book entries directly through personal copies in their PDA databases—an embodiment that Cordance's construction excludes.

## VI.    CONCLUSION

For the foregoing reasons, Amazon.com's proposed constructions of the disputed terms should be adopted by the Court.

OF COUNSEL:

POTTER ANDERSON & CORROON LLP

Lynn H. Pasahow
J. David Hadden
Darren E. Donnelly
Saina S. Shamilov
Ryan Marton
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Tel: (650) 988-8500

By:    /s/ David E. Moore
       Richard L. Horwitz (#2246)
       David E. Moore (#3983)
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       Wilmington, DE 19801
       Tel: (302) 984-6000
       rhorwitz@potteranderson.com
       dmoore@potteranderson.com

Dated: August 27, 2008
Public Version Dated: September 3, 2008
880305 / 30763

*Attorneys for Defendants
Amazon.com, Inc. and
Amazon Web Services, LLC*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on September 3, 2008, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on September 3, 2008, the attached document was Electronically Mailed to the following person(s):

Steven J. Balick
John G. Day
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19899
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

Michael A. Albert
Robert M. Abrahamsen
Jeffrey O'Neill
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210-2206
malbert@wolfgreenfield.com
rabrahamsen@wolfgreenfield.com
jeffrey.oneill@wolfgreenfield.com


By:  /s/ David E. Moore
        Richard L. Horwitz
        David E. Moore
        Hercules Plaza, 6th Floor
        1313 N. Market Street
        Wilmington, Delaware 19899-0951
        (302) 984-6000
        rhorwitz@potteranderson.com
        dmoore@potteranderson.com

757320 / 30763