1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

  CORDANCE CORPORATION,
4                                    :     CIVIL ACTION
              Plaintiff,             :
5   v                                :
                                     :
6   AMAZON.COM, and                  :
    AMAZON WEB SERVICES,             :
7                                    :     NO. 06-491 (MPT)
              Defendants.
8                              - - -

9                         Wilmington, Delaware
                Wednesday, January 7, 2009 at 11:34 a.m.
10                     *TELEPHONE CONFERENCE*

11                             - - -

12  BEFORE:  HONORABLE **MARY PAT THYNGE**, U.S. MAGISTRATE JUDGE

13                             - - -

  APPEARANCES:
14

15           ASHBY & GEDDES, P.A.
             BY:  JOHN G. DAY, ESQ.
16
                    and
17
             WOLF GREENFIELD & SACKS, P.C.
18           BY:  MICHAEL C. ALBERT, ESQ.,
                  JEFFREY C. O'NEILL, ESQ., and
19                ROBERT M. ABRAHAMSEN, ESQ.
                  (Boston, Massachusetts)
20
                    Counsel for Cordance Corporation
21

22           POTTER ANDERSON & CORROON, LLP
             BY:  DAVID E. MOORE, ESQ.
23
                    and
24

25                         Brian P. Gaffigan
                           Registered Merit Reporter

1

2   APPEARANCES:  (Continued)

3

4                  FENWICK & WEST, LLP
                 BY:  J. DAVID HADDEN, ESQ., and
5                       DARREN E. DONNELLY, ESQ.
                     (Mountain View, California)
6
                          Counsel for Amazon.com
7

8

9

10

11

12

13

14

15

16

17                          - oOo -

18                     P R O C E E D I N G S

19              (REPORTER'S NOTE:  The following telephone

20   conference was held in chambers, beginning at 11:34 a.m.)

21              THE COURT:  Good morning, counsel.

22              (The attorneys respond, "good morning, Your

23   Honor.")

24              THE COURT:  Before we get started, let's find

25   out who is on the line on behalf of Cordance.

1          MR. DAY:  Good morning, Your Honor.  On behalf

2     of Cordance you have John Day at Ashby & Geddes as Delaware

3     counsel; and with me on the line are Michael Albert, Robert

4     Abrahamsen and Jeff O'Neill, our lead counsel at Wolf

5     Greenfield in Boston.

6          THE COURT:  Thank you, and Happy New Year to all

7     of you, too.

8          (The attorneys respond:  "You, too, Your Honor.

9     Thank you.")

10          THE COURT:  On behalf of Amazon, who is on the

11     line, please?

12          MR. MOORE:  Good morning, Your Honor.  It's

13     David Moore at Potter Anderson.  With me on the line from

14     Fenwick & West are David Hadden and Darren Donnelly.

15          THE COURT:  All right.  Also Happy New Year to

16     your group as well.

17          (The attorneys respond, "Thank You, Your

18     Honor.")

19          THE COURT:  My understanding is that based upon

20     the second submissions by the parties that we were down to

21     two issues, one issue for each side; is that correct?

22          (The attorneys respond, "Yes, Your Honor.")

23          THE COURT:  So why don't we deal with

24     Cordance's.  And I'm not doing this with my type of

25     preference.  It's just that Cordance is the plaintiff.  Why

1    don't we deal with Cordance's issue first and then Amazon's

2    issue.  Who is going to be speaking on behalf of Cordance,

3    please?

4                 MR. ABRAHAMSEN:  This is Bob Abrahamsen, Your

5    Honor.

6                 THE COURT:  All right, Bob.

7                 MR. ABRAHAMSEN:  For months now, Your Honor,

8    we've been trying to get ahold of documents underlying

9    Amazon's SEC filings.  We've had even had a couple of

10   hearings on this already.  And we thought certainly as a

11   result of the last hearing that those materials were going

12   to be produced.

13                THE COURT:  Was that the hearing, Bob, on

14   November 14th?  2008.

15                MR. ABRAHAMSEN:  Yes, Your Honor.

16                THE COURT:  Okay.  Thank you.  Go ahead.  I

17   apologize for interrupting.

18                MR. ABRAHAMSEN:  Okay.  And a couple days before

19   we took our damages-related depositions, we finally got a

20   couple documents that Amazon said were supposed to be these

21   documents underlying the SEC filings.

22                THE COURT:  Now, what type of documents are

23   they?  And what did they tell you?

24                MR. ABRAHAMSEN:  They're actually attached to

25   Amazon's responsive paper.

1              THE COURT:  Okay.  Let me find out which one

2    that is.  Is that the one that was folded over, the large

3    piece of paper?

4              MR. ABRAHAMSEN:  I believe that is it, yes, Your

5    Honor.

6              THE COURT:  All right.  The big Exhibit A?

7              MR. ABRAHAMSEN:  Correct yes.

8              THE COURT:  And was Exhibit B part of that, too?

9              MR. ABRAHAMSEN:  Exhibit B was something they

10   gave us in response to an interrogatory identifying accused

11   sales.

12             THE COURT:  All right.

13             MR. ABRAHAMSEN:  Exhibit A is a document

14   apparently they created specifically for this litigation.

15             THE COURT:  How do you know that?

16             MR. ABRAHAMSEN:  Because that is what I believe

17   Amazon told the Court and us, that they would have to go out

18   and prepare this document.  It turns out the top half of

19   document is largely duplicative of what is in their 10-K

20   filings anyway.  And it doesn't provide us any underlying

21   data with respect to the 10-K filings.

22             THE COURT:  Let me just try to understand what

23   you are saying because I'm trying -- I'm looking at

24   relatively small print.  Are you saying that when you talk

25   about the top of the document -- and I'm looking at the

1    first page of Exhibit A, which is Amazon's 642335 Bates

2    number.  And I imagine it's the same all the way through.  I

3    mean I didn't sit there and study each page.  But when you

4    reference the top part of the document, are you talking

5    about both sections, the ones that start off with product

6    revenue, total revenue, cost of sales?

7              MR. ABRAHAMSEN:  That whole top table is what

8    I'm calling the top part.

9              THE COURT:  All right.

10             MR. ABRAHAMSEN:  The bottom table, the witness

11   that I deposed testified that that is something that is not

12   even used by the accounting department.

13             THE COURT:  And that witness was who?

14             MR. ABRAHAMSEN:  Shelly Reynolds.

15             THE COURT:  Shelly?

16             MR. ABRAHAMSEN:  Shelly.

17             THE COURT:  Thank you.

18             MR. ABRAHAMSEN:  And, you know, not only is this

19   not a document underlying the SEC filings but there are some

20   serious problems with this document that our damages expert

21   has told us exist, and they have told us generally they need

22   these, they need -- these 10-K tie-out binders should give

23   them the information they need to reconcile some of the

24   facts here.  I can tell you what some of those

25   inconsistencies are, if you want.

1          THE COURT:  All right.  You are saying there are

2    inconsistencies in this document in relationship to other

3    documents that you received?

4          MR. ABRAHAMSEN:  Yes.  In fact, one of the big

5    ones is an inconsistency between what is in Exhibit A and

6    what is in Exhibit B.

7          THE COURT:  Okay.  And not that I want a

8    complete laundry list of where the inconsistencies are, but

9    what are the most gross inconsistencies that directly affect

10   your ability to appropriately do an analysis on damages?

11         MR. ABRAHAMSEN:  Well, I think probably the

12   easiest one to understand is that you look at the Exhibit B,

13   which is the all sales spreadsheet.

