## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

CORDANCE CORPORATION,

       Plaintiff,

       v.

AMAZON.COM, INC. and
AMAZON WEB SERVICES, LLC,

       Defendants.

)
)
)
)
)
)
)
)
)
)
)

C.A. No. 06-491-MPT

**JURY TRIAL DEMANDED**

**PUBLIC VERSION**

## DECLARATION OF DR. LORENZO ALVISI IN SUPPORT OF
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Richard L. Horwitz (#2246)
David E. Moore (#3983)
D. Fon Muttamara-Walker (#4646)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
fmuttamara-walker@potteranderson.com

OF COUNSEL:

Lynn H. Pasahow
J. David Hadden
Darren E. Donnelly
Saina S. Shamilov
Ryan Marton
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Tel: (650) 988-8500

*Attorneys for Defendants*
*Amazon.com, Inc. and*
*Amazon Web Services, LLC*

Dated: January 23, 2009
Public Version Dated: January 30, 2009
899849 / 30763

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORDANCE CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 06-491-MPT |
| v. | ) | |
| | ) | |
| AMAZON.COM, INC. and | ) | |
| AMAZON WEB SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF DR. LORENZO ALVISI IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

I, Lorenzo Alvisi, Ph.D., hereby declare as follows:

1.     I am a Professor at University of Texas (UT) at Austin in the Department of Computer Sciences, where I founded and currently serve as co-director of the Laboratory for Advanced System Research (LASR) (now comprising six faculty members), which conducts leading-edge research in distributed systems, networking, security, and operating systems. I joined the faculty at UT in 1996 as an Assistant Professor. While at UT, I was also a Visiting Professor in the Department of Computer Science of several universities including Cornell University, the Sapienza University in Rome and the University of Trento.

2.     Before joining the faculty at UT, I was a graduate student at Cornell University, completing my Ph.D. (1996) and M.S. (1994) degrees in Computer Science and an undergraduate student at University of Bologna, Italy where I obtained a Laurea degree *summa cum laude* in Physics in 1987.

3.     My research focus is in the area of dependable distributed computing—my goal is to build distributed systems that will reliably do what we ask of them, and nothing else, despite

disruptions due to hardware or software failures, environmental causes, or even malicious attacks.

4.   The type of systems that I research form the foundation for computing on the scale of, and with the dependability requirements of, that performed by the defendants in this case.

5.   My work has been recognized with multiple *best paper* awards from some of the most prestigious conferences in distributed and fault tolerant systems, including the bi-annual ACM Symposium on Operating Systems Principles (SOSP – in 2005 and 2007), the USENIX Technical Conference (2007), the IEEE Conference on Dependable Systems and Networks (DSN – in 2005) and the International World Wide Web Conference (2001). I was selected as a Sloan Research Fellow in 2001, and I received the NSF CAREER Award in 1998 and the IBM Faculty Partnership Award in 2001 and 2002.

6.   I served as Technical Program Chair for two highly prestigious conferences in the field: the IEEE International Conference on Dependable Systems (in 2006) and the ACM Symposium on the Principles of Distributed Computing (in 2009) and as Technical Program Co-chair or Vice chair of several other conferences and workshops and Technical Program Committee member of over 40 international conferences and workshops. I am currently serving on the Steering Committee for DSN and on the Editorial Board of the journals IEEE Transactions on Dependable and Secure Computing (since 2005), of ACM Computing Surveys (since 2005) and Springer-Verlag Distributed Computing (since 2008).

7.   I have authored more than seventy publications pertaining to computer science. I have taught numerous formal and informal courses and seminars on computer science. In addition, I have been serving on the Scientific Advisory Board of the Bertinoro International

2

Center for Informatics since its inception in 2001.  My *Curriculum Vitae* is attached hereto as Exhibit A.

8.      I have been retained by Defendants in this action, Amazon.com, Inc. and Amazon Web Services, LLC (collectively "Amazon") to provide my expert opinions on certain issues in this case.

9.      I understand that Cordance asserts several patents against Amazon in this litigation.  I have reviewed all the currently-asserted patents: U.S. Patent No. 5,863,325 (the '325 Patent), U.S. Patent No. 6,088,717 (the '717 Patent) and U.S. Patent No. 6,757,710 (the '710 Patent).  I have also reviewed U.S. Patent No. 6,044,205 (the '205 Patent) to which the asserted patents claim priority.  I have also reviewed prosecution histories of all these patents.[1]

10.     The '710 Patent is the last in a family of patents that originated with the filing of the '205 Patent in February 1996.  The '205 Patent introduces a communications system that automates a communications relationship between two entities – referred to in the patent as an information provider and an information consumer – by replicating and transferring copies of "communications objects" or "control structures" from the database of the provider to the consumer.  The '710 Patent includes all the '205 Patent disclosures and both patents describe the same general invention.

