# EXHIBIT 1

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

### CONFIDENTIAL
### PURSUANT TO PROTECTIVE ORDER

### SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 3

### CONFIDENTIAL
### PURSUANT TO  PROTECTIVE ORDER

### SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 4

May  6 200.  17:28   P. 08   #10

ATTORNEY'S DOCKET NO: 100234.70007.US

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| Applicant: | Reed (formerly "Reed, et al.") |
| Serial No: | 10/068,341 |
| Filed: | February 5, 2002 |
| For: | ON-LINE TRANSACTION INFRASTRUCTURE (formerly, "OBJECT-BASED ON-LINE TRANSACTION INFRASTRUCTURE") |
| Confirmation No.: | 4490 |
| Examiner: | B. Barot |
| Art Unit: | 2154 |

CERTIFICATE OF FACSIMILE TRANSMISSION UNDER 37 C.F.R. §1.8(a)

The undersigned hereby certifies that this document is being facsimile transmitted to the United States Patent and Trademark Office in accordance with 37 C.F.R. §1.6(d), on the ___ of May, 2003.

_____
Signature

Commissioner for Patents
P.O. Box 1450
Alexandria, VA  22313-1450

Dear Sir:

Declaration of Drummond Reed under 37 C.F.R. §1.131

I, Drummond Reed, the inventor in the above-identified application, hereby declare as follows:

1.      That prior to August 29, 1995, I conceived a computer-implemented method (referred to herein below as "the First Method") comprising steps of: (a) providing customer data storing information for a customer usable to automatically complete an on-line purchase of an item from a seller; (b) providing the customer with information from the seller with respect to an item; (c) receiving from the customer an indication to initiate a purchase transaction for purchasing the item; (d) in response to the received indication, automatically completing the purchase of an item from the seller by accessing the

700085.1

DEPOSITION
EXHIBIT
Mushero 27
8-2008 AB

AMZC 122954

Serial No.: 10/068,341                    -2-                    Art Unit: 2154

customer data to retrieve the information and process the retrieved information so as to complete the purchase transaction.

2.      That prior to August 29, 1995, I conceived a computer-implemented method (referred to herein below as "the Second Method") comprising steps of: (a) providing information provider data storing information for an information provider usable to automatically complete an on-line transaction; (b) providing the information provider with information from an information consumer with respect to a proposed transaction; (c) receiving from the information provider an indication to complete the proposed transaction; (d) in response to the received indication, automatically completing the transaction from the information consumer by accessing the information provider data to retrieve the information and process the retrieved information so as to complete the proposed transaction.

3.      A copy of a document prepared by me and witnessed on a date prior to August 29, 1995 describing each of the First Method and the Second Method is presented in Appendix A.

4.      Said document describes at least at page 2, §5.2.1, and at page 11, entry 1, third paragraph, providing a database of information pertaining to a customer/user (e.g., name, shipping address, billing address, mailing address, telephone number, credit card number, etc.). Accordingly, said document describes providing customer data storing information for a customer, as described in step (a) of the First Method. Further, said document describes at page 11, entry 1, third paragraph, that a screen can be produced using information from the database including all necessary ordering information. Accordingly, said document describes that the information is unable to automatically complete an on-line purchase of an item from a seller, as described in step (a) of the First Method.

5.      Said document describes at least at page 2, §5.2.1, and at page 11, entry 1, third paragraph, providing a database of information pertaining to a customer/user (e.g., name,

AMZC 122955

May  6 206.  17:29    P.10

Serial No.: 10/068,341                     - 3 -                      Art Unit: 2154

shipping address, billing address, mailing address, telephone number, credit card number, etc.). Accordingly, said document describes providing an information provider object storing information for a information provider, as described in step (a) of the Second Method. Further, said document describes at page 11, entry 1, third paragraph, that a screen can be produced using information from the database including all necessary ordering information. Accordingly, said document describes that the information is usable to automatically complete an on-line transaction, as described in step (a) of the Second Method.

6.      Said document describes at least at page 11, entry 1, second paragraph, providing the customer with information from the seller including basic product information. Accordingly, said document describes providing the customer with information from the seller with respect to an item, as described in step (b) of the First Method.

7.      Said document describes at least at page 11, entry 1, second paragraph, providing the customer with information from the seller including basic product information. Accordingly, said document describes providing the information provider with information from an information consumer with respect to a proposed transaction, as described in step (b) of the Second Method.

8.      Said document describes at least at page 11, entry 1, third paragraph, that once the customer has made up his mind about which product to purchase, ordering may be achieved by clicking a product ordering button. Accordingly, said document describes receiving, from the customer, an indication to initiate a purchase transaction for purchasing the item, as described in element (c) of the First Method.

9.      Said document describes at least at page 11, entry 1, third paragraph, that once the customer has made up his mind about which product to purchase, ordering may be achieved by clicking a product ordering button. Accordingly, said document describes receiving from the information provider an indication to complete the proposed transaction, as described in element (c) of the Second Method.

Received from < > at 5/8/03 5:39:19 PM [Eastern Daylight Time]

AMZC 122956

May  6 200.  17:29    P.11

Serial No.: 10/068,341          - 4 -                    Art Unit: 2154

10.    Said document further describes at least at page 11, entry 1, third paragraph, ordering a product by clicking a product ordering button, such that a screen is produced including all necessary ordering information from the database. Additionally, said document describes at page 11, entry 1, fourth paragraph, that a customer may click to confirm and order an item. Accordingly, said document describes automatically completing the purchase of an item in response to the received indication from the seller, by accessing the customer data to retrieve the information and process the retrieved information, so as to complete the purchase transaction, as recited in element (d) of the First Method.

11.    Said document further describes at least at page 11, entry 1, third paragraph, ordering a product by clicking a product ordering button, such that a screen is produced including all necessary ordering information from the database. Additionally, said document describes at page 11, entry 1, fourth paragraph, that a customer may click to confirm and order an item. Accordingly, said document describes automatically completing the transaction from the information consumer in response to the received indication, by accessing the information provider data to retrieve the information and process the retrieved information so as to complete the proposed transaction, as recited in element (d) of the Second Method.

12.    Said document describes at least at page 2, §5.2.1, that access objects can be located and retrieved from computers, and processed and stored on computers running the server program. Accordingly, said document describes storing the information provider data in an information consumer's computer, as recited in claim 4.

13.    Said document describes at least at page 2, §5.2.1, describes a global database of information pertaining to the user of the client program that is available to all access objects. Accordingly, said document describes maintaining the customer data as an object, as recited in claim 5.

AMZC 122957

Serial No.: 10/068,341                – 5 –                Art Unit: 2154

14.    Said document describes at least at page 2, §5.2.1, describes a global database of information pertaining to the user of the client program that is available to all access objects. Accordingly, said document describes maintaining the customer data as an object, as recited in claim 6.

15.    That from a date prior to August 29, 1995 until at least September, 1995, I was interviewing potential members of a development team for Intermind, Inc. (assignee) for the purpose of reducing each of the First Method and the Second Method to practice.

16.    That in August 1995, a website was developed and posted on the Internet for the purpose of furthering the recruitment of the development team.

17.    That in September 1995, I began hiring members of the development team and moved into new offices in Seattle, WA.

18.    That from August 1995 through October 1995, I set about finding a patent attorney for the purpose of obtaining patent protection for each of the First Method and the Second Method.

19.    That beginning in October 1995, through November 1995, I interviewed several patent attorneys for the purpose of selecting one to file a patent application for each of the First Method and the Second Method.

20.    That, during the course of interviewing patent attorneys, in late November 1995 I contacted Steven J. Henry ("Mr. Henry"), an attorney at the law firm of Wolf Greenfield and Sacks, P.C. in Boston, MA to discuss filing a patent application for each of the First Method and the Second Method. On or about November 26, 1995, Mr. Henry reviewed disclosure material pertaining to each of the First Method and the Second Method as a result of my contacting him, in preparation for a meeting with me and other members of my development team.

AMZC 122958

May   6 20L   17:30   P. 13

Serial No.: 10/068,341                    -6-                    Art Unit: 2154

21.   That on or about November 28, 1995, I traveled to Boston, MA to meet with Mr.
Henry and to discuss, with him, filing a patent application for each of the First Method
and the Second Method. That disclosure meeting was followed by activity from late
November 1995 to early January 1996 related to the filing of a patent application,
including numerous communications.

22.   That on or about January 2, 1996, Mr. Henry commenced writing a patent
application directed to each of the First Method and the Second Method, and continued to
work on the application, along with his associate Brett N. Dorney, until it was filed on
February 28, 1996, resulting in United States Patent Application 03/609,115 (now U.S.
Patent No. 6,044,205), a parent application to the present application.  Such activity is
supported in billing record from Mr. Henry's firm, which I have not attached due to the
potential of losing attorney-client privilege.

23.   That my daily work activities from just prior to August 29, 1995 through at least
February 28, 1996 were principally focused on code development for the purpose of
producing a product embodying each of the First Method and the Second Method, and
getting a patent application therefore on file.  At no time did I digress from these
activities for more than a day or two at a time, other than for illness, holidays, and
attending to business needs to keep operational matters of the development of First
Method and the Second Method running.

24.   That the above statements made of my own knowledge are true, and all statements
made on information and belief are believed to be true.

25.   The above statements were made with the knowledge that willful false statements
and the like are punishable by fine and/or imprisonment or both, under Section 1001 of
Title 18 of the United States Code and any such willful false statement may jeopardize the

AMZC 122959

May  6 200  17:30    P.14

Serial No.: 10/068,341          - 7 -          Art Unit: 2154

validity of this application or any patent resulting therefrom.

Drummond S. Reed, Declarant

Date: May 5, 2003

700085-1

Received from < > at 5/6/03 5:38:19 PM [Eastern Daylight Time]

AMZC 122960

Appendix A                    (13 pages + 1 FIG.)

## Access Object Network Disclosure Document

### Section I: Functional Description

The following paragraph and accompanying definitions are a complete functional description of the process for which SoftPages, Inc. intends to seek patent protection:

A process for controlling and automating communications consisting of multiple location-independent non-exclusive computer programs operating over a computer network (hereinafter referred to as an access object network) and a means for exchanging data between them as follows: an *authoring program* enables an abstraction of any or all of the communications properties of an information object to be encapsulated in a data file (hereinafter referred to as an access object), combined with or without additional data concerning or containing the information object, and copied to one or more computers running the server program; a *server program* enables access objects to be stored, searched, retrieved, and copied to any number of computers running the client program; a *client program* enables access objects to be located and retrieved from computers running the server program and processed and optionally stored on computers running the client program for the purposes of controlling and automating communications and transactions pertaining to the information object, either through the access object network or entirely independent of it; and a *response program* enables the automatic or semi-automatic processing of communications resulting from the use of an access object to any computer or other information processing device running the response program, whether through the access object network or entirely independent of it.

*Definitions integral to the above description:*

1. A 'computer network' is defined as any group of computers or other information transmission, processing, or storage devices that share a means of information exchange, whether continuous or intermittent, or by direct physical connection, data modem, or any other means.

2. 'Location-independent non-exclusive' is defined as the ability of any of the subject computer programs to operate from any node of the network possessing the necessary computer hardware to run the program, and for any or all of the subject programs to operate from the same node simultaneously or sequentially.

3. An 'information object' is defined as any entity that serves as an information repository or a symbol of an information repository,

AMZC 122961

including but not limited to persons, companies, products, services, public offices, governmental agencies, documents, books, magazines, libraries, directories, audio or video programs, computer files, databases, knowledgebases, etc. Information objects may also include collections of access objects and data associated with them.

4.      'Communications properties' are defined as any data that assists in providing access to an information object, including but not limited to telephone numbers; postal or electronic mail addresses; data communications protocols; names, descriptions, and locations of data files or fax files; subject or topic indexes; text search or database query parameters; security passwords or mechanisms, cross-references to related access objects, etc.

