# EXHIBIT 1

## CONFIDENTIAL
## PURSUANT TO  PROTECTIVE ORDER

## SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 2

# W3C° > About the World Wide Web Consortium (W3C)

*Translations of these pages available in:* العربية, *Bosanski, Deutsch, Ελληνικά, 한국어, Castellano, Polski, Српски . More about translations.*

The World Wide Web Consortium (W3C) is an international consortium where Member organizations, a full-time staff, and the public work together to develop Web standards. W3C's mission is:

**To lead the World Wide Web to its full potential by developing protocols and guidelines that ensure long-term growth for the Web.**

## W3C Develops Web Standards and Guidelines



**Tim Berners-Lee, W3C Director and inventor of the World Wide Web**

W3C primarily pursues its mission through the creation of Web standards and guidelines. Since 1994, W3C has published more than 110 such standards, called W3C Recommendations. W3C also engages in education and outreach, develops software, and serves as an open forum for discussion about the Web. In order for the Web to reach its full potential, the most fundamental Web technologies must be compatible with one another and allow any hardware and software used to access the Web to work together. W3C refers to this goal as "Web interoperability." By publishing open (non-proprietary) standards for Web languages and protocols, W3C seeks to avoid market fragmentation and thus Web fragmentation.

Tim Berners-Lee and others created W3C as an industry consortium dedicated to building consensus around Web technologies. Mr. Berners-Lee, who invented the World Wide Web in 1989 while working at the European Organization for Nuclear Research (CERN), has served as the W3C Director since W3C was founded, in 1994.

## W3C Is an International Consortium

Organizations located all over the world and involved in many different fields join W3C to participate in a vendor-neutral forum for the creation of Web standards. W3C Members and a dedicated full-time staff of technical experts have earned W3C international recognition for its contributions to the Web. W3C Members (sample testimonials), staff,

and Invited Experts work together to design technologies to ensure that the Web will continue to thrive in the future, accommodating the growing diversity of people, hardware, and software.

W3C's global initiatives also include nurturing liaisons with national, regional and international organizations around the globe. These contacts help W3C maintain a culture of global participation in the development of the World Wide Web. W3C coordinates particularly closely with other organizations that are developing standards for the Web or Internet in order to enable clear progress. The document *Worldwide Participation in the World Wide Web Consortium* summarizes W3C efforts in broading our international impact; see our international relations home for more information.

W3C operations are supported by a combination of Member dues, research grants, and other sources of public and private funding, and the Supporters Program. W3C operations are jointly administered by the MIT Computer Science and Artificial Intelligence Laboratory (CSAIL) in the USA, the European Research Consortium for Informatics and Mathematics (ERCIM) headquartered in France and Keio University in Japan. W3C also has World Offices in many regions around the world. The W3C Offices work with their regional Web communities to promote W3C technologies in local languages, broaden W3C's geographical base, and encourage international participation in W3C Activities.



**Keio Univ. (Japan)**



**ERCIM (France)**



**MIT/CSAIL (USA)**

This set of pages also available as a single HTML page for printing; a printable brochure entitled W3C At a Glance(in PDF) is also available.

**Translations** of these pages are available in these languages: العربية, Bosanski, Deutsch, Ελληνικά, 한국어, Castellano, Polski, Српски. Many thanks to the W3C Offices for leading the translation of these pages, and for all the independent translators who are contributing to W3C. Note that at times there may be slight differences between the English version and a translated page. Translations of W3C standards and other documents are available on the Web.

*Ian Jacobs, Head of W3C Communications.*
*Please send feedback to site-comments@w3.org (public archive).*
*Translations of this page may be available.*
*Last modified $Date: 2008/04/29 17:36:49 $ by $Author: ijacobs $*

Copyright © 2004-2007 W3C® (MIT, ERCIM, Keio), All Rights Reserved. W3C liability, trademark, document use and software licensing rules apply. Your interactions with this

site are in accordance with our public and Member privacy statements.

Photo credits: Sam Ogden, Cédric Kiss; Olivier Théreaux; Steve Bratt.



# EXHIBIT 3

<u>CONFIDENTIAL</u>
<u>PURSUANT TO  PROTECTIVE ORDER</u>

<u>SUBMITTED UNDER SEAL</u>

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 4

CONFIDENTIAL
PURSUANT TO  PROTECTIVE ORDER

SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 5

## CONFIDENTIAL
## PURSUANT TO  PROTECTIVE ORDER

## SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 6

## CONFIDENTIAL
## PURSUANT TO PROTECTIVE ORDER

## SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 7

## CONFIDENTIAL
## PURSUANT TO PROTECTIVE ORDER

## SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 8

## CONFIDENTIAL
## PURSUANT TO PROTECTIVE ORDER

## SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 9



Science : Discoveries

# Patent May Threaten E-Privacy

Chris Oakes ✉ 11.11.98

The future of a key Web standard that would give consumers control over their online privacy hangs in the balance after news emerged that an entrepreneur will likely be awarded a set of patents on the technology.

The technology, the Platform for Privacy Preferences (P3P) is critical to the Internet industry's current effort to show the US government that it can look after the interests of consumers. The specification was to be used in the next versions of America Online, Netscape Communicator, Microsoft Internet Explorer, and many other software products and Web sites.

"If somebody owns [P3P], they can prevent other people from using it," said Deirdre Mulligan, staff counsel for the Center for Democracy and Technology.

"We put all this work into something that works, then who knows if it's going to get out there."

At the core of the issue is one man, Drummond Reed, CEO of Intermind. Reed said that the US Patent and Trademark Office is expected to issue his company a patent on the idea of P3P.

Intermind was, until July, a member of the standards group that is collectively developing P3P. He resigned when word spread among the members that he would likely be awarded patents on technologies affecting a broad category of "automated information exchange using software objects."

That sounds very much like P3P. The standard is meant to provide a way for consumers and the Web sites they visit to automatically negotiate what can and can't be done with any personal data collected by a site. The technology would reside within both Web browsers and Web sites.

On a document on the Intermind Web site, Reed said that his company would request a minimum royalty of US$50,000 per year to a maximum of $2.5 million from companies implementing P3P, plus 1 percent of all revenues directly associated with the technology.

Both Microsoft and Netscape declined to comment for this story.

"P3P is the nuclear weapon of privacy," said Matt Markus, chief architect and cofounder of Privacy Bank, a company developing an automatic registration service that safeguards a user's privacy.

Privacy Bank shifted its company strategy to lessen its dependence on P3P. Markus said he expects the patent will be revoked.

"[The patent] is going to hurt young companies who want to help develop the solution," Markus said. "It is the snake in the grass, a complete surprise, it would really shoot the morale at my company if I was depending on [P3P]," he said.

Reed acknowledges that some working group members want "to just crucify us" – but he says his company has been up-front from the beginning that it has held intellectual property rights pertaining to P3P and other Web standards relating to "push" technology.

"We have been in communication with the [Consortium] and working group members pretty much from the start," Reed said. "We've been in constant communication with W3C management and key member companies involved in this area."

P3P is not yet a final standard, but progress in the World Wide Web Consortium working group has slowed since news of the pending patent seeped out in July, according to Steve Lucas, chief information officer for an Excite division that has been developing P3P-based software.

"There are ways of working around P3P," he said. These include custom-made variations on the protocol that circumvent elements covered by the patent, and shifting work toward an older protocol known as the Open Profiling Standard.

Lucas said companies are going ahead with work on P3P. But they are simultaneously making contingency plans should the patent have a stifling effect.

If Drummond's pending patents stand, the thousands of companies doing business on the Internet could face new laws designed to protect the interests of consumers. The Federal Trade Commission, which would recommend such laws, has given the industry until the end of this year to demonstrate that it can "self-regulate," and P3P is key to that plan.

"P3P is not so much key as it is an ideal solution," said David Medine, an associate director with the Bureau of Consumer Protection at the Federal Trade Commission.

"Because it was almost invisible on a hit-by-hit basis, P3P offers some tremendous efficiencies," Medine said. "From the consumer's point of view, it offers a greater uniformity. The consumer selects their own preferences and it gets applied to the site automatically instead of having [the consumer needing] to read a privacy [practices] statement."

"The advantage of P3P is that it really serves everyone's interests," said Medine.

Daniel Weitzner, who oversees the development of P3P at the World Wide Web Consortium, insists P3P development is still on track, but echoed the same concerns.

"If anyone succeeds in extracting big licensing fees for P3P implementations, that would hamper the availability of the technology," he conceded.

"Really the question turns on what happens with that patent."

But working on ways to perform privacy negotiations without a standard presents a big obstacle to the industry.

"Not having a standard everybody can agree on does create some interoperability problems," Lucas said.

"This is a collaborative process about trying to develop socially useful protocols and now we have somebody walking away and saying they own it," added working group member Mulligan of the Center for Democracy and Technology.

Weitzner said the issue now is not who said what when but what to do once the patents are issued. He declined to comment on the possibility of mistakes made in the past by W3C management.

"The issue is whether or not the patent is valid, not who told what to whom or when," Weitzner said. "The concern I hear is about the attack on openness, not the timing."

That issue – how a patent might affect a Web standard – is a new one for the W3C.

"Our members have not had to face this issue because no one has had to try to stand in the way of openness in a way that Intermind appears to be doing...." The question now is "whether or not they're going to be able to hold up a standard that has a potentially significant social impact."

*James Glave contributed to this report.*

## *Related Wired Links:*

W3C Seeks to Clear the Fog

2.Nov.98

**The Trouble with P3P**
25.Jun.98

**W3C Drafts Web Privacy System**
19.May.98

**Intermind Changes Its Mind and Its Fortunes**
31.Dec.97

submit        **Digg** submit        Yahoo! Buzz

Stumble
ShareThis

Search Wired                          | **Top Stories**

GO

Related Topics:

## Comments (0)
Want to start a new thread or reply to a post?
Login/Register and start talking!

There are no comments

Login/Registration

Corrections | Sitemap | FAQ | Contact Us | Wired Staff | Advertising | Press Center | Subscription Services | Newsletter | RSS Feeds

CondéNet web sites:

Webmonkey.com | Reddit.com | ArsTechnica.com | Epicurious.com | NutritionData.com | Concierge.com | HotelChatter.com | Jaunted.com |

Subscribe to a magazine:        Condé Nast web sites:

© 2009 CondéNet, Inc. All rights reserved.
Use of this site constitutes acceptance of our User Agreement and Privacy Policy

# EXHIBIT 10



# Analysis of P3P and US Patent 5,862,325

## W3C Note 27-October-1999

**This version:**
  http://www.w3.org/TR/1999/NOTE-P3P-analysis-19991027
**Latest version:**
  http://www.w3.org/TR/P3P-analysis

**Editors:**
  Joseph M. Reagle, W3C <reagle@w3.org>
  Daniel J. Weitzner., W3C <djw@w3.org>
**Authors:**
  Barry D. Rein, Pennie & Edmonds llp
  Garland T. Stephens, Pennie & Edmonds llp
  Henry C. Lebowitz, Pennie & Edmonds llp

Copyright © 1999 W3C ® ( MIT, INRIA, Keio), All Rights Reserved. W3C liability, trademark, document use and software licensing rules apply.

## Abstract

This Note is a response to a request from the W3C for Pennie & Edmonds' opinion as to whether implementations of the W3C's Platform for Privacy Preferences Project ("P3P") specification would infringe any claim of Intermind's U.S. Patent No. 5,862,325.

## Status of this document

This analysis is published as a W3C NOTE for the benefit of P3P implementors and the Web community  Publication of a W3C Note does not imply endorsement by the entire W3C Membership. A list of current W3C technical reports and publications, including Working Drafts and Notes, can be found at http://www.w3.org/TR.

