**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

CORDANCE CORPORATION,      :
          :
          Plaintiff,      :
          :
      v.          :      Civil Action No. 06-491-MPT
          :
AMAZON.COM, INC. and,      :
AMAZON WEB SERVICES, LLC,      :
          :
          Defendants.    :

## <u>MEMORANDUM ORDER</u>

**INTRODUCTION**

This is a patent case.  On August 8, 2006 Cordance Corporation ("Cordance")

filed suit alleging that Amazon.com Inc. and Amazon Web Services, LLC (collectively,

"Amazon") infringe U.S. Patent Nos. 6,757,710 ("the '710 patent"), 6,044,205 ("the '205

patent), 5,862,325 ("the '325 patent"), and 6,088,717 ('the '717 patent").[1]  On October

23, 2006 Amazon filed its answer asserting numerous counterclaims and defenses,

including a counterclaim of patent infringement of its U.S. Patent No. 6,269,369 ("the

'369 patent").  Subsequently, Cordance and Amazon stipulated to a dismissal of claims

and counterclaims relating to infringement of Cordance's '205 patent and Amazon's

'369 patent.  Therefore, the remaining patents in suit are Cordance's '325, '717, and

'710 patents.  Currently before the court is Cordance's motion for partial summary

judgment with regard to certain defenses raised by Amazon.[2]  Cordance contends it is

---

[1] The Cordance patents are in the same patent family–three of them have the same specification (the '710, '325, and '717 patents), and one has a shorter specification (the '205 patent).

[2] D.I. 313 (Cordance's Motion for Partial Summary Judgment).  The court notes that Amazon has moved for summary judgment on prosecution laches as well.  D.I. 316 (Defendants' Motion for Summary Judgment re Lack of Written Description and Prosecution Laches for U.S. Patent 6,757,710 B2).  The

entitled to summary judgment on the following defenses raised by Amazon:  (1) prosecution laches, (2) patent misuse, (3) limitation on damages for failure to mark under 35 U.S.C. § 287, and (4) costs barred in action for infringement of a patent containing an invalid claim under 35 U.S.C. § 288.

## SUMMARY JUDGMENT

Summary Judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[3]  Once there has been adequate time for discovery, Rule 56(c) mandates judgment against the party that "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[4]  When a party fails to make such a showing, "there can be no 'genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[5]  The moving party is therefore entitled to judgment as a matter of law because "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."[6]  A dispute of material fact exists where "the evidence is such that a reasonable jury could

---

court will address the portion of Amazon's motion for summary judgment motion with regard to laches in this opinion and will address the portion of that motion directed at the written description of the '710 patent in a separate opinion.

[3] Fed. R. Civ. P. 56(c).
[4] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).
[5] *Id.* at 323.
[6] *Id.*

return a verdict for the nonmoving party."[7]

The moving party bears the initial burden of identifying portions of the record which demonstrate the absence of a genuine issue of material fact.[8]  However, a party may move for summary judgment with or without supporting affidavits.[9]  Therefore, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence supporting the nonmoving party's case."[10]

If the moving party has demonstrated an absence of material fact, the nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial."[11]  If the nonmoving party bears the burden of proof at trial, he "must go beyond the pleadings in order to survive a motion for summary judgment."[12] That party "may not rest upon the mere allegations or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial."[13]  At the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial."[14]  Further, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."[15]  The threshold inquiry therefore is "determining whether there is a need for trial – whether, in other words, there are any genuine factual

---

[7] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[8] *Celotex*, 477 U.S. at 323.
[9] *Id.*
[10] *Id.* at 325.
[11] Fed. R. Civ. P. 56(c).
[12] *Yeager's Fuel v. Pennsylvania Power & Light Co.*, 22 F.3d 1260, 1273 (3d Cir. 1994).
[13] *Anderson*, 477 U.S. at 248.
[14] *Id.* at 249.
[15] *Id.*

issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."[16]

**DISCUSSION**

Cordance contends that it is entitled to summary judgment on the following defenses Amazon asserts in its Answer:  (1) prosecution laches; (2) patent misuse; (3) limitation on damages for failure to mark under 35 U.S.C. § 287; and (4) costs barred in action for infringement of a patent containing an invalid claim under 35 U.S.C. § 288.

A.      Prosecution Laches

Cordance and Amazon each move for summary judgment on the issue of prosecution laches.[17]   Amazon specifically moves for summary judgment that the '710 patent is unenforceable due to prosecution laches.  It contends that Cordance waited more than six years after filing the parent patent application before telling the PTO it had claims to "automatically complet[ing] an on-line purchase."  In addition to the six year delay from the filing of the parent application to the filing of the application that led to the '710 patent, Amazon contends the delay is unreasonable because during that delay Cordance:  (1) kept its invention hidden from the world; (2) represented to the public that it had a different invention; and (3) even acknowledged that Amazon had pioneered one-click purchasing.

---

[16] *Id.* at 250.

[17] *Williams v. Philadelphia Housing Authority*, 834 F. Supp. 794, 797 (E.D. Pa.1993) *aff'd*, 27 F.3d 560 (3d Cir.1994) ("In cases where the parties filed cross-motions for summary judgment, each side essentially contends that no issue of material fact exists from its perspective.  We must, therefore, consider each motion for summary judgment separately.  The standards under which we grant or deny summary judgment do no change because cross motions are filed.  Each party still bears the initial burden of establishing a lack of genuine issues of material fact.  Such contradictory claims do not necessarily guarantee that if one party's motion is rejected, the other party's motion must be granted.")  (citations omitted).

Cordance contends that there is no factual basis to support Amazon's prosecution laches defense.  Cordance notes that its five patents are of the same patent family; that several were prosecuted simultaneously; and that all issued within eight and a half years of Cordance's first date of filing.  Cordance insists there is no indication that it unreasonably or inexplicably delayed the prosecution of any of its patents, noting that several of its patents issued within two and a half years of filing.  Because the defense of prosecution laches is an equitable doctrine which is applied only in rare and extreme cases involving abusive delays of the patenting process, it argues that it is entitled to summary judgment in its favor on Amazon's prosecution laches defense.

Prosecution laches is an equitable doctrine "that may be applied to bar enforcement of patent claims that issued after an unreasonable and unexplained delay in prosecution even though the applicant complied with pertinent statutes and rules."[18] There are no "firm guidelines for determining when such laches exists."[19]  "There are legitimate grounds for refiling a patent application which should not normally be grounds for a holding of laches, and *the doctrine should be used sparingly* lest statutory provisions be unjustifiably vitiated.  The doctrine should be applied *only in egregious cases of misuse of the statutory patent system.*"[20]  The Federal Circuit noted that "an examination of *the totality of the circumstances*, including the prosecution history of *all*

---

[18] *Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found.*, 277 F.3d 1361, 1363 (Fed. Cir. 2002) ("*Symbol I*").
[19] *Symbol Techs., Inc. v. Lemelson Med., Educ. & Research Found.*, 422 F.3d 1378, 1385 (Fed. Cir. 2005) ("*Symbol II*").
[20] *Id.* (emphasis added).

