1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

    CORDANCE CORPORATION,
4                                   :    CIVIL ACTION
              Plaintiff,            :
5    v                              :
                                    :
6    AMAZON.COM,                    :
                                    :    NO. 06-491 (MPT)
7              Defendant.
                              - - -
8
                         Wilmington, Delaware
9           Wednesday, August 5, 2009 at 8:44 a.m.
                          *VOLUME C*
10
                              - - -
11
    BEFORE:  HONORABLE **MARY PAT THYNGE**, U.S. MAGISTRATE JUDGE,
12                                                and a jury
                              - - -
13   APPEARANCES:

14
              ASHBY & GEDDES, P.A.
15            BY:  JOHN G. DAY, ESQ.

16                 and

17            WOLF GREENFIELD & SACKS, P.C.
              BY:  MICHAEL C. ALBERT, ESQ.,
18                 ROBERT M. ABRAHAMSEN, ESQ., and
                   JEFFREY C. O'NEILL, ESQ.
19                 (Boston, Massachusetts)

20                 Counsel for Cordance Corporation

21
              POTTER ANDERSON & CORROON, LLP
22            BY:  RICHARD L. HORWITZ, ESQ.

23                 and

24
    Valerie Gunning                    Brian P. Gaffigan
25   Official Court Reporter            Official Court Reporter

1    APPEARANCES: (Continued)

2

3                    FENWICK & WEST, LLP
                     BY:  LYNN H. PASAHOW, ESQ.,
4                         J. DAVID HADDEN, ESQ.,
                          DARREN E. DONNELLY, ESQ.,
5                         SAINA S. SHAMILOV, ESQ., and
                          RYAN J. MARTON, ESQ.
6                         (Mountain View, California)

7                         Counsel for Amazon.com

8

9

10

11                         - oOo -

12                    P R O C E E D I N G S

13            (REPORTER'S NOTE:  The following proceedings

14    were held in open court, beginning at 8:44 a.m.)

15            THE COURT:  Please be seated.

16            You needed to talk with me today?

17            MR. ALBERT:  Yes, Your Honor.  We have two

18    issues, if we might.

19            THE COURT:  Yes.

20            MR. ALBERT:  The first one we have largely, but

21    not completely, resolved, I think.  And that is the proposed

22    cautionary instruction.

23            THE COURT:  Yes.

24            MR. ALBERT:  We have some language that I can

25    hand up to the court that has been agreed upon.  It's only

1    subject to Cordance's reservation of rights on the ruling

2    yesterday with the 102 issue, I would state for the record,

3    but there is agreed upon language.  I think the only

4    difference at this point that we have is over the timing of

5    when it is offered.

6             Our suggestion would be that given the volume

7    and complexity of the issues before the jury, it would be

8    helpful to have it in context.  And our proposal, as we

9    indicated on the cover motion, would be that it, that the

10   instruction be provided at the first occasion on which the

11   issue comes up, when someone mentions the '411 patent.

12            THE COURT:  All right.  Why don't you pass up

13   the proposed language.  Thank you.

14            (Document passed forward.)

15            MR. ALBERT:  We hand wrote it, so you have that

16   copy.

17            THE COURT:  Yes.

18            MR. PASAHOW:  And, Your Honor, our suggestion on

19   timing is that Your Honor give it the first thing this

20   morning.  I'll be using the patent during my examination of

21   Mr. Reed this morning and would prefer it not be given in

22   the middle of the examination.

23            MR. ALBERT:  I think I will be difficult for the

24   jury to understand what this is in reference to given there

25   has been no discussion of that until now and we don't know

1    if, when or how.  Clearly, apparently they do plan to raise

2    it but I think in the context in which it arises, it will be

3    clear for the jury what we're talking about, what the Court

4    is talking about.

5                THE COURT:  All right.  I have some comments

6    concerning the proposed instruction.  I think adding

7    something to the first sentence, which says "you may hear

8    evidence that Amazon has a patent," I think we should tell

9    them it's called the '411 patent.

10               MR. ALBERT:  That's fine, Your Honor.

11               THE COURT:  Is everybody comfortable with the

12   third paragraph?

13               MR. ALBERT:  We reached agreement on the

14   language there, Your Honor.

15               THE COURT:  All right.

16               MR. PASAHOW:  Yes, Your Honor.

17               THE COURT:  All right.  As to the timing of it,

18   I think if this going to be some examination that is

19   follow-up of what was done yesterday, I'll probably

20   interrupt your cross-examination to do an instruction

21   shortly before you start talking about the '411 patent

22   rather than introducing it to them this morning.

23               MR. PASAHOW:  Thank you, Your Honor.

24               THE COURT:  Because I think that you indicated

25   to me there was some additional questioning you were going

1   to be doing, and I would like you to get that out of the

2   way, and then I will explain that to them.

3               MR. PASAHOW:  I'm not sure I understood that.

4               THE COURT:  My understanding is that you were

5   going -- yesterday, when you stopped, that you were going to

6   be continuing to question Mr. Reed but it was not going to

7   be in the '411 patent because, at that time, you wouldn't

8   know whether I was going to allow you to talk about it.

9               MR. PASAHOW:  Yes, Your Honor.

10              MR. ALBERT:  Your Honor.

11              THE COURT:  Yes.

12              MR. ALBERT:  May we be heard on one other issue?

13              THE COURT:  Yes, Mr. Albert.  What is the

14  problem?

15              MR. ALBERT:  It appears that Amazon intend to

16  use a document that we dispute whether they should be

17  permitted to do so during the course of cross-examination of

18  Mr. Reed.  And if I may allow Mr. O'Neill to address that

19  issue.  Thank you.

20              THE COURT:  And what document is it?

21              MR. O'NEILL:  Your Honor, I guess there is a

22  couple issues.  The first one is that it appears that Amazon

23  would like to use a document called the '131 declaration

24  from the prosecution history.

25              THE COURT:  Yes.

1          MR. O'NEILL:  What this document is, is it

2    informed the Patent Office that Mr. Reed had conceived of

3    his invention at an earlier date and that he was diligent in

4    reducing the invention to practice.  So this '131

5    declaration, it isn't relevant to any of the issues before

6    the jury.  It doesn't go to infringement.  It doesn't go

7    to -- well, it doesn't go to validity.

8          Amazon is arguing that I believe it's part of

9    its inequitable conduct allegations, that Mr. Reed

10   misrepresented his invention to the Patent Office in this

11   '131 declaration but that is something that is going to be

12   heard at the bench trial that will take place after this

13   trial.

14         The other possibility is that they're using the

15   '131 declaration as part of a claim construction argument.

16   One of Amazon's apparent test themes in this case that is

17   Mr. Reed's invention is a two click invention and not a

18   one-click invention.  They can certainly make that argument

19   but they should do that using the 1993 conception document.

20         This document, which is part of the prosecution

21   history doesn't, it shouldn't be used to argue the scope of

22   the claims to the jury.  The only issue with the conception

23   document is whether this 1993 conception document

24   corroborates Mr. Reed's invention, his one-click invention.

25         So Mr. Reed may testify at some point about his

1      conception invention or I guess he did so yesterday.   And

2      this 1993 document corroborates that conception.   So my

3      question is whether or not that document has sufficient

4      corroboration.   Amazon is free to argue whether that

5      conception document is one click or two clicks, but the '131

6      declaration from the prosecution history should not be used

7      for purposes of trying to limit or change the scope of the

8      claims as already construed by the Court.

9                  Another issue.

10                 THE COURT:   Let's get this issue done now.

11                 MR. PASAHOW:   Yes, Your Honor.   This is about

12     the priority document.   The document that in opening

13     statement Mr. Albert told the jury was the one-click

14     document.   So the jury that -- I'm sorry.   The document, in

15     testimony yesterday, Mr. Reed said was about semiautomatic,

16     even though it uses the word automatic, and then he tries to

17     interpret automatic to semiautomatic.   The document we're

18     talking about is a document sworn under oath by Mr. Reed in

19     which he says that the priority document is about automatic,

20     not what he testified yesterday is semiautomatic processing.

21                 THE COURT:   Do you want to show inconsistent

22     statements?

23                 MR. PASAHOW:   Yes, Your Honor, and impeach him

24     on.   It's directly relevant to the priority document and

25     whether, in fact, that is a document about any of the claims

1    in this case.  It's also a document I used in my opening

2    statement without objection.

3                MR. ALBERT:  Your Honor, I didn't want to

4    interrupt the flow of the opening statement but it is

5    objectionable.  It's a purely inequitable conduct argument.

6                THE COURT:  I don't think it is.  He will not be

7    allowed to use it as inequitable conduct or suggest they

8    made a misrepresentation to the PTO.  But he certainly can

9    use it to show that Mr. Reed has made inconsistent

10   statements about when he conceived and what he conceived.

11   So I don't consider it to be, my suggestion of inequitable

12   conduct, especially since this jury isn't going to hear

13   anything about inequitable conduct certainly in any

14   instructions from the Court and it's not going to be an

15   issue that will be addressed.  But it is an issue to sit

16   there and show that witnesses may have made inconsistent

17   statements or made inconsistent representations on documents

18   or made at the same time in court that is inconsistent with

19   something else they made previously so that is not purely

20   inequitable conduct.

21                I'm going to allow it.  I'm going to allow you

22   to suggest to the jury that Mr. Reed did something improper

23   before the PTO.  It also cannot be used in any way, shape or

24   form to suggest or change my claim construction.

25                MR. ALBERT:  Thank you, Your Honor.

1           THE COURT:  It can be used for that other

2     purpose.

3           And, Mr. O'Neill, there is something else?

4           MR. O'NEILL:  Yes.  The second issue is in

5     Amazon opening they used documents from the prosecution

6     history.  My understanding is that these documents are

7     essentially being used to suggest that the scope of the

8     claims are different from how they read and how they have

9     been construed.

10          I think the primary example of that appeared in

11    Amazon's opening, was Amazon focused heavily on the

12    reference called the Chelliah, a patent by Chelliah.  Amazon

13    is noting that the Patent Office initially rejected

14    Cordance's claims over this Chelliah reference.  And in

15    response to that, Cordance did swear behind the Chelliah

16    reference.  By doing that, they said in the Patent Office,

17    well, regardless of what Chelliah says, our invention is

18    earlier so we don't need to say anything about Chelliah.

19          So at that time, Cordance had two options.  They

20    could have distinguished Chelliah and said our invention is

21    different or they could swear behind it; and they chose to

22    swear behind instead of to distinguish Chelliah.  But that

23    doesn't create any kind of implication that the Chelliah

24    reference would anticipate Cordance's claims.

25          So I believe Amazon is trying to use the fact

1     that Cordance swore behind the Chelliah reference to argue

2     that Chelliah does, in fact, anticipate Cordance's claims.

3     So I think this is an improper use of the prosecution

4     history to give, to argue the scope of the claims is

5     different from the Court's claim construction.  So I don't

6     think Amazon should be allowed to use the prosecution

7     history in any way that suggests that the scope of the

8     claims is different from what the Court has construed.

9               THE COURT:  Any last comments?

10              MR. PASAHOW:  I'm not even sure I understand

11    the accusation.  We talked about Chelliah because Chelliah

12    is one of the prior art experts that our expert, Dr. Alvisi

13    said anticipates the claims.  I talked about it in the

14    prosecution history because the examiner --

15              THE COURT:  Because it was considered by the

16    PTO.

17              MR. PASAHOW:  I thought the same thing; and I

18    think that is relevant.  It's also important that the jury

19    understand that although it's on the face of the patent as

20    having been considered by the examiner, it's not something

21    that he considered and then changed his mind about.  It's

22    something he stopped considering because of this swearing

23    behind, which we think was erroneous.

24              THE COURT:  Yes.

25              MR. ABRAHAMSEN:  Your Honor, Amazon is not

1   relying on Chelliah as an anticipatory reference.  Instead,

2   they chose to rely on a public use of a system in 1994.

3   They apparently are using Chelliah as evidence of the

4   existence of that system in 1994.  Their expert report does

5   not say the claims are anticipated by Chelliah.  Their

6   expert reports says it's anticipated by the system that

7   existed earlier than Chelliah.

8           MR. HADDEN:  Do you want me to respond?  I can.

9           That is not really accurate.  Chelliah is about

10  a product from a company called Broad Vision.  Our expert

11  discusses both the product and the Chelliah patent which

12  describes it.  His claim chart cites to literature about the

13  product and the patent itself, the specification shows where

14  all the elements are.  So our expert does opine about

15  Chelliah extensively.

16          THE COURT:  To me, the prosecution history that

17  was said before the PTO is relevant at times for the jury to

18  hear.  It is not relevant to claim construction at all.  And

19  I will not allow it to be used that way because hopefully

20  the Court has applied it correctly.  And when counsel made

21  their arguments to me regarding claim construction,

22  hopefully the Court has taken into account the prosecution

23  history in its analysis in coming up with the appropriate

24  interpretation of the claims.

25          Right now, I'm getting two arguments basically

1    suggesting that Chelliah was not part of Amazon's case and

2    the argument that Chelliah is part of Amazon's case, and I'm

3    kind of at an impasse in making a determination.  I don't

4    think the reference to Chelliah was improper.  I listened to

5    that.  I also read it, at the time, tried to read portions

6    of the opening statements.

7              I'm going to reserve and hold off on making a

8    complete ruling on this; but, again, I go back to you can't

9    use -- you can't change the claim construction.  If your

10   expert is using Chelliah as a prior art reference to support

11   anticipation or another argument for invalidity, then fine.

12   If it turns out they aren't, then we'll have to address it.

13             MR. ABRAHAMSEN:  Your Honor, this actually

14   raises a deeper issue which is the -- I don't know if you

15   have a copy of the report or not but what their expert says

16   is this system was in public use in 1994.  Chelliah, along

17   with a couple other documents, they say are evidence of that

18   public use.  We have a serious issue, a hearsay issue here

19   that they're using these documents to prove the existence of

20   a system in public use and they're not allowed to do that.

21             Maybe you need to see the expert report to be

22   comfortable that they really are not relying on Chelliah as

23   anticipatory reference.

24             THE COURT:  I need to see that.  I need to

25   review it.  But your other argument, again, is an issue

```
 1    that I don't know whether that is the case.  And until the

 2    evidence is attempted to be presented that way, then you can

 3    address it at that time.  But I understand you giving me

 4    notification that that may exist.

 5              All right.

 6              MR. ABRAHAMSEN:  There was one final issue.

 7              THE COURT:  Yes.  I'm sorry.  I didn't realize

 8    there was another one.

 9              MR. ABRAHAMSEN:  We had been having discussions

10    about how to move documents into evidence.

11              THE COURT:  Yes.

12              MR. ABRAHAMSEN:  We sent a list, albeit it was

13    late last night, of the witnesses in the witness binder

14    minus the one the Court had seen the objections on regarding

15    the newspaper article.  We would like to move these into

16    evidence at this time.

17              MR. PASAHOW:  We got this at midnight.  I've got

18    one of my associates checking it.  If I could just wait

19    until the break and check back?  It will be fine, I'm sure.

20              MR. ABRAHAMSEN:  We just want to make sure there

21    are no issues here.

22              THE COURT:  If there is going to be an issue,

23    we'll address it at the time of the break.

24              MR. ABRAHAMSEN:  Okay.

25              THE COURT:  And remind me of that so I don't
```

1    forget.

2              Are we ready for the jury, counsel?

3              MR. PASAHOW:  Yes, Your Honor.

4              THE COURT:  Give me one moment.  I'll be right

5    back.

6              MR. ALBERT:  Your Honor?

7              THE COURT:  Yes.

8              MR. ALBERT:  I'm sorry.  One brief question.

9              THE COURT:  Sure.

10             MR. ALBERT:  The next series of witnesses are

11   going to be deposition read-ins.

12             THE COURT:  This is one thing I wanted to talk

13   to you about.  And it's in my standard trial order or not

14   in the pretrial order.  You will have the right to use

15   transitional statements to explain to the jury what you do,

16   including about the witnesses.  You don't go into great

17   detail and testify, but you are allowed to give enough

18   background information or enough transitional information to

19   have a flow.

20             I noticed that wasn't used yesterday, and I just

21   wanted to remind you; although I think everybody knew who

22   Mr. Reed was because he had been brought up in the opening

23   statements.  I'm not certain they knew who the first witness

24   was necessarily, but he certainly covered that when he took

25   the stand.  But I want to remind you can do those type of

1    things as long as it doesn't amount to testifying for the

2    witness.

3               MR. ALBERT:  Thank you, Your Honor.

4               Does the Court have a preferred procedure with

5    regard to read-ins?

6               THE COURT:  Are you have literally going to read

7    them in?

8               MR. ALBERT:  There are some in video, some will

9    be read in, and the thought was to put an individual on the

10   stand to simply play that witness.

11              THE COURT:  And that's fine.  That is how it's

12   usually done, and I think it's kind of nice to have somebody

13   there because at least it's not attorney being a talking

14   head by themselves.

15              MR. ALBERT:  Does the Court prefer that

16   counsel offering the witness do all the read-ins, including

17   the counterdesignations, or that the counsel trade-off on

18   that, one side's designations and the other side's

19   counterdesignations?  So if we've proposed certain lines

20   from the deposition and they've proposed different lines, do

21   you have counsel trade-off on doing the read-ins?

22              THE COURT:  Whoever made the proposal is the

23   side that I have read in.  Do you understand what I said?

24   Unless I'm not understanding what you are asking.

25              MR. PASAHOW:  Sometimes there will be a long

1    section and then just three or four lines that are

2    counterdesignated, then a long section.  The question is

3    should we switch attorneys for those three or four lines?

4              MR. ALBERT:  We can do it all by the same

5    counsel.

6              MR. HADDEN:  I think that would be fine with us.

7              THE COURT:  If that is fine with you, that's

8    fine.

9              MR. ALBERT:  That's fine.

10             MR. HORWITZ:  Your Honor, the only thing I would

11   suggest so the jury understands it includes both sides if,

12   after counsel says we're going to have some deposition

13   testimony, if you could just say to the jury this includes

14   sections that both sides have designated that they think are

15   important to their case.

16             THE COURT:  All right.  I'll be back in just a

17   movement.  I need to get my cup.

18             MR. PASAHOW:  Thank you.

19             (Brief recess taken.)

20             THE COURT:  Regarding the issue concerning one

21   side reading everything, we're going to need to know how

22   much time for each in the deposition.  So if one side doing

23   all of the reading, we're not going to know where Cordance's

24   December designations begin and end.

25             MR. PASAHOW:  We had understood your Honor's

Reed - cross

1    order to say it was the ratio of the line designated by each

2    party.

3                    MR. ALBERT:  We can calculate that and provide

4    it to the Court.

5                    THE COURT:  And that means how many minutes?

6                    MR. PASAHOW:  Well, the, take the ratio of lines

7    and apply that to the minutes and use the same ratio, is

8    what we understood.

9                    THE COURT:  That's fine.

10                   MR. ALBERT:  That's fine with us.

11                   THE COURT:  That's fine.  We'll give you the

12   time that he has for the total during the break.

13                   (The jury entered the courtroom and took their

14   seats in the box.)

15                   THE COURT:  Please be seated.

16                   Good morning to you.  We will now be continuing

17   with the cross-examination of Mr. Reed.

18                   MR. PASAHOW:  May I proceed, Your Honor?

19                   THE COURT:  Yes, you may.

20                        CROSS-EXAMINATION

21   BY MR. PASAHOW:

22   Q.    Good morning, Mr. Reed.

23   A.    Good morning.

24   Q.    Mr. Reed, what is your current position at Cordance?

25   A.    I'm a director, meaning a member of the board, and a

Reed - cross

1    technical advisor.

2    Q.    Now, getting back to where we were at the end of the

3    day yesterday, do you recall we were talking about PlanetAll

4    and your concern that PlanetAll had infringed one of your

5    patents, and had you been concerned that PlanetAll had

6    copied from your patent in doing what it's doing?

7    A.    When you say, "copied from my patent," what do you

8    mean?

9    Q.    Yes.  Had you been concerned that it had gotten

10   information from your patent somehow and used that to design

11   what it was doing?

12   A.    I'm not sure.  I would have to go back.

13               I can't recollect what -- was it -- what

14   was in my head at that time when I was looking at their

15   system.  I knew of what I had invented.  I'm not sure that

16   our patents had been published at that time.

17   Q.    So you didn't mean to say yesterday that you thought

18   that they had copied something from the patent?

19   A.    I don't believe so.

20   Q.    And how about with 1-click?  You meant to say that

21   you thought Amazon had copied something from your patent and

22   it's 1-click innovation?

23   A.    I'm not sure of the question you are asking.

24   Q.    It is really the same question.  Did you have a

25   concern back when you learned about 1-click and you

Reed - cross

1    expressed your surprise, did you have a concern that they

2    had somehow gotten information from your patent and used

3    that in formulating the Amazon idea?

4    A.    Given that the patent had not been published yet, no,

5    I did not have that concern.

6    Q.    Now, yesterday, you testified about prior art

7    purchase systems, and one of the things you explained to us

8    was this slide.

9             What prior art purchasing system was this from?

10   A.    I'm not sure the slide represented any particular

11   prior art purchasing system, to my knowledge.

12   Q.    Is this what -- did you intend to suggest this is

13   what a returning customer would see on a prior art

14   purchasing system?

15   A.    Again, I didn't suggest it represented any particular

16   shopping cart system.  It's a general depiction of what the

17   shopping cart system process is like.

18   Q.    You did not mean to suggest this was what any Amazon

19   site was like?

20   A.    For the third time, I didn't suggest it was what any

21   particular system was like.

22   Q.    Now, back historically, it's true, is it not, that

23   you became aware of Amazon some time in early 1996?

24   A.    It was probably some time not too long after they

25   launched, given that I was actively working on the Web and

Reed - cross

1   they were a Seattle company.

2   Q.     And you were paying pretty close attention, then, to

3   what was happening on the Web?

4   A.     Relatively, yes.

5   Q.     And do you recall that the first time you went to

6   Amazon and purchased something, you were very impressed with

7   its ordering system?

8   A.     I -- yes.  I think I was -- I thought Amazon did a

9   pretty good job with its ordering system.

10  Q.     And you thought they had some good ideas that

11  Intermind could use?

12  A.     When you say "could use," we -- to anticipate, we

13  would eventually need some kind of an ordering system for

14  our customers.

15  Q.     And you thought that Amazon had some ideas that

16  Intermind could use?

17  A.     Just as I described yesterday, the -- the features of

18  other systems, whether it's competitors or other systems

19  on -- in your industry are something that every company

20  studies every other company.

21              MR. PASAHOW:  May I hand this to the witness?

22              THE COURT:  Yes, you may.

23              (Mr. Pasahow handed an exhibit book to the

24  witness.)

25              (Pause.)

Reed - cross

1    BY MR. PASAHOW:

2    Q.     And in the first set of tabs here, the defendant's

3    exhibits, could I ask you to turn to 106, please?

4    A.     Did you say 106?

5    Q.     Yes, I did.

6    A.     There it is.  Yes.  I've turned there.

7    Q.     And this is a series of e-mails beginning with one

8    from you; is that correct?

9    A.     It appears that the first e-mail in the thread is

10   from me.

11   Q.     And it was to Mr. Mushero; is that correct?

12   A.     Yes.

13          MR. PASAHOW:  No objection?

14          MR. ARNOLD:  No objection.

15   BY MR. PASAHOW:

16   Q.     So if we could look at your e-mail, it indicates you

17   sent it, I think, in January 1996; is that correct?

18   A.     That looks like the date.

19   Q.     So that would be about six months after Amazon

20   started up?

21   A.     Again, I don't recollect.  You know the exact date

22   they started.

23   Q.     And do you see there where you say, you ordered a

24   book and their billing system looks very sharp?

25   A.     Yes, I do.

Reed - cross

1    Q.      You say, With a little schmoozing, they might have

2    all the answers we're looking for.  Check them out.

3    A.      Yes, I do.

4    Q.      What answers for online purchasing were you looking

5    for?

6    A.      We anticipated that at some point, we might need a

7    billing system if we were going to reach a point where we

8    were sell Intermind Communicator directly to the public.

9    Q.      And so did Intermind ever have an online purchasing

10   system?

11   A.      We made a business decision at a certain point that

12   rather than sell our product directly to the public, we were

13   going to give away the part that end users would use, and

14   only sell the software that companies would need to publish

15   with the product.

16           So, therefore, although we started work on what

17   would be a billing system to be able to sell directly to end

18   users, we decided not to do that.  We stopped that work.

19   Q.      So Intermind never had an online sale system; is that

20   correct?

21   A.      To sell directly to the end users, no, we never

22   produced one.

23   Q.      You never had one to sell to anyone; is that correct?

24   A.      It turned out for corporate customers, those sales

25   were made one at a time.  We didn't need an online billing

Reed - cross

1   system for that.

2   Q.     So Intermind never had an online billing system; is

3   that correct, sir?

4   A.     Are you saying we never did anything to build one or

5   we never finished one and put it on -- put it out so that it

6   was never operating?

7   Q.     You never had an operating one?

8   A.     We never had an operating one, that's correct.

9   Q.     And you never had the software that could be used to

10  have an operating one?

11  A.     I don't understand.  We started working on a billing

12  system.  It says that right in this e-mail.

13  Q.     Well, let's look at that.  Can we look at the top

14  message, please?

15          And you see there, perhaps you could tell us who

16  Mr. Arnold -- actually, this is Mr. Mushero's e-mail at the

17  top; is that correct?

18  A.     That's correct.  He's the chief technical officer

19  that testified yesterday.

20  Q.     And you see where he says in the first line, We're

21  not really following anyone's model, since we don't really

22  have a purchasing system?

23  A.     Yes.  And then he says, there is no product

24  selection.  So he's underscoring the point I was just

25  making.  We didn't really need anything near what -- the

1    kinds of functions that were in Amazon's system.

2    Q.     But you, in your original e-mail, thought you might,

3    down at the bottom there?

4    A.     Well, again, this is why the e-mails were going back

5    and forth.  We had talked about the need, the potential

6    need, and we had started some work.

7                   As you see, at the end of his -- four lines

8    down there, he says, BTW -- that means by the way -- Dan O,

9    that stands for Oberlander -- excuse me -- Dan O.  Dan Banay

10   is one of our developers.  Jeff Oberlander is the other.

11                  So I think he meant Dan is doing the will

12   system.  That meant the initial project had been assigned to

13   one of our developers, but the line you've highlighted said,

14   Mr. Mushero was saying, we're not follow anyone else's model

15   because we don't really need a complex purchasing system.

16   Q.     What experience did you have with doing product

17   fulfillment for online purchasing?

18   A.     What experience did I have personally, or did the

19   company have?

20   Q.     You, sir, personally.

21   A.     Well, I had the experience that I was talking about

22   yesterday, when I talked about the whole history of what I

23   had developed for Egghead Software, and then the problem

24   that I was trying to solve, which was how to sell

25   information very easily online.

Reed - cross

1    Q.    And did you help Egghead prepare a fulfillment system

2    for selling online?

3    A.    We talked about the SoftPapers system being used as

4    an online system from which information might be available

5    in their stores.

6           Is that what you mean?

7    Q.    No.  I'm talking about sell online.  That is, selling

8    products online.  You understand that, I hope?

9    A.    Yes, I do understand selling products online.

10   Q.    All right.  The question is:  Did you ever work with

11   a system for helping a company, including Egghead, sell

12   products online?

13   A.    Well, it was -- we were just at the point where

14   Egghead was looking at things like online sales.  We never

15   reached a point where we went into detail about how that

16   would work, how it would be tied to their existing

17   inventory.

18   Q.    Can you tell me in an online fulfillment system, what

19   does a company have to do to fulfill an order after the

20   customer says, I want to buy a product?

21   A.    I know there are a number of steps involved.  I'm not

22   an expert in what all the steps would be.

23   Q.    What are the steps?

24   A.    Well, the order comes into the back-end systems.

25   There, it depends a great deal on the architecture of the

1   back-end system that has been created.

2              In general, it goes into a customer

3   processing system, where there's two parts to it.  You need

4   to process the purchasing transaction.  That's to begin

5   order fulfillment and to start the process of charging a

6   customer's credit card, and then there's the process of

7   actually fulfilling and shipping the order.  And those two

8   things have to be carefully coordinated.

9              As I mentioned yesterday, Visa International was

10   the company that came after we announced our system in 2000

11   and decided to partner with us, and ended up becoming the

12   co-chair of the technical committee that we started at

13   Oasis.

14              So I began working with Visa International.  I

15   learned a great deal about the fact that the payment system,

16   when an order comes in, the payment is not charged

17   immediately.  Actually, the vendor is not allowed to charge

18   until they ship the order.

19              So, basically, the payment has to come in.  It

20   has to be stored by the vendor until they are ready to ship

21   the order.  When they ship the order, then they can actually

22   charge the credit card.

23              More advanced systems do what's called reserving

24   funds, which is, in order, before they will actually ship

25   the product out, they don't charge a card, but they do

Reed - cross

1   what's called a payment authorization, and that's when they

2   check and see, do you actually have the balance to pay this.

3   The bank will actually reserve the funds.

4          If they reserve the funds, then the payment to

5   the bank says, that's okay.  Then the merchant will say,

6   it's all right to ship the product.  They will then ship the

7   product and charge your credit card.  And that's not a

8   physical system.  That's why Internet commerce is not so

9   very easy to do.

10  Q.   Now, yesterday, you were showing us a sample of how a

11  transaction worked.

12          MR. PASAHOW:  Next slide.

13  BY MR. PASAHOW:

14  Q.   And you showed us this slide.

15          Do you recall that?

16  A.   Yes, I do.

17  Q.   And you have up there on the right, transaction

18  complete.  And by that, do you mean the credit card had

19  finally been charged and the order shipped to the customer

20  so he had this book?

21  A.   No.  I only meant that the order had been received by

22  the merchant so that it could begin the processing of

23  completing that order.

24  Q.   So let's go back a step, actually, to the prior part

25  of this transaction.  And you put up an earlier slide, which

Reed - cross

1   was this one, where you said, this is what the merchant had

2   sent over on the Internet, and the customer could now push

3   that "buy now" button.

4   A.     Yes.

5   Q.     Did you mean to say that is something you describe in

6   your patent?

7   A.     This process of automatic purchasing?

8   Q.     What you've got a picture of here, where there's this

9   "buy now" button and you go across and the customer could

10  purchase it, yes.

11  A.     Yes, where a customer could take a single action to

12  purchase an item.

13  Q.     Yes.  Can you show me where?

14  A.     In the '205 are or the '710 patent?

15  Q.     The '710 patent, sir.

16  A.     Okay.

17  Q.     It is a joint exhibit, so it's among the second part

18  of these and it's No. 9 in that book.

19  A.     Is it in the book that we had yesterday?

20  Q.     It's in the book from yesterday.  Let me get that

21  back to you.

22  A.     Oh.

23  Q.     Well, actually, we've got the '325 specification in

24  the book, it looks like instead, under Tab 3.

25            Would you at that?  And that is the same

Reed - cross

1   specification; is that right?

2   A.      What tab is it under?

3   Q.      Three in the Joint Exhibits.

4   A.      Okay.  I was just going to -- I was going to say one

5   thing.  I prepared a declaration for the Court of the

6   supporting -- the written description support and all

7   the references that were there are in my deposition --

8   excuse me -- my declaration.  So if you want to make it easy

9   for me to find the various things, it's a fairly large

10  patent, I could use that.  If you prefer that I just thumb

11  through and find them, I am happy to do that.

12  Q.      I don't have a declaration, but are you saying

13  without the declaration, you can't find it in the patent?

14  A.      No.  No.  It will just take me a minute.  I will go

15  ahead and start right now.  I just wanted to find out if I

16  could use that tool.  That's fine.

17              (Pause.)

18              THE WITNESS:  I'm looking for a specific sex

19  that has some key words in it and it's going to take me just

20  a minute.  I was wondering, if those key words could be

21  used, I could find it more quickly.

22  Q.      Let me see if I can help you find what might be

23  after.              In Column 121 --

24  A.      No.  The section I'm thinking of is near the start of

25  the patent.  It's about ten pages in.  It's where the term,

1  automatically and semi-automatically appear.

2  Q.    All right.

3  A.    Where it first appears in the specification.

4           Again, I have all the references in my

5  declaration, so if anyone has a copy of the declaration,

6  then they are all listed there.

7  Q.    And you think that describes then having a Web page

8  come across with a Buy Now button on it?

9  A.    If we could get the reference on the screen?  Yes,

10  that's exactly what it describes.

11  Q.    So it says the merchant sends an e-mail or rather a

12  Web page to the customer and that Web page has a Buy Now

13  button on it?

14  A.    Yes.  Can we get the reference?  Let's take the time

15  to find that reference so we can put it on the screen so we

16  can show exactly what it says.

17  Q.    If you tell me what you want, we can put it on the

18  screen?

19  A.    All right.  Give me just a minute to find it in the

20  section.

21           (Pause.)

22           I think I'm getting close.  There is a whole

23  section near the start that talks about how all of this is

24  implemented, as we said yesterday.  The whole system I was

25  describing can be implemented on the World Wide Web with

Reed - cross

1    HTML forms, HTML screens, HTML servers, so there is a whole

2    section on forms describing the use of forms that starts on

3    Column 28 of that patent.

4    Q.    And that has a description of a form that has a Buy

5    Now button?

6    A.    I just was pointing out I'm into the section that is

7    describing forms.  What we talk about is a special form

8    that has the capability.  I think it's near the end of that

9    section so give me a minute to find that exactly.

10              (Pause.)

11              I think it's ironic, I'm sitting here reading

12   about how the system allows the information to be processed

13   and searched automatically and here I'm doing it manually.

14              (Pause.)

15              All right.  I've located the reference.  It's on

16   Column 14.

17   Q.    Yes?

18   A.    It's on Column 14.

19   Q.    And where in Column 14?

20   A.    I believe right next to the start of the paragraph.

21              Okay.  So this paragraph, again, is at the

22   section where we're talking about the capabilities of the

23   system to automate the exchange of information and it

24   says --

25              You can highlight.  Let's just take this a

Reed - cross

1    sentence at a time.  Highlight the first sentence, please.

2                Great.  Thanks.

3                Now, I don't know if it's -- and this is too

4    hard to do, but if we can show this screen and the parts I

5    highlight and then we can flip to the other screen, and I

6    can point to the things we're illustrating.  Can you do

7    that?

8    Q.    Sure.

9    A.    Okay.  So first we're explaining, the information

10   stored in a consumer database can include the data,

11   metadata, and instructions to be used by the consumer

12   program for controlling and automating communications

13   between the provider and consumer.  Again, the provider

14   being again the seller of the information and the consumer

15   being you, the one who will use the one-click button to buy.

16               So if we can switch to the other screen.

17               Okay.  So on the left-hand side, there is the

18   user, okay?  And what you are seeing now is that the

19   information that was created, structured by the provider is

20   sent over so the consumer would have this, these controls

21   and these capabilities now there on their screen.  Okay?

22               When you implement this in the World Wide Web,

23   you are creating what is called an HTML form.  And you

24   probably also had a form if you used a browser.  It's a page

25   in which you can type information that you can send back to

Reed - cross

1   the other side.

2           In this case, this form has come over, and it

3   has information in it that can be used now to identify the

4   product, the price and the ability now to buy it with one

5   click.  And that information is in that form.

6           Okay.  Can we go back now to the patent

7   specification?

8   Q.    If I could ask you a question about that.

9           MR. PASAHOW:  Could we go back.  It says the

10  information stored in the consumer database.  Now I want,

11  can we go back to the picture?

12  BY MR. PASAHOW:

13  Q.    Where is this consumer database?

14  A.    Any information stored on that machine could be

15  considered part of the consumer database.

16  Q.    What information is stored in a database on the

17  customer machine?

18  A.    Well, that customer ID number that we're pointing to

19  right there in an envelope.

20  Q.    You are saying that's in a database?

21  A.    Yes, the final system is a database.

22  Q.    Okay.

23          MR. PASAHOW:  Put it back.

24  A.    Okay.

25  BY MR. PASAHOW:

Reed - cross

1    Q.    Actually, I should ask then:  So the customer ID is

2    stored in the file system, and you are saying that is a

3    database.  Is anything else stored in that database in this

4    example?

5    A.    In this particular example, we're showing nothing

6    else has to be stored in that database.  It could be stored

7    there but in this example we're showing the information is

8    stored on the other side.

9    Q.    Okay.

10   A.    Okay.  So we just illustrated that first sentence.

11         Now, let's go to, if you could highlight the

12   second sentence.

13         Okay.  So in the second sentence, we're saying,

14   now, again, the wording in there refers back to through the

15   section of the patent that explains here is how it's laid

16   out.  Here is how these programs work together to control

17   this communication.