14         THE COURT:  Yes, I have that in front of me.

15   And I'm looking at the first page.

16         MR. ABRAHAMSEN:  And according to the witness

17   who testified about that document --

18         THE COURT:  Who testified about Exhibit B?

19         MR. ABRAHAMSEN:  Diane Lye, L-Y-E.

20         THE COURT:  Thank you.

21         MR. ABRAHAMSEN:  She said the numbers

22   represented there are gross revenue for all product sales at

23   Amazon, gross revenue.  She had no knowledge of the contents

24   of Exhibit A was her testimony.

25         The witness who testified about Exhibit A,

1    Shelly Reynolds, she represented that one of the line items

2    on that document is the net revenue from product sales.

3                THE COURT:  And does that specifically say "net

4    revenue" or did she direct you to where the net revenue is

5    found?

6                MR. ABRAHAMSEN:  There is a line item that says

7    "product revenue," the first one.

8                THE COURT:  Oh, I'm sorry.  Yes.  Yes, I see it

9    now.  Thank you.

10               MR. ABRAHAMSEN:  She said that was the net

11   revenue from product sales.  There are a couple problems

12   that our damages expert has pointed out to me.  One of

13   them is, first of all, that the gross revenue is lower

14   than the net revenue, if you add them all up.  They need an

15   explanation for why that is the case.  It's not apparent

16   from the spreadsheets.  Either witness was familiar with --

17   one of the witnesses was familiar with one of the documents,

18   one was familiar with the other.  Neither had any knowledge

19   of the other document.  They're entirely independently

20   created.  Our damages expert is not able to tie the two

21   together.

22               The gross revenues should be higher than the net

23   revenue.  I think logic says that.

24               And there is another reason it should be higher

25   is that in the all sales data ...

1              THE COURT:  Yes.  Exhibit B?

2              MR. ABRAHAMSEN:  Yes.  The revenue for third

3    party sales, which would be a sale for like Amazon.com, in

4    that document the witness testified that the Delaware figure

5    is the product quantity times the product cost.

6              THE COURT:  So it's the product quantity times

7    the what?

8              MR. ABRAHAMSEN:  The product cost.

9              THE COURT:  Okay.

10             MR. ABRAHAMSEN:  In the product revenue of the

11   other document, the net revenue ...

12             THE COURT:  Yes.

13             MR. ABRAHAMSEN:  The third party sales, the

14   revenue is, really, Amazon gets a commission from the sale

15   and it's a small percentage of the product cost so it should

16   be a lower number.  So, again, the gross revenue should be a

17   lot higher -- there are two different reasons -- than the

18   net revenue but it's lower for some reason.  We need an

19   answer to that.

20             THE COURT:  Now, why do you think that the --

21   I'm sorry -- the 10-K tie binders would tell you all this

22   wonderful information?

23             MR. ABRAHAMSEN:  It would give us the

24   information used to file the 10-K reports which should have

25   underlying data, like the sales figures that were given to

1   us, and we can compare that underlying data.  There may

2   be an explanation here.  The witnesses couldn't provide

3   it because they didn't know anything about the other's

4   document, but our expert thinks that the tie-out binder will

5   provide that explanation.

6               THE COURT:  I'm sorry.  It's a tie-out binder?

7               MR. ABRAHAMSEN:  Tie-out binder, yes.

8               THE COURT:  Okay.  Bob, is that the extent of

9   your argument at least at this point?

10              MR. ABRAHAMSEN:  There are a couple other

11  inconsistencies.

12              THE COURT:  So we have Inconsistency 1, which is

13  basically gross revenue.

14              MR. ABRAHAMSEN:  Another one is that the

15  operating profit stated in the 10-Ks, which you don't have

16  in front of you there, but our expert has told us that that

17  doesn't tie to the operating profits stated in this document

18  they created for the litigation.

19              THE COURT:  So it does not tie to Exhibit A?

20              MR. ABRAHAMSEN:  Correct.

21              THE COURT:  And that would be under what?  Is

22  that under product revenue?  Do you know what line item that

23  is?

24              MR. ABRAHAMSEN:  That would be I think the

25  operating margin.  I can't even read it on my copy here.

1           THE COURT:  Wait a minute.  Is it under

2    "contribution profit detail?"

3           MR. ABRAHAMSEN:  It would be under, actually,

4    the top table is the one we're looking at.

5           THE COURT:  All right.

6           MR. ABRAHAMSEN:  "Operating profit."

7           THE COURT:  I'm trying to find that.  And I'm

8    having a hard time reading it, myself.

9           MR. ABRAHAMSEN:  The last entry on the top.

10          THE COURT:  Oh, I see it.  Thank you.  Boy, I

11   can't see the numbers but I can at least see the words.

12          MR. ABRAHAMSEN:  Yes.  And our expert told us

13   that that operating profit could not be tied to the

14   operating profits stated in the 10-Ks.  Again, they think

15   these tie-out binders will hopefully answer that question as

16   to why that is the case.

17          THE COURT:  Did any individual that you deposed

18   on behalf of Amazon, that is, an Amazon individual, did they

19   give you any information as to what the tie-out binders

20   contain?

21          MR. ABRAHAMSEN:  I asked the question simply:

22   Does Amazon keep information underlying its SEC filings?

23          And she said:  Sure.

24          And, what do you call that?

25          Oh, that's our 10-K tie-out binder.

1              And she said that includes a whole lot of

2       information that collect the details that underlie the

3       stuff.  Our expert seems to think that that is a pretty

4       common practice to keep this type of information and

5       they're familiar with what would be in the underlying

6       documentation.

7              THE COURT:  And what did your expert expect

8       if you are willing to disclose it?  Because I don't know

9       whether that would be disclosing strategy.  What would

10      your expert expect to see in the 10-K tie-out binders?

11      Typically, what would your expert expect a company to do or

12      what type of information would he expect a company to have

13      in a document such as that?

14             MR. ABRAHAMSEN:  We didn't go into that level of

15      detail.  She did tell me that they thought the information

16      would be sufficient to help them answer these questions.

17             And this operating profit question, Your Honor,

18      it's a key issue in this case.  In determining reasonable

19      royalty, a damages expert looks at the operating profit as

20      one of the primary factors, and we have this inconsistency

21      here.  I think we really need to get to the bottom of it.

22             THE COURT:  Is there anything that you wish to

23      highlight to me about inconsistencies that goes to the

24      heart of damages -- that is important, really important to

25      the heart of damages?

1              MR. ABRAHAMSEN:  One other one is that you

2      should look at Exhibit A.

3              THE COURT:  Yes.

4              MR. ABRAHAMSEN:  There is some international

5      sales there, like Canada.  It looks like Germany, France,

6      U.K.

7              THE COURT:  Oh, yes, yes, yes.  Across the top,

8      yes.

9              MR. ABRAHAMSEN:  Apparently, if you look further

10     to the left, there is "U.S." and then "U.S. Other."  The

11     U.S. entry is U.S. Amazon.com sales.  U.S. Other is

12     third-party sales that Amazon facilitates.  And there is a

13     very different profitability model on the two because one

14     is a commission whereas the other is really the profit of

15     the sales, the revenue minus the costs.

16             THE COURT:  Is it fair to assume that the

17     U.S. Other, where it's the third-party sales that Amazon

18     facilitates, that would be the commission?

19             MR. ABRAHAMSEN:  Yes.  So the U.S. Other would

20     be the comission sales.  And I guess there is some

21     additional information in the U.S. Other like memberships

22     and programs and stuff like that, which the 10-K tie-out

23     binder should help us separate some of those but I think

24     that is a little less critical.