11.     Cordance's patents describe "an automated communication system which coordinates the transfer of data, metadata, and instructions between databases in order to control

---

[1] Patent Numbers 5,862,325, 6,044,205, and 6,088,717 cited herein refer to D.I. 174 and Patent Number 6,757,710 refers to D.I. 175.  The prosecution history of U.S. Patent No. 6,004,205 refers to D.I. 176; the prosecution history of U.S. Patent No. 5,862,325 refers to D.I. 177-178; the prosecution history of U.S. Patent No. 6,008,717 refers to D.I. 179-180; and the prosecution history of U.S. Patent No. 6,757,710 refers to D.I. 183-184.

and process communications." '205 Patent at 1:9-14; '710 Patent at 1:16-19.  The Abstract

states that the invention is one in which

> [a]n automated communications system operates to transfer data, metadata
> and methods from a provider computer to a consumer computer through a
> communications network.  The transferred information controls the
> communications relationship ...

'205 Patent, Abstract; '710 Patent, Abstract.

12.     In particular, Cordance explained that its invention addresses the need "for an

automated communications system which allows providers and consumers to quickly and easily

establish an automated communications relationship[.]"  '205 Patent at 5:62-65; '710 Patent at

7:63-66.

13.     Specifically, Cordance addressed this need with a communications system in

which "software programs being executed by a provider computer and consumer computer

communicate directly."  '205 Patent at 6:6-9; '710 Patent at 8:9-13.  The '205 Patent explains

that "[c]ommunications objects are the core data structure transmitted from the provider program

to the consumer program to control communications between the provider and consumer."

'205 Patent at 13:31-34.  "Communications objects encapsulate communications data, metadata,

and methods for automating communications with the provider of the object."  *Id.* at 42:52-54.

Likewise, the '710 Patent explains that "methods in the *communications objects* are used to

automate control of underlying communication operations."  '710 Patent at 9:33-35 (emphasis

added).

14.     To obtain its patents Cordance argued to the Patent Office that the exchange of

this control structure from provider to consumer was a distinguishing feature of its invention and

relied on it to distinguish prior art communications systems in which "no control structure [is]

transferred from provider to consumer to control communications."  *See e.g.* App. Exhs. 11-13.

4

15.     Thus, the key aspect of Cordance's invention described in the patent specifications is the use of a "communications object" or "control structure" that is transferred between a provider and consumer computer, and includes processes to control future communications between those computers.

## One Skilled in the Art

16.     Having reviewed the asserted patents and their associated prosecution histories, it is my opinion that one skilled in the art would have the following attributes. One skilled in the art would be familiar with the types of systems cited in the Invention Disclosure Statements submitted during the prosecution of the asserted patents. Additionally, one skilled in the art would have experience building distributed computing systems, or equivalent academic training.

## Non-Infringement

17.     I understand that Cordance alleges that Amazon infringes claims 20, 109, 111, 112, 113, 119, and 125 of the '325 Patent and claims 50, 74, 96, and 97 of the '717 Patent.

18.     I understand that the Court has construed the term "feedback information" contained in the all of the asserted claims of the '325 and '717 to mean "evaluation attributes and corresponding value choices." Memorandum Order re Claim Construction (D.I. 279) at 8.

19.     I understand that Cordance accuses what it calls a "buyer/seller feedback" feature on Amazon's website. I have examined this feature on Amazon's website. This feature allows Amazon users to post text-based comments and provide an overall rating of parties that buy or sell products through Amazon's website.

20.     I understand that Cordance also accuses a feature of Amazon's website that allows Amazon's users to review products offered for sale through the website. I have examined this feature on Amazon's website. This feature for all product reviews (with the possible

exception for toys, wireless carrier, and restaurant categories during certain periods) similarly allows users to post only reviews in the form of text-based comments and an overall product rating.

21.     Upon my examination of the accused features, I conclude that neither the "buyer/seller feedback" feature nor the product review feature (with the possible exception for toys, wireless carrier, and restaurant categories during certain periods) provide Amazon users with the ability to rate people or products based on predefined characteristics, *i.e.* "evaluation attributes," of the person or product.

## Written Description

22.     I understand that Cordance alleges that Amazon's 1-click feature infringes claims 1, 2, 3, 5, 6, 7, 8, and 9 of the '710 Patent.  I have reviewed the Memorandum Order Re Claim Construction issued in this case.

### The '205 Patent Specification Does Not Contain an Adequate Written Description of the '710 Patent Claims

23.     I understand that the '710 Patent claims priority to the '205 Patent, the '325 Patent, and the '717 Patent.  *See* '710 Patent at 1:4-12.

24.     Upon reviewing the '205 Patent, it is my opinion that the specification of the '205 Patent does not describe any infrastructure or methodology for conducting online or electronic purchase transactions.  It is my further opinion that the patent does not describe, suggest or imply any step of "automatically completing the purchase of an item from the seller" as required by the asserted claim 1 (and each of its dependent claims) or "automatically completing the purchase of an item" as required by the asserted claim 7 (and each of its dependent claims) of the '710 Patent.