5.      'Automating communications and transactions related to the information object' includes but is not limited to the following:

5.1.    Automatic addressing of any type of communication.

5.2.    Automatic inclusion of data relevant to the content of the communication, or relevant to the automation of a response to the communication, from any collection of data available to the client computer program, including but not limited to:

5.2.1.  A global database of information pertaining to the user of the client program, defined in the specification of all authoring and client programs, maintained by the client program, and available to all access objects. Such data includes but is not limited to the client program user's name; shipping, billing, and mailing addresses; telephone and fax numbers; electronic mail addresses; credit card or other transaction account numbers; usage preferences; etc.

5.2.2.  A local database defined by the user(s) of one or more authoring programs (whether maintained by the client program or other independent programs) and available only to the access objects created with those authoring programs. Such data includes but is not limited to product ownership or service subscribership information, registration numbers, product/service usage information, transaction histories, account numbers, security passwords, etc.

5.2.3.  Data input by the user of the client program when prompted for and validated by the client program using specifications provided by the access object, including but not limited to

By: _____

By: _____

AMZC 122962

passwords and other security mechanisms; keywords, Boolean expressions, and other data query criteria; transaction size, time, cost, relevancy rank, or other transaction limitation criteria; text strings, numeric variables, logical variables, or any form of conventional data input; etc.

5.2.4.  Data available directly from the computer or computer network on which the client program is running, including but not limited to information about installed hardware and software, configuration information, usage information, etc.

5.2.5.  Data stored in the access object itself, including but not limited to identification and version numbers, origin dates, download dates, text strings, numeric variables, etc.

5.3.  Automatic updating, modifying, or deleting of the access object or related access objects, or automatic retrieval of additional access objects, or automatic retrieval or transmission of other data by any delivery means including postal, telephone, fax, e-mail, or data, based on parameters defined in the access object by the user of the authoring program and/or parameters entered by the user of the client program. Such parameters include but are not limited to:

5.3.1.  The relevance of the access object(s) or other data to the user of the client program.

5.3.2.  The passage of time, either absolutely or relative to the date the access object or other data is retrieved, accessed, updated, modified, or deleted.

5.3.3.  The frequency with which the access object(s) or related data are employed by the user of the client program.

5.3.4.  The costs associated with retrieving or updating the access object(s) or other data.

5.4.  Automatic debiting or crediting of the client program user's monetary or other exchange accounts for charges or credits related to a communications or data exchange..

6.  'Through the subject network or entirely independent of it' includes but is not limited to the following:

By: _____
By: _____

AMZC 122963

6.1.   Electronic mail, fax, data, audio, video, or other electronic information exchanges traveling through the access object network.

6.2.   Electronic mail, fax, data, audio, video, or other electronic information exchanges traveling through any other computer network.

6.3.   Telephone or fax communications traveling through a telephone network.

6.4.   Postal communications traveling through a postal network.

7.   'Automatic or semi-automatic processing of communications resulting from the use of an access object' is defined as the ability of the response program to choose a response, or to present a relevant range of response choices to a human operator, or retrieve data from a database, knowledgebase, or other information repository, by virtue of the data referenced in definition 5.2 above.

## Section II: Patent Claims

To the best of its knowledge, SoftPages believes there is no existing communications or information exchange system that represents real-world information objects with abstract "access objects" in computer data, or that constructs a network architecture around the process of creating, storing, using, and responding to access objects. We believe such an architecture has at least five key attributes that distinguish it from the prior art:

- *Inherent Directory*
- *Universal Programmability*
- *Network Independence*
- *Programmable Object Persistence*
- *Programmable Data Exchange*

1.   **Inherent Directory.** A key consequence of the way access objects abstract real-world information objects is that *an access object network is its own directory.* There is no need for a user to translate his/her real-world knowledge of the existence of an information object into a separate piece of data necessary to access that object (i.e. look up a phone number to call a person). The user can just enter the name of the information object and select from any of the access objects listed under (or referenced to) that name[1].

---

[1] In the case of trademarked products, services, or companies, a real-world legal mechanism already exists to ensure the uniqueness of this name.

SoftPages Confidential Disclosure Document .        By:

Page 4         Date:         By:

AMZC 122964

If the access objects are stored in an active object database (allowing objects, for example, to delete themselves after a programmed expiration date), the directory can also be self-maintaining.

While every communications system from the telephone to online services uses some type of directory service to map real-world names onto communications addresses, no communications system of which the SoftPages is aware offers a integral directory system with these attributes.

2.    **Universal Programmability.** Besides directory services being inherent, they are also *distributed*, i.e. access objects can be *created* and maintained from anywhere on the network. This would be the equivalent of being able to add a new phone number to a phone system from an existing phone number, or giving every user on an e-mail system the ability to add and modify e-mail accounts. The difference, of course, is that an access object lets you not only add new addresses, but also the capability to automate communications pertinent to these addresses.

The only prior art of which SoftPages is aware that offers a portion of this functionality are certain online information services and e-mail systems. (For a complete discussion see section III, parts 2 and 3.)

3.    **Network Independence.** A third consequence of an access object architecture is that access objects can automate communications *independent of the access object network*. By entering any type of communications parameter understood by the client program (see definition 4), the user of an authoring program can have an access object automatically dial telephone calls, login and access other computer networks, or even automate the printing of mailing labels and barcodes for postal deliveries.

With the minimal exception of the World Wide Web on the Internet (see section III, part 5), no communications control system of which the authors are aware permits automation of functions outside of its own native network.

4.    **Programmable Object Persistence.** This can be stated most simply as the ability of access objects to update themselves. While a very basic concept by itself, when multiplied by the number of parameters that both the author and user of an access object can manipulate to make "intelligent" update decisions (see definition 5.3) and the wide variety of information objects that access objects can represent (see definition 3), this essentially amounts to the ability to create sophisticated custom "agents" capable of identifying and retrieving information of very high relevance and value to the user.

While Telescript also enables agents as a core process of a communications system architecture (see section III, part 6), it takes a fundamentally different approach that requires significantly greater effort on the part of the user to execute certain functions that access object persistence makes almost transparent.

AMZC 122965

May  6 20~  17:32   P.20

5.  **Programmable Data Exchange.** This attribute refers to the ability of an access object to read, copy, and make logical decisions based upon data from either the global client program database (see definition 5.2.1), or to one or more local client program or independent databases (see definition 5.2.2). It also refers to the ability of a response program to reply to access-object-driven communications containing such data (see definition 7).

Perhaps the best way to characterize this ability is to step back and see an access object network as a means for automating information exchanges between two entities: the real-world information object and the user of the client program (see the Conceptual Overview diagram). The data inherent in each of these entities can be represented in electronic form by one or more databases (in fact some information objects may already be electronic databases or knowledgebases). In this case what an access object represents is a programmable means for automating exchanges between these two "pools of data". (For detailed examples of how such procedures might work, please see Section IV.)

Again, while many processes exist for the automated interchange of data between remote sites, SoftPages is not currently aware of any system (with the possible exception of Telescript—see Section III) which provides a programmable platform for this purpose accessible to both the information provider and the end user.

## Section III: Comparison to the Prior Art

In this section we will briefly compare these five key attributes of an Access Object Network to the prior art of which SoftPages is aware. This prior art consists of:

- *Screen Phone Systems such as Minitel*
- *Online Systems with Automated Clients*
- *Electronic Mail Systems with Forms and Rules Capabilities*
- *Electronic Data Interchange (EDI) Systems*
- *Internet Access Tools: Archie, Gopher, WAIS, World Wide Web*
- *General Magic's Telescript*

1.  **Minitel and other Screen Phone Systems.** Although more data remains to be gathered here, SoftPage's current knowledge of screen phone systems such as the French Minitel and current U.S. experimental implementations indicates that these technologies have little or no data storage or processing capabilities on the client side.

SoftPages Confidential Disclosure Document        By: _____

By: _____

AMZC 122966

May  6 20~  17:33   P.21

Without such capabilities, it is impossible to implement any of the five advantages of an access object network as all depend on the ability of either an authoring program or a client program to process access objects remotely.

2.  Online Systems with Automated Clients. Most major online systems and some smaller scale bulletin board systems (BBSs) have or are planning to offer some form of intelligent client. Such clients (*CompuServe Information Manager, America Online, FirstClass*) usually include the ability to automatically logon and navigate the online system, search for files, upload and download data, perform offline mail processing, and most importantly to download and store data from the online service for use in automating access to the service (i.e. keywords, section/library lists, icons, update instructions, etc.).

Such systems usually practice a limited form of information object abstraction, in which menus relating to a name or keyword can be accessed by entering that name or keyword. On some systems these menus can also be edited and maintained remotely using the proper software, offering some degree of universal programmability. To our knowledge, however, none of these systems includes the capability to add new information services or their corresponding menus using a separate "authoring program" which also operates over the same network.

In addition, the relationship of these online service to their automated clients bears none of the other attributes of an access object network. Without the ability to store and process information service menus "offline", they cannot automate communications outside of the native network, they can offer little or no programmable object persistence, and they cannot offer programmable data exchanges.

3.  Electronic Mail Systems with Forms and Rules Capabilities. In many ways an access object network resembles an electronic mail network much more than an online service. If one were to replace the standard "user name/address" directory system of an e-mail network server with an active object database capable of storing access objects, and were to give e-mail clients the ability to author and process these access objects, you would have captured much of the functionality of an access object network. If you were to go one step further and enhance the rules-based intelligence now being added to e-mail clients with the ability to formulate rules for responding to messages resulting from an access object *by reference to the original access object*, you would have duplicated a significant degree of response program functionality as well.

However, the only technologies SoftPages is currently aware of that start in this direction are electronic forms (e-forms) programs and rules engines. E-forms packages appear to be highly similar to an access object network's authoring component: both let a user compose a "form" file that is uploaded to the mail server and can be downloaded by any mail client (with the proper access rights) to intelligently process input and use it to direct communications. If e-forms

Received from < > at 5/6/03 5:39:18 PM [Eastern Daylight Time]

By: _____
By: _____

AMZC 122967

directory support is built directly into the e-mail system, e-forms files meet both the criteria of inherent directory and universal programmability.

The difference is that the primary purpose of e-forms is to gather and route data around the e-mail network, and as such they fall short of the other three access object network criteria: they do not have the capability to automate communications outside the native network, they do not offer a programmable form of object persistence, and they offer only basic capabilities to automate data interchanges between the e-mail client user and a response program.

Rules engines, on the other hand, allow for some degree of automated response to e-mail messages, but only based on the message content. What an access object network adds to this process is *a common frame of reference between the respondent and the recipient*, so that response rules can be significantly more accurate and intelligent.

4.    **Electronic Data Interchange (EDI) Systems.** EDI systems provide precisely the common frame of reference that rules engines lack—in fact, they owe their existence to the establishment of common standards for the interchange of routine data. It is for this very reason, however, that EDI systems lack all the other attributes of an access object network, i.e. inherent directory, universal programmability, network independence, and programmable object persistence. And the fact that EDI systems offer even limited programming control over the data exchanges they do automate reveals the precise reason why they would eventually become a "subset" of access object networks.

5.    **Internet Access Tools: Archie, Gopher, WAIS, World Wide Web.** Besides the automated clients evolving for major online services, these Internet tools represent the current state-of-the-art in wide area information access technologies. All are client/server implementations, and all can access or reference resources anywhere on the Internet. And, individually, each of them strongly resemble one or more parts of an access object network.

For instance, locating an access object on an access object network works exactly like locating an Internet file with *Archie*. And using cross references between access objects "live" (i.e. while connected online) works exactly like *Gopher*.

*WAIS* works even more like an access object network by providing both an "authoring program" (*waisindex*) and a client program which can initiate searches and present the resulting files. (To some extent, the *WAIS* "directory-of-servers" also emulates an access object server.) *World Wide Web* (*WWW*) also offers both an authoring component (hypertext editors), and a client component (*WWW* browsers), with the additional wrinkle that *WWW* links can access local or network resources that are not directly on the Internet.