Daniel J. Weitzner, Esq.
Mr. Joseph Reagle
World Wide Web Consortium
Massachusetts Institute of Technology
Room NE43-352

545 Technology Square
Cambridge, MA 02139

Re: <u>United States Patent No. 5,862,325 to Reed et al.</u>

Gentlemen:

This responds to your request for our opinion as to whether the protocol for exchanging data specified by the Consortium's Platform for Privacy Preferences Project ("P3P") would infringe any claim of Intermind's U.S. Patent No. 5,862,325 (the "'325 patent," a copy of which is annexed as Exhibit A).

By way of summary, P3P is a proposed technical specification of the World Wide Web Consortium, a non-profit organization that develops World Wide Web technology standards through industry and public consensus. The proposed standard would allow client programs such as Web browsers to determine whether a Web service's privacy practices are acceptable to the user, permitting the service to acquire user information only to the extent acceptable to the user.

To accomplish this, the service transfers to the user a P3P Proposal describing the service's privacy practices; i.e., the types of user information that the service will gather and the uses it will make of that information. The user's Web browser then compares the privacy practices specified in the Proposal with the corresponding user preferences stored in a User Preference file maintained on the user's computer. The User Preference file specifies what kinds of practices the user will accept, what kinds should be rejected, and what kinds should cause the program to prompt the user to decide how to respond. Thus the P3P proposal sent to the user is a purely descriptive, declaratory statement that is processed by a program resident on the user's computer.

The only similarity between the '325 patent and P3P is that both involve transfer of data structures from a server to a client and both relate broadly to controlling communications. They are otherwise dissimilar. The '325 patent describes an assertedly unique communications system in which a particular object, called a "control structure," is transferred from a server ("provider memory") to a client ("consumer memory"). That control structure is a special piece of software - a "communications object" - which encapsulates both (1) data fully defining an intended server-client communications relationship, and (2) methods for using the data to effect that relationship.[1] After it is transferred to the client, the control structure runs on the client side to control communications between client and server. According to the patent, once the client computer receives a communications object, it need only call the object's methods; the object handles all communications details.

The patent and other documents filed by Intermind in the Patent Office establish that the P3P Proposal sent to the client computer, a simple descriptive data file

incapable by itself of controlling communications between computers, differs markedly from the "control structure" sent to the client in accordance with the patent. Intermind acknowledged as much to the Patent Office, representing that the abstraction, in the communications object, of all information necessary to completely define the client-server communications relationship, was what distinguished its claimed control structure from pre-existing technology. It would not have obtained the patent without so limiting its claims. **Since P3P does not use the "control structure" claimed in Intermind's '325 patent, we conclude, and it is our opinion and judgment, that a properly informed court would hold that use of the P3P protocol would not infringe any claim of the '325 patent.**

As basis for our opinion we have reviewed the '325 patent, its prosecution history, and the prior art of record. We have also reviewed written descriptions of P3P and the APPEL privacy-preferences language (copies annexed as Exhibits B-D and E, respectively) and have conferred with you regarding the manner in which P3P operates.

Importantly, we have *not* considered all potential defenses that might be asserted against the '325 patent since the non-infringement basis set forth above would, we believe, constitute a complete defense against any charge of infringement.

The sections that follow set forth the analyses underlying our opinion including: (i) an analysis of the '325 patent and its file history; (ii) our understanding of the P3P protocol; and (iii) a comparison of P3P to the '325 patent claims.

## A. The Prior Art Background To The '325 Patent

Transferring metadata (data describing other data) from a client to a server for controlling communications between them did not originate in the '325 patent. Long before the '325 patent was applied for in 1996, network computing, and especially the Internet, had given rise to a large body of sophisticated technologies for transferring metadata for that purpose. Much of this technology dates back more than 20 years. It includes the Hypertext Markup Language (HTML) and Hypertext Transport Protocol (HTTP), the essential technologies underlying the World Wide Web, which were developed by Tim Berners-Lee and standardized by World Wide Web Consortium (which Berners-Lee directs) and the Internet Engineering Task Force.

The suite of technologies underlying the Web includes a number of high-level tools that allow easy construction of complex two-way data communication between computers. HTML, for example, provides a syntax for expressing data structures and associated formatting information in text, typically for transmission between computers via HTTP. Thus HTML text files have been used for years to provide the same basic functionality as the '325 patent -- transmitting data structures from a server to a client to control the transmission of user information from the client to

the server.

One HTML feature used to provide this functionality is the *form* element (designated by the <FORM> tag), which (together with related formatting elements and metadata) defines a *form* data structure for soliciting information from a user in a manner akin to a conventional paper form. An HTML form may include text boxes with associated labels in which a user may type text for transmission, along with check boxes and other input elements. The *form* data structure is typically included in an HTML file transferred from a server to a client via HTTP, whereupon the client program processes the received form to determine the data to be transferred to the server, solicits some or all of that information from the user, and controls the transfer of that data back to the server.

Similar basic functionality (apart from prompting the user to provide data), is provided by a "cookie,"which is also acknowledged by Intermind to be prior art. As described in the '325 patent:

A cookie is a data structure passed from a web server to a browser as part of the HTTP protocol. Cookies are produced by the web server and stored locally in a preferences file by the browser. When the user next connects to the web server with the browser, the web server can interrogate the browser for the cookie and use it to identify the user. The cookie can additionally store preference data about the user, whether entered manually by the user via HTML forms or collected automatically by the web server based on the user's browsing choices.

Ex. A, '325 patent, col. 78, ll. 26-35.

Thus prior art Web technologies, including HTML and HTTP, included built-in functionality for transferring data structures from a server to a client to control communications between them. Those data structures included metadata describing data to be transferred from client to server, and were processed by a client program to control the data transfer.

## B. Description Of The Preferred Embodiments Of The '325 Patent

Against this prior art background, Intermind's patent and the patent's prosecution history (the record of proceedings in the Patent Office including what Intermind told the Patent Office in order to secure the patent), treated below, establish that its claims are limited to systems involving transfer to a client of a special type of control structure (Ex. H, IDS at 4) for controlling communications between client and server. Rather than a simple data structure containing a description of data and what is to be done with it, like an HTML form, the claimed control structure is a communications object including data, metadata, and instructions organized using object-oriented programming to encapsulate the data together with the instructions for using it. (Ex. A, '325 patent, col. 8, ll. 10-18, 51-63).

Although all of the patent's 126 claims recite the control structure, its description of the invention, surprisingly, contains no further mention of a control structure. The remainder of the description discusses instead a "communications object," described as an object-oriented combination of data, metadata, and methods. And while there is nothing to explicitly equate the claimed "control structure" with the described "communications object," a reading of the patent reveals that they are in fact the same:

> Communications objects are the primary data structure transmitted from the provider program to the consumer program to control communications between the provider and consumer.

Ex. A, '325 patent, col. 17, ll. 25-28. Intermind confirmed as much in the course of securing its patent, as described below.

According to the patent, the communications objects include methods that "are used to automate control of underlying communication operations." Ex. A, '325 patent, col. 9, ll. 30-32. They do so by specifying processing instructions that execute on a client computer. Ex. A, '325 patent, col. 20, ll. 50-62. The communications objects encapsulate everything needed to provide communications and other services, thus hiding all the complexities of requesting services in a distributed heterogeneous environment, i.e., they provide location transparency. Ex. A, '325 patent, col. 95, ll. 2-4, 53-61. Programs can therefore communicate and access other services by calling the methods of a communications object without regard to how or where the services are provided.

This location transparency provided by the claimed communications object allows a communications relationship between provider and consumer to be defined simply by transferring a communications object. After the transfer, communications originate from, and are received by, the communications object. Ex. A, '325 patent, col. 42, ll. 40-48.

To recapitulate then, the patent describes a control structure including data, metadata, and methods for operating on the data. The control structure is a communications object, and encapsulates the details of communication and remote services invocation. It thus provides location transparency and defines the communications relationship when transferred from one computer to another. As discussed in greater detail below, Intermind represented to the Patent Office that the abstraction of these communications functions in a communications object is what distinguished its invention from the prior art.

## C. The '325 Patent Claims

While the body of the patent describes the communications system, the scope of Intermind's ability to exclude others from practicing the described technology is determined by the patent's claims.[2] The '325 patent has 126 claims. Four of these

are independent: claims 1, 20, 78, and 109. Each of the remaining 122 claims depends from (*i.e.*, incorporates by reference, directly or indirectly) one of the independent claims.

All of the claims are directed to a system or method for controlling communications between a provider memory and a consumer memory. Two of them, claims 1 and 78, deal with controlling the transfer of *update* information from a provider memory to a consumer memory while the other two (claims 20 and 109) describe doing the same for *feedback* information.

Notwithstanding the difference in direction of transfer of update versus feedback information, all four independent claims (and thus all of the patent's claims) specify a single mechanism for controlling the communication of information, namely, transferring a "control structure" from the provider memory to the consumer memory and processing it at the consumer memory to "associate" one or more processes to control the communication of information.

The table reproduced below highlights these relationships for the four independent claims:

| | Claim 1 | Claim 20 | Claim 78 | Claim 109 |
|---|---|---|---|---|
| 1 | A computer-based communication system comprising: | A computer-based communication system comprising: | A computer-based communication method, comprising operating one or more computers to communicate by performing the steps of: | A computer-based communication method, comprising operating one or more computers to communicate by performing the steps of: |
| 2 | a provider memory storing information including provider information; | a provider memory storing information including provider information; | in a provider memory, storing information including provider information; | in a provider memory, storing information including provider information; |
| 3 | a consumer memory storing information including consumer information; | a consumer memory storing information including consumer information; | in a consumer memory, storing information including consumer information; | in a consumer memory, storing information including consumer information; |
| 4 | association means for | association means for creating | creating metadata | creating metadata |

Analysis of P3P and US Patent 5,862,325

| | | | | |
|---|---|---|---|---|
| | creating metadata | metadata | | |
| 5 | associating portions of said information | associating portions of said information | describing associations with portions of said information | describing associations with portions of said information |
| 6 | and defining a **control structure** | and defining a **control structure** | and defining a **control structure** | and defining a **control structure** |
| 7 | for processing at least at said consumer memory | for processing at least at said consumer memory | which is processed at least at said consumer memory | which is processed at least at said consumer memory |
| 8 | to associate with said metadata one or more processes | to associate with said metadata processes | to associate one or more processes | to associate one or more processes |
| 9 | for controlling the communication of said associated information, | for controlling the communication of said associated information, | for controlling communications of said associated information, | for controlling communications of said associated information, |
| 10 | said metadata including update metadata | | said metadata including update metadata | |
| 11 | associating a process | | associating a process | |
| 12 | for determining when said associated information has been updated | | for determining when said associated information has been updated | |
| 13 | and transfer metadata | said metadata including data exchange metadata | and transfer metadata | said metadata including data exchange metadata |
| 14 | associating a process | associating a process | associating a process | associating a process |
| 15 | for transferring at least a portion of the updated | for controlling the transfer of feedback | for transferring at least a portion of the updated | for controlling the transfer of feedback |

Analysis of P3P and US Patent 5,862,325

| | information; | information, | information; | information, |
|---|---|---|---|---|
| 16 | | said feedback information including at least a portion of said consumer information, | | said feedback information including at least a portion of said consumer information, |
| 17 | | to said provider memory; | | to said provider memory; |
| 18 | transfer means for transferring said information, | transfer means for transferring said information, | transferring said information, | transferring said information, |
| 19 | including said metadata defining said control structure, | including said metadata defining said control structure, | including said metadata defining said control structure, | including said metadata defining said control structure, |
| 20 | from said provider memory to said consumer memory; and | from said provider memory to said consumer memory; | from said provider memory to said consumer memory; and | from said provider memory to said consumer memory; |
| 21 | | feedback transfer means for transferring said feedback information from said consumer memory to said provider memory; and | | |
| 22 | processing means for processing said metadata | processing means | processing said metadata | processing said metadata |
| 23 | to execute instructions external to said control structure | for executing instructions external to said control structure to perform said processes | to execute instructions external to said control structure | to execute instructions external to said control structure |

| 24 | to perform said processes. | to control communications of said information. | to perform said processes. | to perform said processes; and |
|---|---|---|---|---|
| 25 | | | | communicating said feedback information from said consumer memory to said provider memory. |

As shown in the table, claim 1 recites a system for controlling the transfer of update information from a provider memory (element 2) to a consumer memory (element 3). The claimed system includes several types of metadata (elements 4-6, 10, 13) including one that defines the "control structure" (element 6) transferred from the provider memory to the consumer memory (elements 18-19). Processing this control structure in the consumer memory (element 7, 22) is what causes execution of processes (element 8, 24) that control communication of the update information to the consumer memory (element 9).[3]

Similarly, claim 20 recites a system for controlling the transfer of feedback information from a consumer memory (element 3) to a provider memory (element 2). The claimed system includes several types of metadata (elements 4-6, 10, 13) including one that defines the "control structure" (element 6) transferred from the provider memory to the consumer memory (elements 18-19). Processing this control structure in the consumer memory (element 7, 22) is what causes execution of processes (element 8, 24) that control communication of the feedback information to the provider memory (element 9).