*of a series of related patents and overall delay in issuing claims*, may trigger laches."[21] This court has stated that "a threshold inquiry must be undertaken as to whether a patent 'was obtained after an unreasonable and unexplained delay in prosecution.'"[22] Next, the court reiterated that "in reviewing the record to determine whether the delay at issue was unreasonable and unexplained, the court must consider the fact that prosecution laches is an equitable tool which has been used sparingly in only the most egregious of cases."[23]   The issue before the court, therefore, is whether Cordance's delay in prosecuting the '710 patent, as one of a series of related patents, was unreasonable and unexplained.

Cordance owns five U.S. patents, which are all part of the same patent family:[24]

Cordance's first application was filed on February 29, 1996 and issued as U.S. Patent No. 6,044,205 on March 28, 2000.  A period of four years and one month.

Cordance's second patent application was a continuation in part of the first application, was filed on September 27, 1996, and issued as U.S. Patent No. 5,862,325 on January 19, 1999.  A period of two years and four months.

Cordance's third patent application was a continuation of the second application, was filed on August 31, 1998, and issued as U.S. Patent No. 6,088,717 on July 11, 2000.  A period of less than two years.

Cordance's fourth patent application was a continuation of the third application, was filed on May 15, 2000, and issued as U.S. Patent No. 6,345,288 on February 5, 2002.  A period of less than two years.

Cordance's fifth patent application was a continuation of the fourth application, was filed on February 5, 2002, and issued as U.S. Patent No.

---

[21] *Id.* at 1386 (emphasis added).
[22] *Intuitive Surgical, Inc. v. Computer Motion, Inc.*, Civ. A. No. 01-203-SLR, 2002 WL 31833867, at *3 (Dec. 10, 2002) (quoting *In re Bogese*, 303 F.3d 1362, 1367 (Fed. Cir. 2002)).
[23] *Intuitive Surgical*, 2002 WL 31833867, at *3.
[24] D.I. 313, Ex. A ("Reed Decl."), ¶¶ 2-7.

6,757,710 on June 29, 2004.  A period of slightly more than two years and four months.

The period between the filing of the first application for Cordance's first patent, February 29, 1996, until the issuance of Cordance's fifth patent, June 29, 2004, is eight years and four months.

The court first notes that in 2006, the average pendency "between application and either abandonment or grant of a U.S. Patent [was] over thirty-one months."[25]  Four of Cordance's five patents issued in less than the 2006 average pendency, with only the parent application taking longer than that average.  Therefore, as an initial matter the time for prosecuting each of the patents in the patent family does not appear to indicate an egregious misuse of the statutory patent system.

Amazon and Cordance each cite the length of time between the filing of the parent application until the filing, or issuance, of the '710 patent as supporting their respective positions.  Amazon contends that the more than six years from the filing of the parent application to the time Cordance filed claims covering "automatically complet[ing] an on-line purchase" is unreasonable.  Amazon points to *Intuitive Surgical, Inc. v. Computer Motion, Inc.* where the court found a delay of four years and four months during prosecution to be unreasonable.[26]  There, however, the applicant, IBM, took four years and four months before notifying the PTO that one of three simultaneously-filed divisional applications had been misplaced by the PTO; even

---

[25] *Ariad Pharms., Inc. v. Eli Lilly & Co.*, 529 F. Supp. 2d 106, 136-37 (D. Mass. 2007) *rev'd in part on other grounds*, 560 F.3d 1366 (Fed. Cir. 2009) (citing U.S. Patent and Trademark Office, Performance and Accountability Report (Fiscal Year 2006) at 22, available at http://www.uspto.gov/web/offices/com/annual/).

[26] Civ. A.  No. 01-203-SLR, 2002 WL 31833867, at *5 (D. Del. Dec. 10, 2002).

though IBM had promptly received official filing receipts from the PTO on two of the three applications.[27]   The court found "four years and four months to be an unreasonable period of time for an experienced patentee such as IBM to identify and correct a misplaced application problem."[28]   Although the court found that delay unreasonable, it also found that some of that delay was explained by the PTO's mistake and the court declined to hold the patent at issue unenforceable by reason of prosecution laches on the record before it.[29]   Ultimately, the *Intuitive Surgical* court found that prosecution laches did not apply even though there had been almost nine years between the original filing and the issuance of the divisional patent at issue.

Cordance notes that the time period in *Intuitive Surgical* is longer than the period from the filing of its parent application and the issuance of the '710 patent.   Cordance also cites *Strambler v. RSA Security, Inc.*, where this court found that "[m]easured from the date of the original application, the Stambler patents issued in less than seven (7) years.   Considering the prosecution history as a whole, seven years does not represent an unreasonable delay."[30]   The court also cited another district court which had held "that a delay of more than seven years between the filing of a parent application and the issuance of a continuation or divisional patent is not unreasonable."[31]   The court also stated that the plaintiff received seven different patents in seven years and noted

---

[27] *Intuitive Surgical*, 2002 WL 31833867, at *4.
[28] *Id.* at *5.
[29] *Id.*   The court notes that the total time between the filing of the parent application and the time that the divisional patent issued was almost nine years, a slightly longer time period from the filing of the parent application and the issuance of the '710 patent in this case.
[30] 243 F. Supp. 2d 74, 76 (D. Del. 2003).
[31] *Strambler*, 243 F. Supp. 2d at 76 n.1 (citing *Gen-Probe Inc. v. Vysis, Inc.*, No. 99-CV-2668H (S.D. Cal. Aug. 5, 2002) (post-trial order) ("[T]he Court finds that eleven years between filing and issuance of the '338 patent is not unreasonable.").

simultaneous prosecution of multiple patents weighed in favor of a finding that any

delay in that case was reasonable.[32]

Duration of prosecution however, does not provide a bright-line rule as to the

reasonableness of prosecution, however.[33]  Although Amazon contends that the time

period of six years between the filing of the parent patent application and the

application that resulted in the '710 was an unreasonable "period of unilateral

prosecution inactivity," that contention is correct only with regard to the inventions

claimed in the '710 patent.  The court must look to the prosecution history of the patent

family as a whole.  During the period Amazon contends constitutes undue delay,

however, Cordance was prosecuting other applications in the patent family.  Cordance

also explains that "[a]s with most small technology companies with limited resources,

Cordance had to be selective in filing patent applications, and Cordance's five

applications were filed in 1996, 1996, 1998, 2000, and 2002, respectively."[34]  That

explanation is reasonable, particularly in light of evidence cited by Amazon that

"Cordance's business continued to struggle financially and by 2002, it was reducing

---

[32] *Strambler*, 243 F. Supp. 2d at 76 & 76 n.3 ("Defendants argue that plaintiff's delay of more than three years in filing the division applications for the Stambler patents following the patent office's original restriction requirement constitutes an unreasonable delay.  This court disagrees.  *During this period, plaintiff was prosecuting two other patent applications based on the original application*, which ultimately issued as patent nos. 5,267,314 and 5,524,073.  Plaintiff's delay in filing the division applications for the Stambler patents under these circumstances is not unreasonable.") (emphasis added).