18         So we're explaining, again, because the provider

19   of the information, that's the computer on the other side,

20   the seller that wants to make a transaction very easy for

21   you, one click, two clicks, because they know what consumer,

22   what communications response options are available to the

23   consumers, you, the buyer, the provider can include the

24   necessary data, metadata -- and that's that information that

25   describes the other data, and if necessary, the instructions

Reed - cross

1   to simplify and automate specific responses from the

2   consumer back to the buyer.  That's just what I was

3   describing in the conception document.

4            Now, could we highlight -- and we've already

5   shown that on the other screen so let's go on to the third

6   sentence.  Yes.  That goes, yes, just to the end of the

7   sentence.  Great.

8            Okay.  So we provide just some specific

9   examples, maybe it clear to the examiner what we're talking

10  about.  For example, a provider can include a Web, that is a

11  URL the last part.

12           I'm laughing because the fact that the last part

13  of that L is, it might be interpreted to be an I.  In Web

14  architecture, there is a huge difference, in fact a giant

15  debate about the difference between an URL and a URI.  My

16  technical committee at Oasis is called XRI.  We are building

17  an extension to the URI specifications defined by the

18  creator of the Web.  So I looked up and I saw URI, and I

19  said, no, that's not what we were talking about there.

20  Okay.  I'm sorry.

21           Uniform resource locater.  That is the address

22  on the Web.  So it says, for example, the provider can

23  include those links to Web pages, or forms on the provider's

24  Web server.  In other words you can interconnect multiple

25  things.

Reed - cross

1          Okay.  Now can we go to the next sentence?

2          Okay.  Or, the provider can also include special

3   forms to be processed by the consumer program 22 that allow

4   the consumer to automatically or semiautomatically transfer

5   data from the consumer database 21 back to the provider.

6          That's exactly the same language I use in the

7   conception document.  It's not a mistake because I was the

8   writer of those documents.  And as I pointed out yesterday,

9   automatically and semiautomatically has a very specific

10  meaning that I defined in the conception document.  So I

11  used -- I felt if I was going to ever need to show I

12  conceived of the invention at that time, I wanted to make

13  sure that it was clear in the patent specification, here is

14  the word processor I copied and used some of the text from

15  the original document.

16         Okay.  Now, the final sentence.

17         Okay.  Now, examples include product order

18  forms, survey forms, customer service request forms,

19  scheduling forms, et cetera.

20         The first thing that appears there is product

21  order forms because it's the first example I provided in the

22  conception document.

23  Q.    So if we can put back to the picture then, you're

24  saying that is a product order form?

25  A.    Yes.  It's a way to order a product.

Reed - cross

1   Q.      And you are saying the Buy Now button is described

2   because the word "automatically" appeared in the

3   specification?

4   A.      Yes, I am.

5   Q.      And you're saying in your mind, back when you were

6   drafting this automatically meant one click?

7   A.      Yes.

8   Q.      Let's look at that conception document then.  This is

9   the document that your counsel described as reads one-click

10  invention.  Is that correct?  Same document?

11  A.      Yes.  That's in the -- is that in this binder or in

12  the one that you gave me yesterday?

13  Q.      You mean this page here?

14  A.      No, I meant the document, the conception document.

15  Q.      The document is in here.  It is part of Tab 4, which

16  is the prosecution history of the '710 patent?

17  A.      Okay.  I turned to that tab.

18  Q.      But I just want to make sure we're talking about the

19  same document --

20  A.      Yes.

21  Q.      -- as --

22  A.      That's an excerpt from the product example in the

23  conception document.

24  Q.      And so what your couple described as Reed's one-click

25  invention, that is the same document?

Reed - cross

1    A.      I believe if that is what you are saying, yes.

2    Q.      So you filed a copy of this document in the Patent

3    Office; is that correct?

4    A.      If you mean when I filed the declaration?

5    Q.      Yes?

6    A.      In conjunction with this patent?  Is that what you

7    are referring to?

8    Q.      Yes, sir.  I am.

9    A.      Yes.  I filed a declaration that I had conceived of

10   this invention as of certain dates using the conception

11   document.  Yes.

12   Q.      And you attached this conception document, what your

13   counsel calls your one-click document to the declaration?

14   A.      Yes.  The procedure is when the Patent Office needs

15   to know when something has been conceived, they need to

16   establish that you had an idea at a certain date.  In the

17   course of that back and forth exchange that we described

18   yesterday, when you are prosecuting a patent, then they ask

19   the inventor to produce evidence of that conception and then

20   you have to submit that evidence together with a document

21   that explains how that evidence supports the patent that we

22   put on file.  And document that you submit with it and sign

23   on it is called a declaration and then the evidence in this

24   case, with my conception document is what is attached to

25   that.

Reed - cross

1   Q.      And you told us yesterday that when you prepared that

2   conception document, you worked with an attorney; is that

3   correct?

4   A.      Yes.

5   Q.      And you understood it was very important that you be

6   careful in that document in describing what it was that you

7   had conceived?

8   A.      I understood that it was extremely important.  My

9   attorneys made that clear.  Absolutely.

10  Q.      We've got a technical problem here in coming up with

11  that declaration for you.

12  A.      Is it in this binder?

13  Q.      Oh, we actually have it on some boards over here.

14  Let's use those.

15              (Mr. Albert placed a chart on the easel.)

16              MR. PASAHOW:  So can you turn that so the jury

17  can see it?

18              MR. ALBERT:  Yes.

19              THE WITNESS:  Would it be easier to put these

20  out here so the jury can look at it?

21              MR. PASAHOW:  Of course.

22              THE COURT:  It might cause some problems for the

23  attorneys to see it.

24              THE WITNESS:  Oh, I'm sorry.  Maybe if it's back

25  in the corner.

Reed - cross

1              THE COURT:  Well, the jury obviously can't see

2   it right now.  And now when you turn it, Mr. Reed is not

3   going be to be able to see it.

4              THE WITNESS:  Your Honor, I would be happy to

5   get up and stand in front of it.

6              THE COURT:  I understand that, but I also

7   want you to be heard by the Court Reporter.  That is my

8   concern.

9              THE WITNESS:  I'm sorry.  I could speak a little

10  more loudly if I have to stand over there.

11             MR PASAHOW:  I have one copy I can hand Mr.

12  Reed.

13             THE COURT:  That would be a good idea.

14             THE WITNESS:  Okay.

15  BY MR. PASAHOW:

16  Q.    Here you go, sir.  I apologize for that (handing

17  exhibit book to the witness).

18  A.    Am I just supposed to put this on top of the other

19  one?

20             THE COURT:  Yes, you can.

21             THE WITNESS:  What?

22             THE COURT:  You can.

23             THE WITNESS:  Okay.

24             THE COURT:  Do you have enough room there?

25             THE WITNESS:  Actually, I don't.

Reed - cross

1                THE COURT:  Why don't you close up one and just

2     use the other one.

3                THE WITNESS:  Okay.

4                MR PASAHOW:  I apologize for that.

5     BY MR. PASAHOW:

6     Q.    So this is a copy of a declaration that we were

7     talking about; is that correct?

8     A.    I believe so.  I'm pretty sure that you would -- if

9     you are going to create the exhibits for the jury, that you

10    copied the declaration that I put in, so I'm assuming it is.

11    I can't read the whole thing from here.

12    Q.    And that declaration was certainly your best belief

13    at the time you filed this; is that correct?

14    A.    Mr. Pasahow, not only was it my best belief, it was

15    an extremely important document, for reasons that I'm

16    looking forward to explaining to the jury.

17    Q.    And so you did your very best to assure its accuracy;

18    is that correct?

19    A.    Well, I should explain why I thought this document

20    was so important.

21    Q.    I would actually appreciate it if you answered my

22    question instead.

23    A.    Yes.

24    Q.    The question was, you did your very best to assure

25    its accuracy?

Reed - cross

1   A.      I tried to do my very best, yes.

2   Q.      And the purpose of the declaration was to show that

3   the description in the priority document, a particular way

4   of doing a transaction online, met what were the pending

5   claims at that time in the prosecution; is that correct?

6   A.      I'm sorry.  Not being a patent attorney, could you

7   explain that a little bit more in plain English?

8   Q.      Sure.  Let's just take it through the declaration.

9           You begin the declaration by saying that, prior

10  to this date in August, you had conceived of a computer-

11  implemented method, and you say, referred herein below as

12  the first method comprising certain steps.

13          And do you recall what those particular steps

14  were?

15  A.      Yes.  I do recall why those steps were important.

16  Q.      And why was that?

17  A.      The reason for creating this document was that, as we

18  explained yesterday, I put the original patent

19  specifications on file, the two patents in 1996, the first

20  one and then the second much larger one, all based on the

21  conception document from 1993.

22          The company subsequently went through our

23  Intermind Communicator, herein got crushed by Microsoft.  So

24  I was going through the struggle that I explained yesterday,

25  to figure out a new direction of the company, where we could

1   use the technology and not be -- and find a way that we

2   could co-exist with large companies without them taking our

3   intellectual property.

4           I had already seen the Amazon 1-click come onto

5   the market in 1997, in a period when I could do nothing

6   about it.  Finally got the company funded in 1999.  We

7   managed to turn it around, managed to get the investors back

8   in on it.

9           In the fall, shortly after we got it funded, it

10  was quite a big to-do on the Web, Amazon announced not only

11  did they have a patent on 1-click, they were using it to --

12  they were asserting it against Barnes & Noble.

13          So not only did they file for their own patent

14  on 1-click, but they asserted it against another company in

15  order to prevent them from using that technology.

16          Now, as we just explained yesterday, I was then

17  working, building a company based on an open standard,

18  something that would allow you to do 1-click everywhere, and

19  now another company that had patented -- said they had a

20  patent on that same technology was now suing another company

21  to prevent them from using it.

22          So we were in a situation where we were, like,

23  this is -- we had --

24  Q.          MR. PASAHOW:  Excuse me.  I'm going to interrupt

25  and ask that the testimony be struck as nonresponsive, your

Reed - cross

1   Honor.

2   BY MR. PASAHOW:

3   Q.     The question, sir, was --

4             THE COURT:  What's your position?  Let's take it

5   a sidebar.

6             (Sidebar conference held as follows.)

7             MR. ALBERT:  Our position would be that, I don't

8   know whether he has finished his answer --

9             THE COURT:  I think his testimony has been

10  completely off the mark today.  I think he goes on and he

11  wants to make statements and he wants to do this.

12            He is not answering the questions until he has

13  this whole litany of information he wants to put in front of

14  the jury repeatedly, so I'm going to indicate that this

15  response is to be struck because it was nonresponsive.

16            MR. ALBERT:  Your Honor, if there's anything I

17  can do to assist the situation, I would.  We're complying

18  with the --

19            THE COURT:  I understand that, but your client

20  goes on very long dissertations, is dragging this out.

21  Quite frankly, is eating up time for both sides in this

22  regard.

23            MR. ALBERT:  He doesn't understand.

24            THE COURT:  He answered your questions a little

25  bit more directly.  He feels that he has to lecture.  I'm

1   just telling you, this is my view of it.  And I'm getting

2   concerned because he does eventually respond, but a lot of

3   the stuff that he is putting on the record in this response

4   in particular -- other responses, I can't say 100-percent,

5   but this response in particular has nothing to do with the

6   answer.

7              MR. ALBERT:  He does have a certain style.  I

8   don't know if there's anything I can do.

9              THE COURT:  And he has a certain style, and my

10  concern is, I hope that his style and hasn't been something

11  that has been promoted by counsel.

12             MR. ALBERT:  Very much to the contrary, your

13  Honor.  It's not something that I seem to have much control

14  over when I interact with him.

15             THE COURT:  All right.

16             MR. ALBERT:  But under the present

17  circumstances, I can't.

18             THE COURT:  Well, I think I'm going to give him

19  an instruction.

20             MR. ALBERT:  Unless the Court would prefer that

21  we attempt to do so, but I'm mindful of the Court's

22  admonition yesterday, so I don't want to do that without the

23  courts express suggestion.

24             MR. HORWITZ:  Your Honor, I think you're

25  correct, striking the response and telling him to respond to

1    the question would be sufficient.

2              THE COURT:  That's what I'm going to do.

3              (End of sidebar conference.)

4              THE COURT:  The entire last comment that you

5    heard from Mr. Reed is being struck.  You are not to

6    consider it.

7              Mr. Reed, I will direct you to try to have the

8    response directed to the question that is asked.

9              THE WITNESS:  I understand.  I believe, Your

10   Honor, I was trying to -- to answer the question.

11             THE COURT:  You don't need to explain anything.

12   I'm just cautioning you to respond to the questions that are

13   asked, not only by counsel for Amazon, but also by your own

14   counsel.

15             THE WITNESS:  I understand.

16   BY MR. PASAHOW:

17   Q.    So let's, then, look at this conception document,

18   what's referred to as your 1-click document.

19             (Mr. Albert placed a chart on the easel.)

20   BY MR. PASAHOW:

21   Q.    So this, then, is the first page.

22             THE COURT:  Now, does he have that document in

23   front of him?

24             MR. PASAHOW:  Yes.

25             THE COURT:  Because I can tell you right now, I

Reed - cross

1   would not be able to see it from where he's sitting.

2            MR. PASAHOW:  If he flips forward, it is

3   attached to his declaration in that book.

4            THE WITNESS:  Yes.  It's the attachment in

5   the -- to the declaration.

6   BY MR. PASAHOW:

7   Q.    And that was what you filed attached to the

8   declaration in the Patent Office back in 2003?

9   A.    Yes.  As I explained earlier, filed the declaration,

10  which is a series of statements about the exhibit, which is

11  your evidence that you had conceived of it.

12  Q.    Now, I would like to go to Page, I believe it's 11 of

13  that, with the heading that says, Usage Scenarios.

14            (Mr. Albert placed an exhibit on the easel.)

15  BY MR. PASAHOW:

16  Q.    So this is Section 4 of that document, Mr. Reed, if

17  you would like to find it in your notebook.

18  A.    Yes.  This is the section on examples at the end of

19  the document that I was talking about yesterday.

20  Q.    Yes, sir.  And so this is simply a copy of the

21  document that you filed with the Patent Office.  That is the

22  same document you were talking about yesterday; is that

23  correct?

24  A.    Yes.

25  Q.    And it starts off with this software vendor and

Reed - cross

1    software customer example; is that correct?

2    A.    Yes.  This is an example in the example section at

3    the end of the document.

4    Q.    And you said this is the example that was most

5    closely involved with your conception?

6    A.    It was one of the specific functions of the

7    invention.  You talked about the Swiss Army knife.  It was,

8    like, one of the specific functions in that Swiss Army

9    knife, what we might call the scissors, to do automated

10   purchasing.

11   Q.    Now, if you look down, and we've got it on the screen

12   here, too, it begins by saying that the customer can use the

13   access object to request the objects for several programs

14   you are considering purchasing.

15         That would bring up a screen that indicated

16   something about the software that the customer might want to

17   purchase; is that correct?

18   A.    Yes.  You could get information about a product that

19   you wanted to buy.

20   Q.    And then, at the beginning of the third paragraph,

21   you say, once the customer has made up their mind about

22   which product to purchase, ordering the product would be as

23   simple as clicking the product ordering button on the access

24   object.

25   A.    Yes.

Reed - cross

1   Q.     So on this screen that came up would be a button that

2   the customer could push; is that correct?

3   A.     Just like we were describing, you showed in the

4   example that we showed to the jury.

5   Q.     But what you were describing in this document that

6   you created back in 1993 and sent to the Patent Office in

7   2003 is, we have this first screen that has product ordering

8   information.  It has got a button, and the customer can push

9   that button to indicate they want to buy?

10  A.      Yes.  If they want -- as it says right there, once

11  the customer has made up their mind about which product to

12  purchase, ordering the product would be as simple as

13  clicking the product ordering button.

14  Q.     And is the customer, then, done?

15  A.     Not in this example.

16  Q.     Well, what more does the customer have to do?

17  A.     You know, I believe, again, this is an example, so in

18  the example section of the document, it's written, so --

19  Q.     Excuse me, sir.  The question was:  What more does

20  the customer have to do?

21  A.     I just want to read the rest of -- of -- just have

22  the jury read what's here on the screen, or I will read it

23  to them.

24  Q.     I would appreciate it if instead, sir, you would

25  answer my question, which is, what more does the customer

Reed - cross

1   have to do?

2   A.    The next thing is they're shown a second screen that

3   has the product ordering information they would want to

4   confirm that they want to use to order that product, and

5   then, as it says in the start of the third paragraph, they

6   make one more click, a second click, to confirm that the

7   order will be sent at that time.

8   Q.    Now, why, then, was this your 1-click document as

9   your counsel explained it to us earlier?

10  A.    I would be happy to explain that to the jury, if you

11  would like me to do that.

12  Q.    The question is, why is -- well, we've got up here in

13  front of us now a 1-click system.

14  A.    Could we go back to definition seven in this

15  document?

16  Q.    You have to go back to Definition 7 to explain why

17  this is a 1-click system?

18  A.    Mr. Pasahow, this is an example of how the invention

19  can be used.  The invention is defined in the first four

20  pages of the document, in a structured definition.

21  Q.    The question, sir, is, I'm asking about the

22  explanation, that this is a 1-click system.

23              Is there a definition of a 1-click system

24  somewhere in this document?

25  A.    Absolutely, there's a definition.

Reed - cross

1    Q.    Okay.  Let's go to the definition that you would like

2    to look at of a 1-click system.

3              Where is that?

4    A.    Let us go to Paragraph 7 of the functional

5    description of the invention, which is the definition I put

6    up of the document.

7              That's in the second section of the document.  I

8    am talking about the first section of the document, numbered

9    Paragraph 7, the last one, the last paragraph in the

10   functional section.

11             Actually, since you are there, go to

12   Paragraph 5.

13   Q.    Let's look at your Paragraph 7.

14   A.    Okay.  That's fine.

15             Okay.  Could you highlight the first line there?

16   Okay.

17             Now, as we explained yesterday, this is a -- a

18   carefully crafted document, for reasons I'm happy to explain

19   to the jury.  And in the functional definition, we go

20   through and we explain, these -- this is the -- a technical

21   description of the capabilities of the system.  This is all

22   what it's capable of.

23             And in the section where it talks about

24   automated processing and communications, it was very

25   important, as the inventor, I realized that some of the

Reed - cross

1    actions you could take completely automatically, you, in

2    fact, did not want.  You wanted to have your own control

3    over what information was going to be sent.  That, as we

4    explained yesterday, is when you want to click.  You want to

5    be able to click a button and then confirm that the

6    information is going to be sent.

7              That's semiautomatic processing, as it explains

8    right here.  Automatic or semiautomatic processing of

9    communications resulting from the use of an access object is

10   defined as the abilities of the response program to choose a

11   response, or to present a relevant range of responses to a

12   human operator.  That's you, the user.  Or to retrieve data

13   from a database, knowledge base, or other information

14   repository, by virtue of the data referenced above.  That's

15   all the data that's structured it's using.

16             The example that we provide in the end is

17   semiautomatic processing, because you are doing a

18   confirmation step.  That's 2-click.  Automatic processing is

19   1-click.

20   Q.    So when your counsel put up that page we've got in

21   front of us, the section, for example, Usage Scenario which

22   you are now telling us is semiautomatic, he said that was

23   one click, is that one click?

24             MR. ALBERT:  Objection, Your Honor.  May we have

25   a sidebar?

Reed - cross

1                (The following took place at sidebar.)

2                THE COURT:  Mr. Albert.

3                MR. ALBERT:  It's inappropriate to characterize

4    what the opening was.  The jury can decide for themselves

5    what was said about that.  And I don't think that was a

6    direct quote, as best I recall.

7                THE COURT:  I can go back and look it up because

8    I can't remember, quite frankly.

9                MR. PASAHOW:  I'm happy --

10               MR. ALBERT:  He should be asking the witness a

11   question about his knowledge rather than characterizing what

12   happened.

13               THE COURT:  Hold on.  Wait a minute.  Is this a

14   plaintiff's exhibit?

15               MR. HORWITZ:  This is our slide.

16               THE COURT:  This is your slide that says Reed's

17   One-Click Invention?

18               MR. ALBERT:  Which is, as I recall, the

19   two-click embodiment.  There was a one-click embodiment.

20   There was automatic and semiautomatic.  This came out in

21   opening and direct testimony yesterday, so I don't think

22   it's constructive to go back over what counsel says, but ask

23   the witness questions about his own personal knowledge.

24               MR. PASAHOW:  I'm happy to focus on what this

25   says and not talk about what counsel said.

Reed - cross

1          THE COURT:  That's fine.

2          (End of sidebar conference.)

3   BY MR. PASAHOW:

4   Q.    So going back to this slide then, Reed's one-click

5   invention, this page that is up there that this excerpt is

6   from, that is not a one-click example.  Are we agreed on

7   that?

8   A.    That the example we are talking about here, it's not

9   a one-click example.  It's a two-click example.  Yes.

10  Q.    And that's the example that this excerpt is from here

11  on this page; is that correct?

12  A.    Yes.

13  Q.    Now, let's look then at the declaration you filed.

14          MR. PASAHOW:  And let's leave that page up.

15  We'll put the declaration here on the screen.  And can we go

16  to Page 4 of the declaration?  And let's just highlight the

17  beginning there, Paragraph 10.

18  BY MR. PASAHOW:

19  Q.    And now you are talking about the attachment when you

20  say "said document;" is that correct?

21  A.    Yes, that refers to the document.

22  Q.    And --

23  A.    The Exhibit N, the conception document.

24  Q.    So you say here:  Said document further describes at

25  least at page 11, entry 1.

Reed - cross

1          That is what we've got up on this board; is that

2     correct?

3     A.     Yes.

4     Q.     And you say, in the third paragraph:  Ordering a

5     product by clicking a product ordering button such that a

6     screen is produced including all necessary ordering

7     information from the database?

8          That is just what we looked at; is that right?

9     A.     Yes.

10    Q.     So that's the first click?

11    A.     Excuse me.

12    Q.     That's the first of the clicks we've talked about?

13    A.     No, that's just the product ordering button.

14    Clicking a product ordering button.

15    Q.     Yes.  Oh, I'm sorry.  You are absolutely right.

16          So then we go on add and say:  Additionally,

17    said document describes -- no -- I'm sorry.  I guess I'm

18    confused.  You say that in the third paragraph.  Let's look

19    down at the document itself.  You can look in your notebook.

20    There's the third paragraph.

21          And the third paragraph is where it says:  Once

22    a customer has made up its mind which product to purchase,

23    ordering the product would be a simple as clicking the

24    product ordering button on the access object.

25    A.     Yes, that's what it says in the third paragraph.

Reed - cross

1    Q.    And so in this declaration where you say, third

2    paragraph, ordering a product by clicking a product ordering

3    button, that's the first click in the ordering process,

4    isn't it?

5    A.    No.  It just says ordering product by clicking a

6    product ordering button.

7    Q.    Is that something different than the document

8    statement, once the customer has made up their mind about

9    which product to purchase, ordering the product would be as

10   simple as clicking the product ordering button?

11   A.    It's a reference, page 11, entry 1, third paragraph.

12         Can I stand up just so I can make sure I can

13   look at the same thing the jury is looking at right there?

14   Q.    It's in your book, right in front of you.

15   A.    Just, it's awkward because I would like to point to

16   the same thing.  Can we hold that up here so I can -- okay.

17   I'll just read from this.

18         It's a reference to page 11, entry 1, third

19   paragraph.  Right.

20   Q.    Yes.  The product ordering button?

21   A.    Yes.  It's a reference to clicking the product

22   ordering button.

23   Q.    And that's the first click in the product ordering

24   process; is that correct?

25   A.    No, it has nothing to do with -- it just says it's a

Reed - cross

1    reference to clicking a product ordering button.

2    Q.     And what happens when you click that?

3    A.     Are you asking me what that says up there?

4    Q.     I'm asking in your conception, and as described in

5    this document, what happened when you clicked the product

6    ordering button?

7    A.     In that example of semiautomatic, you then produced

8    another screen, but that is not what I was -- that's not

9    what that paragraph is about.

10   Q.     Let's look at the declaration.  The declaration

11   says --

12                MR. PASAHOW:  Can we clean that up?  We're just

13   on the declaration.

14   BY MR. PASAHOW:

15   Q.     It says:  Said document further describes at least

16   at page 11, entry 1, third paragraph.

17                So we're talking about the third paragraph on

18   this page in this example; is that right?

19   A.     That's right.

20   Q.     And you say:  Ordering a product by clicking a

21   product ordering button such that a screen is produced,

22   including all the necessary ordering information from the

23   database.

24                So you are talking about this example; is that

25   correct?

Reed - cross

1   A.     Yes.  It refers to that example and it says:

2   Clicking a product ordering button such that a screen is

3   produced, including all the necessary ordering information

4   from the database.  That is what that example says.

5   Q.     And you go on and say:  Additionally, said document

6   describes at page 11, entry 1, fourth paragraph, that a

7   customer may click to confirm and order an item.

8             Is that correct?

9   A.     Yes.  That's I believe the first couple words in the

10  fourth paragraph.

11  Q.     Okay.  So in this example, we've gone through two

12  clicks to make the purchase; is that correct?

13  A.     You're taking this completely out of context.  This

14  is part of the declaration in which I'm going through and

15  pointing out to the examiner where the supporting -- what's

16  called the support is in this document.  And it says up

17  there:  Said document further describes.

18            At least in this page, we are pointing out

19  specific things that the examiner needed to know in order to

20  agree that this document described, fully described the

21  invention for which we were asking for claims.

22  Q.     Mr. Reed, the question was just we're talking about

23  the second click to complete the purchase; is that correct?

24  A.     This -- what I was attesting to here is not is it one

25  or two clicks.  That is not how this document -- that is not

Reed - cross

1    what I was -- that's not the structure of what this document

2    is describing at all.

3    Q.    Mr. Reed, the question is this paragraph, or this

4    sentence we just looked at, that's referring to the fourth

5    paragraph of the original document, and that's talking about

6    the second click; is that correct?

7    A.    No, it's not talking about a second click.  I'd be

8    happy to explain what I'm attesting to here.

9    Q.    Okay.  So that, in your mind, is not a second click.

10   Let's go on to the next sentence which says:  Accordingly,

11   said document describes automatically -- automatically --

12   completing the purchase of an item in response to the

13   received indication from the seller.

14             So you told the Patent Office it was your belief

15   back then that automatically referred to this two-click

16   example.  Is that right?

17   A.    That is completely not what I was attesting to in

18   this document.  You are taking -- I'd be happy to explain

19   what this means, but you have to walk through this in

20   Paragraph 10 of what I was attesting to in that document.

21             Could we walk through the paragraphs and I

22   explain exactly what -- I was the one who was asked by my

23   attorneys in a careful process to prepare a declaration as

24   to why my conception document described both one-click and

25   two-click automated purchasing.  We spent a great deal of

1   time on that process to prepare that document, both my

2   attorneys working with me.  It's very carefully constructed

3   to the exact requirements that the Patent and Trademark

4   Office has for such a document because it was extremely

5   important in the whole history of this.

6   Q.    Mr. Reed, let's look at Paragraph 11 of that document

7   then.  Again, we're in your declaration.  We just go down

8   the page to Paragraph 11.  And you say there:  Said document

9   further describes at least at page 11, entry 1, third

10  paragraph.

11             So we're talking about the same third paragraph

12  on the same page that is up in front of jury; is that

13  correct?

14  A.    Exactly the same thing.

15  Q.    Okay.  And it says:  Ordering a product by clicking a

16  product ordering button, such that a screen is produced

17  including all necessary ordering information from the

18  database?

19             So I've clicked once; is that correct?

20  A.    Yes.  I'll point out that is exactly the same

21  sentence as the first sentence of Paragraph 10.

22  Q.    And then it says:  Additionally, said document

23  describes at page 11, entry 1, fourth paragraph, that a

24  customer may click to confirm and order an item?

25             I've now clicked twice; is that correct?

Reed - cross

1    A.      Again, it has nothing to do with clicking twice.  In

2    fact, that's exactly the same second sentence as the

3    paragraph before it.

4    Q.      And then you say:  Accordingly, said document

5    describes automatically -- again, automatically --

6    completing the transaction from the information consumer in

7    response to the received indication?

8            That's what you said this document meant back in

9    2003; is that correct?

10   A.      I know very, very well what I meant when I wrote this

11   document and I attested to it in sworn testimony to the

12   Patent Office that I had described one-click and two-click

13   inventing -- excuse me -- purchasing.

14           So if you look at put those two paragraphs side

15   by side, I will explain exactly what these things mean.

16   Q.      Now, in both of these paragraphs -- let's go back up

17   to Paragraph 10, if we could.

18           There is this language that talks about, it's

19   automatically completing the purchase of an item in response

20   to the received indication from the seller.  Do you see

21   that?

22   A.      Yes, I do.

23   Q.      What is the received indication from the seller?

24   A.      The word "seller" there was a mistake.  That was a

25   mistake I did not catch in the document and neither did my

Reed - cross

1    attorneys.  I need to point that out because it is

2    absolutely a mistake in that document.  I later realized

3    that when I looked at the document, and so did my attorney.

4    So I just need to point that out.

5              In your opening testimony yesterday, you showed

6    two mistakes, what you believe are two mistakes in this

7    document.  Excuse me.  Your opening statement.  One of them

8    you crossed out.  "Seller" was meant to be "buyer" there.

9    That was a mistake that none of us caught.

10             You also showed, you crossed out the word

11   "automatically" and inserted the word --

12   Q.    Excuse me.  I'm going to interrupt you again because

13   the question was what was the received indication from the

14   seller?

15             THE COURT:  And that question is now going to be

16   answered.  You indicated to repeatedly --

17             THE WITNESS:  But --

18             THE COURT:  No, wait a minute.

19             THE WITNESS:  Yes.

20             THE COURT:  You indicated there was a mistake

21   from the seller.  Now please answer the question.

22             THE WITNESS:  Right.  Provided we understand

23   what is intended there was the word "buyer."  That, in the

24   example we showed yesterday or I mean what you saw this

25   morning was the message that comes back across that

1    indicates the product order has been submitted, so now it

2    can be processed.

3    BY MR. PASAHOW:

4    Q.    And so in this example that you sent to the Patent

5    Office that is in front of us, which click is it, the first

6    click or the second click, that causes that indication to

7    happen?

8    A.    That doesn't make any sense.  It's -- a received

9    indication is the message that goes back across to the

10   buyer.  It can be produced after either one click or two

11   clicks on the part of the buyer.

12            MR. PASAHOW:  Can we go back to Paragraph 8 of

13   the declaration on the prior page?

14   BY MR. PASAHOW:

15   Q.    Do you see there where what you said to the Patent

16   Office was:  Said document describes at least at page 11,

17   entry 1, third paragraph?

18            So we're back to the third paragraph of what is

19   in front of the jury here.  That once the customer has made

20   up his mind about which product to purchase, ordering may be

21   achieved by clicking a product ordering button?

22            And then you say:  Accordingly, said document

23   describes receiving, from the customer, an indication to

24   initiate a purchase.

25            So you were saying that that first click in the

Reed - cross

1   third paragraph described initiating this receiving an

2   indication to purchase from the customer; is that correct?

3   A.    No, that's not correct.  What I'm describing is that

4   a product ordering button is clicked in order to result in

5   the message that goes from the buyer to the seller.

6            You saw in your own illustration that you put

7   up there.  The customer must click a button in order to

8   eventually send that product order to the seller.  They can

9   either, if they receive that form that we were showing

10  there, they can either click once to send the product order

11  if they don't want to do any confirmation or my invention

12  describes, if they want it semiautomatic, they can click

13  once to have a product order ordering form to fill out.  Now

14  they have a second screen and they can click a product

15  ordering button there and then they get the automatic order.

16  Q.    Mr. Reed, we're talking about what you told the

17  Patent Office in 2003 you understood this document to mean.

18  And what you told them in 2003 it meant was when the

19  customer clicked that first time in the third paragraph, it

20  created this indication to initiate a purchase transaction?

21  A.    Yes, that is exactly what I said.

22  Q.    And in that example, the customer still had to wait

23  and click one more time to confirm; is that correct?

24  A.    The example we were showing yesterday was one click.

25  Q.    Sir, I'm not talking about the example yesterday.

1    We're talking about what you told the Patent Office under

2    oath in 2003 about the document that is in front of the

3    jury?

4    A.    Yes.

5    Q.    And I'm asking about that?

6    A.    That example was two click.

7    Q.    And so in that example, after the first click, which

8    created this indication to initiate a purchase, the customer

9    still had to click a second time; is that right?

10   A.    Again, that's not what this declaration.  You are

11   taking Paragraph 8, Paragraphs 10 and 11 out of context.

12   That is not what I was attesting to.  You're trying to read

13   into the words I was putting here without putting the

14   paragraph next to it and understand how this document was

15   constructed.

16   Q.    Is there another paragraph to this declaration you

17   think we should look at?

18   A.    Yes.  I would be happy to --

19   Q.    What --

20   A.    Well, first of all, I would like to put Paragraph 8

21   and 9 right next to each other.  I would like to put

22   Paragraph 10 and 11 right next to each other.

23   Q.    Sure.  Let's put Paragraph 8 and 9 next to each

24   other.

25   A.    In fact, if we could, the easiest way to understand

Reed - cross

1    this document is to start a little earlier and actually do

2    the paragraphs that start the opening --

3    Q.    Well, you said, let's starts with 8 and 9.  Let's do

4    that.

5              You say in Paragraph 9, said document describes

6    at least at Page 11, Entry 1, third paragraph, that once the

7    customer has made up his mind about which product to

8    purchase, ordering may be achieved by clicking a product

9    ordering button.

10             So, again, we're talking about that first click

11   in the third paragraph; right?

12   A.    We are talking about clicking a product ordering

13   button; right?  And just to make my point, please highlight

14   the first sentence of Paragraph 8.

15             MR. PASAHOW:  Please do.

16   BY MR. PASAHOW:

17   Q.    So both of them refer to the third paragraph and

18   clicking on the button that's described there; is that

19   correct?

20   A.    Yes.  I just --

21   Q.    And in the third paragraph, you've told us, that is

22   the first of the two clicks; is that right?

23   A.    Yes.  No.  Wait.  No.  I'm sorry.

24             Clicking a product ordering button, and I'm just

25   pointing out to the jury, that's exactly the same sentence.

1    Okay?

2              So we see in both cases, what we're referring to

3    is, once the customer has made up their mind about what to

4    purchase, they can order it by clicking the product ordering

5    button, which is what we were referring to in that specific

6    third you paragraph, talking about clicking a product

7    ordering button.

8              Now, there are two -- 8 and 9 are right to each

9    other, because the language that follows that is the

10   language from the two claims that we had submitted.

11             One claim was for 1-click ordering and the other

12   claim is for 2-click ordering.  One is automatic, one is

13   semiautomatic.  That's the structure of this document.

14             We were going through and answering the

15   customer's question, where have you shown support for

16   1-click ordering and where have you shown support for

17   2-click ordering.  That's the whole structure of this

18   document.  Each of these is a pair of paragraphs.

19             The first part of each one describes where in

20   the specification did we say what was necessary to support

21   the claim.  The second part is the language we propose for

22   the claim.  One claim is designed to cover 1-click ordering.

23   The other claim is designed to cover 2-click ordering,

24   automatic, semiautomatic.  That's the structure of this

25   document.

Reed - cross

1    Q.      So there's a first method and a second method?

2    A.      Yes.  That's what we referring to in this.

3    Q.      One is automatic and one is semiautomatic?

4    A.      One is 1-click ordering, which is the automatic

5    purchasing that we described in the specification earlier.

6    The other one is semiautomatic.  That's 2-click purchasing,

7    as we described in the document earlier.

8    Q.      Which one is automatic in 1-click?

9    A.      In Section 7 of the document that we're referring to,

10   right in the first sentence, it says, Said document

11   describes at least in that place.  Okay?

12           Section 7 says, automatic and semiautomatic.

13   Q.      The question is, is it Method 1 or Method 2, your

14   1-click?

15   A.      Okay.  I would like to highlight an indication to

16   initiate a purchase transaction.

17   Q.      Sir, no.  The question is, is Method 1 or Method 2

18   1-click?

19   A.      Method 1 is 1-click because it says it is indicated

20   to initiate a purchase transaction.  Method 2 is 2-click

21   because it says to complete the proposed transaction.

22   Q.      All right.  So let's look at Paragraph 10, then.

23           Now, if we look at the last line of this, it

24   says, Paragraph 10 is about the first method; is that

25   correct?

Reed - cross

1    A.      Yes.

2    Q.      So this is about 1-click, in your mind?

3    A.      Yes.

4    Q.      Okay.  And we have already been through it, but let's

5    just double-check.

6            And this one first describes, we click on the

7    button in the third paragraph; is that right?

8    A.      There are two parts, there are two statements at the

9    start of this before the language is taken from the claim.

10   The first sentence is the first statement.  The second

11   sentence is the second statement.