25             The other issue I wanted to point out is the

```
 1    international sales have no separation as between retail

 2    sales and third parties sales, and because the revenue model

 3    and the profit model are so different, our expert would like

 4    to look at those separately.

 5              THE COURT:  Why?

 6              MR. ABRAHAMSEN:  I don't know if I can really

 7    answer that question.

 8              THE COURT:  Okay.

 9              MR. ABRAHAMSEN:  They want to look at them

10    separately because there is a huge difference in

11    profitability.  One may be 10 percent, the other is

12    70 percent.  Maybe they're planning on those differently for

13    royalty purposes.  I don't know the details of why, but they

14    definitely told me that they want that information.

15              THE COURT:  All right.

16              MR. ABRAHAMSEN:  Those are the big issues I have

17    here.  And going back to the beginning, we've been asking

18    for and seeking court intervention to get these sorts of

19    materials for months now.  I thought the Court had ordered

20    Amazon to actually produce the information that it agreed to

21    produce, which includes the documents underlying the SEC

22    filing, which is why we're really troubled by this.

23              We don't see what the issue is.  They have the

24    information.  It's kept in the ordinary course of business.

25    It's not prepared specifically for litigation.  I think
```

1    we're entitled to it.  Our damages expert needs it.

2              THE COURT:  Are you finished, Bob?

3              MR. ABRAHAMSEN:  I am.

4              THE COURT:  All right.  I will listen to

5    Amazon's counter-response.

6              MR. HADDEN:  Good morning, Your Honor.  This is

7    David Hadden for Amazon.

8              Let me start with the last point, this notion

9    we were ordered to produce all documents related to our

10   SEC filings.  That is just not accurate.  The hearing where

11   we had the discussion and the order regarding producing

12   financial information was the October 15th hearing, Your

13   Honor.  The transcript of that is actually attached to

14   Amazon's motion as Exhibit B; and we went over this notion

15   of whether we were going to produce reports that specific-

16   ally provided Cordance with the information they wanted --

17             THE COURT:  Are you saying, Dave --

18             MR. HADDEN:  -- rather than all documents.  And

19   it's at Page 27, Your Honor --

20             THE COURT:  Now, wait a minute.

21             MR. HADDEN:  -- Exhibit B.

22             THE COURT:  I'm sorry.  Is this the November

23   hearing date or --

24             MR. HADDEN:  No.  This is the October 15th

25   hearing, Your Honor.

1           The November hearing was about Cordance's belief

2    there were documents relating to the value of the accused

3    features, that is, 1-click and product reviews, that hadn't

4    been produced.  And that was what the November 14th order

5    and hearing was about.

6           THE COURT:  And where was this?  At what page?

7           MR. HADDEN:  Yes.  At Page 27, Your Honor, of

8    Exhibit B to Amazon's brief.  And on Line 13, I'm talking to

9    Mr. Albert and proposing that we would provide Cordance with

10   reports showing the revenue figures for the accused features

11   by month that they wanted and that they could then take a

12   30(b)(6) deposition.

13          And Mr. Albert said below that:  Yes, that is

14   exactly what we want.

15          And then Mr. Abrahamsen continued, starting at

16   the bottom of 27, on to 28, and he points out that they had

17   amended their document request so that they were no longer

18   asking for all documents but only documents sufficient to

19   show the financial information they wanted.

20          So that's what we did, and that's what we were

21   ordered to do.  And so we produced documents, including

22   Exhibit A and Exhibit B that you were discussing with

23   Mr. Abrahamsen a minute ago, and those documents show both

24   the details of the revenue figures that are also in a more

25   generalized form in Amazon's SEC filings and August

1   financials.  That is what is in Exhibit A.  And Exhibit B

2   breaks down sales figures by whether it's using the 1-click

3   accused feature or based on the shopping cart, the other

4   ordering methods that aren't accused in the case.

5          Those are the things they wanted.  We produced

6   both of those.  We produced witnesses who would discuss

7   them.  There were two different witnesses, so one witness

8   didn't know what was in the document that the other witness

9   was talking about.

10          The witness that talked about Exhibit B, Diane

11   Lye, she is the keeper of the data warehouse in Amazon so

12   she knew how that report was generated.  Shelly Reynolds is

13   a financial person.  She talked about Exhibit A, which

14   relates to their security filings.

15          So we provided all of the information that we

16   were ordered to produce.  We provided all the information

17   that they need to do their reasonable royalty analysis.  And

18   then at the deposition, they asked if there were documents

19   that supported the 10-Ks and Ms. Reynolds says yes.  She

20   didn't say that there is anything relevant in those

21   documents analysis and Cordance hasn't pointed to anything

22   relevant in those documents that is not in the spreadsheets

23   or Amazon's audited financials.

24          THE COURT:  Well, that would be the --

25          MR. HADDEN:  The notion there is something wrong

1    with Amazon's audited 10-K operating profit figure is just

2    sort of mind boggling to me.  I mean if Amazon is cooking

3    its books and its 10-K, we have a lot bigger problems in

4    this case.  So if this is just a fishing expedition to find

5    something fishy in their audited financials, I don't think

6    that is the appropriate instrument in this case.

7                 THE COURT:  I don't think --

8                 MR. HADDEN:  But there is some particular -- oh,

9    I'm sorry, Your Honor.  I didn't mean to interrupt.

10                 THE COURT:  I'm been trying to get in, David.

11   And I realize --

12                 MR. HADDEN:  I'm sorry.  That's not fair.

13                 THE COURT:  No, I understand that you are on a

14   role.  But I think what they brought out is they are sitting

15   there saying we have tried to do this comparison with what

16   information you have given us on the latest Exhibit A that

17   I have in this motion and B, and we've got a problem here

18   because our understanding of what they say, there are at

19   least these three inconsistencies and we don't understand

20   where these figures came from.  We don't understand if they

21   were just made for litigation.  We don't have the documents

22   that support where these figures came from.

23                 MR. HADDEN:  Yes.  I could respond, Your Honor.

24                 First, this is the first time they have raised

25   this notion of there being an inconsistency between A and B

1    and that is why they need the tie-out binder, so I'm

2    responding a bit on the fly on that.  But if that is their

3    issue, we can resolve that.

4           The short answer is Exhibit A is based on a

5    database that keeps track of orders because that is the way

6    they track whether it was a 1-click order versus a shopping

7    cart order.  The problem is not all orders ultimately turn

8    into revenue because there can be returns, or they can be

9    canceled.  So that is why Exhibit B is not identical to

10   Exhibit A because Exhibit A actually tracks real money, that

11   is, orders that have been fully completed and are part of

12   Amazon's financials.  But if that is their issue, we can get

13   an explanation for that.

14          But that is not going to be in the 10-K tie-out

15   binders.  The 10-K tie-out binders don't have anything to

16   do with the method of sales or the information that is in

17   Exhibit B.  What they are is they have a draft of the 10-K

18   that is marked up by lawyers and accountants with comments

19   and then they have documents that support the numbers that

20   are in the 10-K, like the number of common shares, the

21   number of employees, revenue figures, but those are the same

22   revenue figures that were generated for Exhibit A.

23          So there is no indication that the 10-K tie-out

24   binders include any of the answers you are looking for.  And

25   they do include a lot of attorney work product that would be

1   very difficult to review and redact.  So it doesn't seem to

2   us to be a reasonable way to get at whatever inconsistencies

3   they're concerned about.

4            THE COURT:  Well, what documents are out there

5   that would explain all this if it's not necessarily in the

6   10-K tie-out binders?

7            MR. HADDEN:  Well, again, the question, I'm not

8   sure what the "all this" is.  If it's a discrepancy between

9   the figures in Exhibit A and Exhibit B, I don't think there

10  is an document but we can find out what the answer is.  The

11  answer is basically what I think I just said, which is one

12  tracks orders as they come in, because that is how we track

13  the order method, and the other tracks actual completed

14  transactions, and they may not always be the same number.