6

25.     I understand that during discovery in this litigation, Cordance responded to an

interrogatory propounded by Amazon with a list of citations from the application that issued as

the '205 Patent that Cordance maintains support the asserted claims of the '710 Patent. *See*

Cordance's Third Supplemental Response to First Set of Interrogatories (Interrogatory 8) at 7-9.

I note that Cordance did not identify any passages of the application that issued as the

'205 Patent that it contends support claim 6 of the '710 Patent.  I have reviewed in detail

passages of the application identified by Cordance.  None of the elements of the asserted claims

of the '710 Patent are described in those passages.

26.     The only passage identified by Cordance that alludes to online purchases or

product ordering is at column 10, lines 48-54 of the '205 Patent:

> Or the provider can include special forms to be processed by the
> consumer program 22 that allow the consumer to automatically or
> semi-automatically transfer data from the consumer database 21 back
> to the provider.  Examples include product order forms, survey forms,
> customer service request forms, scheduling forms, etc.

Although this passage mentions product order forms, the specification does not describe in

response to receiving a completed order form from the consumer the step of "automatically

completing the purchase of an item from the seller" as required by claim 1 (and all its dependent

claims) or "automatically completing the purchase of an item from the information consumer" in

claim 7 (and all its dependent claims).

27.     Attached as Exhibit B to this declaration is a chart that explains how each portion

of the application that issued as the '205 Patent identified by Cordance as supporting the

'710 Patent claims lacks adequate description of the claimed elements.

28.     Moreover, in my opinion, none of the portions of the '205 Patent specification,

whether identified by Cordance or not, support the asserted claims of the '710 Patent.  The

'205 Patent specification does not mention, let alone discuss, online or electronic purchasing

7

transactions. The '205 Patent does not contain a description sufficient to convey to one of

ordinary skill that the inventor conceived of using any data or metadata to "automatically

complete" an online purchase of an item as required by all the asserted claims of the '710 Patent.

29.    I have carefully reviewed deposition testimony of Mr. Drummond Reed provided

in this litigation.

**REDACTED**

App. Exh.[2] 2 at 223:7-225:5 and 225:21-229:12; '205 Patent at 40:59-44:55. The

Acknowledgement section generally describes that a receipt of the form by the provider can

trigger an automatic response or automatic processing of the form.

30.    The only automatic response process described in the '205 Patent is the following:

> When the transmission containing the form data is received by the
> provider program 12, the transmission can indicate the system ID
> of the originating communications object. It can also indicate the
> name of the response processing method associated with this
> object which can be used to automate the processing of the form
> data for the provider.

'205 Patent at 41:48-54. This statement simply indicates that the name of a method associated

with the object that initiated the transmission of the form data can be included with the form data

and used to process the data. The statement does not describe what process is performed, or

even suggest that the processing has anything to do with purchasing an item. Thus, the statement

does not describe "automatically completing the purchase of an item" (when read alone or with

any other portion(s) of the '205 Patent) as required by both claims 1 and 7 and their dependent

claims. In sum, the '205 Patent does not describe or convey to one skilled in the art the

---

[2] All documents cited herein as "App. Exh." refer to exhibits contained in the Appendix in
Support of Defendants' Motions for Summary Judgment filed concurrently herewith.

invention for "automatically completing the purchase of an item" in an online purchase transaction.

<u>The '710 Patent Specification Does Not Contain an Adequate Written Description of the '710 Patent Claims</u>

31.   I have also reviewed in detail the parties' claim construction briefs filed with the Court in this litigation. It is my understanding from those briefs (*e.g.*, Cordance's Opening Claim Construction Brief (D.I. 192) at 12), Mr. Reed's deposition testimony and statements made by Cordance during prosecution of the '710 Patent (see App. Exh. 21) that Cordance maintains the "Payment Service Objects and Partner Servers" section of the '710 Patent supports the '710 Patent claims. I note that the "Payment Service Objects and Partner Servers" section is not included in the '205 Patent. The "Payment Service Objects and Partner Servers" section generally describes using communications objects in payment transactions. The section does not describe the steps of claim 1 or 7 or provide sufficient description such that one skilled in the art would understand that Cordance, Mr. Reed, or the authors of these sections envisioned the use of communications objects in completing purchase transactions.

32.   The only passage in the "Payment Service Objects and Partner Servers" section that relates to completing a purchase transaction is at column 122, lines 27-35 of the '710 Patent:

> Now a data exchange method 141 on the payment partner server 1302 can carry out the purchase order transaction using the verified purchase order data, the verified customer account certificate, and the verified merchant account certificate (step 4466). This may involve any sequence of steps between the payment partner server 1302 and other payment servers or data processing systems, such as the consumer's bank or credit clearinghouse, a credit card processor, a cybercash server, and so on.

Neither in the passage itself nor anywhere else in the "Payment Service Objects and Partner Servers" section nor elsewhere in the '710 Patent specification is there a description of "verified

purchase order data, the verified account certificate, and the verified merchant account certificate" being used to "carry out the purchase order transaction."