With the small exception of this *WWW* external access capability, however, none

SoftPages Confidential Disclosure Document    By: _____

Page 8    Date: _____    By: _____

Received from < > at 5/9/03 5:39:19 PM [Eastern Daylight Time]

AMZC 122968

of these access tools offers the last three attributes of an access object network, i.e. they cannot automate access to resources outside the Internet, they do not provide a persistent connection to an information resource, and they do not automate the bi-directional exchange of data.

(*Note*: The ability of an access object network to add these capabilities, plus the ability of the Internet to provide the addressing, e-mail, fax, and other transport services required by an access object network, means that the Internet represents an ideal opportunity for deployment of one or more access object networks.)

6.  **General Magic's Telescript.** A full comparison is difficult here due to the sparse information available about *Telescript*. The following quotes, assembled from a variety of computer periodicals, provide at least an overview of the *Telescript* technology:

> "Telescript will allow any device with an operating system that supports it to communicate with any other Telescript-supported machine."

> "Telescript's smart messaging concept is unique because it transforms messages into messengers by treating each message command like a computer program."

> "Among other things, General Magic would like to make addressing transparent to users. That means users won't have to request and key in other people's addresses. To that end, messaging systems built using Telescript will use interpersonal messages as address transports. Anyone who sends you a TeleCard will automatically be sending you her other contact information, which is available for inspection or other uses, such as posting to your local address book. That means you can reply via a different mode, and the messaging system won't care. We expect many companies to adopt whatever record format General Magic defines for this address exchange."

> "Telescript is an object-oriented programming language for implementing distributed applications.... It helps developers write applications that project their instructions into the network. For example, if a user sends a message to someone, instead of requesting the message back if that person doesn't receive it, the originator can redirect the message elsewhere."

> "Telescript [is]a programming language which can be wrapped around electronic messages—or 'intelligent agents' in Magic-ese—as they move through a network. Telescript is implemented as a portable interpreter, called a Telescript engine. There is no user interface as Telescript relies on its interface to the host platform. Programs written in Telescript are called, yes, scripts, although the language seems to have more in common with a programming language than the applications scripting language with which many users are familiar.... The idea of Telescript is to encapsulate the information content of a message in universal program code which can trigger events as the message moves from sender to recipient. Essentially this gives the message (in the loosest sense of the word) the ability to control the network through which it flows."

> "Telescript is a programming language and communications protocol. You will use Telescript to talk to a communications device the way you currently use PostScript to talk to a printer....What's the big deal about Telescript? It gives people a lingua franca—you can use a single language to communicate with all sorts of boxes. Because it has directories and addresses, it also solves the problem of how to identify people."

SoftPages Confidential Disclosure Document     By: _____

Page 9         Date:       By: _____

Received from < > at 5/6/03 5:39:19 PM [Eastern Daylight Time]

AMZC 122969

"Telescript is described by General Magic officials as being to communications applications what the Macintosh is to graphics applications. A key function of Telescript is smart messaging. A Telescript message envelope will contain information about the message inside, and will have built-in intelligence to help it locate the recipient."

It appears from these sources that while the ultimate goal of *Telescript* and access object networks is the same—"intelligent communications"—the underlying approaches are fundamentally different. *Telescript* attempts to provide the "access intelligence" in the message envelope and the network that processes it, whereas an access object network attempts to provide the access intelligence primarily in the access object.

From a functional standpoint, these descriptions make it appear that a *Telescript* communications architecture would likely provide the inherent directory and universal programmability of an access object network. *Telescript* also appears to be able to automate communications "in a different channel" than that in which a message was received, although it is unclear whether this includes phone networks and non-*Telescript* computer networks.

Both technologies also provide a programmable means of maintaining communications relationships over time. Structurally, however, this capability is quite different. *Telescript* relies on a user-programmed "agent" operating on a network to perform this task. An access object network allows this type of agent capability to be pre-programmed by the access object author and merely confirmed, customized, or overruled by the access object user. It also allows the agent to function from the client program, "requesting" information, as well as "launching" the agent onto a network to retrieve it as in *Telescript*.

Finally, while *Telescript* also has a means for automating data exchanges, it does not itself provide a mechanism for providing a common frame of reference for such exchanges, either through a globally-defined database or a database defined by the access object author.

Ultimately, the two technologies appear complementary, and it is possible *Telescript* could become the message transport used inside of an access object network, with access objects themselves being able to author and respond to "smart" *Telescript* messages.

SoftPages Confidential Disclosure Document

Page 10      Date:

By: _____

By: _____

Received from < > at 5/6/03 5:38:19 PM [Eastern Daylight Time]

AMZC 122970

## Section IV: Example Usage Scenarios

This section is intended to illustrate the concepts involved with an access object network through real world examples of its usage. Three scenarios will be presented:

- *A Software Vendor and Software Customer*
- *An Elected Representative and a Constituent*
- *A Product Information Vendor and a Consumer*

1.  **A Software Vendor and Software Customer.** This scenario is perhaps the best possible example of how an access object network might be deployed because it involves a highly information- and service-intensive information object—namely, a software program.

Initially, the customer may use the access object network client program to request the access objects for several software programs he/she is considering purchasing (or he/she could request the relevant access object from an independent product information vendor—see scenario 3). These access objects would present basic product information about each of the products and one-click buttons to request additional information or "references" (to be sent by any means the customer desires—mail, fax, or hypertext file).

Once the customer has made up their mind about which product to purchase, ordering the product would be as simple as clicking the product ordering button on the access object. The resulting screen would already included all necessary ordering information from the client's global database (name, shipping address, credit card number, sales tax charges, etc.), plus as any vendor-specific data from the vendor's own local database (if the customer had purchased other products from this vendor, this might include an account number, product registration number, acquisition date, etc.).

One click to confirm and the order will either be sent immediately, or at the user's option, be stored and uploaded in the next online session with additional messages and/or access object actions. All the necessary ordering information will be sent to the address specified in the access object , and if necessary, an automated receipt can be generated by a response program (note that a response program is *optional* for order processing on the vendor's side; the message can just as easily be sent to a fax machine or standard e-mail account).

When the software arrives (by mail or by high-speed network connection), a new or enhanced access object could be installed as part of the software's own installation process. This access object could automate a number of processes:

SoftPages Confidential Disclosure Document          By: _____
          Page 11          Date:          By: _____
Received from < > at 5/6/03 5:39:19 PM [Eastern Daylight Time]

AMZC 122971

a)  **Ordering any type of product or service related to the software product,** including hardware or software accessories, books, usage newsletters (print, fax, or electronic), and third-party product catalogs (which themselves can contain links to the corresponding access objects). It would also be possible to subscribe to a "help file service" that automatically ships you updates to a custom help file for the software product (i.e. bug reports, workarounds, user tips, etc.).

b)  **Asking technical support questions** can be as simple as bringing up the access object's tech support menu, choosing from one or more submenus that help narrow the question, and then typing in your question. Not only will the access object see to it that the question is routed to the appropriate electronic address, but it also has the capability to query the computer and attach to the message relevant system configuration and initialization information (subject to the user's permission, of course). The access object can also add the user's preferred means of reply (phone, fax, e-mail account) and cost of the query, if any.

c)  Accessing product forums, files, and knowledgebases such as those available on CompuServe, BBSs, and other online sources could be almost completely automated by the access object. Scanning, initiating, and responding to forum threads and searching for support files or knowledgebase entries could be accomplished through mechanisms identical to those currently offered by offline clients such as *TAPCIS, OZCIS, NAVCIM,* and others.

Finally, by enabling the persistence attributes of the software product's access object, the user would allow the access object to be updated automatically as access parameters changed. This technique would also allow the user to be automatically notified when updates, bug fixes, or other enhancements for the software product were released, as well as to automatically order them through the updated access object.

2.      **An Elected Representative and a Constituent.** Every citizen of the United States is represented by a specific set of elected representatives holding certain offices, and over time the representative holding that office spends a great deal of his time working on a limited set of issues. This model is ideally suited to the communications automation potential of an access object network. Each elected office would be represented by one access object (linked to additional access objects as necessary), and every user of an access object network could download the access objects for any or all of the elected offices that represent them (in fact, with some governmental or private support, it would be relatively easy to create a

By: _____
By: _____

AMZC 122972

special server that automatically retrieved all the relevant public office access objects for a specific address or precinct number anywhere in the country[2]).

The public office holder or his/her staff would be responsible for maintaining a list of current issues and corresponding information retrieval or response mechanisms. These could include "white papers" on important issues, copies of pending legislation, electronic survey forms, public issue discussion forums, constituent request forms, etc.

During elections, voter information pamphlets could also be offered as access objects (automatically mailed to clients in the appropriate voting districts), complete with links directly to the access object for each candidate. In a matter of an hour or so, a voter could gather and process more information than they could in weeks of attending public meetings or researching printed materials.

Lastly, to complete the "electronic democracy" scenario, access objects are—with the proper identification verification procedures—an ideal mechanism for voting electronically.

3.   A Product Information Vendor and a Consumer. Although consumer information services such as Consumer Reports are already available online, the access object mechanism would make them immensely easier and more productive to use.

A simple example is the software product buying decision mentioned in scenario #1. By searching for the access object of an independent consumer information company using the keyword "software", a consumer could quickly be presented with one or more choices of such vendors. Their access objects would provide complete one-button menus of the product/service "reports" they offer (possibly with "previews" or other incentive offers), together with a transparent, efficient mechanism for charging such transactions, even if the amount was less than a dollar.

If the reports are retrieved in electronic form (vs. mail or fax), the access object for any product or service they reference can be retrieved with one mouse click.

---

[2] Project VOTE in Oregon already operates such a database, complete with special-interest group ratings of election candidates.

SoftPages Confidential Disclosure Document          By: _____

Page 13          Date: _____          By: _____

AMZC 122973



Access Object Network Conceptual Overview

Received from < > at 5/6/03 5:39:19 PM [Eastern Daylight Time]

AMZC 122974

# EXHIBIT 5

# Introducing
# Hypercommunications

**A White Paper from
Intermind Corporation**

With its first product, *Intermind Communicator*™, Intermind is introducing not just a new Internet tool, but an entirely new way of communicating over electronic networks. This patent-pending technology, which has its roots in the same principles as hypertext, has the potential to significantly alter the way we access, organize, and exchange information over the Internet and intranets.

This white paper explains the core principles behind hypercommunications and how these are implemented by Intermind Communicator v1.0 on the World Wide Web.

*Introduction* _____ *2*
   Imagine... _____ 2
*The Basic Principles of Hypercommunications* _____ *3*
   An Example: The Speed-Dial Button _____ 3
   Properties of Hyperconnections _____ 6
   How is This Like Hypertext? _____ 8
   From Phones to Computers _____ 8
*Applying Hypercommunications to the World Wide Web* _____ *9*
   The Current HTML Publishing Model _____ 9
   Adding Hypercommunications to a Web Site _____ 11
   Anatomy of a Hyperconnector _____ 12
   How Updates are Transmitted _____ 13
   Completing the Feedback Loop _____ 14
*How Hypercommunications Differs from related Technologies* _____ *15*
   Electronic Mailing Lists _____ 15
   Bookmarks and Offline Browsers _____ 16
   Server Broadcasting _____ 17
   Software Agents _____ 18
   Distributed Object Standards _____ 18
*Summary* _____ *19*
*About Intermind* _____ *20*

CORD075002

## Introduction

Thirty years ago computer pioneer Ted Nelson coined the term *hypertext* for a new way of accessing information electronically. Hypertext is based on a simple principle: embedded links in electronic documents that let readers jump directly to related information. Nelson called these *hyperlinks*, and claimed they were the key to making computers access and display information the way people actually think. He predicted that their simplicity and power would one day change the way all human information was organized and accessed.

Although it took twenty-five years to unfold, Nelson's vision is proving uncannily accurate. The catalyst was the development of the first global network hypertext system—the Internet's World Wide Web. Originally conceived in 1989 by Tim Berners-Lee to help European physicists share research, this simple set of protocols for a global hypertext system took root like Jack's beans. Today the Web continues to grow at a rate of over 100% per year. It is widely considered to be the next great revolution in computing and communications, after the PC revolution twenty years ago.