The elements of claims 78 and 109 correspond substantially to those of claims 1 and 20, respectively, including the control structure, but are written as a series of steps for performing a method rather than as a combination of elements of a system.

As originally filed, the single claim of the '325 patent application did not recite a control structure; that limitation was added during prosecution in response to the rejection of the original claim, as explained in the next section.

### D. Prosecution of the '325 patent

The '325 patent was filed September 27, 1996 as application serial No. 08/722,314 ("the '314 application"). Entitled "Communications System," it claimed benefit of the filing date of application serial No. 08/609,115 filed February 29, 1996 as a continuation-in-part of that earlier application.[4] The sole claim filed with the original application did *not* recite a "control structure."

On October 8, 1997, the Patent Office issued an Office Action (Exhibit F) objecting to the title of the application and rejecting its single claim as anticipated by (i.e., previously disclosed in) U.S. Patent No. 5,628,005 to Hurvig. Intermind responded (Exhibit G) by amending the application's title to read "Computer-Based Communication System and Method Using Metadata Defining a Control Structure" and canceling claim 1 in favor of newly added claims 2-102. Each of the new claims recited metadata "defining a control structure which is processed at least at said consumer memory." In the remarks accompanying its response, Intermind stated (in part):

> As defined by the [newly added] claims, the system allows a definition for control of a communications relationship to be transferred from a provider of information to a consumer of information. . . . All [claims] share the use of metadata defining a control structure. The art of record does not teach or suggest such a system. It does not teach or suggest a structure which is processed to determine updates to information in the provider memory and transfer updated information to the consumer memory. Certainly, it does not employ metadata defining a control structure or the processing of a control structure which is used to determine an update or transfer updated information.

Ex. G, Response at 28. It is clear, then, that Intermind explicitly relied on the claimed control structure as the critical element distinguishing its invention from the prior art.

Intermind then filed an Information Disclosure Statement ("IDS") with the Patent Office listing 72 patents and 69 non-patent references (Exhibit H) arranged in eight groups. At the beginning of each group, it explained the distinction between the cited prior art in the group and its claimed invention. Intermind stated in its IDS that what it was claiming was not just a control structure, *but a special type of control structure, a "communications object."*

Thus, distinguishing the first group of references (relating to "File, Data and Object Consistency"), Intermind explained:

> This art is directed at the problem of maintaining consistency between multiple copies of files, data, or objects in a distributed processing network. This art is easily confused with a communications object system of the present invention because a communications object system also performs automated replication of information described by a communications object (including the communications object itself). *The difference, however, is that a communications object system, as claimed, accomplishes this using a special type of control structure - a communications object - that is exchanged from the provider to the consumer to define and control the replication.*[5]

Ex. H, IDS at 4. Intermind thus conceded that its claimed control structure performs the same function (automated replication of described information) as the cited references, differing only in that the recited control structure is a *communications object*.

The second group of references, relating to "Software Distribution and Consistency," was described as a special case of the first group and distinguished for the same reason. Intermind similarly distinguished the third group, relating to "Object Transparency and Remote Procedure Calls," by conceding that the claimed control structure performed the same function as the cited references, differing only in that it was a *communications object* encapsulating the data necessary to perform the function of remote method calls:

> This art is directed at a different problem in distributed object systems: how an object on one node can transparently call the methods of another target object on another node, i.e., "abstract" the details of knowing how to send and receive a message from the target object. Again, a communications object system accomplishes this function using a novel new control structure, the *communications object*, which carries the information necessary to perform this abstraction.

Ex. H, IDS at 7.

To distinguish the fourth group of references, relating to "Communications Transparency and Middleware," Intermind similarly conceded that the cited prior art performed the same function as its claimed control structure, asserting that it differed only in that the latter abstracts the details of communications to completely define the communications relationship between provider and consumer:

> This art relates to a larger-scale version of the proceeding [sic], which is to provide complete transparency "layer" (commonly referred to as *middleware*), for abstracting the details of distributing data or sending messages from a communications source to a communications destination. *A communications object system is a novel new approach to this problem by abstracting these details to a control object that completely defines the communications relationship between any two nodes, in both directions, via any network or protocol, using any middleware.*

In discussing the remaining three groups of cited references, Intermind similarly relied on the control structure (Ex. H, IDS at 10-12) to distinguish the prior art from its claimed invention.

In addition to these remarks expressly limiting its claimed communications object to a control structure that encapsulates "the details of distributing data or sending

Case 1:06-cv-00491-MPT   Document 355-1   Filed 03/03/09   Page 34 of 96
Page 12 of 20
Analysis of P3P and US Patent 5,862,325

messages from a communications source to a communications destination" and "completely defines the communications relationship between any two nodes in both directions, via any network or protocol, using any middleware," Intermind used a numeric shorthand for distinguishing each individual reference from the claims, explaining that:

At the end of the text relating to each reference, in parentheses, are one or more numbers keyed to distinguishing remarks identified by the following key and not repeated textually in order to avoid verbosity:

Key to remarks:

1) No control structure transferred from provider to consumer to control communications.

2) No update determining control, or not performed by control structure.

3) No transfer control [i.e. no control of the transfer of information], or not performed by control structure.

4) No feedback control, or not performed by control structure.

Ex. H, IDS of May 7, 1998, at 2-3.

All but six of the references treated in the IDS were distinguished on all four grounds. Those six (U.S. Patents Nos. 5,625,818 to Zarmer et al., 4,974,149 to Valenti, 5,566,302 to Khalidi et al., 5,499,343 to Pettus, 5,515,508 to Pettus and 5,548,726 to Pettus) were distinguished only on grounds 2, 3, and 4. As indicated by the absence of distinction number 1, Intermind realized that these six disclosed control structures transferred from provider to consumer to control communications between them. This shows, once again, how Intermind was constrained to distinguish the prior art on the ground that its claimed control structure was of a specific type - a "communications object" with special properties. For example, U.S. Patent No. 4,974,149 to Valenti (Exhibit I) disclosed a system for distributing data across a network using a control structure (referred to as a "data descriptor") "produced by a central system and provided to a remote system. The remote system then uses the information in the data descriptor to retrieve the described data and install it in the remote system." Ex. I, Valenti, col. 28, l. 68 - col. 29, l. 4.

Valenti's data descriptor identifies data on the central system to be distributed to the remote system, and includes a destination operation descriptor used to perform operations related to retrieving the information from the central system:

[Data descriptor] DD 305 is a data structure which must contain data

identifier (DID) 313, which identifies the data to be distributed from
[data source] S 309 to [data destination] D 311, and may also contain
destination operation descriptor (DOD) 315, which contains
information used by [retriever] RETR 307 to perform various
operations connected with retrieving the data to be distributed and
storing it in [data destination] D 311. ... Only [data identifier] DID 313
is required for [retriever] RETR 307 to successfully distribute data from
[data source] S 309 to [data destination] D 311, but the addition of
[destination operator descriptor] DOD 315 to [data descriptor] DD 305
greatly increases the flexibility and efficiency of operation of the
present invention.

Ex. I, Valenti, col. 6, ll. 6-21.

Note that Valenti discloses the use of a control structure (the "data descriptor")
comprising data and metadata that is transferred from server to client and read by
a program (the "retriever") executing on the client. The retriever program uses the
data and metadata in the data descriptor to perform transfer control - i.e., it
controls various operations connected with retrieving and storing data to be
distributed. Thus, in Intermind's distinction number 3 - "[n]o transfer control, *or
not performed by control structure*" - the words "not performed by control
structure" must exclude systems where data or metadata is read by a client
program to perform transfer control. Otherwise, Valenti could not have been
distinguished on that ground. Put differently, the distinction requires that transfer
control actually be performed by the control structure. As used in its description of
communications objects, the word "perform" refers to execution of a method. *See,
e.g.,* Ex. A, '325 patent col. 13, ll. 10-13, col. 43, ll. 42-46, col. 57, ll.3-6. A control
structure that is not executed or that does not include methods or instructions
cannot *perform* transfer control.

After filing its IDS Intermind made certain additional amendments to its claims,
but merely to correct "certain apparent typographical and grammatical errors in
the claims, including improper dependencies, as well as potential lack of clarity."
Ex. J, Supplemental Amendment of July 2, 1998, at 22. On July 16, 1998, the
Patent Office issued a Notice of Allowability and the '325 patent issued on January
19, 1999.

## E. Legal Principles Relating to Claim Construction

Three sources of information bear on the proper interpretation of the claims:
(1) the claims themselves; (2) the patent specification (i.e. its text and drawings);
and (3) its prosecution history, i.e., the record of its examination in the Patent
Office.[6] These three sources comprise the "intrinsic evidence of record."[7]
Certain "extrinsic evidence" (such as expert opinion and scholarly works) may also
be considered in interpreting the claims,[8] but may not be used to support an

interpretation inconsistent with the intrinsic evidence.[9] The meaning of the claims is a question of law for decision by a judge, not a jury.[10]

The meaning of all claims of the '325 patent hinges on the phrase "control structure." We have shown that the patent itself explicitly defines this term to mean a combination of data, metadata, and instructions organized as an object-oriented combination of metadata, data, and methods for operating on the data. The prior art discussed in the patent also compels this construction because under any other construction the claims would encompass pre-existing technology (including that discussed in the patent such as HTML forms). Since a patented invention must be novel and non-obvious, the scope of the claims must exclude pre-existing technology.

Intermind explicitly acknowledged, by its repeated and forceful representations to the Patent Office, that its claimed "control structure" is the "communications object" defined in the patent, and relied upon these representations to distinguish its claims from the prior art.

Intermind further narrowed the meaning of "control structure" by relying with equal force on specific properties of its claimed communications object to distinguish it from prior art control structures that performed the same functions. Its claimed control structure must also be construed, therefore, to include those features of the communications object relied upon by Intermind to distinguish this prior art, including that:

(i) the control structure actually performs transfer control,

(ii) the control structure itself carries the information necessary to transparently perform remote method calls, and

(iii) the control structure itself carries the details of distributing data or sending messages from a communications source to a communications destination such that it completely defines the communications relationship between any two nodes in both directions, via any network or protocol, using any middleware.