[33] *Symbol II*, 422 F.3d at 1385. ("[T]here are no strict time limitations for determining whether continued refiling of patent applications is a legitimate utilization of statutory provisions or an abuse of those provisions.  The matter is to be decided as a matter of equity, subject to the discretion of a district court before which the issue is raised.").

[34] D.I. 336 at 17-18; *cf. Reiffin v. Microsoft Corp.*, 270 F. Supp. 2d 1132, 1156 (N.D. Cal. 2003) (stating that the "textbook case," of prosecution laches, "if one exists, involves a patent application filed and then followed by a lengthy period of unexplained *inactivity*." (citing *Woodbridge v. United States*, 263 U.S. 50, 56 (1923) ("In this case we have a delay of 9 ½ years in securing a patent that might have been had at any time in that period for the asking."))

staff and minimizing projects to reduce its burn rate" and that "Cordance would eventually file for bankruptcy in September 2003 while the '710 Patent was still pending before the PTO."[35]

Although Amazon references certain evidence including Cordance "monitoring Amazon's highly publicized 1-click patent litigation against Barnsandnoble.com" and that it had "purchased an insurance policy with Lloyd's of London to cover the expense of any potential future litigation it [might] bring,"[36] similar considerations regarding the exercise of plaintiff's patent rights and the effect on a competitor and the market noted by the *Intuitive Surgical* court were insufficient to establish prosecution laches.[37] Moreover, the court notes that Cordance's patents were all filed after June 1995, and, therefore, was not extending its patents' term by delaying to file the claims of the '710 patent.[38]

---

[35] D.I. 317 at 5.

[36] D.I. 317 at 5.

[37] *Intuitive Surgical*, 2002 WL 31833867, at *5 ("[T]he record arguably demonstrates that IBM was not motivated to pursue its patent rights until it entered into a license agreement with plaintiff, a direct competitor of defendant, at a time when defendant had already committed its resources to producing the AESOP 2000 (the first voice controlled surgical robot), ultimately enabling plaintiff to monopolize the market without contributing a product for the public's use and, indeed, enabling plaintiff to divest both defendant and the public of a valuable medical product."); *see also, id.* at *3 n.2 (The parties spend considerable time in their briefs debating the applicability of intervening rights, terminal disclaimers, prejudice, patent specification disclosures, the alleged infringer's knowledge and the differences in pre-1952 and post-1952 patent law to the doctrine of prosecution laches. Plaintiffs direct the court to the proposition that a patentee has the right to draft claims to cover competitors' products in the marketplace. *See, e.g., Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 874 (Fed. Cir.1988) (internal citation omitted). Defendant relies on the proposition that "subject matter disclosed but not claimed in a patent application is dedicated to the public." *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1106 (Fed. Cir.1996) (internal quotations omitted). It is the court's view, however, that none of these tenets of patent law is relevant until the threshold inquiry is conducted and the court finds that the delay at issue was unreasonable and unexplained.").

[38] *See Ariad Pharms., Inc. v. Eli Lilly & Co.*, 529 F. Supp. 2d 106, 136 n.46 (D. Mass 2007), *rev'd in part on other grounds*, 560 F.3d 1366 (Fed. Cir. 2009) ("Prior to June 1995, patent owners who experienced a long examination period before the patent issued in effect obtained an extension of the term of their patent grant. This occurred because the term of the patent grant was seventeen years from the date of issuance; however a patent owner is granted priority on his or her invention from at least the date of application. Thus, a patent owner who experienced a long examination period could potentially

Consequently, Cordance's motion for summary judgment on Amazon's prosecution laches defense is granted and Amazon's motion for summary judgment on that defense is denied.

B.    Patent Misuse

Cordance contends that Amazon has not pled facts showing a defense of patent misuse and that the undisputed facts show that Amazon has no such defense. Cordance states that it voluntarily provided a royalty-free licensing opportunity to a non-profit entity in order to promote digital identity standards for the Internet community.  It argues that Amazon has ignored the substance of those royalty-free licenses in that they not contain any provisions which could support a finding of patent misuse.

Patent misuse is an affirmative defense which:

arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage.  Patent misuse relates primarily to a patentee's actions that

---

reap the rewards of a larger pool of infringing defendants or a larger market from which to collect royalties.
        In 1994 Congress changed the patent term from seventeen years *from date of issuance* to twenty years *from date of application*.  This greatly reduced the ability of patent holders to create so-called "submarine" patents, that is, patented technology that remains unpublished until it surfaces years after application and surprises the market and effectively eliminates the issue of prosecution laches for patent applications filed after June 7, 1995.  *See Uruguay Round Agreements Act*, Pub. L. No. 103-465, 108 Stat. 4809, codified at 35 U.S.C. § 154(a)(2).  In addition, prior to 1999 patent applications were kept confidential by the PTO, with the result that potential infringers had no notice of a pending patent during its pendency.  The 1999 American Inventors Protection Act provided for the publication of many patent applications 18 months after filing, giving potential infringers notice of pending patents in some cases. *See* Pub. L. No. 106-113, 113 Stat. 1501, codified at 35 U.S.C. § 122(b).") (emphasis in original)); *see also Digital Control Inc. v. McLaughlin Mfg. Co., Inc.*, 248 F. Supp. 2d 1015, 1018 (declining to make a broad ruling that prosecution laches could never apply to a patent under the GATT system but noting that "patents subject to GATT or terminal disclaimers limiting patent protection to twenty years will tend to be reasonable" and that "Courts condemning continuation practice have generally done so in the context of inventors that effectively extend the life of patents").  In its opposition brief, Amazon notes the expiration dates of Cordance's patents:  "Cordance filed its first patent application on February 29, 1996.  Each of the subsequent patent applications claimed priority to the February 29, 1996 application.  Therefore, pursuant to 35 U.S.C. § 154(a)(2), the term of each patent containing a specific reference to an earlier patent application will be twenty years from the date the first application was filed.  With the exception of the '710 patent, for which 168 additional days was granted, each patent-in-suit will expire by February 29, 2016.  The '710 patent will expire by August 15, 2016."  D.I. 344 at 6 n.3.

affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant.[39]

To establish the defense "the alleged infringer [must] show that the patentee has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect."[40]

Specific practices have been identified as constituting *per se* patent misuse, for example, "'tying' arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good, and arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties."[41]

35 U.S.C. § 271(d) lists "specific practices [that] may not support a finding of patent misuse."[42]

When a practice alleged to constitute patent misuse is neither *per se* patent misuse nor specifically excluded from a misuse analysis by § 271(d), a court must determine if that practice is "reasonably within the patent grant, *i.e.*, that it relates to subject matter within the scope of the patent claims."[43]

---

[39] *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998) (citing *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 703-04 (Fed. Cir.1992)).