12   Q.      The question, sir, is, in this first sentence, we're

13   describing the first click, which is in the third paragraph;

14   is that correct?

15   A.      It's not correct, because all it says is you're

16   clicking a product ordering button.  That's what it says.

17   Q.      And it's the product ordering button that's described

18   in the third paragraph of your priority document; is that

19   correct?

20   A.      Specifically, yes, in the third paragraph.

21           Let me bring the third paragraph up so I can

22   read it.

23           Once the customer has made up their mind about

24   which product to purchase, ordering the product will be as

25   simple as clicking the product ordering button.

Reed - cross

1   Q.      And so that's a first click; is that correct?

2   A.      No.  That's a click.

3   Q.      Okay.

4   A.      There's nothing there that says anything about first

5   click or second click.  The claim is where we're -- we're

6   saying, it's an indication to initiate a purchase.

7           When you want to initiate a purchase and then

8   you want it to all happen automatically, that's 1-click

9   ordering.  When you want -- you've already started

10  initiating a purchase and then you want to complete it

11  automatically, that's 2-click purchasing.

12  Q.      But what you've told the Patent Office was, after

13  that first click, additionally, the document describes, at

14  Page 11, Entry 1, fourth paragraph, that a customer may

15  click to confirm an order; is that correct?

16  A.      What that says is, to the Examiner, when you are

17  creating one of these declarations, you are telling the

18  Examiner, here's where things are described in the document.

19  We needed to show for that claim that there were two things

20  described in the document.  One, that you were ordering a

21  product, that what we were doing was product ordering, and

22  you were clicking the button.  That's the first thing we had

23  to show.

24          The word additionally appears there because

25  there was a second thing that this claim required, and that

Reed - cross

1   was automatic processing of the data.  So we put in a second

2   thing.

3            And we said, additionally, the document also

4   describes that the customer could confirm the order.  So we

5   were saying both of the requirements of this claim, you

6   click a product ordering button, and the order can be --

7   that can be used to complete a product order were supported

8   in the -- in the exhibit.

9   Q.    So this is the first method, and it shows the

10  customer doing two clicks; is that correct?

11  A.    No, it does not show the customer doing two clicks.

12  You're misreading what it says right there on the screen.

13  We needed to point to two things in the conception document.

14            One, that there was description of a product

15  ordering button.

16            Secondly, that there was a description that

17  an order that resulted in confirmation of an order.  Both of

18  those things are there, and we talked about them happening

19  automatically or semi-automatically.

20            So it was very clear that the Examiner had

21  everything he needed to -- to grant our claims.

22  Q.    And in this Paragraph 10, in describing this first

23  method, where you talk about the click of the third

24  paragraph and the click of the fourth paragraph, you say,

25  that part of the document describes automatically completing

Reed - cross

1    the purchase of an item.

2    A.     Excuse me.  I didn't understand your question.

3    Q.     In this Paragraph 10, which is about the first

4    method, you've got a sentence that talks about the third

5    paragraph click, a sentence that talks about the second -- a

6    fourth paragraph click, and then you say, that describes

7    automatically completing the purchase of an item.

8    A.     The whole last sentence is the claim.  Okay?  The

9    claim that we were asking for, the first claim, first method

10   was 1-click.  A second claim was 2-click.

11          We were pointing the Examiner to the

12   support in the specification that provides -- that describes

13   one is automatic, one is semiautomatic.  The Examiner just

14   asked us, point to where in the conception document you have

15   the support for doing this, and that's what we were doing

16   here.

17          If you put Paragraph 10 and 11 side by side, or

18   those two, you will see, the whole first part is the same

19   for both of them.  We point to the combination of things in

20   this document and say, these described that we did 1-click

21   and these described that we do 2-click.

22   Q.     Let's look at another document.

23          MR PASAHOW:  Will you pull up 108?

24          THE COURT:  Before we begin, this might be the

25   time to take a short break for the jury.

Reed - cross

1          MR. PASAHOW:  Thank you, your Honor.

2          THE COURT:  We'll take a 15-minute break and

3    come back at around ten of.

4          (The jury was excused for a short recess.)

5          THE COURT:  All right.  Counsel, I want talk to

6    you a little bit about this case.

7          You may stand down, Mr. Reed.

8          (Witness temporarily excused.)

9          THE COURT:  My concern is, quite frankly, that

10   we're moving along rather slowly, and I understand that

11   maybe it will speed up when you start getting to some

12   deposition testimony, but I imagine the experts are going to

13   be long.

14          I'm going to give you a warning.  If there's an

15   indication to me that witnesses are not answering questions

16   and that they're going off on dissertations, then I'm going

17   to start attributing the -- and if it's is the witness of --

18   whoever's witness it is, I'm going to start attributing that

19   witness' comments and the extension of that time against

20   that party even if they are not the party examining the

21   witness.

22          MR. ALBERT:  Understood, your Honor.

23          THE COURT:  All right.

24          MR. PASAHOW:  Yes, your Honor.

25          THE COURT:  That goes for both, because I have

Reed - cross

1    no idea what's going to happen in the future with certain

2    witnesses, but I've got my concerns now, that we are going

3    to have -- I've got some very serious concerns about what is

4    going to be happening in the future.

5              (Short recess taken.)

6                  -   -   -

7              (Proceedings resumed after the short recess.)

8              THE COURT:  We're ready to proceed, counsel?

9              MR. PASAHOW:  Yes, Your Honor.

10             THE COURT:  Let's bring in the jury, please.

11             (The jury entered the courtroom and took their

12   seats in the box.)

13             THE COURT:  Please be seated.

14             MR. PASAHOW:  May I continued, Your Honor?

15             THE COURT:  Yes, you may.

16   BY MR. PASAHOW:

17   Q.    Mr. Reed, now that change where you indicated a word

18   seller should be buyer or purchaser, is that significant or

19   does it matter?

20   A.    The reason I don't believe it matters is because the

21   document is nonsensical otherwise, so --

22   Q.    That --

23   A.    Go ahead.

24   Q.    Finish your answer, please.

25   A.    When it was first pointed out to me, it did give me

Reed - cross

1  pause to think why that error wasn't caught, and after I

2  reviewed the entire context of that document and its

3  preparation, I was confident in why that it happened.

4  Q.    But substantively, does it matter whether the word

5  buyer appears there, or purchaser?  I'm sorry.  Seller or

6  purchaser?

7  A.    Yes.

8  Q.    And let me -- let's go back to that other notebook,

9  then, get this one off here for you.  Take that one.

10            And if could I then ask you to look at

11  Exhibit 1844, Defendant's Exhibit 1844.

12  A.    I'm turned to that page.

13  Q.    And that's a declaration you made in February of this

14  year; is that correct?

15  A.    Yes, it looks correct.

16  Q.    And if you turn to Page 14, that is your signature,

17  Under penalty of perjury?

18  A.    Yes, that is my signature.

19  Q.    If I could ask you to turn, then, to Page 9 of the

20  declaration.

21            MR. PASAHOW:  If we could pull up Paragraph 32.

22  BY MR. PASAHOW:

23  Q.    And there, you are talking about your patent, and you

24  say, Claims 1 through 6 of the '710 patent describe a

25  purchase transaction where a customer is purchasing from a

Reed - cross

1   seller.  You say, in one step of the method, the seller

2   provides the customer with information about the item that

3   is available for purchase.

4             You go on to say, with this communication, the

5   seller is the provider and the customer is the consumer.

6   A.     Yes.

7   Q.     And then you say, in another step of the method, the

8   customer provides an indication to the seller to indicate --

9   to initiate a purchase transaction for the item.

10            Is that correct?

11  A.     Yes.

12  Q.     And --

13  A.     I'm not sure --

14  Q.     And then you finish, with this communication, the

15  seller is the provider -- I'm sorry.  I'm having trouble

16  reading today.

17            With this communication, the customer is the

18  provider and the seller is the consumer.

19  A.     That's right.  The claims that we submitted with that

20  declaration, the claims that we were asking the Patent

21  Office to approve, used two different sets of terms.

22            In the patent specification, we talked

23  about providers and consumers of information.  In the

24  context of a purchase transaction, we wanted to make it

25  clear, these were buyers and sellers.  But the claims --

607

Reed - cross

1  and, again, patent attorneys, you know, they're the experts

2  in this process.  The claim -- for example, 1-click uses the

3  terms buyer and seller, and the claims that pertain to

4  2-click, they use different terms.  I would have to go back

5  and look at them.

6          There are reasons for doing this, so a

7  substitution had to be made in my mind, providers,

8  consumers, buyer, seller, and then I think it was customer,

9  and I can't remember what the second one was.

10          So those substitutions had to be made, and not

11  only did I not catch in one place, which had been buyer was

12  seller, I didn't catch it, but the attorneys did not catch

13  it.

14  Q.    And what you are saying in this declaration that you

15  filed earlier this year, that the indication is sent from

16  the customer to the seller; is that correct?

17  A.    Yes.

18  Q.    And then the seller has to process that in order to

19  complete the transaction?

20  A.    Yes.

21  Q.    Now, it's your understanding, is it not, that if the

22  claim is construed to mean that the seller must receive the

23  indication to initiate a transaction, and then after that,

24  the information is retrieved and processed by the seller,

25  then this example that we were looking at of the software

Reed - cross

1    vendor, that does not fit within what is described in the

2    current claims of the patent; is that right?

3    A.    That particular example does not describe -- when you

4    say it does not fit within the claims of the patent, I

5    believe in my deposition, it said it -- it was covered by

6    the claim.

7    Q.    Well, let's look at what you said in your deposition.

8    A.    Yes.

9    Q.    It starts at Page 63.

10            (Videotape deposition played as follows.)

11            "Question:  Let's focus on the software vendor

12   customer example that's on Page AMZC122971.  I guess it's

13   all on that page.  That example, will you agree that that

14   example does not do what Claim 7 requires.

15            "Answer:  When you say, it does not do what

16   Claim 7 requires, not being an attorney, the key point

17   you're trying to make is that in this example, the

18   processing, the automated processing that takes place, is

19   that the customer data is accessed before the customer

20   performs this 1-click to confirm, meaning that they are

21   confirming the sending of this information.  That is what is

22   described in this particular example.

23            "Question:  And in that particular example, it

24   does not meet the requirement of Claim 7, which says:  In

25   response to the received indication, automatically

Reed - cross

1   completing the purchase of an item from the information

2   consumer by accessing the information provider data to

3   retrieve the information and process the retrieved

4   information by processing said metadata associating said

5   information with the proposed transaction so as to complete

6   the proposed transaction; right.

7          "Answer:  Again, to the extent that I understand

8   the point you're making here, that this example involves

9   processing the metadata in order to retrieve it and display

10  it to the user first, if this claim is interpreted, say, in

11  response to the received indication, meaning a message that

12  has already been sent to the seller before that information

13  is retrieved, then this appears to be a different scenario.

14          (Videotape stopped.)

15  BY MR. PASAHOW:

16  Q.    So if it works the way you pictured it yesterday,

17  where the buyer sends some information to the seller and the

18  seller then looks up the customer information, you are

19  saying that's a different scenario than as described in the

20  claims?

21  A.    No, it's not a different scenario that's described in

22  the claims.  That's not the scenario that's described in the

23  example that I provided in my conception document.

24          In that example, the -- the seller sends the

25  buyer the automatic product ordering form, and it's two

1    clicks.  So the buyer clicks once to get -- to say I want to

2    buy this product and then the information is looked up, so

3    they get a completed filled form.

4                    So 1-click was to say, I want to buy the

5    product.  Give me all the information.  And then they

6    confirm that information.  Yes, this is what I want to send,

7    and they click a second time, and that's 2-click ordering.

8    Q.    Can I ask you to look in that notebook to the Joint

9    Exhibit 51?  It will be in the second tab, the large

10   divider.

11   A.    I think I'm there.

12   Q.    We looked at this yesterday.  Do you recall?

13   A.    Yes.

14   Q.    And your counsel asked you about some of these

15   minutes?

16                    Now, there are minutes in here for a couple of

17   days:  July 24th, July 25th, July 29th, and then there are

18   some attachments.

19                    Do you recall at which meeting these attachments

20   were used?

21   A.    Are they attached to this set of minutes?

22   Q.    If you turn to the end of this exhibit, you will see

23   that there are these several board meeting minutes, and then

24   there are these attachments.

25   A.    Oh, I see.  So it's a package of minutes and

Reed - cross

1    attachments.  So, no.  I don't -- I can't recall which of

2    those set of meetings the attachments were for.

3                MR. PASAHOW:  Could we have page 43949?

4    BY MR. PASAHOW:

5    Q.    Now, this is called target licensees.  What use was

6    made by this to the board?

7    A.    Excuse me.  The last part of your question?

8    Q.    What use was made of this exhibit by the board?

9    A.    So as I explained yesterday, this is in the period

10   where the company, again, had just been crushed by

11   Microsoft, and so the board was trying to decide what were

12   our alternatives, and one strategy was licensing and the

13   other one was to go and create a new business plan.

14   Q.    And yesterday, you explained your views about various

15   companies, and one of them was Intuit, which you said had

16   done a very good job of staying focused.

17   A.    Yes.

18   Q.    And what was its focus?

19   A.    It's focus was automating personal finance software.

20                MR. PASAHOW:  Could you highlight over on the

21   right-hand side?

22   BY MR. PASAHOW:

23   Q.    You have got Intuit on this chart, and then under

24   Infringing Technology, it says yes.  Do you see that?

25   A.    Yes.

Reed - cross

1    Q.     So you thought this finance software infringed your

2    patents, too?

3    A.     First, I wasn't the one that created this chart.

4    This was created by our CFO, Gordon Gardiner.  And there

5    was, this was a list of all the potential companies that may

6    be headed in the direction of infringement.  It was not a

7    list of companies that we felt had gone out and infringed.

8    Q.     And software that says infringing, that doesn't mean

9    that they're infringing?

10   A.     No.  It means do they have the potential to infringe?

11   Are they headed in a direction where we believe they will,

12   that they might infringe, meaning they're going to want the

13   products, the features in the market that we believe our

14   technology covered.

15   Q.     And is this the group of companies then you and your

16   colleagues approached to attempt to get licenses?

17   A.     No.  This was, as you can tell, quite an exhaustive

18   list.  We didn't have anywhere near the resources.  This was

19   prepared as part of a background for the board to discuss

20   the whole potential licensing direction of the company.

21   Q.     Now, up there, you have got question marks for some

22   companies under Infringing Technology.  What does that mean?

23   A.     I think that means that whoever prepared this chart

24   was not sure whether they were headed in the direction that

25   might be infringing.

Reed - cross

1    Q.     Now, could I ask you to look at some other board

2    minutes?  And they would be Exhibit -- I'm sorry.  It isn't

3    a board minute.  It is an e-mail.  It is Exhibit 395 in the

4    front of this notebook.

5              And this is an e-mail message from someone named

6    Mr. Gardiner to various people.  Is that correct?

7    A.     I'm still looking to find it here.

8    Q.     It's 395.  It would be in the front?

9    A.     Oh, there it is.

10             Oh, yes.  Gordon Gardiner was the Chief

11   Financial Officer of the company.

12   Q.     And he says:  Update from/to Alex. Brown.  What was

13   Alex. Brown.

14   A.     Alex. Brown was an investment banking company that

15   also did mergers, acquisitions and licenses.

16   Q.     Had they been retained by Intermind?

17   A.     I'm not sure.  Are you talking about the formal

18   retainer?  Or were we in discussions with them to

19   potentially help us?

20   Q.     Were you working with them?

21   A.     Yes.

22   Q.     And as you go down this, it says:  Bob returned my

23   call this morning to apologize for Dyan's lack of

24   communication.

25             And it says:  We went through the list.  And

1    there is a list of companies there?

2              Is that the list of companies that you were

3    trying to license to?

4    A.    I'm not sure what list.  This was, as you just saw in

5    the chart that was presented, Mr. Gardiner, as our Chief

6    Financial Officer, was responsible for investigating the two

7    options in front of the company, the financial implications.

8    And what the board wanted to know was what the potential

9    future if we go into licensing and, actually, it was part of

10   my job to say what was the potential future if we go into

11   product revenue of the company, which became OneName.  And

12   this is right after being crushed by Microsoft and having a

13   lot of investment already in us, so it was a critical

14   decision.

15             So Gordon Gardiner, the CFO, was exploring

16   licensing.  I was exploring the product revenue.  And so

17   what he was doing in that -- I mean I was a member of the

18   board but I don't remember what specifically this list is

19   that he is referring to.

20   Q.    This is an e-mail you would have received; is that

21   correct?

22   A.    Yes, I'm on the distribution list.

23             MR. PASAHOW:  If we can flip back then to

24   Exhibit 51.

25             And can we have 948.

Reed - cross

1   BY MR. PASAHOW:

2   Q.     That's the scenario analysis you were looking at

3   yesterday?

4   A.     Yes.

5   Q.     And could you explain again what this is?

6   A.     So in this, what we were doing -- and, again, I

7   don't -- I expect probably Gordon Gardiner would have

8   prepared this as part of what he was doing.  We were looking

9   at the different companies that we might license, and it was

10  an analysis of four factors:

11          How much money would we need to raise from our

12  investors to pursue that licensing opportunity?

13          Second was business risk?  How are risky was it

14  that we would be able to succeed?

15          The third one was how probable was it to have

16  that company license we would have to proceed with a

17  lawsuit?

18          The fourth one was what is the value today of a

19  license to that company?

20  Q.     And so, for example, for Microsoft, you were figuring

21  the value would be $47 to $140 million?

22  A.     Yes.  As I explained yesterday, the value of a

23  license is different to every company.  It's just like a

24  Swiss Army knife.  Its value is different to different

25  potential users, depending on what features they need.

Reed - cross

1    Q.     And this was discussed with the board some time in

2    late July; is that correct?

3    A.     Yes.  That's roughly in that late summer period is

4    where the board was having to really concentrate on this.

5    Q.     If you will turn back a few pages, there is the board

6    minutes from July 29, for example.  So would this have been

7    discussed at a board meeting around that time?

8    A.     I think someplace around that time.

9    Q.     Now, you also discussed these July 29 minutes

10   yesterday?

11           MR. PASAHOW:  And if we can look at the last

12   paragraph, Before Other Business.  Before other business.

13   BY MR. PASAHOW:

14   Q.     This was the discussion with the Coopers & Lybrand

15   people?

16   A.     Yes.

17   Q.     And it indicates that there was a preliminary verbal

18   opinion about this $50 million value?

19   A.     Yes.  It says:  Although a preliminary verbal

20   opinion, they felt that execution of a license with either

21   Netscape or Microsoft would indicate a present minimum

22   valuation of $50 million for the company.

23   Q.     And did the company ever go on and get more than this

24   preliminary verbal opinion?

25   A.     We did continue discussions with Coopers & Lybrand to

Reed - cross

1    get more information about that $50 million assessment.  I

2    don't know how much further we went.

3    Q.    So this was July 29th; is that correct?

4    A.    Yes.

5    Q.    Now, were you negotiating with Microsoft at that

6    time?

7    A.    I can't remember the exact timing of the discussions

8    with Microsoft.  We did have discussions with Microsoft.

9    Q.    And was Microsoft willing to pay you millions of

10   dollars for a license?

11   A.    As I recall from that last chart, the column entitled

12   Litigation, the answer is no.  They were not willing to pay

13   anywhere near what we felt it was worth for a license.

14   Q.    Can you look at Exhibit 25, please?  That would be

15   the Defendant's Exhibit 25 in the front.

16          And this is a fax from Intermind to Microsoft;

17   is that correct?

18   A.    This is a cover page.  Yes, this is to a gentlemen

19   named Greg Stanger.

20   Q.    What this was was an offer of a license from

21   Intermind to Microsoft; is that correct?

22   A.    To characterize it as an offer would I think be very

23   generous.  I know the context of this document quite well.

24   Q.    Well, let's look at the accompanying letter.  And

25   let's look at the first paragraph.

Reed - cross

1           It says:  Further to our discussion yesterday

2      morning, I have attached a term sheet which outlines the

3      very general terms we are prepared to discuss regarding a

4      licensing arrangement.

5      A.     Yes.

6      Q.     So those were terms that Intermind was prepared to

7      accept; is that correct?

8      A.     I believe you just read it, and it said we are

9      prepared to discuss, and yet you just, in your question

10     said, we're prepared to accept.

11     Q.     So, let's look at the next page.

12           And you see there it has license fees; and under

13     license fees, it says $750,000?

14     A.     Yes.

15     Q.     That is what Intermind was prepared to accept to

16     discuss with Microsoft; is that correct?

17     A.     In the context of this letter and in the context of

18     this discussion, that's the number that appears.

19     Q.     Are you saying you were prepared to discuss $750,000

20     but the company was really going to demand $30-$40 million?

21     A.     No, we weren't.  Take the Swiss Army knife.  What we

22     were prepared to discuss was Microsoft licensing the one

23     thing they needed for their infringing product:  the channel

24     definition format language that they had put on the market,

25     they had announced to the market and which we -- you know,

Reed - cross

1    again, that read like it was right out of our patents, and

2    it was a direct copy of our product.  So this discussion was

3    about, okay, what would you pay just to have that one

4    feature so your browser is covered.

5    Q.    Let's look up there above there in the term to where

6    it says agreement.  Do you see where it says:  Nonexclusive

7    license agreement covering any use by Microsoft?

8    A.    I do.  And if you keep reading:  For applications --

9    for use on personal computers only.  And then we go on for

10   this agreement, we talk about the application will be

11   computers that run Windows 3.1, Windows 95, Windows NT or

12   MacIntosh.  That is where Microsoft distributed the Explorer

13   browser.

14   Q.    If you could turn to Exhibit 449.

15          And these are board minutes from August 13th, so

16   about a week later; is that correct?

17   A.    Yes.

18   Q.    And under New Business, there is a report on where

19   things stood with Microsoft; is that correct?

20   A.    Yes.

21   Q.    And Microsoft indicated it would pay up to $250,000;

22   is that correct?

23   A.    Yes.

24   Q.    And when they said it had to be a blanket license,

25   that would be a license for anything they wanted to do with

Reed - cross

1    it; is that correct?

2    A.    That would be the other end of the spectrum.  That

3    would be for the whole Swiss Army Knife, everything you can

4    do with it, all features, yes.

5    Q.    And Netscape said they would give you $70,000 for a

6    blanket license; is that correct?

7    A.    No.  Actually, Netscape was specific to that one

8    feature.  Netscape again had done the same thing.  They had

9    that in their browser.  That $70,000 represented what they

10   would pay for that one feature.  We have never discussed a

11   blanket license with Netscape.

12   Q.    So where it says Netscape responded similarly, that

13   doesn't mean it wanted a similar license?

14   A.    No, it does not mean that.  I mean I was party to the

15   discussions with Netscape.  I was the one that talked to

16   their counsel because I already had a relationship with that

17   company because we thought Netscape would profit and partner

18   with us and use that technology in their browser.

19   Q.    After the board was told this, did they still think

20   the license to Microsoft was still worth $40-$50 million?

21   A.    Absolutely.  We did not even -- once we knew -- these

22   were exploratory discussions with people we knew at those

23   two companies.  Greg Stanger went to school with Gordon

24   Gardiner.  He was one person that Mr. Gardiner could go to

25   at Microsoft to say, all right, let's get down to the bottom

Reed - cross

1    line.  If we don't want to go through a lawsuit, what you

2    are willing to pay us for a license to our technology?

3    Because we're willing to give you a license for what

4    you have, a reasonable number.

5         But in the absence of either company being

6    willing to pay anything we thought was reasonable, we said

7    no.  Sort of proving the truth of this matter that small

8    companies and large companies take licensing seriously,

9    unfortunately, in litigation.

10   Q.    Could I get you to turn to Exhibit 168, please?

11   A.    Yes.

12   Q.    And this is an estimate of asset liquidation values

13   that Intermind or I guess it would be OneName at that point

14   filed with the United States Bankruptcy Court; is that

15   correct?

16   A.    I believe so.  I'm not a bankruptcy accountant and I

17   don't see anything right here on this document that says

18   that that was from a bankruptcy proceeding.  If you are

19   telling me that's the case, I'll take your word for it.

20   Q.    Let me show you a certified copy from the United

21   States Bankruptcy Court.

22   A.    Yes.  Thank you.  And that is the filing we made in

23   our Chapter 11.

24   Q.    And this would be during a time you were a director

25   of the company?

Reed - cross

1    A.    Yes, I was the director.

2    Q.    And do you see where it shows other assets, patents

3    and it has a value of $250,000 to $500,000?

4    A.    Yes, I do.

5              MR. PASAHOW:  Can we have Exhibit 641, please.

6    BY MR. PASAHOW:

7    Q.    Can I ask you to turn to Exhibit 641?

8    A.    You said 641?

9    Q.    Yes.

10   A.    Okay.

11   Q.    And can you tell me what this is?

12   A.    It looks like a valuation report from Arthur Andersen

13   related to an internal transaction that the company was

14   trying to perform.

15   Q.    So this was a valuation that OneName, as it was then

16   known, got from the Arthur Andersen firm?

17   A.    Yes.

18   Q.    Could I ask you to turn to Exhibit 588, please?

19   A.    Excuse me.  The number again?

20   Q.    588?

21   A.    Yes.

22   Q.    Could you tell me what this is?

23   A.    It looks like a document we're preparing to publish

24   on information.  The term FAQ that appears up there stands

25   for Frequently Asked Questions.  It's a common format for

1  putting information on some place like a Web so you can

2  quickly find out answers to something when something new or

3  interesting is announced.

4  Q.    And if you looked down at the bottom, do you see that

5  it's got a Web address down there?

6  A.    Yes, I do.

7  Q.    So is this something that Intermind posted on its

8  website?

9  A.    I think it may have been posted on the website.  I

10  can't remember whether we actually posted it or not.

11  Q.    You helped prepare this?

12  A.    I was involved in its preparation, yes.

13  Q.    Could I ask you to turn to the page that has as its

14  last three digits, 155?

15  A.    Yes.

16  Q.    I'll sorry.  Let's start with the section heading

17  just before that.  Can you see there it starts "novelty?"

18          And it says:  The use of metadata in

19  communications is not itself novel.  And it goes on to say:

20  Metadata is in fact the key to the Web.

21          Is that true?

22  A.    Yes.  Metadata, as I was explaining yesterday, is the

23  way that the links in hypertext documents work.  The address

24  of every document, that when you click on a link, the

25  address from that document is inside that link.  That's the

1    data.  The metadata is a wrapper that is the link.  When you

2    are looking at a Web page, the little links that appear in

3    blue are the little envelopes that when you click one, it

4    says, ah, I can get the address and go get the other

5    document.

6    Q.    So that's all standard Web technology?

7    A.    Yes.

8    Q.    And it existed before Intermind came along?

9    A.    Excuse me?

10   Q.    That Web technology existed before Intermind came

11   along?

12   A.    Well, Intermind was founded in 1994.

13   Q.    Yes.

14   A.    And the Web -- Timber & Lee began working on the Web,

15   I believe, in 1990.

16   Q.    Yes.

17   A.    So hypertext's technology had existed for some time.

18   Timber & Lee did not invent hypertext technology.  Okay?

19   Ted Nelson invented hypertext technology in the 1960's.

20   Q.    So you are saying this use of the metadata in tags

21   on, quote, "the Internet" existed since the 1960's?

22   A.    No.  The Internet barely existed in the 1960's.

23   You're saying the use of metadata and hypertext, that is

24   what hypertext is about.

25   Q.    And that existed before Intermind was created; is

Reed - cross

1    that correct?

2    A.    Yes.

3    Q.    Thank you.

4          Could we look at the next page, then, and the

5    paragraph that begins, Agent systems.

6          And, in particular, it says about halfway

7    through, cookies are perhaps the form of metadata that most

8    resembles a communications object.

9          So cookies are metadata; is that correct?

10   A.    Yes.

11   Q.    And cookies, that is something that Intermind didn't

12   invent; is that right?

13   A.    No.  Cookies were actually invented by Netscape, I

14   believe, in 1995.  It might be 1994.

15         Netscape was a company that introduced the

16   first browser, Mosaic browse, and they had the most

17   innovative engineering team around that.  And they came up

18   with the idea that, wow, browsers actually need a way to

19   remember that you've been to a website before.

20   Q.    Then you go on to say, but cookies are not processed

21   by the browser to automate the delivery of new information

22   or the feedback of information stored outside the cookie.

23         Is that accurate?

24   A.    Yes.

25         MR. PASAHOW:  Could we have Exhibit 120, please?

Reed - cross

1    BY MR. PASAHOW:

2    Q.    Turn to 120, please.

3    A.    Excuse me?

4    Q.    120.  What is this document?

5    A.    This appears to be a document from my personal

6    journal.  Again, as a writer, I keep a journal, not

7    necessarily all the time, but I use it primarily just to

8    think.

9    Q.    And this was written by you.  It says, Tuesday,

10   August 31st.  That was in 1993; is that correct?

11   A.    I'd have to read through this.  It is probably that,

12   because I see in the second paragraph, it says, Today is my

13   first day back in the office after one BBSCON.

14                BBSCON was the conference I explained

15   yesterday that I researched and found I needed to go to see

16   if, in fact, what I had invented was novel.  And that's

17   where I met Andrew Curry and formed that relationship.

18   Q.    And --

19   A.    So I assume this was right after I got back.

20   Q.    And this would be about the same time as you created

21   that conception document we've been looking at?

22   A.    Well, the conception document was witnessed on

23   November 1st of that year, so this is in the period in which

24   I'm working up to creating that document.

25   Q.    Could I ask you to turn to the entry that is on the

Reed - cross

1    page that has the last three digits 843, for September 13th,

2    there?

3    A.     Yes.

4    Q.     I would like to ask you about the part towards the

5    bottom there.  It is in the paragraph that begins, My

6    biggest misgiving, in particular, starting with the

7    sentence, it is this potential I fell asleep last night

8    thinking about.

9    A.     What is the question?

10   Q.     You refer there to an ICON object.  What is an ICON

11   object?

12   A.     So up in No. 2, it says, the ability to see the full

13   intelligent communications object network potential be

14   developed.  Each word is capitalized, so together they

15   create the acronym ICON.  And I'm referring here to the fact

16   that these, what are called in the conception document

17   access objects, here I first coined the term ICON object.

18                      I was trying to work out what is the

19   marketing term?  How am I going to explain this to the

20   world?  And I've done a lot of work in software marketing

21   and product sales, so I knew that you had to come up with a

22   good, easy way of explaining what you were doing, and a good

23   name for it.

24   Q.     You go on to say, I found myself saying last night,

25   this is a map for the global brain.

Reed - cross

1           Now, what does that mean?

2   A.    Can you highlight that?

3   Q.    The document is in front of you.

4   A.    No, no, no.  I'm just looking and realizing, I was

5   explaining to the jurors yesterday why I called the company

6   Intermind, and I don't think I had thought of the name

7   Intermind there, and that's -- but, clearly, it came out of

8   that thought.  Connecting hypertext's database that

9   represent people and companies via what's now called digital

10  identities is allowing all of us to connect over the

11  Internet in ways that we do directly today.

12          We do it in person, but now we are able to do

13  that over the Internet, and that's taking all of us online.

14  That's taking all of our, you know, our ability to think and

15  share ideas.  This is what social networking is about.

16          So I believe I was looking at that and,

17  obviously, I was very excited about it.

18  Q.    So that's the same concept as is in your conception

19  document?

20  A.    When you say, that's the same concept, the potential

21  for this -- the technology we talk about here, that has

22  had -- I believe, the names, if I progress through, I first

23  called it -- well, here, I called it ICON.  Then I called it

24  access objects.  And then in the patent, it became

25  communications objects.  And then, for marketing reasons, we

1    started call it hypercommunications.

2                      And then we realized that, oh, that

3    probably is too complex.  Let's just refer to -- what's the

4    next thing after that?  Active pages.  And then, finally,

5    when we moved to an open standard, we first called it XNS,

6    and now, today, finally, settled on SDI.

7                      It has been stable for six years now, so I

8    think we're there.

9    Q.    Could I ask you to turn to the page that has the last

10   three digits 854, the November 1 entry.

11                     And down at the bottom there --

12   A.    Okay.

13   Q.     -- of the last paragraph, at the bottom, it referred

14   to AON, Access Object Network?

15   A.    Yes.

16   Q.    And then you say, that's the new tech name for the

17   system based on the patent prep paper?

18   A.    Yes.

19   Q.    So was that another name for this global brain?

20   A.    No.  As I just explained, that was the name when I

21   reached the step where I had to put the ideas down into that

22   conception document in order to share them with Andrew

23   Curry, and I said, I now need to do a good technical

24   description of this.  What's a good name to use for this

25   core concept, which is this package of metadata that has

1    moved around.  And I said, okay.  Access object.  It gives

2    you access to that information.  And that's when I adopted

3    that term and then here I just referred to it.

4    Q.    And then if we go onto the next page, continuing that

5    same paragraph and going into the next paragraph, in the

6    next paragraph, you say, Which leads to this incredible

7    revelation I just had.  I was very briefly contemplating

8    trade NAMES for such a service.

9            And then you have an interruption.  And you say,

10   and came up with the name VIS.

11           So was VIS another name you used for all of

12   this?

13   A.    This journal is used for one and only one purpose:

14   To think out loud.  The mere idea that I'm actually sitting

15   in a courtroom, looking at my own thoughts that were never

16   met for anyone else, is amazing.

17           I'm thinking out loud here about names.  I do

18   that.  You know, anyone who is an entrepreneur is going to

19   think about how you best market your product.

20   Q.    And so is VIS another of the names you had for the

21   same concept?

22   A.    It looked like I was going VIS and VIX.

23   Q.    If we can then turn to the page that has the last

24   three digits 858.  And this is Friday, December 17th, 1993;

25   is that correct?

1   A.      Yes.

2   Q.      And then you say, The above is a very prophetic

3   statement, because I just received the most profound

4   challenge to that conceit yet.  And all it took was the

5   pages of one magazine -- the January 1994 edition of Wired.

6           So I take it you subscribed to Wired?

7   A.      Yes, I did.

8   Q.      And then you go on to say, First, it contains a

9   complete description of the World Wide Web and its Mosaic

10  clients.

11          Now, Mosaic, that was one of the Web

12  browsers; is that correct?

13  A.      That was the first graphical Web browser that had

14  graphical use and interface.  You could see text and images

15  and just click on things versus the old standard, you know,

16  characters on a black screen.

17  Q.      So the Mosaic client is the Mosaic Web browser; is

18  that correct?

19  A.      Yes, it's the Mosaic Web browser.

20  Q.      And then at the end of that paragraph, you say,

21  There's the key right there.  In short, Mosaic is a living,

22  breathing execution of VIS in existence right now.

23          Now, VIS, that was this idea in your conception

24  document, you said; is that correct?

25  A.      VIS was a name for, as we discussed earlier, the

Reed - cross

1    potential system or service I was thinking about offering,

2    based on that document.

3    Q.    And then down at the bottom of that section for that

4    day, just before Tuesday, you say, And yet, Mosaic exists

5    now, is produced by the National Center For SuperComputing

6    Applications, and is growing daily.  Suddenly, Mosaic is the

7    competition.  Mosaic is what we are shooting at.

8              Is that accurate, or I should say, was that

9    accurate?

10   A.    You say, is it accurate?  What do you mean, is it

11   accurate?  Those are the words I typed there, but you keep

12   skipping over paragraphs to leave out my whole train of

13   thought.

14   Q.    The question is:  Is that last paragraph accurate,

15   sir?

16   A.    When you say accurate, are you saying those are the

17   words on the screen?  Yes, those are the words on the

18   screen.

19   Q.    And when you wrote that, you believed it to be true?

20   A.    What do you mean, believed it to be true?  I'm

21   saying, if you want to understand what I believed to be

22   true, you need to read the document.  If you keep taking

23   little snippets of it, you're missing what I'm saying.

24   Q.    So you can't tell us whether you believed what is in

25   that paragraph to be true?

Reed - cross

1    A.    I believe what I wrote here to be true, especially as

2    I'm sitting here, reading it right now.  The two paragraphs

3    before that I think make it very clear what I was thinking.

4    Q.    Well, let's actually go through it, then.

5          So it begins up there with, first.  And let's

6    just highlight that paragraph.  It begins, First.  Paragraph

7    by paragraph.  Just that one paragraph.

8          You say, First, it -- and we're talking it would

9    be Mosaic; is that correct?

10   A.    No.  I believe it's the Wired magazine article I was

11   referring to there.

12   Q.    Okay.  So Wired magazine has this complete

13   description of World Wide Web and Mosaic, and it almost,

14   emphasized every way, it duplicates the functionality of

15   VIS, at least as far as the Internet goes.

16         You say, I was almost aghast to realize all

17   that it can do.  It really made my CompuServe metaphor look

18   old, and catch this quote:  Mosaic also offers support for

19   embedding interactive forms in your documents.