15           THE COURT:  Well, what is --

16           MR. HADDEN:  Other internal inconsistencies with

17  respect to just Exhibit A itself, I think Ms. Reynolds is in

18  a position to answer those questions.  As far as I know, I

19  don't think there are any unresolved ones, but if there are,

20  we can get the answer.

21           THE COURT:  Well, my understanding of what

22  they're saying is if they look at Exhibit B, it's supposed

23  to be gross revenue.  Because even you have said that to

24  me, that it's based upon all orders that are made and not

25  all orders end up becoming actual income, because there are

1    cancellations, returns, and that type of thing.

2              MR. HADDEN:  That's my understanding, Your

3    Honor.

4              THE COURT:  But then Exhibit A is supposed to

5    show what the net revenue is.  And what they're saying is

6    Exhibit A is showing net revenue higher than gross revenue,

7    which is a little problematic.

8              MR. HADDEN:  I understand the issue.  This is

9    the first time I have heard this issue so I can't tell you

10   the answer to, you know, whether it points out a difference

11   and whether or not the orders in B are all included in

12   Exhibit A or whether that there is, you know, something

13   else.  I don't know the answer.

14             THE COURT:  Well, the relationship --

15             MR. HADDEN:  I just don't think it's in the

16   tie-out binders or that's the right way to find it.

17             THE COURT:  Well, the relationship that exists

18   between Exhibit A and Exhibit B -- the different relationships

19   that exist between Exhibit A and Exhibit B I think need to

20   be explained and why the numbers are the way they are in both.

21             MR. HADDEN:  I have no problem with that, Your

22   Honor.  Certainly.

23             THE COURT:  And to the extent that there are

24   documents that would explain that, Cordance is entitled to

25   get those documents.  Whether you call them the 10-K tie-out

1    binder, which you have indicated to me doesn't sound like

2    it's necessarily going to give the answers, there might be

3    other documents that show it.

4            There was another inconsistency that Cordance

5    brought out and that was the operating profit that is

6    listed in the 10-K versus the operating profit that shows in

7    Exhibit A.  Again, those numbers don't jive.  And to the

8    extent there is a way to explain the relationship between

9    Exhibit A and operating profits or the numbers there in

10   relationship to what shows up in your financial 10-K.  In

11   other words, there are other numbers out there that Amazon

12   is putting out to the public saying "here it is," and that

13   there are other numbers apparently have been prepared like

14   Exhibit A that have been prepared for litigation and they

15   appear to be different or at least the experts can't tie

16   them -- Cordance's experts can't tie them together.  And

17   that is I think problematic, too.

18           MR. HADDEN:  Understood, Your Honor.  Again,

19   this is the first time I have heard that.

20           THE COURT:  Okay.  But, David, before you --

21           MR. HADDEN:  But I will certainly -- if there

22   are documents or an explanation, we will provide it.  I'm

23   not trying to --

24           THE COURT:  I'm not suggesting --

25           MR. HADDEN:  Conceal information, Your Honor.

1                 THE COURT:  I'm not suggesting that you are.

2      But was Exhibit A prepared for litigation purposes only?

3                 MR. HADDEN:  It was, Your Honor.  It was a

4      report that was -- the attempt, as I understand it, was to

5      provide more details than was in the 10-K to show the sort

6      of more granular information they wanted for their damages

7      report.

8                 MR. ABRAHAMSEN:  Your Honor --

9                 THE COURT:  Wait a minute.  Hold on.

10                 MR. HADDEN:  If they don't add up to the 10-K,

11      it would surprise me, but I don't have an explanation at

12      this point because it's the first time I heard it.

13                 THE COURT:  Do you know where -- there are

14      numbers here that show first quarter.  Let's go to Exhibit

15      A.  It shows me the entire year 2000 and it breaks it down

16      to first quarter, second quarter, third quarter, fourth

17      quarter.  It breaks it down to "United States," which

18      Cordance understands is Amazon.com, and then "United States

19      Other," which Cordance understands is the third-party sales

20      that Amazon facilitates for which Amazon's gets a commission

21      and it may be some other things.  And then there is also

22      other countries -- is DE Delaware by any chance?  Or

23      Denmark?

24                 MR. ABRAHAMSEN:  Germany, Your Honor.

25      Deutschländ.

1           THE COURT:  I'm sorry, Deutschländ.  Okay.

2    Germany, France, U.K., Japan.  Is CN Canada?

3           MR. HADDEN:  I believe so.

4           THE COURT:  Anyway, there are other countries

5    and they're not broken down like the U.S. and others where

6    there may be, I guess in Cordance's mind, a potentially

7    different approach possibly to the type of running royalty

8    that might attach to where Amazon is getting a commission

9    versus where Amazon is get the income directly, if you

10   understand what I mean.

11          MR. HADDEN:  Yes, I understand that point.  As

12   far as the foreign sales, they're irrelevant in the U.S.

13   case.

14          MR. ABRAHAMSEN:  I'm sorry.  The service that

15   operate those websites, Your Honor, are in the U.S.  They

16   are certainly relevant to this case.

17          THE COURT:  I understand.

18          MR. HADDEN:  I don't believe that is the case.

19          THE COURT:  Okay.  I don't know whether there is

20   evidence to show that all these sales are being made in the

21   U.S.  I don't know the answer to that question.  I really

22   don't.  I don't know what evidence Cordance has to support

23   that position to say that the foreign sales are relevant to

24   this case because they're actually U.S. sales.

25          MR. HADDEN:  Your Honor, if you look at their

```
 1    all sales data, or their 1-click sales data, they included
 2    several foreign websites.  They acknowledge that those
 3    servers were operated in the U.S. at the time those sales
 4    were made.
 5              MR. ABRAHAMSEN:  Well, what we provided is not
 6    an admission that they're U.S. sales or infringing sales.
 7    We're going off course.
 8              THE COURT:  Please.  Gentlemen, just stay with
 9    me for a moment because I'm trying to get this down.
10              I think what they're saying to you is this, and
11    what I'm asking you is where did these numbers come from?
12    I mean is there underlying documentation that shows where
13    these numbers came from for the U.S., U.S. Other, at the
14    very least?  There has got to be some place Amazon is
15    keeping this information.  You had to get it from some
16    source.  I don't know how it was put together, but you had
17    to get it from some source or from some sources, how Amazon
18    keeps it together; right?  I mean unless they just go
19    merrily along and have no idea whether or not they're making
20    a profit from year to year.  And I find that a little bit
21    surprising.
22              MR. DONNELLY:  Your Honor, this is Darren
23    Donnelly for Amazon.
24              The material that was assembled to compare
25    Exhibit A was assembled in response to Cordance's request
```

1    for additional more granular data supporting the information

2    in our public filings.  We, in accommodation, agreed to go

3    out and provide that information to them.  That information

4    is not just kept around because it's not the type of data

5    which is assembled in the way in which Cordance sought for

6    the public filings, but we agreed to assemble it.  It took

7    our financial analyst days and days of work to do it but

8    they did it and it's from the underlying financial data

9    which the company keeps for ultimately preparing its public

10   filings and whatever else.

11             THE COURT:  Did you ever give that underlying

12   financial data to Cordance?

13             MR. DONNELLY:  It's in the spreadsheet.

14             THE COURT:  See, that is kind of a circular

15   response.  The question I have is how Amazon keeps its

16   records.  Did you give that information to Cordance?  And,

17   you know, they can sit there and dig through that and try to

18   figure out how that stuff meshes and they may never be able

19   to do it.

20             MR. DONNELLY:  The underlying transactional

21   data, we didn't not give to Cordance.  If the Court is

22   asking if there is a description of what is in the public

23   filings, it's generally accepted accounting means.