33.    There is not enough information in the patent for one skilled in the art to understand how the inventors contemplated the certificates and purchase order data would be used to carry out the transaction. The patent does not even describe or suggest what is meant by carrying out the purchase order transaction.

34.    In addition, the statement "any sequence of steps" is not an adequate description to convey to one of ordinary skill that the inventor had in his possession an invention to "carry out the purchase order transaction." For example, the sequence of steps required to carry out the purchase transaction between the payment partner server and a consumer's bank can be very different from the sequence of steps that may be required between the payment partner server and a cybercash server. There is no information provided in the specification of what these "any sequence of steps" may entail or whether they are automatic or manual, or whether the inventor had even contemplated that as part of his invention.

35.    Certainly, one skilled in the art would not understand from reading the above passage, the "Payment Service Objects and Partner Servers" section or the remainder of the '710 Patent specification that the inventor contemplated how many mouse clicks or other user actions were required to order an item. One skilled in the art after reading the '710 Patent would not understand that the patent described a method or a system for completing purchase transactions with one mouse click, or any number of mouse clicks for that matter.

36.    Claim 1 and its dependent claims require "automatically completing the purchase of an item from the seller." '710 Patent at 144:49-50. Claim 7 and its dependent claims require "automatically completing the purchase of an item from the information consumer." *Id.* at

10

145:9-11. I have reviewed Cordance's infringement contentions provided in this litigation, and it is my understanding that Cordance does not draw any distinction between the terms "seller" and "information consumer." *See, e.g.*, App. Exh. 35. I thus describe the following opinions with references to the phrase in claim 1, but my analysis equally applies to the phrase in claim 7.

37.   The '710 Patent does not describe "automatically completing the purchase of an item from the seller." The "Payment Service Objects and Partner Servers" section describes transmission of purchase orders from buyers to payment partner servers. Payment partner servers in the patent are intermediary entities between buyers and sellers. The '710 Patent specification does not describe anything the seller does when it somehow receives a purchase order.

38.   I understand from reading the claim construction papers filed with the Court that Cordance maintains that a statement in the '710 Patent specification that suggests that the payment partner server can be combined with other functionality supports "automatically completing the purchase of an item from the seller" requirement of the claims. *See* Cordance's Answer Claim Construction Brief at 17. The statement relied on by Cordance is:

> In another embodiment of the present invention, the functions of either or both programs 12, 22 and databases 11, 21 can be combined with a partner server 1302 and a partner server database 1301.

'710 Patent at 128:51-54.

39.   This statement is not included in the "Payment Service Objects and Partner Servers" section and one skilled in the art would not understand from reading this statement or the remainder of the '710 Patent specification that the payment partner server can be combined with seller functionality. The patent describes how the payment partner servers mediate the interactions between buyers and sellers and facilitate secure financial transactions between those parties. Combining the functionality of the seller with the payment partner server would defeat

11

the very purpose of using payment partner servers as an intermediaries between buyers and sellers. In addition, even if a payment partner were also a seller, the patent still does not describe automatically completing the purchase of an item. One of skill in the art after reading the 144-column specification would not understand Cordance to have invented a system for automatically completing the purchase of an item as claimed in the '710 Patent.

40.   The '710 Patent specification also does not describe "receiving from the customer *an indication to initiate a purchase transaction* for purchasing the item *including metadata associating said customer with said transaction,*" as required by the third element of claim 1 of the '710 Patent. '710 Patent at 144:45-48 (emphasis added). I understand the Court construed "metadata associating said customer data with said transaction" as "data that is used to identify the stored customer data as data to be used in completing the transaction." D.I. 279 at 4-5.

41.   I understand that Cordance claims that the "customer account certificate" discussed at column 122, lines 27-35 of the '710 Patent is the "metadata associating said customer data with said transaction." The conclusory statement that the purchase order can be carried out by the "customer account certificate" does not describe the further limitation that the customer account certificate must associate said customer data with said transaction. There is no passage in the specification that describes what data, if any, is identified by the "customer account certificate." Nor is there a description of using the "customer account certificate" to "identify the stored customer data" that is to be used to complete the purchase transaction as is required by the Court's construction.

42.   The '710 Patent specification also does not describe completing a purchase "by processing said metadata associating said customer data so as to complete the purchase transaction" as is required by the last element of claim 1 of the '710 Patent. '710 Patent at

12

144:50-52. I understand the Court construed the phrase "processing said metadata associating said customer data so as to complete the purchase transaction" to mean "using the metadata to retrieve the stored customer data and using the retrieved data to complete the purchase transaction." D.I. 279 at 5. The specification does not describe how any metadata is used to retrieve any customer data that is then used to complete the purchase transaction. There is no disclosure that suggests using the customer account certificate to retrieve customer data.

43.     Thus, one of ordinary skill reading the specification would not have understood the inventor to have in his possession the invention claimed by the '710 Patent claims.