The Web revolution is now poised to enter a new phase. This time the enabling technology is called *hypercommunications*, and it is based on the same fundamental principle as hypertext. Rather than creating intelligent links between electronic documents, however, hypercommunications creates intelligent *connections* between electronic *communications programs*. Following Ted Nelson's lead, this new kind of link is called a *hyperconnection*.

Unlike the simple links in hypertext documents, hyperconnections are smart communications channels that can automatically send, receive, filter, organize, process, and display any type of electronic communication for the user—everything from e-mail to multimedia broadcasts. Just as a web browser lets a user self-select and organize bookmarks for the World Wide Web, a hypercommunications program will allow a user to self-select and organize the hyperconnections responsible for both their incoming and outgoing communications.

## Imagine...

- Imagine having your own smart communications channel where each item of information you receive is of relevance and importance to you, arranged the way you want to see it, and continuously updated.

- Being able to locate people, companies, products, services, and topics in self-updating *hyperdirectories*—and receiving alerts that tell *you* when there's something new you might be interested in.

- Seeing a highly personalized view of any web site without filling out any forms—and without giving up any personal privacy.

- Automatically filtering and organizing all your incoming e-mail, phone calls, even faxes according to your precise preferences about priority, sender, subject, urgency, etc.

Intermind Corporation

CORD075003

- Having an electronic address book that keeps every entry current automatically—and tells you whenever anything's new.

- Paying bills or ordering products electronically with two or three mouse clicks—all tracked in your checkbook and cleared with your bank automatically.

- Voting in a local, regional, or national election using a completely secure, authenticated electronic ballot linked to online discussions about all the candidates and issues you're voting on—and seeing the results instantly.

In a hyperconnected world, all the above will become as commonplace as hypertext is on the World Wide Web today. But that world is not some distant imaginary future—it may unfold as quickly as the Web itself.

## The Basic Principles of Hypercommunications

How can the world of electronic communications become so much smarter and friendlier so fast? The secret lies in the same basic principle as hypertext: *distributing communications controls to communications partners*. To see how this works, let's start with an example of how hypercommunications would apply to a communications tool we use every day: the telephone.

### An Example: The Speed-Dial Button

Telephones have grown progressively smarter ever since Alexander Graham Bell first invented them. One recent innovation that's now a standard on most touchtone phones is the speed-dial button. To use a speed-dial button, you first program a number into the button. Later you simply press the button whenever you want to dial the number—a real timesaver.



Speed-dial button

Intermind Corporation

CORD075004

Now picture four friends on a telephone network: Bob, Carol, Ted, and Alice. Bob is quite popular, so Carol, Ted, and Alice all want a speed-dial button for him. The way phones work today, each of them would first need to get Bob's phone number, then program it into the speed-dial buttons on their phones.



Bob is always on the move. Every time he changes his number, Carol, Ted, and Alice have to get the new number and reprogram their speed-dial buttons.



Now, imagine we replaced these phones with newer, smarter phones—let's call them *hyperphones*. Hyperphones have a unique new property: they can send and receive speed-dial names and numbers directly from each other. We'll call these special speed-dial buttons *hyperbuttons*.

Intermind Corporation

CORD075005

When Bob gets his hyperphone, he first enters his own name and number in its memory. Now there are two ways he can share it with his friends. If Bob knows Carol wants his number, he can call Carol's hyperphone and press a special "Send Button" command. Carol's hyperphone will automatically receive and store Bob's hyperbutton (subject to Carol's approval, of course). This approach is called "push", because the new information is pushed from Bob to Carol.



The other approach, called "pull", is when Ted and Alice both want a hyperbutton for Bob, so they call his hyperphone and press a "Request Button" command. Each of their hyperphones automatically retrieves Bob's hyperbutton from his hyperphone. Both Ted and Alice are "pulling" the new information from Bob.



Now Carol, Ted, and Alice all have hyperbuttons for Bob—yet no one but Bob has had to program it. This is nice, but the real payoff comes when Bob moves across town and changes his phone number. Now all Bob has to do is enter his new number into his hyperphone, and *everyone else's hyperphone is updated automatically.*

Intermind Corporation

CORD075006

How? It's an automated version of the same push or pull process above. In the first case—push—Bob's hyperphone records each time Bob sends his hyperbutton to another hyperphone. In essence Bob's hyperphone is keeping a little address book with the phone numbers of all the people Bob likes to stay in touch with. Then, whenever Bob changes his number, his hyperphone knows to automatically call the hyperphones on his address list and update their hyperbuttons.



In the second case—pull—Bob's hyperphone doesn't need to keep an address book. This is because his friend's hyperphones know to periodically call and "check in" with Bob's hyperphone to see if anything has changed. Bob sets this up by setting a *polling interval* for his hyperbutton. When Ted's and Alice's hyperphones first get Bob's hyperbutton, they use the polling interval—say one week—to mark an internal calendar with a reminder. When that day comes, these hyperphones call Bob's hyperphone to check for impending changes.



Regardless of whether push or pull is used, the result is the same: Carol, Ted, and Alice all now have a "smart" connection with Bob. Their hyperbuttons let them call Bob at one touch, even without knowing his actual phone number. Better yet, they know their "Bob" button will always reach Bob no matter how often he moves or changes his number. This intelligent communications relationship is called a **hyperconnection**, and it's the fundamental building block of hypercommunications.

## Properties of Hyperconnections

It may sound like a neat trick to have a self-updating set of speed-dial buttons, but that would hardly be reason enough to run out and buy a hyperphone. The real power of hyperconnections lies in the additional *properties* they can have. To illustrate, let's add a few more properties to our hyperbuttons.

**CORD075007**

Case 1:06-cv-00491-MPT   Document 330-1   Filed 01/30/09   Page 36 of 84 PageID #: 6153

The first feature we might add is *voicemail*. If Bob adds a voicemail option into his hyperbutton, Carol's, Ted's, and Alice's hyperbuttons for Bob will be updated with this information automatically, as described above. Now, whenever Carol wants to leave voicemail for Bob, she can press his hyperbutton, choose the voicemail option, and start talking.



The best part is *Carol doesn't need to call Bob's hyperphone first*. Her hyperphone is smart enough to record her message directly itself. When she's done, Carol's hyperphone can call Bob's hyperphone and deliver the voicemail. No waiting for the call to go through, message prompts, beeps, and so forth.

This is the key principle of hypercommunications: controlling communications at the point of origin. With ordinary voicemail, we need to dial the phone, wait for the call to go through, navigate the menus, and record the voicemail message. With a hypercommunications system, voicemail gets "smarter" because the hyperphones can handle all this routine business. Specifically, they can use the instructions in the hyperbuttons to know how to exchange voicemail directly.

Now let's add another twist. Bob is getting so popular he decides he wants to start screening his calls. First he adds a "Identify Caller" option to his hyperbutton, and all his friend's hyperphones are updated as before. Second, Bob sets options *for each of his friends hyperbuttons*: Carol he always wants to hear from, Ted he only wants to hear from at night when he's not working, Alice he only wants voicemail from.



Now when Ted calls Bob, Ted's hyperphone tells Bob's hyperphone it's Ted calling. Before Bob's hyperphone rings, it checks Bob's preferences for Ted's hyperbutton. If it's daytime, it turns Ted over to voicemail. If it's evening, it rings and flashes Ted's name.

Intermind Corporation

CORD075008

With each property Bob adds, the hyperphone system is getting smarter: self-maintaining directories, automatic voicemail, intelligent call screening. This is just the beginning of the promise of hypercommunications.

## How is This Like Hypertext?

When an publisher creates an HTML (HyperText Markup Language) document for the World Wide Web, he or she creates hyperlinks in the document which point to other documents. In essence, the publisher is embedding "buttons" that readers can use to automatically retrieve related documents—without knowing anything about them.



These buttons contain the network address of the related document—just the way our hyperbuttons contain the phone numbers of the person being called. To retrieve the document, a reader only needs to click the link—the same way a caller presses a hyperbutton to dial someone.

| Hypertext System | Hyperphone System |
|---|---|
| Browser | Hyperphone |
| Hypertext document | Hyperbutton menu |
| Hyperlink | Hyperbutton |
| Controls information access | Controls voice communications |

In fact, the only real differences between hyperlinks and hyperbuttons are that hyperbuttons: a) are permanently stored on the caller's hyperphone, b) update themselves automatically, and c) control other communications functions besides information access. But beneath it all, both hyperlinks and hyperbuttons represent the same thing: *embedded communications controls given from one communications partner to another*. In a hypertext system, this control is only used to retrieve and display documents. In a hypercommunications system, this control can be used to automate a fascinating array of common communications functions.

## From Phones to Computers

Of course, we're not likely to see a hyperphone tomorrow. It's simply too big of a leap for an ordinary telephone. However, it's a much smaller leap for a personal computer. In fact, personal computers are an excellent environment for creating a hypercommunications system because they allow "hyperbuttons" to be developed entirely in software. Better yet, software programming has evolved an ideal tool for creating the electronic equivalent of a telephone speed-dial button: the *software object*.

Intermind Corporation

CORD075009

In the same way that speed-dial buttons hide the complexity of remembering and dialing phone numbers, software objects hide the complexity of performing computer tasks. And since software objects can be easily exchanged between computer programs, they are perfectly suited to act as the "hyperbuttons" exchanged between hypercommunications programs.

The only other ingredient required is a data communications network shared by all these personal computers—one which is capable of exchanging these software objects between hypercommunications programs. Fortunately, this is exactly what the Internet now provides. In fact, the Internet has adopted a protocol for transmitting objects via e-mail called MIME (Multimedia Internet Mail Extensions). MIME was subsequently adopted as the Web HTTP object transmission protocol standard as well, making it an ideal format in which to transport hypercommunications objects.

As a result, if you took our "hyperphone" scenario above, replaced the hyperphones with personal computers, replaced the hyperbuttons with software objects, and replaced the telephone network with the Internet, you'd have a working hypercommunications system.

| Hyperphone System | Hypercommunications System |
|---|---|
| Hyperphone | Hypercommunications program |
| Hyperbutton | Hypercommunications object |
| Telephone network | Internet/intranet |
| Controls voice communications | Controls all types of communications |

This is exactly what Intermind is introducing with *Intermind Communicator 1.0*: the first hypercommunications system for the World Wide Web.

## Applying Hypercommunications to the World Wide Web

Although the basic principles of hypercommunications can be applied to all forms of communications, Intermind's first focus is automating information exchange over the World Wide Web. This is not just because the Web represents a rich new medium with a staggering amount of content, but because the existing structure of the Web leaves a huge unfilled need. To understand this need, let's first look at the structure of the Web today.

### The Current HTML Publishing Model

Currently, Web publishers follow a straightforward process to make information available via a Web site. First, the publisher creates an HTML document using some form of publishing tool—anything from Notepad to PageMill. Then the publisher posts the document to their Web site.

Intermind Corporation

CORD075010



As the publisher adds documents to the Web site, the publisher embeds hyperlinks that provide pathways between related documents, or to documents on other Web sites. As the Web site grows, so does this "web" of hyperlinks.



It's precisely this web of hyperlinks that makes hypertext so accessible and inviting to the reader. Using his/her browser, the reader can view any document on the Web site and follow the hyperlink pathways to find exactly the information in which the reader is interested.



The problem is this: the reader's "connection" to the Web site lasts only as long as the reader follows links within the site. When the reader leaves, the connection is broken. No permanent relationship is established. The Web publisher can add new

Intermind Corporation

CORD075011

information—or even change the entire Web site—and the reader has no way of knowing. This is the same situation as Bob changing his phone number and Carol, Ted, and Alice all having to find out the new number themselves.

## Adding Hypercommunications to a Web Site

In the same way that hyperphones automated the process of updating phone numbers, Intermind Communicator automates the process of communicating with readers from Web sites. Intermind Communicator does this by operating as a "helper application" to a Web browser such as Netscape Navigator or Microsoft Internet Explorer.