In our judgment, therefore, a properly informed court would construe the term "control structure" in claims 1-126 of the '325 patent as limited to a combination of metadata, data, and instructions organized as an object-oriented combination of metadata, data, and methods for operating on the data, to encapsulate location transparency and completely define the communications relationship between two computers in both directions via any network, protocol, or middleware.

## F. P3P Does Not Infringe Any Claim of the Intermind Patent

A P3P-compliant Web service (or site) uses a P3P proposal to declare its privacy

practices with respect to information collected from its users. The proposal and a client-resident User Preferences file are compared by software running on the client (e.g., a browser), and depending on the result of the comparison the browser can accept the proposal, reject it, or prompt the user to decide how to respond. The browser may also store user information (such as the user's name and address) and, if the user desires, provide the stored information in response to requests from Web sites that declare privacy practices acceptable to the user.[11]

The Web service declares its privacy practices by including a Web address and a unique identifier for a P3P proposal in its response to a user's request for a Web page or other resource. The user's Web browser can use the address to retrieve the proposal, which is a text file conforming to an XML syntax specified by P3P. Statements in the proposal identify the information the service wants to collect and the uses it will make of that information. The proposal is thus a static declaration of the service's policies wholly lacking anything resembling methods. The proposal, its Web address, and its unique identifier are the only pieces of information that P3P requires be sent from the server to the browser.

After retrieving a proposal, the Web browser parses its text to compare the proposal with the User Preferences file, which uses rules to specify the user's preferences. Like the proposal, the User Preferences file contains no methods. Each rule specifies the Web browser behavior desired by the user when a proposal matches the rule. P3P specifies three behaviors: "accept," indicating that the proposal is acceptable; "prompt," indicating that the user should be consulted to determine whether the proposal is acceptable; and "reject," indicating that resources associated with the proposal should not be accessed.

P3P preferences may be expressed in a computer language, such as A P3P Preference Exchange Language (APPEL). Ex. B, P3P Syntax, sections 1.5-1.6. Preferences so expressed may then be stored in a file and transferred from one computer to another using conventional file transfer means. A user receiving such a file may, if she desires, accept the preferences expressed in the file as her own simply by installing the User Preferences file on her machine. Unlike P3P proposals, User Preferences files are not intended to be transferred from server to client as part of a browsing session, and therefore cannot constitute the claimed control structure.

Hence P3P does not include the control structure of the '325 patent claims for at least two fundamental reasons: (1) neither the proposal nor the User Preferences file includes data, metadata, and instructions organized using object-oriented programming to encapsulate the data together with the instructions for using it, and (2) neither the proposal nor the User Preferences file provides location transparency or completely specifies a communications relationship.[12] For these reasons, P3P-compliant Web services and user agents do not literally infringe any claim of the '325 patent.

If an accused device does not infringe a claim literally, it may nevertheless infringe it under the doctrine of equivalents. Under that doctrine, a product or process will be held to infringe if there is "equivalence" between the elements of the accused product or process and those of the claim.[13] Two elements are equivalent for that purpose if, in the context of the invention, substitution of the accused element for the claimed element constitutes merely an insubstantial change.[14]

In our judgment, P3P does not infringe the '325 patent under the doctrine of equivalents because of the explicit manner in which Intermind limited the patent during prosecution. By representing to the Patent Office that its claimed system's use of "a special type of control structure - a communications object" distinguished it critically from the prior art, Intermind surrendered any right to assert infringement by any other type of control structure under the doctrine of equivalents. In other words, its representations to the Patent Office *estop* it from asserting the contrary - that its claims are not so limited - in any subsequent proceeding.

Prosecution history estoppel in this manner limits the degree to which claims can be expanded beyond their literal terms under the doctrine of equivalents by excluding from the range of equivalents subject matter disclaimed during prosecution either by explicit amendments to narrow the claims or as a result of argument to secure their allowance.[15]

Here Intermind did both. In response to the Examiner's rejection, Intermind canceled originally filed claim 1 in favor of newly added claims, all of which recited a "control structure" transferred from a provider memory to a consumer memory for controlling communications. And in its Information Disclosure Statement, Intermind repeatedly distinguished a large volume of highly relevant prior art on the basis that its claimed control structure was of a special type - a communications object.

Application of the prosecution history estoppel doctrine requires a two-step analysis. First, the purpose of the amendment or argument must be determined. If presented to distinguish prior art (and perhaps in certain other circumstances[16]), an estoppel is created. Otherwise, no estoppel results. Second, if an estoppel is created, the scope of the estoppel must be determined.[17]

Here, the first step of the analysis is straightforward: Intermind's extensive remarks accompanying the limitation of all of its claims to require a "control structure" explicitly said that the amendment was made to distinguish the prior art. This triggered application of the doctrine of prosecution history estoppel.

Having established that prosecution history estoppel applies, the second step of the analysis is to determine its scope. The scope of the estoppel includes the subject matter that a reasonable competitor would conclude was surrendered by

Case 1:06-cv-00491-MPT   Document 355-1   Filed 03/03/09   Page 39 of 96
Page 17 of 20
Analysis of P3P and US Patent 5,862,325

Intermind in making the amendment or argument. The determination is made with reference to the particular prior art and the amendments or arguments made to distinguish it.[18]

Here, Intermind repeatedly asserted that its claimed invention differed from the prior art *because* the recited control structure was a communications object. It conceded that the prior art included a "control structure transferred from provider to consumer to control communications," thus surrendering coverage for control structures that are not communications objects.[19]

Intermind further limited the range of equivalents for its claims in relying on additional characteristics of the communications object to distinguish the prior art. It characterized communications objects as abstracting the details necessary for location transparency, and relied upon this characterization to distinguish prior art performing the same function. Again, the only reasonable conclusion a competitor could reach from this characterization is that Intermind surrendered coverage for control structures that do not comprise communications objects encapsulating location transparency.

Intermind also distinguished prior art by representing that its communications object abstracted the details necessary for data distribution and messaging, and "completely defin[ed] the communications relationship between any two nodes, in both directions, via any network or protocol, using any middleware." Here too, Intermind conceded that the distinguished prior art performed these functions, surrendering protection for control structures that do not encapsulate these functions.

The use of P3P does not involve a communications object, much less a communications object that completely defines the communications relationship between a provider and consumer, or that provides location transparency. Accordingly, P3P does not infringe any claim of the '325 patent under the doctrine of equivalents.

## G. Conclusion

For the foregoing reasons, summarized in the second through the sixth paragraphs of this opinion, we conclude, and it is our opinion and judgment, that the use of P3P would not infringe any claim of the '325 patent.

Very truly yours,

PENNIE & EDMONDS LLP

By: /s/ Barry D. Rein
Barry D. Rein

Analysis of P3P and US Patent 5,862,325

A Member of the Firm

/s/ Garland T. Stephens
Garland T. Stephens
An Associate of the Firm

/s/ Henry C. Lebowitz
Henry C. Lebowitz
An Associate of the Firm

## List of Exhibits

Exhibit A. U.S. Patent No. 5,862,325 to Reed et al..

Exhibit B, Platform for Privacy Preferences (P3P) Syntax Specification," W3C Working Draft (26 August 1999)

Exhibit C, P3P Base Data Set" W3C Working Draft (26 August 1999)

Exhibit D, P3P Harmonized Vocabulary," W3C Working Draft (26 August 1999)

Exhibit E, A P3P Preference Exchange Language (APPEL) Working Draft

Exhibit F, U.S. Patent Office Action dated October 8, 1997 in the case that issued as the '325 patent.

Exhibit G, Intermind's response, dated April 8, 1998, to U.S. Patent Office Action dated October 8, 1997.

Exhibit H, Information Disclosure Statement filed by Intermind in the case that issued as the '325 patent.

Exhibit I, U.S. Patent No. 4,974,149 to Valenti.

Exhibit J, Supplemental Amendment, filed by Intermind on July 2, 1998 in the case that issued as the '325 patent.

## Footnotes

1. As used in the field of object-oriented programming, the word "method" means a set of instructions contained in an object for operating on the object's data.

2. *See Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 619-20 (Fed. Cir. 1995).

Analysis of P3P and US Patent 5,862,325

3. We do not here address the issue of whether the '325 patent is valid, and it is therefore our intention that even if privilege is waived with respect to the subject matter of this letter, the waiver would not extend to issues of validity, or other issues relating to the '325 patent other than noninfringement. *See Applied Telematics, Inc. v. Sprint Corp.*, 1995 U.S. Dist LEXIS 14061 (E.D. Pa. Sept. 21, 1995). We note in passing, however, that in construing the claims as part of our noninfringement analysis, we have observed that the independent claims are rife with serious ambiguities. For example, the words "said information" and "said processes" are repeatedly used without any clear antecedent. Our noninfringement conclusion is not affected by these ambiguities.

4. A continuation-in-part is a patent application filed during the lifetime of an earlier application that repeats some or all of the earlier application and adds new matter not disclosed in the earlier application. To the extent that the subject matter of the continuation-in-part appears in the earlier application, the continuation-in-part is entitled to the filing date of the earlier application.

5. All emphasis in quotations in this letter has been added unless otherwise noted.

6. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996).

7. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

8. *See Markman*, 52 F.3d at 980.

9. *See Vitronics*, 90 F.3d at 1583; *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308-09 (Fed. Cir. 1999).

10. *See Markman*, 52 F.3d at 979.

11. P3P is specified in three documents, entitled "Platform for Privacy Preferences (P3P) Syntax Specification," W3C Working Draft (26 August 1999) (Ex. B); "P3P Base Data Set" W3C Working Draft (26 August 1999) (Ex. C); and "P3P Harmonized Vocabulary," W3C Working Draft (26 August 1999) (Ex. D). The P3P Syntax Specification includes the main body of the specification. The P3P Base Data Set includes the detailed syntax and data types of the base data set used by P3P, and the P3P Harmonized Vocabulary includes the human language semantics of the privacy disclosure vocabulary.

12. We note in passing that a P3P proposal may be transferred from a computer other than the server governed by the proposal. In that case, the proposal cannot be the claimed control structure for the additional reason that it is not used to control communications with the computer from which it was transferred.

13. *See Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 21

Analysis of P3P and US Patent 5,862,325

(1997).

14. *See Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed. Cir. 1996).

15. *See Sextant Avionique, S.A. v. Analog Devices, Inc.*, 172 F.3d 817, 826 (Fed. Cir. 1999) (*citing Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1459-60 (Fed. Cir. 1998) (*en banc*)); *Ekchian v. Home Depot, Inc.*, 104 F.3d 1299, 1303-04 (Fed. Cir. 1997).

16. The Federal Circuit has ordered en banc review of its decision in *Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 172 F.3d 1361 (Fed. Cir. 1999). *See Festo Corp v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 51 USPQ.2d 1959 (Fed. Cir. 1999). Among the questions to be addressed by the Court are (i) the circumstances in which prosecution history estoppel arises, and (ii) what scope of equivalents is available for a claim element that is subject to estoppel.

17. *See Sextant*, 172 F.3d at 826 (*citing Bai v. L&L Wings, Inc.*, 160 F.3d 1350, 1355 (Fed. Cir. 1998)).

18. *See Sextant*, 172 F.3d at 826-27.

19. *See Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1299 (Fed. Cir. 1999).