[40] *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997) (internal quotation marks omitted).

[41] *Id.* at 868 (internal quotation marks and citations omitted).

[42] *Id.* at 869.  35 U.S.C. § 271(d) recites:  "No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following:  (1) derived revenue from acts which if performed by another without his consent would constitute contributory infringement of the patent; (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement; (4) refused to license or use any rights to the patent; or (5) conditioned the license of any rights to the patent or the sale of the patented product on the acquisition of a license to rights in another patent or purchase of a separate product, unless, in view of the circumstances, the patent owner has market power in the relevant market for the patent or patented product on which the license or sale is conditioned."

[43] *Virginia Panel*, 133 F.3d at 869 (quoting *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 708 (Fed. Cir. 1992).

"If . . . the practice has the effect of extending the patentee's statutory rights and does so with an anti-competitive effect, that practice must then be analyzed in accordance with the 'rule of reason.'"[44]

Where the court finds an anti-competitive effect, "that practice must then be analyzed in accordance with the 'rule of reason.'"[45]  Under the rule of reason, only certain anti-competitive effects will constitute patent misuse:  "'the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition, taking into account a variety of factors, including specific information about the relevant business, its condition before and after the restraint was imposed, and the restraint's history, nature, and effect."[46]

Amazon presents two reasons it asserts that Cordance has misused its patents. First, Amazon contends that Cordance attempted to coerce the World Wide Web Consortium ("W3C") into purchasing or licensing its patents for an emerging Internet standard.  Second, Amazon maintains that Cordance obtained a contract to provide services beyond the life of its patents by asserting they were essential to a standard.

The W3C is a consortium of Internet companies working in conjunction with staff and the public to develop the infrastructure of the World Wide Web through the development of standards.  In 1997, after learning at a W3C workshop about an emerging standard that would respond to users' wish for better on-line privacy control, Cordance personnel joined several Platform for Privacy Preferences Project ("P3P")

---

[44] *Id*. at 869.
[45] *Id*.
[46] *Id*. (quoting *State Oil Co. v. Kahn*, 522 U.S. 3, 10 (1997)).

Working Groups to participate in shaping the standard.  The P3P technology was created to enable web browser software to negotiate with various websites to determine what personal data the web user was willing to disclose and how that data could be used.[47]  Amazon contends that "Cordance misused its patents by attempting to hold up the on-line privacy protection standard ("P3P") developed by the W3C."  Amazon cites a July 1998 memorandum by Drummond Reed and an email that same month from Reed to his co-inventor Peter Heymann concerning potential to sell or license its patents to the W3C or the software industry participants hoping to implement on-line privacy protections.  In August 1998, Cordance approached W3C's P3P regarding a license to its intellectual property.  At that time, Cordance had not yet been issued any patents and the W3C had not implemented a standard for P3P.  After that August 1998 request, Cordance had no involvement with the W3C and made no attempts to obtain a licence from the W3C or the member companies participating in the P3P standard.  Further, in a November 1998 email from Reed, he states that Cordance had ceased its earlier licensing attempts.[48]  Subsequently, around March 2000, Cordance expressly informed the W3C that it was no longer seeking patent licenses relation to P3P.  The P3P released its first P3P standard in April 2002.

First, the court notes that an attempt to license a patent is not patent misuse.[49]

---

[47] D.I. 345, Ex. 3 at CORD165934.

[48] "We are not devoting one ounce of energy to licencing.".

[49] See 35 U.S.C. § 271(d) ("No patent owner otherwise entitled to relief for infringement or contributory infringement of a patent shall be denied relief or deemed guilty of misuse or illegal extension of the patent right by reason of his having done one or more of the following:  . . . (2) licensed or authorized another to perform acts which if performed without his consent would constitute contributory infringement of the patent; (3) sought to enforce his patent rights against infringement or contributory infringement . . . .").  Here, there was merely an attempt to license and the W3C and the member companies participating in the P3P standard never licensed any of Cordance's patents.  See D.I. 357, ¶ 4.

Although Amazon contends that Cordance attempted:  to "hold up" the P3P standard; to "to hold the standard hostage"; to "use its patents to undermine on-line privacy efforts"; to "shake down the W3C over the on-line privacy standard"; and impose a "burdensome licensing scheme," the court does not find that the evidence cited by Amazon demonstrates that Cordance "impermissibly broadened the physical or temporal scope of the patent grant" as required to show patent misuse.[50]  Moreover, the court disagrees with Amazon's accusation that Cordance's licensing attempt "imposed an unreasonable restraint on competition in that it attempted to commercially exploit technology which had been developed cooperatively to the benefit of an entire industry."  Cordance attempted to license its forthcoming patents in 1998; after which it had no involvement with the W3C and did not make further attempts to license those patents.  In 2000, Cordance expressly informed the W3C that it was not seeking patent licenses relating to P3P and slightly over two years later, the standard for P3P was implemented.

Next, Amazon contends that Cordance misused its patent by improperly extending the effective term of its patents through a license agreement with XDI.ORG. In 2002 Cordance formed a non-profit corporation, the XNS Public Trust Organization ("XNSORG," later known as "XDI.ORG").[51]  Cordance's May 2003 E-name Registry Business Plan states that:

> [Cordance] is uniquely suited to capitalize on the need for persistent Internet identity because the company invented and patented [a] new way of linking data across any two databases.  The heart of this solution is a new all-purpose digital identifier known technically as an XRI (Extensible Resource Identifier) and generically as an *e-name*.  XRIs and e-names

---

[50] *Virginia Panel Corp.*, 133 F.3d at 868.
[51] D.I. 345, Ex. 11 at CORD223264.

solve the inherent problems with trying to use addresses that may change (email addresses, phone numbers, domain names) as persistent identifiers.  They also provide the first standard way to automatically exchange, link, and synchroniz[e] contact and other identity data.[52]

In July 2002, Cordance granted XDI.ORG an exclusive license to its patents in order to create an open Internet standard necessary for widespread adoption.  In exchange, Cordance received a 15-year contract to become the primary operator of global e-name (later "i-name") registry services.  Cordance's 2003 business plan projected annual gross XRI e-name registry revenues from $76,000,000 to $195,000,000.