20         Now, let's stop there.

21         Did Mosaic offer support for embedding

22   interactive forms in documents?

23   A.    Mosaic had support for forms in the document.  It

24   turned out they were not interactive.

25   Q.    So what Wired wrote you think was wrong?

Reed - cross

1   A.      No.  What I was doing was saying, wow, I think this

2   thing could be what I had invented.  Remember, the reason,

3   what I said, right above that, it's like, this is a huge

4   deal.

5                   I just read an article, the first article

6   in Wired magazine, about the World Wide Web.  I had been

7   working with hypertext now for four or five years, and then

8   I had this big revelation at this point, like seven months

9   previously, about hypercommunication system.  And now, for

10  the first time, I read a complete description about the

11  World Wide Web.  And I was thinking, oh, wow, they've

12  thought of all -- the whole Swiss Army knife.  And it looked

13  like they would have forms in there.

14                  It turned out they weren't interactive.

15  Q.      Well, you say, And catch this quote.

16                  So aren't we talking about a quote?

17  A.      That's the quote from the article.  That's why I -- I

18  was so taken by it.  But it turned out that, again, if we

19  can keep reading -- well, actually, not right here.

20                  I obviously went and got a copy of Mosaic,

21  started using it, started studying it, and discussed, the

22  forms weren't interactive.  They did not do what I had

23  described in my document.

24  Q.      And what does interactive mean in the sense that you

25  say Mosaic didn't do it?

Reed - cross

1   A.     It did exactly what we've been talking about here and

2   illustrating on the screen.  A standard Web form by itself

3   does not do 1-click purchasing and it doesn't do 2-click

4   purchasing.  It doesn't do automated feedback.

5   Q.     So you can't do any kind of purchasing with the

6   standard Web form?

7   A.     It didn't say you couldn't do any kind of purchasing.

8   What I was talking about was my invention.  Standard Web

9   forms.  Once I went in -- I mean, obviously, I created this.

10           When I read about the Web, having been in

11  hypertext as long as I was, I was extremely excited.  I

12  said, oh, my God, this is huge.  Now, when I first looked at

13  it and read this Wired article, it said, interactive forms.

14  Of course.  Someone else -- I was doing my research.  I was

15  still in my research period here, and now I found, this

16  looks like they do it.  And when I got went and got a copy

17  of Mosaic, I studied it, no, it doesn't do interactive

18  forms, it just does forms.

19  Q.     So you did your research, but it was in December of

20  1993 that you discovered the World Wide Web and the

21  Internet?

22  A.     No.  It's when Wired magazine wrote an article about

23  it.  They had a huge amount of information that had not

24  been -- that I couldn't find in other sources there, because

25  the Web had just been invented.

Reed - cross

1  Q.     Let's look at the next paragraph.

2              So you say, and yet, it's not the whole thing.

3  Just the way Telescript stopped me in my tracks until I

4  figured out what the difference was, so did Mosaic.  But

5  this time, it didn't take as long.

6              Then you go on in the next paragraph.  The

7  difference is simply one of scope.  VIS is Mosaic taken to

8  the next higher level along several dimensions.  Mosaic

9  works completely on the Internet; VIS theoretically works

10  with any system, including CompuServe or direct access

11  servers.  Mosaic works only in live connections; VIS is both

12  offline and online.  Mosaic, to my knowledge, obviously,

13  I've got to check all this out, does not off persistent

14  object connections; VIS does.  Mosaic works with existing

15  Internet server resource; VIS will introduce an entirely

16  library of server resource types.  That's way out there,

17  though.  Mosaic does not have, to my knowledge, a universal

18  charge system; VIS does.

19  A.     Yes.  A universal charge system.  That was the

20  payment.

21  Q.     And then you go on to say, In short, Mosaic is not

22  yet a complete information service operating system; VIS

23  will be all that and more.

24              And then you conclude, and, yet -- and we went

25  through that paragraph.

Reed - cross

1   A.      Yes?

2   Q.      Was it after that that you first got a copy of

3   Mosaic?

4   A.      I'm quite certain it would have to be after that,

5   because, you know, I didn't -- I didn't -- all of these

6   things were being written about this product and I didn't

7   know exactly what it did.

8               I don't remember the precise date that I got the

9   copy of Mosaic.

10  Q.      So Mosaic was the first Web browser?

11  A.      Well, technically, it's not the first Web browser.

12  When Timber & Lee first created it, he created it using an

13  old character method.  It didn't have graphical user

14  interface.  It was used by a set of research universities in

15  Switzerland, and then a grad student at the University of

16  Illinois, Mark Andreesen, saw it, saw it was hypertext

17  through the Internet and said, wow, this could take off, but

18  it's got to be a lot easier to use.

19              So he created a graphical client that let

20  you see pictures and layout pages.  That was Mosaic.

21  Created it at the University of Illinois.  It caught on so

22  fast that an entrepreneur from Silicon Valley came and

23  teamed up with them and they started Netscape.

24  Q.      So Mosaic was the first graphical interface?

25  A.      It's was the first graphical Web browser.

Reed - cross

1   Q.      You hadn't used that until after December 17, 1993?

2   A.      Again, I don't remember the exact dates, but I don't

3   think it would -- given what I'm reading here, was probably

4   after this.

5   Q.      Could I ask you to turn to Exhibit 24, please?  I'm

6   sorry.  It's Joint Exhibit 24, so it would be in the back.

7   A.      Yes, I'm there.

8   Q.      What is this?

9   A.      This is the cover page of a White Paper that

10  Intermind created to take to the W3C Push workshop.  W3C

11  stands for the World Wide Web consortium.

12                  When I mentioned yesterday that I'm a

13  Technical Committee Chair at Oasis, that's one of the three

14  major Internet standards bodies.  The World Wide Web

15  consortium where Sir Tim Berners-Lee is a head is another

16  and the ITF, Internet Task Force is the oldest.

17                  They were holding this area Push, in which our

18  first products had been introduced.  The W3C, there was so

19  much activity there that they said, perhaps we should

20  standardize this.  That's what they do.  They're a standards

21  body.  And before they make that decision, they hold what's

22  called a workshop, to explore with the different vendors and

23  people interested in that area, should we create a standard

24  here.  And as one of the companies that was well-known in

25  this space, we were invited.

1  Q.     And so this was a paper that was being passed out at

2  this W3C conference?

3  A.     Yes.  Specifically about our Push technology, which

4  is one -- it's the corkscrew of the Swiss Army knife.

5  Q.     And did you have a hand in helping to create this?

6  A.     Yes.  I was definitely involved.  Well, it says at

7  the bottom, I'm the contact.

8  Q.     Could I ask you to turn to Page 5?  And you see

9  there's a chart there?

10  A.     Yes.

11  Q.     And on the left, it says, Web, and on the right, it

12  says channels?

13  A.     Yes.

14  Q.     And what this shows is on the left, those are

15  features of the standard Internet Web; is that correct?

16  A.     Those are the features of the Web without any Push

17  features added to it.

18  Q.     Without any features that Intermind invented; is that

19  correct?

20  A.     I need to read the list but I think that's the

21  purpose of the column, yes.

22  Q.     So one of the things you can do on the Web, according

23  to this document, if you read down there, is the Web makes

24  it easy to transfer user input data via Web forms.  Is that

25  correct?

Reed - cross

1    A.    Yes.  On the left column, it says:  Makes it easy to

2    transfer user input data via Web forms.  That is what

3    standard Web forms do.

4    Q.    And that is without using any technology from

5    Cordance, Intermind, OneName?

6    A.    That's correct.

7    Q.    And then down a little bit farther, it says:  Allows

8    the use of third-party servers for forms processing,

9    advertising, auditing, et cetera.

10            The Web allowed that as well; is that correct?

11   A.    Yes.

12   Q.    And then down below the chart, if we could look down

13   there, it says:  In short, what the Web does for documents,

14   channels do for communications.

15            And then you say the reason this analogy rings

16   true is because channel architecture and Web architecture

17   are based on the same basic principle:  the use of metadata

18   (data describing other data) to create associations between

19   information.

20   A.    Yes.  Absolutely.

21   Q.    So using the Web without any technology from

22   Intermind, OneName, Cordance, you can create associations

23   between information using metadata; is that correct?

24   A.    Again, that is what hypertext does.  That's the core

25   concept of hypertext was invented by Ted Nelson in the

1   1960s.  Tim Berners-Lee is well to be acknowledged as the

2   person that figured out how to do that on the Internet and

3   that why the Web took off, but hypertext has been around

4   since the 1960s.

5   Q.     Now, could I ask you to turn back in the Defendant's

6   Exhibit to Exhibit 128, please.

7   A.     All right.

8   Q.     This is a memo you wrote in July 1995?

9   A.     Yes.

10  Q.     And can you tell us who the three people on the two

11  line are?

12  A.     Bill Bauce, Jim Voelker and Brian McManus, or, at

13  that time, were three of the four other directors of

14  Intermind.  Brian McManus, was, up until nine days before

15  that, the CEO and he had just resigned.

16  Q.     If we look down that first page, then, you say:  In

17  my view, there are two options:

18             Selling the business opportunity to another

19  entity.

20             Selling the patents and technology to the

21  industry.

22             Do you see that?

23  A.     Yes.  The context being that we were particularly at

24  a critical juncture right at that point.

25  Q.     Then if we look at the next page, you have this

Reed - cross

1   paragraph, the second option.  So that would be the option

2   of selling the technology to the industry?

3   A.     Yes.

4   Q.     And you say:  The second option, selling the patents

5   and technology to the industry has greatly increased in

6   feasibility since the W3C press release on May 3.

7              Now, W3C, that is this industry consortium that

8   you just talked about; right?

9   A.     Yes, the World Wide Web consortium.

10  Q.     And you say:  This move by the W3C is proof of the

11  level of frustration that the patents have given the major

12  industry players in trying to advance a privacy standard.

13             Were your patents causing frustration to the W3C

14  in their efforts to institute a privacy standard?

15             MR. ALBERT:  Objection.  Can we have a sidebar

16  on this issue?

17             THE COURT:  Yes.

18             (The following took place at sidebar.)

19             MR. ALBERT:  This is their inequitable conduct

20  argument, Your Honor.

21             MR. O'NEILL:  Patent misuse argument.

22             MR. ALBERT:  Well, it's really both.  These are

23  issues the Court preserved.  This is precisely what they

24  argued in the papers is what is supporting the two arguments

25  the Court reserved for later.

1          MR. PASAHOW:  Your Honor, Mr. Reed, in his

2    direct testimony yesterday, testified about the donation of

3    these patents to the W3C and suggested it happened under

4    circumstances which are dramatically unlike the truth; and I

5    would like to explain that there was no voluntary donation

6    of these on the W3C audience, and it was only after they got

7    an opinion letter and published it showing that there was no

8    infringement of his privacy standard that they went ahead

9    and agreed to allow what the witness testified to yesterday.

10   And that it is another example of them grossly overvaluing

11   their patents and having inflated views of their worth

12   because what he says in this document is the patents are

13   worth $25 to $30 million for this and they wind up giving

14   them away for free.

15          MR. ALBERT:  If he wants to point to the $25 or

16   $30 million valuation issue, that's one thing.  But the rest

17   of it is all about inequitable conduct.

18          THE COURT:  However, your client did say

19   yesterday that he gave these patents away to them.

20          MR. ALBERT:  Yes, just on that issue, but the

21   rest of the statements of the interactions are precisely the

22   basis --

23          THE COURT:  What he is saying is he is leaving

24   an implication he gave them away voluntarily.  That is the

25   implication he gave.

Reed - cross

1                MR. ALBERT:  He said he gave a royalty-free

2       license for certain purposes which was going to add value

3       for both sides.  That's all he said.

4                THE COURT:  No, but he opened up the door to sit

5       there and suggest he gave them away.  Now, you can modify

6       your questions so that they don't suggest or try to suggest

7       patent misuse.  I don't think inequitable conduct so much.

8                MR. ALBERT:  Patent misuse is more the point.

9                THE COURT:  Patent misuse.

10               MR. PASAHOW:  I will do that, Your Honor.

11               THE COURT:  Modify it, and you will be allowed

12      to explore whether this was, you know, along the lines of

13      being voluntary or whether it was sort of not so voluntary.

14               MR. PASAHOW:  Yes, Your Honor.

15               MR. ALBERT:  Thank you, Your Honor.

16               (End of sidebar conference.)

17      BY MR. PASAHOW:

18      Q.    Now, I believe the question, sir, was were the

19      patents causing great frustration to the W3C in its effort

20      to have this privacy standard?

21      A.    Yes, they were.

22      Q.    And why was that?

23      A.    Brian McManus, who, as I just mentioned, had been

24      the CEO of the company.  I had been participating on the

25      first open standard for privacy on the Internet.  It was

Reed - cross

1    referred to earlier as P3P, standing for Platform For

2    Privacy Preferences Project.  It's a somewhat convoluted

3    acronym the W3C came up with.  It was the first standard.

4            People used Web browsers and started to get

5    concerned about their information, as Mr. Mushero testified

6    yesterday, cookies automatically tracking their movements

7    around the Internet, whether their personal information was

8    being used now as it related to websites, was it flowing out

9    there on the Internet?  Internet privacy was becoming a huge

10   issue.

11           We knew, I knew from early on our work on the

12   Intermind communicator attenuated to us on this issue of

13   privacy.  We talked about the core of the technology being

14   automation and control if you don't have control of that

15   automation you end up with this situation.

16           THE COURT:  Mr. Reed, please respond to the

17   question that has been asked.

18           THE WITNESS:  Okay.  So the Platform For Privacy

19   Preferences Project was the open standard that the W3C

20   wanted to create and I participated on that open standards

21   committee.  To try to keep the story short, I was a

22   participant until I think it was August or September of the

23   previous year.  Brian McManus was hired as the CEO of the

24   company.  He came from the telecom industry.

25           The W3C became aware of our -- we had told them

1    about patents and the patent portfolio and sat down and

2    said, you know, we don't want this to become a problem.  We

3    want to have this become an open standard for the Internet.

4    And he said fine, come to the table.  Sit there with the

5    other players.

6              After Mr. McManus was hired, Netscape joined the

7    P3P working group.  We had been in licensing discussions

8    with Netscape.  As soon as Netscape joined that group, they

9    sent an e-mail message to the other members of the P3P group

10   and said are you aware that Intermind's patents cover this

11   P3P standard that you are working on?

12             Now, we had already met.  I met twice with him

13   to explain to him that was the case, and he said no problem.

14   Come, be part of the group.  If that issue comes up, just

15   explain do you want that technology to become a standard

16   license.

17             And so I have been working at that point for

18   about, I think it was about six months on the P3P group.

19   When Netscape joined, they sent the e-mail around.  And the

20   head of the W3C, the administrative head sent me an e-mail

21   and said there's now a concern among the companies that the

22   patents might be, you know, an issue here.  So what is your

23   position?  And I thought, oh, this is wonderful.  We get

24   some acknowledgment from the companies, in fact, we have

25   created core technology in this area.

Reed - cross

1              Unfortunately, Mr. McManus, coming from the

2       telecommunications industry, decided that the stance the

3       company would take was to say we're going to license the

4       patents.  We're going to charge a royalty for the patents to

5       use this privacy standard.

6              I bitterly, bitterly opposed that stance against

7       all the other directors, who, because they had hired

8       Mr. McManus, said, no, we're going to go with his view.

9       And he sent a letter, under my name, because I was the

10      representative, back to the W3C to say we're going to charge

11      a license.  That is our stance.

12      Q.    So you had told the W3C that they could have an open

13      standard license that's free?

14      A.    They could have a license?  Okay.  Reask that

15      question.

16      Q.    Let me ask a clearer question.  What did you mean

17      when you said they could have an open standard license?

18      A.    Are you talking about in my conversation with Tim

19      Berners-Lee?

20      Q.    Yes?

21      A.    What I had said was, and I personally represented

22      this to Mr. Berners-Lee.  I said the company would provide

23      the necessary license for this to become an open standard.

24      Q.    And did you discuss cost?

25      A.    When you do a license for an open standard, for World

1    Wide Web, for things on the Internet, it's a royalty-free

2    license.  You can't charge royalties and have it widely

3    adopted.  So I had told Mr. Berners-Lee, of course, if we're

4    going to participate in an open standards forum, we're going

5    to provide a royalty-free license.

6    Q.    Okay.  Now, we're looking at this July 1999 memo that

7    you wrote.  And then part down this page, you talk about a

8    strategy and you say there are several other advantages to

9    this strategy.

10              Do you see that?

11   A.    Yes.  What is the strategy I'm talking about?

12   Q.    And then you explain it.  You say maximum return on

13   the intellectual property.

14   A.    Excuse me.  I don't know what strategy I'm talking

15   about here.  Can I take time to read this?

16   Q.    Of course.

17   A.    Can we highlight the paragraph right before that so I

18   can see what the strategy is?  The jury can see what the

19   strategy is?

20   Q.    Why don't we go on and I'll ask the questions; okay?

21   A.    I'm sorry.

22   Q.    You are talking about the second option, selling the

23   patented technology to the industry.

24   A.    How do I know it's the second option?

25   Q.    If you look up on the page, you see, you begin at the

Reed - cross

1    second option, selling the patented technology to the

2    industry is greatly increased in feasibility.

3    A.      I'm sorry.  The second of the overall options, yes.

4    Q.      And then you get down there to this paragraph,

5    maximum return on the intellectual property.  And you say:

6    Without question, the consortium will pay more for the

7    patents than any single player.  My own belief is that with

8    the patents issued and P3P poised where it is, the base

9    price we should ask a consortium for the full patent

10   portfolio and all our digital address and privacy filter

11   technology should be $25 million.

12           So that was your opinion at the time; is that

13   correct?

14   A.      In the context of everything else that is said here,

15   including the context I'm trying to point out, that's what

16   I'd said.

17   Q.      Now, did the company charge the W3C $25 million?

18   A.      We did not.

19   Q.      Why not?

20   A.      Because the W3C would never have paid for a license.

21   It was a tactic I was taking with these, the other directors

22   in the company to say if you want to even explore that,

23   let's go and try and see if they are going to consider

24   paying a license.  This would have been the first time that

25   W3C ever would have paid a license for intellectual property

1   for the Web.  I was extremely doubtful that they would ever

2   do that, as it would set a precedent that they never wanted

3   to repeat and they never have repeated.

4   Q.     Well, isn't it true that the next thing that happened

5   is the W3C published an opinion letter that there was no

6   infringement of your patents?

7   A.     I think it was about eight or nine months later, yes.

8   Q.     Could we look at Exhibit 586?

9                MR. ALBERT:  Objection, Your Honor.

10               THE COURT:  Sidebar.

11               MR. ALBERT:  Yes.

12               (The following took place at sidebar.)

13               MR. ALBERT:  This is irrelevant and prejudicial.

14   They're getting into a different infringement analysis all

15   together by somebody else of a different set of.

16               THE COURT:  And I'm a little bit concerned about

17   that.  That is not the analysis that is going to be used.

18   What do you plan to use the document for?

19               MR. PASAHOW:  Just the fact that was the W3C's

20   next step.  I don't care if the exhibit goes in evidence or

21   not.

22               THE COURT:  And you can't show it to the jury.

23               MR. PASAHOW:  Okay.

24               THE COURT:  Okay.

25               (End of sidebar conference.)

Reed - cross

1    BY MR. PASAHOW:

2    Q.    So I believe the question, sir, was the next step was

3    the W3C published an opinion letter?

4    A.    Yes, as I said.  I can't remember how much later.

5    Q.    And it indicated that the W3C did not infringe?

6               MR. ALBERT:  Your Honor, this is the same issue.

7    May we?

8               THE COURT:  You have already with asked and

9    answered the question.

10   BY MR. PASAHOW:

11   Q.    Could I ask you to look at Exhibit 526, please?

12   A.    That 526?

13   Q.    Yes, sir.  This is an e-mail you wrote; is that

14   correct?

15   A.    Yes.  That is an unusual form of the address, but

16   yes.

17   Q.    And part of the e-mail is an article; is that

18   correct?

19   A.    Let me go through it.

20   Q.    If you look down in it --

21              MR. ALBERT:  Your Honor, we have the same

22   objection to this article.  It's the same issue.

23              THE COURT:  Side bar.

24              (The following took place at sidebar.)

25              THE COURT:  Well, it's kind of interesting on

Reed - cross

1    this one because they are talking about it between

2    themselves; right?

3                 MR. ALBERT:  Yes.

4                 THE COURT:  The gentleman by the name of Evan

5    and the company for Mr. Drummond.

6                 MR. PASAHOW:  Yes.

7                 THE COURT:  And what questions were you planning

8    to ask on this type of question?

9                 MR. PASAHOW:  The end here, it says there was a

10   demand for royalty of $50,000 per year plus one percent of

11   all P3P-related transaction revenues.  Mr. Reed insisted the

12   numbers were consistent with intellectual licensing fees.

13                THE COURT:  Okay.

14                MR. ALBERT:  Just that portion.

15                THE COURT:  That portion.

16                MR. ALBERT:  Just that portion, that's fine,

17   Your Honor.

18                THE COURT:  That portion will be allowed.

19                (End of sidebar conference.)

20   BY MR. PASAHOW:

21   Q.    So if we could go to the end of that e-mail, in the

22   second page, just before the end, there is an indication in

23   this article that is quoting someone and it says:  Lucas

24   cited Intermind's demand for minimum royalties of $50,000

25   per year, plus one percent of all P3P-related transaction

Reed - cross

1   revenues.

2               Was that what Intermind was demanding?

3   A.      I need to go back and look at the letter Brian

4   McManus wrote, but I have no reason to believe that is not

5   what the terms were.  I do remember that the terms were

6   absolutely something the W3C would never agree to.

7   Q.      The next sentence says Reed insisted that the numbers

8   were consistent with normal licensing fees.  That is you; is

9   that correct?

10  A.      As I said, that letter was sent out under my name

11  because I was the representative of the W3C under tremendous

12  personal duress.

13  Q.      You're saying that where Reed insisted that the

14  numbers were consistent with normal licensing fees, that's a

15  reference to the original letter?

16  A.      I'm not sure what that's a reference to.  It looks

17  like -- it looks like it's quoting from -- I'm not sure what

18  it's quoting from.  It looks lake an article about the

19  controversy, which was widely covered in the press,

20  especially the Internet press.

21  Q.      Did you speak to reporters in the Internet press

22  about it?

23  A.      I did.  It was extremely difficult because I was

24  still the public face of the company.  The company had taken

25  the stance, and myself, privately, bitterly opposed it, and

Reed - redirect

1    knew that it was going to -- it was going to cut our

2    throats.

3              MR. PASAHOW:  I have nothing further, your

4    Honor.

5              MR. ALBERT:  Shall I redirect at this time, your

6    Honor?

7              THE COURT:  Yes.  Begin your redirect, please.

8                      REDIRECT EXAMINATION

9    BY MR. ALBERT:

10   Q.    Good afternoon, again, Mr. Reed.

11   A.    Good afternoon, Mr. Albert.

12   Q.    Now, Mr. Pasahow asked you this morning where in your

13   patent you described your 1-click invention.

14            Do you recall that discussion?

15   A.    Yes.

16   Q.    And you indicated that there were a number of places

17   and you did not have them all in front of you?

18   A.    Right.  I wrote a declaration about that and helped

19   prepare a table with all the references.

20   Q.    All right.  And at one point in that discussion, you

21   discussed Column 14 of your specification this morning with

22   Mr. Pasahow.

23            Do you recall that?

24   A.    Yes.

25   Q.    Now, if I could direct your attention to Columns 121

Reed - redirect

1   and 122 of the specification.  In particular, if you have

2   Joint Exhibit 9, which is the '710 patent.  And that's the

3   same specification we looked at this morning, right,

4   although it was with the '325 patent; is that right?

5   A.    Yes.  I'm not sure it's in this book.  I see Joint

6   Exhibit 3 and 10.

7   Q.    Well, if you turn to Exhibit 3 in that book.

8   A.    I'm sorry.  Three is the '325.

9   Q.    Three is the '325 patent, yes.

10  A.    Yes.

11        MR. ALBERT:  Now, if you could go to Columns 121

12  and 122, please?

13  BY MR. ALBERT:

14  Q.    And, Mr. Reed, while we're getting this up --

15  A.    Yes.

16  Q.     -- do you have it in front of you in the document?

17  A.    Columns 121 and 122, yes.

18  Q.    Now, if you look at the first paragraph down, it's

19  intended on Column 121, where it says, to begin using this

20  account.

21        Do you see that?

22  A.    Yes, I do.

23  Q.    Can you tell the jury whether this section of the

24  patent here provides a further description of your 1-click

25  invention?

Reed - redirect

1    A.     Yes.

2    Q.     Would you explain how it does that?

3    A.     Yes, I'm happy to.

4              This part of the patent actually -- I use a

5    Swiss Army knife analogy because the patent is actually set

6    up that way.

7              First, it describes a core invention.  Then

8    it describes a number of control processes of the control

9    invention.  Then it describes a number of what we call those

10   partner service processes, things that could be performed by

11   a third-party server.  That's divided into functional

12   features that could be done, just like the features of the

13   Swiss Army knife.

14             This section is called payment service objects

15   and partner service, so it's about how electronic payment is

16   accomplished automatically by the invention.

17   Q.     Could you show us where in this paragraph you have

18   discussion of some of those features?

19   A.     Yes.  We start out here -- this is the portion of the

20   section that's actually, you know, about two columns into

21   it.  And where we explain how you set up a payment partner

22   server to perform these automated purchasing transactions.

23             And we can walk through this section because it

24   basically , in patentese, describes just what we were

25   showing in that picture yesterday.

Reed - redirect

1             First, to begin using this account, meaning a

2      merchant account with a customer -- in other words, this is

3      a merchant register with a payment partner service saying, I

4      want to start using your services.

5             So the merchant includes the merchant account

6      certificate.  That's the package of data that's created.

7      It's called a certificate here because it has what's called

8      a, key included with it.

9             Digital keys are essential to signing messages,

10     encrypting them so that they're secure when you send them

11     over the Internet.

12            All of this whole section is very dense, because

13     it has a lot of information about security.  And that

14     involves encryption and it takes a lot to describe.

15            So the merchant account certificate contains the

16     merchant information and a link, what we call link component

17     object from the payment service object, where the merchant

18     wishes to use payment services.

19            So that basically says the merchant can say,

20     here is the payment services I want to use.  I want to use

21     Visa, MasterCard and PayPal.  Okay?  We call those payment

22     service options.  And the merchant says, in my account, I

23     want to use those three.

24     Q.    Now, if you go to the sentence -- if you skip down

25     three lines and pick up with the sentence that begins, The

Reed - redirect

1    merchant can indicate.

2    A.    Yes.

3    Q.    What are you describing in that passage?

4    A.    What we're saying is that the merchant can then

5    indicate for each of those payment service objects that

6    they've chosen, as I said, Visa, MasterCard, PayPal, that

7    they can use the names or logos of such appropriate credit

8    card, debit card, so on, in a product ordering form, so

9    on.

10                  We were envisioning you could have a form

11   that not only gave you a 1-click button, actually gave you

12   multiple 1-click buttons, and you could choose the one you

13   wanted to represent the form of payment you would use.

14   Q.    What do you describe in the next sentence?

15   A.    Okay.  So the next one is when the customer actually

16   orders one of these, when a customer chooses one of these

17   options and submits the data input form.

18                  So that's, again, we were saying, okay.

19   Now we've got, again, not just one 1-click button; several,

20   representing the different forms of payment.  All you have

21   to do is click MasterCard.

22   Q.    Would that be an example of the 1-click idea?

23   A.    Yes, that would be 1-click.

24   Q.    Now --

25                  MR. ALBERT:  You can take this down.

Reed - redirect

1   BY MR. ALBERT:

2   Q.    Mr. Pasahow showed you a document that described a

3   number of companies that Intermind was looking at to

4   determine if they might be, I think you said, headed down

5   the road of infringing.

6   A.    Yes.

7   Q.    Do you recall that?

8   A.    Yes.

9   Q.    Did Cordance ever sue any of those companies?

10  A.    No.

11  Q.    Has Cordance ever sued anyone than Amazon for patent

12  infringement?

13  A.    No.

14          MR. ALBERT:  Now, could you bring up Plaintiff's

15  Exhibit 849?  Go to the second page.  Highlight the middle

16  paragraph.

17  BY MR. ALBERT:

18  Q.    Now, Mr. Reed, this is a document we looked at

19  yesterday, do you recall, in your direct testimony?

20  A.    Yes, I do.

21  Q.    And do you recall the date when you created this

22  document?

23          MR. ALBERT:  If you could just highlight that at

24  the bottom of the page.

25          THE WITNESS:  Yes.  January 4th, 1997.

1   BY MR. ALBERT:

2   Q.     Now, this is still eight months before Amazon came

3   out with 1-click; is that correct?

4   A.     Yes, before they introduced any of it to the website.

5   Q.     And what are you describing in the middle paragraph

6   that's highlighted here?

7                   MR. ALBERT:  And if you could highlight

8   just that first sentence, and then four lines down, where it

9   says, With as little as one mouse click.

10                  THE WITNESS:  Again, that you could carry out

11  any electronic transaction instantly, and with as little as

12  one mouse click.

13                  And, you know, it goes on to say, So we can

14  exchange name, addresses, credit card numbers, but

15  potentially also other information:  Shoe sizes, paper

16  checks, all of those things done manually.

17                  If you use our technology, all of that

18  information will be transferred automatically with both

19  accuracy, because machines are exchanging the information.

20  They don't make the transcription mistakes that people do

21  typing into forms.

22                  If you ever typed in your credit card number

23  incorrectly to a form and then hit the submit button, then

24  the resulting mess that can take you ten minutes to unravel.

25                  So it's a huge advantage to have digital

1    accuracy, but the second thing is the security.  That's why

2    machines can -- can wrap that metadata, apply the keys,

3    secure the transaction.

4              We said you can get all of this convenience with

5    as little as one mouse click, and specifically to handle

6    electronic invoicing an payments, even electronic banking.

7    Q.    How does the 1-click technology that you described in

8    this January 1997 document relate to the 1-click technology

9    you described in your patent?

10   A.    That is the technology I described in the patent.

11   Q.    Now, could you bring up Defendant's Exhibit 449,

12   please?

13             And, Mr. Reed, this morning, counsel for

14   Amazon showed you this document.  Do you recall that?

15   Certain board minutes from Intermind?

16   A.    Yes, I do.

17   Q.    From August 13th, 1997?  And under new business, he

18   discussed the first paragraph there.  But I actually would

19   like to go down to the third paragraph, which he did not

20   show you.

21             And if you could highlight that one,

22   please.

23             Now, could you explain what you were discussing

24   in this board meeting as reflected in that paragraph, sir?

25   A.    Right.  The first thing I was explaining is that,

1    while our patent applications were pending with the Patent

2    and Trademark Office, we hadn't even received the first step

3    of what you get back.

4              So after you go back and forth with those

5    -- with your applications and any revisions, the step when

6    you finally know you're going to get a patent is called an

7    allowance.  That's when the Examiner finally comes back, and

8    when they showed either rejected or accepted, it's when you

9    finally get accepted.

10   Q.    And what did this discussion that you had at that

11   board meeting, what views were discussed within Cordance

12   about the value of your technology?

13   A.    Right.  Well, I just -- to finish that point, it's

14   not until they're accepted you even know the patent is going

15   to issue.  We didn't have acceptance yet.  Okay?  So I'm

16   explaining the status, and then I'm saying, follow the

17   discussion of our patent licensing strategy.

18   Q.    And what was your discussion at that board meeting

19   with regard to the license to Microsoft that Mr. Pasahow

20   asked you about earlier today?

21   A.    Excuse me?  Okay.

22   Q.    What was your discussion with regard to the license

23   to Microsoft, the proposed license to Microsoft that Mr.

24   Pasahow asked you about this morning?

25   A.    Oh, well, what we're going on here to do is to

Reed - redirect

1   explain for a patent portfolio of this, as I say, of this

2   breadth is rare.  It's rare to have a patent that covers a

3   whole Swiss Army knife and all the features that you can do

4   with it in technology like this.

5               We were discussing, so what are other

6   similar examples?  And we cite a company called StarSight,

7   whose entire business is based on licensing.  Only one

8   license to Microsoft was $20 million, and the company sold

9   for $279 million.

10              We felt the market value of our portfolio

11  could be considered comparable to StarSight's.

12              We provide another example in the last

13  paragraph, I mean the last sentence of the paragraph.

14              RSA Data Security is one of the best known

15  companies.  It's named for the three people that invented

16  digital encryption technology that I was describing earlier,

17  three professors.

18              They held the patents for public encryptography,

19  and they were sold for $198 million.

20  Q.     Now, lastly, with regard to the Microsoft license

21  that Mr. Pasahow had you discuss or the proposed license --

22  A.     Yes.

23  Q.     -- at the time you were having those discussions

24  with Microsoft, did you have any issued patents yet?

25  A.     No.  We didn't even have an acceptance yet.

1    Q.    Did you know whether those patents were ever going to

2    issue?

3    A.    You can never be certain a patent is going to issue

4    until you get an acceptance.

5    Q.    Now, the license that you were discussing with

6    Microsoft, was that a license to use 1-click shopping?

7    A.    No, not even close.  It was for the corkscrew

8    feature, the Push feature, and only on their browser and for

9    their operating system.

10   Q.    And did Microsoft say that they wanted a license to

11   implement a 1-click system?

12   A.    No.

13   Q.    Did they say they wanted a license to implement an

14   automated feedback system?

15   A.    No.  They didn't ask for -- well, in our discussions,

16   they didn't ask for a license for any other key feature, but

17   the final response we got back is, oh, for $250,000, we'll

18   take the whole Swiss Army knife.

19   Q.    Did that license have anything to do with the

20   technology that you were considering that is at issue here

21   today?

22   A.    No.

23              MR. ALBERT:  Thank you.  No further questions.

24              MR PASAHOW:  Just very few questions.

25              THE COURT:  I want to have a discussion with

Reed - redirect

1    counsel.

2              (Sidebar conference held as follows.)

3              THE COURT:  I want to know, are we going to do

4    direct, cross, we direct and recross?

5              MR PASAHOW:  I believe so.

6              MR. ALBERT:  I would see no reason to do

7    recross, Your Honor.

8              THE COURT:  What are your questions?

9              MR PASAHOW:  To point out the specification

10   section that he put up goes on to say, the user has to put

11   in the password or a key before the transaction is complete.

12             MR. ALBERT:  That's a very long specification.

13   It says a lot of things.  He could have covered any of that.

14             THE COURT:  I think right now --

15             MR. PASAHOW:  I didn't know that anyone was

16   going to point to that and say that was the 1-click

17   transaction.

18             MR. ALBERT:  You had three days of depositions

19   of Mr. Reed.  You had ample time to ask any questions you

20   would like.

21             THE COURT:  I'm trying to remember now, in his

22   original testimony when he was doing cross, he was directed

23   to that paragraph, and Reed said, no, I want to talk about

24   Paragraph 14.

25             MR. HORWITZ:  That's right.

Reed - recross

1          MR. ALBERT:  He said he wants to have his

2     declaration, because that listed --

3          THE COURT:  He also said he wanted to go to

4     Column 14.

5          MR. ALBERT:  He did.  He said that was one

6     example.

7          THE COURT:  That was one example.

8          MR. ALBERT:  So he did.

9          THE COURT:  Very minimal followup on this, but,

10    generally I'm not going to allow much in the way, if any, in

11    the way of recross.

12         MR. PASAHOW:  Thank you.

13         THE COURT:  Very limited.

14         MR. PASAHOW:  Yes, Your Honor.

15              (End of sidebar conference.)

16                   RECROSS EXAMINATION

17    BY MR. PASAHOW:

18    Q.    Mr. Reed, just very briefly, if you could go back to

19    Exhibit 3, which was the patent, and you were talking about

20    Column 121.

21    A.    Yes.

22    Q.    And you pointed out part of the beginning of that,

23    which you said indicated the 1-click purchase.

24              I will ask you to look down around line 50 and

25    from there to the end.  And you see it says, This data

Reed - recross

1    exchange method calls an authentication method.

2                So what gets started up above continues and it

3    calls another part of the program; is that right?

4    A.    Yes.  I believe that's what it's saying here.  You

5    have to have the context of reading the full paragraph.

6    Q.    And then, if we go down to line 55, it says, The

7    authentication method also digitally signs the purchase

8    order using the customer account certificate private key,

9    Step 4459.  It says, As described above, this key may be

10   stored as an encrypted element in the payment service object

11   and require a password from the customer to decrypt.

12   A.    Yes.

13   Q.    So the customer, after he clicked, would have to

14   supply this password; is that correct?

15   A.    It says, The key may be stored as an encrypted

16   element.

17   Q.    Yes.

18   A.    That means it may or it may not.  It's not required

19   that it be stored as an encrypted element.