24             THE COURT:  Okay.  The public filings are out

25   there.  You prepared Exhibit A to say here is the breakdown,

1    Cordance.  Here is our public filings.  Here is a breakdown

2    in relationship to our public filings.  Right?

3              MR. HADDEN:  Yes, Your Honor.  And we put up

4    Shelly Reynolds as a witness to explain Exhibit A.

5              THE COURT:  To be able to explain what they

6    took, what the sources were, what the information was, where

7    they got the information from, to put all these numbers

8    together.  She was able to testify to that?

9              MR. DONNELLEY:  As best she could.  And I think

10   she did a pretty good job in answering the questions that --

11             MR. ABRAHAMSEN:  May I jump in, Your Honor?

12             THE COURT:  No, you may not.  I'm trying to find

13   out exactly what Amazon did to get Exhibit A together.

14             MR. ABRAHAMSEN:  Sorry.

15             MR. DONNELLY:  As I understand it, Your Honor,

16   Ms. Reynolds worked with her team and people on her team

17   went to the data that is in Amazon's financial repositories

18   and assembled it.

19             MR. HADDEN:  These are all electronic databases,

20   Your Honor.  They ran the appropriate queries and put this

21   together.

22             THE COURT:  Does anybody know what queries they

23   actually made to put it together?  Or did anybody ever ask

24   those questions?

25             MR. DONNELLY:  No.

1          THE COURT:  All right.  Now, in response to this

2     particular issue, Bob, if you want to make a comment, you

3     can at this point.

4          MR. ABRAHAMSEN:  Sure.  Your Honor, the product

5     revenue lying in Exhibit A, our damages experts tells me

6     that that does match with what is in the 10-K.

7          THE COURT:  Yes.

8          MR. ABRAHAMSEN:  So we think the 10-K tie-out

9     binder would provide this information that you are talking

10    about that underlies the numbers in this report as well as

11    what is in their 10-K, so we're pretty confident the

12    information would be there.  Again, the document exists in

13    the ordinary course of business that they keep to underlie

14    their 10-K, and I think we're entitled to it.

15          I was just looking at the letters filed in

16    advance of November and we specifically asked for documents

17    underlying Amazon's SEC filings.  And Amazon specifically

18    committed producing quarterly reports that underlie its SEC

19    filings since the inception of the company.

20          THE COURT:  And I think that is what they're

21    saying they did with Exhibit A.

22          MR. ABRAHAMSEN:  Yes, Your Honor.  Okay.  But

23    we've been in correspondence.  And in conversations, we

24    asked over and over again we need documents underlying the

25    SEC filings, not some document prepared for the litigation

1    that is going to, you know, present the information.  Pretty

2    much the top, the information at the top is not much more

3    than what is in their SEC filings.  It's a restatement of

4    that broken out a little bit by, I think -- what was the

5    difference?  Maybe U.S. and maybe U.S. Other is different or

6    something like that, but it's very similar otherwise.  What

7    we need is the documents underlying this.

8              THE COURT:  And what I'm trying to find out is,

9    I'm not 100 percent certain, or necessarily certain based

10   upon what Amazon told me, that the particular documents that

11   you are requesting, that is, the 10-K tie-out binders, will

12   necessarily give you that information.  I don't want to

13   revisit this issue for the hundredth time.  I want to get it

14   done and I want to get it done now.

15             What I'm hearing from Amazon is two things:

16             One.  Judge, we really don't think the

17   information is going to be any different.  We think it's

18   just going to be a repeat.  The numbers in the tie-out

19   binders are just going to be a repeat of the numbers that

20   you have here.  That is the read I got from what Amazon

21   told me.  And,

22             Two.  There are a lot of comments in there

23   made by attorneys that we're going to be sitting there and

24   have to go through and exclude because they're subject to

25   attorney-client privilege.  That is what I'm hearing.

1            So I said, and I asked the question, are there

2    documents from which these 10-K tie-out binders or are there

3    other documents out there which tell you the breakdown or

4    provide you with the underlying numbers that end up going

5    into the product revenue, for example, or the total revenue

6    or the cost of sales?  That was my question.

7            MR. ABRAHAMSEN:  That's a question for Amazon;

8    right?

9            THE COURT:  That's a question for Amazon.

10   Obviously, I'm not asking Cordance because I don't think you

11   can answer that question.

12           MR. ABRAHAMSEN:  Okay.

13           MR. HADDEN:  So if the question is are there

14   documents that showed total revenue, I mean all those

15   documents would have been created from the same place that

16   Exhibit A was created, which is the financial database that

17   Amazon keeps and maintains.  So I think if there are issues,

18   Your Honor, like the inconsistencies that Cordance is now

19   raising between the operating profit in the 10-K and the

20   operating profit in Exhibit A or the gross profit in Exhibit

21   B and Exhibit A, we are happy to go try to resolve those

22   discrepancies.  If there are documents that show why this

23   number is different from that number, we will collect them

24   and produce them.

25           But it's, again, the notion of just doing the

1    10-K tie-out binders which I don't think will answer any

2    of these questions.  And we made an attempt in Exhibit A

3    to give them what they asked for, which is what we'll

4    ordinarily do.

5           Now, if there are questions about the internal

6    inconsistencies of Exhibit A, we're happy to try to resolve

7    those.  If there are documents that will enlighten that, we

8    will produce that.  But the notion that there is just a pile

9    of documents from which these numbers can be obtained, I

10   don't think that is the case.  This is all queries from a

11   database.  And if they need more information about what

12   queries were run, that they didn't ask during the deposition

13   of Ms. Reynolds, we're happy to try to answer those as well.

14   It's just the numbers are what they are, and we're happy to

15   try to explain them the best we can.

16          MR. ABRAHAMSEN:  Your Honor, what I think I'm

17   hearing is that even Amazon's lawyers don't know what is

18   in these tie-out binders.  The testimony was that is the

19   documentation underlying the SEC filings.  I understand the

20   difficulty producing it.  In fact, Amazon says I thought

21   that they would produce it.  Now they're saying they would

22   produce something else.

23          MR. HADDEN:  We produced Exhibit A, which is

24   what we were ordered to produce and what you asked for,

25   which specifically provides the financial information,

1    including operating profit and costs that you need for

2    reasonable royalty calculation.

3              THE COURT:  Have you looked at any of these --

4              MR. HADDEN:  10-K tie-out binders is a lot of

5    lawyer notes and a lot of things about a number of issues,

6    stock and employees and things that are not relevant to

7    reasonable royalty calculation.

8              THE COURT:  Stay with me for one moment, though,

9    from Amazon's perspective.  Have you actually looked at a

10   10-K tie-out binder?

11             MR. HADDEN:  I have not, but I have talked to

12   in-house counsel who had one in front of her and they struck

13   the witness.

14             THE COURT:  Did you check with in-house counsel

15   as to whether, in these 10-K tie-out binders -- one of

16   the things that you expressed to me was a concern about

17   attorneys' notes on issues that would be going before the

18   board or shareholders' matters and stuff like that.  I

19   agree with you.  In my mind, it's not relevant or there has

20   been no showing that it is relevant to the issue of what an

21   appropriate running royalty would be or reasonable royalty

22   would be.  Okay.  We can put that to one side.

23             Did she indicate to you or was it ever asked

24   that the information regarding the accounting materials was

25   separate?  That is, I mean it would seem to me there is a

1    possibility that these 10-K tie-out binders might have a

2    segment that would indicate the accounting aspect versus the

3    more legal aspect, the business aspect versus the more legal

4    aspect.

5         MR. HADDEN:  I think there are documents

6    relating to accounting included in the binders along with

7    the legal comments and documents supporting the

8    non-financial aspects of statements made in the 10-K.

9         THE COURT:  Well, do you know whether or not

10   they're separable?  Do you understand what I'm asking?