## Invalidity

44.     I have reviewed Cordance's infringement theories provided during discovery in this litigation. I understand that Cordance alleges that Amazon's 1-click feature, that allows customers to purchase items on Amazon's website with a single click on a "1-Click" button infringes claims 1, 2, 3, 5, 6, 7, 8, and 9 of the '710 Patent.

45.     The elements of independent claims 1 and 7 are very similar. One difference is that claim 1 includes terms "customer," "seller," and "purchase transaction" and claim 7 includes terms "information provider," "information consumer," and "online transaction." Compare '710 Patent, claims 1 and 7. In its infringement contentions, Cordance does not draw a distinction between these terms and the scopes of claims 1 and 7 and treats "information provider" as "customer," "information consumer" as "seller," and "online transaction" as "purchase transaction." See, e.g., App. Exh. 35.

46.     I have also reviewed source code referenced in the Declaration of Craig Kulfan and produced in this litigation with production reference AMAZON SC LAPTOP 00013\AllFilesJune1995\AllFilesJune1995, specifically directories named "acwb," "customer,"

"distributor," "libamazon++," "manaus" and "src" (referred hereafter as "Amazon source code"). It is my understanding that this source code was used to run the amazon.com website in or before July 1995.  Declaration of Craig Kulfan ("Kulfan Decl.") at ¶¶ 9-10.  I have analyzed the source code in detail, and based on this analysis, I describe below how Amazon's online purchasing system worked in 1995.

47.    I have also reviewed relevant portions of the deposition testimony of Sheldon J. Kaphan provided in *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, United States District Court, Western District of Washington, Case No. C99-1695P, and the testimony describes the Amazon source code I reviewed.

**REDACTED**

14

**REDACTED**

53.     I am familiar with Cordance's infringement contentions regarding the 1-Click feature of the Amazon website. Because the asserted claims do not distinguish between initiating a purchase with a "one-click button" or shopping cart "confirm order" button, Amazon's prior art system available in 1995 Cordance's contentions do not provide substantial basis for distinguishing this prior art.

REDACTED

                                                                    . *See*

App. Exh. 36. In this scenario, the customer performs similar steps as in the 1995 version system to place items in his or her shopping cart, but initiates the purchase of the items by clicking a "1-click to check out" button rather than a "confirm order" button.

55.     In my opinion, Amazon's prior art system available in 1995 performed each and every element of the asserted claims of the '710 Patent.

56.     I have reviewed the Court's claim construction order entered in this case and apply the Court's constructions in my analysis.

57.     The first element of independent claim 1 is "providing a customer data storing information for a customer usable to automatically complete an on-line purchase of an item from a seller." '710 Patent at 144:39-41. I understand that the Court construed the term "providing a customer data storing information for a customer" to be "making available for use data about a customer that is stored in a data storage medium." D.I. 279 at 3. Amazon's prior art system performed this element.

REDACTED

16

**REDACTED**

58.    The second element of independent claim 1 is "providing the customer with information from the seller with respect to an item." '710 Patent at 144:42-43.

**REDACTED**
Upon selection of a graphical representation of a book, the customer was presented with detailed information about the book. Thus, Amazon's prior art system performed this element.

59.    The third element of independent claim 1 is "receiving from the customer an indication to initiate a purchase transaction for purchasing the item including metadata associating said customer data with said transaction." '710 Patent at 144:45-48. The Court construed the phrase "metadata associating said customer data with said transaction" to mean "data that is used to identify the stored customer data to be used in completing the transaction." D.I. 279 at 4-5.

**REDACTED**

60.    The last element of claim 1 is "in response to the received indication, automatically completing the purchase of an item from the seller by by [sic] processing said metadata associating said customer data so as to complete the purchase transaction." '710 Patent

17

at 144:49-52. I understand that the Court construed the phrase "processing said metadata associating said customer data so as to complete the purchase transaction" as "processing the metadata to retrieve the stored customer data and processing the retrieved customer data to complete the purchase transaction." D.I. 279 at 5. As I explain above, none of Cordance's patents include enough detail for one skilled in the art to understand that Cordance contemplated a purchase transaction could be competed automatically, or how it would be done. *See* ¶¶ 22-43, above.

**REDACTED**

61.     I understand that Cordance also asserts claim 7 in this litigation. Claim 7 includes limitations that are similar to claim 1. I have reviewed Cordance's infringement contentions, and conclude that Cordance draws no distinction between the scope of these two claims. Cordance matches the elements of claim 1 to Amazon's 1-click feature and elements of claim 7 to Amazon's 1-click feature in the same manner. *See, e.g.*, App. Exh. 35.

62.     The first element of claim 7, similarly to the first element of claim 1, requires: "providing an information provider data storing information for an information provider usable to automatically complete a proposed on-line transaction, including metadata associating said information with said transaction." '710 Patent at 144:66-145:3. As construed by the Court, I understand the term to mean "making available for use data about a provider of information that

is stored in a data storage medium usable to automatically complete a proposed on-line transaction, including data that is used to identify the stored customer data as data to be used in completing the transaction." D.I. 279 at 3. Amazon's prior art system performed this element.