Intermind Communicator is used by both Web publishers and readers, just as a word processor can be used to both create and read documents. From the *publisher's* perspective, the process is very similar to publishing HTML documents. First the publisher uses Intermind Communicator to create a new type of software object called a Hyperconnector™. The publisher then posts the Hyperconnector to his or her Web site as a MIME object file, a process identical to posting HTML files.



The publisher next creates hyperlinks between the HTML documents and the Hyperconnectors . These hyperlinks make it simple to download the Hyperconnectors while browsing a Web page.



Intermind Corporation

CORD075012

As long as the reader has downloaded a copy of Intermind Communicator, the reader can explore a Hyperconnector just like any other Web page—by clicking on its link.



The difference is that Hyperconnectors are not ordinary HTML pages that will disappear as soon as the reader is finished browsing. Instead they are software objects that can be stored on the reader's machine and relied upon to perform future communications tasks. The way this works is that the reader's browser "hands off" the Hyperconnector MIME object to Intermind Communicator. Intermind Communicator stores it in an internal database, then displays the contents of a Hyperconnector as an HTML page back to the browser.

In essence, Intermind Communicator operates like a miniature Web server on the reader's own desktop. Intermind Communicator dynamically produces HTML "pages" from its database of Hyperconnectors in the same way database-driven Web sites produce HTML pages on-the-fly.

## Anatomy of a Hyperconnector

The same way hyperbuttons store phone numbers and related information for automating phone calls, Hyperconnectors store Web addresses and related information for automating Web communications. The diagram below shows a "cross section" of a Hyperconnector MIME object.

Intermind Corporation



**Messages**
Dynamic content that can include links to the Publisher's Web site, graphics, video and audio. Delivered automatically to subscribers.

**Headlines**
Appear in subscriber's New Messages area. Can be linked directly to the Publisher's Web site.

**Topics**
Publisher-defined message categories.

**"Object Shell"**
Code that controls polling, URL references, and the automatic exchange of information and feedback.

Inside the object "shell", the first layer is the message **Topics**. This is the key property of Hyperconnectors in Intermind Communicator 1.0; topics define the different message "channels" a reader can choose from within each Hyperconnector. The reader can change topic selections at any time by editing a simple form. Each topic can contain a **Headline**; these summarize updates from Web publishers. Each headline can be linked directly back to the publisher's Web site, or they can be linked to one **Message** page inside the Hyperconnector. This is a standard HTML page composed by the publisher (note that any graphics must be indirect references back to the publisher's Web site).

In addition to the properties above that control message display, a Hyperconnector also contains two other key properties:

1) **Hyperconnector URL:** This is the address of the Hyperconnector MIME object file on the publisher's Web site. Like the phone number in a hyperbutton, this is how the Hyperconnector can automate checking for updated information.

2) **Polling interval:** This is the time interval after which each Hyperconnector will check for an update. Because publishers know how frequently their information changes, this is a powerful tool for controlling how often readers receive new messages.

## How Updates are Transmitted

Once a reader obtains and activates a Hyperconnector —a process called "subscribing" — the Hyperconnector will begin updating the subscriber with new messages on the subscriber's selected topics. This follows the same steps as the "pull" process for updating hyperphone numbers above.

First, the publisher uses Intermind Communicator to update the messages in the Hyperconnector MIME object file. Secondly, the publisher posts the updated

Intermind Corporation

Hyperconnector file to the Web server (overwriting the previous file). Then, when the polling interval has elapsed, each subscriber copy of the Hyperconnector checks back with the original file on the Web site. If the file has been updated, Intermind Communicator downloads the new version, compares the new headlines and messages with the topics the subscriber has selected, and displays only those that match.

The result is a complete, automated communications channel from the publisher's desktop to the subscriber's desktop — all without any special server software involved.



## Completing the Feedback Loop

Just as a Web site allows publishers to gain insight about their readers using Web server statistics, a publisher's Hyperconnectors can offer a wealth of valuable feedback about subscriber's interests. To gather this feedback while protecting subscriber's privacy, Intermind Communicator includes a special hyperconnection between each reader's copy of Intermind Communicator and the Intermind Statistics Database.

This built-in hyperconnection updates the Statistics Database when subscribers *select* new Hyperconnectors, *modify* Hyperconnector topic selections, or *discard* Hyperconnectors. All statistical updates are completely anonymous: Intermind Communicator users are always anonymous unless they chose otherwise, and the system has been designed to ensure that identifying specific subscribers in any way is impossible. The result is that users' privacy is completely ensured, while publishers receive extremely invaluable feedback describing the overall needs of the publisher's audience.

Publishers, of course, can use this essential information to shape communications, better tailor topic definitions, modify content offerings, etc. Publishers use password-protected accounts to access the database to see subscription statistics, as well as any demographic data voluntarily offered by subscribers during initial registration of Intermind Communicator.

The Intermind Statistics Database also provides an opportunity for subscribers to offer direct feedback to the publisher of an Hyperconnector completely anonymously. Subscribers can post this input without revealing e-mail addresses or any other identifying information. In this sense, each Hyperconnector becomes a fully

Intermind Corporation

CORD075015

personalized two-way communications channel connecting the publisher and subscriber.

## How Hypercommunications Differs from Related Technologies

As quickly as the Web is evolving, so are different solutions to the problem of maintaining persistent communications relationships over the Internet. Online information exchanges take one of two forms, commonly referred to as either "push" or "pull". This section will describe how the hypercommunications architecture differs from other approaches.

### Electronic Mailing Lists

E-mail is the most common form of information "push" employed by Web sites today. By setting up electronic mailing list software on a server (called a "listserv"), Web site publishers can solicit e-mail addresses from visitors who would like to receive ongoing notifications about new information. The newest generation of listservs also allow subscribers to select notification on specific topics.

While e-mail is the most widely-used information pushing mechanism today, it has a number of disadvantages in comparison to hypercommunications:

- **Large administrative burden for Web publishers.** Besides the effort involved with setting up and maintaining a listserv program, listservs must also maintain the current e-mail address of every subscriber—a task that becomes very difficult as subscribers move. The listserv must also distribute messages to the entire list, a process which can consume large amounts of processor time and network bandwidth. *Hyperconnectors avoid this problem completely by using an information "pull" architecture that requires no centralized address storage and fully distributes the transmission load.*

- **More effort for subscribers.** Listservs require that subscribers send commands via e-mail to subscribe, unsubscribe, change their preferences, etc. This can be cryptic, awkward, and burdensome when subscribers change e-mail accounts.

- **Not anonymous.** Because subscribers must give up their e-mail addresses, listservs are not anonymous. In fact many allow public searches of subscriber names and e-mail addresses.

- **No automatic filtering, sorting, and indexing for the subscriber.** Perhaps the most critical difference between e-mail and hypercommunications is subscriber control. With e-mail, every message is coming down the same "channel", limiting the

Intermind Corporation

CORD075016

subscriber's ability to filter and sort new messages. With Hyperconnectors, every message is automatically filtered by topic and sorted by its originating Hyperconnector, as well as by user-defined *categories* of Hyperconnectors. This makes Intermind Communicator a much more attractive communications client than standard e-mail software.

- **Plain** text messages. Although some e-mail clients are becoming HTML-enabled, they are still separate applications from the browser and contain no inherent hypertext functions. A hypercommunications program like Intermind Communicator is an active *hypertext communications processor*, using the full capabilities of the browser to filter, organize, display, and process communications for the user.

Because of these limitations, e-mail is somewhat ineffective for enabling rich, persistent communications relationships over the Web.

### Bookmark Monitors and Offline Browsers

As the Web began its rapid growth, two new solutions appeared for monitoring Web sites for updated information. Both were client-side programs that "pulled" the new information from a Web site to the subscriber's desktop. The first one, called a *bookmark monitor* or *URL watcher*, allowed the subscriber to specify which Web pages to monitor. The monitoring program then periodically polled these pages and reported those that had changed to the subscriber.

A further extension of this functionality was the *offline browser*. This program not only monitored selected Web pages, but automatically downloaded those that changed to the subscriber's machine, so they could be viewed in their entirety offline.

Unfortunately, neither of these approaches fundamentally solves the problem of creating a persistent communications relationship between a Web publisher and subscriber. The pages being monitored are designed to simply *display* information, not to communicate about content changes. This mechanism also fails to distinguish changes that are relevant, or point users toward new content on pages other than those being monitored.  Furthermore, the monitoring process provides little or no feedback to the Web publisher about who is interested in what information—in fact, the Web server statistics generated by URL watchers or offline browsers can be highly deceiving, since the programs poll Web pages blindly without regard for how often, or how seldom, the content actually changes.

CORD075017

Case 1:06-cv-00491-MPT   Document 330-1   Filed 01/30/09   Page 46 of 84 PageID #: 6163

### Server Broadcasting

Another alternative for creating communications relationships using a "pull" approach is by operating a special server that "broadcasts" information to special clients designed to monitor it over a network. By allowing the client application to select specific information topics or "channels" from the server broadcast stream, the publisher is able to effectively "narrowcast" to an audience, and subscribers are able to receive the subset of information they desire. This architecture is already being successfully deployed by several companies on the Internet.

This model is a significant improvement over the push approach of e-mail and the pull approach of bookmark monitors or offline browsers. It allows the publisher to actively send information to subscriber desktops, including hypertext links that the subscriber can follow for further information. If a feedback mechanism is deployed, the publisher can also learn more about the size and composition of the audience. For their part, subscribers can use the capabilities of the client application to control the filtering, organization, and display of information received via the selected channels.

While an attractive new medium for information dissemination, the server broadcasting model has several drawbacks as a new two-way communications platform.

- First, it requires the use of a specialized server, limiting availability and posing compatibility problems.

- Secondly, it requires the publisher to use a centralized publishing process, creating bottlenecks in the highly distributed many-to-many environment of the Internet.

- Thirdly, server-based "channels" effectively limit the granularity of information topics the publisher can offer and subscribers can choose.

- Lastly, server channels give subscribers only limited control over the information received via these channels—there is no inherent mechanism for processing or responding too the information arriving via each channel.

By contrast, hypercommunications architecture is entirely server-independent. By using the Internet-standard HTTP protocol, Intermind Communicator allows any Web publisher to use any standard HTTP server as a "broadcast" station. No special server software is required. This enables publishing to be as widely distributed as HTML authoring is distributed today. Future versions of Intermind Communicator will also support other industry standard protocols such as SMTP, FTP, and NFS, so different types of servers can function as hypercommunications hosts.

Intermind Corporation

CORD075018

In addition, the fundamental object-orientation of hypercommunications architecture permits much greater communications control on the part of both publishers and subscribers. Since every Hyperconnector creates its own communications "channel", publishers can offer a much finer granularity of information topics to subscribers, and more easily evolve these based on subscriber feedback. Hyperconnector objects also give subscribers a simple, intuitive way to select, organize, filter, display, and archive hypercommunications messages.

Perhaps the best way to characterize the difference in the two architectures is that the server broadcasting model is the logical extension of the client-server model of the past decade, while hypercommunications represents a new "object-to-object" communications model that will transcend any particular client-server relationship.

## Software Agents

The ability to deliver personalized information to the desktop has long been the promise of software agents. Although the word "agent" is widely used and has several meanings, it generally refers to software programs which independently navigate different servers on an electronic network to find specific information or accomplish specific tasks for the user.

While Intermind Communicator definitely delivers many of these same benefits, it should be apparent from this discussion that it uses a completely different architecture. No special servers are involved, nor are their any software programs that "roam" a computer network. Hypercommunications, in many ways, is the complete opposite: it establishes direct, object-to-object "microchannels" across communications networks that let publishers and subscribers share information of direct, personal relevance.

However, this is not to say that agent technologies do not have their place, particularly the latest generation of object-oriented agents that enable "smart" Web sites to offer their users personalization features. To the extent that these technologies employ one or more objects on the server as a representative or "proxy" of the user, they are actually quite complementary to hypercommunications. The next logical step is to enable these software agents to have a hypercommunications channel directly to the desktop using Hyperconnectors.