# EXHIBIT 11

CONFIDENTIAL
PURSUANT TO  PROTECTIVE ORDER

SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 12

## CONFIDENTIAL
## PURSUANT TO  PROTECTIVE ORDER

## SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 13

### CONFIDENTIAL
### PURSUANT TO  PROTECTIVE ORDER

### SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 14

<u>CONFIDENTIAL</u>
<u>PURSUANT TO  PROTECTIVE ORDER</u>

<u>SUBMITTED UNDER SEAL</u>

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 15

CONFIDENTIAL
PURSUANT TO  PROTECTIVE ORDER

SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 16

## CONFIDENTIAL
## PURSUANT TO  PROTECTIVE ORDER

## SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 17

### CONFIDENTIAL
### PURSUANT TO  PROTECTIVE ORDER

### SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 18

<u>CONFIDENTIAL</u>
<u>PURSUANT TO  PROTECTIVE ORDER</u>

<u>SUBMITTED UNDER SEAL</u>

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 19

### CONFIDENTIAL
### PURSUANT TO  PROTECTIVE ORDER

### SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN
# REDACTED IN ITS ENTIRETY

# EXHIBIT 20

CONFIDENTIAL
PURSUANT TO  PROTECTIVE ORDER

SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 21

<u>CONFIDENTIAL</u>
<u>PURSUANT TO  PROTECTIVE ORDER</u>

<u>SUBMITTED UNDER SEAL</u>

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 22

CONFIDENTIAL
PURSUANT TO  PROTECTIVE ORDER

SUBMITTED UNDER SEAL

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT 23

<u>CONFIDENTIAL</u>
<u>PURSUANT TO  PROTECTIVE ORDER</u>

<u>SUBMITTED UNDER SEAL</u>

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT 24

<u>CONFIDENTIAL</u>
<u>PURSUANT TO  PROTECTIVE ORDER</u>

<u>SUBMITTED UNDER SEAL</u>

THIS EXHIBIT HAS BEEN
REDACTED IN ITS ENTIRETY

# EXHIBIT 25

### CONFIDENTIAL
### PURSUANT TO  PROTECTIVE ORDER

### SUBMITTED UNDER SEAL

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 26



# Global Services Specification V1.0

## Appendix I: I-Broker Agreement

## Final Approved Version, 7 June 2006

**Document I-Name:**
xri://@xdi.org/(+specification)/gss*($v*1.0)*(+appendix)*i

**Document I-Number:**
*[To be assigned after GRS launch]*

**Current Location:**
http://gss.xdi.org/

**Status:**

This document is an appendix to the Global Services Specification (GSS). Please see http://gss.xdi.org for other notices and links to the GSS and all other appendicies.

Comments should be posted to the appropriate page of the XDI.org wiki at http://wiki.xdi.org, or submitted to the appropriate mailing list as described on http://www.xdi.org/mailing-lists.html.

This and all contributions to XDI.org are open, public, royalty-free specifications licensed under the XDI.org license available at http://www.xdi.org/docref/legal/xdi-org-license.html.

# I-BROKER AGREEMENT

This I-Broker Agreement (the "*Agreement*") is between Cordance Corporation ("*Registry Operator*"), for, on behalf of, and under authorization from XDI.org, and the entity signing below as an I-Broker ("*I-Broker*").

WHEREAS, XDI.org, a Utah non-profit corporation, with principal offices at 14901 Saddle Leaf Ct., Draper, UT 84020 is the governance authority for a set of publicly available XRI and XDI services, which are based on open standards and specifications currently developed and published by the Organization for the Advancement of Structured Information Standards (OASIS) XRI and XDI Technical Committees;

WHEREAS, Registry Operator has appointed NeuStar, Inc. as a subcontractor to provide the technical back-end services to I-Broker on behalf of Registry Operator ("*Subcontractor*");

WHEREAS, multiple registrars are expected to provide XRI registration services;

WHEREAS, I-Broker wishes to act as a registrar for XRIs;

NOW, THEREFORE, for and in consideration of the mutual promises, benefits and covenants contained herein and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Registry Operator and I-Broker, intending to be legally bound, hereby agree as follows:

## 1. DEFINITIONS

1.1   *Confidential Information.* "Confidential Information" means all information and materials, including, without limitation, computer software, data, information, databases, protocols, reference implementation and documentation, and functional and interface specifications, provided by the Disclosing Party to the Receiving Party under this Agreement and marked or otherwise identified as Confidential, provided that if a communication is oral, the Disclosing Party will notify the Receiving Party in writing within 15 days of the disclosure.

1.2   *Confidential Contact Data.* "Confidential Contact Data" means the Registrant supplied contact information held by a Contact Data Custodian that is to be used only by a Contact Agent to provide notice of certain claims and disputes pertaining to a Registrant's XRI pursuant to the GSS dispute resolution policy.

1.3   *Contact Agent.* "Contact Agent" shall mean an XDI.org accredited and registered agent who provides Registrant notice using Confidential Contact Data of certain claims and disputes pertaining to a Registrant's XRI pursuant to the GRS dispute resolution policy. In no event shall the Contact Agent be owned or controlled, in whole or in part, by I-Broker. If I-Broker does not designate a specific Contact Agent for XRIs sponsored by I-Broker, the default Contact Agent shall be XRI Contact Services, Inc.

1.4     ***Contact Data Custodian***. "Contact Data Custodian" means an XDI.org accredited and registered holder of Confidential Contact Data. In no event shall the Contact Data Custodian be owned or controlled, in whole or in part, by I-Broker. If I-Broker does not designate a specific Contact Data Custodian for XRIs sponsored by I-Broker, the default Contact Data Custodian shall be NeuStar, Inc.

1.5     ***Diligent Efforts***. "Diligent Efforts" means, with respect to a given goal, the application of material and substantial energy toward the achievement of that goal as expeditiously as possible.

1.6     ***Global Registry Services (GRS)***. "Global Registry Services" means the set of global registration and resolution services for XRIs provided by XDI.org.

1.7     ***Global Service Specifications (GSS)***. "Global Service Specification" or "GSS" shall mean the specifications published by XDI.org governing the operation of services offered by XDI.org and its authorized agents. The GSS is set forth in Exhibit A of this Agreement and http://gss.xdi.org.

1.8     ***Intellectual Property***. "Intellectual Property" shall mean all Intellectual Property rights, including by way of explanation, but not by limitation, those statutory or common law rights in and relating to copyrights, patents, trademarks, trade secrets, moral rights, or any similar rights.

1.9     ***Mandatory Registration Agreement Provisions***. "Mandatory Registration Agreement Provisions" shall mean those terms and conditions which are required to form part of the Registration Agreement. The current Mandatory Registration Agreement Provisions are set forth at Exhibit D. Registry Operator reserves the right to revise the Mandatory Registration Agreement Provisions prospectively upon thirty (30) days notice to I-Broker.

1.10     ***Registrant***. "Registrant" means an individual or organization that enrolls with I-Broker to obtain a service from the Global Registry Services.

1.11     ***Registration Agreement***. "Registration Agreement" means the document under which a Registrant registers with I-Broker for one or more services from the Global Registry Services.

1.12     ***Registry Agreement***. "Registry Agreement" means the agreement between Registry Operator and XDI.org for the operation of the Global Registry Services as may be amended from time to time.

1.13     ***Term***. "Term" means the term of this Agreement, as set forth in Subsection 8.1.

1.14     ***XRI***. "XRI" means the URI-compatible scheme and resolution protocol for abstract identifiers used to identify and share resources across domains and applications as defined by the OASIS XRI Technical Committee.

1.15     Other terms used in this Agreement as defined terms shall have the meanings ascribed to them in the context in which they are defined.

## 2. OBLIGATIONS OF REGISTRY OPERATOR

2.1 **Access to Global Registry Services.** Throughout the term of this Agreement, Registry Operator shall provide I-Broker with access to the Global Registry Services as specified in the GSS.

2.2 **Maintenance of Registrations Sponsored by I-Broker.** Subject to the provisions of this Agreement and the GSS, Registry Operator shall maintain the registrations of XRIs sponsored by I-Broker during the term for which I-Broker has paid the fees required by Subsection 4.1.

2.3 **Engineering and Customer Service Support.** Registry Operator shall provide I-Broker with engineering and customer service support as set forth in the GSS.

2.4 **Registrant Data.** In accordance with the GSS, Registry Operator shall not receive or maintain any personally identifiable information related to any Registrant other than the registered XRI and any associated authentication credentials to the extent that the Registrant elects to participate in a service that requires such credentials.

2.5 **XDI.org Requirements.** Registry Operator's obligations hereunder are subject to modification at any time as a result of XDI.org-mandated requirements and consensus policies as set forth in the GSS. Notwithstanding anything in this Agreement to the contrary, I-Broker shall comply with all such XDI.org requirements in accordance with the timeline defined by XDI.org or its authorized agents.

2.6 **Subcontracting.** Registry Operator shall have the right to have any or all of its obligations hereunder performed by a subcontractor.

## 3. OBLIGATIONS OF I-BROKER

3.1 **Accredited I-Broker.** During the term of this Agreement, I-Broker shall remain at all times in compliance with the requirements for accreditation as set forth by XDI.org in the GSS.

3.2 **I-Broker Responsibility for Customer Support.** I-Broker shall provide (i) support for XRI registration and (ii) customer service, billing and technical support to Registrants.

3.3 **Registration Agreement.** At all times while it is sponsoring the registration of any XRI, I-Broker shall have in effect an electronic or paper Registration Agreement with the Registrant. I-Broker shall include in its Registration Agreement those terms required by this Agreement, the Mandatory Registration Agreement Provisions and other terms that are consistent with I-Broker's obligations to Registry Operator under this Agreement. I-Broker shall comply with, and shall include in its Registration Agreement the current Mandatory Registration Agreement Provisions.

3.4 **Indemnification Required of Registrants.** In its Registration Agreement with each Registrant, I-Broker shall require such Registrant to indemnify, defend and hold harmless Registry Operator, Subcontractor, and their directors, officers, employees and agents from and against any and all claims, damages, liabilities, costs and expenses, including reasonable legal fees and expenses, arising out of or

relating to the Registrant's XRI registration. The Registration Agreement shall further require this indemnification obligation survive the termination or expiration of the Registration Agreement.

3.5 **Security.** All data exchanged between I-Broker's system and the Global Registry Services shall be protected to avoid unintended disclosure of information. I-Broker shall comply with all security obligations set forth in the GSS data protection policies.

3.6 **Resolution of Technical Problems.** I-Broker agrees to employ necessary personnel with sufficient technical training and experience to respond to and fix all technical problems concerning the use, registration, and maintenance of XRIs in conjunction with I-Broker's systems. I-Broker agrees that in the event of significant degradation of the Global Registry Services or other emergency, Registry Operator may, in its sole discretion, temporarily suspend access to the Global Registry Services. Such temporary suspensions shall be applied in a non-arbitrary manner and shall apply fairly to any registrar similarly situated.

3.7 **Time.** I-Broker agrees that in the event of any dispute concerning the time of the entry of a registration into the Global Registry Services, the time shown in the Global Registry Services records shall control.

3.8 **Change in I-Broker.** I-Broker may assume sponsorship of a Registrant's existing XRI registration from another I-Broker by following the policy set forth in the GSS regarding registration transfers.

3.9 **Restrictions on Registered XRIs.** In addition to complying with XDI.org standards, policies, procedures, and practices limiting XRIs that may be registered, I-Broker agrees to comply with applicable statutes, laws and regulations limiting the XRI that may be registered.