Cordance's current contract with XDI.ORG, dated September 13, 2004 ("XDI.ORG Global Service Provider Agreement"), provides that as each Global Service,[53] including "i-name" and "i-number" registration services, is implemented Cordance has the right of first refusal to provide that service for up to 15 years.  The term of the contract extends to the later of July 9, 2017 or 15 years after the commencement of the final Global Service.  Amazon argues that because a number of Global services have yet to be implemented as of February 2009, the exclusive contract to provide those services extends well beyond the expiration of Cordance's patents in 2016.[54]

In response to Amazon's argument that it improperly extended the effecting term

---

[52] D.I. 345, Ex. 11 at CORD223264.
[53] D.I. 345, Ex. 14 at CORD141233 ("Global Servies – The set of XDI interactions that shall be offered by XDI.ORG to all members of the XDI Community to facilitate interoperability of XDI infrastructure, including bue not limited to the Designated Global Services."); D.I. 345, Ex. 14 at CORD141232 ("Designated Global Services – I-Name Services, I-Number Services, Directory Services, Reputation Services, and Public Resolver Services . . . .").
[54] As noted previously herein, the patents-in-suit will each expire by February 29, 2016, with the exception of the '710 patent which expires by August 15, 2016.

of its patents through a license agreement with XDI.ORG, Cordance first contends that Amazon does not even cite any evidence of a patent license agreement between Cordance and XDI.ORG.  Cordance contends that the agreement between it and XDI.ORG, the "XDI.ORG Global Service Provider Agreement.," does not convey any patent rights.  Cordance states that the agreement relates only to providing business services.  According to Cordance, therefore, the agreement cannot extend Cordance's patent term and that Amazon does not cite any contrary evidence.  Even if Amazon was able to overcome those evidentiary hurdles, Cordance maintains that Amazon has not shown anticompetitive effect.  Consequently, Cordance contends it is entitled to summary judgment of no patent misuse.

Taking Cordance's last argument first, Cordance itself notes that "[a]nticompetitive effect is not required for *per se* misuse."[55]  In its opposition brief Amazon explicitly alleges *per se* misuse:  "Cordance has extended the life of its patents beyond its limited grant by trading a license to the patents for a 15-year monopoly on the provision of services necessary to use the license.  To extend the life of its patent rights beyond its limited grant is *per se* patent misuse."[56]  With regard to evidence of a

---

[55] D.I. 256 at 5 n.2.

[56] D.I. 344 at 15 (italicization added); *see Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 869 (Fed. Cir. 1997) ("The courts have identified certain specific practices as constituting per se patent misuse, including . . . arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties." (citing *Brulotte v. Thys Co.*, 379 U.S. 29 33 (1964)).  Amazon does, however, argue that Cordance's right of first refusal to provide any new Global Services contained in the agreement with XDI.ORG "monopoliz[es] the provision of these fee-based services, [thereby] restraining competition in an industry in its infancy."  D.I. 344 at 15.  Amazon acknowledges that "[t]he licenses offered by XDI.ORG to companies and individuals who wish to develop applications utilizing the standards are royalty free."  It contends that "in order to implement their applications, the developers have to pay Cordance to gain access to the registry and other services and every customer must purchase an 'i-name' or 'i-number' in order to utilize the applications."  D.I. 344 at 15.  It is the provision of the fee-based services associated with the XRI and XDI standards beyond the term of the patents which Amazon contends constitutes patent misuse.

17

patent license agreement between Cordance and XDI.ORG, Amazon has cited:  (1) the

XDL.ORG Global Service Provider Agreement ("To accomplish [the] purpose [of the

agreement], XDI. ORG has obtained licenses to use certain technology covered by the

Patent Rights . . . .");[57] (2) the E-name Registry Business Plan ("In July 2002,

[Cordance] granted XNSORG [ XDI.ORG] a license to [Cordance's] database linking

patents in order to create an open Internet standard necessary for widespread

adoption.  In exchange, [Cordance] received a 15-year contract to become the primary

operator of global e-name registry services.");[58] and (3) a February 6, 2006 document

titled "The Potential for a Cordance/AmSoft Merger" (Under "Overview of Major Assets,"

the document recites:  "[Cordance's] 15-year contract with XDI.ORG for XRI global

registry services (GRS) and the partnership it has developed with NeuStar to

commercialize this contract.  This is the crown jewel that originally motivated investors

to make the decision five years ago to "trade" and exclusive license to the patents to

XDI.ORG for this revenue stream.").[59]

Based on the evidence presented, and giving all reasonable inferences to the

non-movant (Amazon), the court cannot determine, as a matter of law, that Cordance's

agreement with XDI.ORG is not patent misuse.

Consequently, the court grants Cordance's motion for summary judgment

concerning Amazon's patent misuse defense with regard to activities relating to

---

[57] D.I. 345, Ex. 14 at CORD141221; *id.*, Ex. 14 at CORD141234 ("Patent Rights – (1) United
States letter of patent issued under numbers 5,862,325[,] 6,044,205[,] 6,088,717, 6,345,288, and
6,757,710 . . . .").
[58] D.I. 345, Ex. 11 at CORD223264.
[59] D.I. 345, Ex. 24 at CORD330405.  That document also lists "GRS registry fees (global i-names
and i-numbers)" as one of four primary sources of revenue for the merger discussed therein.

W3C/P3P and denies its motion with regard to activities relating to XDI.ORG.

      C.     Failure to Mark 35 U.S.C. § 287(a)

     Cordance argues that Amazon has no factual basis to support its allegation that

Cordance's damages for patent infringement should be limited by a failure to mark a

patented article under 35 U.S.C. § 287(a).  Cordance contends that the evidence shows

it has marked its products with its patent numbers at all relevant times.  Cordance also

argues that Amazon has failed to produce any evidence giving rise to a genuine issue

of material fact as to whether Cordance has complied with the marking requirement.

     As set forth in 35 U.S.C. §287,[60] a patentee is entitled to damages from the time

it provided constructive notice by marking its product, or when it actually notified the

accused infringer of its infringement, whichever is earlier.[61]  When constructive notice is

provided, the patentee is entitled to damages from the time the marking began.[62]

"[O]nce marking has begun, it must be substantially consistent and continuous in order

for the party to avail itself of the constructive notice provisions of the statute."[63]  The

marking requirement includes "persons making or selling any patented article for or

under" the patentee.[64]  Therefore, "licensees . . . and other authorized parties . . . must

---

[60] 35 U.S.C. § 287(a) ("Patentees, and persons making, offering for sale, or selling within the United States any patented article for or under them, or importing any patented article into the United States, may give notice to the public that the same is patented, either by fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of the patent, or when, from the character of the article, this can not be done, by fixing to it, or to the package wherein one or more of them is contained, a label containing a like notice.  In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice.  Filing of an action for infringement shall constitute such notice.").