20   Q.    Yes.  And then it goes on to say, Alternatively, the

21   customer may supply the key manually in some other way.

22               So it presents two options:  Either he provides

23   the password or he puts in the key some other way; is that

24   correct?

25   A.    Actually, above the section, it says, Authentication

1    is entirely optional.  Everything we're talking about here

2    is optional.  These are different options for how the buyer

3    would determine they want to control the security of their

4    transaction.

5    Q.    Sir, my point was just, you pointed out a section of

6    121 that was about a particular process, and that process

7    then called this data authentication method.  And in that

8    data authentication method, the customer still had to supply

9    a password or a key; is that correct?

10   A.    Only if the key was stored as an encrypted element.

11   It says the key may be stored as an encrypted element it

12   doesn't require the key to be stored as encrypted element.

13   The whole thing is optional.

14   Q.    It says if it's not stored as an encrypted element,

15   the customer has to supply it some other way; is that

16   correct?

17   A.    If it's not stored as an encrypted element.

18              MR. PASAHOW:  Thank you.  I have nothing

19   further, Your Honor.

20              THE COURT:  Thank you, Mr. Reed.  You may stand

21   down.

22              THE WITNESS:  Thank you.  And thank you to the

23   jury.

24              (Witness excused.)

25              THE COURT:  Are there still some materials up

1    there?

2                    (Pause.)

3                    THE COURT:  Now, as to time, counsel, what do

4    you plan to do?  We've got about a half an hour before we

5    break for lunch.

6                    Do you have one video read-in you can do?

7                    MR. ALBERT:  This is the time we'd be doing the

8    depositions, yes.

9                    THE COURT:  You would like to read in a

10   deposition?

11                   MR. ALBERT:  I'm trying to determine if there's

12   one we could do within that space of time.  We'll do one.

13                   THE COURT:  All right.  If you would like to,

14   counsel, you can explain to the jury what this means, and I

15   will also explain to the jury the facts that, about the

16   testimony.  So if you wish to do a transitional statement.

17                   MR. O'NEILL:  Cordance will call Peterson by

18   deposition.  I'm sorry.  Cordance will call Brian O'Neill by

19   deposition.

20                   Members of the jury, Mr. Brian O'Neill is an

21   Amazon employee who developed software for Amazon's website

22   and he has personally developed some of the software that

23   implements some of Amazon's feedback systems.

24                   Mr. O'Neill is not available to testify today,

25   and we're going to read you portions of testimony that he

O'Neill - designations

1    gave in May 2008 as part of this litigation.

2              I will be reading the questions that were

3    previously asked to Mr. O'Neill, and my colleague, Michael

4    Thomas, will be reading the answers that Mr. O'Neill

5    provided to those questions.

6              THE COURT:  A deposition is testimony just like

7    it is in court, except you're not in court.  It was taken

8    under oath.  The witness is sworn.

9              In addition, my understanding is, Mr. O'Neill

10   will be reading not only questions that were propounded by

11   Cordance, but also the questions that were propounded by

12   Amazon.  So both Cordance and Amazon's questions that

13   they've agreed to be presented to you are included.

14              (Brian O'Neill deposition designations read into

15   the record.)

16              "Question:  Start off with some background

17   information.

18              "Can you recount your education post high school

19   for me, please?

20              "Answer:  I have a Bachelor's of Science degree

21   in computer engineering from the University of Washington."

22              THE COURT:  Counsel, I'm going to ask you, could

23   you speak a little bit closer to the microphone.

24   BY MR. O'NEILL:

25              "Question:  And what was your title when you

1    started at Amazon.com?

2              "Answer:  Senior software engineer.

3              "Question:  Were you in a particular group?

4              "Answer:  Yes, communities.

5              "Question:  How would you define the communities

6    group in terms of responsibilities?

7              "Answer:  There are a few features we deliver on

8    the website.  Customer image upload was the feature that I

9    worked on initially.  At the time we were also responsible

10   for wish lists and wedding registries, customer reviews,

11   reputation, and that's primarily it.  At least at the time I

12   was there.

13             "Question:  Okay.  What is the difference

14   between reputation and reviews?

15             "Answer:  Reputation is responsible for

16   collecting votes for customer-contributed contents and then

17   ranking that content.

18             "Question:  And what's reviews, then?

19             "Answer:  Reviews?  It allows customers to

20   provide feedback on products.

21             "Question:  All right.  Let's talk about

22   customer reviews, but before we do, customer reviews, is

23   that the only type of reviews that you actually worked on.

24             "Answer:  Yes.

25             "Question:  And the only type of feedback?

1          MR. THOMAS:  There's an objection at this point.

2     Do you want me to read it?

3          MR. O'NEILL:  No.

4          "Answer:  Yes.  The question again is?

5          "Question:  And the only type of feedback?

6          "Answer:  Yes.

7          "Question:  So when a review is submitted to the

8     Web server, what is the code that would be used to receive

9     that post of the review, to process it initially?

10          "Answer:  It's the customer review service.

11          THE COURT:  Before you continue on, are you able

12     to hear both?

13          A JUROR:  No.

14          THE COURT:  Okay.  That's what I was afraid of.

15          I'm going to ask you to speak up.  I'm also

16     going to ask you to speak a little slower when you respond.

17     We all have a tendency, that when we read something, we

18     mumble a little bit and we also read it faster than we would

19     normally talk.

20          MR. THOMAS:  Okay.

21     BY MR. O'NEILL:

22          "Question:  And is that run on the Web server?

23          "Answer:  No.

24          "Question:  So kind of the first place the

25     review process is called the CustomerReviewService?

1          "Answer:  The review of pass through the Web

2     server.

3          "Question:  Okay.  And then will it reach the

4     CustomerReviewService?

5          "Answer:  Yes.

6          "Question:  And where does it go after it

7     reaches the CustomerReviewService Service?

8          "Answer:  It goes into our CMTY database.

9          "Question:  So -- maybe if you could just step

10    me through a high level how the CustomerReviewService would

11    process a request by the Web server for a particular review

12    filtered in a particular way.  Let's say -- take a simple

13    example, the Web server wants to include -- someone clicks

14    on the browser and says, see all reviews.

15          Can you step me through the process of how that

16    information would be -- how the request would be made to the

17    database and the information transferred back?

18          "Answer:  I need more context.  All reviews on

19    what?

20          "Question:  On a product.  I'm sorry.  And let's

21    do a specific example.  Say I'm looking at a detailed page

22    for a book on Amazon.com and I'm browsing through the

23    reviews, you know, a subset of reviews that are given there,

24    and I want to see all of them, so I click on the link, see

25    all reviews.

1            "Answer:  Okay.

2            "Question:  Can you step me through the process

3    of how that request would be passed on to the database and

4    the information that would be transferred back?

5            "Answer:  I cannot provide all the details on

6    the Web server, because I was never responsible for that

7    code.

8            "Question:  Okay.

9            "Answer:  A request would be made to the -- to

10   CustomerReviewService, which would be search for all reviews

11   for this product ordered by highest rank.

12           "Question:  Okay.  And what is the format of

13   that message?

14           "Answer:  From the Web server to customer

15   reviews?

16           "Question:  Correct.

17           "Answer:  The way it's encoded, I can't say.

18           "Question:  What information is included in the

19   message.

20           "Answer:  Pretty much everything I just said.

21   There was an entry point in the CustomerReviewService, which

22   is to retrieve reviews.  Additional parameters are supplied

23   to determine exactly which reviews are requested.

24           "Question:  So the message, you don't know the

25   message format?

1          "Answer:  No.  That's hidden away.

2          "Question:  Okay.  But there's going to be

3   something indicating that it should use the entry point to

4   retrieve reviews?

5          "Answer:  Yes.

6          "Question:  So the Web server passes a query to

7   the CustomerReviewService.

8          "Answer:  Not in a raw form.  Indirectly, by

9   stating it wants reviews.

10          "Question:  Is there a particular command that

11   means I want reviews?

12          "Answer:  I don't know the exact name of the

13   command.

14          "Question:  But there is some command?

15          "Answer:  Yes.

16          "Question:  And is there some command that says,

17   by the way, when you get me the reviews, give them to me in

18   the order by the highest rank?

19          "Answer:  That's a parameter pass.

20          "Question:  But does that parameter instruct the

21   CustomerReviewService to use a particular method to rank the

22   reviews?

23          "Answer:  It does not use this to computer rank.

24          "Question:  Okay.

25          "Answer:  It assumes that the rank is already

O'Neill - designations

1   available.

2                "Question:  Okay.  So when they retrieved from

3   the TOPPS database, they're already in a particular rank.

4                "Answer:  Yes.

5                "Question:  Is there an instruction that can be

6   given to the CustomerReviewService to reorder them in a

7   different rank?

8                "Answer:  To reorder?  Technically, no.

9                "Question:  I know you didn't know the exact

10  format of the messages, the HTTP messages that are passed,

11  but they're not passed using something like the SOAP

12  protocol, are they?

13               "Answer:  Does not use SOAP.

14               "Question:  Does it use anything like SOAP?

15               "Answer:  Yes.

16               "Question:  Is there an internal name that

17  Amazon uses to refer to those messages?

18               "Answer:  Datagram.

19               "Question:  I've seen references to something

20  called PublishSubscribe.  Does that have any relation to

21  these datagrams?

22               "Answer:  PublisheSubscribe is a different

23  messaging technology.

24               "Question:  Then the datagram?

25               "Answer:  The word "datagram" is used in

1    multiple contexts.

2              "Question:  Okay.

3              "Answer:  Datagram merely is a message encoding.

4              "Question:  But what sorts of things are

5    included in the datagram that's included -- that is

6    transferred from the Web server to the

7    CustomerReviewService?

8              "Answer:  Only the arguments necessary for

9    invoking an activity.

10              "Question:  And there's data included?

11              "Answer:  The review text, yes.

12              "Question:  Is there metadata included in the

13    datagrams transferred from the Web server to the

14    CustomerReviewService?

15              "Answer:  The datagram must be formatted

16    correctly.  It does not contain instructions other than the

17    data itself.

18              "Question: Is there data about the data in the

19    message?

20              "Answer:  No.  Just the data.

21              "Question:  So how does the receiving device

22    know what type of data it's receiving?

23              "Answer:  It's up to the communication protocol,

24    which I'm not terribly familiar with, for making sure that

25    the proper activity is invoked.

1        "Question:  Let's move on to Exhibit 53-A.

2   Actually, let me represent to you, 53-A was the Web page

3   that was returned in response to the post of 52, the get of

4   52.

5            53-B was the header that accompanied HTML that

6   was returned to create the Web page 53-A.

7            53-C is the HTML code itself that followed that

8   header.

9            And 53-D is a portion of the HTML code which was

10  extracted from the beginning on Page 75 of the HTML code and

11  ending at the very end of Page 89 of the code.

12           And my understanding is that the portion of the

13  code that has been marked as Exhibit 53-D is actually the

14  HTML form -- the code used to create the HTML form that's

15  processed when a customer submits the review for the

16  preview.

17           "Are you able to read HTML?

18           "Answer:  Somewhat.

19           "Question:  Okay.  Let's look at Exhibit 53-D.

20           "I should also let you know just for the record

21  that we've removed some of the white space and what not to

22  make it easier to read but the context should be the same as

23  in 53-C.

24           "If you look at the very beginning of this,

25  there is a form cost, crForm.

 1              "Answer:  Yes.

 2              "Question:  What does that mean?

 3              "Answer:  I don't.

 4              "Question:  You don't know what a crForm cost

 5    is?

 6              "Answer:  I don't.

 7              "Question:  What about the 'method=post?'  What

 8    does that mean?

 9              "Answer:  That instructs the browser how to

10    transmit the message to the server.

11              "Question:  And what about 'action=,' and then

12    there is a path there?

13              "Answer:  That tells the Web server what path

14    should receive the post.

15              "Question:  And were those instructions to the

16    Web browser or to the Web server?

17              "Answer:  To the Web server.

18              "Question:  If you would turn to Page 13 of

19    the -- of 53-D.

20              "At the very top of that page, is that the

21    definition of that button?

22              "Answer:  All I can say is it looks like it.

23              "Question:  Just to be clear, Exhibit 53-C --

24    make sure I have the right one.

25              "Yeah.  53-C, which is the HTML, that includes

1    data; right?

2              "Answer:  All I can say is that it looks like

3    it.

4              MR. THOMAS:  I'm sorry.

5              "The Witness:  In the sense that a Web page is

6    data, yes.

7              MR. O'NEILL:  You have to go to a different part

8    of the transcript.

9              MR. THOMAS:  I have you on 103.  Your question

10   was just asked on 103.  Your question was just asked.  Are

11   you on 104 now?  I'm sorry.

12             MR. O'NEILL:  No.  103, the answer is Line 17.

13             MR. THOMAS:  I'm sorry.

14             "Answer:  Does the HTML include data?

15             "Question:  Yes.

16             "Answer:  In the sense that a Web page is data,

17   yes.

18             "Question:  It includes metadata?

19             "Answer:  I wouldn't be able to identify whether

20   or not, considering size of this.

21             "Question:  Let's look at 53-B.

22             "Again, this was the header that accompanied the

23   HTML code.

24             "Mr. Abrahamsen:  It's the header that preceded

25   the HTML code which is marked as Exhibit 53-C.

1          "Question:  What is the first line on that, the

2     "HTTP/1. X 200 OK"?  What is that telling the Web browser?

3          "Answer:  "200 OK" is a standard message saying

4     that the request was completed correctly.

5          "Question:  Okay.  And the HTTP part?

6          "Answer:  That's the version of the protocol

7     that the server is using.

8          "Question:  The date field, what is that telling

9     us?

10          "Answer:  That's the date of the content as

11     defined by the server.

12          "Question:  Is that metadata?

13          "Answer:  No, it's a time stamp.

14          "Question:  What about the "date" portion?  Is

15     that metadata?

16          "Answer:  That's the name portion of a name

17     value pair.

18          "Question:  But your testimony is that is not

19     metadata?

20          "Answer:  It is not metadata.

21          "Question:  Okay.

22          "Let's turn to Exhibit 54 now.

23          "I will represent to you that this is the HTTP

24     post that was transmitted to the Web server -- or from the

25     Web browser, anyway, when the 'preview your review' button

O'Neill - designations

1    on the second page of 53-A was pressed.

2              "Let's step through it just a few of these.  On

3    the header, at the very end, it says 'action=preview.'  What

4    is that telling a Web server to do?

5              "Answer:  That's a parameter which is passed --

6    I don't know exactly how the parameter is interpreted,

7    though.

8              "Question:  What would be the purpose of setting

9    a parameter along with a post like this?

10             "Answer:  It's a regular parameter passed

11   through a function.  Function can interpret a parameter

12   however it sees fit.

13             "Question:  Can you tell me what Exhibit 59 is,

14   please?

15             "Answer:  This is the file which I was referring

16   earlier, which -- which is all the entry points into the

17   CustomerReviewService.

18             "Question:  What I would like to go over now is

19   the process by which feedback information is retrieved from

20   the TOPPS database and brought back to the -- the Web

21   browser.  And the example we have chosen is the

22   'GetReviewsByStarRating' which we had discussed earlier, and

23   I think your testimony was that is something that is handled

24   by the communities group; is that right?

25             "Answer:  The reviews is part of the

1    communities.

2                "Question:  But retrieving reviews by star

3    rating is something that communications handles?

4                "Answer:  Yes.

5                "Question:  I'll represent to you that Exhibit

6    62-A is a detail page for a particular product, in this case

7    a book, and 62-B is the HTML code used to render that page.

8                "If you look on Page 5 of 12 of 62-A, you will

9    see a link there that says '5 star,' the lower left-hand

10   corner.

11               "Answer:  Yes.

12               "Question:  What is your understanding of what

13   happens when that link is clicked on, at a high level?

14               "Answer:  Presented a page which shows all the

15   reviews from this product that have been given the five-star

16   rating.

17               "Question:  And the rendering of that page

18   requires retrieval of the feedback information from the

19   TOPPS database; correct?

20               "Answer:  It is retrieval of reviews information

21   from the TOPPS database.

22               "Question:  If you could now to Exhibit 63-A and

23   B.

24               "I'll represent to you that 63-A is the HTTP get

25   command that was sent on the five-star link we looked at was

684

O'Neill - designations

1    pressed.

2              "63-B is a reformatted version of 63-A with just

3    some of the fields separated to facilitate the readability

4    of it.

5              "I guess the first question is" what is it in

6    this get request that identifies the feedback information

7    that is to be retrieved?

8              "Answer:  All the elements of the URL.

9              "Question:  So the -- following the

10   www.amazon.com, there is a path there to review product, and

11   I think we discussed earlier, that would lead to a

12   particular function?

13             "Answer:  Yes.

14             "Question:  Following that, is that next number,

15   the ASIN?

16             "Answer:  The number 0451207149 is an ASIN.

17             "Question:  And what is the following field, the

18   'FilterBy=addFiveStar,' -- what is that telling the Web

19   server and downstream devices to do?

20             "Answer:  It is only interested in five-star

21   reviews.

22             "Question:  But is it telling some component

23   downstream in particular to only retrieve five-star reviews?

24             "Answer:  It's the CustomerReviewService that

25   has to do the retrieval of the reviews.

1          "Question:  So that is going to cause the

2     CustomerReviewService to implement a function that retrieves

3     only five-star reviews?

4          "Answer:  It will not implement the function, it

5     will execute the function.

6          "Question:  So it tells the CustomerReviewService

7     to execute a function that retrieves only five-star reviews?

8          "Answer:  Yes.

9          "Question:  Now, 63-A, when the information in

10    that get is received by the Web server, what then is passed

11    along to the CustomerReviewService for processing?  And

12    we're talking about in a specific example, what would be

13    passed along?

14         "Maybe I can ask from a perspective, what would

15    be received by the CustomerReviewService in response to a

16    get command like this?

17         "Answer:  It's going to call an appropriate

18    action to retrieve reviews, and it's going to pass along a

19    parameter, whatever add five star maps to.

20         "Question:  And if you look back to Exhibit 59,

21    can you identify the particular function that would be

22    employed?  Or action, you said?

23         "Answer:  I see two functions which may be

24    appropriate, but I don't know specifically which ones would

25    be invoked.  'GetReviewsByASIN' at the end of Page 22 and

1    'GetReviewsBySubject' on Page 25.

2              "Question:  Are each of those functions employed

3    in at least one circumstance in the operation of the

4    website?

5              "Answer:  Are you asking me do I know that they

6    are ever used?

7              "Question:  Yes.

8              "Answer:  At least one of them are used.

9              "Question:  But you don't know whether either

10   one of them are used?

11             "Answer:  I know that one of them is used.  I

12   don't know which one.

13             "Question:  Let step through these, please,

14   starting on Page 22.  The 'GetReviewsByASIN' function.  I

15   guess it spells over on to Page 23 right away.

16             "What does the MarketplaceID do?

17             "Answer:  Marketplace ID defines the retail

18   site.  U.S., Canada, et cetera.

19             "Question:  Is that used for any purpose in the

20   community service at this point in time?

21             "Answer:  Yes.

22             "Question:  Now, going back to Page 23 of

23   Exhibit 59, the sort by input.  What is that telling it to

24   do?

25             "Answer:  It's asking for reviews in a

O'Neill - designations

1    particular order.

2              "Question:  Is that information included in the

3    get of 63-B?

4              "Answer:  No.

5              "Question:  Do you know if that is a necessary

6    input?

7              "Answer:  It is not necessary.

8              "Question:  Are there any calls made that

9    include a sort by input?

10             "Answer:  Yes.

11             "Question:  What is an example of those?

12             "Answer:  You can ask for the newest reviews, so

13   it would be by date.

14             "Question:  And where would that instruction be

15   in the get command?

16             "Answer:  It would be appended to the end of the

17   get command and the URL.

18             "Question:  So similar like the 'filterBy' in

19   the example we have here?

20             "Answer:  Yes.

21             "Question:  Let's look at the next one that you

22   have handed out as a possibility.  On Page 25, I think you

23   said 'GetReviewsBySubject' is one that may be called.

24             "Answer:  Yes.

25             "Question:  Do you see any differences between

1    those two?

2                "Answer:  Yes.

3                "Question:  What differences do you see?

4                "Answer:  The difference is that this takes a

5    subject input instead of an ASIN input.

6                "Question:  Okay.

7                "But in terms of the different functions that

8    could be performed, they appear to be the same?

9                "Answer:  The subject is a more general term for

10   ASIN.

11               "Question:  But, I mean, in terms of the

12   functions that we, that are defined, like the 'sortBy',

13   'filterBy', those sorts of things, those appear to be the

14   same between the two?

15               "Answer:  Yes.

16               "Question:  Exhibit 70 was -- appears to have

17   been last updated before you even arrived at Amazon; is that

18   right?

19               "Answer:  Yes.

20               "Question:  I just have a couple questions about

21   this.

22               "The second sentence under the description, it

23   says, 'customer reviews are one of the 'essential' features

24   requested by all of our partners and future marketplace

25   customers.'

1          "Is that still true?

2          "Answer:  I am not the business owner.  I don't

3     know.

4          "Question:  Within your group, is it viewed as

5     an essential feature?

6          "Answer:  The group I'm in now is caching.

7          "Question:  Within the communities group?

8          "Answer:  It's an important service within the

9     communities group.

10         "Question:  Why is it important?

11         "Answer:  Because we believe our customers like

12    to see customer reviews.

13         "Question:  Are you aware of any marketing

14    documents that evaluate the impact of customer reviews on

15    customer behavior at Amazon?

16         "Answer:  No.

17         "Question:  I'd like to identify as many use

18    cases as we can where the Web server obtains feedback

19    information from the TOPPS database.  Is that a list that

20    you could come up with off the top of your head?

21         "Or is there a document that describes that?

22         "Answer:  I am not aware of any document.

23         "Question:  So what are the scenarios where the

24    information is transferred from TOPPS to the Web server?

25         "Answer:  In communities I could think of, only

O'Neill - designations

1   a handful.  Customer Reviews, Discussions Customer Image

2   Upload, Listmania, and So You'd Like to Guide.

3              "Question:  So you --

4              "Answer:  So You'd -- y-o-u-'d -- Like to.  Like

5   at the beginning of a sentence.  'So you'd like to' guide.

6              "Question:  Is the mechanism for obtaining the

7   information from the reputation tables the same as that for

8   obtaining information from the customer review tables?

9              "Answer:  It's very similar.

10             "Question:  Is the information for populating

11  the reputation tables similar to that for populating the

12  customer review tables?

13             "Answer:  I can't say for sure.

14             "Question:  Do you have any idea at a high level

15  how that information is popular?

16             "Answer:  The process by which a review is

17  submitted is similar to the process in which a vote is

18  stored.  Other reputation calculations, I don't know how

19  that is done.

20             "Question:  By a vote, you mean either selecting

21  one of the five stars?  Is that an example of a vote?

22             "Answer:  A vote is, 'Did you find this review

23  helpful, yes or no?'

24             "Question:  What about the one- to five-star

25  selection?  Is that considered a vote?

1          "Answer:  That is not a vote.

2                 "Question:  What is that called?

3                 "Answer:  That's the star rating, which is part

4    of the review.

5                 "Question:  Any other use cases you can think

6    of.

7                 "Answer:  No.

8                 "Question:  Now, in terms of the customer

9    reviews and the use cases, I understand customer reviews is

10   one, but what are the circumstances where a user is

11   presented with customer reviews?

12                "You have your detail page.  I know that is one.

13   What are the other ways that customer reviews are retrieved

14   from the TOPPS database?

15                "Answer:  There is a page which shows all the

16   reviews written by a particular review author.

17                "Question:  Others use cases?

18                "We talked about the review by star number, by

19   number of stars.

20                "Answer:  That would be the review detail page

21   or the alt detail page, which, yes, just shows reviews for a

22   product without all the other product information.

23                "Question:  Review detail page.

24                "And a different name is alt detail page?

25                "Answer:  Sometimes the term alt detail page is

1    used.

2           "Question:  What are the other circumstances?

3           "Answer:  That reviews are surfaced?

4           "Question:  Yes.

5           "Answer:  On the customer profile page, if you

6    have ever communicated any community content, review or

7    image or list would create a profile page, and from there we

8    will link to recent reviews that you have written.

9           (Brian O'Neill deposition designations end.)

10          MR. O'NEILL:  Those are all the questions I

11    have.

12          THE COURT:  Thank you.

13          We will now break for lunch.  And we'll be

14    returning at 2:00 o'clock.  Thank you.

15          (Jury left courtroom.)

16          THE COURT:  Counsel, I know I had warned you

17    today that I was going to have a detention hearing in this

18    courtroom.  Then I realized that I would be disturbing you

19    badly probably to try to get everything wrapped up so I'm

20    going to have that at this time in another courtroom so you

21    don't have to worry about cleaning off your tables.

22          (The attorneys respond, "Thank you, Your

23    Honor.")

24          THE COURT:  Fortunately, I'm going back to my

25    old courtroom.  Judge Stark isn't here this week so I'm

1    going to use this courtroom.  I'll see you then at 2:00

2    o'clock.

3              MR. PASAHOW:  Your Honor, just one quick matter.

4              Mr. Reed testified about the '411 patent so you

5    may want to give the instructions we discussed.

6              THE COURT:  Yes, I will give that instruction.

7    You did mention it.  You moved to strike it but they did

8    hear it, so the question is do we tell them?

9              MR. ALBERT:  I think it was so tangential, and

10   it was in the information that was stricken.  That I would

11   suggest to the Court raising it only the first time it ever

12   actually is brought it into play.

13             THE COURT:  That's fine.

14             MR. PASAHOW:  That's fine.

15             MR. ABRAHAMSEN:  Your Honor, we also want to

16   make sure these exhibits are moved into evidence.

17             THE COURT:  I know.

18             MR. ABRAHAMSEN:  I apologize.

19             THE COURT:  That's okay.  That's all right for

20   being persistent.  Have you come to an agreement to all the

21   exhibits?  Is there any problem?

22             MR. ABRAHAMSEN:  We had a witness binder that we

23   identified.  They objected to some.  I think you sustained

24   one of the objections.

25             THE COURT:  That was just the objection on the

1   newspaper article.  I think everything else was okay.  At

2   least for your's.  At least for Cordance's.  When I use

3   your's, Cordance's exhibits.  I'm not certain that ...

4           (Counsel confer.)

5           MR. ABRAHAMSEN:  We had a procedure in place

6   where we disclose exhibits two days in advance, objections

7   were exchanged, et cetera.  These were, I thought all the

8   objections were raised before the proceeding.

9           MR. DONNELLEY:  Why don't we talk and see first.

10          THE COURT:  Why don't you make sure that you are

11  all on the same page --

12          MR. ALBERT:  Keep trying to do that.

13          THE COURT:  -- before you present it to me, and

14  then I will try to address it.  If not before the jury comes

15  back at 2:00, I will definitely address it after 5:00 or

16  when we close today.

17          MR. ALBERT:  Okay.

18          THE COURT:  And I will put you in charge of

19  reminding me that we have to address that issue, which you

20  have been very good at.

21          MR. ALBERT:  I think I can do that.

22          THE COURT:  Okay.

23          (Brief recess taken.)

24              AFTERNOON SESSION

25          THE COURT:  Before we call in the jury, there

1    are a couple things that I want to -- there's a matter I

2    want to bring up, a couple things I want to do.

3              On these transition statements, particularly

4    when we're doing depositions -- and you can do transition

5    statements for a live witness as well -- I think giving the

6    jury some context as to what the testimony is going to be

7    about, that is, not only identifying who the individual is

8    and a little bit of the background of that person that may

9    not be coming in through the deposition testimony, it might

10   not be a bad idea just to say to them, and these questions

11   relate to this, because I'm not certain the context that

12   when we did the last, the most recent deposition, I'm

13   concerned whether the jury is able to put it into any type

14   of context because they have not got even the whole picture

15   as to what the person was testifying about.

16             All right.  Now, on the exhibits, my

17   understanding is that you're providing 24 to 48 hours,

18   whatever the agreement is between counsel, a list of

19   exhibits that you intend to use for certain witnesses on any

20   particular day.  That does not necessarily mean all of those

21   exhibits are being used.

22             And my understanding is, what's to be

23   admitted are the exhibits that you actually used in front of

24   the jury.

25             MR. ALBERT:  I think we have an agreement on

1    the exhibits that we've been talking about, is my

2    understanding.

3              THE COURT:  I mean, when you give us the list

4    and give us the exhibits for the jury to be able to use, are

5    you intending, or was it the thoughts of counsel to include

6    in that list all of the exhibits that you've agreed to

7    versus exhibits that you actually presented to the jury and

8    talked about?

9              MR. ABRAHAMSEN:  There will be some items like

10   that, Your Honor.

11             MR. PASAHOW:  This list includes several that

12   were not talked about in front of the jury.  They weren't

13   things we were concerned about, so we did not object, but if

14   your Honor rules that they don't come in --

15             THE COURT:  Well, I am trying to find out what

16   you guys have thought that you were going to do, because I

17   would like to know about that now.

18             It may be a little bit problematic for the

19   witnesses that have testified so far, but I'm trying to find

20   out what your understanding was.

21             MR. PASAHOW:  We actually had not thought about

22   the problem until we got the list that included exhibits

23   that hadn't been shown to the witness.

24             MR. ALBERT:  But I thought our understanding had

25   been that we would make this exchange, and if there were no

1    objections, then anything that was on that list could be

2    offered in, although that said, we would not necessarily

3    choose to offer them all, just --

4              THE COURT:  In other words, you say, here's the

5    universe --

6              MR. ALBERT:  Right.

7              THE COURT:  -- here's what we may actually move

8    and here could be the universe of what was actually

9    presented to the jury.

10             MR. ALBERT:  Exactly.

11             THE COURT:  I understand that's what counsel has

12   agreed to.

13             MR. HORWITZ:  Your Honor, I think that's not

14   exactly right, but I don't think that we have an issue for

15   this first batch.

16             THE COURT:  Okay.

17             MR. HORWITZ:  We had than e-mail exchange,

18   where Mr. Day and I were talking about which approach that

19   you would take, because we know that different judges on

20   this Court take drastically different approaches.  And we

21   thought --

22             THE COURT:  Well, let me just ask this.  Who

23   takes the approach that if counsel has agreed to a whole

24   bunch of exhibits that have not been presented to the jury,

25   that you that we're still going to admit it?

1              MR. DAY:  Judge Farnan does.

2              THE COURT:  Judge Farnan does?

3              MR. DAY:  Yes.

4              MR. HORWITZ:  And what we thought was, what I

5     said to Mr. Day, and the response was, okay, was that we

6     thought you were more like the Judge Robinson's approach,

7     which is why we have been not putting things up on the

8     screen until we talk about them a little bit.  And I think

9     that that will be the most orderly way to go going forward,

10    but, as Mr. Pasahow said, we don't have any problem with the

11    documents that counsel have been talking about today.

12             THE COURT:  And that was my concern.  I had not

13    discussed this with you before.  I wasn't going to exclude

14    exhibits that you chose not to move before the jury but

15    could have mentioned, because that would be unfair.

16             I think from this point on, it's more

17    appropriate that what has been discussed and presented to

18    the jury are those exhibits, potentially, that could be

19    admitted.  And if there are some exhibits that are maybe

20    C.V.'s or something all those lines, I'm not going to --

21             MR. ABRAHAMSEN:  For example, your Honor, there

22    are some source code exhibits that our expert witness has

23    reviewed and relied upon that we'd like to get into

24    evidence.

25             THE COURT:  Now?

1          MR. ABRAHAMSEN:  But we don't want to have him

2     talk about those in front of the jury.

3          THE COURT:  Well, he could identify what they

4     were.

5          MR. ABRAHAMSEN:  You want him to go through that

6     exercise?

7          THE COURT:  He could identify what they are and

8     then that would be allowed.  I mean, that's what I've said.

9     You can do it in a very short-handed, short form way in

10    getting somebody to present it.

11         I understand.  I mean, what we saw during the

12    deposition testimony, obviously, was source code, which was

13    all of this gobbledygook that comes up that looks like curse

14    words.  It's a pattern of stuff.  When it comes up on my

15    computer, I'm saying, I have no idea what this is.  But I

16    don't think the jury got an idea as to what this was.  I

17    don't think they realized it was source code.

18         So I don't have a problem with an expert -- if

19    the parties have agreed to it being admitted -- and you can

20    do a short-handed way.  You don't want to sit here and say,

21    here, here's 30 pages of source code, or here's a pages of

22    this.

23         I don't want you to go through it in detail.

24    They can sit there and say, this is what source code looks

25    like.  This is what a printout of source code looks like.

1    This is what I reviewed and analyzed in coming to my

2    conclusion.

3              MR. PASAHOW:  Your Honor, if I might, as to

4    source code site, which is different than HTTP page code

5    that we were looking at, we'd actually like to keep that out

6    of evidence and just put in these place markers forward and

7    let counsel keep it in case it's necessary.

8              There is an enormous concern about security at

9    the Amazon site about source code becoming publicly known,

10   the possibility of hacking the site, and so they generally

11   ask that the source code not be put in in public records.

12             So what I would suggest is we just put in a

13   place marker for it and counsel keep a copy.  If anyone ever

14   needs it, it will be available.  But no juror is ever going

15   to look at the source code, and I think that the expert

16   opinion based upon it is going to be what the jury is going

17   to be hearing.

18             THE COURT:  How does the source code -- are you

19   suggesting that it's a piece of evidence that the jury does

20   not see?  You are not suggesting that?

21             MR PASAHOW:  I think the source code would be on

22   a disk; right?  Is that what you are suggesting?

23             MR. ABRAHAMSEN:  There are some printed-out

24   copies and there is a laptop with source code which actually

25   has not been objected to yet.  It was on our list.  They did

1   not object to it.

2               MR. PASAHOW:  Well, we had not understood --

3               MR. ABRAHAMSEN:  And just to create a record,

4   Your Honor, we understand the jury is 99.9 percent, they are

5   not going to look at the source code, but we need to create

6   a record and a factual predicate.

7               THE COURT:  That's what I'm trying to figure

8   out.  The record can be created without the document going

9   back to the jury, and I'm not comfortable that that can

10  happen.

11              And Amazon has a concern about making its entire

12  source code, or potentially its entire source code public.

13              Has anybody of heard of putting it under seal at

14  trial?

15              MR. HORWITZ:  Well, sometimes, your Honor, the

16  courtroom is cleared when --

17              THE COURT:  That's true.  So that evidence could

18  be under seal, so we could have it under seal, not actually

19  make it -- have it under seal, and if it's on a disk.

20              MR. PASAHOW:  Well, the huge chunk of it is

21  literally on a laptop, which we've kept secure.  So we

22  supplied the laptop with the code.

23              MR. ABRAHAMSEN:  As long as this code is

24  admitted into evidence, I don't think our expert actually

25  needs to talk about the code.

1                    THE COURT:  All right.

2                    MR. ABRAHAMSEN:  So I don't think there's a need

3     to seal the courtroom, but we just want to make sure it gets

4     into evidence and we have the factual predicate.

5                    THE COURT:  All right.  And that it will be

6     admitted into evidence under seal?

7                    MR. PASAHOW:  That would be fine.

8                    THE COURT:  All right.  Then we can do it that

9     way.

10                   MR. PASAHOW:  All right.

11                   THE COURT:  I'm hoping that's a current

12    analysis, but that's the only one I can come up with right

13    now.

14                   In continuing the testimony today, at least the

15    next couple of hours or so, is it the intent of Cordance to

16    present further deposition testimony at this time?

17                   MR. ABRAHAMSEN:  I'm sorry to report, but, yes.

18                   THE COURT:  No, that's fine.  That's fine.

19    That's the reason why I wanted to bring up the transition

20    statement.  I think putting what this testimony is about in

21    context is appropriate, I really do, and it gives the jury

22    sitting there an understanding as to what this person is

23    going to be testifying about.  I mean, you know, because I

24    listened to it, I was able to pick up stuff on it.

25                   I'm always concerned that they are not getting

```
 1    it, as to the importance of what their testimony was.

 2              Is everybody been comfortable with that?

 3              MR. ALBERT:  Yes, Your Honor.

 4              MR. PASAHOW:  Yes, your Honor.

 5              THE COURT:  All right.  Are we all ready for the

 6    jury now?

 7              MR. ALBERT:  Yes.

 8              THE COURT:  Let's bring in the jury.

 9              I'm going to try to handle the criminal matters,

10    if I can, in Judge Starks courtroom as much as I possibly

11    can.

12              (The jury entered the courtroom and took their

13    seats in the box.)

14              THE COURT:  Please be seated.

15              Members of the jury, good afternoon.

16              Is Cordance prepared to continue on?

17              MR. ALBERT:  Yes, Your Honor.

18              THE COURT:  And it's my understanding that

19    further deposition testimony will be presented at this time?

20              MR. O'NEILL:  That's right, your Honor.

21              THE COURT:  And it's going to be presented in

22    the same manner that had been presented this morning?

23              MR. O'NEILL:  Yes.  Cordance right now is

24    calling Kyle Peterson by deposition, and afterwards, we're

25    calling Thomas Keller by video deposition.
```

1          THE COURT:  We'll go through each one of them

2     and identify who they are, an overview, very high level

3     overview of what their testimony relates to?