11        MR. HADDEN:  Yes, I do understand what you are

12   asking.  I believe at some level there must be copies of

13   those documents that are not part of the binders or, you

14   know, before they were provided to the lawyers for review

15   and comment.

16        THE COURT:  That's right.  That's what I'm

17   trying to find out.  If they exist, then producing just

18   those documents that relate to the financials, pure

19   financials without lawyers' comments I don't think

20   necessarily would be problematic.  First of all, you

21   have a ready-made non-attorney, no problem with the

22   attorney-client privilege arising because there would be

23   no attorney comments.

24        MR. HADDEN:  Yes.  I appreciate that, Your

25   Honor.

1           THE COURT:  And the other stuff in my mind

2    with the attorneys' comments on them and analysis and other

3    things that are unrelated to the financials, what would be

4    purely financial information, I don't think Cordance is

5    entitled to get at least in this analysis or argument that

6    they're making as to the purpose that they want to obtain

7    that information in the 10-K tie-out binders.

8           MR. HADDEN:  Understood, Your Honor.

9           THE COURT:  So I'm narrowing it.  And I think

10   you need to find out whether or not that information exists

11   because if this is all electronic stuff, at some stage it

12   was put on in an electronic database, at some stage before

13   there were actually comments made by attorneys.  I don't

14   know whether that is saved and I don't know whether it goes

15   back as far as 2004.

16          MR. HADDEN:  Okay.  We'll look into that, Your

17   Honor.

18          THE COURT:  I think you need to find out and

19   produce everything in that regard for the time periods that

20   are contained in Exhibit A.

21          MR. HADDEN:  Will do, Your Honor.

22          MR. ABRAHAMSEN:  Okay.  Your Honor, the other

23   financial documents we were looking for are the monthly

24   management reports.  And we've asked Amazon to explain to us

25   what is in those to see if it's really going to be helpful

1    or not, and we haven't got a coherent explanation yet.

2              If they can represent --

3              MR. HADDEN:  Yes, I can represent.  I have

4    one of those in front of me, Your Honor.  I think I can

5    short-circuit this.  The witness didn't know what was in

6    these.  There is nothing financial in them.  They are memos

7    with short term sales trends by category.  So, let's say,

8    shoes are up this month, CDs are down.  They're not relevant

9    to any of accused features.  They don't discuss the accused

10   features.  They don't have any financial information that

11   can be used for the calculation.

12             THE COURT:  So what you are representing to the

13   Court and to Cordance is these are general topics under

14   products rather than features, particular features that are

15   offered within the software or available via the website?

16             MR. HADDEN:  Exactly, Your Honor.  So there is

17   mention of a product being -- this Kindle product they have

18   for reading books electronically was mentioned on the Oprah

19   Winfrey show, so they had a boost in sales that month for

20   that.  That's the type of information in these reports.

21   It's very short term and it's not related to accused

22   features or any hard financials.

23             MR. ABRAHAMSEN:  Your Honor, if they can

24   represent that there is nothing in those reports that

25   talks about 1-click or feedback product reviews, and there

```
1   is no financial information, I don't think it's going to be

2   helpful to us and I don't think we need it, but I'd like

3   that representation at least.

4           THE COURT:  Well, are you looking for a

5   representation to be made today on this telephone call or in

6   some other format?

7           MR. ABRAHAMSEN:  It doesn't matter, Your Honor.

8   If they can look at them and confirm that for us in writing,

9   that will be sufficient.

10          THE COURT:  Why don't do you that.  Why doesn't

11  Amazon's counsel do that, please?

12          MR. DONNELLY:  That's fine, Your Honor.

13          THE COURT:  And that way, we can make it a

14  nonissue.

15          MR. DONNELLY:  Yes.

16          THE COURT:  All right.  Have we dealt with the

17  first issue completely?

18          MR. HADDEN:  I believe so, Your Honor.  We'd

19  like to -- you know, if we go back and if there are

20  financial documents that are referenced or included in the

21  10-K tie-outs that are not subject to attorney comment and

22  are relevant and we can produce them, we would like to be

23  through with this exercise.

24          THE COURT:  Well, I would hope that would be the

25  case.  I think the first thing that you need to do is to
```

```
 1    find out are there pristine, more pristine-type documents

 2    that end up or would be part of the 10-K tie-out binders

 3    prior to counsel touching them and making their comments,

 4    either directly on them or from another means, so I think

 5    finding that out first would be most helpful.  And if that

 6    is problematic, we need to address that issue.  So I think

 7    that is a short term -- finding out whether you have that

 8    information in general I think is a short term exercise that

 9    I believe -- what is today?  Wednesday.  That you should

10    probably be able to find out from your people by Tuesday.

11              MR. HADDEN:  Yes, Your Honor.

12              THE COURT:  And then if there is a problem with

13    it, then I think we need to readdress this and see how we're

14    going to solve it.  I would like not to have to revisit this

15    again myself, quite frankly.

16              MR. HADDEN:  Yes, Your Honor.

17              MR. ABRAHAMSEN:  Your Honor, there is one

18    remaining issue on that.  To the extent we have questions

19    about whatever documents are produced, we're going to try

20    and work with Amazon's counsel and get answers informally.

21    But in the event that doesn't work out, we want to at

22    least reserve the right to go back and take a deposition,

23    if necessary, to get some answers.

24              THE COURT:  You can.

25              MR. ABRAHAMSEN:  I just want to make sure
```

1    we're not giving up the right to do that at this point.

2                THE COURT:  You can reserve the right.  It

3    doesn't necessarily mean I will grant it.

4                MR. ABRAHAMSEN:  Sure.

5                THE COURT:  I'll allow that.  But, again, I

6    really do think a cooperative effort between counsel would

7    go a long way in that regard.

8                MR. HADDEN:  We have no reason, you know, to not

9    give these numbers or explain them.

10               THE COURT:  I didn't think so.  And I wasn't

11   suggesting that Amazon --

12               MR. HADDEN:  I appreciate that, Your Honor.  I

13   didn't mean to suggest otherwise either.

14               THE COURT:  Now, have we covered Cordance's

15   issues?  Counsel, have we completed with Cordance's issue?

16               MR. ABRAHAMSEN:  Yes, Your Honor.

17               THE COURT:  Now we'll go to Amazon's issue which

18   I understand Amazon's issue is predominantly focused on what

19   is contained in the privilege log and how the information is

20   maintained on the privilege log.

21               MR. HADDEN:  Yes, Your Honor.  This is Dave

22   Hadden for Amazon.

23               So there are two issues relating to claims of

24   privilege in this case.  The first has to do with the log.

25   As we indicate in our letter, it was huge, 400 pages, 5,000

1    entries.  There are thousands of entries with no support for

2    claim of privilege.  There is no author or there is no

3    recipient or there is no lawyer identified or the entry

4    explicitly indicates it was provided to a third-party, like

5    xns.org, which is a licensee of Cordance's patents.  So

6    there is no basis for counter-privilege with respect to a

7    huge chunk of these documents and we need Cordance to

8    provide a real log or produce the documents that are not

9    sufficiently supported in the log.

10            THE COURT:  One are the arguments that they

11   made, David, in their submission back was, gee, judge there

12   was no meet and confer on this particular issue.

13            MR. HADDEN:  Well, we actually sent them a

14   letter December 23rd.  There have been several calls since

15   discussing that.  At some level, there is no way we can have

16   a more meaningful meet and confer.  There are hundreds of

17   entries with no information that we can even talk about.  I

18   mean to have a reasonable meet and confer on specific

19   documents, we need a log that has some basis for the

20   hundreds of documents that there is no basis for now.