**REDACTED**

63.     The second element of claim 7, similarly to the second element of claim 1, requires: "providing the information provider with information from an information consumer with respect to a proposed transaction." '710 Patent at 145:4-6.

**REDACTED**

64.     The third element of claim 7 requires: "receiving from the information provider an indication to complete the proposed transaction." '710 Patent at 145:7-8. After reading Cordance's infringement contentions, it is my understanding that Cordance alleges that a single click by the customer on the "Purchase with 1-Click" button on Amazon's website is both "indication to initiate" and "indication to complete" a transaction. *See, e.g.*, App. Exh. 35. As

**REDACTED**

65.    The last element of claim 7 is "in response to the received indication,
automatically completing the purchase of an item from the information consumer by accessing
the information provider data to retrieve the information and process the retrieved information by
processing said metadata associating said information with the proposed transaction so as to
complete the proposed transaction." '710 Patent at 145:9-146:4.  I understand based on the
Court's construction of the similar element in claim 1 that the Court meant to construe
"processing said metadata associating said information with the proposed transaction so as to
complete the proposed transaction" as "processing the metadata to retrieve the stored information
and processing the retrieved information to complete the purchase transaction."  D.I. 279 at 5.
As I explain above, none of Cordance's patents include enough detail for one skilled in the art to
understand how Cordance contemplated a purchase transaction can be completed automatically.
*See* ¶¶ 22-43, above.  Should the Court not agree with my opinion, Amazon's prior art system
performed this element.

**REDACTED**

**REDACTED**

66.     I understand that Cordance also asserts claims 2 and 9 in this litigation. Claim 2

depends from claim 1 and claim 9 depends from claim 7. Both claims include nearly identical

limitations. Claim 2 includes "wherein the customer data is maintained as an object" and claim 9

includes "wherein the information provider data is maintained as an object." '710 Patent, claims

2 and 9. I understand from reading Cordance's infringement contentions that Cordance alleges

Amazon's representation of customer data as an object in its software meets the limitation of

these claims. *See, e.g.*, App. Exh. 35. But, if this is enough to meet the limitation of the claims,

**REDACTED**

67.     Claim 3 depends from claim 1 and adds a limitation: "processing said metadata

includes processing said metadata to retrieve at least a portion of said customer data from an

associated data store for use in completing the transaction." '710 Patent, claim 3.

**REDACTED**

21

68.     Claim 5 depends from claim 1 and adds a limitation of "the customer data is retrieved from a computer of the seller." '710 Patent, claim 5.  Claim 8 depends from claim 7 and adds the limitation "the information provider data is stored in a computer of the information consumer." *Id.*, claim 8.

**REDACTED**

69.     Claim 6 depends from claim 1 and adds the following limitation "the customer data is retrieved from a third party's computer." '710 Patent, claim 6.  I understand from reading Cordance's infringement contentions, that Cordance accuses Amazon of infringing this claim by alleging that merchants selling items through Amazon's website are sellers and Amazon is the third party that stores customer information. *See, e.g.*, App. Exh. 35.  It is my opinion, that Cordance's allegations with respect to claim 6 are not based on technical differences between functionality used when Amazon is the seller versus when third parties are selling items through amazon.com, but instead on accounting distinctions between the two scenarios.  Cordance seems to accuse the same technology and functionality for claim 5 and for claim 6.  In addition, in my opinion, it would have been trivial to one skilled in the art after becoming familiar with Amazon's prior art system to accommodate that system for sale of books provided by other merchants.  Indeed, one skilled in the art would not have to make any significant technical changes to Amazon's prior art system to start selling items from various sellers.

70.     I have reviewed the Declaration of Darren New and Exhibit B attached to his declaration.  My analysis below is based on my understanding of how the First Virtual system

operated in October of 1994 as learned from the Declaration of Darren New and Exhibit B to his declaration.

71.     In my opinion, the First Virtual system as described by Darren New in his declaration performed each and every element of the asserted claims of the '710 Patent. The First Virtual System is an implementation of the architecture described in the "Payment Service Objects and Partner Servers" section ('710 Patent at 119:26-123:28) of the '710 Patent specification: a partnership between sellers and payment servers based on separation of concerns.

72.     The First Virtual system performed the first element of claim 1, which as construed reads as "making available for use data about a customer that is stored in a data storage medium usable to automatically complete an on-line purchase of an item from a seller." '710 Patent, claim 1, D.I. 279 at 3. Before the buyer could use the First Virtual system, the buyer had to open an account with First Virtual and provide personal information such as name, address, credit card number, etc. to the system. *See, e.g.,* New Decl., Ex. B at AMZC645553, AMZC645612. The system stored this information in data storage mediums of First Virtual computers. *Id.* The stored buyer information was used to automatically complete purchases of electronic documents or other electronic information offered by First Virtual or other sellers.