## Distributed Object Standards

Because hypercommunications architecture is based on a system of distributed communications objects, it may also be tempting to characterize it as a new distributed object standard such as Microsoft's DCOM or the Object Management Group's CORBA.

This is highly misleading. Just as hypertext is a process for automating document retrieval using hyperlinks that can be implemented across any type of operating system, graphical user interface, or document type, hypercommunications is a process of automating communications using software objects that can be implemented using any type of distributed object standard.

Although Intermind's implementation in Intermind Communicator uses a very simple object architecture designed for implementation directly on HTTP servers, Intermind's Hyperconnector system can be extended to be compatible with DCOM, CORBA, DCE, or any other distributed object standards. Intermind Communicator can also be extended with ActiveX or Java interfaces which are also compatible with these standards.

## Summary

Hypercommunications is not a "point" solution to a short-term problem on the Internet or World Wide Web. Rather it is a fundamentally new approach to automating many types of communications functions over any type of data communications network. This process is based on the same fundamental principle of hypertext: *distributed communications controls* shared by information publishers with interested subscribers.

Intermind Communicator is the first product to apply hypercommunications technology to the World Wide Web. Using a patent-pending new type of distributed object called a Hyperconnector, Intermind Communicator lets information publishers and subscribers create rich, personal, anonymous communications channels directly between the publisher's Web site and the subscriber's desktop.

Subscribers retain complete control over all aspects of this communications relationship, while publishers receive more accurate, detailed, and timely feedback than has ever before been possible. Just as store merchants can track those products that are popular, those that sit in inventory, and those that are frequently returned, Web publishers can now track the communications they offer in the same fashion.

Hypercommunications differs significantly from all of the other mechanisms for communicating over electronic networks, including both "push" and "pull" techniques. As a process for using distributed objects to control communications, hypercommunications architecture offers benefits not attainable via any other approach, and has the potential to become an entirely new form of electronic communications.

Intermind Corporation

CORD075020

Case 1:06-cv-00491-MPT   Document 330-1   Filed 01/30/09   Page 49 of 84 PageID #: 6166

## About Intermind

Intermind is a rapidly growing communications company whose pioneering products and services simplify and enrich the way people communicate. Based in Seattle, WA, Intermind Corporation was founded in September 1995 and is privately held.

Additional information is available at our Web site (www.intermind.com) or by calling us toll-free at
1-800-625-6150 ( in Seattle, call 1-206-812-6000).

*For automatic personal notification about future white papers on hypercommunications technology and Intermind products, we invite you to subscribe to the relevant topics in the Intermind Fresh Stuff Hyperconnector included in every copy of Intermind Communicator*

© 1996, Intermind Corporation.

Intermind Corporation

CORD075021

# EXHIBIT 6

CONFIDENTIAL
PURSUANT TO PROTECTIVE ORDER

SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 7



**UNITED STATE    EPARTMENT OF COMMERCE**
**Patent and Trademark Office**
Address: COMMISSIONER OF PATENTS AND TRADEMARKS
Washington, D.C. 20231

| APPLICATION NUMBER | FILING DATE | FIRST NAMED APPLICANT | ATTY. DOCKET NO. |
|---|---|---|---|
| 08/609,115 | 02/29/96 | REED | D   10234/7000 |

B3M1/0513

STEVEN J HENRY
BRETT N DORNY
WOLF GREENFIELD & SACKS
FEDERAL RESERVE PLAZA 600 ATLANTIC AVE
BOSTON MA 02210-2211

| EXAMINER |
|---|
| BAROT, B |

| ART UNIT | PAPER NUMBER |
|---|---|
| 2315 | 8 |

DATE MAILED: 05/13/97

This is a communication from the examiner in charge of your application.
COMMISSIONER OF PATENTS AND TRADEMARKS

## OFFICE ACTION SUMMARY

☑ Responsive to communication(s) filed on _03/20/1997_

☐ This action is FINAL.

☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 D.C. 11; 453 O.G. 213.

A shortened statutory period for response to this action is set to expire ____3____ month(s), or thirty days, whichever is longer, from the mailing date of this communication. Failure to respond within the period for response will cause the application to become abandoned. (35 U.S.C. § 133). Extensions of time may be obtained under the provisions of 37 CFR 1.136(a).

### Disposition of Claims

☑ Claim(s) _2-25_ is/are pending in the application.

Of the above, claim(s) _____ is/are withdrawn from consideration.

☐ Claim(s) _____ is/are allowed.

☑ Claim(s) _2-25_ is/are rejected.

☐ Claim(s) _____ is/are objected to.

☐ Claim(s) _____ are subject to restriction or election requirement.

### Application Papers

☑ See the attached Notice of Draftsperson's Patent Drawing Review, PTO-948.

☐ The drawing(s) filed on _____ is/are objected to by the Examiner.

☐ The proposed drawing correction, filed on _____ is ☐ approved ☐ disapproved.

☐ The specification is objected to by the Examiner.

☐ The oath or declaration is objected to by the Examiner.

### Priority under 35 U.S.C. § 119

☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d).

☐ All ☐ Some* ☐ None    of the CERTIFIED copies of the priority documents have been

☐ received.

☐ received in Application No. (Series Code/Serial Number) _____.

☐ received in this national stage application from the International Bureau (PCT Rule 17.2(a)).

*Certified copies not received: _____

☐ Acknowledgment is made of a claim for domestic priority under 35 U.S.C. § 119(e).

### Attachment(s)

☑ Notice of Reference Cited, PTO-892

☐ Information Disclosure Statement(s), PTO-1449, Paper No(s). _____

☐ Interview Summary, PTO-413

☑ Notice of Draftsperson's Patent Drawing Review, PTO-948

☐ Notice of Informal Patent Application, PTO-152

--SEE OFFICE ACTION ON THE FOLLOWING PAGES--

AMZC 121416

Serial Number: 08/609,115                                          Page 2

Art Unit: 2315

### DETAILED ACTION

1.    Claim 1 is canceled and new claims 2-25 are remain for examination.

### *Specification*

2.    The title of the invention is not descriptive.  A new title is required that is clearly

indicative of the invention to which the claims are directed.

3.    The lengthy specification has not been checked to the extent necessary to

determine the presence of all possible minor errors.  Applicant's cooperation is

requested in correcting any errors of which applicant may become aware in the

specification.

### *Claim Rejections - 35 USC § 112*

4.    Claim 4 is rejected under 35 U.S.C. 112, second paragraph, as being indefinite

for failing to particularly point out and distinctly claim the subject matter which applicant

regards as the invention.

       As to claim 4, claim 4 recites the limitation " the server". There is insufficient

antecedent basis for this limitation in the claims 2 and 4.

AMZC 121417

Serial Number: 08/609,115                                    Page 3

Art Unit: 2315


### *Claim Rejections - 35 USC § 103(a)*

5.    The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made.

> Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.


6.    Claims 2-19 are rejected under 35 U.S.C. 103(a) as being unpatentable over

Lyons (U.S. Patent No. 5,623,656) in view of Davies et al (U.S. Patent No. 5,586,311).


7.    As to claim 2, Lyons discloses a data communication system comprising : an

external computer including a primary database (provider memory) which storing

information including data and instructions; a client computer including a memory

(consumer memory); update information in the primary database in response to receive

a client information; and transfer the update information from the external computer to

AMZC 121418

Serial Number: 08/609,115                                    Page 4

Art Unit: 2315

the client computer (see abstract; figure 1; column 2 lines 28-60 and column 3 line 50 to
column 4 line 5).

However, Lyons does not explicitly disclose to create metadata which can be
processed to determine an update of the information and to control communication of
the information when it is update. Davies discloses a metadata management facility
which can be processed to determine an update of the information and to control
communication of the information when it is update (figures 1 and 6; column 2 lines 5-
12 and 48-67, and column 5 line 34 to column 6 line 7). It would have been obvious to
one of ordinary skill in the art at the time the invention was made to use the metadata
management facility of Davies in the data communication system of Lyons because it
would improve control over the data analyze and access system.

8.      As to claim 3, it would have been obvious to one of ordinary skill in the art at the
time the invention was made to update data or information by comparing a second
version of information with a first version of the last update information.

9.      As to claims 4-6 and 13, Lyons discloses that update information in the primary
database in response to receive a client information; and transfer the update
information from the external computer to the client computer via data server (see
abstract; figure 1; column 2 lines 28-60 and column 3 line 50 to column 4 line 5).

AMZC 121419

Serial Number: 08/609,115                                      Page 5

Art Unit: 2315

10.    As to claims 7-8, Lyons discloses that the external computer receives a client
information via data server from the client computer and updates information in the
primary database in response to receive the client information by comparing the client
information with the last update information in the primary database; transfer the update
information from the external computer to the client computer via data server; and the
client (user) retrieving the update information (instruction) from the client computer and
executing the update information (see abstract; figure 1; column 2 lines 28-60, column
3 line 50 to column 4 line 5, column 4 lines 34-47, column 5 line 21 to column 6 line 27).


11.    As to claims 9-12, above remarks rejecting claims 4-8 equally apply here. Lyons
does not explicitly disclose to store the information in the provider memory and the
consumer memory. But it would have been obvious to one of ordinary skill in the art at
the time the invention was made.


12.    As to claims 14-19, they are also rejected for the same reasons set forth to
rejecting claims 2-13 above.


13.    Claims 20-25 are rejected under 35 U.S.C. 103(a) as being unpatentable over
Lyons (U.S. Patent No. 5,623,656) in view of Davies et al (U.S. Patent No. 5,586,311)
as applied to claims 2-19 above, and further in view of Hamada et al (U.S. Patent No.
5,596,720).

AMZC 121420

Serial Number: 08/609,115

Art Unit: 2315

Page 6

14.   As to claim 20-25, above remarks rejecting claim 1 equally apply here. Neither

Lyons nor Davies explicitly teaches that the consumer transferring the consumer

response information from the consumer memory to the provider memory based upon

the provider response information. Hamada teaches that a client process transferring a

new information (changed or updated information) or re-transferring an old information

from the client process to the processing server via reception server based upon the

server response (figures 1-5; column 2 lines 22-39, column 6 line 56 to column 7 line

29, and column 7 line 34 to column 8 line 38). It would have been obvious to one of

ordinary skill in the art at the time the invention was made to use the method of

Hamada incorporate with the method of Lyons because it would decrease the system

down time and increase the efficiency of the data communication system.

### *Contact Information*

15.   Any inquiry concerning this communication or earlier communications from the

examiner should be directed to **Bharat Barot** whose telephone number is (703)

305-4092.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, **Mr. Parshotam S. Lall,** can be reached on (703) 305-9715.

AMZC 121421

Serial Number: 08/609,115                                          Page 7

Art Unit: 2315

Any inquiry of general nature or relating to the status of this application should be directed to the group receptionist whose telephone number is (703) 305-3900. The fax number for examiner's Art Unit or Group is (703) 308-5356.

β.β.

Patent Examiner Bharat Barot

Art Unit 2315

May 6, 1997

PARSHOTAM S. LALL
PRIMARY EXAMINER
ART UNIT 234

AMZC 121422

# EXHIBIT 8

JUL  3'97 15:31 FR WOL    FFNFIELD SACKS 16177203588 TO    7033085356# P.02

Attorney Docket No. I0234/7000

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

Applicant:      Drummond Reed, et al.
Serial No.:     08/609,115
Filed:          February 29, 1996
Title:          COMMUNICATIONS SYSTEM

Examiner:       B. Barot
Art Unit:       2315

*RECEIVED JUL 3 1997 GROUP 2300*

---

### CERTIFICATE OF TRANSMISSION UNDER 37 C.F.R. § 1.8(a)

The undersigned hereby certifies that this document is being sent by facsimile transmission, addressed to Assistant Commissioner for Patents, Washington, D.C. 20231 to number (703) 308-5356 on the 3rd day of July, 1997.

Brett N. Dorny, Reg. No. 35,866

---

ASSISTANT COMMISSIONER FOR PATENTS
WASHINGTON, D.C.  20231

Dear Sir:

### AMENDMENT

In response to the Office Action dated May 13, 1997, please amend the above

identified application as set forth below.