3.10 **Registrant Data.**
3.10.1. Privacy. In accordance with the GSS, I-Broker shall conspicuously and prominently publish its privacy policy as required in the GSS data protection policies and conform with all terms and conditions thereof.
3.10.2. Required Data Collection. During the Term of this Agreement and for three years thereafter, I-Broker shall maintain its own electronic database, as updated from time to time, containing data for each active XRI sponsored by it. The data for each such registration shall include the elements listed in Subsections 3.13.1 through 3.13.5; and any other data related to the Global Registry Services that I-Broker has submitted to the Registry Operator or placed in the Global Registry Services. Such database shall further contain:
   3.10.2.1 In electronic form, the submission date and time, and the content, of all registration data (including updates) submitted in electronic form to the Registry Operator;
   3.10.2.2 In electronic, paper, or microfilm form, all written communications constituting registration applications, confirmations, modifications, or terminations and related correspondence with all Registrants with I-Broker, including registration contracts; and

3.10.2.3 In electronic form, records of the accounts of all Registrants with I-Broker, including dates and amounts of all payments and refunds.

3.10.3 At the time of registration of each XRI pursuant to this Agreement, I-Broker shall arrange for transmission of Confidential Contact Data to the Contact Data Custodian pursuant to the GSS. I-Broker shall accurately track and keep current in the GRS the XRI of the Contact Data Custodian associated with each XRI sponsored by I-Broker.

3.10.4 I-Broker shall timely refer any inquiries for production of Contact Data to the appropriate Contact Agent. I-Broker shall accurately track and keep current in the GRS the XRI of the Contact Agent associated with each XRI sponsored by I-Broker.

3.10.5 During the Term of this Agreement and for three years thereafter, I-Broker shall make these records available for inspection and copying by XDI.org or its authorized representative upon reasonable notice. Registry Operator shall not disclose the content of such records except as expressly permitted by an XDI.org specification or policy.

3.11   **Code of Conduct.** I-Broker shall comply with the I-Broker Code of Conduct policy as set forth in the GSS.

3.12   **XDI.org Requirements.** I-Broker agrees to comply with all policies and procedures set forth in the GSS related to I-Brokers. I-Broker's obligations hereunder are subject to modification pursuant to the procedures set forth in the GSS Amendments section. As regards the rights and obligations of the I-Broker, in the event of any conflict between the terms of the GSS and the terms of this Agreement, the specifications of the GSS shall govern.

3.13   **Failure Readiness.** In order to allow reconstitution of the Global Registry Services in the event of an otherwise unrecoverable technical failure or a change in the designated Registry Operator, within ten days of any such request by Registry Operator, I-Broker shall submit an electronic database containing the data elements listed in Subsections 3.13.1 through 3.13.5 for all active records in the Global Registry Services sponsored by I-Broker, in a format specified by the Registry Operator.

3.13.1 Unless automatically generated by the Global Registry Services, I-Broker's identity, excluding the Global Network I-Number assigned by the GRS;

3.13.2 The alphanumeric representation of the XRI being registered;

3.13.3 Unless automatically generated by the Global Registry Services, the expiration date of the registration;

3.13.4 Any other data the Registry Operator requires be submitted to it; and

3.13.5 The original creation date of the registration.

3.14   **Rights in Data.** I-Broker disclaims all rights to exclusive ownership or use of the data elements listed in Subsection 3.13.2 for all XRIs submitted by I-Broker to the Global Registry Services for, or sponsored by I-Broker. I-Broker does not disclaim rights in the data elements listed in Subsections 3.13.1 and Subsections 3.13.3 through 3.13.5 concerning active XRIs sponsored by it, and agrees to grant non-exclusive, irrevocable, perpetual, royalty-free licenses to make use of and

disclose the data elements listed in Subsections 3.13.1 through 3.13.5 for the purpose of providing Global Registry Services related services. Upon a change in sponsorship from I-Broker of any XRI, I-Broker acknowledges that the registrar gaining sponsorship shall have the rights of an owner to the data elements listed in Subsections 3.13.2 through 3.13.5.

3.15   **Data Survivability.** During the Term of this Agreement, I-Broker shall clearly and conspicuously publish in a format directly accessible from I-Broker's principal XRI user registration interface and every subsidiary user interface, I-Broker's data survivability policy.

3.16   **Required I-Services.** I-Broker agrees to offer to each of its Registrants the set of XRI-based services required for interoperability, accountability, and integrity of the XRI infrastructure as set forth with more specificity in the GSS.

## 4. FEES

4.1   **Amount of Registry Operator Fees.** I-Broker agrees to pay Registry Operator or its designee the fees set forth in Appendix B of the GSS for initial and renewal registrations, other services provided by Registry Operator to I-Broker, sanctions, and any I-Broker specific fees or credits set forth in Exhibit B (collectively, *"Fees"*). Fees will be established in accordance with the policies set forth in the GSS.  Registry Operator reserves the right to revise the Fees prospectively upon thirty (30) days notice to I-Broker.

4.2   **Payment of Registry Operator Fees.** In advance of incurring Fees, I-Broker shall establish a deposit account accepted by Registry Operator, which acceptance will not be unreasonably withheld so long as payment is assured. All Fees are due immediately upon receipt of applications for initial and renewal registrations, or upon provision of other services provided by Registry Operator (including its agent) to I-Broker. Payment shall be made via debit or draw down of the deposit account. Monthly invoices shall be provided to I-Broker.

4.3   **Non-Payment of Fees.** In the event I-Broker has insufficient funds deposited with Registry Operator or its designee, Registry Operator may do any or all of the following: (a) stop accepting new initial or renewal registrations from I-Broker; (b) terminate this Agreement; and (c) pursue any other remedy under this Agreement.

## 5. CONFIDENTIALITY AND INTELLECTUAL PROPERTY

5.1   **Use of Confidential Information.** During the Term of this Agreement, each party (the *"Disclosing Party"*) may be required to disclose its Confidential Information to the other Party (the *"Receiving Party"*). Each party's use and disclosure of the Confidential Information of the other party shall be subject to the following terms and conditions:

5.1.1. The Receiving Party shall treat as strictly confidential, and use Diligent Efforts to preserve the secrecy and confidentiality of, all Confidential Information

of the Disclosing Party, including implementing reasonable physical security measures and operating procedures.

5.1.2. The Receiving Party agrees that it will use any Confidential Information of the Disclosing Party solely for the purpose of exercising its right or performing its obligations under this Agreement and for no other purposes whatsoever.

5.1.3. The Receiving Party shall make no disclosures whatsoever of any Confidential Information of the Disclosing Party to others; provided, however, that if the Receiving Party is a corporation, partnership, or similar entity, disclosure is permitted to the Receiving Party's officers, employees, contractors and agents who have a demonstrable need to know such Confidential Information, provided the Receiving Party shall advise such personnel of the confidential nature of the Confidential Information and of the procedures required to maintain the confidentiality thereof, and shall require them to acknowledge in writing that they have read, understand, and agree to be individually bound by the confidentiality terms of this Agreement.

5.1.4. The Receiving Party shall not modify or remove any confidentiality legends and/or copyright notices appearing on any Confidential Information of the Disclosing Party.

5.1.5. The Receiving Party agrees not to prepare any derivative works based on the Confidential Information.

5.1.6. Notwithstanding the foregoing, this Subsection 5.1 imposes no obligation upon the parties with respect to information that (a) is disclosed with the Disclosing Party's prior written approval; or (b) is or has entered the public domain through no fault of the Receiving Party; or (c) is known by the Receiving Party prior to the time of disclosure; or (d) is independently developed by the Receiving Party without use of the Confidential Information; or (e) is made generally available by the Disclosing Party without restriction on disclosure.

5.1.7. In the event the Receiving Party is required by law, regulation or court order to disclose any of Disclosing Party's Confidential Information, Receiving Party will promptly notify Disclosing Party in writing prior to making any such disclosure. Receiving Party agrees that if Disclosing Party is not successful in precluding the requesting legal body from requiring the disclosure of the Confidential Information, it will furnish only that portion of the Confidential Information which is legally required.

5.1.8. The Receiving Party's duties under this Subsection 5.1 shall expire five (5) years after the information is received or earlier, upon written agreement of the parties.

5.2   **Intellectual Property.**

5.2.1. Each party will continue to independently own its Intellectual Property. In addition, Registry Operator, or its suppliers and/or licensees, may provide useful registry software or toolkits not otherwise governed by this agreement. The terms of use of such software and toolkits shall be set forth in the click-wrap license for use thereof.

5.2.2. Without limiting the generality of the foregoing, no commercial use rights or other Intellectual Proprietary rights are granted by the Disclosing Party to the

Receiving Party by this Agreement, or by any disclosure of any Confidential Information to the Receiving Party under this Agreement.

5.2.3 Grant of License. Registry Operator grants to I-Broker a paid-up, non-exclusive, worldwide right and license to use the trademarks set forth in Exhibit C, during the Term solely in connection with the provision and marketing of I-Broker Services in order to indicate that I-Broker is accredited as a registrar of XRIs by Registry Operator. Except as provided herein, I-Broker shall not use the Trademarks, any term, phrase, or design that is confusingly similar to the Trademarks, or any portion of the Trademarks in any manner whatsoever, including as an Internet domain name. Registration and any other form of protection for the Trademarks shall only be obtained by Registry Operator in its name and at its expense. Any and all rights in the Trademarks that may be acquired by I-Broker shall inure to the benefit of, and are herby assigned to, Registry Operator. I-Broker shall not assert ownership of the Trademarks or any associated goodwill. Registry Operator shall have the sole discretion to initiate and maintain any legal proceedings against known or suspected third party infringer of the Trademarks. I-Broker agrees to execute such other documents and to take all such actions as Registry Operator may request to effect the terms of this Section, including providing such materials (for example samples of any promotional materials bearing the Trademarks), cooperation, and assistance as may be reasonably required to assist Registry Operator in obtaining, maintaining, and enforcing trademark registration(s) and any other form of protection for the Trademarks. I-Broker shall not sublicense any of its rights hereunder to any other person or entity (including any of I-Broker's resellers) without the prior written approval of Registry Operator.

## 6. INDEMNITIES AND LIMITATION OF LIABILITY

6.1   **Indemnification.** I-Broker, at its own expense and within thirty days after presentation of a demand by Registry Operator or Subcontractor under this Section, will indemnify, defend and hold harmless Registry Operator, Subcontractor and their employees, directors, officers, representatives, agents and affiliates, against any claim, suit, action, or other proceeding brought against Registry Operator, Subcontractor or any their affiliates based on or arising from any claim or alleged claim: (i) relating to any product or service of I-Broker; (ii) relating to any agreement, including I-Broker's Registration Agreement; (iii) any infringement, misappropriation or violation of any Intellectual Property right asserted by any third party relating to any material provided to Registry Operator by or on behalf of I-Broker, or (iv) relating to I-Broker's XRI registration business, including, but not limited to, I-Broker's advertising, XRI application process, systems and other processes, fees charged, billing practices and customer service; provided, however, that in any such case: (a) Registry Operator and/or Subcontractor provides I-Broker with prompt notice of any such claim, and (b) upon I-Broker's written request, Registry Operator and/or Subcontractor will provide to I-Broker all available information and assistance reasonably necessary for I-Broker to defend such claim, provided that I-Broker reimburses Registry Operator and/or Subcontractor for its actual and reasonable costs incurred in

connection with providing such information and assistance. I-Broker will not enter into any settlement or compromise of any such indemnifiable claim without Registry Operator's or Subcontractor's (as applicable) prior written consent, which consent shall not be unreasonably withheld. I-Broker will pay any and all costs, damages, and expenses, including, but not limited to, reasonable attorneys' fees and costs awarded against or otherwise incurred by Registry Operator and/or Subcontractor in connection with or arising from any such indemnifiable claim, suit, action or proceeding.

6.2 **Limitation of Liability.** IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES FOR ANY VIOLATIONS OF THIS AGREEMENT.