[61] *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).

[62] 35 U.S.C. § 287(a); *American Medical Sys., Inc. v. Medical Engineering Corp.*, 6 F.3d 1523, 1537 (Fed. Cir. 1993).

[63] *American Medical*, 6 F.3d at 1537.

[64] 35 U.S.C. § 287(a).

also comply" with the marking requirement.[65]  The patentee "has the burden of pleading

and proving at trial that she complied with the statutory requirements."[66]  "When the

failure to mark is caused by someone other than the patentee, the court may consider

whether the patentee made reasonable efforts to ensure compliance with the marking

requirements."[67]

Cordance contends that since its first patent issued, it has properly marked all

products with which it has been involved that are covered by any claim of its patents.[68]

In response to Amazon's Interrogatory No. 24,[69] Cordance explained that it was

involved in developing two products, the Extensible Name Service Platform and the

OneName Identity Server, both of which were marked with the patent numbers of the

patents-in-suit.[70]  Cordance identified sixty documents by Bates number to support its

response and stated its two products were "marked with the patent numbers during

development and marking continued through the lifetime of the products."[71]

Cordance states that it has no knowledge of any licensee who has developed a

---

[65] *Maxwell*, 86 F.3d at 1111.

[66] *Id.*

[67] *Id.* at 1111-12.

[68] Because the '710 patent includes only method claims, the marking statute does not apply to that patent.  *See Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1581 (Fed. Cir. 1983) ("[I]t is . . . settled case law that the notice requirement of [35 U.S.C. § 287] does not apply where the patent is directed to a process or method."); *State Contracting & Engineering Corp. v. Condotte America, Inc.*, 346 F.3d 1057, 1074 (Fed. Cir. 2003) ("[W]e look to the asserted patents independently" to determine compliance with the marking statute.).

[69] Interrogatory No. 24 recites:  "**Identify** each product that has ever been marked with the patent numbers of any of the **patents-in-suit**, including the date when such marking was first made, the date on which such marking stopped (whether temporarily or permanently), and the patent number or numbers marked, identify all documents or things that you contend provide evidence of such marking, and identify all persons with knowledge concerning such facts (specifically identifying the person or persons most knowledgeable)."  D.I. 313, Ex. C. at 7 (emphasis in original).

[70] Cordance avers that since the issuance of its first patent, it has not been involved in the development of any other products that would be covered by its patents.

[71] D.I. 313, Ex. C at 8;  D.I. 313, Ex. A, ¶ 9 (Reed. Decl.).

product that would be covered by any of its patents.  It states that it is involved in promoting two standards for digital addressing called XRI and XDI.  As Cordance would like to encourage the adoption of the XRI and XDI standards, Cordance has granted a royalty free license to its patents to anyone who implements the XRI or XDI standards, subject to certain terms and conditions.  Several entities have developed implementations of the XRI or XDI standards, but none of those implementations are covered by any of Cordance's patents.  According to Cordance, therefore, no issue arises concerning the marking of any such product.

Cordance contends that Amazon has failed to put forth any evidence calling into question or otherwise challenging the sufficiency of Cordance's marking practices and Amazon has not identified a single instance where Cordance's patents have been implemented without proper marking.

Amazon argues that, as a threshold matter, if Cordance maintains that it provided constructive notice to Amazon through marking its patented or licensed products, Cordance must plead compliance under § 287.  Amazon contends that Cordance failed to so plead. [72]  In *Sentry Protection Products, Inv. v. Eagle Mfg. Co.*, the Federal Circuit stated that *Maxwell* "only makes the bare statement that the plaintiff 'had the burden of pleading and proving at trial that she complied with the statutory requirements.'"[73]  "Under the rule announced in *Dunlap* [*v. Schofield*, 152 U.S. 244 (1894)], [the patentee's] pleading that the 'infringements have been willful and with full knowledge [of the patents-in-suit]' was sufficient," therefore, "[the patentee] did not

---

[72] *Maxwell*, 86 F.3d at 1111.
[73] 400 F.3d 910, 918 (Fed. Cir. 2005).

21

waive its marking argument by failing to plead notice."[74]  After *Sentry*, other courts have

determined that pleading willful infringement also pleads marking.[75]  Here, Cordance

alleges, as to each of its patents, that Amazon's infringement was "deliberate and

willful."[76]  Therefore, Cordance has met its duty to plead compliance with section

287(a).[77]

Next Amazon challenges the assertion by Cordance that it has identified

documents sufficient to establish evidence of marking all the products sold by Cordance

which are covered by the patents-in-suit:  the Extensible Name Service Platform and

the OneName Identity Server.  Amazon states that the documents identified by

Cordance with respect to the OneName Identity Server have a copyright date of 2002

and are related to a single version of the product:  the OneName Identity Server 2.4a.

Amazon cites Cordance's October 2001 Business Plan, in which Cordance indicated

that the company was currently generating revenue from sales of its products, including

the OneName Identity Server.[78]  That Business Plan referred to versions 1.0 to 2.1 of its

---

[74] *Sentry*, 400 F.3d at 918.

[75] *See, e.g., Bowling v. Hasbro, Inc.*, 490 F. Supp. 2d 262, 275 (D.R.I. 2007) (citing *Sentry* as holding that "pleading the knowledge element of willful infringement severs to notify the accused infringer that the patentee will pursue damages under the constructive notice provisions of the marking statute."); *Topline Corp. v. Dynasty Footwear, Ltd.*, No. C06-1126JLR, 2007 WL 27105, at *1 (W.D. Wash. Jan. 2, 2007) (citing *Sentry* for the proposition that "[a] complaint alleging that infringement was willful or knowing necessarily alleges notice of infringement under section 287"); *Avid Identification Sys., Inc. v. Philips Electronics N. America Corp.*, No. 2:04-CV-183, 2006 WL 1408318, at *1 (E.D. Tex. May 18, 2006) (alleging that defendants "willfully and deliberately infringed" patentee's patents fulfilled "duty to plead compliance with 287(a)" consistent with *Sentry*).

[76] D.I. 156 at ¶¶ 13, 18, 24, 29.

[77] The court also notes that Amazon appears to have understood Cordance's pleading as notice of compliance with section 287(a) in that it served Cordance an interrogatory requesting evidence of marking products with the patents numbers of any of the patents-in-suit.

[78] D.I. 345, Ex. 17 at CORD061803 ("OneName markets a commercial product suite that takes full advantage of XNS as an open standard.  The suite includes:  OneName Identity Server . . . .  The Company generates revenue from sales of its products and associated services.  OneName Identity Server licenses range from $250 thousand to several million dollars, depending on the number of Web identity agents hosted per servers.").

software.[79]  According to Amazon, Cordance's interrogatory answers demonstrate that

Cordance has provided no evidence showing marking of those earlier versions.