4          MR. O'NEILL:  Yes.

5          So Amazon is call Mr. Kyle Peterson by

6     deposition, as we did before, and he is an Amazon employee.

7     He developed software for Amazon's website.  And this

8     software implements Amazon's 1-click shopping system, which

9     is being accused of infringement in this litigation.

10          And Mr. Peterson explains the operation of

11     Amazon's 1-click system.  This includes the creation of the

12     Web pages that you see examples of and relates to the

13     communications that are sent back and forth between the

14     customer's computer and Amazon's Web server.

15          Mr. Peterson also explains the operation of

16     Amazon's software that exists on its website, or how Amazon

17     receives requests to purchase items and how it processes

18     them in completing purchases.

19          THE COURT:  And also, members of the jury, my

20     understanding is that the examinations by both Cordance and

21     Amazon will be presented through one attorney, and --

22          A JUROR:  Is there a way to tell who's asking

23     the questions, whether it's the plaintiff or the defendant?

24          THE COURT:  We can do that.  We can indicate

25     that.

Peterson - designations

1              A JUROR:  Thank you.

2              MR. O'NEILL:  So previously, Mr. Peterson was

3    deposed by Cordance's attorneys.  Cordance's attorney has

4    asked him questions, and Mr. Peterson --

5              THE COURT:  Mr. O'Neill, I think that --

6              MR. DONNELLEY:  I was going to say there are no

7    questions for these witnesses.

8              THE COURT:  For this witness?

9              MR. DONNELLEY:  For any of these witnesses.

10             THE COURT:  All of the questions that are going

11   to be asked I understand are from Cordance?

12             MR. DONNELLEY:  Yes.

13             MR. O'NEILL:  Okay.  Now, during the deposition,

14   Amazon did not ask the witness any questions.

15             THE COURT:  All right.  Thank you.

16             MR. O'NEILL:  All right.  So Amazon calls Kyle

17   Peterson to present evidence of infringement by Amazon's

18   1-click system.

19             And, again, my colleague, Michael Thomas, will

20   be providing the answers that Mr. Peterson previously

21   provided.

22             (Kyle Bradley Peterson deposition entered into

23   the record.)

24             "Q.    BY MR. ABRAHAMSEN:  Okay.

25                    I guess before we get started in the

1      substance, I'd like to learn first a little bit about your

2      background and your work experience.  Can you tell me where

3      you went to -- or your education post-high school?

4              A.     I have a bachelor's degree in computer

5      science from Harvard University.

6              Q.     Any other formal education?

7              A.     No.

8              Q.     And what is your role with respect to 1-Click

9      ordering?

10             A.     I am the senior software engineer for all of

11     the pieces of software owned under Thomas Vaughan.

12                    MR. ABRAHAMSEN:  I'd like to mark another

13     exhibit.  For the record, this is a color copy of a document

14     entitled "Manaus/ProductDevelopersCorner/

15     Authentication/Workflow."

16                    (Deposition Exhibit 6 was marked

17                        for identification.)

18             Q.     BY MR. ABRAHAMSEN:  If you could please just

19     tell me what this exhibit is, generally.

20             A.     It is a Wiki page about something called

21     Manaus.

22             Q.     BY MR. ABRAHAMSEN:  With respect to the ones

23     that are important for 1-Click ordering process, I'm trying

24     to get kind of a block diagram.

25             A.     It uses a service called the CheckoutService,

1     which is also known as OA at times, and it uses a service

2     called the SessionService, and it uses a service called the

3     CustomerMasterService.

4          Q.     Are those three services run by separate

5     servers?

6          A.     Yes.

7          Q.     And how does the Web server communicate with

8     those other servers?

9          A.     Over HTTP.

10         Q.     What is the role of the CheckoutService with

11    respect to 1-Click ordering?

12         A.     The CheckoutService implements the interface

13    to all order creation methods.

14         Q.     Are there any other services you can think of

15    that are involved in the 1-Click ordering process?

16         A.     Could you be more specific?

17         Q.     Are there any more services other than the

18    OA, the SessionService and the CustomerMasterService that

19    are involved in processing a 1-Click order?

20         A.     Yes.

21         Q.     What other services are those?

22         A.     The OrderingManipulationAuthority, the

23    DeliveryService and PaymentPlanService, the

24    RemoteCatalogService, the OfferContentService,

25    OfferListingService, the OrderPersistenceService,

708

Peterson - designations

1    DatabaseProxyService, the OrderCalculationService,

2    PromiseService, the TaxService, the ShipOptionEligibility

3    Service, ShippingChargeService.  Those are the services I

4    know about that are involved.

5               Excuse me.  Also the CartService.

6         Q.    Now, do all of these various services -- do

7    they live on separate servers?

8         A.    Yes.

9         Q.    I've seen reference to what's called

10   publish/subscribe messaging.  Is that the messaging protocol

11   that these various servers use to communicate with one

12   another?

13        A.    No.

14        Q.    It's just HTTP?

15        A.    Yes.

16        Q.    I've seen reference in the documents to

17   something called a $ customer object.  What is a $ customer

18   object?

19        A.    It's a PERL hash in Gurupa.

20        Q.    What does that mean?

21        A.    It's a -- a hash is a -- it's a standard PERL

22   data structure.  It's a list of key values in Gurupa that

23   contains customer data.

24        Q.    And does the Web server obtain that list of

25   key values using the CustomerMasterService?

Peterson - designations

1          A.     Yes.

2          Q.     So is there a database associated with the

3     CustomerMasterService?

4          A.     There is.

5          Q.     What's that database called?

6          A.     I don't know.

7          Q.     I think I've seen reference to CUST.  Does

8     that ring a bell?

9          A.     That database does not exist anymore.

10         Q.     Do you know what it was replaced by?

11         A.     It was replaced by a set of databases.

12         Q.     Is there one database in particular that

13    stores information for all of the customers?

14         A.     No.

15         Q.     What are the databases accessed by the

16    CustomerMasterService?

17                THE WITNESS:  I don't know.

18         Q.     BY MR. ABRAHAMSEN:  But those databases store

19    the customer objects?

20         A.     Yes.

21         Q.     Where is the credit card information for

22    customers stored?

23         A.     I don't know the details of that.

24         Q.     Does the CustomerMasterService -- is that the

25    service that's in charge of obtaining that information?

Peterson - designations

1          A.      Yes.

2          Q.      So there's a database that the

3    CustomerMasterService runs which stores the credit card

4    information?

5          A.      I don't know the details of it, but . . .

6          Q.      But?

7          A.      It -- from the CustomerMasterService,

8    those -- those are obtained.

9          Q.      What is the role of the CheckoutService with

10   respect to 1-Click ordering?

11         A.      The CheckoutService implements the initiate

12   and confirm method, that is called by the Web service for

13   placing a 1-Click order.

14         Q.      And what is it that causes that method to

15   begin?

16         A.      It's invoked by mason code and Gurupa.

17         Q.      Is there a communication from a user's

18   browser that causes the mason code to implement this

19   initiate and confirm method?

20                 THE WITNESS:  Could you -- could you restate

21   it?

22         Q.      BY MR. ABRAHAMSEN:  Is there a communication

23   from a user's Web browser that causes the mason code to call

24   the initiate and confirm method?

25         A.      Yes.

1      Q.      What is that communication?

2      A.      It's an HTTP request for the -- for the

3    1-Click handler.

4      Q.      Is it the HTTP post from the Web browser that

5    causes that request to be made?

6      A.      Yes.

7      Q.      Is there a separate method to initiate a

8    shopping cart purchase?

9      A.      A separate method?

10     Q.      A separate method used by the CheckoutService

11   for -- when you click on the proceed to checkout button,

12   does that cause a separate method to be processed that

13   involves initiation of a purchase?

14     A.      In most cases.

15     Q.      In what cases would it not?

16     A.      1-Click sometimes uses that method, as well.

17     Q.      So the CheckoutService initiates a purchase

18   transaction when the HTTP post is received from the Web

19   browser?

20             THE WITNESS:  Could you make it more clear

21   what you mean when you say when it receives that?

22     Q.      BY MR. ABRAHAMSEN:  In response to it.

23     A.      At some point, yes.

24     Q.      And in response to the user clicking on the

25   proceed to checkout button, the CheckoutService implements

1  an initiate purchase method?

2        A.    Yes, it implements two.

3        Q.    What are the two methods?

4        A.    Initiate customer purchase and initiate

5  customer purchase with defaults.

6              MR. ABRAHAMSEN:  What is the role of the

7  SessionService with respect to the 1-Click ordering process?

8              THE WITNESS:  The SessionService is used to

9  recognize a customer session.

10       Q.    BY MR. ABRAHAMSEN:  Is that service also used

11 to make sure a customer is logged on?

12       A.    Yes.

13       Q.    What about the PaymentPlanService, what is

14 that service's role with respect to 1-Click ordering?

15       A.    The service's role is same as it is with

16 respect to regular ordering.  It validates that payment

17 information provided by the customer is valid for the order.

18       Q.    Is that check made before the CheckoutService

19 is able to confirm the purchase transaction?

20       A.    Yes.

21 How does the PaymentPlanService verify that the payment

22 information for a customer is valid?

23       A.    It has a large set of rules, most of which I

24 don't know, but -- it may include public information,

25 working on the public information and the credit card

1    expiration date, for example.

2          Q.     What about the DeliveryService, what's the

3    DeliveryService's role with respect to 1-Click ordering?

4          A.     The DeliveryService's role with respect to

5    1-Click ordering is the same as it is with respect to

6    regular ordering.  It validates that information provided

7    relevant to the delivery of goods is -- is valid, is correct

8    for the order.

9          Q.     What is the DeliveryService -- which entity

10   is it called by?

11         A.     The order manipulation authority.

12         Q.     Is the order manipulation authority also the

13   one that calls the PaymentPlanService?

14         A.     Yes.

15         Q.     What entity calls the OMA service?

16         A.     The CheckoutService.

17         Q.     And what is the OMA service's role with

18   respect to 1-Click ordering?

19         A.     The OMA is responsible for transactionally

20   placing orders that are considered business correct, whether

21   they be 1-Click or not.

22         Q.     What do you mean by "business correct"?

23         A.     Things like the payment information is

24   considered good enough to take the order, and the delivery

25   information is considered complete and correct, these types

1    of -- these types of logic.

2         Q.    What is the role of the

3    OrderCalculationService with respect to 1-Click ordering?

4         A.    The OrderCalculationService is used to

5    determine the amount that an order will cost, including

6    detailed breakdown of that.

7         Q.    Would that be done before or after the

8    1-Click post is received by the Web server?

9         A.    After.

10        Q.    Okay.

11              And finally for now, the CartService, what's

12   its role with respect to 1-Click ordering?

13        A.    The CheckoutService uses the CartService to

14   make the set of items requested for 1-Click look like cart

15   items, which the CheckoutService understands that process.

16        Q.    So it basically builds a cart?

17        A.    Yes.

18        Q.    I'm sorry.  The OrderCalculationService, is

19   that called by the OMA service?

20        A.    Yes.

21        Q.    Where is the credit card number stored?

22        A.    There's a table called "Credit Cards."

23              Oh, excuse me.  That's not correct.  The

24   credit card number is not stored there.  The credit card

25   number is not stored on those databases.  It's stored in

1   a -- a high-security independent database of some sort.  I

2   don't know the details around it.

3          Q.      In the early documentation I saw a reference

4   to a CC Motel.

5          A.      CC Motel is the name of that, yeah.

6          Q.      Is that still used?

7          A.      In some incarnation, yes.

8          Q.      And I don't know if it was just being

9   colorful or not, but the reference was that the -- they

10  analogized it to the Roach Motel, that the credit card

11  numbers get in but they don't get out.

12         A.      Yes.

13         Q.      Is that why it's called the CC Motel?

14         A.      Yes.

15         Q.      Okay.

16                 Now, in the database that the

17  CustomerMasterService has access to, is there a reference to

18  the location of the credit card number?

19         A.      Yes.

20                 Sorry.  There's a reference to -- to the

21  credit card.

22         Q.      And what is that reference?  What is it

23  called?

24         A.      Cc_id.

25         Q.      So how was the CustomerID used to obtain the

1   cc_id?  What is that process?

2              THE WITNESS:  I don't know the details of

3   that process.  It's behind the CustomerMasterService.

4        Q.    BY MR. ABRAHAMSEN:  Do you know for a fact

5   that that's done, though, that the CustomerID is used to

6   look up the cc_id?

7        A.    Yes.

8        Q.    And the cc_id, then, is used to look up the

9   credit card number?

10       A.    Not in this -- in this request handling, no.

11       Q.    So how was the CustomerID used to retrieve

12  the credit card number?

13       A.    The credit card number isn't used for placing

14  a 1-Click order.

15       Q.    Is there some sort of validation that the

16  credit card is valid before the 1-Click order is confirmed?

17       A.    No.

18       Q.    You assume that a credit card number is

19  valid?

20       A.    On entry there is some validation of a -- of

21  new credit card number.  Beyond that time we assume that it

22  stays valid.

23       Q.    What do you mean, "on entry"?

24       A.    When a customer on the Web site enters a

25  credit card number, you can -- there are basic checksums for

1   credit card numbers that you can do to make sure they're a

2   correct number, and offline one can try charging the thing

3   at some point, but there's no validation when -- during the

4   handling of a 1-Click request.

5       Q.    So a 1-Click order will be confirmed without

6   checking to make sure that the credit card number is still

7   valid?

8           In other words, if I'm on my computer and I

9   have a credit card that is expired, and I hit "Order Now

10  with 1-Click" and send the post off to Amazon, you're

11  telling me that I'll get a thank you page confirming my

12  order has been placed, even though my credit card is

13  expired?

14      A.    Expiration is checked.  Expiration is public

15  and easy to check.  It's a one-time piece of information.

16      Q.    BY MR. ABRAHAMSEN:  What if the credit card

17  was canceled, do you check that?

18      A.    No, it's not something we can check in real

19  time.

20      Q.    And how is the expiration checked?

21      A.    The credit card data that comes back from the

22  CustomerMasterService is passed to the

23  PaymentPlanValidationService, and it checks that.

24      Q.    What information is that that is transferred

25  from the CustomerMasterService to the PaymentPlanService?

Peterson - designations

```
 1          A.      It's a -- it's an -- it's a datagram -- a key

 2    value data structure that contains, among other things, a

 3    set of fees for -- related to the payment being used.  In

 4    the case of a credit card that will contain an expiration

 5    date.

 6          Q.      So how is the expiration date checked unless

 7    the credit card number is known?

 8          A.      The expiration date is stored publicly on

 9    that -- in whatever store CMS has.  The credit card number

10    itself is not.

11          Q.      Oh.  So the expiration date is just checked

12    to make sure it's --

13          A.      Yes.

14          Q.      -- it hasn't passed?

15          A.      Right.  Exactly.

16                  So if I understand, when a 1-Click post is

17    received by the Web server, the initiate and confirm method,

18    among other things, has the CustomerMasterService retrieve

19    the credit card expiration date so that the

20    PaymentPlanService can check that expiration date and make

21    sure it hasn't expired?

22          A.      Yes.

23          Q.      Okay.

24                  Is there any other information retrieved by

25    the CustomerMasterService that's used by the initiate and
```

Peterson - designations

1    confirm method?

2          A.    Yes.

3          Q.    And what other information is that?

4          A.    The shipping address is looked up from the

5    CustomerMasterService, and off of that properties like the

6    shipping addresses, default ship speed or ship method is

7    looked up, and the -- oh.  And the credit card that's

8    preferred for that address.

9                So credit cards -- I should amend something I

10   said earlier.  Credit cards can be looked up by -- credit

11   cards in terms of their public information can be looked up

12   either by the CustomerID or the address ID.  In the case of

13   a 1-Click to choose which one's going to be used, it's done

14   by the address, actually.

15         Q.    And the credit cards are identified by cc_id

16   and expiration date; is that right?

17         A.    It's identified by cc_id.  Expiration date is

18   a property of it.

19         Q.    Okay.

20                So there's a -- a CustomerMasterService,

21   if -- make sure I have this straight, is used to look up to

22   figure out which credit card is associated with -- or should

23   be associated with 1-Click transaction?

24         A.    With the address being used in the 1-Click

25   transaction, yes.

1           Q.      Okay.

2                   And that cc_id and the expiration date is

3      passed to the CheckoutService; is that right?

4           A.      It's -- it's returned to the CheckoutService.

5      The CheckoutService is the one making a call to

6      CustomerMasterService in this case.

7           Q.      Okay.

8           A.      And CheckoutService passes it down to the

9      OrderingManipulationAuthority.

10          Q.      What does Amazon actually call the thing

11     that's retrieved from the CustomerMasterService by the

12     CheckoutService?

13          A.      It's the CM client customer.  Or, sorry, the

14     CustomerMaster::customer.

15          Q.      Is that the same thing as that $ customer

16     object we talked about earlier?

17          A.      No.

18          Q.      No?

19                  What is the difference between those two?

20          A.      For one thing, one is a C++ class, the other

21     is a PERL data structure.  They have some different

22     properties, though I couldn't say off the top of my head

23     what those are.

24          Q.      So the CustomerMaster::customer is a C++

25     class?

Peterson - designations

1      A.      Yes.

2      Q.      Does that make it an object using the

3  terminology you used before?

4      A.      It's not a distributed object, no.

5      Q.      What kind of object is it?

6      A.      It's -- well, it's not an object as a class.

7  An instance of it in -- in standard terminology would be

8  sometimes referred to as an object, but that's in a

9  different sense from like OMG distribution objects.

10     Q.      So what does an instance of the

11  CustomerMaster::customer object look like within the

12  CustomerMasterService?  I mean, what does the format look

13  like?

14     A.      It --

15

16             THE WITNESS:  It has a -- a CustomerID, it

17  has -- it has a -- it has a set of methods that aren't

18  necessarily directly hinged off of a customer but are

19  interfaces to the CustomerMasterService for looking up

20  addresses by their IDs, and probably has the customer name

21  on it.  The other properties that it has, I couldn't say off

22  the top of my head.

23     Q.      So it has both properties and methods?

24     A.      The class has properties and methods.

25     Q.      And the properties include at least the

Peterson - designations

1     CustomerID and the customer name; is that right?

2          A.     Yes.

3          Q.     And what are the methods that are included?

4          A.     The methods are -- some of them are getters

5     on those properties, so get CustomerID, get customer full

6     name, and some are getters for related -- related data, like

7     get address by address ID.

8          Q.     BY MR. ABRAHAMSEN:  You now have what's been

9     marked as Exhibit 7.  Can you tell me what this document is,

10    please.

11         A.     Just one moment as I read through it.

12                This is an internal Wiki page, entitled

13    "ExtractingCustomerIdFromXMainInCookie."

14         Q.     And there's a process here described for how

15    you extract the CustomerID from the x-main cookie, right?

16         A.     There is, yes.

17         Q.     Is this used by the 1-Click ordering process?

18         A.     I don't know.  This -- this only confirms

19    this is outside of my proper space of understanding because

20    it's contrary to what I thought was in there.

21         Q.     Okay.

22                So your belief is that the SessionService

23    somehow figures out what CustomerID to use to get the -- to

24    get the object from the CMS?

25         A.     Yes, my belief was that the cookie contained

Peterson - designations

1    only a session ID that the SessionService used to -- and

2    then from that the customer's identity was determined, but

3    this contradicts that.  I don't know which is correct.

4         Q.    Okay.

5               But you're pretty certain that one or the

6    other is that?

7

8               THE WITNESS:  I -- yes, relatively certain,

9    yes.

10        Q.    One thing I didn't cover on our initial list

11   of 1-Click scenarios, which I don't know if we need to.  I

12   saw reference to a wish list 1-Click.

13        A.    Yes.

14        Q.    How long has that feature been around?

15        A.    I don't know.

16        Q.    Is it possible it's been around since 2004?

17        A.    I believe it has been around since at least

18   2004.  Again, it's possible it's been disabled and reenabled

19   at times in that time period.

20              And what do you call the customer object

21   that's obtained from the CustomerMasterService by the

22   CheckoutService?

23              THE WITNESS:  This is -- this is the C++

24   client, the -- an instance the CustomerMaster::Customer

25   class.

1          Q.      BY MR. ABRAHAMSEN:  But what does Amazon call

2     that?

3          A.      It's just called the customer.

4          Q.      Customer?

5          A.      Yeah.

6          Q.      So what part of the process is considered the

7     order pipeline?

8          A.      The order pipeline is the process from the

9     time of hitting either proceed to checkout or 1-Click to

10    the -- to the thank you page.  That's in this context.

11    Order pipeline is a term that is used for entire -- some

12    entirely different things in Amazon and other contexts.

13              THE WITNESS:  I don't actually understand

14    what that would mean.

15          Q.      BY MR. ABRAHAMSEN:  In other words, for the

16    order pipeline to begin, there has to be some indication

17    received from the customer, I guess that they've selected an

18    item for purchase?  Is that what starts the order pipeline

19    process?

20              THE WITNESS:  The process is started by a --

21    a post to a specific URL.  That's what, you know,

22    technically denotes the beginning of the order pipeline.

23    It's -- yeah, that's --

24          Q.      BY MR. ABRAHAMSEN:  But before that post is

25    submitted, does Amazon assume that the customer is still

1    browsing at that point?

2         Q.    BY MR. ABRAHAMSEN:  So it's not necessary to

3    start processing an order?

4              THE WITNESS:  It doesn't assume or not assume

5    that.  It's -- it's not -- it's not as if the world is, you

6    know, an order is being placed unless we think an order

7    isn't being placed, right?  That's positive action, placing

8    an order.

9         Q.    BY MR. ABRAHAMSEN:  But the order placement

10   process from Amazon's perspective begins when that post,

11   either from the --

12        A.    Yes.

13        Q.    From the 1-Click button being pressed or the

14   procedure checkout button being pressed?

15        A.    Right.

16        Q.    BY MR. ABRAHAMSEN:  You now have what's been

17   marked as Exhibit 9.  If you can tell me what this document

18   is, please.

19        A.    This is a document called the Gurupa 1-Click

20   integration guide.  It explains to developers how to use

21   Gurupa 1-Click.

22        Q.    Did you author this document?

23        A.    I did, yes.

24        Q.    And is this document still used by people at

25   Amazon?

726

Peterson - designations

1          A.      I do not know.

2          Q.      Was the purpose to facilitate the migration

3    or to facilitate the use of Gurupa?

4          A.      To facilitate the use.

5          Q.      The first item there says, "In cases where we

6    are unable to initiate and confirm the order without

7    additional customer input," and then it identifies certain

8    steps that are taken.

9                  I guess I just wanted to make sure that

10   during a 1-Click ordering process, normally once the

11   customer hits the post, that's all they have to do to have

12   the order completed, right?

13         A.      Normally, yes.

14                 Or "normally" means that's the -- the case

15   that we want to happen the most, yeah.

16         Q.      Okay.

17                 An exception may be when the customer hasn't

18   logged in yet; is that right?

19         A.      That's one possible type of exception.

20         Q.      Okay.

21                 Are there other situations where additional

22   customer input may be required?

23         A.      Yes.

24         Q.      What are those?

25         A.      Could be that the customer -- that the credit

Peterson - designations

1    card we attempt to use for 1-Click is expired, so want to

2    have them fix that up, or could be that the shipping address

3    they're using for the 1-Click is international and the item

4    can't be shipped internationally.  There are a large open

5    set of these.

6              Going back one page, to 56278, there's a list

7    there of use cases.

8         A.    Yes.

9         Q.    Is there anything on that list that's not

10   currently practiced by Amazon?

11             MR. ABRAHAMSEN:  I'm sorry.  The currently

12   supported list.

13             THE WITNESS:  The -- all of those use cases

14   are currently supported.

15        Q.    BY MR. ABRAHAMSEN:  Are there any use cases

16   you can think of that are not on the currently supported

17   list but that are currently supported?

18        A.    You mean use cases that I know of that

19   actually are occurring or --

20        Q.    Correct.

21        A.    Yes.

22        Q.    And what are those?

23        A.    1-Click from the thank you page.  This is the

24   order placement thank you page.  And 1-Click from search

25   results.

 1          Q.      Is that all you can think of at this time?

 2          A.      That's all I can think of at this time.

 3          Q.      BY MR. ABRAHAMSEN:   You now have in front of

 4     you Exhibit 11, which bears Production Nos. AMZC 055698

 5     through 055718.

 6                  If you could tell me what this document is,

 7     please.

 8          A.      This seems to be the 2006 yearly planning

 9     document for Identity Services, planning out what work

10     they'll do in 2006.

11          Q.      I think you mentioned before the Identity

12     Services had something to do with the CustomerMasterService.

13          A.      They own the CustomerMasterService, yes.

14                  Let's look at Page 2 of Exhibit 6, and if you

15     could just walk me through the basic flow from what happens

16     from when a 1-Click post was submitted either from a detail

17     page or a buy now -- or buy the shopping cart with 1-Click,

18     using these components here.  I mean, where did that -- what

19     happens?

20          A.      Well, in terms of the flow just between the

21     components, it's very simple in Obidos.  The -- an HTTP post

22     comes to Obidos, which is the Web server as well as the

23     container of all of the -- the rest of the business logic --

24          Q.      Okay.

25          A.      -- and that kind of thing, and I don't know

1   the details of how authentication worked in Obidos or any of

2   that process.

3                   In terms of actually creating the order,

4   there was a long procedural code path for creating a

5   customer order struct, filling it in with information that

6   was retrieved from a customer struct, which would have been

7   looked up from the -- from the COSS database or the

8   CustomerMasterService, and once that was populated it would

9   be stored onto this Oracle database, ACB.

10                  In terms of the way this is picturing it,

11  though, that's not actually correct.  It went to a database

12  called the WEB, which then copied it into ACB.  And that's

13  the basic flow of it.

14       Q.    So the -- what was actually created?  Was it

15  a document?

16       A.    No, what's created is a set of rows in an

17  Oracle database.  A customer orders row, customer order

18  items row, and some other related child tables.

19       Q.    And when that -- once that was created,

20  you're saying it was stored on a WEB database?

21       A.    A database called WEB something or other.  It

22  would be WEB 1 or WEB 2 or WEB 3 or WEB 4.

23       Q.    Okay.

24                  And then was it moved to a different

25  database?

Peterson - designations

1          A.      Then it would automatically get copied over

2     to a database called ACB.

3          Q.      What would cause it to be copied over?

4          A.      Oracle replication was set up between the two

5     databases so it was automatic for any customer orders row

6     that was on the WEB database.

7          Q.      But what triggered that to happen?  How would

8     it know that it's ready to be transferred?

9          A.      I don't know the details of how Oracle

10    replication works.  It's an Oracle proprietary technology we

11    were using.

12         Q.      Was there a flag in the row that said this

13    order is complete, or what was it --

14         A.      Oh.  There is -- there is a condition column

15    on the order -- on the customer orders row.

16                 No, actually, that's not what gets used.

17                 There's a -- there's a column on the customer

18    orders row called SiteOwner, and the way it worked -- it

19    actually gets replicated over all the time.  It would always

20    get replicated over, you know, within some short period of

21    time getting inserted, but then only when that SiteOwner was

22    not still marked as being the WEB database, it would be

23    deleted automatically, as well, from the WEB database so

24    that it only existed on ACB.

25         Q.      Okay.

Peterson - designations

1           Was the WEB considered the front end and the

2    ACB the back end, then, of the --

3           A.      That was the idea, yes.

4           Q.      And then what was done on the back end

5    generally once the order was on the ACB database?

6           A.      In broad terms, and I can't speak to the

7    details of how this was structured particularly in the times

8    of Obidos, some processes would match the -- the -- an

9    ordered item to inventory in some physical fulfillment

10   center, another process would use the referenced payment

11   information off of the order to start a charge processing,

12   you know, actually running the credit card if it was a

13   credit card.  And -- those are -- those two things are the

14   primary processes.  There are some processes specific to the

15   fulfillment centers for, you know, actually getting a unit

16   of inventory into a box and all that kind of flow once it's

17   been assigned, but I really can't go into the details of

18   that.

19          Q.      So the WEB servers, then, were responsible

20   for creating the order?

21          A.      Yes.

22          Q.      Whereas the ACB servers were responsible for

23   processing the order?

24          A.      Things using ACB were responsible for, yes,

25   managing the fulfillment and payment of the order, yeah.

1          Q.     Now, in the current system is there a similar

2     differentiation between a front end and a back end?

3          A.     There is, yes.

4          Q.     And how does that work?

5                 In other words, once the initiate and

6     complete process is done, what happens to the order?

7          A.     The order is similarly inserted onto the WEB

8     databases, same -- same schema.  Actually that part is

9     basically unchanged.  Some more columns might have been

10    added to the schema but it's the same process.

11         Q.     Is it still called the WEB database?

12         A.     Yes.  It's a partition database, so what it

13    is is there are several WEB databases.  The order could end

14    up on any one of them.

15         Q.     Okay.

16         A.     There is -- we have replaced the process of

17    Oracle replication with an in-house replication piece of

18    software but the same idea of copying the data over from the

19    WEBs, which are only used under the front end, to ACB.

20    Though ACB is only logical at this point, it's, again, a

21    partitioned set of ACBs.  And then -- then a message is sent

22    to an application called the customer order workflow, or

23    COW.  That message used to be automatically triggered by

24    the -- it was an Oracle trigger on the insertion of a

25    customer order row on ACB.  At this point I believe it's

Peterson - designations

1    the -- it's one of the services that wraps database access,

2    I believe a service called DPS that's sending that message.

3              And when is it determined that the credit

4    card should actually be charged, or the payment instrument,

5    whatever it is, be used?

6         A.    When is it determined that we should start

7    that process, you mean?

8         Q.    Yes.

9         A.    At the point that inventory's reserved in the

10   fulfillment center.

11        Q.    Is that a computer-implemented process for

12   reserving inventory?

13        A.    It is.

14        Q.    Now, you mentioned earlier that there was a

15   message that was sent to the COW system.

16        A.    Yes.

17        Q.    What was that message called?

18        A.    It's broadly under the label "Order Created

19   Message."  I don't know the specific subject of it.

20        Q.    The created order, what is that really

21   referring to?  Is that a set of database entries, you said?

22        A.    It is, yes.

23              Let's mark another exhibit.

24              (Deposition Exhibit 12 was marked

25                for identification.)

1    Q.    BY MR. ABRAHAMSEN:  And I'll represent to you

2    that these are screen shots of a folder directory that we

3    created from a laptop which was given to us by Amazon's

4    counsel, which we were told contains the source code

5    relating to the 1-Click ordering process.

6    A.    Right.

7    Q.    How about the OMSServer?

8    A.    OMSServer is the heart of the code that's now

9    OMA.  It's the OrderingManipulationAuthority.  It's -- it's

10   the code that implements several of the key order creation

11   code paths.  It's the specific steps of initiating a

12   purchase, confirming a purchase, the steps involved in

13   determining what items get grouped into what orders.  And

14   the delegation to business components for determining, you

15   know, what still needs to happen with an order before it can

16   be completed on the Web site.

17           It's -- it also contains some core code paths

18   for the order care operations on the site, the your account

19   type of functionality, things --

20           Let me drill down for one second.

21           Oh.  It wants a password again.

22   Q.    Oh.

23   A.    Right.  So these are things that don't

24   necessarily have a -- where a -- an independent business

25   owner other than ordering itself hasn't been identified for

Peterson - designations

1    the functionality.  Operations like modifying the quantity

2    on an item in a placed order, things like that.  Things that

3    are to the core of the order.  Manipulate the core of the

4    ordering structures.

5                    So that's -- yeah, that's what's in

6    OMSServer.  It's mostly defined by what hasn't been able to

7    be located elsewhere yet.

8              Q.    Okay.

9              A.    Trying to break up a monolithic structure.

10             Q.    So it's not just the functions performed by

11   an OMA service?

12             A.    All of this is inside the OMA service.

13             Q.    All of this being just the OMSServer stuff?

14             A.    No, there's more than the OMSServer in the

15   OMA service.  The OMA service is very large.

16             Q.    So the initiate and confirm function is not

17   in the OMSServer, then, it's in something that --

18             A.    The initiate --

19             Q.    CheckoutService.

20             A.    The initiate and confirm function, they're --

21   there are multiple initiate and confirm functions.  There's

22   one in CheckoutService, there's one in a package that gets

23   built into -- into OrderingManipulationAuthority, that's

24   elsewhere on your list.  We'll get to it.

25             Q.    Okay.

1       A.      But it does use some initiate-specific logic

2   from OMSServer and some confirm-specific logic that's in

3   OMSServer.

4       Q.      BY MR. ABRAHAMSEN:  I should ask you first,

5   are you proficient in reading HTML, understanding it?

6       A.      For the most part, yes.

7       Q.      Okay.

8               I'll represent to you that 16-A is the Web

9   site or the Web page that was returned in response to the

10  get command in 15-A.  16-B is the header that came back.

11  16-C is the HTML code.

12      A.      Right.

13      Q.      And 16-D is an excerpt from the HTML code,

14  which begins at Page 117 of Exhibit 16-C.

15      A.      Sorry.  It begins on Page 17?

16      Q.      117.

17      A.      Oh, 117.

18      Q.      And I've been told it is the contents of the

19  form for the post --

20      A.      Yes.

21      Q.      When the 1-Click button is pressed.

22      A.      Yes.

23      Q.      And we have reproduced it from 16-C just to

24  save a bit of paper.

25      A.      Yes.

1      Q.      We've also removed some of the white space to

2   make it more legible.

3      A.      All right.

4      Q.      Now, in the HTML that comes back in response

5   to the get, I assume there is information about the product

6   that's being offered for sale; is that right?

7      A.      Yes, all of the information that's rendered

8   on the page about that product is in the HTML that's

9   returned.

10     Q.      And that includes information about the terms

11  of the proposed transaction?

12             THE WITNESS:  Could you explain what you mean

13  by that?

14     Q.      BY MR. ABRAHAMSEN:  Information like the

15  price that the thing is being offered for sale at,

16  information about the proposed transaction.

17             THE WITNESS:  It does contain the information

18  about the price of the item.

19     Q.      BY MR. ABRAHAMSEN:  And I'll represent to

20  you, again, that Exhibit 17-A is the transmission from the

21  browser to Amazon.com that occurred when the "Buy now with

22  1-Click" button on Exhibit 16-A was pressed.

23             Exhibit 17-B is a reformatted version of 17-A

24  to make it more readable.

25     A.      Right.

1      Q.      And similar to the question before, if you

2   could let me know what information in the post is pertinent

3   to the processing of the 1-Click transaction.

4              MR. ABRAHAMSEN:  Actually, let me strike that

5   question.  Let's step through these things.

6      Q.      Beginning with the URL to which the post is

7   made --

8      A.      Yes.

9      Q.      What does that signify?

10     A.      That signifies a request to a mason component

11  that handles gp/product/handle-buy-box as a path.

12     Q.      Okay.

13             And the next line?

14     A.      The next line is the HTML post line.

15  Contains the path to which the post is directed.

16     Q.      And the next one?

17     A.      The next one is the host, which is the

18  top-level domain name of the address where it's directed.

19             What about the cookie fields, to the extent

20  you have an understanding?

21     A.      I can't give any certain details about how

22  those are handled.

23     Q.      Do you know that there's at least some

24  information in the cookies that allows the receiving --

25  allows Amazon.com to figure out who the customer is so that

1    they can retrieve the information from the CMS service about

2    the customer?

3           A.     There is some information that -- I don't

4    know if that's directly the case.  There is some information

5    that allows that to be retrieved potentially indirectly.

6           Q.     But you're not sure whether it's in a cookie

7    or somewhere else?

8                  Cookies.  I'm sorry.

9           A.     The information in the cookie should allow

10   this.  I don't know if it allows a direct identification of

11   the customer or not, or if it's a -- a multistep process.

12          Q.     But there's some information in this post

13   that allows the CMS service to retrieve information about

14   the customer?

15                 THE WITNESS:  I don't know -- directly, I

16   don't think so, but through indirect process.

17          Q.     BY MR. ABRAHAMSEN:  So there's some

18   information here that allows some component on Amazon.com's

19   site to be able to retrieve information about the customer;

20   is that right?

21                 THE WITNESS:  I -- I believe that's roughly

22   correct.  That sounds correct.  But I'm not an expert on the

23   contents of the cookie and how that gets interpreted.

24          Q.     BY MR. ABRAHAMSEN:  Okay.

25                 On Page 2 of the post -- let's step through

Peterson - designations

1   these so I understand what they are.  The ASIN, I think I --

2   that's the product identifier; is that right?