21            THE COURT:  Well, have you identified to them

22   the entries that are made on the privilege log for which you

23   argue or it is Amazon's position that Cordance has --

24            MR. HADDEN:  Yes, Your Honor.  We have.  In --

25            THE COURT:  -- failed?

1          MR. HADDEN:  -- two separate letters, we've

2    listed hundreds of entries that are improper and just not

3    close to having the required information.

4          THE COURT:  And what case are you relying upon?

5    Are you relying upon the *Apollo* case in this jurisdiction as

6    to what appropriate privilege log should contain?

7          MR. HADDEN:  In part, Your Honor.  Yes.

8          THE COURT:  I can't pronounce --

9          MR. HADDEN:  They have entries that have -- for

10   example, if you look at Exhibit D to our brief, you have an

11   entry on the first page.  It's from author Intermind, no

12   recipient, no cc, and just a claim of attorney-client

13   privilege.

14         THE COURT:  That was Items 12 and 13, I believe;

15   right?

16         MR. HADDEN:  It's PRIV09 on their log.

17         THE COURT:  Okay.  I see it.

18         MR. HADDEN:  Exhibit B is what I'm looking at,

19   Your Honor.

20         THE COURT:  All right.

21         MR. HADDEN:  And then there is one right below

22   that, PRIV10, which is from P. Heymann, who was the CEO, no

23   recipient, and another claim of privilege.  So I don't know

24   other than us saying what gives, I'm not sure how meaningful

25   a meet and confer we can have about this.

1              MR. ABRAHAMSEN:  Your Honor, if I think the

2    point is here this issue is just premature.  Both parties

3    have issues with the other party's privilege log.  We have a

4    phone call scheduled for this afternoon to discuss some of

5    these issues.  Yes, we got a letter a couple days before

6    Christmas and another one just a couple days ago which we

7    haven't had an opportunity to respond to yet because of the

8    holidays, but we're not dodging this issue.  We're willing

9    to address it and work with them.

10             And as far as the representations we've had

11   discussions about this, we've had no discussions concerning

12   the substance of the log.  We just haven't talked about it

13   yet.

14             THE COURT:  Counsel, you know what my thought

15   is on privilege logs?  They're about worth the piece of

16   paper they're written on, which doesn't say much.  Except

17   for the fact that I forget how many pages Exhibit D in

18   Amazon submission makes up.  I think it's over 400-and-some

19   pages.  And I can be quite frank with you.  I didn't go sit

20   there and go line by line through every one of these.

21             I do think that, however, what is good for the

22   goose is good for the gander and that your privilege log

23   should be consistent.  In other words, if Cordance is

24   lacking in some information and Amazon is lacking in like

25   information, the two of you have to be consistent with one

1    another as to what you are going to come agreement as to

2    what will be contained on your respective privilege logs.

3    And I would like the two of you to address that together,

4    have a discussion, go through it and say here are points

5    where we don't feel this is a privileged document because,

6    based upon the information you gave to us, it shows it was

7    distributed to a third-party or it shows that it was

8    distributed just to the CEO or the COO and there is no

9    indication of any attorney being involved in analyzing this

10   or reviewing it.

11            I recognize under the description part that is

12   a little bit problematic for both sides because the more

13   information you put in, the possibility of waiving the

14   privilege arises, but generally I found in most descriptions

15   the information to be extremely basic and extremely limited.

16   I'm not saying necessarily that Amazon or that Cordance is

17   necessarily bad, I'm just saying that I recognize that

18   becomes problematic under the description.  And when I see

19   work product in 1999, I'm kind of wondering the basis for

20   the work product when this lawsuit wasn't filed until 2006.

21   So there are those type of questions that even come up into

22   my mind about this.

23            I'm just saying the two of you, in developing

24   your respective privilege logs, what the Court is going to

25   require is that what agreement you come to as to how the

1    content of the privilege log is going to be and what is

2    going to be acceptable for one is going to be the same that

3    will be acceptable for the other.  So you come up with the

4    standards that you are going to use for your privilege log

5    and you live with it.

6              MR. ABRAHAMSEN:  Okay.

7              MR. HADDEN:  Okay, Your Honor.  And if we are

8    not able to get the information that at least Amazon is

9    agreeing to put forth, will we be coming back in front of

10   Your Honor?

11             THE COURT:  You can, but I would like some

12   direction from you as to what remedy you are looking for and

13   what you expect the Court to do.

14             MR. HADDEN:  Yes.  The remedy would be to

15   require them to provide reasonable information to support

16   a claim of privilege for these hundreds of documents or

17   produce the documents.

18             THE COURT:  Well, that is fine.  I would like a

19   little bit more direction from either one of you if this

20   issue re-arises as to what type of information you consider

21   necessary to be able to help you or appropriately help you

22   determine the basis for privilege balanced with the fact

23   that what type of information you may be requesting can only

24   go so far so that the privilege is not waived.

25             MR. HADDEN:  That is understood, Your Honor.

1    I'm just looking at Page 3 of our exhibits where there are

2    just rows of documents with no author, no recipient, no

3    date.

4              THE COURT:  Yes, I agree with you.  The absence

5    of dates I think is always problematic.  How do you know a

6    privilege exists?

7              MR. HADDEN:  Right.  There is a work product

8    claim for a bunch of documents that have no date, no

9    recipient, no author.

10             THE COURT:  Yes, I know.

11             MR. HADDEN:  I don't know what I can do with

12    that.

13             THE COURT:  Well, it doesn't tell you anything.

14    And, likewise, when I'm saying goose-and-gander situation,

15    I'm expecting both of you to live with the same rules in

16    this regard.  When you come up with the rules you are

17    willing to live with, I'll go along with that.

18             MR. HADDEN:  Understood, Your Honor.

19             The other issue related to instructions on

20    privilege of Mr. Reed.

21             MR. ABRAHAMSEN:  Your Honor, hold on.  Amazon

22    told us they would be dropping all issues except for the

23    privilege log issues here.  I'm a little puzzled as to why

24    this is being raised at this point.

25             MR. HADDEN:  I'm sorry if you misunderstood.  We

1   assumed that this is part of the same privilege issue.

2          THE COURT:  Wait a minute.  Wait a minute.  Hold

3   on.  What are you looking at?  What are you looking at that

4   Cordance feels is not on the table anymore?

5          MR. HADDEN:  I'm looking at the issue that is

6   the instruction of Mr. Reed's deposition that he not testify

7   whether or not he was looking at Amazon's own 1-click patent

8   when he drafted the claims in 2003 that he is now asserting

9   against Amazon.

10          THE COURT:  No, no.  I'm trying to find out --

11          MR. HADDEN:  He was instructed not to answer

12   that question.

13          THE COURT:  Oh, I understand what your issue,

14   what Amazon's issue is coming from.  I'm trying to find out

15   from Cordance what it's basing its argument on that this

16   issue is no longer teed up for this Court to consider.

17          MR. ABRAHAMSEN:  Your Honor, in Document 295,

18   which is our letter filed yesterday, Exhibit B to that

19   letter, and I will quote.  This is an e-mail from Amazon's

20   counsel to us stating the subject of our agreement.  "Does

21   Amazon agree to drop the issues raised in its letter filed

22   with the court today except the issues related to Cordance's

23   privilege log?"