73.     The First Virtual system also performed the second element of claim 1, "providing the customer with information from the seller with respect to an item." The system displayed items available for purchase to the buyers via Infohaus, First Virtual's catalog of electronic items available for purchase. *See, e.g.,* New Decl., Ex. B at AMZC645555-56. The system also provided buyers after they decided to purchase items viewed under "letting buyers try before they buy" policy with emails that included descriptions of items viewed by buyers and

23

available for purchase. *Id.* at AMZC645560-AMZC645565; New Decl. ¶ 11. The emails included buyers' names, sellers' names, descriptions of the items, their price, and price currency. *Id.*

74.     The First Virtual system also performed the third element of claim 1 that was construed by the Court to mean "receiving from the customer an indication to initiate a purchase transaction for purchasing the item including data that is used to identify the stored customer data as data to be used in completing the transaction." D.I. 279 at 4-5 (construing "metadata associating said customer with said transaction"). To purchase an item the buyer viewed under First Virtual's "letting buyers try before they buy" policy, the buyer responded with a word "yes" to the email received from First Virtual. *See, e.g.*, New Decl., Ex. B at AMZC645556, AMZC645557, AMZC645560-AMZC645562. Upon receipt of the "yes" response, the system parsed a transaction code required to be included in the subject line of the email (the transaction code was always transmitted in the subject like of the email from First Virtual sent to the buyer). New Decl. ¶ 11, Ex. B at AMZC645560-AMZC645565. The transaction code was used by the system to identify buyer information stored at First Virtual computers. *Id.* ¶ 11.

75.     The First Virtual system also performed the last element of claim 1, which was construed by the Court to mean "in response to the received indication, automatically completing the purchase of an item from the seller by processing the metadata to retrieve the stored customer data and processing the retrieved customer data to complete the purchase transaction." D.I. 279 at 4-5. In response to the received "yes" response from the buyer, the First Virtual system completed the purchase without any further input or interaction from the customer. New Decl. ¶ 11. The system used the transaction code retrieved from the subject line of the "yes" response and used the transaction code to locate a transaction record stored in a database at First Virtual's

computers. *Id.* The transaction record included the seller's account number, the buyer's account number, the item, and the price. The system then used the buyer's account number from the transaction record to look up buyer's account and use buyer's information, such as credit card information, to complete the purchase by charging the buyer's credit card. *Id.*

76.    Similarly, the First Virtual system performed each and every limitation of asserted claim 7.

77.    The First Virtual system performed the first element of claim 7 that, as construed, reads "making available for use data about a provider of information that is stored in a data storage medium." '710 Patent, claim 7; D.I. 279 at 3. As described above with respect to claim 1, the First Virtual system stored customer information in a data storage medium at First Virtual's computers and made that information available for use in automatically completing purchase transactions. Buyers were required to open accounts and provide their information such as name, address and credit card number. *See, e.g.,* New Decl., Ex. B at AMZC645553, AMZC645612. The account information was then stored in a data storage medium of a secure First Virtual computer and used to complete purchase transactions requested by the buyer. *Id.* For example, to complete a purchase of an electronic document, the First Virtual system used stored buyer information to charge the buyer's credit card. As described above, each buyer's account was assigned a First Virtual account number unique to each buyer. This account number was looked up by using the transaction code that was received by the First Virtual system as part of the email from the buyer indicating that the buyer wanted to purchase an item. New Decl. ¶ 11.

78.    The First Virtual system also performed the second element of claim 7 of "providing the information provider with information from an information consumer with

respect to a proposed transaction." '710 Patent, claim 7. This limitation is similar to the second limitation of claim 1 "providing the customer with information from the seller with respect to an item." *Id.*, claim 1. As described above, the First Virtual system provided its buyers with information about items available for sale either through Infohaus or emails seeking whether buyers wanted to purchase viewed items. *See, e.g.*, New Decl. ¶ 11, Ex. B at AMZC645555-56, AMZC645560-AMZC645565.

79.     Another limitation of claim 7 is "receiving from the information provider an indication to complete the proposed transaction." '710 Patent, claim 7. This element is different from the similar element of claim 1 in that claim 1 requires receiving an "indication to initiate" a transaction whereas claim 7 requires "indication to complete" the transaction. *Compare* '710 Patent, claims 1 and 7. But, in its infringement contentions, Cordance draws no distinction between these two claim terms. *See, e.g.*, App. Exh. 35. Cordance alleges that upon a customer clicking on "Purchase with 1-Click" button on Amazon's website, Amazon's system receives an indication to either initiate or complete the transaction. *Id.* Consistent with Cordance's application of the two terms to Amazon's system, the First Virtual system received an indication to either initiate or complete a transaction when the buyer transmitted a "yes" response to purchase the item.