### IN THE TITLE:

Please amend the title to read "COMMUNICATIONS SYSTEM FOR

TRANSFERRING INFORMATION BETWEEN MEMORIES ACCORDING TO

PROCESSES TRANSFERRED WITH THE INFORMATION."

126360.1

AMZC 121425

JUL  3'97 15:31 FR WOL' ?FFNFIELD SACKS 16177203500 TO 7 4170330853568 P.03

U.S. Serial No. 08/609,115              -2-                    Art Unit 2315

<u>IN THE CLAIMS:</u>

    Please cancel claims 20-25 without prejudice as to the subject matter underlying these claims.

    Please amend claims 2-19 as follows:

    2.   (Amended)  A computer-based communication system comprising:

    a provider memory storing Information [including data, metadata, and instructions];

    a consumer memory;

    [transfer means for transferring said Information from said provider memory to said consumer memory;]

    association means for creating [association] metadata <u>and storing said metadata at said provider memory, said metadata describing associations with at least a portion of said information and defining a control structure</u> which [can be] <u>is</u> processed <u>at least at the consumer memory to define a process for determining</u> [to determine] an update of <u>an associated portion of</u> said information <u>in the provider memory associated with said control structure</u> and [to control] <u>for controlling</u> communication of said [information] <u>associated portion to said consumer memory</u> when [it] <u>said associated portion</u> is

126360.1

AMZC 121426

JUL  3'97 15:31 FR WOLF  PFENFIELD SACKS 16177203500 TO ???#17033085356# P.04

U.S. Serial No. 08/609,115                    -3-                    Art Unit 2315

updated[, said association metadata including associations between said data,

metadata, and instructions];

transfer means for transferring and storing a copy of said associated portion and

said control structure, from said provider memory to said consumer memory;

update determining means for processing said information, including said control

structure, to determine when said [information] associated portion in said provider

memory has been updated;

transfer control means for processing said information, including said control

structure, to transfer a copy of said associated [a] portion [of said information] from said

provider memory to said consumer memory when said update determining means

determines that said [information] associated portion has been updated.

3.    (Amended)  The computer-based communication system of claim 2,

wherein said update determining means includes:

versioning means for storing a first version value of a last update of said

information in said provider memory;

comparison means for comparing a second version value of [information] said

associated portion previously transferred to said consumer memory with said first

version value of said last update information.

[26360.1]

AMZC 121427

JUL  3'97 15:32 FR WOLF  ?FFNFIELD SACKS 16177203500 TO ???#17033085356# P.05

U.S. Serial No. 08/609,115                    -4-                    Art Unit 2315

~~4~~ 3    (Amended) The computer-based communication system of claim ~~2~~ 1,

wherein said [information includes] <u>control structure is associated with</u> a

communications network server address and polling control data, and wherein said

[metadata] <u>control structure</u> includes an association between said <u>communications</u>

network server address, polling control data, and [a] <u>said associated</u> portion [of said

information to be transferred to said server when said information is updated]; and

        wherein said transfer control means includes:

        [(a)    transfer means for transferring said portion of said information from said

provider memory to a server at said network server address as updated information,]

        [(b)] <u>(a)</u>    polling trigger means for processing said polling control data to

trigger update processing at the consumer memory <u>based upon the process defined by

the control structure,</u>

        [(c)] <u>(b)</u>    instruction retrieval means for retrieving transfer instructions from

said consumer memory based upon said polling control data,

        [(d)] <u>(c)</u>    access means for accessing [said] <u>a</u> server at said <u>communications</u>

network server address to request transfer of <u>a copy of</u> said updated information

according to the transfer instructions retrieved from said consumer memory, and

        [(e)] <u>(d)</u>    reception means for receiving said updated information transferred

by said server in response to a request and for storing said updated information in said

consumer memory.

126360.1

AMZC 121428

JUL  3'97 15:32 FR WOLF  >FFNFIELD SACKS 16177203500 TO 7774170330@S356# P.06

U.S. Serial No. 08/609,115                      -5-                      Art Unit 2315

9. (Amended)  The computer-based communication system of claim 2,
wherein said [information includes] control structure is associated with a
communications network address associated with said consumer memory, [and
wherein said metadata includes an association between said communications network
address and a portion of said information to be transferred to said consumer memory
when said information is updated]; and

        wherein said transfer control means includes:



        (a)    instruction retrieval means for retrieving, based upon the process defined
by the control structure, transfer instructions associated with said information from said
provider memory,

        (b)    transfer means for transferring a copy of said associated portion [of
information] to said communications network address according to the transfer
instructions retrieved from said provider memory as updated information,

        (c)    access means for accessing, based upon the process defined by the
control structure, said communication network address from said consumer memory to
retrieve said updated information, and

        (d)    reception means for receiving said updated information transferred from
said communications network address and for storing said updated information in said
consumer memory.

126360.1

AMZC 121429

JUL  3'97 15:32 FR WOLF  OFFNFIELD SACKS 16177203500 TO 777#17033085356# P.07

U.S. Serial No. 08/609,115                -6-                Art Unit 2315

8.    (Amended)  The computer-based communication system of claim 2,
wherein said [information] control structure includes a communications network casting
address, and wherein said [metadata] control structure includes an association between
said casting address and [a] said associated portion [of said information to be
transferred to said consumer memory when said information is updated]; and
         wherein said transfer control means includes:
         (a)    provider instruction retrieval means for retrieving, based upon the process
defined by the control structure, transfer instructions associated with said [information]
associated portion from said provider memory,
         (b)    transfer means for transferring said associated portion [of said
information] to said casting address according to the transfer instructions retrieved from
said provider memory as updated information,
         (c)    consumer instruction retrieval means for retrieving based upon the
process defined by the control structure said transfer instructions associated with said
[information] associated portion from said consumer memory,
         (d)    monitoring means for monitoring said casting address from said consumer
memory to retrieve said updated information based upon said transfer instructions, and
         (e)    reception means for receiving said updated information from said casting
address and for storing said updated information in said consumer memory.

126360.1

AMZC 121430

JUL  3'97 15:32 FR WOLF  FFNFIELD SACKS 16177203500 TO 777#17033065356# P.08

U.S. Serial No. 08/609,115                -7-                    Art Unit 2315

7. (Amended) The computer-based communication system of claim 2, wherein said [metadata] control structure includes notification metadata, said notification metadata including associations that [can be] are processed to control notifying a user of at least portions of the updated information; and

wherein the system further comprises notification control means including:

(a)    instruction retrieval means for retrieving notification instructions associated with said associated portion[s] of said updated information in said consumer memory based upon the process defined by the control structure;

(b)    instruction execution means for executing said notification instructions to notify the user of said updated information.

8. The computer-based communication system of claim 7, wherein said notification metadata includes a plurality of information references, each information reference being associated with a portion of the updated information; and

wherein said instruction execution means includes:

(a)    user preference means for receiving at least one user reference,

(b)    preference comparison means for comparing said plurality of information references to said at least one user reference, and

(c)    reference notification means for notifying the user of portions of the updated information associated with information references which correspond to said at least one user reference.

126360.1

AMZC 121431

JUL  3'97 15:32 FR WOLF  "FNFIELD SACKS 16177203500 TO 777#170330B5356# P.09

U.S. Serial No. 08/609,115          -8-                    Art Unit 2315

8
~~9~~.   (Amended)  The computer-based communication system of claim ~~2~~,
wherein the [information] control structure includes [provider] response control
information for defining a second process for controlling a transfer of a copy of
consumer [response] information stored in the consumer memory to a communications
network address specified by said [provider] response control information; and

the system further comprising:

consumer transfer means, associated with the consumer memory, for processing
the [provider] response control information to transfer said copy of said consumer
[response] information to the communications address.

9
~~10~~.   (Amended)  The computer-based communication system of claim ~~9~~ 8,
wherein the communications address is associated with the provider memory, and

the system further comprising:

reception means, associated with the provider memory, for receiving the
consumer [response] information from the communications address and storing it in the
provider memory based upon the second process defined by the response control
information.

10
~~11~~.   (Amended)  The computer-based communication system of claim ~~9~~ 8,
further comprising:

126360.1

AMZC 121432

JUL  3'97 15:33 FR WOL  ʳʳFRNFIELD SACKS 16177203500 TO 777#17033095356# P.12

U.S. Serial No. 08/609,115                    -9-                    Art Unit 2315

consumer request means, associated with the consumer memory, for requesting the consumer [response] information from a user based upon the second process defined by the response control information; and

consumer input means for receiving the consumer [response] information input by a user and storing said information in the consumer memory.

11
~~12.~~   (Amended)  The computer-based communication system of claim 8, further comprising:

update determining means for determining when consumer [response] information in said consumer memory has been updated based upon the process defined by the control structure; and

instruction execution means for processing said [provider] response control information  to transfer a copy of said consumer [response] information which has been updated from said consumer memory to said communications address.

12
~~13.~~   (Amended)  The computer-based communication system of claim 4, wherein [the information] control structure includes [provider] response control information [instructions for transferring] defining a second process for controlling a transfer of consumer [response] information stored in the consumer memory to the provider memory; and

the system further comprising:

126360.1

AMZC 121433

JUL  3'97 15:33 FR WOLF  GFFNFIELD SACKS 16177203500 TO 777#17033095356# P.11

U.S. Serial No. 08/609,115               -10-                          Art Unit 2315

consumer transfer means, associated with the consumer memory, for

transferring a copy of said consumer [response] information to the provider memory

based upon the second process defined by the response control information

[instructions]; and

wherein said association means associates portions of said information in said

provider memory with said consumer memory based upon said consumer [response]

information.

24.    (Amended)  A computer-based method for communicating updated

information comprising the steps of:

[associating information including data, metadata, and instructions] creating

metadata defining a control structure in a provider memory, said control structure

including associations with portions of said information in a provider memory, said

control structure defining a process to transfer [metadata including associations to be

processed to cause transfer of] an associated portion of said information associated

with said control structure to a consumer memory; and

transferring a copy of the associated portion of said information, and said control

structure, from the provider memory to the consumer memory; and

determining when the associated portion of said information in said provider

memory has been updated based upon processing of said control structure; and

126360.1

AMZC 121434

JUL  3'97 15:53 FR WOLF   FFNFIELD SACKS 16177203500 TO ???#1?0330053S6# P.12

U.S. Serial No. 08/609,115          -11-                    Art Unit 2315

processing said information, including said control structure at least at said

consumer memory, to transfer a copy of said associated portion of said information

from said provider memory to said consumer memory when the associated portion of

information in said provider memory has been determined to have been updated.

20
15.   (Amended)  The computer-based method of claim 14, wherein said

[information] control structure includes notification [information] metadata representing a

process for notifying a user of at least portions of the updated information; and

the method further comprising the step of processing said notification

[information] metadata to notify the user of said at least portions of the updated

information.

21
16.   The computer-based method of claim 15, further comprising the steps of:

setting user preferences representing types of information for which a user is to

be notified of updated information;

comparing updated information with said user preferences; and

notifying the user of updated information based upon the comparing step.

22
17.   (Amended)  The computer-based communication [system] method of

claim 14, wherein the [information] control structure further includes [provider] response

control information, including a communications network address, for transferring a

12/0/60.1

AMZC 121435

U.S. Serial No. 08/609,115                    -12-                      Art Unit 2315

copy of consumer [response] information stored in said consumer memory; and the

method further comprises the step of:

    processing said [provider] response control information to transfer a copy of said

consumer [response] information from said consumer memory to said communications

network address.

    23.

    18.     (Amended)  The computer-based communication [system] method of

claim 17, wherein the communications network address is associated with the provider

memory; and the method further comprises the steps of:

    processing said [provider] response control information to transfer said consumer

[response] information from said [consumer memory] communications address to said

provider memory; and

    receiving and storing the consumer [response] information in the provider

memory.

    24.