**7. DISPUTE RESOLUTION.** Disputes arising under or in connection with this Agreement, including requests for specific performance, shall be resolved through binding arbitration conducted as provided in this Section pursuant to the rules of the International Court of Arbitration of the International Chamber of Commerce ("**ICC**"). The arbitration shall be conducted in the English language and shall occur in the Commonwealth of Virginia, USA. There shall be three arbitrators: each party shall choose one arbitrator and, if the two arbitrators are not able to agree on a third arbitrator, the third shall be chosen by the ICC. The parties shall bear the costs of the arbitration in equal shares, subject to the right of the arbitrators to reallocate the costs in their award as provided in the ICC rules. The arbitrators shall render their decision within ninety days of the initiation of arbitration. Any litigation brought to enforce an arbitration award shall be brought in a Commonwealth or federal court in the eastern district of the Commonwealth of Virginia, USA; however, the parties shall also have the right to enforce a judgment of such a court in any court of competent jurisdiction. For the purpose of aiding the arbitration and/or preserving the rights of a Party during the pendency of an arbitration, each Party shall have the right to seek temporary or preliminary injunctive relief from the arbitration panel or a court located in the Eastern District of the Commonwealth of Virginia, USA, which shall not be a waiver of this arbitration agreement.

**8. TERM AND TERMINATION**

8.1 **Term of the Agreement; Revisions.** The Term of this Agreement shall commence on the date on which it is first executed by both parties and, unless earlier terminated in accordance with the provisions of this Agreement, shall expire on the expiration of the Registry Agreement. In the event that revisions to Registry Operator's approved form of Registry-I-Broker Agreement are approved or adopted by XDI.org, I-Broker will either execute an amendment substituting the revised agreement in place of this Agreement or, at its option exercised within fifteen (15) days after receiving notice of such amendment, terminate this Agreement immediately by giving written notice to Registry Operator. In the event that I-Broker continues to provide GRS registration services fifteen (15) days after receipt thereof, I-Broker shall be deemed to have assented to such revised agreement.

8.2    **Termination.** This Agreement may be terminated as follows:

8.2.1. Termination For Cause. In the event that either party materially breaches any of its obligations under this Agreement and such breach is not substantially cured within thirty (30) calendar days after written notice thereof is given by the other party, then the non-breaching party may, by giving written notice thereof to the other party, terminate this Agreement as of the date specified in such notice of termination. In addition, the following shall constitute irreparable breaches of this agreement and provide a basis for immediate termination:

8.2.1.1 Any material misrepresentation, material inaccuracy, or materially misleading statement supplied by or on behalf of I-Broker in connection with I-Broker's application for accreditation, including any material accompanying the application;

8.2.1.2 I-Broker (or any officer or director thereof) is convicted by a court of competent jurisdiction of a felony or other serious offense related to financial activities, or is judged by a court of competent jurisdiction to have committed fraud or breach of fiduciary duty, or is the subject of a judicial determination that Registry Operator reasonably deems as the substantive equivalent of those offenses;

8.2.1.3 I-Broker is disciplined by the government of its domicile for conduct involving dishonesty or misuse of funds of others;

8.2.1.4 I-Broker fails to comply with a ruling granting specific performance related to this Agreement.

8.2.2. Termination at Option of I-Broker. I-Broker may terminate this Agreement at any time by giving Registry Operator thirty (30) days notice of termination.

8.2.3. Termination in the Event of Termination of Registry Agreement. This Agreement shall terminate in the event that Registry Operator's Registry Agreement with XDI.org is terminated or expires without entry of a subsequent Registry Agreement with XDI.org and this Agreement is not assigned under Subsection 9.1.1.

8.2.4. Termination in the Event of Insolvency or Bankruptcy. Either party may terminate this Agreement if the other party is adjudged insolvent or bankrupt, or if proceedings are instituted by or against a party seeking relief, reorganization or arrangement under any laws relating to insolvency, or seeking any assignment for the benefit of creditors, or seeking the appointment of a receiver, liquidator or trustee of a party's property or assets or the liquidation, dissolution or winding up of a party's business.

8.3    **Effect of Termination.** Upon the expiration or termination of this Agreement for any reason:

8.3.1. Registry Operator will complete the registration of all XRIs processed by I-Broker prior to the effective date of such expiration or termination, provided that I-Broker's payments to Registry Operator for Fees are current and timely.

8.3.2. I-Broker shall immediately transfer its sponsorship of XRIs to another XDI.org-accredited registrar in compliance with any procedures established or approved by XDI.org.

8.3.3. All Confidential Information of the Disclosing Party in the possession of the Receiving Party shall be immediately returned to the Disclosing Party.

8.3.4. All fees owing to Registry Operator shall become immediately due and payable.

8.4 **Survival.** In the event of termination of this Agreement, the following shall survive: (i) Subsections 3.5, 3.10, 5, 6, 7, 8.3, 8.4, 9.2, 9.3.3, 9.5, 9.6, 9.9, 9.11, 9.12 and 9.13 and (ii) the Registrant's indemnification obligation under Subsection 3.4. Neither party shall be liable to the other for damages of any sort resulting solely from terminating this Agreement in accordance with its terms.

## 9. MISCELLANEOUS

9.1 **Assignments.**

9.1.1. Assignment to Successor Registry Operator. In the event the Registry Operator's Registry Agreement is terminated (and such termination is deemed final under the Registry Agreement) or expires without entry by Registry Operator and XDI.org of a subsequent registry agreement, Registry Operator's rights under this Agreement may be assigned to a company with a subsequent registry agreement covering the Global Registry Services upon XDI.org's giving I-Broker written notice within sixty days of the termination or expiration, provided that the subsequent registry operator assumes the duties of Registry Operator under this Agreement.

9.1.2. Assignment in Connection with Assignment of Agreement with XDI.org. In the event that Registry Operator's Registry Agreement with XDI.org for the Global Registry Services is validly assigned, Registry Operator's rights under this Agreement shall be automatically assigned to the assignee of the Registry Agreement, provided that the assignee assumes the duties of Registry Operator under this Agreement. In the event that I-Broker's accreditation agreement with XDI.org for the Global Registry Services is validly assigned, I-Broker's rights under this Agreement shall be automatically assigned to the assignee of the accreditation agreement, provided that the subsequent registrar assumes the duties of I-Broker under this Agreement.

9.1.3. Other Assignments. Except as otherwise expressly provided in this Agreement, the provisions of this Agreement shall inure to the benefit of and be binding upon, the successors and permitted assigns of the parties. Neither party shall assign or transfer its rights or obligations under this Agreement without the prior written consent of the other party, which shall not be unreasonably withheld.

9.2 **Notices.** Any notice or other communication required or permitted to be delivered to any party under this Agreement shall be in writing and shall be deemed properly delivered, given and received when delivered (by XRI contact page, by hand, by registered mail, by courier or express delivery service, by e-mail or by telecopier during business hours) to the XRI, address, or telecopier number set forth beneath the name of such party below, unless party has given a notice of a change of address in writing:

If to I-Broker:

The address set forth on the signature page of this Agreement.

If to Registry Operator:

Cordance Corporation
XRI: @Cordance
3020 Issaquah-Pine Lake Rd., #74,
Sammamish, Washington 98075
Fax: 425-369-3176

9.3    **Representations and Warranties.**

9.3.1. I-Broker. I-Broker represents and warrants that: (1) it is a corporation duly incorporated, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, (2) it has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement, (3) it is, and during the Term of this Agreement will continue to be, accredited by XDI.org or its successor, (4) the execution, performance and delivery of this Agreement has been duly authorized by I-Broker, (5) no further approval, authorization or consent of any governmental or regulatory authority is required to be obtained or made by I-Broker in order for it to enter into and perform its obligations under this Agreement.

9.3.2. Registry Operator. Registry Operator represents and warrants that: (1) it is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Washington, (2) it has all requisite corporate power and authority to execute, deliver and perform its obligations under this Agreement, (3) the execution, performance and delivery of this Agreement has been duly authorized by Registry Operator, and (4) no further approval, authorization or consent of any governmental or regulatory authority is required to be obtained or made by Registry Operator in order for it to enter into and perform its obligations under this Agreement.

9.3.3. Disclaimer of Warranties. THE GLOBAL REGISTRY SERVICES AND ANY COMPONENT THEREOF ARE PROVIDED "AS-IS" AND WITHOUT ANY WARRANTY OF ANY KIND. REGISTRY OPERATOR EXPRESSLY DISCLAIMS ALL WARRANTIES AND/OR CONDITIONS, EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY OR SATISFACTORY QUALITY AND FITNESS FOR A PARTICULAR PURPOSE AND NONINFRINGEMENT OF THIRD PARTY RIGHTS. REGISTRY OPERATOR DOES NOT WARRANT THAT GLOBAL REGISTRY SERVICES OR ANY COMPONENT THEREOF WILL MEET I-BROKER'S REQUIREMENTS, OR THAT THE OPERATION OF THE GLOBAL REGISTRY SERVICES OR ANY COMPONENT THEREOF WILL BE UNINTERRUPTED OR ERROR-FREE, OR THAT DEFECTS IN THE GLOBAL REGISTRY SERVICES OR ANY COMPONENT THEREOF WILL BE CORRECTED. FURTHERMORE, REGISTRY OPERATOR DOES NOT WARRANT NOR MAKE ANY REPRESENTATIONS REGARDING THE USE OR THE RESULTS OF THE GLOBAL REGISTRY SERVICES OR ANY COMPONENT THEREOF OR RELATED DOCUMENTATION IN TERMS OF

THEIR CORRECTNESS, ACCURACY, RELIABILITY, OR OTHERWISE. SHOULD THE GLOBAL REGISTRY SERVICES OR ANY COMPONENT THEREOF PROVE DEFECTIVE, I-BROKER ASSUMES THE ENTIRE COST OF ALL NECESSARY SERVICING, REPAIR OR CORRECTION OF I-BROKER'S OWN SYSTEMS AND SOFTWARE.

9.4 **Insurance.** During the Term of this Agreement, and any renewal Terms, I-Broker shall have in place at least one million dollars (US $1,000,000) in liability insurance covering losses claimed by third parties arising from the I-Broker's performance under this Agreement. I-Broker shall obtain such insurance from a reputable insurance provider with an A.M. Best rating of "A" or better. Such insurance shall be used to indemnify and hold harmless Registry Operator and its employees, directors, officers, representatives, agents and affiliates from all costs and damages (including reasonable attorneys' fees) which it may suffer by reason of I-Broker's failure to indemnify Registry Operator as provided above. I-Broker shall provide a copy of the insurance policy to Registry Operator upon Registry Operator's reasonable request. These insurance requirements are subject to changes approved by XDI.org pursuant to Section 2.5 above. In the event that I-Broker clearly demonstrates that such insurance is not available to I-Broker on a commercially reasonable basis as a result of circumstances beyond I-Broker's control (such as insurance practices in I-Broker's country of operation), I-Broker may petition Registry Operator for alternative means of providing similar assurances.

9.5 **Third-Party Beneficiaries.** The Parties expressly agree that XDI.org and Subcontractor are intended third-party beneficiaries of this Agreement. Otherwise, this Agreement shall not be construed to create any obligation by either party to any non-party to this Agreement, including any holder of a XRI. I-Broker acknowledges that nothing in this Agreement shall confer upon I-Broker the status of an intended third-party beneficiary to the Registry Agreement. Nothing in this Agreement entitles I-Broker to enforce any agreement between Registry Operator and XDI.org or between Registry Operator and Subcontractor.

9.6 **Relationship of the Parties.** Nothing in this Agreement shall be construed as creating an employer-employee or agency relationship, a partnership or a joint venture between the parties.

9.7 **Force Majeure.** Neither party shall be liable to the other for any loss or damage resulting from any cause beyond its reasonable control (a "*Force Majeure Event*") including, but not limited to, insurrection or civil disorder, war or military operations, national or local emergency, acts or omissions of government or other competent authority, compliance with any statutory obligation or executive order, industrial disputes of any kind (whether or not involving either party's employees), fire, lightning, explosion, flood, subsidence, weather of exceptional severity, equipment or facilities shortages which are being experienced by providers of telecommunications services generally, or other similar force beyond such Party's reasonable control, and acts or omissions of persons for whom neither party is responsible. Upon occurrence of a Force Majeure Event and to the extent such occurrence interferes with either party's performance of this

Agreement, such party shall be excused from performance of its obligations (other than payment obligations) during the first six months of such interference, provided that such party uses Diligent Efforts to avoid or remove such causes of nonperformance as soon as possible.

9.8 **Amendments.** Except as otherwise provided herein, no amendment, supplement, or modification of this Agreement or any provision hereof shall be binding unless executed in writing by both parties.

9.9 **Waivers.** No failure on the part of either party to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of either party in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy; and no single or partial exercise or waiver of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy. Neither party shall be deemed to have waived any claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such party; and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

9.10 **Currency and Delay.** Unless otherwise stated, all references to currency herein shall refer to U.S. dollars. All payments shall be in U.S. dollars with no deductions for currency conversion or wiring charges. As time is of the essence with respect to all payments due hereunder, shall accrue interest at the lesser of (i) twelve percent per annum calculated on a daily basis or (ii) the highest rate allowed by law. Interest shall apply to the period commencing the day after the date payment is due and ending on the date paid. I-Broker agree to be responsible for and pay the reasonable costs of collecting any overdue amounts related to this Agreement.

9.11 **Attorneys' Fees.** If any legal action or other legal proceeding (including arbitration) relating to the performance under this Agreement or the enforcement of any provision of this Agreement is brought against either Party hereto, the prevailing Party shall be entitled to recover reasonable attorneys' fees, costs and disbursements (in addition to any other relief to which the prevailing Party may be entitled).

9.12 **Construction.** The Parties agree that any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

9.13 **Further Assurances.** Each party hereto shall execute and/or cause to be delivered to each other Party hereto such instruments and other documents, and shall take such other actions, as such other Party may reasonably request for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.

9.14 **Entire Agreement.** This Agreement (including its exhibits and materials referred to therein, which form a part of it) constitutes the entire agreement between the parties concerning the subject matter of this Agreement and supersedes any prior agreements, representations, statements, negotiations, understandings, proposals or undertakings, oral or written, with respect to the subject matter expressly set forth herein.

9.15 **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement and associated Exhibits A, B, C, and D that are hereby incorporated by this reference and all, shall be dated and effective as of _____, 2006.

Cordance Corporation, Registry Operator      I-Broker

By:                                          By:
Name:                                        Name:
Title:                                       Title:
                                                  [full company name], a [jurisdiction] corporation contactable at the following:
     XRI: @[xri]
     [address #1]
     [address #2]
     [country]
     Fax: [number]

Remainder of page intentionally left blank.

**Exhibit A**
**Global Services Specification**

This document is publicly available on the Internet at http://gss.xdi.org. The document i-name (XRI) for this document is:

   xri://@xdi.org/(+specification)/gss*($v*1.0)

After the commencement of GRS registry services, it will be available at the XRI:

   http://xri.net/@xdi.org/(+specification)/gss*($v*1.0)

[pdf of GSS in work]

**Exhibit B**
**Schedule of Registration Fees, Service Fees & Sanctions**

I-Broker agrees to be bound by the following schedule of Fees and Sanctions:

1.      Accreditation Application Fee: (waived if application is filed prior to GRS
opening)                                                         $2,500.00

2.      Sanctions.  In addition to, and not in lieu of, other remedies available to Registry
Operator, including without limitation termination for cause pursuant to Section 8.2 of
the Agreement.  I-Broker agrees that it shall be subject to the following escalating
schedule of sanctions in the event I-Broker breaches any terms or conditions of this
agreement:

      i.     Upon a first breach I-Broker shall receive written warning;

      ii.    Upon a second breach, I-Broker shall be notified of and agrees to pay a fee of one thousand dollars ($1,000.00); and

      iii.   Upon a third breach, I-Broker shall be notified of and agrees to pay a fee of two thousand five hundred dollars ($2,500.00) and shall be suspended from registering or renewing any XRIs for a period of thirty (30) days.

This Exhibit B is acknowledged and agreed as part of the I-Broker Agreement by and
between:

Cordance Corporation,  Registry Operator      [I-Broker], I-Broker

By:                                              By:
Name:                                            Name:
Title:                                           Title:

Remainder of page intentionally left blank.

**Exhibit C**
**Schedule of Licensed Trademarks**

1. "XDI.org Accredited I-Broker™"
2. The "i-name" logo

Remainder of page intentionally left blank.

**Exhibit D**
**Mandatory Registration Agreement Provisions**

This document is publicly available on the Internet at http://gss.xdi.org as Appendix M of the XDI.org Global Services Specifications. The document i-name (XRI) for this document is:

xri://@xdi.org/(+specification)/gss*($v*1.0)*(+appendix)*m

After the commencement of GRS registry services, this document will be available at the XRI:

http://xri.net/@xdi.org/(+specification)/gss*($v*1.0)*(+appendix)*m

Remainder of page intentionally left blank.

# I-BROKER AGREEMENT
# I-SERVICES ADDENDUM

This addendum ("*Addendum*") to the I-Broker Agreement (the "*Agreement*") is between Cordance Corporation ("*Registry Operator*"), for, on behalf of, and under authorization from XDI.ORG, and the entity signing below as an I-Broker ("*I-Broker*").

WHEREAS, XDI.ORG, a Utah non-profit corporation, with principal offices at 14901 Saddle Leaf Ct., Draper, UT 84020 is the governance authority for a set of publicly available XRI and XDI services, which are based on open standards and specifications currently developed and published by the Organization for the Advancement of Structured Information Standards (OASIS) XRI and XDI technical committees;

WHEREAS, Registry Operator has appointed NeuStar, Inc. as a subcontractor to provide the technical back-end services to I-Broker on behalf of Registry Operator ("*Subcontractor*"); and

WHEREAS, I-Broker wishes to offer to Registrants certain value added services that are available through Registry Operator;

NOW, THEREFORE, for and in consideration of the mutual promises, benefits and covenants contained herein and for other good and valuable consideration, the receipt, adequacy and sufficiency of which are hereby acknowledged, Registry Operator and I-Broker, intending to be legally bound, hereby agree as follows:

1. **SERVICES.** Registry Operator shall provision to I-Broker the following services (collectively "*ASP Services*"):

1.1 Contact Service. Make available the Contact Service. "*Contact Service*" means an XRI compatible service that enables an XRI registrant to be contacted via the Web using only the HXRI format of their XRI (e.g., "http://xri.net/example.person") without revealing the registrant's email address, phone number, or any other personal information. Contact Service uses a Web form called a Contact Page hosted by the contact service provider. To send a contact request, the sender must first fill in the Contact Page form and then authenticate their own identity to the contact service provider according to rules set by the registrant. The rules may vary depending on whether the sender chooses to identify themselves with an email address, an XRI, or some other form of identification accepted by the contact service provider. The rules may also require the sender to disclose the sender's contact reputation from the sender's own contact service provider, which prevents contact spam. Contact service also optionally provides a registrant with a method of responding anonymously to a contact request, i.e., without revealing the registrant's email address or other personal information. Contact Pages are also searchable Web pages, so they can make it easy for a registrant to be located on the Web while still providing strong privacy protection.

1.2 <u>Authentication Service</u>. Make available the Authentication Service. The term "*Authentication Service*" shall mean the XRI service that enables the Registrant of an XRI to verify that they control the XRI. Using authentication service, a third party (called a Relying Party) that is presented with an XRI to authenticate (such as via a login box at a website) will first resolve that XRI to look up the Registrant's Authentication Service. The Relying Party will then send a request to the Authentication Service asking for confirmation that the Registrant has logged in or otherwise submitted a credential proving ownership of the XRI. The Authentication Service may provide either a positive response (optionally including information about the type and level of authentication credential provided, such as a password, biometric, hardware token, etc.), or a negative response (including an error). The use of an open standard Authentication Service allows Registrants and Relying Parties to establish trust relationships without the need for Registrants to register new identifiers and authentication credentials for every Relying Party (as is required on the Web today).

1.3 <u>Forwarding Service</u>. Make available the Forwarding Service. The term "*Forwarding Service*" shall mean the XRI compatible service that allows a Registrant to forward their XRI, or any XRI that begins with the Registrant's XRI plus a forward slash ("/") to another URI (Web address) of the Registrant's choosing. For example, the Registrant of "xri://example.person" could forward this XRI to the Registrant's Contact Page. The Registrant could also forward "xri://example.person/blog" to the Registrant's blog, and "xri://example.person/photos" to the Registrant's account at a photo sharing website. These XRIs could all remain constant even if the network location of the blog or photo sharing site changed over time. The Registrant controls the registration of all XRIs within the Registrant's Forwarding Service as well as the target URIs (ultimate destinations) to which these XRIs forward. Note that Forwarding Service is designed to work initially with XRIs expressed in the HTTP URI (HXRI) format (XRIs that use the "http://xri.net/" prefix instead of the "xri://" prefix). Example: "http://xri.net/example.person/photos".

2. **ASP SERVICE FEES.** For and in receipt of the ASP Services, I-Broker shall pay Registry Operator or its designee fifty cents ($US0.50) per ASP Service per Registrant per year that I-Broker elects to use all or any of the individual ASP Services (the "*ASP Service Fee*"). ASP Service Fees may be revised at any time during the Term on not less than ninety (90) days advance notice to I-Broker. ASP Service Fees shall constitute "Fees" as set forth in the Agreement.

3. **CUSTOMER SUPPORT.** Registry Operator shall provide email technical support for the Services on a seven day a week basis with next day response to I-Broker during the Term.

4. **AVAILABILITY OF ASP SERVICES.** The ASP Services shall be provisioned to I-Broker commencing no later than thirty (30) following mutual execution of this Addendum.

5. **LICENSE.** Registry Operator hereby grants to I-Broker a nonexclusive license to market, package, and sublicense to Registrant pursuant to Global Terms of Service the

ASP Services throughout the world during the Term.  Any right not granted to I-Broker hereunder shall expressly be reserved to Registry Operator.  As between I-Broker and Registry Operator and its third party designees, Registry Operator and its designees shall own all right, title and interest in all intellectual property rights in and to the ASP Services, their implementation, and resulting data.  All data and database rights and all subject matter related to the definition, concept and requirements of the Services shall be considered "work made for hire" owned by Registry Operator or its designee.

6.  **CONSTRUCTION.**  Capitalized terms in this Addendum not defined herein shall have the meanings ascribed to them in the Agreement, and capitalized terms neither defined herein nor in the Agreement shall have the meaning set forth in the XDI.ORG Global Services Specification.  This Addendum and the Agreement constitute the entire agreement between the parties hereto with respect to the subject matter hereof and cancels and supersedes any prior understandings and agreements between the parties hereto with respect thereto. There are no provisions or collateral agreements express, implied or statutory, between the parties other than as expressly set forth in this Addendum #1 and the Agreement.

In Witness Whereof the parties have executed this Addendum  as of the ___ day of _____, 2006.


Cordance Corporation, Registry Operator    I-Broker

By:                                        By:
Name:                                      Name:
Title:                                     Title:
                    Remainder of page intentionally left blank.