Cordance responds that it has provided evidence of "substantially consistent and

continuous" marking of its products in the form of its answer to Amazon's Interrogatory

No. 24:  "[t]he Extensible Name Service Platform and the OneName Identity Server

were marked with the patent numbers [of the patents-in-suit]. . . .  The Extensible Name

Service Platform and the OneName Identity Server were marked with the patent

numbers during development and marking continued through the lifetime of the

products."  Cordance sites the Federal Circuit's decision in *Sentry* as support for its

position that Cordance's response, signed by Reed under penalty of perjury, is

sufficient evidence to establish substantially consistent and continuous marking of its

product and showing entitlement to summary judgment on Amazon's marking defense.

The court disagrees.

In *Sentry*, the district court determined, on summary judgment, that the patentee

had not given legally sufficient notice of a particular patent to the defendant, "and so

[defendant] never received either actual or constructive notice of [the patent] while it

was allegedly infringing."[80]  Because the court determined that the patentee could not

obtain damages for infringement of that patent, the court held that the issue of

infringement was moot.[81]  In making its determination concerning a lack of constructive

notice to the defendant, "[t]he district court held that [the patentee's] affidavit stating

---

[79] D.I. 345, Ex. 17 at CORD061826 ("OneName Corporation developed its core software (versions 1.0-2.1) using a relatively small team of senior developers with minimal assistance from outside contractors.").

[80] *Sentry*, 400 F.3d at 913.

[81] *Id.*

that it marked its products with the number [of the patent at issue during a specific period] did not create a genuine issue of material fact regarding notice."[82]  On appeal, the Federal Circuit determined that "the patentee's affidavit stating its products were marked, together with documents showing sales in that period . . . [was evidence] that . . . is not so 'conclusory' or 'lacking in factual support' as to allow us to affirm the grant of summary judgment."[83]  The Federal Circuit then held that "the district court erred by holding that [the patentee's] marking evidence did not preclude summary judgment. [The patentee] is entitled to an opportunity to prove constructive notice and corresponding entitlement to damages for infringement of the [patent at issue]."[84]

Here, however, Cordance is not trying to avoid a motion for summary judgment on the marking issue, but is asking the court to hold, as a matter of law, that its marking was substantially consistent and continuous.  The documentation provided by Cordance in support of its interrogatory answer concerning marking was related to a particular version of its OneName Identity Server.  Amazon has cited evidence that indicates Cordance received revenue from earlier versions of its OneName Identity Server for which no documentary evidence has been brought to the attention of the court. Although under *Sentry*, Cordance's evidence may very well have let it avoid summary judgment on the marking issue had *Amazon* brought such a motion, the court determines that Cordance's evidence is insufficient for it to prevail on this issue. Additionally, Amazon has at least raised other issues of fact regarding a Cordance

---

[82] *Sentry*, 400 F.3d at 913.
[83] *Id*. at 918.
[84] *Id*.

licensee that precludes granting Cordance's motion on the marking issue.

On March 1, 2003, Cordance entered into a Software License Agreement with Epok, Inc. ("Epok"), which granted Epok a non-exclusive license to the use and further development of the OneName Identity Server Code.[85]  Cordance contends, *inter alia*, that Amazon has adduced no evidence that Epok released a product at all, or if it did whether any such product was covered by Cordance's patents and/or was unmarked. Amazon, however, points to Cordance's September 4, 2003 Business Plan Update which reports that "Epok . . . has released v3.3 of the Epok Identity Server based on the code base licensed from OneName in March 2003" and a December 10, 2003 Shareholder/Investor Presentation which recites that "Epok released v3.3 of the Epok Identity Server in October."

Based on the above, and other evidence referenced in Amazon's opposition brief, the court again cannot find as a matter of law that Cordance's licensees marked any potentially relevant products in compliance with the marking statute.  Consequently, Cordance's motion for summary judgment on the marking issue is denied.

D.      Recovery of Costs under 35 U.S.C. § 288

Cordance maintains that Amazon has no factual basis to support its defense that Cordance should be precluded from recovering costs under 35 U.S.C. § 288. Cordance contends that this statute only applies where a claim of a plaintiff's patent was found invalid prior to the initiation of a lawsuit for patent infringement.  Because no

---

[85] D.I. 345, Ex. 18; D.I. 345, Ex. 18 at CORD331689 ("'Included Software' means any and all additional software bundled or tightly integrated with the product, if any, and delivered to Epok as part of the OneName Software. . . .  'OneName Software' shall mean all or any portion of the OneName Identity Server . . . .").  The license agreement with Epok does not require marking.

claim of any of Cordance's patents has ever been found invalid (or even the subject of a prior lawsuit), Cordance maintains that Amazon has no factual basis to allege that Cordance is barred from collecting costs under 35 U.S.C. § 288.

Under 35 U.S.C. § 288, a patent-infringement plaintiff may, in some instances, be prohibited from recovering costs upon the conclusion of the litigation:

> Whenever, without deceptive intention, a claim of a patent is invalid, an action may be maintained for the infringement of a claim of the patent which may be valid.  The patentee shall recover no costs *unless* a disclaimer of the invalid claim has been entered at the Patent and Trademark Office *before* the commencement of the suit.[86]

Cordance contends that the statute applies if:  (1) a claim of plaintiff's patent is found invalid, (2) plaintiff must thereafter fail to enter a disclaimer of the invalid claim with the PTO, and (3) plaintiff must then file suit against defendants.  In support of that contention, Cordance cites a nonprecedential opinion of the Federal Circuit in which that court stated that

> [defendant] overlooks the language of the statute itself, which requires that a disclaimer of the invalid claim be entered at the Patent Office "*before the commencement of the suit.*"  Obviously, then, there must have been a prior determination of invalidity before the patent-infringement suit for which costs are now sought.  There was no prior determination here. [Plaintiff], therefore, falls well outside the boundaries of the statute.[87]

Because no claim of any of its patents has ever been found invalid, Cordance argues that § 288 provides no basis for limiting costs and it is entitled to summary judgment that Amazon has no defense under 35 U.S.C. § 288.

Amazon first notes that Federal Circuit Rule 32.1(d) indicates that the Federal

---

[86] 35 U.S.C. § 288 (emphasis added).

[87] *Bradford Co. v. Jefferson Smurfit Corp.*, No. 2000-1511, 2001 WL 35738792, at *7 (Fed. Cir. Oct. 31, 2001) (emphasis in original) (citation omitted).

Circuit "will not give one of its own nonprecedential dispositions the effect of binding precedent."[88]  It also points out that the language Cordance cites is *dicta*, as the § 288 issue was not raised until the appeal and the court found that the defendant had waived the issue.[89]  Moreover, Amazon contends that the plain language of the statute does not require that a prior court found the claim invalid.  It states that a patentee may disclaim certain claims of a patent after learning that the claim is invalid in light of prior art.[90]

Moreverover, Amazon argues that whether claims are invalid is currently a disputed fact and, therefore, Cordance's motion for summary judgment should be denied.  In support of that argument, Amazon cites *Eli Lilly and Co. v. Zenith Goldline Pharms., Inc.*[91]  The *Eli Lilly* court stated that "[a] straightforward reading of section 288 . . . would prohibit a patentee from recovering costs if it asserted certain claims of a patent against a defendant that ultimately were proven in that suit (or prior to its

---

[88] Federal Circuit Rule 32.1(d) does state, however, that a nonprecedential disposition may be looked to "for guidance or persuasive reasoning."  Federal Circuit Rule 32.1(d) ("**Court's Consideration of Nonprecedential Dispositions.**  The court may refer to a nonprecedential disposition in an opinion or order and may look to a nonprecedential disposition for guidance or persuasive reasoning, but will not give one of its own nonprecedential dispositions the effect of binding precedent. The court will not consider nonprecedential dispositions of another court as binding precedent of that court unless the rules of that court so provide.").

[89] *See Bradford Co.*, 2001 WL 35738792, at *7 ("We note at the outset that while [defendant] contested the district court's award of costs, it has raised the issue concerning section 288 for the first time on appeal.  Accordingly, because [defendant] never gave the district court an opportunity to address this issue, [defendant] has waived the issue for purposes of our review."  The court continued, however, that "even if [defendant] had preserved this issue, we would find that its argument borders on the ridiculous."  The court thereafter wrote the above-cited observation regarding the language of the statute on making a disclaimer "before the commencement of the suit.").

[90] *Allen Archery, Inc. v. Jennings Compound Bow, Inc.*, 686 F.2d 780 (9th Cir. 1982) (patentee learned four years after patent issuance that a prior art bow did in fact achieve all of the prior art patent claims, leading patentee to disclaim two claims).

[91] 101 F. Supp. 2d 1139 (S.D. Ind. 2002).  There is no indication that the *Eli Lilly* court was aware of the *Bradford* decision.

commencement) to be invalid."[92]   The court continued with the following example:

> [I]f a patentee asserted several claims of a patent against a defendant (without filing a disclaimer regarding any of the asserted claims prior to commencement of the suit), perhaps prevailing on one asserted claim but having a second claim declared invalid, the patentee may not be able to recover costs against the accused infringer who was forced to defend against the invalid claim.[93]

The court notes that the facts in *Eli Lilly* are different than those here and that the above statement was unnecessary to the court's ruling.  In *Eli Lilly*, the defendant argued that certain *unasserted* claims were invalid, and, therefore, the patentee could not recover costs.[94]   The court rejected that argument, in part, because it would permit a defendant to avoid paying costs by challenging the validity of unasserted claims.[95]   Also, though *dicta*, the Federal Circuit in *Bradford* would appear to disagree with the statement by the *Eli Lilly* court that a patentee might be unable to collect costs where a claim was declared invalid by a court or jury.  In *Bradford*, the jury found certain claims invalid and other claims valid and infringed.[96]   The Federal Circuit "reject[ed] [defendant's] contention that, under 35 U.S.C. § 288, [plaintiff] had to file a disclaimer about an invalid patent claim before trial in order to recover its costs."[97]   The court stated that:

---

[92] *Eli Lilly*, 101 F. Supp. 2d at 1144 n.6.

[93] *Id.*  Another court appears to hold the same opinion regarding this issue.  *See Bell Sports, Inc. v. Graber Prods., Inc.*, No. 92-C-373-S, 1993 WL 597383, at *7 (W.D. Wis. May, 21 1993) (declining to disallow costs pursuant to 35 U.S.C. § 288; finding that "plaintiff remains entitled to costs since *none of the claims which it pursued at trial or through summary judgment were found to be invalid*") (emphasis added). *Bell Sports* suggests that costs could be disallowed pursuant to section 288 if some claims were to be found invalid on summary judgment or at trial.  The court notes that *Bell Sports* was decided prior to *Bradford*.

[94] *Eli Lilly*, 101 F. Supp. 2d at 1143.

[95] *Id.* at 1144.

[96] *Bradford Co.*, 2001 WL 35738792, at *2.

[97] *Id.* at *1.

> even if [defendant] had preserved this issue, we disagree that section 288
> obligated [plaintiff] to guess about the invalidity of its patent claims *before*
> a jury or some other authority had even ruled on their validity and that
> [plaintiff] therefore had to file a disclaimer about those claims' validity
> before filing suit against [defendant].[98]

This court agrees with Cordance that summary judgment on Amazon's section 288 defense is appropriate.  That section addresses a situation where "a claim of a patent *is invalid*."  In order to recover costs where a claim of a patent is invalid, the patentee must have disclaimed the invalid claim "*before* the commencement of the suit."  It is not disputed that any claim of the patents-in-suit has been determined to be invalid.[99]  Under 35 U.S.C. § 282, an issued patent is presumed valid.  Although Amazon contends that certain of the claims asserted by Cordance are invalid, no such determination was made by any entity prior to the commencement of this suit and, therefore, the court determines that section 288 is not implicated and grants Cordance's motion for summary judgment on Amazon's defense based on that section.  Therefore,

For the reasons contained herein, IT IS ORDERED, ADJUDGED and DECREED that:

1.  Cordance's motion for summary judgment on Amazon's defense of prosecution laches (D.I. 313) is GRANTED:  Amazon's motion for summary judgment on prosecution laches (D.I. 316) is DENIED.

---

[98] *Id.* (emphasis added).

[99] Amazon's citation to *Allen Archery, Inc. v. Jennings Compound Bow*, 686 F.2d 780 (9th Cir. 1982), supporting the unremarkable proposition that a patentee may disclaim certain claims of a patent if the patentee learns that the claims are invalid in light of prior art, does not change the court's analysis here.  In *Jennings*, the inventor learned four years after its patent issued that "certain prior art could be modified to achieve some of its patents claims which [the inventor] had believed were too broad."  After conducting tests on the prior art, and consulting his patent attorney, the inventor filed a disclaimer of certain of his own patent's claims.  *Id.* at 781-82.  Here, Cordance insists its claims are all valid, therefore, in its view, no claims needed to be disclaimed prior to filing this action.

2.   Cordance's motion for summary judgment concerning Amazon's patent misuse defense with regard to activities relating to W3C/P3P is GRANTED, and with regard to activities related to XDI.ORG is DENIED.

3.   Cordance's motion for summary judgment on the marking issue is DENIED.

4.   Cordance's motion for summary judgment on Amazon's defense based on 35 U.S.C. § 288 is GRANTED.

June 30, 2009                                    /s/ Mary Pat Thynge
                                                 UNITED STATES MAGISTRATE JUDGE