3          A.     That's the product identifier, yes.

4          Q.     How about the merchantID, what does that

5   signify?

6          A.     It's an identifier of the seller.

7          Q.     The offerListingID?

8          A.     That is a -- another identifier of the

9   product.

10         Q.     I think I can guess, but quantity?

11         A.     That is the quantity of the item being

12  ordered.

13         Q.     How about submit.one-click-order.x=55?

14         A.     That is the X coordinate of the location on

15  the window in which the customer clicked to initiate this

16  request.

17         Q.     Okay.

18                And the next one is the Y coordinate of the

19  same thing?

20         A.     Yes.

21         Q.     Is that the information in this post that

22  enables the handler to identify this as a 1-Click order?

23         A.     It is.

24         Q.     How about dropdown-selection, what is that

25  one?

1          A.     This is the selection from the address

2    drop-down box.  The identification of an address selected

3    there.

4          Q.     Okay.

5                 So that will be associated with some address

6    stored in the -- by the CMS service?

7          A.     Yes.

8          Q.     BY MR. ABRAHAMSEN:  You now have what's been

9    marked as Exhibit 18-I.  Can you tell me what this document

10   is, please?

11         A.     This is from the USDetailPageApplicationMason

12   package, the component mason/www.amazon.com/gp/product/

13   handle-buy-box/dhandler.

14         Q.     Okay.

15                Now, looking back at Exhibit 17-A, is

16   Exhibit 18-I the handler that would be used to process the

17   post of Exhibit 17-A?

18         A.     Yes, it is.

19         Q.     Is the function one-click.m called in the

20   code of Exhibit 18-I?

21         A.     No.

22         Q.     How does this code get -- assuming it does,

23   get to the initiate and confirm function?

24         A.     On Page 7, at the top, it calls the

25   legacy-handle-buy-box handler.

1      Q.     BY MR. ABRAHAMSEN:  You now have what's been

2   marked as Exhibit 18-J, which is the legacy-handle-buy-box

3   function.

4             Is this the function that would be called by

5   Exhibit 18-I that you pointed out on Page 7?

6      A.     Yes.

7      Q.     Okay.

8             Now, how does this code, Exhibit 18-J, get to

9   the initiate and confirm function?

10     A.     On Page 10 there is a line -- or there's an

11  elsif, begins seven lines down.  The conditional is "command

12  eq 'oneClick)."  The string.  Or "command eq

13  'oneClickWithEncodedOffering')," and the result of invoking

14  a component use-gp-one-click.mi.

15            Now, what's been marked as Exhibit 18-C, at

16  least the end of the string has one-click.m.  Is that the

17  function that's called?

18     A.     Yes.

19     Q.     Okay.

20            How does that function get to the initiate

21  and confirm function of Exhibit 18-D?  Is that on Page 5?

22     A.     It's at the bottom of Page 5.

23     Q.     Okay.

24     A.     Is the invocation of initiate-and-confirm.mi.

25     Q.     Okay.

Peterson - designations

1              Now, it looks like it passes something called

2     "cart = $cart"?

3         A.    Yes.

4         Q.    What would that argument be in this

5     circumstance?

6         A.    In the middle of Page 5, a variable called

7     cart is created as the result of a call to a component at

8     transient-items.mI.

9         Q.    Which service is executing this function, the

10    18-E function?

11        A.    The CheckoutService.

12        Q.    Is this the first function in this set we've

13    looked at that's performed by the CheckoutService?

14        A.    Yes.

15        Q.    The others are performed by the Web server?

16        A.    The others are run on Gurupa, yes.

17        Q.    Okay.

18              Now, in 18-E on Page 2 --

19        A.    Yes.

20        Q.    Right in the middle there's a reference to

21    OACheckout::OMAClient, initiateAndConfirmCustomerPurchase.

22        A.    Yes.

23        Q.    Is that function -- is 18 -- what's been

24    marked as Exhibit 18-G, is that that function that's called?

25              THE WITNESS:  It is.

Peterson - designations

1          Q.     BY MR. ABRAHAMSEN:  And which component on

2     the system is executing that function?  That's 18-G.

3          A.     The OrderingManipulationAuthority.

4          Q.     At this point has the purchase been

5     confirmed, when it gets to this function of 18-G?

6          A.     No.

7          Q.     Not yet?

8                 I'm looking at 18-G, on Page 4.

9          A.     Yes.

10         Q.     There's a reference near the top to

11    OMS::initiateCustomerPurchase.

12         A.     Yes.

13         Q.     What is that?

14         A.     That is a function in the omsOrderCreation

15    module of OMSServer.

16         Q.     Is the OMSServer -- is that related to the

17    OMA?

18         A.     Yes, it's a library that's linked into OMA.

19         Q.     Now, is this the same InitiatePurchase

20    function that's also called when the proceed to checkout

21    button has been pressed and that process is followed?

22         A.     Yes.

23         Q.     What's been marked as Exhibit 18-H, is that

24    the InitiateCustomerPurchase function that's called?

25         A.     It contains the InitiateCustomerPurchase

1    function that's called.

2                    And what does that function do, generally?

3         A.    That function takes the item arguments that

4    were passed to OMA and uses those to construct the -- the

5    OMA's internal item business types, it constructs a purchase

6    business type that will contain all of those, and it will

7    evaluate the items to group them into orders and construct

8    the appropriate order business types underneath the

9    purchase.

10        Q.    And where in this code is the purchase

11   actually confirmed?

12        A.    Purchase is not confirmed in this code.

13        Q.    What's the next step before it is confirmed?

14        A.    Need to return to 18-G.

15        Q.    Okay.

16        A.    The next thing called there, after

17   initiateCustomerPurchase, is OMS::setAttributesNoMCSRt.

18        Q.    Mm-hmm.

19        A.    And that function sets several passed-in

20   attributes on the -- on the purchase and its substructures.

21        Q.    Where does it get those attributes?

22        A.    They were arguments passed into the

23   OrderingManipulationAuthority.

24        Q.    Then how does the purchase actually get

25   confirmed?

1          A.      Beyond that, on Page 6 of this exhibit

2    there's a call to a function OMS::CustomerPurchase_confirm.

3          Q.      And what is done when a purchase is

4    confirmed?

5          A.      The -- all of the business types are copied

6    column by column into related business types that are there

7    to confirm versions of that.  The essentially pending

8    business types that represented the purchase and the order

9    up to this point are marked for deletion.  1-Click

10   consolidation is invoked if it's applicable.

11         Q.      Mm-hmm.

12         A.      The orders are evaluated to verify that no --

13   no business constraints should be preventing them from

14   confirmation, and then there -- yeah, and that's all that

15   happens in the function.

16         Q.      Now, is this the same confirm function that's

17   used during the proceed to checkout process?

18         A.      Yes.

19         Q.      And then once the confirmed -- confirm

20   process is done, what's the next step with respect to the

21   order?  Is it passed somewhere?  Is that when it's passed to

22   the -- the back end that we discussed earlier?

23         A.      Do you see on Page 6, two-thirds of the way

24   down the page, "amazonContext.commit"?

25         Q.      Yes.

1        A.      That takes all of the internal data

2    structures that OMA's been using to hold the orders and

3    turns them into datagrams that are passed to the

4    OrderPersistenceService to be written as rows to the

5    database.

6        Q.      Is that the WEB database at this point?

7        A.      The WEB database at this point, yes.

8        Q.      And then at some point that information is

9    copied to the ACB database?

10       A.      Yes.

11       Q.      For ultimate fulfillment, payment, and that

12   sort of thing?

13       A.      And permanent retention, yes.

14       Q.      BY MR. ABRAHAMSEN:  I represent to you that

15   22-A is a shopping cart page.

16       A.      Yes.

17       Q.      And there's a "Buy all items with 1-Click"

18   button.  Do you see that?

19       A.      Yes.

20       Q.      Okay.

21               I'll represent to you also that Exhibit 22-B

22   is the post that was transmitted in response to pressing

23   that button.

24       A.      Yes.

25       Q.      Which form handler would be used to process

Peterson - designations

1      this post?

2              A.      A mason component with the path gp/cart/view.m.

3              Q.      Okay.

4                      Is that among the code we looked at earlier?

5              A.      It's Exhibit 21.

6              Q.      Now, does this function ultimately find its

7      way to the initiate and confirm function, which was

8      Exhibit 18-D?

9              A.      When you say does it ultimately find its way

10     there, you mean specifically in the case of handling this

11     request?

12             Q.      Correct.

13             A.      Yes.

14             Q.      Now, once this initiate and confirm function

15     is called, which was Exhibit 18-D, is the process the same

16     as it was for the detail page?

17             A.      Yes.

18             Q.      Let me have you look at Exhibit 28.

19             A.      Okay.

20             Q.      Who is Song Bac Toh?

21             A.      He was a technical project manager in

22     ordering, not to a specific team.

23             Q.      BY MR. ABRAHAMSEN:  I have in front of you

24     what's been marked as Exhibit 31.  Can you tell me what this

25     document is, please.

1          A.     31 is an internal Wiki page, titled

2    "OTP/Roadmap2007."

3          Q.     And what does OTP stand for?

4          A.     Ordering transactional platform.

5          Q.     Okay.

6                 It looks like starting on the second page of

7    the document it talks about the order lifecycle?

8          A.     Yes.

9          Q.     Do you know if this is a current document, or

10   does it describe a description of the current order

11   lifecycle?

12         A.     Let me read through it.

13                It is a -- it is up to date, though high

14   level and a little bit abstract over many of the -- the

15   details above the database layer."

16                (Kyle Peterson deposition designations end.)

17                MR. O'NEILL:  I have no further questions.

18                THE COURT:  Thank you.

19                Mr. Abrahamsen.

20                MR. ABRAHAMSEN:  Now you have just heard the

21   testimony of Mr. Peterson, an Amazon employee whose

22   testimony Cordance designated to provide certain background

23   facts that relates to Amazon infringement of Cordance's

24   one-click patent.  The testimony was very technical and we

25   will be hearing a little bit later from an expert witness,

Keller - designations

1    Dr. Michael Shamos who will help explain it to us.

2              But first, Cordance has one more deposition

3    witness to call.  This deposition was recorded on video and

4    so we will play you certain portions of that deposition.

5    The video is about 45 to 50 minutes in length.

6              Again, this testimony is very technical and

7    Dr. Shamos will help you understand it.  But just to give

8    you a brief overview, this video deposition is of Mr. Thomas

9    Keller.  Mr. Keller is an Amazon employee who will testify

10   about how Amazon's customer review system collects and

11   processes feedback information.  The testimony provides some

12   of the facts that will help show that Amazon infringes

13   Cordance's feedback patents.

14              (Video Deposition of Thomas Keller played and

15   entered into the record.)

16      "Q.  Good morning, Mr. Keller.

17       A.  Good morning.

18       Q.  Can you please state your full name for the record?

19       A.  Thomas Lowell Keller.

20       Q.  And what is your current position at Amazon?

21       A.  I am a software engineer.

22       Q.  How long have you been employed with Amazon?

23       A.  Since September of 1999.

24       Q.  Is your title just software engineer or is it senior

25    software engineer?

Keller - designations

1      A.  Software Development Engineer, Level 3.

2      Q.  Are you familiar with the product review system

3   employed by Amazon as it existed in 1999?

4      A.  I am.

5      Q.  Okay.  What about as it existed in 1995?

6      A.  No.

7      Q.  Do you know any of the details of the system that

8   existed in 1995?

9      A.  No.

10     Q.  What about 1996?

11     A.  No.

12     Q.  When was a service first instituted as a way to make

13  reviews accessible by the Web server?  In other words, when

14  was the concept of a customer review service or, calling it

15  something else, when was there a client service model

16  instituted for customer reviews?

17     A.  To the best of my recollection, in the year 2000.

18     Q.  In other words, if a user wanted to review a product

19  in 1999, would they request a page that would have an HTML

20  form?

21     A.  Our Web server would serve a page with an HTML form.

22     Q.  Then how would the user submit the review, via the

23  form?

24     A.  The form would post back to our Web server.

25     Q.  Okay.  And in 1999, what were the components on the

1    form?  What were the possible value choices, attributes,

2    text?

3      A.  I don't believe that it's changed significantly

4    since then.

5      Q.  Okay.  So a user could give a star rating in 1999?

6      A.  Yes.

7      Q.  What about star ratings for multiple attributes?

8      A.  What do you mean by "multiple attributes"?

9      Q.  On the current system, in reviewing toys, you can

10    give one star rating for durability, one star rating for

11    fun.  Could a customer do that in 1999?

12      A.  No.

13      Q.  Okay.  And were cookies used by the review system in

14    1999?

15      A.  No.

16      Q.  Are cookies currently used by the review system?

17      A.  No.

18      Q.  How is a particular review identified?  Like when a

19    user submits a -- clicks preview review, and a review is

20    posted, how does Amazon know who the reviewer is?

21      Q.  How does Amazon know who the reviewer is?

22      A.  Previewing a review, we do not know who the reviewer

23    is.

24      Q.  When a review is received in a post, and we're still

25    talking about the HTTP post, doesn't Amazon initially

1    restore the review in the customer review service?

2        A.   From preview, no.

3        Q.   At what point is it stored in the customer review

4    service?

5        A.   On the final submit.

6        Q.   Is it stored by the Web server?

7        A.   No.

8        Q.   With preview?

9        A.   No.

10       Q.   So all the information in the post, then, is sent

11   back to the browser to be resubmitted; is that right?

12       A.   What do you mean, the "browser"?

13       Q.   The user's browser that wrote the review.

14       A.   Okay.   Yes, that sounds accurate.

15       Q.   Okay.   Because there was prior testimony that when

16   the preview review button was pressed, the review

17   information actually was stored, but then that user was

18   given an opportunity to edit it, and then it was, I guess,

19   confirmed in storage somehow.   That's not accurate?

20       A.   That's not accurate.

21       Q.   Okay.   Now, when the submit review -- is that the

22   button after the user previews?   There's another button

23   that says "submit review"?

24       A.   Correct.

25       Q.   How does Amazon know who the submitter is in that

1    HTTP post?

2        A.  As part of that page, it's given to us by the Gurupa

3    software.

4        Q.  Is it in the post itself?

5        A.  The submit post?

6        Q.  Yes.

7        A.  The customer ID is passed through the submit post,

8    yes, if they're over 13.

9        Q.  What is that identifier called in the submit post?

10       A.  The identifier?

11       Q.  Yes.

12       A.  Do you mean parameter name?

13       Q.  Yeah.

14       A.  Customer ID, I believe.

15       Q.  So with the submit button, the preview button is

16   pressed.

17       A.  Uh-hum (affirmative).

18       Q.  How does Amazon know who the customer is, to put in

19   the submit form that goes back to the user?

20       A.  We don't need it.

21       Q.  You said the customer ID was included in the submit

22   form, right?  That's a hidden form field; is that right?

23       A.  If I recall correctly, yes.

24       Q.  How does the Web server know what customer ID to

25   insert into that -- as a hidden form field?

Keller - designations

1      A.  That's given to us via Gurupa.  It's just available

2  on a Web page, when the page gets rendered.

3      Q.  How does Amazon know -- how does the Web server know

4  what the customer ID is, based on that series of

5  transactions?

6      A.  I don't believe it's based on that series of

7  transactions.  There's something more global on the Amazon

8  Web server that determines customer ID recognition.

9      Q.  Is a cookie used for that purpose?

10     A.  I can't say for sure yes.

11     Q.  Do you know one way or the other?

12     A.  Not positively.

13     Q.  So you don't know one way or the other whether

14  cookies are used -- the cookies that are submitted with the

15  post, in either the preview or the submit HTTP post, you

16  don't know one way or the other whether cookies are used by

17  Amazon to identify the customer?

18     A.  You're relating cookies to the posts?

19     Q.  Yeah.

20     A.  No.  I don't think that the cookies and the posts

21  are used.

22     Q.  But you don't know how the customer is actually

23  identified?

24     A.  I don't know exactly.

25     Q.  (By Mr. Abrahamsen)  So when a review is actually

1     stored in the customer review service, it's linked to a

2     customer ID, correct?

3        A.  A customer ID is part of a customer review.

4        Q.  Okay.  So Amazon needs to know the customer ID in

5     order to store a review, the way it's done currently?

6        A.  Yes.

7        Q.  Okay.  But you don't know how that customer ID is

8     determined?

9        A.  It is accessed on our Mason page.  It's there.

10       Q.  But you don't know how?

11       A.  No.

12       Q.  I'll have you look now at Exhibit 145, please.  And

13    if you could just glance at the document and let me know

14    just what it is.

15       A.  It says it's a general reputation service

16    programmer's guide.  It looks like it's more like an

17    architecture operations and programmer's guide for general

18    reputation service.

19       Q.  Now, how does the general reputation service relate

20    to the services we discussed earlier?  Is it part of the

21    same service, or is it a separate service?

22             MR. ABRAHAMSEN:  Do you understand the

23    question?

24       A.  "Service" in what sense?

25       Q.  (By Mr. Abrahamsen)  Well, currently, there's the

Keller - designations

1    customer review service, right?

2        A.  Yes.

3        Q.  Does the GRS service exist currently?

4        A.  It does exist currently.

5        Q.  But is it a part of the customer review service, or

6    is it a separate service?

7        A.  "Service" in what sense.

8        Q.  In the sense of serving requests from the Web

9    server.  Servicing requests.

10       A.  Yes.

11       Q.  So it's a separate service?

12       A.  In that definition, yes.

13       Q.  It runs on -- is it a separate piece of hardware?

14       A.  Yes.

15       Q.  Now, is the GRS service the service that's

16   responsible for collecting votes about whether a review was

17   helpful or not?

18       A.  Yes.

19       Q.  Is that, the GRS service, also responsible for

20   collecting votes or ratings about items that a customer

21   would give to improve the recommendations?

22       A.  No.

23       Q.  What service is responsible for that?

24       A.  I don't recall the name.

25       Q.  But it's separate from GRS and the CRS?

1      A.  Yes.

2      Q.  The GRS service currently exists?

3      A.  Yes.

4      Q.  When did the GRS service come into being?

5      A.  I can't say for sure.

6      Q.  Was it at least as early as September 2005?

7      A.  I'd be comfortable saying that, given the date on

8  the GRS programmer's guide.

9      Q.  What document would help you answer the question

10  about what the name of the service that implements the

11  "rate this item to improve recommendations" function?

12      A.  I don't know that there is a document.  I believe

13  it's called the "personalization data service," to the best

14  of my recollection.

15      Q.  And when did that service come into existence?

16      A.  That -- I believe it first came around in 2007.

17      Q.  I'll have you look next at Exhibit 146, please.  And

18  if you can, again, glance through the document and just

19  tell me what it is.

20      A.  It's a design document for the customer review

21  system.

22      Q.  And because this is a design document, does that

23  mean the system was not yet implemented, at least as of

24  March 28, 2003?

25      A.  Sorry.  This design was implemented.

1    Q.  And when was it implemented?

2    A.  Best I can say is between March 28th, 2003 and --

3  and the advent of the Carbonado implementation of the review

4  service.  I don't recall the exact date on that.

5    Q.  Based on that code, do you understand that using the

6  BSF service, that when a request is going to be made to a

7  remote service, an object is created, really, to handle

8  that request?

9    A.  I don't believe it's created to handle the request.

10    Q.  Why is the request object created?

11    A.  It's my understanding that it contains the

12  parameters needed to pass to the service.

13    Q.  What about the results object, what is the purpose

14  of creating that object?

15    A.  In client server, it would be to pass the resulting

16  data back to the caller.

17    Q.  Okay.  Well, let's give a specific example.  The

18  3-star review example.  There's going to be some sort of --

19  the Web server is going to issue some sort of, I guess it's

20  going to be, what, an instruction to the BSF service that

21  it wants it retrieve certain reviews using certain

22  parameters?

23           MR. ABRAHAMSEN:  Is that accurate?

24    A.  No.

25    Q.  (By Mr. Abrahamsen)  How does that happen?

Keller - designations

1     A.  The way I view it, the Web server sends an HTTP post

2    to our service.  We use that and formulate a response and

3    send it back to the Web server.

4     Q.  But how does the Web server interface with the BSF

5    service on the Web server side?

6     A.  I can only speak from the customer review service

7    point of view, that we use Codigo to do that.

8     Q.  So you don't know how the Web server interfaces with

9    the BSF service, other than to say Codigo is used; is that

10   right?

11    A.  We use Codigo, yes.

12    Q.  (By Mr. Abrahamsen)  Now, what about on the -- on

13   the

14   client side, on the service side.  Are you able to explain

15   how the BSF service interfaces with the customer review

16   service in terms of taking the post and extracting the

17   relevant information and passing it into the service?

18    A.  That is Codigo as well.

19    Q.  Okay.  While we were off the record, I marked some

20   exhibits here.  And we created these.  Let me explain to

21   you what they are.

22        I'll represent to you that 150-A is an HTTP Get

23   request for a detail page.  Underneath that request is a

24   header of HTML that was returned in response to that Get.

25        150-B is the returned HTML for the detail page.

1   And 150-C is a screen shot of the detail page that was

2   rendered by our browser.

3          Okay.  Exhibit 151-A is an HTTP Get -- listen to

4   this, make sure I Get it right, Jeff -- it was issued from

5   the browser when we clicked on the link that says "3-star,"

6   which is on the third page of the screen shot on 150-C.

7          Do you see that, do you see the 3-star link?

8   A.  Uh-hum (affirmative).

9   Q.  Okay.

10          At the bottom of 151-A is the header that was

11   returned along with the HTML, which has been marked as

12   151-B.

13          And 151-C is the screen shot that was rendered

14   by the browser in response to 151-B HTML.

15          Just to provide you with a context here.

16   A.  Okay.

17   Q.  Now, my questions initially are going to relate to

18   the 3-star review link.  I'm going to use that as one

19   example to try and track the manner in which a request

20   finds its way to the customer review service, and then the

21   3-star reviews find their way back.

22   A.  Okay.

23   Q.  So if you look at the Get command, which is 151-A --

24   or, I'm sorry, the Get request.

25   A.  151-A?

1      Q.  Yes.  First of all, let me ask you if the cookies

2   are used for any reason in connection with the retrieval of

3    reviews for display in each HTML page.

4      A.  No.

5      Q.  Okay.  The -- in the Get URL, is there an ASIN

6    included?

7      A.  In the Get URL, that's the first line of this

8    document?

9      Q.  Well, the URL is above it.

10     A.  Oh, that's the page, the Get.  Immediately below the

11   line that says "Get"?

12     Q.  Yeah.

13     A.  I see an ASIN after the "/review/product," yes.

14     Q.  What is the "ref=cm_" et cetera, what does that

15   mean?

16     A.  Reference markers are used throughout Amazon's Web

17    site for part of our internal metrics.

18     Q.  How about "showViewpoints=0"?

19     A.  That would be a parameter to the

20   "Mason/review/products/ASIN."

21     Q.  Would the ASIN be considered a parameter as well?

22     A.  Yes, it would be.

23     Q.  That is?  Okay.

24         And then the next one is "filterBy=addThreeStar."

25   What is that?

1    A.  That would also be a parameter to that Mason page.

2    Q.  Now, where can I find the Mason code that would

3    interpret this Get?  Do you know what it's called?

4    A.  This URL, unfortunately, is rewritten from the exact

5    Mason path.  I can't recall off the top of my head.  It

6    would be something akin to "customer-reviews.M."

7    Q.  Okay.  Let's take a step back, then.  Let's go back

8    to the detail page, which is 150-C, and look at the page,

9    the third page.  They are not numbered, but it's the one

10   with that 3-star link.

11   A.  Yes.

12   Q.  Now, I don't know if you can answer this off the top

13   of your head or not.  But I identified a bunch of

14   different, what I'll call "use cases," where review

15   information will be exposed to this page, or to some page

16   the user -- the 3-star is one.  The link just to the right

17   of that, 128 customer reviews, that would be another one,

18   right?  If you click on that, that's going to cause some

19   reviews to be transferred to the Web server, and then

20   displayed, correct?

21   A.  Correct.

22   Q.  Okay.  Let's use this one, then.  And when the Get

23   is received, that's a 151-A Get, is -- can you explain the

24   process that this goes through, at a very high level,

25   and I'll drill down where necessary, as far as this method?

1      A.  153?

2      Q.  153.

3      A.  By "process," you want me to step through each line

4  as it gets executed?

5      Q.  Just generally, what's happening in the various

6  sections?  It looks like some variables are defined, some

7  methods are defined; you know, that sort of thing.  If you

8  could just walk me through that.

9      A.  Okay.  Tell me if it's too much detail.

10          Documentation section, self-explanatory.  Ones

11  are variables, are used throughout the document, as are

12  shared variables.  A prepare method is part of two-pass

13  Mason.

14     Q.  What does that mean?

15     A.  When pages are rendered, they're rendered in two

16  passes.  First, all the prepares on the components are

17  called, and then, like we saw before, the main routine is

18  called.

19     Q.  Okay.

20     A.  And it's guaranteed the prepare is invoked prior to

21  main.  The prepare takes one required argument, and four

22  optional arguments.

23     Q.  So the product is required?

24     A.  Correct.

25     Q.  The others are optional?

Keller - designations

1    A.  Correct.

2    Q.  Okay.  Now what about the next line under the INIT,

3    under that tag?

4    A.  Uh-hum (affirmative).

5    Q.  What is that doing with respect to ASIN?  It's

6    setting that to something; is that right?

7    A.  There is a Perl object referenced by product.  And

8    it's getting the ASIN attribute of that Perl object and

9    assigning it to the ASIN variable.

10   Q.  Now, what is a Perl object, in this context?

11   A.  Perl objects.  There are many different ways you can

12   form Perl objects.  A Perl object, in the most common

13   sense, is a bucket of properties -- it's the equivalent of a

14   structure in C++.

15   Q.  What is this Perl object that's created?

16   A.  The $product?

17   Q.  Yes.

18   A.  It's passed in to us.

19   Q.  Is it just a bucket of properties?

20   A.  As far as this code shows, yes, it is.  I'm not sure

21   whether there's anything more attached to it.  For our use,

22   that represents information about a product.

23   Q.  So is there one Perl object for processing ASINs,

24   then, or is there a separate object that's created for each

25   of these ASIN objects that's used?

Keller - designations

1    A.  I can't tell.  It would be hidden.  In

2    object-oriented programming, the underlying implementation,

3    we wouldn't know.

4    Q.  (By Mr. Abrahamsen)  Where would that be in the code

5    as far as the definition of the Perl object for this

6    product, and whatever methods are associated with it, if

7    any?

8    A.  I would have to track it back up to where it gets

9    passed in.

10   Q.  Which would be where?

11   A.  Maybe in the dhandler.

12   A.  So it is indeed in the dhandler.

13   Q.  (By Mr. Abrahamsen)  Okay.

14   A.  This is calling a product service.

15   Q.  Okay.  So as a result of this call to a product

16   service, a Perl object is caused to exist on the Web server

17   that you can use a method, Get ASIN, to access the value of

18   ASIN; is that right?

19   A.  That sounds accurate.

20   Q.  Okay.  Before we went off the record we were talking

21   about this ASIN=product, Get ASIN, the Perl object you were

22   talking about?

23   A.  Yes.

24   Q.  The product service, is that a separate -- operated

25   on a separate server, do you know?

1     A.  When I said "service," I was referring to the API

2     that I saw in the other file.  So it actually read as

3     "pi::product::service->retrieve."  That would be a method

4     that's called on that service.

5     Q.  Okay.  So that's a service that the Web server is a

6     client of, then; is that right?

7     A.  That is the way we name our services.  So my best

8     guess would be yes.  I'm not positive, but that's the

9     standard of our Mason.

10    Q.  Okay.  But the ASIN number is persisted, at least on

11    that product service, right?

12    A.  What do you mean by "persisted"?

13    Q.  Product is stored.

14    A.  I can't say that it's on that product service.  I

15    can say that ASIN is stored in some service.

16    Q.  Do you know whether ASIN numbers were stored in

17    memory accessible by the Web server in the 2000 to 2006

18    time period?

19    A.  Define -- define what "ASIN stored in Web server

20    memory" means.  What part of memory?

21    Q.  (By Mr. Abrahamsen)  Do you have any idea how ASINs

22    were stored in memory in that time period?

23    A.  No.  I don't know how ASINs are stored in the Web

24    server.  I wouldn't even say they are stored in the Web

25    server.

1     Q.  Let's look back at Exhibit 153 now.  And move along

2   to Page 2, about a third of the way down.  It says:

3   "My$requestArgs="?

4     A.  Yes.

5     Q.  What is that portion doing?

6     A.  That is saying -- that is putting together the

7   parameters for a request.

8     Q.  And what about the next section that starts:

9   "if(defined($filterBy))."  What is that section doing?

10    A.  That is optionally adding more parameters to the

11  request.

12    Q.  With the example we were looking at, the Get, which

13  is Exhibit 151-A, would this -- that function we just

14  looked at, that "if" statement, would that add an additional

15  parameter in response to that Get?

16    A.  Yes.

17    Q.  And what parameter is that?

18    A.  It is the "filter by" parameter.

19    Q.  And what is that set to?

20    A.  It is set to a query filter.

21    Q.  Would that value, then, be equal to "add 3-star," in

22  the circumstance of 151-A?

23    A.  I'm not positive.

24    Q.  What is the reason for the hesitation?

25    A.  The fact that we are calling set rating on the query

Keller - designations

1    filter.  And even though filter by at the time that that's

2    called, may be add 3-star, we don't know what actually is

3    done by the set rating method.

4       Q.  Okay.  So it may be a different string, but it would

5    still mean "filter by 3-stars," right?

6       A.  I don't know what it would be set to.

7       Q.  (By Mr. Abrahamsen)  What is the purpose of setting

8    that parameter?

9       A.  I'm not positive from the client side.  I would only

10   have to infer it from the naming of the method.

11      Q.  And what would that inference be?

12      A.  Set rating.  So if query filter is "set rating," it

13   would logically mean -- the combination of the two would

14   say "filter."  Based on the signatures here, I would say

15   that we would want to filter by 3-star, whatever that means.

16      Q.  Is that set rating, is that another Perl object?

17      A.  Yes.  Excuse me.  Yes.

18      Q.  Okay.  Now, the next line, the reviews request.  Can

19   you tell me what that one is doing?

20      A.  That one is sending a request to the community

21   review service, using the parameters specified above.

22      Q.  Okay.  Now, what does the "service," and then the

23   "arrow" mean, in that?

24      A.  This is part of what the Codigo generator produces.

25   It produces "pi::communityreviews::queryfiltermanipulator,"

1   and the "pi::communityreviews::service."  It produces all

2   of those objects that we use.  So I'm not sure what the

3    internals of what gets generated for that Perl Inside

4   client part does.

5      Q.  Where would that be defined in the code?

6      A.  Oh -- since this is a Codigo service, it would get

7    generated by Codigo, from the ASTL file.

8      Q.  Okay.  In fact, while we're at it, you had a chance

9   to look at the source code on the laptop, right?

10     A.  Yeah.

11     Q.  That is, in fact, Amazon source code?

12     A.  Yes.

13          MR. ABRAHAMSEN:  I'd actually like to mark the

14   laptop as an exhibit at this deposition.

15          (Whereupon, Exhibit 156 was marked

16   for identification.) (Retained)

17     Q.  Okay.  So the net result of this -- going back to

18   153, at this call to the service "getReviewsbyASIN," that's

19   going to cause BSF to generate a post, right?

20     A.  In a current use of Codigo and BSF, as I understand

21   it, yes.

22     Q.  (By Mr. Abrahamsen)  Okay.  Now, what is 157?

23     A.  This is the implementation that I was telling you

24   about.

25     Q.  Okay.  Now, where is the enact function you

1    mentioned?

2       A.  It is on Page 2, at the very top.  It reads "public

3    void enact () throws exception."

4       Q.  And at a high level, what does that do?

5       A.  People using the Codigo framework are expected to do

6    all of their business logic within the enact method.

7       Q.  So now we're on the server side, and we're in this

8    -- this method.  So what does this method got to do with the

9    example we were talking about earlier, the 3-star?

10      A.  This is going to take what Codigo provides us in

11   terms of the parameters, do what we need to do to fulfill

12   that business function.  And then provide the data for a

13   response.

14      Q.  Okay.  And what functionality is implemented -- or

15   would be implemented by the example we were talking about

16   earlier, the 3-star?

17      A.  Whatever is needed to -- whatever methods are needed

18   to "Get reviews" by ASIN.

19               (Whereupon, Exhibit 159 was marked

20   for identification.)

21      A.  Your question was, is this a Java object with state

22   and methods?

23      Q.  (By Mr. Abrahamsen)  With data and methods.

24      A.  With data members and methods, yes.

25      Q.  (By Mr. Abrahamsen)  What is the purpose of the

1    ReviewQueryImpl object?

2        A.   To formulate a search for customer reviews from a

3    TOPPS data store.

4        Q.   -- so after the comment where it says:  "Subject."

5             Do you see that, "*subject"?

6        A.   Uh-hum (affirmative).

7        Q.   So what is it doing with the object, then?

8        A.   How far down?

9        Q.   However far down it takes to find out what he's

10   doing with it.

11       A.   We'll have to follow query throughout this.

12       Q.   Okay.

13       A.   So there is "query add subject ID."

14       Q.   Okay.  And what is that doing?

15       A.   That is saying that we want to fetch all reviews

16   containing that ASIN from our data store.

17       Q.   The reviews are transferred from the review service

18   to the Web server; is that right?

19       A.   The response to the request is.

20       Q.   Response to the request.  And that response would

21   include the reviews, correct?

22       A.   In this case, yes.

23       Q.   It would also include any star ratings associated

24   with the reviews; is that right?

25       A.   Star ratings aren't associated with reviews, star

Keller - designations

1    ratings are part of reviews.

2        Q.  Okay.  So those are fields?

3        A.  That is an attribute of a customer review.

4        Q.  Okay.  And then, once it's received by the Web

5    server, the Codigo/BSF code or software somehow converts

6    the received reply -- HTPP reply into a format that can be

7    used by Mason to render a page?

8        A.  That's correct.

9            Okay.  Now, looking at Exhibit 160-A, to begin

10   with, can you tell me what Mason code would be invoked when

11   this Get HTTP request was received?

12       A.  No.  As I described earlier with the dhandler and

13   the rewrite rules, I can't pinpoint which .M or .MI file

14   would be used based on /review/create review.

15       Q.  (By Mr. Abrahamsen)  Can you tell that from looking

16   at the source code?

17       A.  Yeah.

18       Q.  Can you take a look, please?

19       A.  Oh, okay.

20       Q.  (By Mr. Abrahamsen)  So is it 166 -- the

21   create-review.MI, is that the code that's --

22       A.  All three of these are.

23       Q.  166, 167, and 168?

24       A.  Yes.

25       Q.  Does Amazon have an image server that's separate

Keller - designations

1    from the Gurupa server?

2        A.   An image server separate from the Gurupa server.

3    Yes.

4        Q.   If I could have you take a look, now, at 160-B.  And

5    take it a look at, beginning at Page 81 of that document.

6        A.   Okay.

7        Q.   And then you'll see form class=crForm.

8        A.   Uh-hum (affirmative).

9        Q.   "Method="post".  And then, "action=" and there's a

10   --

11       A.   Yes.

12       Q.   What is that telling the browser to do?

13       A.   The form itself isn't on the browser to do anything,

14   that form element is not.  It's the beginning of a form

15   element.

16       Q.   But it's on the browser, at least as a form element,

17   right?

18       A.   Yes.  It is telling it is a form element.

19       Q.   And what's it telling about the method to use when

20   the preview button is pressed?

21       A.   Does this actually have the preview button in it?

22   Whatever causes the form to be submitted will post to that

23   URL.

24       Q.   And "post," that's a method executed by the browser,

25   right?

1              MR. DONNELLY:  Objection, vague and ambiguous.

2      A.  A post is an HTTP request from client to the Web

3      server.

4      Q.  What does "crForm" mean?

5      A.  A class is a CSS style.  So it refers to visual

6      display.

7      Q.  What about "action=", what is that telling the

8      browser?

9      A.  In the case of a form element, "action=" is the URL

10      to use for the post.

11      Q.  Okay.  So it's telling the browser where to return

12      the form; is that right?

13      A.  It is -- again, what Amazon expects is when someone

14      clicks submit within one of these forms, it does the

15      appropriate post for standard forms to that URL.

16      Q.  Let me show you what was marked previously as

17      deposition Exhibit 70.  And --

18              MR. DONNELLY:  Do you have a copy?

19              MR. ABRAHAMSEN:  I'm sorry.

20              MR. DONNELLY:  Thanks.

21              MR. ABRAHAMSEN:  -- it's a document authored by

22      you; it's dated October 31st, 2003.

23              Do you recognize this?

24              Actually, a different question:  Did you

25      actually author this document?

1     A.  Yes, I believe so.

2     Q.  (By Mr. Abrahamsen)  The question I had was --

3   actually, the first line of the document, it says:  "The

4   customer review service provides access to customer written

5   product reviews.  Customer reviews are one of the essential

6   features requested by all of our partners and future

7   marketplace customers."

8          What did you mean by -- when you said it was an

9   "essential feature"?

10    A.  2003.  Trying to guess what I remembered at the time.

11  It would mean that it was an important feature for our

12  partners, one of the things that they mention when they

13  come to us and they would like us to provide Web store, Web

14  service for them.

15    Q.  When you said "essential," does that mean that you

16  -- do you think Amazon could remain competitive if it could

17  no longer service reviews of products?

18    A.  I don't know.

19    Q.  (By Mr. Abrahamsen)  Did you consider it to be

20  essential when you wrote that it was "essential"?

21    A.  Essential, is in quotes.  There are many ways that

22  "essential" could be interpreted.  I would not say that the

23  Web site would cease to exist if the customer reviews were

24  not there; that's not the way I would interpret

25  "essential."

Keller - designations

1      Q.   Would Amazon sales go down?  Would their sales go

2    down if reviews weren't there?

3      A.   I have no idea.

4      Q.   (By Mr. Abrahamsen)  Have studies been done to

5    determine whether that would happen?

6      A.   Not that I'm aware of.

7      Q.   Have studies been done to determine the effect of

8    reviews on sales?

9      A.   You said "effect of reviews on" --

10     Q.   Effect of reviews on sales of product.

11     A.   No.  Not that I know of.

12     Q.   What is the code that would be used to receive and

13   process this Get command?

14     A.   Gp/yourstore/ratings/submit.M.

15     Q.   What about 170-B?

16     A.   The same one.

17     Q.   What is "your store"?  What does that refer to?

18     A.   169-C is considered one part of "your store."  Your

19   store is considered this page.  And if you click on any of

20   the links below the search bar, the links reading:  "Your

21   browsing history," "Recommended for you," "Rate these

22   items," "Improve your recommendations," "Your profile,"

23   "Your communities," and "Learn more."

24     Q.   Okay.  If you look at Exhibit 169-B, on Page 90.

25     A.   Okay.

1      Q.   You'll see there, it says -- right about the third

2    of the way down, it says:  "<Input type=hidden,"

3    "name=rating_asin," "value=", and there's a value?

4      A.   Yes.

5      Q.   Does that tell you what that "rating_asin" is?

6      A.   That's a standard HTML input form value, yes.

7      Q.   And at the end of that string, there's a

8    .rating.125=5."

9      A.   Let me see.

10     Q.   Do you see it?

11     A.   I don't see that.

12     Q.   I'm sorry, on Page 178.

13     A.   Okay.  Back in the Get command?

14     Q.   Yes.

15     A.   Okay.

16     Q.   Does that correspond to the star that the user

17   clicked on?

18     A.   Which one again?

19     Q.   "Rating.125=5"?

20     A.   It is "1592286461.rating.125=5."

21     Q.   But does the "=5," does that correspond to the star

22   the user clicked on?

23     A.   I would have to look at the content.  It would

24   correspond to that input element in value.

25     Q.   And 170-B, in the Get command, there's an "ASIN=" --

1    I'm sorry -- "rating_ASIN=", there's a long string, and

2    then "rating.own=own"?

3        A.   Uh-hum (affirmative).

4        Q.   Does that correspond to that the user clicked on the

5    "I own it" box?

6        A.   I'd have to look at the form element on that page.

7        Q.   Is that your understanding, though?

8        A.   My understanding is there would be an input element

9    with "1592286461.rating.owned," and if it was checked, then

10   it would be sent to "own."

11       Q.   Let's look at 171-A now.  I'll represent to you that

12   this is a Get that was issued by the browser when a user

13   clicked on -- the bottom of Page 3, there's some "yes-no"

14   buttons where it says:  "Was this review helpful to you,"

15   at the very bottom.

16       A.   Of which exhibit?

17       Q.   Of 150-C.

18       A.   That looks right.

19       Q.   Does a user have to sign in to vote whether a review

20   is helpful to them or not?

21       A.   Not to my recollection.

22       Q.   Let me have you look at 171-A, which I'll represent

23   to you is the Get that was issued when the "yes" button was

24   clicked on.

25            At the very end of the URL of the Get request,

1       there's a parameter that says:  "NeedsSignIn=1."

2           A.  Okay.

3           Q.  Do you know what that is doing?

4           A.  I'm not sure what that is doing.

5           Q.  Okay.  Could a user have to sign in to vote whether

6       a review is helpful or not?

7           A.  Sorry.  I missed --

8           Q.  Is it possible that a user would have to sign in to

9       vote as to whether a review is helpful or not?

10          A.  It is possible.

11          Q.  And the "voteValue=1" at the very end, is it your

12      understanding that that corresponds to a "yes" vote?

13          A.  It would depend on what the input value is for that

14      button in the form that's being displayed.  It would be an

15      input with name-vote-value and "value=1."  I'm not sure

16      that's assigned -- which element it's assigned to on 150-C.

17          Q.  How about content ID?

18          A.  Sorry.  Content ID.  The "2115%7CR1," etc., to the

19      next ampersand, refers to the customer review.

20          Q.  Okay.  So that identifies the customer review?

21          A.  It contains the customer review identifier in it.

22          Q.  Okay.  All right.  And I assume that you have no

23      idea what role, if any, cookies play, either sending or

24      receiving cookies in the processing of these, or issuing

25      these pages?

Keller - designations

1     A.   No.  It would be the same extent to which the

2     customer reviews functions.

3     Q.   Okay.  Now, I'll have you look at 175.  I guess we

4     can -- A through D -- I'm sorry, A through E.  And I'll

5     represent to you that these are Get commands that were

6     issued by the browser when the user clicked on -- there it

7     is -- one of the stars on the middle of Page 3, where it

8     says:  "Rate this item to improve your recommendations."

9     A.   Okay.  I see that.

10    Q.   What source code would be used to process this Get,

11    when it's received by the Web server?

12    A.   Because the URL is www.amazon.com, it would be

13    another Mason component.  My best guess at a name would be

14    "/gp/yourstore/ratings/nav2submit.M."

15    Q.   All right.  How long has Amazon allowed users to

16    rate items to improve recommendations?  How long has that

17    feature. Been around?

18    A.   I believe it was here when I hired on, September

19    '99.  So it predates me.

20    Q.   Okay.  How about the rating whether the review was

21    helpful or not?

22    A.   It's actually modifying the review to add helpful

23    votes to it.  So it's a change on the customer review.  And

24    that would have come about with our launch some time in

25    2000."

```
 1                    (Thomas Keller deposition designations end.)

 2                    MR. ABRAHAMSEN:  We're done.

 3                    THE COURT:  Is it done?  Is that completed?

 4                    All right.  We'll take a 15-minute break,

 5      stretch your legs, do some jumping jacks.

 6                    (The jury was excused for a short recess.)

 7                    THE COURT:  Please be seated.

 8                    Does Cordance have some more witnesses that they

 9      intend to call today?

10                    MR. ABRAHAMSEN:  We have our expert witness

11      available, who will probably be on for several hours.  I

12      don't know if you want to start today or start in the

13      morning.

14                    THE COURT:  How many other witnesses do you have

15      besides -- this is the expert on liability?

16                    MR. ABRAHAMSEN:  We have some more deposition

17      read-ins.  No more videos of this nature.  And we have our

18      damages expert.

19                    THE COURT:  I'm sorry.  Damages expert?

20                    MR. ABRAHAMSEN:  Damages expert, yes.

21                    THE COURT:  How do you think the read-ins will

22      take, roughly?  A morning, an afternoon?

23                    MR. ALBERT:  Now as long as the ones we had

24      today, certainly.  Probably a couple of hours.

25                    THE COURT:  Is it the belief that the expert is
```

1    going to take a day to get done, between -- well, I'm asking

2    for examination, cross-examination?

3                MR. HADDEN:  I suspect a couple hours.

4                THE COURT:  So let's just say tomorrow is

5    probably going to be mostly devoted to the expert.

6                And was it your intent after you did your expert

7    on liability to then put these depositions, to do these

8    depositions?

9                MR. ALBERT:  Yes, your Honor.

10               MR. ABRAHAMSEN:  Yes.

11               THE COURT:  So there's a possibility you could

12   get both of those done tomorrow?

13               MR. ABRAHAMSEN:  A possibility, yes.

14               THE COURT:  Is there a probability?

15               MR. ABRAHAMSEN:  Probably not.

16               THE COURT:  Is Friday your expectation for the

17   damages exert?

18               MR. ALBERT:  Yes, Your Honor.

19               THE COURT:  Now, what is the circumstance for

20   Amazon, as far as when it's beginning?

21               MR. PASAHOW:  I'm sorry, your Honor.  I didn't

22   hear the last few words.

23               THE COURT:  Once Cordance completes its case, it

24   sounds like it could be done by Friday.  Is Amazon prepared

25   to start going forward on Friday?

```
 1                    MR. PASAHOW:  Absolutely.  Yes, your Honor.

 2                    THE COURT:  All right.  And how many witnesses

 3      are we talking about on your side?  Are you planning to have

 4      any depositions read in?

 5                    MR. PASAHOW:  I'm not sure we still need

 6      depositions.  We will figure that out and see where we are

 7      after today.

 8                        In terms of live witnesses, seven, I believe.

 9                    THE COURT:  All right.  Experts will probably

10      take most of the day, then?  One expert, the expert of

11      liability?

12                    MR. PASAHOW:  The expert of liability will be

13      long, yes.

14                    THE COURT:  Are you saying the experts for both

15      of you on damages should not take you longer than half a

16      day, that is for each of you?

17                    MR. PASAHOW:  I believe that's accurate.

18                    THE COURT:  Direct and cross for each of your

19      experts I can't believe would take more than half a day, I

20      really can't.

21                    MR. ALBERT:  I think that's right, your Honor.

22                    MR. PASAHOW:  Yes, Your Honor.  This being a

23      patent case, I think their liability experts would be back

24      on to rebut --

25                    MR. ALBERT:  We would have a rebuttal case after
```

 1    their evidence.  Try to be brief, if we can, your Honor.

 2               THE COURT:  I'm sorry?

 3               MR. ALBERT:  Try to be brief, if we can, your

 4    Honor.

 5               THE COURT:  I'm trying to figure out how long

 6    it's going to take and what next week looks like and whether

 7    we're on schedule.  The reason I'm asking that is, I could

 8    let the jury break now and that would take 45 minutes from

 9    today or get your expert started.

10               MR. ALBERT:  My sense is that we're, believe it

11    or not, actually on, or even perhaps ahead of schedule.

12               THE COURT:  Mr. Albert, I wish I believed you.

13               MR. ALBERT:  I know it always gets worse as you

14    get closer to the end of the case.

15               THE COURT:  It does.  It does.  I'm sure there's

16    going to be some time that the Court and counsel are going

17    to have to spend regarding instructions.

18               MR. ALBERT:  Yes, Your Honor.

19               THE COURT:  And also the jury verdict sheet.

20    Those are two biggies I see at the end.

21               MR. ABRAHAMSEN:  I think it would be our

22    preference to start our expert first thing in the morning,

23    your Honor.

24               THE COURT:  I'm sure that's your preference.  I

25    have no doubt about that at all.

1              MR. PASAHOW:  I think if we want to make sure

2      that the liability expert is done tomorrow, we ought to use

3      our time.  That's my suggestion.

4              MR. ALBERT:  I don't think we're going to have

5      any difficulty with that.  We're down to one live witness

6      after him.

7              THE COURT:  How is it going to take you to do

8      the credentials?

9              MR. ABRAHAMSEN:  Probably 15 minutes.

10             THE COURT:  Why don't we get the credentials

11     done an then we'll break.  Just put the credentials on and

12     you can remind the jury tomorrow about the credentials and

13     the background.  Just the credentials, get them done.

14             My concern is, I'm not exactly certain the jury

15     can take too much more today because it was a bit grueling

16     this afternoon.  The stuff was very, very deep.

17             MR. ALBERT:  The worst part.

18             THE COURT:  That was not easy stuff to absorb.

19     That's for sure.

20             You were going to say something?

21             MR. HADDEN:  No.  I was just switching chairs,

22     your Honor.

23             MR. ABRAHAMSEN:  May I use the facilities, your

24     Honor?

25             THE COURT:  Yes.  I will let counsel have some

1    of the break that the jury had.

2                (Brief recess taken.)

3                THE COURT:  Is everybody ready for the jury to

4    be brought back in?

5                MR. ALBERT:  Yes, Your Honor.

6                THE COURT:  All right.  Bring in the jury,

7    please.

8                (The jury entered the courtroom and took their

9    seats in the box.)

10                THE COURT:  Members of the jury, I'm going to

11    try to get you out a little bit early today.  There has been

12    some heavy -- we're going to put another witness on the

13    stand, but it is not going to be as heavy as the material we

14    just heard.

15                I understand Cordance is planning to call its

16    expert on the liability aspects, and what we're going to do

17    is just get the expert credentials, and then we will break.

18    And I've been assured that shouldn't take long.

19                Right?

20                MR. ABRAHAMSEN:  There may be a few basic

21    questions, very basic.  Is that okay?

22                THE COURT:  That's fine.

23                MR. ABRAHAMSEN:  Plaintiff calls Dr. Michael

24    Shamos.

25                THE COURT:  Go around the maze, Dr. Shamos.

1          ... MICHAEL IAN SHAMOS, having been duly

2          sworn as a witness, was examined and testified

3          as follows ...

4                    DIRECT EXAMINATION

5    BY MR. ABRAHAMSEN:

6    Q.     Good afternoon, Dr. Shamos.

7    A.     Good afternoon.

8    Q.     Please state your full name for the record.

9    A.     It's Michael Ian Shamos.

10   Q.     And, Dr. Shamos, where do you live?

11   A.     In Pittsburgh, Pennsylvania.

12   Q.     And what is your current occupation?

13   A.     I'm employed as a professor by Carnegie Mellon

14   University in Pittsburgh.

15   Q.     And how did you get that job?

16   A.     Well, therein lies a tale.  My current position, I

17   have the title of Distinguished Career Professor at Carnegie

18   Melon.  I suppose that means that I was to have had a

19   distinguished career, but what really happened was, I went

20   and asked for a raise one day, and I came out with a new

21   title instead, which was the way things usually happen at

22   University.

23          My job is to -- I'm employed by the School of

24   Computer Science, which is a separate school within Carnegie

25   Melon.  It's similar to an engineering school in that it has

Shamos - direct

1   many different departments.  I have appointments in two of

2   those departments.

3          One is the Institute For Software Research,

4   which does pretty much what you would expect for something

5   named the Institutes For Software Research, and I also have

6   an appointment in something called the Language Technologies

7   Institute, which is another department that studies the

8   processing of language of various kinds by computers.  For

9   example, the understanding of human speech, translation of

10  text from one human language into another, and very

11  recently, although I'm not involved in it, the study of

12  genetic DNA sequences as a language by which nature

13  expresses things, like properties of organisms.

14         We consider that a language because it really is

15  composed of letters that indicate the genetic code.

16         Within the Institute For Software Research, my

17  full-time job is to run a program that's a professional

18  Master's degree in e-business technologies.

19         We take people who have typically undergraduate

20  degrees in computer science or engineering, who have usually

21  something like five years of work experience in industry,

22  and then we bring them in and train them to be professionals

23  and designing electronic business processes and creating the

24  technology behind those electronic business processes.

25         So if you take a traditional business, one that

1    hasn't really been computerized before, and you would like

2    to give it all the advantages of wireless technology, the

3    Internet, computers, global positioning system, all of that,

4    our people would swoop down on your business, analyze it,

5    and come up with technological solutions that would bring

6    you into the information age.

7            That is a 12-month full-time problem.  I direct

8    it and I teach two of the units in that program.  One is

9    called Ubiquitous Computing, which is the idea of, what kind

10   of technology would we need to have computers everywhere.

11   There's one in front of me here, but we could have them

12   embedded in the table and walls of the room.  There can be

13   cameras and microphones all being processed together.

14   That's what Ubiquitous Computing is.

15           And the other unit that I teach is Electronic

16   Payment Systems, which is -- it's real simple in concept.

17   It's how do vendors get actually paid for things when they

18   sell them electronically.

19           Outside of that Master's program, I teach a

20   course in law of computer technology.  It's a required

21   course for a different Master's program that we also -- that

22   we offer, but many the students in my program take it.

23           How did I get the job?  I've been associated

24   with Carnegie Melon continuously since 1975, although I've

25   taken some time as an adjunct faculty member, which means I

1    didn't have full-time teaching responsibility, to do some

2    other things.

3              And the way I got to Pittsburgh was, I started

4    out being involved with computers when I was 15 years old,

5    which is a really long time ago, but it was 1962.  And if

6    you want to separately do your arithmetic to figure out how

7    old I am, you can do that.  I don't want to tell you.

8              But I had the opportunity to attend Columbia

9    University while I was in high school on Saturdays.  They

10   had a free program for high school students, and one of the

11   newfangled technologies that was available then at Columbia

12   was computers.  They allowed us hands-on time with computers

13   and provided instructors to teach us programming.  I became

14   hooked then.  I did some programming for my high school.

15             When I went to undergraduate school, they had a

16   computer center, but you couldn't really study computer

17   science.  It wasn't even a named discipline.  They had

18   courses in programming, but you couldn't get a degree in it.

19             So I took an undergraduate degree in physics

20   from Princeton, but I spent most of my time in the computer

21   center.  The idea was at the end of that, I wanted to get

22   the dream job working for IBM.

23             And that's exactly what happened.  I did get the

24   dream job.  I became a programmer for IBM in their largest

25   facility in the world, which meant most people still have

1    never heard of.  It's called IBM East Fishkill.  It's in a

2    tiny place in -- slightly north of New York City, where they

3    manufacture semiconductors for internal use within IBM,

4    the actual circuits that do the processing for IBM

5    computers.

6            I loved that job.  It was a modern facility.  We

7    were doing all the latest stuff, but then the Vietnam war

8    entreated, and IBM told me that they weren't going to put me

9    up for anymore deferments.  I was just going to have to go.

10           So after trying out various opportunities for

11   enlistment, I ended up in the United States Public Health

12   Service, serving at the National Cancer Institute in

13   Bethesda, Maryland for the two years of my service.

14           I was a supervisory programmer at the National

15   Cancer Institute.  The project there is a huge project.  The

16   Cancer Institute was spending a fortune, and still does

17   spend a fortune to test every substance in the world, to see

18   if it might in some way cure or slow the progress of cancer.

19   They test every chemical.  They test every plant.  They test

20   every thing, because we would look really stupid if

21   Styrofoam cups cured cancer and we never figured it out.  It

22   wouldn't be good.

23           So there was a very large data processing system

24   involved that took in data from all the testing laboratories

25   around the world.  I processed them every night and then

1    issued reports to the doctors that they could study to see

2    whether anything showed any promise.  I was responsible.  I

3    was the supervisory programmer for that data system.

4            And I spent a lot of my time at the computer

5    center, at the National Institutes of Health.

6            My fiancee suggested it might be time to get

7    another degree, to advance my career, and by that time,

8    there was a computer science.  So this was now 1972.

9            By 1972, there were universities that had

10   departments of computer science.  I thought I had enough

11   credentials and I applied to Yale University, which had

12   recently started a computer science department.  I was in

13   the second intern class at Yale.  There, I studied

14   theoretical computer science somewhat far removed from

15   programming, although I did continue to program because I

16   liked it.  And after three years, I left Yale because I got

17   hired by Carnegie Melon University.

18           My job at Carnegie Melon was to do two things.

19   One was to teach graduate courses in algorithm design, which

20   is the field I had studied for the Ph.D., but also to be in

21   charge of undergraduate introductory programming.

22           So I had to design and staff the introductory

23   programming courses, so the Jekyll part of me was teaching

24   undergraduate in freshman, and the Hyde part was teaching

25   the graduate students.

1           As if this wasn't enough to keep me busy, I

2    enroll in law school in 1978 for historical reasons we need

3    not go into, but I became an attorney in 1981.  I was

4    admitted in Pennsylvania, still admitted.  And because I had

5    technical credentials, I was eligible to take the Patent Bar

6    Examination, and so I became a patent attorney also in 1981,

7    never with the intention of practicing, but circumstances

8    were that I had the occasion to start a software business in

9    Pittsburgh.

10          I took adjunct status from Carnegie Melon.  The

11   purpose of this was to commercialize some software that had

12   been written by a graduate student at Carnegie Melon that I

13   thought -- it was the greatest thing I had ever seen up to

14   that point, and I thought it would be a real shame if nobody

15   got to use it.

16          So I formed a company, and I immediately found

17   that being a lawyer was pretty useful if you were forming a

18   company and trying to negotiate contracts with people and

19   negotiate deals, and particularly worry about copyright and

20   patent -- patent issues.

21          I spent from 1979 through to 1987, I formed two

22   software companies in Pittsburgh, and ultimately sold them

23   in 1987.  And then the time wasn't right to go back to CMU

24   for personality reasons between me and other faculty and

25   administrators.  So instead, I went to one of the law firms

1    that helped me in starting my businesses, and I said, how

2    about if I come work for you?

3             And so I was hired as a full-time intellectual

4    property lawyer from 1990 to 1998.  I did patent copyright

5    and trademark law for other people.  But almost every case I

6    was involved in had something to do with computers.  That

7    was my specialty there.  So any computer case came to me,

8    and any weird case came to me.

9             In 1998, I sort of did a reassessment, is this

10   what I want to do forever.  It was fascinating.  Every time

11   a new matter came in, I loved it, but there was a major

12   grind to it.  You had to account for every 15 minutes that

13   you spent all day long.  And so I was kind of ripe for a

14   change.

15            And a Christmas party happened to be held on my

16   block, and the dean of the school of computer sciences in a

17   neighborhood of mine, we found ourselves at the same

18   Christmas party.  And I mentioned to him a project I had

19   seen that CMU was then involved in called the universal

20   library, the idea of which was to digitize everything on

21   earth that had never been digitized before.

22            So now if you publish a book, it's in digital

23   form.  The typists at the publisher will key it into a

24   computer.  It's digitized even though it may be printed on

25   paper.  But books that were printed in 1850 are not

 1    digitized, and so the only way you're ever going to find

 2    them is to go to a library, find a library that has one and

 3    kind of skim through it, because you can't search paper

 4    books.

 5            So the idea of the universal library was just

 6    digitize everything there is and create a search engine for

 7    it.  And I found that project kind of huge and wonderful and

 8    fascinating.  So I mentioned to the dean, I'm really

 9    fascinated by this universal library project you've got.

10    And he said, how would you like to run it?  And I said,

11    okay.

12            So that night, it was December of 1997 was when

13    the party was, I agreed to come back to CMU full-time, but I

14    had been getting promoted sort of in absentia during that

15    time, so I was already at the full professor level.

16            And I came back, and the universal library

17    project was fascinating, but something equally interesting

18    came up about a few months later, when -- this was at the

19    time of the Internet boom.  This was the late 1990's.  The

20    Internet had been around and had been flowering for four or

21    five years.  Companies, like Amazon, for example, were

22    expanding very rapidly and had very huge stock

23    capitalizations in the market.  They were worth billions,

24    billions of dollars, even companies that didn't show

25    profits.

1            And our customers at the university -- and it

2     might surprise you to know that our customers are not our

3     students.  Our customers are the companies that hire our

4     students.  They're the ones that want to be sure that we're

5     producing people that are hirable.  They came and said, who

6     are you producing who are capable of running e-commerce

7     businesses?  And the business school looked at us and we

8     looked at the business school, and between us, we decided we

9     weren't producing anybody who was capable of running an

10    e-commerce business.  So we did a joint venture with the

11    business school.

12            They -- we created an institute for e-commerce.

13    They hired one of their guys as the director from the

14    business school side, and the computer science school named

15    me as the director for the computer science side.

16            So as director and co-direct, we designed and

17    implemented that business program.  It lasted for five

18    years.  It got ranked number two in the world by the Wall

19    Street Journal.  And then the business school got a new

20    dean.  They pulled out.  And I took over the whole thing.

21    And so now it's run completely out of the school of computer

22    science by me and 12 other faculty.

23            So it was sort of a long roundabout way of

24    answering your question, but that's how I got to my current

25    position.

Shamos - direct

1   Q.      Thank you, Dr. Shamos.

2              MR. ABRAHAMSEN:  Plaintiffs would like to tender

3   Dr. Shamos as an expert in this matter.

4              MR. HADDEN:  No objection, Your Honor.

5              THE COURT:  He is accepted.  Granted.

6   BY MR. ABRAHAMSEN:

7   Q.      Just a few simple questions today.  What is a

8   browser?

9   A.      Well, I'm glad you asked a simple question because I

10  was sitting here listening to those depositions and most of

11  those questions were not simple.

12             Okay.  So a browser is a computer program.

13  Typically, it runs on a personal computer that is operated

14  by an individual.  So if you would like to view things on

15  the Internet, the way you typically do it, although it's

16  possible to do it other ways, but almost universally people

17  run a program called a browser; and the most famous one now

18  is Internet Explorer, but there is also something called

19  Firefox, and now Google has its own called Chrome.  So

20  they're competing with one another because you spend so much

21  of your time while you are on the Internet at the browser,

22  and so whoever is controlling your browser is controlling

23  your experience.

24             So it's a computer program that accepts files

25  that are served to it from other computers around the world

1   over the Internet, and those computers that serve things to

2   the browser are called servers or typically Web servers.

3   Q.      And what is HTML?

4   A.      HTML is one of the most popular representation

5   languages that is understood by browsers.  So when you look

6   at a Web page, you see text, you see colors, you see images,

7   you see underlined and highlighted things that you can click

8   on.  You see buttons.  You see all kinds of stuff on a page

9   that makes for a very rich visual experience for you.

10          The problem, though, is in a computer, you can't

11   represent an image is a picture.  An image is just zeroes

12   and ones and text is just zero and ones, and buttons are

13   just zeroes and ones.

14          So what is it that you can send to the browser

15   program that would make it produce that pretty page that you

16   can easily interact with?  And there is a language that was

17   developed very early in the time of the World Wide Web

18   called HTML.  That is actually stands for hypertext markup

19   language.

20          There was testimony from Mr. Reed this morning

21   about hypertext and hypertext started in the 60s.  But there

22   wasn't a hypertext markup language for the Web until the

23   early 1990s.  And the hypertext markup language is kind of

24   intermediate language.  It's something that computers can

25   understand but it's also something that the trained human

Shamos - direct

1  being can actually look at it and read.  I think in the

2  video deposition, there were times when the witness was

3  asked to look at some HTML and answer questions about it.

4  If he had been asked to look at huge sequences of ones and

5  zeroes in the computer, he wouldn't have been able to answer

6  any questions about it.  So it's this kind of wonderful

7  intermediary thing that trained humans can understand.

8          But the browser takes this HTML, and it starts

9  at the top of the HTML files and reads each line and

10  interprets some lines in the command to cause it to go fetch

11  a picture and stick it here and go create a button and put

12  the button there and highlight this and boldface that.  And

13  it all happens very fast because, as you know, if you have a

14  high speed Internet connection, that screen can flash up in

15  a fraction of a second.  But some of the HTML that causes

16  that to happen is many, many, many, many pages long.

17          And so it's one of the main languages of the

18  Web.  There are other ways of expressing Web pages to a

19  browser but HTML is the popular one.

20  Q.     How about HTTP?  What is that?

21  A.     Yes.  So the H stand for the same thing.  HTTP means

22  hypertext transfer protocol.  And if you understand that

23  HTML is hypertext, then the question is -- well, maybe I

24  should explain what hypertext is.

25          You all know what text is.  A book has text in

Shamos - direct

1   it.  But if you want to distinguish between boldface and

2   italics and big chapter headings and footnotes and things

3   like, that how do you tell that this text is supposed to

4   look different from that text?  And the way you do that is

5   by putting markings in it.  Something like what a

6   proofreader might do if he wanted to say you should

7   italicize this.  He will put a symbol and mark where you

8   should italicize or maybe make this boldface.

9           But hypertext markup language is a way of

10  expressing those things.  Hypertext is text with additives,

11  stuff added to it.  And HTML is one way of expressing

12  hypertext.

13          But on the Internet, what you have to do is you

14  have to get the hypertext from the server that is housing it

15  to your browser, my browser, everybody else's browser; and

16  that requires transportation, transmission.  And so another

17  word for that is transport.  How do you transport the file

18  or the content of the file from one place on the Internet to

19  another place on the Internet?  And so HTTP is a protocol,

20  the hypertext transfer protocol which is a set of rules that

21  are commonly understood and implemented by a Web browsers

22  and all Web servers.  If they don't speak HTTP, then they

23  can't talk to each other.

24          So if I have a Web server, it's a guarantee it

25  knows HTTP.  If I have a Web browser, it's a guarantee it

Shamos - direct

1    understands HTTP.

2         So there are a small number of commands that

3    these guys send each other.  One typical command is Get, for

4    example, which says I know there is something out there that

5    you've got.  I want to get it.  Please send it to me.  And

6    another one we've been talking about is Post, which is I

7    have got some stuff that I want you to accept.  I want to

8    post it to you.  It's posted almost in the same essence as

9    the Post Office is mailing it to them.  And so the HTTP is a

10   protocol which means it is a set of rules understood and

11   implemented by computer programmers, but there are also some

12   commands in HTTP like Get and Post that we've been talking

13   about.

14   Q.    And I think the final question for today is, what is

15   a cookie?

16   A.    Well, a cookie is many things, aside from something

17   delicious to eat.

18         A cookie is a very clever mechanism that is used

19   on the World Wide Web that enables websites to store small

20   amounts of information on the hard drive of your computer.

21   But when I say "clever," the reason it's clever is that it's

22   done in such a way that if Amazon puts a cookie on your

23   machine, then nobody else, other than you, can read what is

24   in that cookie.  Their competitors, Barnes & Noble, for

25   example, cannot look at the Amazon cookie; and Amazon can't

Shamos - direct

1     look at the Barnes & Noble cookie.

2               And if you are an active Internet user, you

3     might have thousands of cookies on your machine, and they

4     only go to the website that created them.  And the

5     information that is stored in the cookies is pretty much up

6     to the website that created them.  Sometimes they're easy to

7     read and understand.  Sometimes they're encrypted for

8     various reasons.  Sometimes for your own security, you don't

9     want to, for example, have your credit card number stored

10    straight as a credit card number in a cookie.  It's getting

11    transmitted over the Internet unencrypted.  You don't want

12    that.

13              But there is another reason for encrypting

14    cookies, and that is that you don't want one person to be

15    able to masquerade as another person.  So if I want to order

16    something from Amazon, I don't want to be able to order on

17    your behalf and have you get charged for it, or at least

18    Amazon doesn't want that and you don't want that.

19              So there are various reasons that cookies, when

20    you look at them, don't have an obvious meaning.  They just

21    seem to be a jumble of characters.

22              In each part of the process of sending hypertext

23    over the Internet, the browser automatically knows if there

24    are any cookies that are related to this website.  It sends

25    all cookies that are related to that website with every HTTP

1    message that gets sent over the Internet.  And, typically, a

2    website will have one or a small number of cookies, but they

3    could have them all.

4              THE COURT:  All right.  Thank you.

5              MR. ABRAHAMSEN:  That's it for today.

6              THE COURT:  Members of jury, we're going to

7    close out the day, and I will see you then tomorrow at 9:00

8    o'clock.

9              Just as a reminder, please do not read or look

10   at anything in the media that may be related to this case,

11   have safe travels and a good night.

12             (Jury left courtroom.)

13             THE COURT:  Dr. Shamos, you may stand down.

14             Just as a reminder, you are not to discuss your

15   testimony.  Thank you.

16             Counsel, is there anything that you wish to

17   bring to my attention?  I know that we've got to finish up,

18   we've got to get the documents or the exhibits completed.

19   Do you have those together?

20             MR. ABRAHAMSEN:  We do have a list here.  And

21   this includes both some that weren't actually discussed and

22   the other ones; but I think we agreed for today these were

23   okay?

24             THE COURT:  I think I said I would allow it for

25   today because of the circumstances because we had discussed

1   it previously.

2              MR. PASAHOW:  Can we just check the list and

3   verify?

4              (Pause.)

5              MR. ABRAHAMSEN:  I guess they want to take a

6   second and look.  We'll give you the list in the morning,

7   Your Honor.

8              THE COURT:  In the morning?  We will need the

9   list of that.  We can attach exhibit numbers to them.  I

10  guess you know the exhibit numbers you have there are the

11  exhibit numbers on the stand?

12             MR. ABRAHAMSEN:  Yes, these will be the final

13  exhibit numbers.

14             THE COURT:  Okay.  And the plaintiff will have

15  plaintiff, defense and joint exhibits included in that list.

16             MR. ABRAHAMSEN:  Correct.

17             MR. PASAHOW:  Your Honor, we've been

18  contemplating a motion to put under seal, and we're

19  wondering what we should be doing with that list for the

20  code documents, and then the computer.  Shall we just go

21  ahead and indicate that they're under seal, and, when the

22  time comes to have them leave this court, we can --

23             THE COURT:  Well I think you'd better designate

24  them as being under seal and the rest.

25             MR. PASAHOW:  Okay.

1          THE COURT:  Because I don't know which exhibit

2     numbers they are.

3          MR. PASAHOW:  Sure.  We will do that.

4          THE COURT:  That will be most helpful.  That

5     way, we can -- you are going to hold on to that information

6     anyhow, for now at least.  And I don't know if we have to

7     deal with that during the trial.

8          (Court and deputy clerk confer.)

9          THE COURT:  Mr. Looby has had a suggestion based

10    upon past experience with this.

11          One approach is that the Court can hold on to

12    the sealed exhibits and we may need to do so through the

13    appeal process, and then if anybody made a request for them,

14    you just go, "sorry, we can't give them to you" or we have

15    to have a hearing.  I don't know if anybody outside the

16    parties are necessarily going to be interested, but there

17    could be, as Amazon has expressed a concern about, frankly.

18          The other approach is to let you hold on to

19    them.  That they'd have to be preserved in some way, and

20    then the obligation would fall on to you to make sure they

21    are preserved and safe and kept, should an appeal occur --

22    when the appeal occurs in this case.  If there is any reason

23    that the Fed Circuit wishes to look at this, we would have

24    to produce it.

25          MR. PASAHOW:  Right.  Given the Fed Circuit

1    record, that's not likely, but ...

2              THE COURT:  Probably not.

3              MR. PASAHOW:  I understand.  Yes.

4              THE COURT:  What I don't want to have happen is

5    if the request is made by an appropriate authority, and we

6    sit there and go, gee, we don't know where it is.

7              MR. PASAHOW:  Absolutely.  They certainly need

8    to be preserved.  We understand that.

9              Why don't we discuss which of the two methods.

10             THE COURT:  And if you have a third method,

11   fine, I'll listen to it; but these are the two methods that

12   have been done in this court before.

13             MR. PASAHOW:  Very good.  Thank you.

14             THE COURT:  Now, is this going to be, besides

15   this list of exhibit, is counsel aware of anything else that

16   potentially needs to be discussed tomorrow morning before we

17   continue with the testimony of Dr. Shamos?

18             MR. ALBERT:  No, your Honor.

19             MR. PASAHOW:  No, your Honor.

20             THE COURT:  All right.  So then we will begin at

21   9:00.

22             And you've got access to get in contact with me.

23   However, if you send me an e-mail at 12:30, I'm probably not

24   going to read it before 5:30 tomorrow morning.

25             MR. DAY:  Your Honor --

```
 1                  THE COURT:  Yes?

 2                  MR. DAY:  -- with respect to e-mails, we had

 3    some confusion about e-mails last night, and e-mails got

 4    sent to you without anybody from our side being copied.

 5                  I just wanted to put it in the record, should

 6    they use e-mail in the future to contact your Honor, they

 7    should make sure all parties are copied.

 8                  MR. ABRAHAMSEN:  Your Honor, we were copied on

 9    the e-mail.

10                  MR. ALBERT:  Certain people were, certain people

11    weren't.

12                  THE COURT:  I think maybe you should indicate or

13    designate who definitely needs to be copied, and it would

14    make sense to me that probably local counsel should be

15    included on that list.

16                  MR. DAY:  Thank you, your Honor.

17                  MR. PASAHOW:  I apologize.

18                  MR. DAY:  No apology necessary.

19                  THE COURT:  Well, they are eventually

20    responsible, because if outside counsel causes me any

21    headaches, local counsel are going to get the blame.

22                  All right?  Understood.  All right.

23                  All of you have a very good evening.

24                  (Counsel respond, "Thank you, Your Honor.")

25                  (Court recessed at 4:57 p.m.)
```