24          THE COURT:  I'm looking at Exhibit B.  And this

25   is the e-mail from Jeff -- no, from Ryan.

```
 1                    MR. HADDEN:  You must be looking at a different

 2    e-mail.

 3                    MR. ABRAHAMSEN:  From Ryan Marton to me.

 4                    THE COURT:  Yes, to Mr. Abrahamsen.

 5                    MR. HADDEN:  Yes.

 6                    MR. ABRAHAMSEN:  And it begins:  "This is to

 7    summarize our call."

 8                    THE COURT:  Yes.

 9                    Okay.  The last paragraph, the last sentence is

10    what you are basing it on?

11                    MR. ABRAHAMSEN:  Yes.

12                    THE COURT:  Did you get any response, by the

13    way, from Amazon to this particular e-mail?

14                    MR. ABRAHAMSEN:  I'm sorry?

15                    THE COURT:  Did you get a response from Amazon

16    to this particular e-mail?

17                    MR. ABRAHAMSEN:  This was Amazon's e-mail to us.

18                    THE COURT:  I'm sorry.  I'm sorry.  That's

19    right.

20                    MR. ABRAHAMSEN:  I did respond with a few

21    clarifications but nothing to do with this paragraph.

22                    THE COURT:  Okay.  Well, Bob?

23                    MR. ABRAHAMSEN:  Yes.  I'm sorry, Your Honor?

24                    THE COURT:  Mr. Abrahamsen.

25                    MR. ABRAHAMSEN:  Yes, that is me.
```

```
 1                    THE COURT:  Hold on for a minute.

 2                    MR. ABRAHAMSEN:  Sure.

 3                    THE COURT:  This was Mr. Marton's e-mail to

 4       Mr. Abrahamsen and Mr. O'Neill; right?

 5                    MR. ABRAHAMSEN:  Right.

 6                    THE COURT:  Well, what is left then?

 7                    MR. ABRAHAMSEN:  We discussed the privilege log

 8       already.  I thought that was all that was on the table from

 9       Amazon's perspective.

10                    THE COURT:  Well, what is --

11                    MR. ABRAHAMSEN:  I was surprised when they

12       raised this other issue.

13                    THE COURT:  What is Amazon's response to this?

14                    MR. HADDEN:  Your Honor, this is Dave Hadden for

15       Amazon.

16                    THE COURT:  Yes.

17                    MR. HADDEN:  Our response was that we understood

18       the instruction on privilege was also still part of the

19       issues we were moving forward on.

20                    THE COURT:  Okay.  But if this was your e-mail

21       to them, then explain to me the last sentence.

22                    MR. HADDEN:  I can't find anything more than

23       what is there.  I did not write the e-mail.  I'm just

24       explaining my understanding of what our agreement was, Your

25       Honor.
```

1          THE COURT:  It says:  "Amazon agrees to drop

2     the issues raised in its letter filed with the court today

3     except for the issues related to Cordance's privilege log."

4          It certainly appears to me that Amazon took the

5     issue of what instructions occurred during a deposition off

6     the table.

7          MR. HADDEN:  We would like the issue addressed,

8     Your Honor.  I understand what that e-mail says.  If we to

9     raise this in another letter brief, I guess we can do that.

10          THE COURT:  You know what, guys?  What I really

11     think you ought to do is you ought to talk about this and

12     make sure that you have worked it out.  I mean I don't

13     know -- I don't know why it was taken, why Amazon agreed

14     to drop the issues raised in its letter which included

15     this particular issue that, Dave, you want to bring up --

16     Mr. Hadden wants to bring up.  I don't know what agreement,

17     if anything, that Amazon and Cordance came to on this

18     particular point.  Was there an agreement reached on this,

19     Jeff?

20          MR. ABRAHAMSEN:  I'm sorry, Your Honor?

21          THE COURT:  Okay.

22          MR. ABRAHAMSEN:  This is Bob Abrahamsen.

23          THE COURT:  Okay.  Bob, I apologize.  Who had

24     the conversation with Ryan?

25          MR. ABRAHAMSEN:  That was me.

1          THE COURT:  Bob?  Okay.  Was there an agreement

2    reached between Amazon and Cordance concerning what happened

3    during -- whose deposition was it?  I'm sorry.

4          MR. ABRAHAMSEN:  Drummond Reed.

5          THE COURT:  Mr. Reed's deposition.

6          MR. ABRAHAMSEN:  We didn't discuss that

7    specifically but Amazon told us they would drop everything

8    except for the issues relating to their privilege log.  Most

9    of the issues in Amazon's letter weren't even discussed

10   between us.  Amazon just agreed to drop them.

11         THE COURT:  I want the two of you to talk about

12   Mr. Reed's deposition and about the issue concerning, when

13   he was instructed not to answer particular questions because

14   "privilege was raised in that circumstance," and the basis

15   for that privilege and see if you guys can work it out.  And

16   I would suggest, Mr. Hadden, that you talk to Mr. Marton and

17   find out what he was thinking.

18         MR. HADDEN:  Yes, Your Honor.

19         THE COURT:  And maybe Mr. Marton and

20   Mr. Abrahamsen and you talk together on the phone and see if

21   you guys can come to an agreement.  I'm not going to discuss

22   it today because I don't think Cordance was prepared to go

23   forward with it.  I certainly wouldn't have been prepared if

24   I received this type of e-mail.

25         MR. HADDEN:  I understand, Your Honor.

1           THE COURT:  And if it needs to be addressed with

2    the Court, we will address it.  What were you looking for as

3    a solution for this in any event, Mr. Hadden?  At least your

4    thought for a solution.

5           MR. HADDEN:  An opportunity to get him to answer

6    the question, Your Honor.  My thought was if there are other

7    issues in the log that ultimately those documents end up

8    being produced and not privileged, we could have a short

9    deposition with him on those newly produced previously

10   withheld documents as well as this issue and resolve them

11   all in one fell swoop.

12          THE COURT:  So you want to reserve the right to

13   take a further deposition of Mr. Reed?

14          MR. HADDEN:  Yes, Your Honor.

15          THE COURT:  I'll allow you to reserve the right.

16   I'm not saying I will grant it.

17          MR. HADDEN:  I appreciate that, Your Honor.

18   Thank you.

19          THE COURT:  It's the same thing I gave to

20   Cordance.

21          MR. HADDEN:  I understand.

22          THE COURT:  Now, does that complete our

23   discussions today, counsel?

24          MR. HADDEN:  Yes, Your Honor.

25          MR. ABRAHAMSEN:  Actually, there is one

1   housekeeping thing I think we should address, Your Honor.

2   This is Bob Abrahamsen, again.

3           THE COURT:  Okay.  Bob, what is the concern?

4           MR. ABRAHAMSEN:  The agreement between the

5   parties, we agreed to extend the disclosure deadlines for

6   expert reports under certain terms.  Currently, that

7   deadline is Friday of this week and we want to make sure our

8   agreement is not going to be inconsistent with the Court's

9   order.  I don't know how you want us to address that.  This

10  is not something that will affect your schedule at all.

11  This is just the expert disclosures.  Do you want us to file

12  a stipulation with the Court?

13          THE COURT:  I think it would be a good idea so

14  we have a record both sides agree to it.  As you know, I

15  really don't care what you do with your time.  I'm more

16  concerned with what you do with my time.

17          MR. ABRAHAMSEN:  Yes.  Understood.

18          MR. HADDEN:  Yes, Your Honor.

19          THE COURT:  And to the extent you need

20  additional time, I'm usually not the one to block it if both

21  of you are in agreement on that point.

22          MR. ABRAHAMSEN:  Okay.  So we will get a

23  stipulation on file then, Your Honor.

24          THE COURT:  All right.  David, do you understand

25  that the parties are in agreement on that point?

1                 MR. HADDEN:  I do, Your Honor.

2                 THE COURT:  All right.  Just get me a

3     stipulation so we have a track record of it, an order

4     actually out there, and a stipulation.

5                 I appreciate the effort that both Amazon and

6     Cordance's counsel made in narrowing the issues for the

7     discussion today.  Thank you.

8                 (The attorneys respond, "Thank you, Your

9     Honor.")

10                 THE COURT:  Take care, counsel.  Good-bye now.

11                 (Telephone conference ends at 12:40 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25