80.     The last element of claim 7 is "in response to the received indication, automatically completing the purchase of an item from the information consumer by accessing the information provider data to retrieve the information and process the retrieved information by processing said metadata associating said information with the proposed transaction so as to complete the proposed transaction." '710 Patent, claim 7. The term "processing said metadata associating said information with the proposed transaction so as to complete the proposed

26

transaction" as indicated by the claim construction order should mean "processing the metadata to retrieve the stored information of the provider and processing the retrieved information to complete the proposed transaction." D.I. 279 at 5. The First Virtual system performed this element.

81.     In response to the "yes" email from the buyer, the First Virtual system automatically, without any further input from the buyer, retrieved the transaction code from the email, looked up buyer's First Virtual account number from the transaction record, used the account number to retrieve buyer's information from the buyer's account and used the retrieved information, such as the stored credit card number, to complete the purchase by charging the customer's credit card. New Decl. ¶ 11.

82.     In its infringement contentions, Cordance alleges that Amazon's system meets the limitation of claim 2 by storing customer profile information in software objects at Amazon's computers. In my opinion, storing customer information in software objects is a trivial implementation technique. It was well known in the field at the time First Virtual deployed its system that data can be stored using various data structures and implementations including objects associated with a predetermined set of operations that can be performed on them, such as software objects. Software objects, however, are not the only objects that were known at the time First Virtual deployed its system. For example, First Virtual itself used file objects to store buyer account information. New Decl. ¶ 11. A file object, as software object, is associated with a set of predetermined methods such as create, read, write, append, or delete. In my opinion, First Virtual's storage of buyer's information in individual file objects meets the limitation of claims 2. Claim 9 is similar to claim 3 as it requires that "provider information data is

27

maintained as an object." '710 Patent, claim 3.  For the same reasons that apply to claim 2, the limitation of claim 9 was performed by the First Virtual system.

83.     Claim 3 is "The method of claim 1 processing said metadata includes processing said metadata to retrieve at least a portion of said customer data from an associated data store for use in completing the transaction." '710 Patent, claim 3.  The First Virtual system performed this limitation.  To complete a purchase transaction, the First Virtual system used a transaction code to identify buyer's account number to retrieve buyer's account information such as credit card numbers from its computers storing buyers' accounts.  New Decl. ¶ 11.

84.     Cordance also asserts dependent claim 5: "The method of claim 1 wherein the customer data is retrieved from a computer of the seller." '710 Patent, claim 5.  In its infringement contentions, Cordance explains that Amazon allegedly infringes claim 5 because when "Amazon is the merchant" customer information is retrieved from "Amazon's computer," which is a seller's computer in the scenario.  *See, e.g.,* App. Exh. 35.  As with Amazon's ability to sell items itself, the First Virtual system was a seller as well as it sold items through its Infohaus.  *See, e.g.,* New Decl., Ex. B at AMZC645555-56.  In situations where buyers purchased products through Infohaus, buyers' account information were retrieved from First Virtual's computers, i.e., computers of the seller.  Claim 8 is similar to claim 5; its limitation was also performed by the First Virtual system.  *See* '710 Patent, claim 8.

85.     It is my understanding that Cordance alleges that Amazon infringes claim 6 because it allows merchants to sell their items through Amazon.  *See, e.g.,* App. Exh. 35.  In this scenario, Cordance maintains that Amazon's computers storing customer information are third party computers.  *Id.*  Similarly the First Virtual system allowed sellers to sell information through their own websites and use the First Virtual system to effectuate payment for purchases.

28

New Decl., Ex. B at AMZC645560-61. In this situation, the buyer's account information was still stored at First Virtual computers, which were not computers of the sellers of information. Thus, the First Virtual system retrieved customer data from a third party computer as required by the claim.

I declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct, and that I executed this declaration on January 23, 2009 in Austin, Texas.

By: _Lorenzo Alvisi_____
Lorenzo Alvisi, Ph.D.

29

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, D. Fon Muttamara-Walker, hereby certify that on January 30, 2009, the attached

document was electronically filed with the Clerk of the Court using CM/ECF which will send

notification to the registered attorney(s) of record that the document has been filed and is

available for viewing and downloading.

I further certify that on January 30, 2009, the attached document was Electronically

Mailed to the following person(s):

Steven J. Balick
John G. Day
Tiffany Geyer Lydon
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19899
sbalick@ashby-geddes.com
jday@ashby-geddes.com
tlydon@ashby-geddes.com

Michael A. Albert
Robert M. Abrahamsen
Jeffrey O'Neill
Chelsea A. Loughran
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA  02210-2206
malbert@wolfgreenfield.com
rabrahamsen@wolfgreenfield.com
jeffrey.oneill@wolfgreenfield.com
cloughran@wolfgreenfield.com

By:  */s/ D. Fon Muttamara-Walker*
    Richard L. Horwitz
    David E. Moore
    D. Fon Muttamara-Walker
    POTTER ANDERSON & CORROON LLP
    (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com
    fmuttamara-walker@potteranderson.com

757320 / 30763