    19.     (Amended)  The computer-based communication [system] method of

claim 17, wherein said processing step includes:

    requesting consumer [response] information from a user; and

    receiving consumer [response] information input by a user;

    storing said consumer [response] information in the consumer memory; and

126360.1

AMZC 121436



JUL  3'97 15:34 FR WOLF  GREENFIELD SACKS 16177203500 TO  777#1703300853S6#  P.14

U.S. Serial No. 08/609,115          -13-          Art Unit 2315

transferring a copy of said consumer [response] information to said

communications network address.

Please add claims 26-31 as follows:

13  26.   The computer-based communication system of claim 2, wherein said

provider memory operates as a web server and said consumer memory operates as a

client of said web server.

14  27.   The computer-based communication system of claim 2, wherein said

information includes instructions, and said metadata includes associations with at least

said instructions.

15  28.   The computer-based communication system of claim 2, wherein said

metadata includes associations with said control structure.

16  29.   The computer-based communication system of claim 2, wherein said

associations include hypertext links.

17  30.   The computer-based communication system of claim 2, wherein said

control structure is embodied as a MIME object when transferred.

124360.1

AMZC 121437

JUL  3'97 15:34 FR WOLF  GREENFIELD SACKS 16177203500 TO ???#170330#S356# P.15

U.S. Serial No. 08/609,115                    -14-                    Art Unit 2315

31.   The computer-based communication system of claim 2, wherein said control structure is stored in a portion of the provider memory at a communications server separate from a portion of the provider memory storing other of said information.

## REMARKS

The title was objected to as not being indicative of the invention.  Claim 4 was rejected under 35 U.S.C. § 112, second paragraph, as being indefinite.  Claims 2-19 were rejected under 35 U.S.C. § 103(a) as being unpatentable over Lyons in view of Davies.  Claims 20-25 were rejected under 35 U.S.C. § 103(a) as being unpatentable over Lyons in view of Davies and Hamada.  Reconsideration is respectfully requested.

Preliminarily, applicants wish to thank the Examiner for the courtesies shown in connection with a personal interview and several telephone interviews.  Applicants also appreciate the Examiner's willingness to review proposed amendments to the claims so that prosecution of this application has been expedited.  Such courtesies have assisted applicants in better understanding and responding to the art rejections made in the Office Action.

The title has been amended and is clearly indicative of the claimed invention.  Accordingly, the objection to the title should be withdrawn.

Claim 4 has been amended to correct the references to the server and the server address, as noted in the Office Action.  In each instance, claim 4 refers to a communications network server address and a server corresponding to the

124360.1

AMZC 121438

JUL  3'97 15:34 FR WOLF  GREENFIELD SACKS 16177203500 TO ???H17033085356H P.16

U.S. Serial No. 08/609,115                    -15-                         Art Unit 2315

communications network server address.  Therefore, claim 4 is definite, and the

rejection under 35 U.S.C. § 112, second paragraph, has been overcome and should be

withdrawn.

     Applicants respectfully assert that claims 2-19 patentably distinguish over the

cited art.  Claims 2-19 have been amended to more particularly recite the present

invention.  The amendments clarify certain aspects of the invention which clearly

distinguish over the cited art.  In particular, the present invention, as recited in claim 2,

for example,  relates to a computer-based communication system.  The system

includes an association means for creating metadata describing associations with

portions of information stored in a provider memory, which are stored at the provider

memory.  The metadata also defines a control structure which can be processed at

least at the consumer memory to determine updates to information in the provider

memory and transfer the information from the provider memory to the consumer

memory when an update occurs.  The system also includes means for transferring and

storing a copy of the information and the control structure from the provider memory to

the consumer memory.  Finally, the system includes update determining means and

transfer control means which process the information, including the control structure, to

determine an update and transfer the information to the consumer memory when an

update has occurred.  As defined by the claims, the system allows a definition for

control of a communications relationship to be transferred from a provider of information

to a consumer of information.  A copy of at least portions of the control is resident at

AMZC 121439

1'

JUL  3'97 15:34 FR WOLF  GREENFIELD SACKS 16177203500 TO 777#17033085356# P.17

U.S. Serial No. 08/609,115                   -16-                              Art Unit 2315

both the provider and consumer, where it is processed to control subsequent transfers
of information between the provider and consumer.  As discussed in more detail below,
various dependent claims also relate to control of information transfers from the
consumer to the provider.

   The cited art does not teach or suggest such a system.  Lyons, the principal
cited art, discloses a script preprocessor as part of a data server.  HTML scripts are
used to provide information from the data server to a user.  When the user submits
information using HTML forms, the script preprocessor can use the information in
connection with subsequent scripts.  The script preprocessor can also retrieve
information from a local or external database in connection with generation of scripts
sent to the user.  Lyons does not teach or suggest a control structure which is
processed to control communications between a provider and consumer.  In particular,
it does not teach or suggest a structure which is processed to determine updates to
information in the provider and transfer updated information to the consumer.  In fact,
nothing in Lyons determines an update in the database.  Furthermore, nothing in Lyons
is processed to define a process for transferring information from the provider to the
consumer.  The only processing occurs with respect to information on forms.  This
relates solely to content and not to the processes for transfer.  Also, claim 2 recites that
the control structure is transferred to, stored at, and processed at the consumer
memory.  The client computer in Lyons only receives and displays HTML scripts.  There

125360.1

AMZC 121440

JUL  3 '97 15:35 FP. WOLF   ~FNFIELD SACKS 16177203500 TO 777#17033085356# P.18

U.S. Serial No. 08/609,115                -17-                          Art Unit 2315

is no transfer, storage, or processing of a control structure which is used to determine an update or transfer updated information.

   Davies fails to overcome the deficiencies of Lyons with respect to claim 2. Davies relates to an object oriented data access and analysis system. The system is used solely to access a database. It does not include any control structure which is processed to determine updates of data and to transfer the updated information, when it is determined. As noted in the Office Action, Davies does identify attribute information update objects. These objects are used to provide updates on the status of databases being accessed by the system, such as availability. They do not determine when information in the databases have been updated. Furthermore, while they relate to metadata, they do not define a control structure which is processed to determine when an update has occurred and to transfer updated information to the consumer. Davies also fails to transfer and store information, including any control structure, to the consumer for processing to determine updates and control transfer of information.

   Hamada has not been applied against claim 2 and also fails to provide any of the elements of claim 2. Hamada relates to a redundant message processing system. A reception server between a client process and a processing server performs various processing functions. It does not teach or suggest any control structure transfered from a provider to a consumer which is processed to control determinations of updates or transfer updated information.

126360.1

AMZC 121441

U.S. Serial No. 08/609,115                 -18-                 Art Unit 2315

In summary, none of Lyons, Davies nor Hamada teaches or suggests a control structure as recited in claim 2. Also, none of the cited art teaches or suggest transferring information from a provider to a consumer which includes control of future transfers of updated information. Therefore, the combination of these references fails to include any of these features. Claim 2 patentably distinguishes over the cited art and is condition for allowance.

Claims 3-13 depend from claim 2 and are allowable for at least the same reasons. These claims also further distinguish over the cited art.

For example, claim 3 recites that the update determining means of claim 2 includes a versioning means for storing a version value of a last update and a comparison means for comparing a second version value to a version value of previously transferred information. None of the cited art teaches or suggests versioning values with respect to transferred information. In fact, none of the cited art teaches or suggests storing information at a receiving location, i.e., the consumer memory. Therefore, there is no need for versioning of information to determine updates.

Claims 4-6 recite different manners in which transfers can occur, respectively, through a network server, a network address, and a casting address. The control structure defines a process for transferring the information through these respective manners. The cited art does not teach or suggest a control structure which defines a process for transferring information in the manners recited in claims 4-6.

126360.1

AMZC 121442

JUL  3'97 15:35 FR WOLF  ^FFNFIELD SACKS 16177203500 TO ???41703300353564 P.20

U.S. Serial No. 08/609,115               -19-                    Art Unit 2315

Claims 7 and 8 relate to use of notification metadata within the control structure. The notification metadata is used to provide notification to a user of specific information which has been updated and transferred to the consumer memory. As recited in claim 8, the notification can be based upon preferences set by the user. The cited art does not teach or suggest notification of specific information based upon metadata within a control structure or notification based upon user preferences.

Claims 9-13 relate to a response control structure as part of the overall control structure. The response control structure defines processes for transfer of information from the consumer memory back to the provider memory. None of the cited art teaches or suggests such a feature. None of the cited art suggests transfering a control structure from a provider to a consumer memory which defines processes for providing response information from the consumer memory to the provider memory. Lyons has a specific HTML form which is completed, but does not transfer any structures to the client. Neither Davies nor Hamada discloses or suggests a system which requests response information from a user.

Therefore, claims 3-13 patentably distinguish over the cited art and are in condition for allowance. The rejection under 35 U.S.C. § 103 should be withdrawn.

Claim 14 is an independent method for communicating updated information. Similar to the apparatus recited in claim 2, claim 14 recites the steps of creating metadata including a control structure defining a process to transfer information, transferring a copy of the control structure, determining when information has been

126360.1

AMZC 121443

U.S. Serial No. 08/609,115                    -20-                    Art Unit 2315

updated based upon the control structure, and transferring the updated information

based upon the control structure.  As discussed above, none of the cited art teaches or

suggests a control structure defining a process for transfer of information.  None of the

cited art teaches or suggests transferring the control structure from a provider memory

to a consumer memory.  Without a control structure transferred to the consumer

memory, the cited art cannot teach or suggest determining updates or transferring

updated information based upon that control structure.  Therefore, claim 14 patentably

distinguishes over the cited art and is in condition for allowance.

      Claims 15-19 depend from claim 14 and are allowable for at least the same

reasons.  These claims also further distinguish over the cited art.  Claims 15 and 16

relate to the method for creating notification metadata as part of the control structure.

The notification metadata is used to define a process for notifying a user of updated

information which has been transferred.  Claim 16 recites that the notification process is

based upon user preferences.  As discussed above, none of the cited art teaches or

suggests transfer of updated information or notification of a user of the updated

information.  Accordingly, claims 15 and 16 patentably distinguish over the cited art and

are in condition for allowance.

      Claims 17-19 relate to the methods for transferring consumer information from

the consumer memory.  In particular, the control structure includes response control

information for transfer of information stored in the consumer memory.  The response

control information is processed to transfer the consumer information to a network

*126360.1*

AMZC 121444

JUL  3'97 15:36 FR WOLF  ^FFNFIELD SACKS 16177283500 TO ???#170330853S6# P.22

U.S. Serial No. 08/609,115                   -21-                   Art Unit 2315

address, as recited in claim 17.  The information can be further transferred to the

provider memory through the method recited in claim 18.  Claim 19 recited requesting

the information from a user.  None of the cited art relates to response information from

a consumer memory.  Furthermore, none of the cited art teaches or suggests using a

control structure transferred from the provider memory for defining processes to transfer

the consumer information to the provider memory.  Accordingly, claims 18-19

patentably distinguish over the cited art.

        In order to expedite prosecution of this application, claims 20-25 have been

canceled without prejudice.  Applicants anticipate pursuing these claims in a

subsequent application.

        Finally, claims 26-31 have been added.  These claims depend from claim 2 and

are allowable for at least the same reasons.  They also further define features of the

present  invention not in the claims as originally filed.

        In view of the foregoing amendments and remarks, reconsideration and

favorable action upon all claims in the present application are respectfully requested.  In

the event that the Examiner has any questions regarding this amendment or the

application in

126360.1

AMZC 121445

JUL  3'97 15:36 FR WOLF GREENFIELD SACKS 16177203500 TO 7774170330053564 P.23

U.S. Serial No. 08/609,115                    -22-                    Art Unit 2315

general, he is encouraged to telephone the undersigned attorney so that prosecution of
this application may be expedited.

Respectfully submitted,

Drummond REED, et al.

By _____
Brett N. Dorny, Reg. 35,860
Wolf, Greenfield & Sacks, P.C.
600 Atlantic Avenue
Boston, MA 02210

126360.1

** TOTAL PAGE.023 **

AMZC 121446

# EXHIBIT 9

## CONFIDENTIAL
## PURSUANT TO PROTECTIVE ORDER

## SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY