1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

      CORDANCE CORPORATION,

4                                   :     CIVIL ACTION
                   Plaintiff,       :

5       v                           :
                                    :

6       AMAZON.COM,                 :
                                    :     NO. 06-491 (MPT)

7                   Defendant.
                              - - -

8

                          Wilmington, Delaware

9               Thursday, August 6, 2009 at 8:56 a.m.
                           ***VOLUME D***

10                             - - -

11

      BEFORE:   HONORABLE **MARY PAT THYNGE**, U.S. MAGISTRATE JUDGE,

12                                        and a jury
                              - - -

13      APPEARANCES:

14

                   ASHBY & GEDDES, P.A.

15                 BY:  JOHN G. DAY, ESQ.

16                      and

17                 WOLF GREENFIELD & SACKS, P.C.
                   BY:  MICHAEL C. ALBERT, ESQ.,

18                      ROBERT M. ABRAHAMSEN, ESQ.,
                        JEFFREY C. O'NEILL, ESQ., and.

19                      CHELSEA A. LOUGHRAN, ESQ.
                        (Boston, Massachusetts)

20
                        Counsel for Cordance Corporation

21

22                 POTTER ANDERSON & CORROON, LLP
                   BY:  RICHARD L. HORWITZ, ESQ.

23
                        and

24

25      Kevin Maurer                    Brian P. Gaffigan
        Official Court Reporter         Official Court Reporter

```
1    APPEARANCES: (Continued)

2

3              FENWICK & WEST, LLP
               BY:  LYNN H. PASAHOW, ESQ.,
4                   J. DAVID HADDEN, ESQ.,
                    DARREN E. DONNELLY, ESQ.,
5                   SAINA S. SHAMILOV, ESQ., and
                    RYAN J. MARTON, ESQ.
6                   (Mountain View, California)

7                       Counsel for Amazon.com

8

9

10

11                      - oOo -

12              P R O C E E D I N G S

13              (REPORTER'S NOTE:  The following proceedings

14   were held in open court, beginning at 8:56 a.m.)

15              THE COURT:  Please be seated.

16              Before we get started today, that is, having the

17   jury brought back in, on the yesterday's transcript, I think

18   I -- well, I haven't checked the other transcripts in detail

19   but this one did concern me a little bit.  Page 538 of the

20   transcript, last paragraph on that page, the word "not" is

21   missing from the second sentence.  I responded, I said I'm

22   going to allow it.  It should be I'm "not" going to allow

23   you to suggest it to the jury that Mr. Reed did something

24   improper before the PTO.

25              MR. ALBERT:  Thank you, Your Honor.
```

1          THE COURT:  I just wanted to make sure everybody

2    knew that.  Now, I haven't checked in detail the other

3    transcripts to confirm it.  Certain things when there is a

4    slight error, I don't get concerned about, but when there is

5    a word like a "not" inserted or excluded, I think that is

6    important.

7          In addition, I've also received two motions:

8    One from Cordance to strike the surprise Kulfan declaration

9    and one on behalf of Amazon to preclude plaintiff from

10   presenting damages on infringement on the '717 and the '325

11   patents prior to December 11th, 2001.

12         Since we are not having any testimony today that

13   I'm aware of on damages -- is that correct?

14         MR. ALBERT:  It would depend on whether we

15   complete the liability phase, which is a possibility.

16         THE COURT:  Okay.  Well --

17         MR. ALBERT:  We can simply decide we won't.  If

18   Your Honor wishes to make sure we don't start that until

19   tomorrow morning, we can resolve the issue.

20         THE COURT:  Well, you could start damages and

21   get some evidence in and we can just reserve this portion

22   until we get the issue decided.  I mean this is part of the

23   damage claim.  It's not all of the damage claim.

24         MR. ALBERT:  Yes, Your Honor.

25         THE COURT:  So I'm thinking maybe it's something

1    I work on tonight.  It will also give I guess Cordance an

2    opportunity, if they wish to, file a written response to the

3    motion.  It's up to you.  You don't have to.

4              MR. ALBERT:  We would wish to, Your Honor.  I

5    mean it is -- the Court had indicated there would be no

6    Daubert motions so this come as something of a surprise to

7    us.

8              THE COURT:  I don't think this is a Daubert as

9    much as it being a 15(c) motion as to how far back you can

10   go on damages.  I don't consider it to be Daubert because it

11   doesn't go to the qualifications of the expert.

12             MR. ALBERT:  It doesn't go to his

13   qualifications.  I believe the arguments they're advancing

14   is the approach he took to the analysis.

15             THE COURT:  No, I think they're simply saying

16   you have got a statute of limitations problem and you can go

17   only back -- on the damage aspect, you can only go back six

18   years.

19             MR. ABRAHAMSEN:  Your Honor, I don't think I

20   received the motion.

21             THE COURT:  Well, this came in at 8:40.

22             MR. ABRAHAMSEN:  That's why.

23             MR. ALBERT:  We haven't been provided a copy,

24   Your Honor.

25             THE COURT:  Okay.

1              MR. HORWITZ:  Your Honor, we just filed it, as

2     you know, at that time and someone was going to bring over

3     the copies as soon as we could bring them.

4              THE COURT:  That's fine.

5              MR. HORWITZ:  We didn't intend to raise it this

6     morning.

7              THE COURT:  Well, I got it.

8              MR. HORWITZ:  No, I understand.  And we would

9     have mentioned that but Your Honor beat us to the punch, but

10    we didn't intend to raise it this morning.

11             THE COURT:  You should be given an opportunity,

12    if you wish to file a written response, to file a written

13    response.

14             MR. ALBERT:  Thank you, Your Honor.

15             THE COURT:  However, I need the written response

16    by 6:00 o'clock tonight.

17             MR. ALBERT:  If we could have a copy of the

18    motion, perhaps we could get started on that.

19             THE COURT:  And I would think that you could

20    provide that.  If they don't have a copy for you, we can

21    make a copy for you.

22             MR. ALBERT:  Thank you.

23             THE COURT:  Concerning Cordance's emergency

24    motion to strike the surprise Kulfan declaration, is this

25    going to be an issue that is going to arise during any of

1    the testimony today?

2            MR. PASAHOW:  No, Your Honor.  This has to do

3    with testimony during our case, I believe.

4            THE COURT:  Well, I just wanted to make sure.  I

5    was working from the understanding that that was probably

6    the case but I didn't want to assume anything in that

7    regard.

8            MR. HORWITZ:  Your Honor, the motion just

9    arrived.

10           MR. ALBERT:  Oh.  Thank you.

11           (Documents passed out.)

12           THE COURT:  All right.  In light of this, then,

13   if Amazon intends to file a written response to that, they

14   shall do it by 6:00 o'clock tonight.

15           MR. PASAHOW:  Thank you, Your Honor.

16           THE COURT:  So these are two issues I don't need

17   to address now.

18           (Pause.)

19           THE COURT:  Is there anything, though, that I do

20   need to address that counsel wishes to bring to my attention

21   prior to bringing in the jury?

22           MR. ABRAHAMSEN:  The only thing, you can

23   probably guess, Your Honor.  We prepared a list of trial

24   exhibits to be submitted into evidence.  And we've separated

25   them into source code exhibits and non-source code exhibits.

1    Counsel has had an opportunity overnight to look at the list

2    we gave them yesterday.

3              MR. DONNELLEY:  Yes, it's a different list than

4    we got last night.  If it's the same, then we don't have any

5    objection except for sealing of the source code.  We've just

6    checking to see if it's, in fact, the same list.

7              MR. ABRAHAMSEN:  I'll represent it's the same

8    list.  It's just reorganized.  If there has been a mistake

9    in that regard, we can fix that.

10             THE COURT:  And you saw what I'm trying to say,

11   except for the objection?

12             MR. DONNELLEY:  Sealing the source code, Your

13   Honor.

14             Your Honor, the list that we had previously

15   discussed with Cordance's couple had all of the exhibits as

16   exhibit that would be moved into evidence under the same

17   condition.  As the parties discussed yesterday, we're trying

18   to works out the mechanics of having Amazon's source code

19   either sealed or retained at counsel's office, in some way

20   it could be made available.

21             THE COURT:  So the two suggestions I've made,

22   counsel have not come to an agreement on.

23             MR. ABRAHAMSEN:  Your Honor, whichever Amazon

24   wants to do is fine with us.  We're just waiting for them to

25   make the decision.

```
1               THE COURT:  And my understanding is that there
2      is no objection by either side that if it ends up that the
3      source code is to be held by the Court, there is no dispute
4      that it should be under seal; is that correct?
5               MR. ABRAHAMSEN:  That's correct.
6               MR. DONNELLEY:  Amazon certainly wants it under
7      seal.
8               THE COURT:  I just wanted to make sure.  So why
9      don't you pass up the exhibit.  Based on the representations
10     you made, we'll hold on to it.  Amazon will have the right
11     to go through it before the end of court today, tell me
12     whether or not there is something missing or something has
13     been deleted or changed.  But it's been represented by
14     Cordance's counsel that that hasn't occurred.  It's just
15     renumbered, reorganized.  It may take a little bit of time,
16     but considering the number of people that are in this
17     courtroom, with the legions that are probably back in their
18     respective war rooms, we'll get this done.
19              MR. DONNELLEY:  Yes, Your Honor.  The only thing
20     we would request is whatever gets submitted to the Court
21     finally indicate that the source code is to be sealed.
22              THE COURT:  Now, the source code is not on here
23     right now.
24              MR. DONNELLEY:  It is.  But it doesn't indicate
25     it should be sealed.
```

1          THE COURT:  What number is it?

2          MR. DONNELLEY:  It's the last page.  It's got

3    the heading Source Code and we would just want it to say

4    Sealed Source Code.  That's it.

5          THE COURT:  I'm just going to put sealed in

6    right now.

7          MR. DONNELLEY:  Perfect.  Thank you, Your Honor.

8          THE COURT:  What I did just now is put the word

9    "sealed" before the words "source code."

10         And where is Dr. Shamos?

11         DR. SHAMOS:  Present, Your Honor.

12         THE COURT:  All right.

13         MR. ABRAHAMSEN:  Your Honor, just as a warning,

14   for the read-ins this afternoon, I think there are still

15   going to be some disputes we're going to have to raise.

16   That can be done later because I'm sure this is going to go

17   through lunch.

18         THE COURT:  Dr. Shamos will probably go through

19   lunch is what you are saying?

20         MR. ABRAHAMSEN:  Yes.

21         THE COURT:  At the lunch break, hopefully

22   between 1:00 and 2:00, maybe a little longer, but hopefully

23   between 1:00 and 2:00, I do have some commitments on the

24   criminal calender.  They will not be held in this courtroom.

25   I'm going to go back to my old courtroom to handle those.

1    I'm not certain how long those will take.  They'll either

2    happen during that time frame or it's going to happen at

3    5:00 o'clock today.  I don't know which.  It depends upon

4    whether or not they can get -- whether or not the Government

5    can get criminal complaints prepared for me to review.  So

6    hopefully as we get closer to that time, I'll be able to

7    tell you.  And if there are any issues, we need to address

8    before we break for lunch.  If not, we'll have to wait until

9    after lunch or late in the day.

10             Are we ready for the jury to be brought in,

11   counsel?

12             MR. ALBERT:  Yes, Your Honor.

13             MR. HADDEN:  Yes, Your Honor.

14             THE COURT:  All right.  Please bring in the

15   jury.

16             Dr. Shamos, you may come forward and take the

17   stand.

18             (Michael Shamos retakes the stand.)

19             THE COURT:  And I'll just remind you that you

20   are still under oath.

21             THE WITNESS:  Okay.

22             (Jury returned.)

23             THE COURT:  Please be seated.

24             Good morning.

25             (The jurors respond, "Good morning.")

Shamos - direct

1    THE COURT:  Members of the jury, we will be

2    continuing with the testimony of Dr. Shamos who you met

3    yesterday.  Counsel.

4    MR. ABRAHAMSEN:  Thank you, Your Honor.

5    MICHAEL SHAMOS, having previously been sworn,

6    testified further as follows:

7    DIRECT EXAMINATION (Continued)

8    BY MR. ABRAHAMSEN:

9    Q.    Good morning, Dr. Shamos.

10   A.    Good morning.

11   Q.    Were you asked to render an opinion as to whether

12   Amazon infringes Cordance's patents?

13   A.    Yes, I was.

14   Q.    And what is your opinion?

15   A.    My opinion is that Amazon has infringed one or more

16   claims of each of the patents that are involved in this

17   lawsuit.

18   Q.    And what analysis did you do to reach that

19   conclusion?

20   A.    I sifted through a tremendous amount of evidence.

21   Source code, exhibits, deposition transcripts.

22          I actually exercised the Amazon website, took

23   screen shots of various screens that appeared while I was

24   exercising their website.

25   Q.    Did you capture the communications between your Web

820

Shamos - direct

1   browser and Amazon's Web server?

2   A.    Yes, I did.

3   Q.    Approximately, how many hours have you spent working

4   on this case?

5   A.    I think it's a little bit over 500 other over the

6   past 29 months.

7         MR. ABRAHAMSEN:  Dylan, can you please pull up

8   the '710 patent which is Exhibit DX-9?

9         And focus in on just the priority claim section.

10  Q.    I thought before we dig into your analysis, it would

11  be a good idea to give the jury a brief overview of the

12  Cordance patents and the relationship among them?

13  A.    Okay.  Well, the page that is up on the screen, which

14  we're seeing a small block, it's called the cover page or

15  the face page of the screen.  It's the first page and it

16  contains various pieces of administrative information and

17  biographical information:  What the patent number is, what

18  the title of the patent is, who the inventors were, who is

19  the corporate owner of the patent.

20        And, in this block, which is called related U.S.

21  application data, is a place where the applicants for the

22  patent explain to the Patent Office any relationship that

23  this patent application may have to other patent

24  applications that have also been submitted to the Patent

25  Office or any prior patents that have already issued that

1        are related to this, that are related to this application.

2                And so it begins:  Continuation of application

3        No. '09/570,675, filed on May 15, 2000, now the patent

4        number, 6,345,288.  I'll stop there for a second.

5                What this says is that this application is a

6        continuation of another application.  And continuation is a

7        process that is allowed in the Patent Office.

8                I'll give an example of a typical reason that

9        someone would file a continuation application.  I submit a

10       patent application.  I have possibly many claims in there.

11       The examiner decides that my first three claims should be

12       allowed but doesn't like any of my other claims.

13               I now have a choice.  I can keep the application

14       alive and keep fighting with the Patent Office over those

15       other claims.

16               MR. HADDEN:  Your Honor, objection.  Can we have

17       a sidebar?

18               (The following took place at sidebar.)

19               MR. HADDEN:  He is testifying as a patent lawyer

20       about Patent Office procedure.  He says when he designated

21       for it in his report.

22               MR. ABRAHAMSEN:  I believe he talked about the

23       relationship with the applications in his report.

24               MR. HADDEN:  But he didn't talk about what his

25       hypothetical prosecution would do and whether claims are

Shamos - direct

1    allowed and what he is going to do about filing

2    continuations.  What he says all is pure law and Patent

3    Office procedure.

4              THE COURT:  And that is the reason why we have a

5    movie.  I try not to have people testify about Patent Office

6    procedures as witnesses as far as that is concerned.  But I

7    do think he can explain a little bit about what continuation

8    is and what a CIP is.  But to sit there and give this

9    example probably is beyond that point.

10             MR. HORWITZ:  Your Honor.

11             THE COURT:  He can go into more detail about

12   continuations.

13             MR. HORWITZ:  Your Honor did provide a much

14   broader glossary in this case than usual.

15             THE COURT:  Yes, and the jury can refer to my

16   glossary.

17             MR. ABRAHAMSEN:  Okay.  Is there an instruction

18   in the case about continuations and continuations in part?

19             THE COURT:  There was in the glossary.  There

20   was an explanation about what continuation was, and what

21   continuation in part was, what it means.

22             MR. ABRAHAMSEN:  Okay.

23             THE COURT:  It was not in the preliminary

24   instructions.  Certainly we can have in the final

25   instructions some explanation about what continuations are

1   and continuations in part are.

2               MR. ABRAHAMSEN:  Okay.  Why don't we propose

3   something and run it by counsel then?

4               MR. HADDEN:  That's fine.

5               THE COURT:  That's fine.

6               MR. ABRAHAMSEN:  Okay.  Thank you, Your Honor.

7               (End of sidebar conference.)

8   BY MR. ABRAHAMSEN:

9   Q.    Dr. Shamos, without going into a specific example,

10  can you just generally explain to the jury what a

11  continuation, continuation in part is?

12  A.    Yes.  So in a continuation application, what I do is

13  I file another application that is going to get a different

14  serial number but it is textually the same as the original

15  application.  I may delete things from it and continue

16  prosecuting the patent with that material that hasn't been

17  deleted, but because it's the same application and I'm not

18  allowed to add anything new to it, the effective date on

19  which I file this continuing application is the same as the

20  date of the original application.  That's the whole point of

21  continuation applications.  You get to keep the priority

22  date.

23              Now, if you go down to the end of this, and

24  there is a whole sequence of continuation applications here,

25  this is a continuation of this, which is a continuation of

824

Shamos - direct

1    this, which is it a continuation of this, but then down at

2    the end, there is the clause, which is a continuation in

3    part of application No. 08,609,115, filed on February 29,

4    1996, now Patent No. 6,044,205.

5              Continuation in part means there is material in

6    this continuation application that was not present in the

7    original application.  Things have been added.  And so I'm

8    only going to be entitled to this February 29th, 1996,

9    filing date to the extent that the material I'm relying on

10   was present in this '205 patent application.

11             THE COURT:  Before counsel continues on, members

12   of the jury, the Court did provide you as part of the

13   glossary, definitions of continuation and continuation in

14   part that you can refer to.

15   BY MR. ABRAHAMSEN:

16   Q.    Thank you, Dr. Shamos.

17             So the first thing I would ask you to do for the

18   jury is to explain the difference between Amazon's shopping

19   cart system and its 1-click ordering system.  And we've

20   prepared some PowerPoint slides for that purpose.

21             Are we prepared to pull those up?

22             MR. GREEN:  Yes.

23             MR. ABRAHAMSEN:  Please pull up the first slide.

24             And I think a laser pointer --

25             THE WITNESS:  I have one.

Shamos - direct

1                    MR. ABRAHAMSEN:  Oh, you have one.  Okay.

2                    THE COURT:  Dr. Shamos, did anything I have

3        block you?

4                    THE WITNESS:  The stack of books.

5                    (Court rearranges her bench.)

6                    THE COURT:  Can you view it like that?

7                    THE WITNESS:  Yes, pretty much except for the

8        Kleenex.

9                    THE COURT:  All right.  I'll take the Kleenex.

10                   THE WITNESS:  That's fine.  I think we're good.

11                   Yes.  This is a -- I think I mentioned before

12       that I had exorcized the Amazon website, and I actually

13       bought things and had things delivered and paid for them.

14       And I think all of the slides that we're going to show are

15       screen shots of things that I actually did myself on the

16       Amazon website.

17                   And I had to -- I didn't want to just throw away

18       whatever it was that I bought.  So I didn't particularly

19       need anything from Amazon that day.  So I asked counsel, is

20       there anything that your family needs?  And I got a request

21       for an Elmo.  An Elmo doll for the children of one of the

22       lawyers.

23                   So I navigated around to this Fisher-Price Elmo

24       Live page, and then to the traditional shopping cart

25       mechanism for ordering, which itself was a tremendous

Shamos - direct

1    improvement over the old way of ordering things on-line that

2    had been going on before the Internet.  What you do is

3    analogous to shopping in a grocery store.  You have this

4    virtual shopping cart; and if you like the Fisher-Price Elmo

5    Live doll and you want to put it in your cart, there is a

6    button that you can see on the right.

7              I'm sorry.  I pushed the wrong button.  It turns

8    out this laser pointer is nearly invisible.

9              You can see the red dot up there is an "Add to

10   Shopping Cart" button.  So I press the "Add to Shopping

11   Cart" button.

12             And I think the next slide shows that.  You get

13   to adjust the quantity.  I was generous, but I wasn't going

14   to order more than one of these.  So I left it at one.  And

15   I clicked "Add to Shopping Cart."

16             When you click "Add to Shopping Cart," it

17   actually adds the item to this virtual thing, the shopping

18   cart that you have got.  And you can take things out and you

19   can add more things to the shopping cart.  But in this case

20   I only wanted to buy the one thing.

21             So the next step is, on the next slide, it's

22   telling me the current -- before we proceed to checkout, you

23   can see what it shows is what I have added to my shopping

24   cart is a Fisher-Price Elmo Live.  And the price is $59.78.

25   I have ordered one of them.

Shamos - direct

1          One of the things that I could do is I could

2     edit the shopping cart.  I could change the quantity.  I

3     could do various things.  Or I could say, I am done, I would

4     like to proceed to checkout.

5          So by clicking "Proceed to Checkout," when we

6     get to the next phase, the next phase, because they need

7     information that they are going to actually use to charge

8     somebody's credit card, they need to know who I am.  So I

9     have to log in.

10          I happen to have been an Amazon customer for a

11    very long time.  I have had that e-mail address as my

12    sign-in at Amazon.  So I click "I am a returning customer."

13    And my password is..., and I type my password.  Then I

14    signed it, it says "Sign in Using Our Secure Server."

15          So I signed in.

16          Now it really knows who I am.  It was able from

17    my sign-in information to pull up information about me that

18    had previously been entered, since I had ordered things from

19    Amazon before.

20          Over on the left is something called Address

21    Book.  The Address Book contains various addresses to which

22    I have sent things previously from Amazon.

23          So the first address on the left there -- it

24    seems to be a little bit weak -- that is my office address

25    at my university.  This address is an address of a student

Shamos - direct

1    to whom I had sent a book previously that I thought he ought

2    to read.

3                    Then there is another address down here, which

4    is my home address.

5                    And if I want to send this product somewhere

6    else, other than one of those three addresses, there is a

7    form down there, I could fill out a new address.  So I think

8    I actually had it sent to my office, to my recollection.

9                    So I selected my office address because there is

10   always somebody there to sign for it.  And I had the Elmo, I

11   was going to have the Elmo doll shipped there.

12                   The next step is, it wants to know how I would

13   like this shipped.

14                   So these little buttons on the left are usually

15   referred to as -- I am going to make a request for somebody

16   to find me a different laser pointer, because it is taking

17   me a long time to get that tiny red dot to appear.

18                   Anyway --

19                   MR. ABRAHAMSEN:  May I approach the witness,

20   Your Honor?

21                   THE COURT:  You may.

22                   THE WITNESS:  Those five buttons that I was

23   trying to point to, these five buttons over here, called

24   radio buttons, they have the property that you can select

25   one of them at that time.

Shamos - direct

1          So if I don't like standard shipping five

2    business days, if I want free super-saver shipping, I would

3    click this top button here and the second button would

4    disappear and a black dot would appear in that one.  So this

5    enables you to select how you are going to ship.

6          And some of them are free and some of them

7    actually have a cost associated with them.  So I picked a

8    shipping method, I forget which one, I assume standard, and

9    hit "Continue."

10          So we selected the shipping method.

11          Now, it wants information about exactly how are

12    you going to pay for this.  I have at least one credit card

13    on file with Amazon, because I have ordered before.  It's

14    identifying my American Express card that ends in, the

15    number ends in 2001 and has an expiration date of 11/2011.

16    It's already defaulted to that.  You can see, there is a

17    black dot there.

18          So if I don't do anything else, if I just say

19    Continue, then they will charge that credit card.  But if I

20    want to continue with a different credit card, I can select

21    from this drop-down menu that says Card Type.  And if I had

22    one on file of a different type, I could select that.  Or,

23    if I didn't have any others on file, I could enter a new

24    credit card at this time and have them charge that one.

25          So I hit "Continue," because that's the default,

Shamos - direct

1    which was fine with me.

2              Now I get the opportunity to review my entire

3    order.  At this time, it's included what the shipping and

4    handling charge would be.  Now I have a total, which is

5    slightly larger than the actual price of the doll.  I get

6    the chance to check whether I really want it sent to my

7    office, whether I really want standard shipping, et cetera.

8    And I can change various things by clicking on buttons here.

9              But if everything is okay, and I like it, then I

10   can click "Place Your Order."

11             And after you click "Place Your Order," you get

12   a confirmation page, a thank you page, that says, "Thanks

13   For Your Order.  We'll sends you an e-mail confirmation

14   shortly."

15             And I take it the reason for the e-mail

16   confirmation is that this is a screen that just appears

17   temporarily.  As soon as I navigate to something else, it's

18   gone.  So if I want a permanent record of the transaction,

19   it is going to come to me in e-mail, and then I can do

20   whatever I want with it.

21             This is the classic Internet shopping cart

22   process.  You play around with the cart until you are happy,

23   and then you place the order.

24   Q.    Would you please pull up the 1-click PowerPoint

25   slides now?

Shamos - direct

1          Dr. Shamos, if you could please explain the

2     1-click process to the jury now?

3     A.    Yes.  So you can see that in the traditional shopping

4     cart process, you sort of had to go through a lot of steps

5     in order to order the one thing that you knew you wanted to

6     order.

7          So it's possible to streamline this process

8     tremendously.

9          There is actually a slide omitted from here.  In

10    order to invoke 1-click, you have to have signed onto

11    Amazon.  You have to identify yourself by, again, I would

12    type my e-mail address and my password, so it absolutely

13    knows who I am.  That is not shown here.

14         Having signed in, it knows me because my name is

15    printed up there.

16         I get to this Elmo doll page, and if I just want

17    to order it and I don't want to go through all that other

18    hassle, all I have to do is click the button that says "Buy

19    Now With 1-Click."

20         So if I click that, then the next slide shows

21    the page I get.  It says -- if we pull that up -- it says,

22    "Your 1-Click Order Has Been Placed!"

23         And that's it.  I don't have to do anything

24    anymore from there.

25    Q.    Thank you.  Let's pull up the other demonstratives,

Shamos - direct

1    please.

2             Now we can get into the nuts and bolts, if you

3    don't mind.

4    A.    Great.

5    Q.    Dr. Shamos, this is a PowerPoint presentation that

6    you prepared.  Correct?

7    A.    Yes, I prepared almost all of it.  I didn't prepare

8    the graphic background that is on this screen.  I think

9    there are a couple of pictures in there that I didn't

10   prepare that had been used for some other presentation.

11            But the vast bulk of the material on every slide

12   I prepared.

13   Q.    So why don't we get started.  If we can move to the

14   first slide, please?

15            If you can explain to the jury what you intended

16   to communicate by this slide?

17   A.    Yes.  So, basically, what I am going to talk about is

18   divided into four sections.  First we are going talk about

19   the 1-click claims in the '710 patent.  Then I am going to

20   shows the ways in which Amazon infringes those claims.

21   Then, after we are through with 1-click, I am going to talk

22   about the claims of the '325 and '717 patents, which relate

23   to feedback information.  And then I am going to show how

24   Amazon infringes those claims.

25            This is just an outline of the testimony.

Shamos - direct

1    Q.     And before we move on to the next slide, if you can

2    explain for the jury what was the test you applied in

3    determining whether Amazon infringed any given claim?

4    A.     I was obliged to apply the law.  And in determining

5    whether infringement exists, I look at a claim -- and I

6    don't know whether the jury has seen any claims in this case

7    yet.  But I read the claim.  I am obliged to apply the

8    meanings that the Court has given to terms that are used in

9    the claim, and we are all bound by that.  My side is.

10   Amazon is.  And you are going to be bound by what the Court

11   says the words mean in the claim.

12            Then I look at the Amazon system, and with

13   respect to a particular claim, I have to see whether all of

14   the things that are recited in that claim are present in an

15   Amazon system, or if all of the steps that are listed for a

16   method are performed by Amazon.

17            If so, then Amazon infringes that claim under

18   something called the "all elements" rule.  Everything in the

19   claim has to appear in the accused system or the accused

20   device.

21            And with respect to a machine or a system,

22   infringement occurs if that system is made, used, sold, or

23   offered for sale or imported into the United States.  And

24   with respect to a method or a set of steps for doing

25   something, it is infringed if Amazon performs all the steps

1    of that method.

2              If I found that to exist, that could support the

3    opinion that infringement occurred.

4    Q.    Next slide, please.

5              Do you want me to drive the slides?

6    A.    You can drive.

7              MR. ABRAHAMSEN:  May I approach again, Your

8    Honor?

9              THE COURT:  You may.

10   BY MR. ABRAHAMSEN:

11   Q.    What is on this slide?

12   A.    This is a further explanation of the cookies that we

13   were talking about yesterday.

14             Amazon and probably hundreds of thousands or

15   millions of websites now store small files that are called

16   cookies on the customers' computers or, people who have

17   visited their website, when you leave their website, there

18   is some residue left there by the site that you visited.

19             These cookies that are used by Amazon -- these

20   are actual examples -- contain various pieces of

21   information.  It uses the cookies to associate you, the

22   customer, with a particular transaction.

23             I think the next slide has some amplification of

24   that paragraph.

25   Q.    These are examples of cookies on this slide?

Shamos - direct

1  A.     These are examples of contents of cookies, partial

2  contents of cookies, yes.

3            So, unfortunately, we are going to see the word

4  metadata many, many times today because it occurs in claims.

5            The Court has construed what metadata means.

6  Metadata for all of our purposes in this case means:  data

7  that describes or associates other data.

8            What I am going to go through is look at some of

9  these cookie contents and talk about what they describe or

10  associate.

11            I think you need to click.

12            Okay.

13            So this session-id equals is identifying what

14  this number is, because if you look at that number, by

15  itself it just doesn't mean anything.  It's just a sequence

16  of three digits, seven digits, and seven digits separated by

17  hyphens.  You don't know what that is.

18            But when Amazon says, "session-ID equals," this

19  is metadata that describes this data.  It says, oh, that

20  really is a session-id.

21            Now, here is another number which has exactly

22  the same format as this first one.  It has three digits, a

23  hyphen, seven digits, a hyphen, and seven digits.

24            But that's not a session-id, even though it

25  physically might look like one.  It actually is something

836

Shamos - direct

1    that Amazon called ubid-main which is a unique identifier of

2    a particular browser.

3              So it's possible on the same computer to have

4    different browsers.  Some people run -- it used to be common

5    to run Internet Explorer and Netscape on the same computer.

6    If you visited Amazon using one of them, and then visited

7    Amazon using another one of them, there would be two

8    different cookies and they would have two different

9    ubid-mains in them.

10             But just by looking at that number, you can't

11   tell whether it is a ubid-main or a session-id.  You need

12   the metadata, session-id equals or ubid-main equals, to help

13   describe that data.

14             An important piece of cookie information for

15   Amazon is something called x-main.  And x-main is encrypted.

16   You can see that these characters seem to have no syntax to

17   them at all.

18             That is an encrypted piece of information, which

19   is an Amazon customer ID.  I think we discussed yesterday

20   the reasons you might want to encrypt something.

21             So this is a slide that is going to show, at a

22   very high level, the steps in an Amazon 1-click transaction.

23   You just saw me go through one with the Elmo.  This is sort

24   of a block diagram of it.

25             Before we start, the customer, this is somebody

Shamos - direct

1    who is visiting Amazon over the Internet, in my case it was

2    me, I was sitting in my home at my personal computer that's

3    connected through a DSL line to an Internet service

4    provider.  So I had Internet service.

5                 I had previously visited Amazon many times on

6    this computer.  So there were cookies stored on my computer

7    that identified the browser, then had a session-id,

8    identified that x-main, so Amazon would know who I was when

9    I visited the website.

10               And what I did was, I visited Amazon, click, and

11   I asked Amazon, and navigated to the Elmo page, which means,

12   Amazon, please send me information about this product.  And

13   it did.  It sent a picture of the product, a little

14   description of the product, the price of the product, et

15   cetera.

16               So now, information about the Elmo -- and you

17   can actually see Elmo up there -- was sitting on the screen

18   of my computer.

19               And in the 1-click transaction, you recall, all

20   I had to do was click on the button that said "Buy Now With

21   1-Click."  And when you do that, what happens is, an

22   indication to initiate the transaction, that is, the

23   1-click, and the cookies that were all of the Amazon cookies

24   that are on my machine get sent to Amazon every time I click

25   on one of those Amazon links.  The cookies and whatever

Shamos - direct

1    other information is associated with that hyperlink get

2    transmitted to Amazon.

3           And you saw in the 1-click transaction I didn't

4    have anything to do after that.  And Amazon automatically

5    completes the purchase transaction using customer data that

6    was previously stored at Amazon at my request.  If you

7    haven't previously visited Amazon and given information to

8    Amazon, you can't do a 1-click transaction because they

9    doesn't have enough information to know what to do with the

10   product or how to bill you for the product.  And that's a

11   1-click transaction.

12          There is a variation of a 1-click transaction

13   called a cart 1-click transaction.  What you can do is

14   instead of just buying one thing, if you know several things

15   that you'd like to buy, you can visit those pages, add them

16   to the cart, and then you can buy everything in the cart

17   with a single click.  And so there will be some more steps

18   here but it's very similar to a buying one product.  So for

19   the first product, that's the Elmo doll, I asked for

20   information about an item.  And then I asked Amazon, please

21   add that to my shopping cart.

22          Now, I asked for information about another item.

23   And it was too much work for me to change the graphic on it,

24   so pretend it's not on the Elmo doll.  I get information

25   about the next item.  I can decide I want to put that item

Shamos - direct

1    in the cart, and maybe more.  As many things as I know I

2    want, I'll put them in the cart.

3         Then when I'm done, I'll say that I can buy the

4    entire contents of the cart with a single click, and that's

5    an indication to complete the transaction, which, when I

6    click on that link, cookies, all the Amazon cookies go along

7    with that message to the Amazon server.  And as you know

8    from 1-click, I don't have to do anything anymore.  Amazon

9    automatically completes the purchase transaction using

10   stored customer data that is already at Amazon, and the

11   information from the cookies, it gets sent with that

12   indication.

13        This is a summary of my opinion about

14   infringement.  That 1-click for single product infringes

15   Claims 1, 2, 3, 5, 6, 7, 8 and 9 of the '710 patent.  And

16   cart 1-click, where you are buying more than one thing with

17   one click, infringes Claims 7, 8 and 9 of the '710 patent.

18        This is a blown-up version of what is called a

19   detail page which gives all kinds of details about a

20   particular product.  And it contains information which says

21   it's in stock so I pretty well know if I order it now, I'll

22   get it soon, other pieces of information.  And there are the

23   various options.  I can add it to the cart or I can just buy

24   the thing.

25        Next.  I click Buy Now with 1-click.

Shamos - direct

1           And that's just a blow-up of the thank you page.

2    Your 1-click order has been placed.  You don't have to do

3    anything.

4           Okay.  I'm going to apologize in advance for

5    this.

6           MR. HADDEN:  Your Honor, can we have a sidebar?

7           (The following took place at sidebar.)

8           THE COURT:  Yes.

9           MR. HADDEN:  He is giving a speech.  I thought

10   we were supposed to have questions and answers.

11          MR. ABRAHAMSEN:  I can ask questions.

12          THE COURT:  Yes, I think it would be appropriate

13   for direction.

14          MR. HADDEN:  Thank you, Your Honor.

15          MR. ABRAHAMSEN:  Not a problem.

16          (End of sidebar conference.)

17   BY MR. ABRAHAMSEN:

18   Q.    Dr. Shamos, is this a claim from the '710 patent?

19   A.    Yes.  This is the complete text of Claim 1 of the

20   '710 patent.

21   Q.    And what do you intend to illustrate with this slide?

22   A.    Well, this is -- I just want to present the whole

23   text of the claim to the jury at one time.  Then we're going

24   to have to go through the A,B,C and D completely separately,

25   to understand what they mean and see what the correspondence

Shamos - direct

1    is between the claim elements and anything in an Amazon

2    system.

3    Q.    Okay.  Is there anything else you want to say about

4    this slide before we move on?

5    A.    Yes.

6    Q.    Okay.

7    A.    As I was about to say, I want to apologize in advance

8    because we're all bound by this language.  I mean this is

9    what the patent says, and there is no way, there is no way

10   of getting around it.  The problem is that patent claims are

11   written in a language that I like to call patentese which

12   outwardly looks like English but it isn't really English.

13   It has a very special syntax, and there are words in there

14   that have special meanings and they're not common every day.

15   So it's sometimes not so easy to completely understand what

16   a patent claim says or means.

17   Q.    Okay.  Is there anything else before we move on?

18   A.    I don't -- give me a flash preview of the next slide.

19   Let me see.

20         Yes.  Let's go back a second.

21         Okay.  So this claim is called a method claim.

22   It says a computer implemented method.

23         A method is a set of steps like a recipe.  Do

24   this, do this, do this, and do that.  It's things to do as

25   opposed to a thing, like this microphone.  This microphone

Shamos - direct

1    isn't a thing to do; a microphone has a face and it has some

2    foam on here and it has a neck.  It's pieces.  But a method

3    has steps that you are supposed to perform.

4              And in this one, in this claim, when you see, A

5    is in brackets up there.

6              It's like magic.  I can see it right here but

7    when it gets up to the screen, the red dot is invisible.

8    Q.    There we go.

9    A.    So this A,B,C,D in brackets, those were, are added

10   for our convenience.  They are not in the original patent.

11   So the steps are divided out.

12             So this method has to include doing four things:

13   You have to provide some customer data.  You have to provide

14   the customer with information.  You have to receive

15   something from the customer.  In response to, that you have

16   to do something.

17             And then if you do all those things, then you

18   have infringed Claim 1.

19             And so now we can go on and pick it apart, piece

20   by piece.

21   Q.    And what does this slide show?

22   A.    This shows the preamble of the claim.  And the

23   preamble is an introductory phrase that kind of sets the

24   environment or the scenario for the claim.

25             This says that it's a computer implemented

Shamos - direct

1    method.  And then following is the word "comprising."  And

2    comprising in patentese means including at least.  It can

3    have more things but it has to have these things.  Okay?

4              And the computer implemented method of the '710

5    patent is one in which all the steps are performed by

6    computers.  If you go back and look at those four steps,

7    A,B,C,D, they're all computer steps.  And Amazon, in fact,

8    performed all the steps of the asserted '710 claims by a

9    computer, and so they have a computer implemented method

10   that comprises certain things.

11             So they satisfy the preamble.  That is the

12   1-click system satisfies the preamble.

13   Q.    Okay.  And what does this slide show?

14   A.    It shows the first claim limitation.  Sometimes the

15   steps are the elements of a claim are referred to as

16   limitations because they're things that must be satisfied.

17             The first step is providing customer data

18   storing information for a customer.  And the Court has

19   construed exactly what that means.  It means making

20   available for use data about a customer that is stored in a

21   data storage medium.  That is what providing customer data

22   storing information for a customer means.

23   Q.    And how about this slide?

24   A.    Yes.  Well, I've just repeated the first limitation,

25   1[a], but I applied the Court's construction to it.  So the

844

Shamos - direct

1    question is, does Amazon perform Step 1, or Step [a].  And

2    it does if it makes available for use data about a customer

3    that is the stored in a data storage media.

4            You have seen from the demonstration that Amazon

5    stores information about its customers.  It knew my name, my

6    office address, my home address, my credit card number, et

7    cetera.  It stores information about its customers in data

8    storage media on its computers.  It makes that information

9    available for use in on-line purchasing.  So when I want to

10   buy something from Amazon, it displays that information to

11   me.  I know it has it.  And it, in a 1-click transaction, it

12   doesn't even have to show it to me.  It just says thank you,

13   we're done.

14           So it uses the stored information to

15   automatically complete a 1-click purchase.  So Amazon

16   1-click perform Step 1[a].

17   Q.    And what does this slide show?

18   A.    This is the next limitation, Step 1[b].  Providing

19   the customer with information from the seller with respect

20   to an item.

21           In the case of the Elmo doll, Amazon was the

22   seller.  Amazon provided me with information about the Elmo

23   doll.  It showed a picture of it, it showed a price, et

24   cetera, and some characteristic of the doll.  So Amazon's

25   1-click performs Step 1[b].

Shamos - direct

1    Q.      How about this slide?

2    A.      This is the third step, which is 1[c]:  receiving

3    from the customer an indication to initiate a purchase

4    transaction for purchasing the item including metadata

5    associating said customer data with said transaction.

6            Now, the Court has construed a couple of the

7    terms in this limitation.  The Court's construction of

8    "indication to initiate" was a message to start processing.

9            And the Court's construction of "metadata" we

10   looked at earlier but I just put it back on a slide,

11   metadata is data that describes or associates other data.

12           So the customer has to -- somebody has to

13   receive from the customer an indication to initiate a

14   purchase transaction, which is they have to receive a

15   message to start processing the transaction.  And that

16   message to start processing the transaction has to include

17   some data that describes or associates other data.  If that

18   doesn't happen, then this step isn't performed.  And Claim 1

19   can't be infringed.

20   Q.      And what does this slide show?

21   A.      This shows the indication to initiate.  That is, the

22   message to start processing that is sent when the user hits

23   buy with 1-click.  So if you remember the Elmo screen was

24   up and over on the top right, there were a couple, some

25   different buttons, things I could do.  I could put it in the

Shamos - direct

1    cart or one of the choices was Buy Now with 1-click.  And

2    what this is showing is the actual message that was sent

3    when I hit Buy Now with 1-click.

4            The only exception is there are a couple of

5    places here I have three dots, three dots, three dots, three

6    dots.  That means there was other stuff in the message that

7    doesn't relate to this particular claim step.  I didn't

8    include in the slide because the message can actually be

9    very long.

10           And obviously when I hit buy with 1-click, that

11   is a message to start processing the purchase transaction

12   because until then, Amazon didn't know that I wanted to buy

13   the Elmo doll.

14           And this message includes cookies that contain

15   metadata that tells Amazon how to find the stored

16   information about me that it's going to need to know in

17   order to complete the transaction.

18           So there's a bunch of stuff in here; and this

19   HTTP/::, you may be familiar with that if you used a browser

20   that is an URL.  That indicates there is a communication

21   that is to take place with the www.amazon.com server.  And

22   it's to take place over HTTP which is the hypertext transfer

23   protocol.

24           This next line, "post" is a command that says I

25   have some stuff for you.  Please accept it.

847

Shamos - direct

1          An then there is some information here in blue

2     that is not important.  But this dark red material, this is

3     the content of the cookies that were stored on my machine

4     that are included with every one of these messages that goes

5     to Amazon.  And if you remember what this x-main is.  X-main

6     is an encrypted form of customer ID.  It tells Amazon who I

7     am.

8          And the item that I'm purchasing, the Elmo doll

9     has an ASIN number which is a product number so that Amazon

10    knows exactly what a product is that I'm buying.  And so

11    ASIN equals is metadata that describes this data.  It says

12    it's a product number.

13         And there is information down here that says

14    this is a 1-click transaction, submit 1-click order, et

15    cetera.

16         So the question is does this message satisfy

17    the claim limitation, which is that there has to be an

18    indication to initiate the transaction.  It has to include

19    metadata associating the stored customer data with the

20    transaction.  And it has all that.  So Amazon performs Step

21    1[c].

22    Q.    Okay.  How about this slide, Dr. Shamos?

23    A.    That is just a summary of what I just said.

24          This is the last step.

25    Q.    Okay.

Shamos - direct

1    A.    Step 1[d].  It says:  In response to the received

2    indication, automatically completing the purchase of an item

3    from the seller by processing said metadata associating said

4    customer data so as to complete the purchase transaction.

5              The Court has construed what it means, what

6    "automatically completing the purchase" means.  It means

7    completing the purchase without human input.

8              And so the received indication occurs when I

9    click Buy Now with 1-click.

10             After I click Buy Now with 1-click, no more

11   human input is required.  And so the Amazon 1-click process

12   means this claim limitation also because it uses the

13   metadata and the cookies to retrieve information about me,

14   my office address, for example, my credit card number, et

15   cetera, and it completes the transaction and no human input

16   is required after that message to initiate is, has been

17   sent.

18   Q.    Okay.  Does that cover all of the steps, Dr. Shamos?

19   A.    Yes.  This is just a little review slide.  We're

20   going to check off whether or not Amazon 1-click satisfies

21   the preamble and the four steps, and we know it does so you

22   can click quickly through the checkmarks.

23             But that is the all elements rule.  If any one

24   of those steps were missing, then there wouldn't be

25   infringement.  So every one of the steps has to be there.

Shamos - direct

1            So since Amazon 1-click meets all the

2    limitations of Claim 1, Amazon infringes Claim 1.

3    Q.    Okay.  Let's move on to the next claim, if we can.

4    Claim 2.

5            What does this slide show?

6    A.    Well, it's the text of Claim 2.  This is -- well,

7    I'll read it.

8            2.  The computer implemented method of Claim 1,

9    wherein the customer data is maintained as an object.

10            Now, I'm going to switch around the order in the

11    material in this slide.

12            Claim 2 is a particular kind of claim called a

13    dependent claim.  Because it has a cross reference, Claim 2

14    has a cross reference to Claim 1.  So in order to infringe

15    Claim 2, you first have to satisfy all the limitations of

16    Claim 1 and then also whatever new limitations are added by

17    Claim 2.

18            So Claim 2 adds one more limitation.  It says:

19    wherein the customer data is maintained as an object.

20            And the parties have agreed that the phrase

21    "maintained as an object" means "kept as an object."  That

22    might not be particularly helpful to you because we have to

23    understand what the term "object" means.  And so --

24            Let's go to the next slide.

25            An object is a computer program construct.  You

Shamos - direct

1   heard I think a lot of discussion yesterday about objects

2   and access objects.

3            MR. HADDEN:  Your Honor, can we have a sidebar?

4            THE COURT:  Yes.

5            (The following took place at sidebar.)

6            MR. HADDEN:  He is giving an opinion on claim

7   construction I don't believe is part of the Court's claim

8   construction.  He is defining "object" for the jury.

9            MR. ABRAHAMSEN:  I think he is explaining his

10  understanding of what "object" -- the ordinary meaning of an

11  "object" is.

12           THE COURT:  I think that has to be made clear if

13  this an ordinary meaning.  I wasn't ask to construe the term

14  "object."

15           I don't recall.  In the last series, did you

16  agree to what "object" means?

17           MR. HADDEN:  No, Your Honor.

18           MR. ABRAHAMSEN:  It was the phrase "maintained

19  as an object."  Both parties did not attempt to define the

20  word "object."  I thought it had and ordinary meaning and

21  maybe.

22           MR. HADDEN:  It's just he puts up a slide and

23  says "object equals," that means that is some sort of

24  definition.

25           THE COURT:  I think you should make it clear

Shamos - direct

1   this is not a Court claim construction but he is basically

2   saying what he understands to be terms that are accepted by

3   one skilled in the art.

4              MR. ABRAHAMSEN:  Okay.

5              MR. HADDEN:  Thank you, Your Honor.

6              THE COURT:  All right.

7              (End of sidebar conference.)

8              MR. ABRAHAMSEN:  If you can put up the slide.

9   BY MR. ABRAHAMSEN:

10  Q.    Dr. Shamos, if you just want to make clear, this is

11  not the Court's claim construction or construction of the

12  term "object?"

13  A.    Yes, I don't believe there was one.

14  Q.    Is this your understanding of what an object is?

15  A.    Yes.

16  Q.    Okay.  Well --

17  A.    So my understanding is that an object is a computer

18  program construct that combines data and instructions for

19  accessing the data.  I'll leave it at that for now.  We'll

20  see if further explanation is required later.

21           There is a religion associated with object

22  oriented programming, and the data is usually referred to as

23  properties, and the instructions for accessing the data are

24  called methods.

25           This is extremely confusing in patent cases

Shamos - direct

1   because there are things called method claims.  If you

2   remember, Claim 1 is a method for doing something.  And

3   Claim 2 is a method according to Claim 1 that adds some

4   additional limitations.  So the use of the word method

5   associated with objects is extremely confusing because

6   patentese has its own word "method" that it means something

7   completely different.

8           Anyway, you wrap data together with instructions

9   for accessing the data.  And so you don't actually change

10  the data directly on an object.  You ask the object, would

11  you please change the data to this?  And the object decides

12  how to do that.  Or you can ask the object, please respond

13  to me with some data that you have got stored in you, and

14  the object figures out how to do that and just sends you the

15  data back.  And that is the kind of object that is being

16  talked about in Claim 2.

17  Q.     Okay.  And what does this slide show?

18  A.     And so this is an actual copy of the deposition

19  transcript of Kyle Peterson.  His deposition that was taken

20  on May 14th, 2008.  Page 60, Line 21, to page 61, line 10.

21          And he was asked:

22          "Question:  So what does an instance of the

23  CustomerMaster::customer object look like within the

24  CustomerMasterService?  I mean, what does the format look

25  like?"

Shamos - direct

1          And Mr. Peterson answered:

2          "Answer:  It has a -- a CustomerID, it

3    has -- it has a -- it has a set of methods that aren't

4    necessarily directly hinged off of a customer but are

5    interfaces to the CustomerMasterService for looking up

6    addresses by their IDs, and probably has the customer name

7    on it.  The other properties that it has, I couldn't say off

8    the top of my head."

9               So what Amazon's witness is answering is that

10   Amazon maintains customer data or keeps the customer data as

11   an object.

12   Q.    Is Claim 2 infringed in your opinion, Dr. Shamos?

13   A.    Yes.  We already saw that all of the limitations of

14   Claim 1 were, or all of the steps of Claim 1 were performed

15   by Amazon.  And this limitation, wherein a customer data is

16   maintained as an object, is also satisfied by Amazon 1-click

17   so that means that Claim 2 is infringed --

18   Q.    And just to be clear --

19   A.    -- on the patents.

20   Q.    -- the difference between independent and dependent

21   claims; if, for some reason Claim 2 was not infringed, would

22   Claim 1 still be infringed?

23   A.    Yes.  The infringement of each claim is decided

24   independently of any other claim except that what this says

25   is you have to meet the limitations of Claim 1 and the

Shamos - direct

1    additional limitation.  But if Claim 1 were found not to be

2    infringed, then this one couldn't be infringed.  But if this

3    one were not to be found infringed, Claim 1 could still be

4    infringed.

5    Q.    And the patent would still be infringed in that

6    circumstance?

7    A.    Yes.  Infringement of a patent occurs if at least one

8    claim of the patent is infringed.

9    Q.    Okay.  Let's move on to the next claim, if we can,

10   Claim 3.  What does this slide show?

11   A.    It shows the full text of Claim 3.  Claim 3 is also a

12   dependent claim and the language that patent attorneys use

13   is they say it depends from Claim 1.  It means it's kind of

14   hanging down from Claim 1.  It's underneath Claim 1.

15          The method of Claim 1, wherein processing said

16   metadata includes processing said metadata to retrieve at

17   least a portion of said customer data from an associated

18   data store for use in completing the transaction.

19          And so the question is:  Is there metadata in

20   there that is used to retrieve at least a portion of

21   customer data from an associated data store.

22          You already know that there is, because I showed

23   the cookies that are sent.  The cookies identify who the

24   customer is.  And in the 1-click transaction, you know that

25   Amazon uses that information to go look up my address, my

Shamos - direct

1   credit card number, et cetera.  And all that metadata is

2   present in the post, post command that I showed up on the

3   screen associated with Claim 1.

4         This associated data store is the database

5   customer information that Amazon maintains.  It has all this

6   information in it.  It uses all this in completing these

7   transactions.

8         So because it meets, Amazon meets, performs all

9   the steps of Claim 1 and meets the additional limitation of

10  Claim 3, Amazon infringes Claim 3.

11  Q.    Let's move on to the next claim.

12        Claim 5.

13  A.    Yes.  This is the complete text of Claim 5:  "The

14  method of Claim 1 wherein the customer data is retrieved

15  from a computer of the seller."

16        We already saw that Amazon performs all the

17  steps of Claim 1.  So we just have to see whether the

18  customer data is retrieved from a computer of the seller.

19        In the case of the Elmo transaction, I bought

20  the Elmo from Amazon.  Amazon was the seller.  The customer

21  data associated with me was retrieved from Amazon's

22  computers.  So, therefore, the customer data was retrieved

23  from a computer of the seller.

24        Therefore, Amazon meets the additional

25  limitation of Claim 5 and infringes Claim 5.

Shamos - direct

1   Q.      How about Claim 6, Dr. Shamos?

2   A.      Yes.  The text of Claim 6 is "The method of

3   Claim 1" -- again, it is another dependent claim -- "The

4   method of Claim 1 wherein the customer data is retrieved

5   from a third party's computer."

6           What this means is all the steps of Claim 1 have

7   to be performed and the additional limitation that the

8   customer data is retrieved from a third party's computer has

9   to be met.

10          I didn't show a transaction with a third party.

11  But if you have used the Amazon website, you know that

12  Amazon will handle orders for other merchants.  Amazon has a

13  relationship with you.  It knows your data.  It has a nice

14  website for accepting orders.  It will take an order and it

15  will pass the order on to someone who actually is the seller

16  of the goods.

17          In that case, Amazon isn't the seller.  The

18  other merchant is the seller.  And Amazon is the third

19  party, because Amazon isn't you, the customer, and it isn't

20  the seller.  So Amazon, in accepting these orders for other

21  merchants and sellers, it's the third party.  But it

22  retrieves the data about you, the customer data, from its

23  own computers.

24          So in those circumstances, Claim 6 is infringed.

25  Q.      Shall we move on to the other independent claim?

Shamos - direct

1    A.      Yes.

2    Q.      What does this slide show?

3    A.      This is the full text of Claim 7.  It has some

4    similarities to Claim 1, but different terminology is used.

5    And there is a critical difference that I have indicated in

6    underlined red in Step [c].

7              So instead of talking about customer and seller,

8    we are talking about something called an information

9    provider, which is here in Step (b), and then we are also

10   talking about an information consumer in Step (b).

11             I have to tell you, I have been working on this

12   case for 29 months.  I still find the phrases "information

13   provider" and "information consumer" confusing, because the

14   word "providing" is used in the claim, and there is an

15   information provider, and you would normally think that the

16   information provider is the guy who has got to be doing the

17   providing.

18             You have information consumer, but in a purchase

19   transaction you have a consumer, somebody who is buying.

20             So you would think that the information consumer

21   would have to be the consumer.  But that's not always true

22   in these claims.  That's the reason I find them massively

23   confusing.

24             Anyway, that's the full text of Claim 7.  We

25   will go through the individual steps separately.

Shamos - direct

1    Q.      What does this slide show?

2    A.      This is my listing of what I considered to be the

3    differences between Claim 1 and Claim 7.  They have the same

4    preamble.  It's a "computer-implemented method

5    comprising..."

6            However, the phrase "information provider" has

7    replaced "customer."  And "information consumer" has

8    replaced "seller."  And that's why it's so confusing,

9    because the consumer here is Amazon, not the customer.  So

10   you have to reverse everything.  The phrase "proposed online

11   transaction" is used in Claim 7 instead of the earlier

12   phrase "purchase transaction."

13           Then there is another difference, which really

14   is a substantive difference, which is an "indication to

15   complete the proposed transaction must be received from the

16   information provider," in this case the customer.

17           And an indication to complete is not the same as

18   an indication to initiate.  Indication to complete was

19   construed by the Court.  And we will get to that

20   construction at the appropriate moment.

21   Q.      How about this slide, Dr. Shamos?

22   A.      This contains what the relevant constructions are for

23   interpreting this claim.

24           So the Court has construed "information

25   provider" to mean "provider of information."  In this

Shamos - direct

 1   particular claim, the customer provides information to

 2   Amazon.

 3            The Court construed "information consumer" to

 4   mean "user of information."  With respect to this claim and

 5   1-click, Amazon uses the information that has been provided

 6   by the customer.

 7            The Court construed "indication to complete to

 8   mean "a message to complete."  So the indication is the

 9   actual message.  It is not the act that the customer

10   performs by clicking.  It is actually a message.

11            And under these constructions, Steps 7(b) and

12   7(d) are completely analogous to Steps 1(b) and 1(d).

13            So we don't have to really look at Step 7(b) and

14   7(d) because all you do is switch around the words and it

15   becomes equivalent so to what we saw in Claim 1.

16            Let's look at 7(a).

17            "Making available for use."  This is the claim

18   language with the Court's constructions applied.  So instead

19   of "providing," I inserted "making available for use," which

20   was the construction I have provided.  "Making available for

21   use information provider data storing information for an

22   information provider usable to automatically complete a

23   proposed online transaction, including metadata associating

24   said information with said transaction."

25            Well, we know that Amazon stores information

Shamos - direct

1   about its customers, such as credit card information, and

2   shipping addresses, et cetera, in data storage media

3   associated with Amazon's computers.

4              And Amazon provides metadata by storing cookies

5   on the customer's computer.

6              I showed you the contents of those cookies, and

7   they say things like x-main equals, which is metadata.

8              So Amazon performs Step 7(a).

9   Q.    How about this slide, Dr. Shamos, what does this

10  show?

11  A.    It's just a continuation of what I just said:

12  "Amazon makes this stored customer information available for

13  use in online purchasing."

14             And it uses the stored information to

15  automatically complete a 1-click purchase.  "Automatically

16  complete" means the same thing in Claim 7 that it did in

17  Claim 1, which is without human input.

18             Both Amazon 1-click and cart 1-click perform

19  Step 7(a).

20             The reason that cart 1-click performs 7(a) is,

21  after you have been selecting items to go into your cart,

22  when you say you want to buy the entire cart with 1-click,

23  that satisfies the construction of indication to complete.

24  Q.    Move on to the next slide now?

25  A.    Yes.

Shamos - direct

1   Q.      What does this slide show?

2   A.      This is the text of 7(b).  "Providing the information

3   provider with information from an information consumer with

4   respect to a proposed transmit."

5            And because I can't remember which is which, I

6   just put it back on the slide.  I have a reminder that the

7   information provider here is the customer.  So in both

8   Amazon 1-click and Amazon cart 1-click, Amazon provides the

9   customer with information about items that can be purchased.

10  The Elmo doll, for example, it provided me with information

11  about the Elmo doll.

12           That is true of both 1-click and cart 1-click.

13  So they both perform Step 7(b).

14           How about Step 7[c]?

15  A.      7(c) "receiving from the information provider an

16  indication to complete the proposed transaction."

17           So this limitation is somewhat different.  I

18  didn't say that this one was analogous to anything in Claim

19  1.  In Step 7[c], the indication to complete does not have

20  to include metadata.  The indication to initiate in Claim 1

21  had to include metadata.  But this limitation says nothing

22  about metadata.

23           So all that has to happen to satisfy Claim 7(c)

24  is that the -- there has to be a receipt from the

25  information provider of an indication to complete.

Shamos - direct

1          When the customer clicks on the 1-click button,

2    the browser sense a message to Amazon to complete the

3    proposed transaction.  That happens in both 1-click and cart

4    1-click.

5          So Step 7[c] is performed in both.

6    Q.    How about Step 7(d)?

7    A.    Yes.  It's long.

8          "In response to the received indication,

9    automatically completing the purchase of an item from the

10   information consumer by accessing the information provider

11   data to retrieve the information and process the retrieved

12   information by processing said metadata associating said

13   information with the proposed transaction so as to complete

14   the proposed transaction."

15         I said that I spent over 500 hours on this case.

16   Many, many, many of those hours were spent staring at that

17   claim limitation to try to understand what it meant.

18         Amazon uses the metadata in the cookies to

19   retrieve stored customer data and to complete the purchase

20   transaction.

21         The purchase is automatically completed after.

22   After you hit 1-click, no human input is required, whether

23   you hit "Buy With 1-Click" in a regular single-item 1-click

24   transaction or in the cart 1-click.  Once you hit "Buy

25   Everything in the Cart" with 1-click, no human input is

1    required.

2                  So both cart Amazon 1-click and cart 1-click

3    perform Step 7(d).

4                  This is just the checklist, the preamble, and

5    all four method steps are performed in both 1-click and cart

6    1-click.  So both of those infringe Claim 7.

7    Q.    Let's move on to Claim 8.  What does this slide show?

8    A.    This is a dependent claim.  But it depends from Claim

9    7.  It says, "The method of Claim 7 wherein the information

10   provider data is stored in a computer of the information

11   consumer."

12                 And, again, I find this so confusing that I just

13   have to remind myself on every slide who is the information

14   provider and who is the information consumer.

15                 Here, the customer is the information provider,

16   and Amazon is the information consumer.  The customer data

17   is stored in Amazon's computer.  So it's stored in a

18   computer of the information consumer.  So the information

19   provider data, which is the customer data, is stored in a

20   computer of the information consumer, who is Amazon.

21                 So, therefore, the limitation of Claim 8 is met.

22   So 1-click and cart 1-click both infringe Claim 8.

23   Q.    And, finally, for this patent, how about Claim 9, Dr.

24   Shamos, what does this slight show?

25   A.    Claim 9 is another dependent claim, depending from

Shamos - direct

1    Claim 7.  It says, "The computer-implemented method of Claim

2    7, wherein the information provider data is maintained as an

3    object."

4              We have to remember that the information

5    provider is the customer.  So it's wherein if the customer

6    data is maintained as an object, but then that turns it into

7    the same as Claim 2, and we already saw that the customer

8    data is maintained as an object, so because all of the

9    limitations of Claim 7 are met and the limitation of Claim

10   9, Claim 9 is infringed by both 1-click and cart 1-click.

11   Q.    And what is this slide, Doctor?

12   A.    This is a checklist summary of the asserted claims of

13   the '710 patent, 1, 2, 3, 5, 6, 7, 8 and 9.  And we have

14   shown that all those that have been asserted are infringed

15   by Amazon.  In the case of 7, 8 and 9, it's also cart

16   1-click.  But in the Case of 1, 2, 3, 5 and 6, it's just

17   1-click alone.

18   Q.    Okay.  Moving on to a different subject now, what

19   does this slide show, Dr. Shamos?

20   A.    This is just an overall summary of my opinion that

21   Amazon's customer review system infringes at least one claim

22   of each of the '325 and '717 patents.  So therefore, it

23   infringes those patents.

24   Q.    How about this slide?

25   A.    This is a high-level block diagram of a customer

Shamos - direct

1      review transaction.  We have the customer, who is sitting at

2      his browser.  And there are cookies on his computer that

3      were put there by Amazon.

4               Over on the right-hand side, we have Amazon,

5      that has a web server and a cluster of other computers that

6      store customer data, they store information about products,

7      and they store reviews that customers have submitted without

8      products.

9               So the next following arrows are going to show

10     various steps in a customer review transaction.

11              So in this case Amazon has provided information

12     about a product that the customer is going to review.  So if

13     I bought the Elmo doll, I didn't play with it, but Amazon

14     didn't know that, so I did have the opportunity to provide a

15     product review for the Elmo doll.

16              So I can navigate to that page, and then I can

17     say to Amazon, yes, I would like to enter some feedback

18     about the doll.  And then Amazon sends a web page to me

19     that's going to allow me to enter feedback about the doll.

20              Then I am going to fill out that page.  And I am

21     going to send the feedback information.  But if you

22     remember, every time I click on a link to Amazon's web

23     server, all of Amazon's cookies that are stored on my

24     machine are going to go along with that message.

25              That is how Amazon is going to know various

Shamos - direct

1    things, including who I am, so it knows whom to associate

2    that review with.

3              So here is an example of the detail page for a

4    Monopoly game.  And here is the detail page, part of the

5    detail page.  If you scroll down the detail page, you will

6    see customer reviews.  And there is a summary there of the

7    128 reviews of that product, how many people gave a

8    five-star rating, four-star, et cetera.

9              Then you can see here that there are different

10   categories for reviewing that game -- how durable was it,

11   how much fun was it, how educational it was.

12             And here is an actual review by a customer that

13   includes text.  It's his own comments about it, including

14   the star ratings that he gave it.

15             And I read that, maybe I agree with it, and I do

16   nothing.  Maybe I say, no, I had a different experience with

17   Monopoly, I would like to create my own review.

18             So after I click "Create Your Own Review," now I

19   am given the opportunity to put my own rating in.

20             So the question, "Are you over 13," is to comply

21   with some consumer safety laws that preclude companies from

22   soliciting information from people who are too young to

23   appreciate the significance of that.

24             So we don't -- that's not relevant to the

25   claims.

Shamos - direct

1          No. 2, I am asked to rate the toy on these

2     different dimensions.  Is it fun?  Is it educational?  Is it

3     durable?

4          Then there is an overall rating that I could

5     give in stars.  The way you do that is actually you just

6     click on the particular star, if you want five stars, you

7     can click on the last star and it fills them all in.

8          You can give the review a title.  You can add

9     your own text, if you care to.

10          Then down at the bottom of the screen is a

11     preview of your review, which lets you look at it to make

12     sure that you really want to say all that.

13          And then -- go to the next slide.

14     Q.     Did you actually fill out the review?

15     A.     Yes.

16     Q.     Is this that review?

17     A.     Yes.  I didn't want to fill out a review for Elmo

18     since I didn't think it was honest.  I hadn't played with

19     the toy.

20          But I have in my lifetime played Monopoly.  So I

21     navigated to Monopoly, and I filled out the review form, and

22     I said, "This game is as fresh now as it was during the

23     Depression when it was invented.  What a pleasure to play a

24     game without electronic do-dads."

25          It's a board game with little pieces and dies

Shamos - direct

1    and you don't need any electronics to play it.

2              You click on "Preview Your Review."  And it

3    shows you your review.  If you are happy with it, click

4    "Publish Review."

5              It says, "This is how your review will appear."

6    And it added the date.  I didn't put that in.  That's the

7    date this all took place on.

8              I didn't want my name to be shown, so I had a

9    screen name, I called myself Monopoly Lover.  And where it

10   says "See All My Reviews," that enables someone who is

11   looking at the review to say, I would really like to gauge,

12   is this guy a nut or does he really give good reviews.  I

13   want to see everything that Monopoly Lover has sent to

14   Amazon.

15             So clearly, Amazon is associating the identity

16   of the customer with the review when it is storing it or it

17   wouldn't be able to bring back, See All My Reviews when

18   somebody clicked on that.

19             So I liked it, so I hit "Publish It."  I did

20   that because I really, truly believe what I said in that

21   review.

22   Q.   How about this slide?

23   A.   That's the acknowledgment page that I got from

24   Amazon.  It says, "Thanks.  Your review is being processed."

25             It might take 48 hours, but it's going to be up

Shamos - direct

1   on the site.  I think it's there.  You can go look at it if

2   you want.

3   Q.     Okay.  What does this slide show, Dr. Shamos?

4   A.     This is a summary of the different types of feedback

5   that Amazon accepts from users.

6          What we just saw was something called product

7   feedback.  I selected a product.  In that case, it was the

8   Monopoly game.  And I sent feedback about that product

9   according to certain rating dimensions.  So the operating

10  dimensions for games were durability, fun, educational

11  value, and then there is an overall review.

12         But those rating dimensions wouldn't be

13  appropriate for certain other kinds of products, like a

14  toaster, toasters, I don't think, are supposed to be fun.

15  So there would be a different kind of rating that you would

16  give for toasters.

17         There is also something called buyer/seller

18  feedback, where I can give feedback about a particular

19  seller rather than a particular product.

20         So if I buy from Amazon's outside merchants, or

21  Amazon processes the order but I actually am supposed to get

22  the goods shipped from somebody else, occasionally, these

23  guys ship late or they run out of stock or something goes

24  wrong, in order to help customers decide whether they ought

25  to be willing to buy from these third-party merchants, it's

Shamos - direct

1    very useful to have people be able to say things about what

2    their experience was.

3              So Amazon collects that information, if you care

4    to give it.  Before I buy from a particular outside

5    merchant, I can see what the experiences were of other

6    Amazon customers with that merchant.

7              No. 3, "Rate this item to improve your

8    recommendations."

9              Okay.  So Amazon was really early in this field.

10   I used to teach about this.  It is an extremely positive

11   thing.  Amazon, because it knows, mostly, the stuff I buy

12   from Amazon are books, I didn't buy Monopoly, I did buy

13   Elmo, but mostly it's books, and Amazon knows all the books

14   I have bought from Amazon.  So it knows what I like.

15             It also knows the books you have bought from

16   Amazon and knows what you like.

17             By taking information from millions of people,

18   it's able, with almost pinpoint accuracy, to figure out, of

19   the books I haven't bought yet, which are the ones I am

20   likely to like.

21             So when I sign on to Amazon, I get a page that

22   says, "Hi, Michael, we have recommendations for you."  And

23   the recommendations are typically spot on.  I mean, they

24   really are books that I would be interested in buying.

25             If you haven't bought a lot from Amazon, they

1    don't have much information about you, so they can't give

2    such good recommendations.

3              So they offer this capability, which is "Rate

4    this item to Improve your Recommendations."

5              This enables you to go to a different product,

6    books, for example, and say, I have this, I really like this

7    one; no, I don't like that one.  By collecting the

8    information about your preferences, that enables Amazon to

9    improve its ability to give you good recommendations.

10             So that's another form of feedback that you give

11   Amazon, is how much you like products that you didn't even

12   necessarily buy from Amazon.

13             Another form of feedback, this is kind of

14   review-review, "Was this review helpful?"

15             This is a question that is asked on the review

16   page.  You can tell Amazon, if you read a review from

17   somebody else, like Monopoly Lover, I wrote this very brief

18   review, it's probably so brief it's probably not too useful

19   to people, so they could say, this review didn't help me at

20   all in making my decision about whether to buy Monopoly or

21   the review was tremendously useful, say yes or no.

22             So you can see of a review what other people

23   thought of a review, which may help you in judging whether

24   to make any use of the review.

25             That is feedback about reviews.

Shamos - direct

1        All of these infringe one or more claims of the

2   Cordance feedback patents, the '325 and '717.

3   Q.    Okay.  If we can dig into the claims now.  You have

4   Claim 109 of the '325 a patent on the screen.  What does

5   this slide show?

6   A.    Unfortunately, Claim 109 is long.  So this is just

7   the first three steps of Claim 109.  We are going to go

8   through everything individually.  But basically, it's a

9   method claim that says you have to do things.  Steps (a) and

10  (b), you have to store some information.  Step [c], you have

11  to create some metadata.  We will get into the details

12  later.

13        Give me the next slide.

14        Then you have to transfer some information.  You

15  have to process some metadata.  And then you have to

16  communicate feedback information from one memory to another

17  memory.

18        That is the basic structure of Claim 109.  It

19  has six steps.

20        What does this slide show?

21  A.    The Court has construed the term "feedback

22  information."  Feedback information means, evaluation

23  attributes and corresponding value choices.

24        Product reviews are feedback information,

25  because, for example, in a product review, for a game, I get

Shamos - direct

1    to review whether it's durable or not, whether it's

2    educational or not.  And I can give a value choice for that

3    from one through five stars, star ratings, overall star

4    ratings, how good was this product.  The evaluation is

5    goodness and the value choice is the star rating.

6              A rating in response to rate this item is

7    feedback information.

8              Yes/no to "Was this review helpful?"  is

9    feedback information, because the evaluation attribute is

10   helpfulness, and the corresponding value choices are yes and

11   no.

12             Amazon offers a web page entitled "Leaving

13   Feedback About Your Shopping Experience" that explains how

14   to provide all that feedback.

15             So Amazon knows and acknowledges that that's

16   feedback.

17   Q.    What does this slide show, Dr. Shamos?

18   A.    This is a little roadmap of Claim 109.  I have not

19   put the full language of Claim 109 on this slide because you

20   can't fit it in one slide.  So this is just a quick summary

21   that we can use to guide our way through the claim.

22             In Steps (a) and (b), you have to store provider

23   information in a provider memory and consumer information in

24   a consumer memory.

25             And for the first systems that we are going to

1    look at, which have to do with the interaction that occurs

2    between a user and the Amazon web server, the information

3    provider is Amazon, and the information consumer is the

4    customer.

5            And that may change later on for a different

6    system.  But for now, the provider is Amazon and the

7    consumer is the customer.

8            In Step [c], it's necessary to create metadata

9    defining a control structure, processed at the customer's

10   computer, to control the transfer of feedback information.

11   The Court has construed control structure.  It's a set of

12   data that specifies how information is to be processed or

13   transferred.  So metadata has to define this set of data

14   that specifies how information is to be processed or

15   transferred, and then that control structure itself has to

16   be transferred from Amazon to the customer.

17           Then metadata has to be processed to execute

18   instructions outside the control structure to transfer the

19   feedback.  And then the feedback has to be sent from the

20   customer to Amazon.

21           If all those things happen, then Claim 109 is

22   infringed.

23   Q.    Okay.  How about this slide?

24   A.    This is the preamble of Claim 109.  It's a computer

25   based communication method comprising, operating one or more

Shamos - direct

1    computers to communicate by performing the steps of.  We

2    already saw before, comprising means including at least.

3    You have to do all these things.  You could do other things,

4    too, but you have to do these things.

5         Customers clearly send feedback to Amazon using

6    a computer-based communication method.  When you are at your

7    browser, you are communicating, your computer is

8    communicating with the Amazon Web server over the Internet.

9         And so the preamble is satisfied.  Amazon

10   feedback is a computer-based communication method that

11   comprising operating one or more computers.  In fact, in

12   this case, it's at least two computers.  It's yours and

13   Amazon's.

14   Q.    Okay.  What does this slide show?

15   A.    These are the first and second limitations which were

16   parallel to one another:  In a provider memory, storing

17   information including provider information.  And Step [b] is

18   in a consumer memory, storing information including consumer

19   information of.

20        Amazon, in the system we're talking about now,

21   is the provider.  And it provides information about the

22   subject matter of the feedback.  So if you are giving

23   feedback about the Monopoly game, Amazon is going to show

24   you a Monopoly page.  And so that information about Monopoly

25   is stored in Amazon's provider memory.

1          The customer is the consumer who is giving the

2    feedback.  The customer's memory, that is the hard disk on

3    your own computer containing cookies identifying you, and

4    Amazon is the one that puts the cookies there.  So Amazon

5    stores information in a provider memory that includes

6    provider information.  And it also stores information in a

7    consumer memory that includes consumer information.

8          So, Amazon perform Steps [a] and [b].

9    Q.    And how about Step [c], Dr. Shamos?

10   A.    Yes.  So in Step [c], I've added the things in

11   brackets.  I added just so we can keep the pieces straight.

12   So the [c] and the [i], [ii], [iii] are not actually in the

13   original text of the claim.  But I haven't added or deleted

14   any words from the claim.

15         Amazon has to create metadata describing

16   associations with three things.

17         Portions of said information, and said

18   information is the provider and consumer information that we

19   were referred to in Steps [a] and [b].

20         And, two, that metadata has to define a control

21   structure, which is processed at least at said consumer

22   memory.  That's the customer's memory associates one or more

23   processes for controlling communications of said associated

24   information.

25         Okay.  So I guess said associated information is

Shamos - direct

1    the stuff in I there:  Associations with portions of said

2    information.

3              The portions that are associated are said

4    associated information.

5              So Amazon stores information on its computers

6    about the product being reviewed.  And these products have

7    an ASIN.  ASIN's the product number that Amazon uses tos

8    uniquely identify products.

9              Amazon creates metadata, including such things

10   as ASIN equals, that describe an association with that

11   product data.

12             The control structure that Amazon creates is the

13   Web page that it sends to you, that using hypertext markup

14   language that includes things like said cookie to store

15   cookie information on your computer, and action equals,

16   which control the transfer of information because action

17   equals tells the destination that the information is to go

18   to.

19             All that information is created by Amazon is

20   sent to your computer where it's processed by your browser,

21   so the browser processes the control structure and it

22   communicates back a product review associated with that ASIN

23   to Amazon.  Because, of course, Amazon has to know what

24   product you are reviewing.  Otherwise, they couldn't

25   associate the review with that product.

Shamos - direct

1          So let's go on to the next slide.

2          So here is some HTML which actually shows some

3    of the control structure.  So "form method equals post."

4    "Method equals post" is an instruction to execute computer

5    instructions that are going to cause this information that's

6    in this form to be sent to and received by an Amazon

7    computer.

8          The instructions that actually cause the sending

9    are not here.  They're not part of the metadata.  So they're

10   external to the control structure.  The control structure

11   says what programs to execute.  But the actual frame itself

12   that is being executed is not part of the control structure.

13   So that is why it satisfies the external to said control

14   structure limitation.

15   Q.     Okay.  Is that the point you just made?

16   A.     Yes.

17   Q.     Okay.  How about this slide, Dr. Shamos?

18   A.     The last, Limitation C, has more than three things in

19   it.  It has five things in it.

20         So the metadata also has to include data

21   exchanged metadata associating a process for controlling the

22   transfer of feedback information, and said feedback

23   information including at least a portion of said consumer

24   information, to said provider memory.

25         So method equals post is exchange data,

Shamos - direct

1    metadata.  It associates a process, the post process for

2    controlling the transfer of the feedback information.

3              The feedback information includes cookies.

4    Every time a message goes to Amazon from your computer, all

5    of Amazon cookies go along with it, including an

6    identification of unique customer identification.  And so

7    the feedback information includes cookies on the customer's

8    computer that identify the customer as the author of the

9    feedback.

10             And so even though Step [c] was long and had

11   five things, all five things are satisfied by Amazon

12   feedback.

13   Q.    Okay.  How about this slide?

14   A.    Yes.  This is the last three steps.  So Step [d]:

15   Transferring said information, including said metadata

16   defining said control structure, from said provider memory

17   to said consumer memory.

18             Well, that occurs when Amazon sends the Web page

19   that has the method equal post on it.

20             Step [e].  Processing said metadata to execute

21   instructions external to said control structure to perform

22   said processes.

23             Well, metadata is processed both at the

24   customer's computer and at Amazon.  But the post causes

25   instructions that are external to the control structure to

Shamos - direct

1    be executed, and they perform the step of communicating the

2    feedback from your computer back to Amazon.

3                    And so Steps [d], [e], and [f] are performed

4    with by the Amazon feedback process in the customer Web

5    server interaction.

6    Q.    And what does this slide illustrate?

7    A.    This is actual text of, if you remember, I provided

8    feedback about the Monopoly game.  This is the actual

9    message that got sent to Amazon with my feedback.  So, of

10   course, as usually all the cookies were sent, including the

11   x-main cookie which identifies me uniquely.

12                    Right there, you can see the actual text:  This

13   game is as fresh now as it was during the Depression.

14                    And there are the ratings.  I said I gave it

15   five on fun, five on educational, three on durability

16   because it falls apart when you keep using it, as you keep

17   folding it and unfolding it, but I gave it a five overall.

18                    And that is the ASIN that is the unique

19   identification of that Monopoly product.  And I am obviously

20   over 13, so it says equals over 13 is Y.  It's information

21   about me.

22   Q.    Was this is the message that was sent when you

23   clicked on the preview review button?

24   A.    I think this is the message that was sent when I put

25   what I wanted to post on the review.

Shamos - direct

1          Let's see.  It says down here, preview X,

2   preview Y.  This is in response to the preview.  That's

3   correct.

4   Q.    And this is was summary again of this is a summary

5   illustrating that Claim 109 is infringed; is that right?

6   A.    Yes, it says to checklist of preamble and all other

7   steps of the claim.  So we've already seen the preamble is

8   meant and all the steps were performed.  So we can check

9   them off, one by one, and then get to the conclusion which

10  is that Amazon product feedback meets all of the limitations

11  of Claim 109.  So Amazon infringes Claim 109.

12  Q.    Okay.  What does this slide show?

13  A.    Okay.  So at the beginning we talked about feedback.

14  I talked about the four different types of feedback.  There

15  is product review.  Now, I have to go through the other

16  types to see whether accumulation of feedback in those

17  methods in infringes Claim 109 also.

18          So in buyer/seller feedback, a customer who has

19  bought an item from a seller other than Amazon can rate the

20  seller to do that, you visit a page offering a product of

21  that seller and you are offered a hyperlink on that page.

22  You can click to leave feedback.

23          Feedback page appears for that seller with

24  metadata identifying the seller.  Just like in product

25  review, there is an ASIN that identifies the product.  In

Shamos - direct

1   buyer/seller feedback, there is metadata that identifies who

2   the seller is.

3          When you submit the feedback about that seller,

4   as usually, cookies are including that identity so that your

5   identity can be associated with that, with that feedback.

6   It's completely analogous to product review except you are

7   not reviewing product, you are reviewing the seller.

8          Next.

9   Q.     How about this slide?

10  A.     Infringement By Rate This Item.  This is an

11  abbreviation.  It's Rate This Item to Improve Your

12  Recommendations.  It's very much like product review.

13         Amazon provides customized product

14  recommendations to customers based on what they bought and

15  how they rated prior items.  And Amazon allows a customer

16  to yet improve the quality of those recommendations by

17  rating some products just so they can gauge what kinds of

18  things you like and what kinds of things you don't like.  So

19  you can visit a page that offers a product for which you

20  like to leave this kind of feedback.

21         Then a feedback page appears for that item.  It

22  says on the slide, it says "that seller" but it should say

23  "that item" with metadata identifying the product -- that's

24  the ASIN -- and the selection of star ratings.  And when you

25  submit the rating, cookies identify you.  Obviously, Amazon

Shamos - direct

1    has to know who you are.  Otherwise, they can improve your

2    recommendations.  So it's really completely analogous to

3    product review.

4    Q.    How about this one, Dr. Shamos?

5    A.    Was this review helpful?  Amazon collects feedback

6    on whether you liked or whether you found a review useful or

7    not.  So if you are looking at a review, you can click a

8    link to indicate to Amazon whether that review was helpful

9    to you or not.

10          That review page that you are looking at

11   contains metadata identifying the review because when you

12   submit the feedback, Amazon has to be able to associate it

13   with that review, but also cookies identify you.  So it

14   knows who you are, it knows the product or knows the review

15   that you're rating.  You can select yes or no.  It's in the

16   Court's construction on feedback.

17          And so it's really, it's analogous to a product

18   review except it's not about a product, it's about a review

19   of a product.  It's not something that has been offered for

20   sale.  It's your comment on a review.

21          So these really are all analogous for the

22   purpose of the claims that we have been talking about.  The

23   one claim that we've talked about.

24   Q.    How about this slide?  What does this show?

25   A.    Okay.  This lists the four kinds of feedback that

1    Amazon allows you to submit.  And it's my opinion that in

2    the interaction between the customer computer and the Amazon

3    Web server, there is no substantive difference among the

4    feedback modes regarding the Cordance feedback claims

5    because there is no limitation in the claims about the type

6    of information that is going back and forth.  It just has to

7    be provider information and consumer information.

8           Claims don't say anything about whether it's a

9    review or seller or product or anything of that.  So from

10   the point of view of the claims, they're all analogous.

11          So if we can show that there is infringement by

12   product review, then there is infringement by the remaining

13   review, that simplifies and shortens it.

14   Q.    How about this Slide of Claim 119?  What does this

15   slide show?

16   A.    This is a Claim 119 of the '325 patent.  It's a

17   dependent claim.  It depends from Claim 109, which means in

18   order to infringe this, you have to perform all the steps of

19   109 and you also have to meet this additional limitation

20   that says:  Wherein said processing step further includes

21   the step of translating said information according to a

22   selected markup language based upon processing of said

23   control structure.

24          If we wanted to be really meticulous, we would

25   go back to Claim 109 and we would look at said processing

Shamos - direct

1    step.  I don't think it's really necessary to do that

2    because the markup language that we're talking about here is

3    HTML.  And HTML is a form of hypertext that is, it includes

4    text plus additional things -- special markers that are put

5    into the file to indicate what the significance of various

6    pieces of information are.

7                So metadata in the HTTP headers that are sent

8    along with the information from the browser contains HTML.

9    HTML is a markup language.  Amazon sends metadata to the

10   customer that directs the customer's browser to translate

11   the consumer and provider information according to HTML,

12   which is a markup language, so the limitation of 119 is

13   satisfied in product reviews and all the other forms of

14   feedback.

15   Q.    And, once again, what does HTML stand for?

16   A.    Hypertext markup language.  I think we showed several

17   pages of it here today.  But it contains, for example, in

18   the Elmo page, it contains a reference of where to go to get

19   the Elmo picture.  It contains the price information, an

20   indication of what text should be in red, what should be

21   boldfaced, what the buttons should look like, et cetera.

22                That was easy, because it meets all the

23   limitations of 109 and the additional limitation of product

24   feedback.  The product feedback systems infringes Claim 119.

25   Q.    And how about this claim, Dr. Shamos, Claim 124?

Shamos - direct

1    A.      Yes, Claim 124 is another dependent claim that

2    depends from 109, so you have to perform all the steps of,

3    and you have to satisfy this very long extra limitation that

4    says:  wherein said metadata includes link metadata

5    associating a portion of secondary information stored at a

6    location separate from said provider memory and said

7    consumer memory, and wherein said processing step includes

8    processing said link metadata to transfer said portion of

9    said secondary information to at least one of said provider

10   memory and said consumer memory.

11           You can stare at that for a very long time

12   before you would be able to figure out what it means, but

13   link metadata is metadata specifying links to data stored at

14   someplace that is neither the provider nor the consumer

15   memory.

16           So the Web server at Amazon has some memory

17   associated with it.  But Amazon maintains many, many other

18   servers that contains other pieces of information,

19   including, for example, photographs of different products.

20   They're stored in the image server.  I believe in the

21   deposition testimony that was played yesterday, one of the

22   witnesses said that there was a separate image server that

23   that stored images at Amazon.

24           So link metadata in this case is a hyperlink

25   that points to an image server that says please go get a

Shamos - direct

1    picture of this product and add it in along with all the

2    other information.

3                    So with that understanding of that is link

4    metadata, this limitation of Claim 124 is also met by

5    product review.

6                    And here is an example of some link metadata

7    that is created by Amazon, and it's sent in a Web page to

8    the customer, so the customer's browser can obtain

9    information about a product.  For example, a picture of the

10   product.

11                   And so this text actually comes from Plaintiff's

12   Exhibit 493 at Page 76.  I just copied it directly out of

13   there.  And so you can see there is some metadata here,

14   source equals, SRC equals.

15                   And this is a hyperlink.  And you can see that

16   the server here, g-ecx.images.amazon.com, that is not an

17   Amazon Web server.  The Amazon Web server is www.amazon.com.

18                   So this is neither the provider nor the consumer

19   memory and that is the secondary information that is being

20   retrieved in order to form that Elmo, the Elmo page.

21                   So that's the metadata there.  That's the link.

22   And there is metadata that identifies it as such.

23                   The same thing.  It satisfies, product review

24   satisfies the limitations of Claim 109 and the additional

25   limitation of 124.  So Amazon infringes that claim.

Shamos - direct

1   Q.     Okay.  Moving along to the '717 patent.  What is this

2   slide?  What does this slide show?

3                  THE WITNESS:  Is there a break-in our future?

4                  THE COURT:  That is what I was going to ask.

5   Since we're starting a new patent, it probably wouldn't be a

6   bad idea if we took a break.  Members of the jury, you need

7   to come back at 11:15.

8                  (Jury left courtroom.)

9                  THE COURT:  You may stand down, doctor.  You

10  don't need to stay at the witness stand.

11                 Counsel, we'll see you in about 20 minutes.

12                 (The attorneys respond, "Thank you, Your

13  Honor.")

14                 (Brief recess taken.)

15                 THE COURT:  Please bring in the jury.

16                 (Jury enters courtroom at 11:17 a.m.)

17                 THE COURT:  Please be seated.

18                 Mr. Abrahamsen, you may continue.

19                 MR. ABRAHAMSEN:  Thank you, Your Honor.

20  BY MR. ABRAHAMSEN:

21  Q.     So just before the break, we moved on to the '717

22  patent.  Can you please tell the jury what this slide is?

23  A.     Well, I am just saying that Claim 50 of the '717

24  patent is infringed by the process of interaction between

25  the Amazon web server and the customer's remote computer in

Shamos - direct

1    providing feedback.

2    Q.     Is that the same process we were just discussing?

3    A.     Yes.

4    Q.     What does this slide show?

5    A.     This is the even more confusing Claim 50, because it

6    keeps on referring to node and said node and said second

7    noticed, et cetera.

8           So we are really going to have to break this

9    down in order to make it understandable.

10          This is just the full text of the first three

11   steps of Claim 50.  We will go through them individually.

12          There is some substructure to Claim 50, there

13   are steps, and substeps, and sub-subsets, so these numbers

14   that I have given, [c](2), [d], [d](1), those are not

15   actually in the original text of the patent.  But I added

16   them just so we can keep things straight.  The patent a

17   couple of times says, see [d], at least one of, and then

18   there is a [d], a [d](1), a [d](1)(b), a [d](1)(c), and then

19   [d](1) says "at least one of."  So when you see...

20          On the screen I actually left out text of the

21   claim that is not relevant, because there are steps in there

22   that don't have to be performed, and we are not saying they

23   need to be performed, so we don't need to talk to them.

24   Otherwise, it actually takes five slides to put the entire

25   text of Claim 50 upon the screen.

Shamos - direct

1    Q.      What does this slide show?

2    A.      This is the preamble of '717, Claim 50.  I will just

3    read it.  Then we will go through and see if everything is

4    satisfied in the Amazon system.

5                 "A method for use at a node of a computer-based

6    communications system which includes multiple nodes arranged

7    and adapted to intercommunicate via a communications

8    network, said method characterized by the steps of..."

9                 So this is saying it is a method that is being

10   used at a node of a computer-based communication system.

11   Q.      So what is a node?

12   A.      It may not be necessary to give a precise definition

13   of it.  But certainly, if I have a computer, and Amazon has

14   a computer, and I am talking to Amazon's computer over the

15   Internet, then I have a node, Amazon has a node, and we are

16   using a computer-based communications system.

17                As we are going to see later, Amazon has

18   multiple computers that it maintains, and they communicate

19   with each other, also, over a network.

20                So Amazon inside Amazon has separate nodes.  But

21   a node is basically a place that messages come to and

22   messages go out of.  Typically, it is going to be a

23   computer.

24                Now, this computer-based communications system

25   has to include multiple nodes, arranged and adapted to

1    intercommunicate via a communications network.

2            Multiple means more than one.  Amazon uses at

3    least two nodes in this interaction that is occurring

4    between your computer and Amazon's computer.  One of them is

5    Amazon's web server and another one is your computer, the

6    customer's security.

7            Because they communicate over the Internet, we

8    understand that that is a computer-based communications

9    network.

10           So Amazon's method satisfies this preamble.  It

11   has all of the things that the preamble requires.

12   Q.    How about this slide?

13   A.    Well, the extra sad news about Claim 50 is it's a

14   means-plus-function claim.  That's a particular form of

15   claiming that is allowed in patents.  What you can do is

16   state that there is a means for performing a particular

17   function.  And a means is a device.  But a means for

18   performing a function, that device has to do a particular

19   thing.

20           In order to see whether or not there is a means

21   in the Amazon system that fulfills the requirements of the

22   patent, you have to go through this legal test.  In order to

23   find a means in the accused Amazon system that corresponds

24   to a claimed means, you first have to find -- it says "an

25   elements," but it should be "an element or elements," that

Shamos - direct

1    performs the same function as is recited for the means in

2    the patent, and has the same structure as the means talked

3    about in the patent or its equivalent.

4              So the function has to be the same.  But the

5    actual structure can be the same or equivalent.

6              Determining what the function is and what the

7    structure is is the province of the Court.  The Court has

8    done that.  And we are all bound by what the Court has said

9    the function is and what the structure is that corresponds

10   to each means in this particular claim.

11             So the first step of Claim 50 is "providing

12   storage means for storing information."

13             The Court has construed storage means for

14   storing information.  The function of it is, it has to store

15   information.  And the structure is, a database.  A database

16   is a storage means for storing information for the purposes

17   of this case.

18             Amazon's web servers access databases.  You

19   heard many of them referred to in the testimony yesterday.

20   There is a TOPPS database, for example, that contains

21   reviews.  Amazon's web servers access databases that store

22   information about items and sellers that can be reviewed.

23             So Amazon provides storage means for storing

24   information according to the Court's construction.

25   Q.    What does this slide show?

Shamos - direct

1   A.      It shows the second step of Claim 50:  "Associating

2   portions of said information with metadata, said metadata

3   definition a control structure."

4           So this said information is the information that

5   is stored in Step [b].  That's what we mean by "said

6   information."

7           Well, when we analyzed Claim 109, we saw that

8   Amazon creates metadata that defines a control structure and

9   associates portions of the information that are stored at

10  Amazon.  For example, for products, there is an ASIN number;

11  for review, there is a review number; for a seller, there is

12  an identification of the seller.

13          Amazon stores information on its computers about

14  the item or person or review being reviewed.  It creates

15  metadata such as "ASIN equals" that describes associations

16  with that information.

17          But control structure they put in the web page

18  that is created by Amazon that contains HTML, that then gets

19  sent over the Internet to the customer's computer.

20          The customer's browser processes that control

21  structure to communicate feedback information for the person

22  or item or review that is being reviewed.

23          And therefore, Amazon associates, it performs

24  this Step (b), associating portions of said information with

25  metadata, said metadata defining a control structure.

1          So Amazon performs Step (b).

2   Q.     What does this slide show?

3   A.     This is the full text of the third step, Step [c] of

4   Claim 50.  I have to write little reminders down there so I

5   can keep straight what said node is and what second node is.

6          But "transferring said metadata," that is

7   metadata that just got created that does the associating,

8   "in at least one direction between said node and a second

9   node of said system to associate with said associated

10  information one or more processes which execute instructions

11  external to said control structure to control communications

12  of said associated information, said metadata including at

13  least one of," and that's going to be on the next slide.

14  Let's see if at least we have got this part of Step [c].

15          In this interaction, between the web serve and

16  the customer's computer, said node is the Amazon web server.

17  The second node is the customer's computer.

18          The metadata is sent from the Amazon web server

19  to the customer computer.  That satisfies this first part,

20  which is transferring said metadata in at least one

21  direction between said node and a second node.  Well, the

22  direction is from Amazon to the customer computer.

23          As to the rest of it, we saw that back in Claim

24  109.  In 109 we saw that the metadata associates one or more

25  processes, which execute constructions external to that

Shamos - direct

1    control structure to control communications.  That's the

2    method equal post, for example, which says what process

3    should you use, that is not part of [b] to transfer this

4    data to Amazon.

5              Remember, now, they say "at least one of."  In

6    the claim, there is a list of things.  But I only put on the

7    slide the "at least one of" that I actually found to be done

8    in the Amazon system.  So we don't have to look at the other

9    stuff that is not present.

10             But you have to understand that in the "all

11   elements" rule, every step has to be performed.  But if

12   there is an alternative, if it says "at least one of," then

13   you only need one of them.  You don't have to have all of

14   them.

15             So the one, in fact, isn't the first one.  It's

16   [c](2), which is, there has to be data exchange metadata

17   which associates a process for controlling the transfer of

18   feedback information, said feedback information including at

19   least a portion of said information stored at the receiving

20   node.

21             Then there is more, there is another thing in

22   the "at least one of."  This is the only one that has to be

23   shown.

24             To simplify this, I am going to make the point

25   that the wording here is nearly identical to the third step

Shamos - direct

1   of Claim 109, where it says, "said metadata including data

2   exchange metadata associating a process," instead of "which

3   associates a process," "for controlling the transfer of

4   feedback information," and here it says said feedback

5   information, down at the bottom, instead of just including

6   at least a portion, said feedback information including at

7   least a portion of said consumer information to said

8   provider memory.

9          They are the same thing.  The words are slightly

10  different.  But the meaning is identical between [c](2) and

11  109(c).

12         Since we saw in 109 that that step was

13  performed, and Step [c](2) was performed in Claim 50.

14  Q.    How about this slide, what does this one show?

15  A.    Step [d], the fourth step, is you have to have at

16  least one of a list of things.  And in this case it's the

17  first thing in the list that is present in the Amazon

18  system:  transferring said information, including said

19  metadata defining said control structure, to said second

20  node to control, and then it has to control at least one of

21  some things.  First let's do this.

22         The crib sheet is down at the bottom, provider

23  memory is said node and consumer memory is the second node.

24         If you remember, Amazon creates the metadata.

25  It puts it in an HTML page, and it sends the metadata to

1    said second node, which is your computer.

2         If you don't remember that, then it turns out

3    that the language of [d](1) is nearly identical to the

4    fourth step of Claim 109 of the '325 patent, which is

5    transferring said information, including said metadata

6    defining said control structure from said provider memory to

7    said consumer memory.

8         This one uses provider memory and consumer

9    memory, but Claim 50 uses said node and said second node.

10   Other than that, they are completely analogous.

11        So Step [d](1) is performed.  That is the only

12   thing in [d] that has to be performed in order to find [d]

13   to be performed.

14   Q.    And what does this slide show?

15   A.    Well, remember, at the end of [d](1), it said to

16   control "at least one of."  Now there is another list of

17   things that the control structure has to control, at least

18   one of a bunch of things.  One of them is [d](1)(b),

19   receiving said feedback information from said second node.

20        So the second node is the customer computer, and

21   sending the feedback information to the Amazon web serve.

22   The metadata sent to the customer computer includes the

23   identifier of the reviewed product, or, in the case of the

24   seller, the seller will review the review.  It includes

25   metadata.  So input name equals ASIN, value equals

Shamos - direct

1    B0O0OIWCT, that says that this strange identifier, bB000IWCT

2    is an ASIN, it identifies a product.  And ASIN equals

3    specifies what specifies the destination of the information.

4    That controls what the Amazon web server does with the

5    information when it is received from the second node.

6              So it controls at least one of the receiving

7    said feedback information from said second node.

8              How about this slide, what does this one show?

9    A.    This is another one of the list.  There was a

10   [d](1)(a), a [d](1)(b), and a [d](1)(c).  Even though you

11   only have to show that one of them is performed, in fact,

12   two of them are performed.  So you have to process said

13   feedback information.

14             Well, certainly Amazon processes the feedback.

15             Information.  It looks at it, it associates it

16   with a customer, it stores it in its database.  But that has

17   to be done by the metadata that does the controlling.

18             In fact, that's what I just explained.  "ASIN

19   equals" tells the destination and other information tells it

20   what kind of feedback it is so Amazon knows what to do with

21   it when it comes back.

22             So Amazon does both [d](1)(b) and [d](1)(c).

23   Only one of them is necessary, but it does both.  So Step

24   [d] is performed by Amazon.

25             There were only four steps.  So if all four are

Shamos - direct

1    performed by Amazon, then Claim 50 is infringed by Amazon.

2              This is true in the web server customer-computer

3    interaction, but it's true for Product Review, Buyer/Seller

4    Feedback, Rate This product, and Was This Review Helpful?

5    Q.    What does this slide show?

6    A.    There is another Claim in the '717.  This is a

7    dependent claim that depends from Claim 50.  It says, "The

8    method of Claim 50 further characterized by executing said

9    processes associated by said metadata to control

10   communications of said information."

11             Well, of course, the processes are executed.

12   That is the purpose of having them there.  The processes are

13   necessary to get the feedback information back to Amazon and

14   to have Amazon process it.

15             So they are executed.  Otherwise, the feedback

16   information would never get communicated to the web serve,

17   and you know it did because I showed slides where I

18   communicated it back to Amazon.

19             So Claim 51 is also infringed in this web server

20   remote computer interaction between you, between a customer

21   and Amazon, by all of Product Review, Buy/Seller Feedback,

22   Rate This Product and Was This Review Helpful?

23   Q.    And how about this slide, what does this one show?

24   A.    There is another claim asserted in '717.  It's Claim

25   74, which is another dependent claim, this one depends from

Shamos - direct

1    Claim 51.  So this is double dependency.  51 depended from

2    50, which means you have all of 50 plus 51.

3              This one depends from 51, which means you have

4    to have all of 50, all of 51, and all of 74, in order to

5    have infringement.

6              The method of Claim 51, wherein said processing

7    step, this is where you are processing the metadata, said

8    processing steps includes:  "processing said data exchange

9    metadata to generate a request to obtain at least a portion

10   of said feedback information from a user; and receiving said

11   portion of said feedback information input by a user and

12   storing said portion of said feedback information at said

13   node."

14             Remember, said node is the Amazon web serve.  We

15   are the second node.

16             The customer computer processes the metadata and

17   solicits feedback from the user.  It says what rating would

18   you like to give?  And throws some stars up on the screen,

19   and it clicks stars and has a yes or no button.

20             As that metadata is processed, it enables the

21   customer computer to extract the feedback from you, and

22   then, you know, from what we have seen already, that it is

23   received by and stored at Amazon.  So in this interaction

24   between the web server and a customer computer, all of the

25   limitations of 74 are met.

Shamos - direct

1          So, therefore, Claim 74 is infringed in Product

2    Review, Buyer/Seller feedback, Rate This Product, and Was

3    This Review Helpful?

4    Q.    What does this slide show?

5    A.    There is yet another claim asserted in '717.  We are

6    up to Claim 96.  It is a good thing we didn't go through 1

7    through 95.

8          "The method of Claim 50 wherein the node

9    operates as at least one of a web serve and a web client."

10         We have been saying that said node is the Amazon

11   web serve.  So said node is the node that's being referred

12   to, and we know the Amazon web server operates as a web

13   server.  So therefore, this limitation is trivially

14   satisfied.

15         So in the web server-customer computer

16   interaction, Amazon infringes, it should say Claim 96 there,

17   not Claim 74, by Product Review, Buyer/Seller Feedback, Rate

18   This Product, and Was This Review Helpful?

19   Q.    Shifting categories a little bit....

20         Can you please explain this slide to the jury?

21   A.    Yes.  Up until now, we have been talking about what

22   happens between the customer and how Amazon solicits,

23   enables the customer computer to solicit feedback from the

24   user and how that feedback gets back to the Amazon web

25   server.  Those were the only two nodes that we talked about.

Shamos - direct

1            But earlier I mentioned that there are other

2    nodes in this communication network, because Amazon has a

3    whole bunch of computers within Amazon that do different

4    things.  They store different types of information.  Some of

5    it is customer information.  Some of it is reviews.  Some of

6    it is data about products, et cetera.

7            These feedback claims that we have just looked

8    at, in the '325 and '717 patents, apply, also, to the

9    exchange of feedback information that occurs internally

10   within Amazon.

11           That's what this slide is, a kind of a very

12   high-level diagram of some of those interactions.

13           So Amazon internal, itself, is a provider and a

14   consumer of feedback information.

15           Here is one reason why.  Remember, there was on

16   one of those screens, I was Monopoly Lover, and I had rated

17   Monopoly and one of the options that a user had was, they

18   could see all the reviews that were by me.  Well, those

19   reviews are stored somewhere.  And they are stored somewhere

20   at Amazon but they are not stored on Amazon's web server.

21           So when a customer asks to see all of the

22   Monopoly Lover's reviews, that request goes to Amazon's web

23   server.

24           So this arrow that seems to go nowhere.  It's

25   communicating with a customer, but that interaction we

1   already talked about.  We are not going to talk about it

2   further.

3              The Amazon web server is asked, please supply me

4   with all the reviews by Monopoly Lover.  But the Amazon web

5   server doesn't have those reviews.  Some other computer at

6   Amazon has them.

7              And so the Amazon Web server has to ask a

8   different node in communication network, would you please

9   send me that feedback information?

10             Ultimately, it's going to take it and it's going

11  to send it off to the customer, but that is not what we're

12  talking about now.

13             So feedback information is moved within Amazon

14  among at least three different servers.  There is the Web

15  servers.  There is the Amazon customer review server,

16  sometimes called CRS, and that has product reviews.  And

17  then there is another server called the Amazon feedback

18  server that has buyer/seller feedback.  That's whether the

19  seller is good or not.

20             The Web server is constantly receiving requests

21  from users for one or the other or both of these types of

22  information, and the Web server has to ask for that

23  information from the other servers.  And what the

24  demonstration is now is how those interactions infringe the

25  claims that we just talked about or some of the claims that

Shamos - direct

1    we just talked about.

2    Q.      And what about this slide?  What does this show?

3    A.      Okay.  So this is a little explanation that the

4    interaction that goes on within, internally, with Amazon is

5    somewhat different from the interaction with the customer.

6    Customers use Web browsers, which means there is a person

7    sitting at a screen, at a keyboard.  And they're responding

8    as a human being put by clicking on things and typing stuff

9    in.

10           And the metadata that is used there is HTML,

11   because that is the kind of universal language of browsers.

12   But, internally, the Amazon Web server, the CRS server and

13   the feedback server, they don't use browsers because that

14   would require a human to be sitting there.  Human beings

15   could never respond fast enough to these requests, so

16   because they're not using browsers, the nature of the meta

17   data that is exchanged between the servers is different.

18   It's not HTML but it comes in packages of data called

19   datagrams.  I think there was some testimony yesterday about

20   datagrams.  It's like a telegram except instead of words in

21   there, there is data but it's a package of data that gets

22   sent together, and Amazon exchanges datagrams among the Web

23   server, the CRS server and the feedback server but the

24   datagrams themselves contain metadata that control the

25   transfer of the review information between the server,

Shamos - direct

1    feedback server and the Web server or the CRS server and the

2    Web server.

3    Q.     And what does this slide show?

4    A.     Alas, this is an actual datagram that was sent by the

5    Web server to the CRS server to request to reviews

6    corresponding to a particular ASIN.  An ASIN, remember, is a

7    product identifier.  So if I want reviews about this

8    product, this is the datagram that the Web server prepared

9    and sent over to the CRS server, asking it to please respond

10   with reviews for this product.

11              And this is metadata, ASIN equals, because it

12   identifies that number as a product number.

13              And method equals get reviews by ASIN, tells the

14   CRS server what to do with this ASIN.  It says, oh, I want

15   all the reviews associated with that, with that ASIN.

16              So this is a demonstration that there is

17   metadata in the datagram that is exchanged.

18   Q.     And what does this slide show?

19   A.     This is a high level flow diagram of what happens

20   when a customer wants a reviews page.  He is looking at a

21   product and he wants to see all of the reviews associated

22   with it or all the three star reviews.

23              So the customer computer sends a get.  He is

24   requesting a page.  And any time the customer requests

25   anything from the Amazon Web server, cookies are going to go

Shamos - direct

1    along with that.

2           The Web server does not have the answer to the

3    customer's question.  The Web server has to get the answer

4    from one of either the customer review server or the

5    feedback server.  So in order to do that, the Web server is

6    going to request and receive the information associated with

7    a particular ASIN.  And so it creates a datagram and it's

8    called a BSF datagram that includes ASIN equals, and method

9    equal get review by ASIN, and it sends that datagram down

10   to the CRS server.  The CRS server processes the datagram

11   so it knows what the Web server wants.  It goes and acts as

12   its database, and one of them that is accessible to the CRS

13   server is called the TOPPS datastore.  It goes to the

14   database, pulls out whatever it was that Web server

15   requested and sends the information back in a different BSF

16   datagram that also has metadata in it that is processed by

17   the Web server.  The Web server then makes up an HTML page

18   that has the necessary stuff and sends it back to the

19   customer computer so you can see it on your screen.

20          But for now, we're only going to be talking

21   about this interaction between the Amazon Web server and

22   either the CRS or the feedback server.

23   Q.    And how about this slide?  What is this one show?

24   A.    It's substantially the same thing except this is

25   about buyer/seller feedback instead of product review

Shamos - direct

1    feedback.

2              So here it's the same thing.  The customer sends

3    a get saying I'd like to see some reviews on this seller.

4    The Web server receives that request but it can't answer it

5    directly.  It has to go to the feedback server which has an

6    database that has all these reviews of sellers in it.

7              And in order to do that, it creates a datagram

8    that contains metadata, sends the datagram to the feedback

9    server.  The feedback server processes the metadata and

10   ultimately it's going to have to create a query to its own

11   database to get the necessary information out of the

12   database and it's going to send that information back to the

13   Web server in a datagram.

14             The Web server, upon receiving that information,

15   is going to pick out pieces, and it's going to create a nice

16   HTML page it's going to send back to the customer, but here

17   we're only talking about the interaction between the Web

18   server and the feedback server.  We already talked but

19   interaction between the CRS server and the Web server.

20   Q.    And what is this slide show?

21   A.    This is my conclusion that Claim 50 is infringed by

22   the interaction between the Web server and the CRS server,

23   and also it's infringed by the interaction of the Web server

24   and the feedback server.

25   Q.    Okay.  How about this slide, Dr. Shamos?

Shamos - direct

1    A.      This is a reminder.  We already looked at Claim 50.

2    This is all the same.  It's the first three steps of Claim

3    50.  And these are the "at least one of" steps that are

4    performed in the Web server/feedback server or Web

5    server/CRS server interaction.  We're going to go through

6    them separately.

7    Q.      Are these the same or different ones than the options

8    on the other Claim 50?

9    A.      My recollection is that they're different.

10   Q.      Okay.  Let's step through them.

11   A.      But it's -- it's tough to remember.

12   Q.      Okay.  If does this slide show?

13   A.      This is the preamble.  So it's a method for use at a

14   node of a computer-based communications system which

15   includes multiple nodes.

16            The same preamble we looked at before.

17            So we have to have a computer-based

18   communications system.  Within Amazon, it's not the

19   Internet.  Amazon has an internal network.  And it has

20   nodes.  And one of the nodes is the Web server, another is

21   the CRS server, and another is the feedback server.  So it

22   has multiple nodes and they're arranged and adapted to

23   intercommunicate the communications network.  They have to

24   be or they couldn't talk to each other.  And so

25   automatically the preamble is satisfied by the internal

1   Amazon structure.

2   Q.    And what does this slide show?

3   A.    This is a repeat of the preamble, but I've emphasized

4   the word "node" because "node" and "said node" mean the same

5   thing throughout the claim.  And so we have to identify what

6   the node is.  In the Web server/CRS server interaction, the

7   node referred to in the preamble is the CRS server.

8            In the Web server/feedback server interaction,

9   the node is the feedback server.  So the second node is

10  going to be the Web server.

11  Q.    And what about this slide?  What does it show?

12  A.    This is the first step of Claim 50:  Providing

13  storage means for storing information.

14           It's a means plus function element.  The Court

15  has construed that the function is storing information and

16  the structure in which it's stored is a database.  We know

17  that Amazon provides its CRS server with a TOPPS database

18  that stores product reviews.

19           The feedback server has a database called FRDS

20  that stores buyer/seller feedback.

21           So Amazon provides storage means for storing

22  information.  So it performs Step [a] in both the CRS and

23  the feedback server interactions.

24  Q.    And what does this slide show?

25  A.    This is the second step of Claim 50 in which they

Shamos - direct

1   have to associate portions of said information with

2   metadata.  Said metadata defining a control structure.

3              So said information is the information that is

4   stored in Step [a].

5              So there has to be metadata that associates

6   portions of it.  And metadata has to define a control

7   structure.

8              So there is metadata such as "ASIN equals" which

9   associates stored reviews about a particular product.  On

10  the feedback end, there is metadata, such as encrypted ratee

11  ID that associates stored feedback records relating to a

12  particular ratee.  Ratee is someone who is rated.  A seller

13  would be a rattee.  I would be the rater if I rated a

14  seller.

15             And the datagrams that are exchanged contain,

16  include name value pairs.  The names, for example, "method

17  equals" are metadata that define the control structure, the

18  elements of the control structure.  So Amazon performs this

19  Step [b] in both of the CRS and the feedback server

20  interactions.

21  Q.    And what about this slide?  What does this one show?

22  A.    This is the first piece of Step [c] because it ends

23  with an "at least one of" because we have to make sure this

24  part is satisfied first.

25             Transferring said metadata in at least one

1   direction between said node and a second node of said

2   system.

3           Well, remember that said node is feedback server

4   or the CRS server, and the only other node we're talking

5   about is the Web server.  So the Web server is the second

6   node here.  And so the metadata has to go in at least one

7   direction between the Web server and the CRS server or

8   between the Web server and the feedback server.  And, in

9   fact, the metadata is transferred from the Web server to the

10  CRS or feedback server because that's the datagram that is

11  requesting that a query be made and information be returned.

12          So it associates said information, said

13  associated information, which is the pieces of information

14  stored that relate to a particular rattee or a particular

15  product, like ASIN.

16          And they associate one or more processes to

17  execute instructions to remember, "method equals get reviews

18  by ASIN."  That's part of the control structure that tells

19  the receiving server what is that the Web server wants you

20  to do?

21          And so this part, Step [c], is satisfied in both

22  the CRS and feedback server interaction.

23  Q.     And what does this slide show?

24  A.     Well, I'm showing now how the stuff, to associate

25  with said associated information of one or more processes

1    which execute instructions external to said control

2    structure.

3              For the CRS server, I already talked about the

4    method equals get reviews by ASIN.  For the feedback server,

5    there is another method called "get feedback list" which

6    associates with stored feedback records or process to get

7    feedback process, for controlling communications of feedback

8    records from the feedback server to the Web server.  It's

9    telling the feedback server to go get the feedback list and

10   send it back to me, associated with a particular seller or

11   particular rattee.

12             And so the actual get feedback list process of

13   the "get reviews by ASIN" process is in computer code that

14   is resident on these servers.  It's not part of the control

15   structure that is being sent here.

16             And so that's why instructions are executed

17   which are external to said control structure.  That's why

18   this underlined piece is satisfied in both of the CRS and

19   the feedback server interaction.

20   Q.   And what does this slide show?

21   A.   This is basically a repeat of the previous datagram

22   that I showed earlier so I could explain the different

23   between HTML and a datagram.  This is the actual -- it's the

24   same one.  This is the one that shows "method equals get

25   reviews by ASIN" which is associating a process external to

Shamos - direct

1    this datagram.  This datagram has the control structure but

2    in here you see no code for get reviews by ASIN, so there

3    has to be some computer instruction outside this control

4    structure in order for this to be executed.

5    Q.      And what about this slide?  What does this one show?

6    A.      This is one of the "at least one" that has to be

7    performed, C2.  Step [c] isn't performed unless at least one

8    of a bunch of things is done.  And C2, there has to be data

9    exchange metadata which associates a process for controlling

10   the transfer of feedback information, said feedback

11   information including at least a portion of said information

12   stored at the receiving node.

13          And so the data exchange metadata, for example,

14   "method equals get reviews by ASIN" controls the transfer of

15   feedback information.

16          Here, the receiving node is the node that

17   receives the control structure.  So if it's Web server/CRS

18   server, it's the CSR server that is receiving it or the

19   feedback server that is receiving it.

20          And this, including at least a portion of said

21   information stored at the receiving node.  What is stored at

22   the receiving node is reviews that are indexed by ASIN or

23   reviews that are indexed by a seller.

24          And so that is the feedback information,

25   including at least a portion of said information stored at

Shamos - direct

1    the receiving node.  It's the information Web server is

2    asking for.  That step is performed.  Step [c] is performed.

3              And [d] has another "at least one of."  And you

4    have to have at least -- there's either a couple levels

5    here.  There is [d], [d](2) and [d](2)[c] because there is

6    another "at least one of."

7              So, [d], I've eliminated what I don't think is

8    done by Amazon.  I put in the one thing that I think is done

9    by Amazon, which is:  receiving said information, including

10   said metadata defining said control structure, from said

11   second node to control at least one of.

12             Well, we know that the datagram comes down to

13   the feedback server.  So it's coming from said second node,

14   which is the Web server, down to the CRS or feedback server.

15             But then the metadata has to control at least

16   one of a list of things, and I've omitted everything except

17   what I think it actually does, which is it controls

18   transferring said information to said second node.  That is,

19   sending it back to the Web server.

20             So the CRS and feedback servers receive the

21   feedback information from the Web server, which is said

22   second node.  They also receive datagrams from the Web that

23   include metadata that control the transfer of feedback.  And

24   so Amazon performs Step [d] because it does the two of those

25   at least once in Step [d].

Shamos - direct

1            And there were only four steps in Claim 50.

2    Even though it was real long, there are only four steps and

3    they're all performed by Amazon in the Web server/CRS server

4    interaction and the Web server/feedback server interaction.

5            So Claim 50 is infringed by the internal

6    manipulation of feedback data within Amazon.

7    Q.    And what does this claim show?  I'm sorry.  This

8    slide?

9    A.    This is going back to the '325 patent.  So I did, for

10   the customer computer/Amazon Web server interaction, we did

11   the '325 first and then the '717.  But because the '717 was

12   fresh in our minds, I started out with the '717, again, and

13   now we have to go back to the '325 to show that is

14   infringed.

15           So this is a summary.  These are not the exact

16   words used in the claims.  This is a little kind of

17   condensed version.  If you remember -- probably not at this

18   point -- Claim 109 had six steps.

19           The first two are storing provider information

20   in a provider memory and store consumer information in a

21   consumer memory.

22           Then you have to create metadata defining a

23   control structure.  In this case, it's going to be the

24   datagram, not the HTML.

25           You have to transfer that control structure from

Shamos - direct

1   the Web server to one of the internal Amazon servers.

2           That metadata has to be processed to execute

3   instructions outside the control structure to transfer

4   feedback.

5           And then the feedback has to be sent from the

6   CRS or feedback server to the Web server.

7           If all those things happen, then this Claim 109

8   would be infringed and the internal manipulation of feedback

9   information at Amazon.

10  Q.    What does this slide show?

11  A.    This is just we've going to have to go through all

12  the steps of 109 again.  This is the preamble.  We have to

13  find a computer-based communication method comprising one or

14  more computers.

15          We know it's got that.  Amazon has a

16  computer-based communication method and it operates one or

17  more computers.

18  Q.    Okay.

19  A.    Move on.

20  Q.    What does this slide show?

21  A.    In a provider memory, storing information including

22  provider information.

23          In a consumer memory, storing information

24  including consumer information.

25          The provider memory stores information about

1    products.  The consumer memory is a database on the CRS

2    server which stores product reviews.

3              And so in the Web server/CRS server interaction,

4    Amazon perform both of those steps.  It provides interaction

5    in provider memory and consumer memory.

6              Remember, consumer memory has to do with what

7    happens.  It's the consumer information, not the buyer of

8    the product.

9    Q.    And what does this slide show?

10   A.    Remember, that Step [c] has five sub-pieces, and the

11   first three of them are on this slide.

12             Amazon has to create metadata that describes

13   associations with I, portions of said information; II, that

14   metadata has to define a control structure; and III, it has

15   to associate processes for controlling communications of the

16   associated information, which is the reviews.

17             So Amazon stores information on the CRS server

18   about a product, and the product has an ASIN.  So when the

19   Web server creates a datagram, it has to tell the CRS server

20   what product it wants information about.  So it includes

21   metadata, ASIN equals, that describes associations with data

22   that is stored at the CRS server.

23             For steps two and three, we've already talked

24   about the control structure in the datagram.  It's the same

25   datagrams we were talking about in the '717.  This "method

Shamos - direct

1    equal," for example, that describes the control structure

2    describes the processes that are to be used for controlling

3    communications.

4              And the next slide is, contains the -- this is,

5    again, the third time that you have seen the same datagram.

6    It's just so you can be reminded there is metadata in there,

7    there is data.  This is metadata that associates the

8    information that is stored at the memory.  And this is the

9    control, part of the control structure.

10             And the next slide I think is the remaining two

11   elements, the two steps of [c].

12             You have to have a data exchange metadata

13   associating process for controlling the transfer of feedback

14   information.

15             And the feedback information has to have at

16   least a portion of said consumer information.  Okay?

17             And, four, the data exchange metadata, method

18   equals, get reviews by ASIN, controls the transfer of

19   feedback information.

20             And, five, the feedback information includes

21   reviews that are stored at the CRS server.  That is the

22   consumer information.

23             And so Step [c] is performed in both the Web

24   server/CRS server and Web server/feedback server

25   interaction.

1   Q.      What about this slide?

2   A.      These are the last three steps.

3           You have to transfer said information between

4   metadata defining said control structure.

5           We know that is done because that is the

6   datagram that does that.

7           Processing said metadata to execute instructions

8   external to said control structure.

9           Well, the "method equal," for example, "get

10  reviews by ASIN" is executed and the instructions for it are

11  outside the control structure.

12          And then communicating said feedback information

13  from said consumer memory to said provider memory.

14          We know that is done because that is how the Web

15  server gets the information that it is requesting.

16          So Steps [d], [e] and [f] are performed and that

17  is all of Claim 109.  So Claim 109 is infringed by both the

18  Web server/CRS server and the Web server/feedback server

19  interaction.

20  Q.      It's infringed by both, Dr. Shamos?

21  A.      I'm sorry.  The whole time we've been talking about

22  the Web server/CRS server, not the feedback server.  The

23  feedback server is different than.

24  Q.      And how about this slide?

25  A.      This is the text of Claim 112 of the '325 patent

1    which we haven't seen before.  Claim 112 is a dependent

2    claim.  It depends from 109, but adds the additional

3    limitation:  wherein the step of processing the metadata

4    includes applying a query to information in said consumer

5    memory to obtain said feedback information.

6            Well, we already know that the review

7    information is stored in the databases and the way that you

8    get information out of the databases to apply to query to

9    the database.  And so when the "method equal," "get reviews

10   by ASIN" is processed in the datagram, what the CRS server

11   does with it is it takes information from there and creates

12   a query that applies to the reviews database to pull out the

13   reviews that responsive to the query and the corresponding

14   ASIN and so, therefore, a Step 112 is performed in the Web

15   server/CRS server interaction.

16   Q.    And a few final slides here.  What is this slide, Dr.

17   Shamos?

18   A.    This is a slide to make sure that the necessary proof

19   of infringement is properly identified for the record.

20   Q.    Okay.

21   A.    It's not intended as part of an expository

22   presentation.  But I created a large number of Web pages in

23   addition to the screen shots associated with Web pages.  I

24   captured the HTML that was part the Web page.  I also

25   captured the headers, header information that was sent along

Shamos - direct

1    with the HTML, and all of those are in exhibits that have

2    either been admitted or are about to be admitted.

3            This is a matrix that shows the PX, Plaintiff's

4    Exhibit, so there is an exhibit number that shows the detail

5    page associated with a page with a 1-click button, the HTML

6    headers associated with the indication to initiate or

7    complete associated with a detail page.  And PX-503 over

8    there on the right, I'm showing the exhibit that has the

9    thank you page that results when you click 1-click from a

10   detail page.

11           So I don't know what the Court's practice is,

12   whether I need to read literally read the contents of the

13   slide into the record or whether --

14   Q.    Doctor, --

15   A.    Whatever of the court's preference.

16   Q.    -- are these documents already in evidence now so

17   there is no need to read through those?

18   A.    My understanding is the documents are in evidence.

19   What yet is not in evidence is the correspondence between

20   the exhibits and what I claim their proof on.

21           MR. ABRAHAMSEN:  Does the Court have a practice?

22           THE COURT:  Are there any objections to those

23   slides?  I don't know what is being referenced.

24           MR. HADDEN:  Your Honor, we object to the slides

25   going into evidence.  We don't object to the exhibits,

Shamos - direct

1      themselves.

2                  MR. ABRAHAMSEN:  What about the few slides

3      showing the charts?

4                  MR. HADDEN:  We object to that.  The actual HTML

5      code can go into evidence but not the slides.

6      BY MR. ABRAHAMSEN:

7      Q.    Dr. Shamos, can you please just read through and

8      state what the proof is for each of these different use

9      cases?

10     A.    Yes.  For the detail page, PX-153 shows a page with a

11     1-click button.  PX-468 shows HTML associated with the

12     indication to initiate complete.

13                 PX-503 shows the thank you page.  Associated

14     with a thank you page, page with the 1-click button, is

15     shown in PX-503.

16                 The HTML indication to initiate, complete,

17     PX-470.  Thank you page at PX-505.

18                 The single page detail page, where Amazon is the

19     seller -- that is what Amazon fulfilled means -- that page

20     is at PX-506.  The indication to initiate or complete is at

21     PX-472.  And the thank you page that results is at PX-507.

22                 For a single page detail, that is a product

23     where the seller is not Amazon but someone else, there is an

24     example of that which I didn't show in my presentation but

25     is in evidence in the record, is at PX-506.  The indication

1    to initiate or complete is at PX-473.  And the thank you

2    page at PX-508.

3              A wish list -- which I haven't talked about but

4    wish list is a list of things that, a customer would like to

5    have and there is a capability of buying everything on your

6    wish list with 1-click.  And I didn't talk about that and

7    show that here, but that also infringes the 1-click claims

8    if you buy with 1-click from the wish list.  And so that

9    page with the 1-click button is shown in PX-510.  The

10   indication to initiate or complete is at PX-476.  The thank

11   you page that results is at PX-511.

12             We did talk about shopping cart 1-click where

13   you can put a bunch of things in a shopping cart and buy all

14   of them with 1-click.  That page with the 1-click button is

15   shown at PX-496.  The indication to initiate/complete at

16   PX-469.  And the thank you page that results is at PX-504.

17             There is a proof chart indicating which pieces

18   of source code were examined and found to support

19   infringement.  There is a cookie stipulation between the

20   parties.  They've agreed as to what the contents are of

21   Amazon's cookies.  That is at Exhibit PX-846.

22             There is a laptop that contains all of the

23   relevant source code at PX-764.

24             And there is specific pieces of source code that

25   are identified as associated with the Web server, PX-604 and

1    PX-631.

2              The checkout service at PX-605.

3              The order manipulation service at PX-848.

4              And I have identified on this slide various

5    computer programming routines that perform various

6    functions.  So on PX-604, I identified initiate and confirm

7    dot line.

8              PX-631, initiate and confirm purchase request

9    dot PM.

10             For the checkout service, PX-605, initiate and

11   confirm purchase function dot CPP.

12             For the order manipulation service at PX-848,

13   initiate and confirm customer service function dot CPP.

14             Then there is some code that includes things

15   called handlers.  And handlers are routines that are invoked

16   to handle various events that occur.  So when you click on a

17   button, a radial button, for example, there is a handler

18   that handles the event of your clicking.

19             So PX-608 is a buy box handler.

20             PX-602 is also a buy box handler.

21             PX-609 is a legacy buy box handler.

22             Legacy, as used in the computer industry, means

23   something that is old that you wish you could get rid of but

24   you really can't because many, many people have come to

25   depend on it.  So when you improve systems, you get a new

1    version, you really have to keep the old legacy system

2    running for much longer than you would like to because you

3    just can't get everyone to transition over to the new thing.

4    So there is a legacy buy box handler in PX-609.

5              PX-603 is a 1-click handler.  And PX-610 is a

6    cart handler.

7    Q.    What about this slide, Dr. Shamos?  What does this

8    slide show?

9    A.    This is the proof chart for the '325 and '717

10   patents.  That is, the feedback.  And I'll just go through,

11   line by line.

12             The control structure for product reviews is at

13   PX-47 and 494.

14             For buyer/seller feedback, at PX-768 and 771.

15             For rate this item, at PX-122, 123, 477, and

16   492.

17             Rate this review control structure is at PX-477

18   and 492.

19             Screen shots of the leave feedback page or for

20   product reviews at PX-519, 520 and 522.

21             For buyer/seller feedback at PX-515, 516.

22             For rate this item at PX-113, and 518.

23             And, for rate this review at PX-518.

24             Messages containing feedback and cookies

25   associated with user, for product reviews are PX-479, which

1    is a preview of your review image.

2                    For buyer/seller feedback, PX-769.

3                    For rate this item, PX-124, 125, 131, 132, 133,

4    134, and 135.

5                    For rate this review, at PX-126 and 127.

6                    A screen shot of the publish review page appears

7    at PX-521 for product reviews.

8                    A message with the review to be published, for

9    product reviews is at PX-120.

10                   The source code on laptop, PX-764.

11                   Associated with product reviews is at PX-589,

12   590, 591, 858, 865 and 866.

13                   For buyer/seller feedback, at PX-615, 616, 617,

14   625, and 626.

15                   For rate this item, at PX-855.

16                   And for rate this review, at PX-856 and 857.

17   Q.    And let's not read these into the record.  I don't

18   believe that is a requirement.

19                   Before we move on -- I think there is one thing

20   we left off.

21                   MR. ABRAHAMSEN:  May I approach, Your Honor?

22                   THE COURT:  Yes, you may.

23   BY MR. ABRAHAMSEN:

24   Q.    Is this a document you also reviewed, Dr. Shamos?

25   A.    Yes this document is Joint Exhibit JX-54.  It says

Shamos - direct

1    Stipulation regarding Community Review Service BSF

2    Datagrams.

3               This was a stipulation by the parties of what

4    the content of the datagrams are that are exchanged between

5    the Amazon web server and the internal servers.  And the

6    exhibit that I showed and the slide that I showed that had

7    that datagram was taken literally directly out of this

8    stipulation, JTX-54.

9    Q.    Maybe you can just tell the jury what this slide is

10   without reading everything into the record?

11   A.    Yes.  You saw yesterday a simulation of the

12   depositions of certain Amazon witnesses.  I reviewed the

13   transcripts of those depositions a long time ago, and found

14   support for evidence of infringement.  Here I am listing the

15   claims of the '710 patent and the places in the Peterson and

16   Vaughan transcripts where I find support for my conclusion

17   that infringement has occurred.

18   Q.    What about this slide, Dr. Shamos?

19   A.    This is a slide of the same kind of deposition

20   testimony.  But, of course, it was different witnesses

21   because Amazon had different people responsible for 1-click,

22   they were different from the people responsible for Product

23   Review.  So the names on this list are different.

24               But the deposition testimony supporting

25   infringement of the '325, Claim 109 came from the Keller,

Shamos - direct

1    O'Neill, and there were several depositions on different

2    dates of Sitar.

3    Q.    This slide?

4    A.    Yes.  Similar, for the '325, Claim 112, the citations

5    from the Keller, O'Neill and Sitar depositions.

6              For '325, Claim 119, from the O'Neill

7    transcript.

8              For '325, Claim 124 from the Keller and Sitar

9    transcripts.

10             For '717, Claim 50 from the Keller, O'Neill and

11   the different dated Sitar transcripts.

12   Q.    And, Dr. Shamos, what is this slide?  What does this

13   show?

14   A.    This shows my conclusions about infringement by

15   Amazon, that Amazon 1-click, Single Product, infringes '710,

16   Claims 1 through 3 and 5 through 9.

17             Amazon cart 1-click infringes 710, Claims 7

18   through 9.

19             Amazon Product Review, Buyer/Seller/ Feedback,

20   Rate This Product and Was This Review Helpful?  infringe

21   '325, Claims 105, 119, 124, and '717 Claims 50, 74, and 96

22   in the web server/remote computer interaction between the

23   web server and the customer.

24             Amazon Product Review infringes '325 Claims 109

25   and Claim 1.  And '717 Claim 50 in the web server/CRS server

Shamos - direct

1    interaction.

2              And Buyer/Seller Feedback infringes '717 Claim

3    50 in the web server/feedback server interaction.

4              Thank you, Dr. Shamos.

5              MR. ABRAHAMSEN:  I have no further questions.

6              THE COURT:  You may proceed.

7              MR. HADDEN:  Thank you, Your Honor.

8                        CROSS-EXAMINATION

9    BY MR. HADDEN:

10   Q.    Good afternoon, Dr. Shamos.

11   A.    Good afternoon.

12   Q.    I believe you testified earlier that you worked 500

13   hours roughly on this case.  Is that right?

14   A.    Yes.

15   Q.    What is your hourly rate?

16   A.    I think it's $525 per hour, but that's billed by a

17   company on my behalf.  I receive 90 percent of that.

18   Q.    So you have a company that you formed to provide your

19   expert opinion services in cases like this?

20   A.    Basically, yes.

21   Q.    Is that for tax reasons?

22   A.    Not particularly.  I had originally been asked by a

23   number of law firms to help them find technical expert

24   witnesses.  And I thought it would be useful to form a

25   company to do that.  Over the years it sort of devolved into

Shamos - cross

1    I am pretty much the only expert witness that it finds.

2              But it wasn't formed specifically for tax

3    purposes -- there is no tax benefit to it, because it's a --

4    it's an LLC.  So any profit flows to its owners.

5    Q.    Had you ever heard of Cordance before you were hired

6    by the lawyers in this case?

7    A.    No.

8    Q.    Had you ever heard of Intermind before you were

9    hired?

10   A.    No.

11   Q.    Had you ever heard of Mr. Reed before you were hired

12   in this case?

13   A.    No.

14   Q.    Could we get JX-9?

15             THE COURT:  Mr. Hadden, would you just speak up

16   a little bit?

17             MR. HADDEN:  I am sorry, I will.

18   BY MR. HADDEN:

19   Q.    Would you look at the field of the invention?

20   A.    Yes.

21   Q.    Now, this is in your binder, if you need to look at

22   it, Dr. Shamos.  This is one of the patents that is asserted

23   in this case.  This is the '710 patent, what has been called

24   by Cordance's lawyer the 1-click patent?

25   A.    Yes.

Shamos - cross

1    Q.     And the field of the invention here says that "The

2    present invention relates to data communications systems.

3    More particularly, it relates to an automated communications

4    system which coordinates the transfer of data, metadata, and

5    instructions between databases in order to control and

6    process communications."

7              Do you see that?

8    A.     Yes.

9    Q.     That's what Cordance told the Patent Office their

10   patent was about.  Right?

11   A.     In very general terms, yes.

12   Q.     It doesn't say anything about purchasing?

13   A.     Well, the word purchasing does not appear in the

14   highlighted material.

15   Q.     Does it say anything about e-commerce?

16   A.     The term e-commerce does not appear in this

17   rectangle.  E-commerce consists entirely of data

18   communications between buyers and sellers of products.  I

19   agree that the word e-commerce or equivalent words do not

20   appear in this rectangle.

21   Q.     So it's your testimony that e-commerce involves

22   entirely communications between buyers and sellers?

23   A.     It's among computers.  That is what the e part of

24   e-commerce is.

25   Q.     But there is also a lot of back-end process in

Shamos - cross

1    e-commerce, right, that happens at the seller in order to

2    complete a purchase?

3    A.      That is the non-e part, yes.

4    Q.      That involves computers as well.  Right?

5    A.      It can.  Or it can involve manual processes.

6    Q.      So you could process an order manually or you could

7    do it automatically without humans.  Right?

8    A.      Yes.

9    Q.      Now, communications between computers, in order to

10   perform computerized tasks, is what is often described as

11   distributed computing, isn't it, Dr. Shamos?

12   A.      I am sorry.  Could you repeat the question?

13   Q.      Sure.  Data communications between computers, where

14   the computers cooperate to do some work is in the field of

15   distributing computing.  Isn't it, Dr. Shamos?

16   A.      I would say distributed commuting includes having

17   computers separately perform pieces of work in a manner that

18   must be coordinated among them.

19           I am not ready to say that any time computer A

20   talks to computer B that that is completely distributed

21   computing.

22   Q.      Here is a book called "Distributed Computing,

23   Fundamentals, Simulations and Advanced Topics."

24           Are you familiar with this book, Dr. Shamos?

25   A.      No.

Shamos - cross

1   Q.      Have you ever taught any courses in distributed

2   computing?

3   A.      I have never taught a course that was titled

4   distributed computing or that concentrated on distributed

5   computing.

6   Q.      Have you ever published any papers in the field of

7   distributed computing?

8   A.      Not offhand, that I can think of.

9   Q.      You haven't published any real technical papers in

10  the last 25 years, have you, Dr. Shamos?

11  A.      I have published some real technical papers, but not

12  in the field of distributed computing.

13  Q.      Have you published any technical papers in the last

14  25 years in any peer-reviewed journals?

15  A.      I had had an article recently in a journal called

16  Bridge, which is a Journal of the National Academy of

17  Sciences, which is peer-reviewed to a degree.  That is, it's

18  reviewed, but not at the level of what you would refer to as

19  scholarly journals.

20  Q.      That paper was about electronic voting.  Right?

21  A.      That's right.

22  Q.      So the first sentence in this standard textbook on

23  distributed computing said "A distributed system is a

24  collection of individual computing devices that can

25  communicate with each other."

Shamos - cross

1              Do you see that?

2     A.    Yes.

3     Q.    Isn't that what the field of the invention is?

4     A.    Well, the field of the invention certainly talks

5     about intercommunicating computers.  This is a very general

6     definition, as the very next sentence says:  "This very

7     general definition encompasses a wide range," et cetera, et

8     cetera.

9     Q.    But the general definition is of distributed

10    computing.  Right?

11    A.    No.  It is of the distributed system.  Not

12    distributed computing.

13    Q.    Do you think those are separate?

14    A.    I think distributed system and distributed computing

15    closely related.  But they are different.

16    Q.    How are they different?

17    A.    Because computing is an act.  A system is a

18    structure.

19    Q.    A distributed system as used in this book entitled

20    "Distributed Computing" is a system for performing

21    distributing computing.  You wouldn't argue with that, would

22    you, Dr. Shamos?

23    A.    No, I wouldn't.

24    Q.    Now, you saw how Cordance described the field of the

25    invention in their patents.  In addition, the Patent Office

1    classifies patents, doesn't it, Dr. Shamos?

2    A.    It classifies patents for the purpose of search and

3    examination.

4    Q.    Right.  So the Patent Office classifies patents so

5    that the applications are sent to the examiners with the

6    appropriate technical expertise.  Isn't that right?

7    A.    It is sent to the place the classification unit

8    believes would be the appropriate place to examine the

9    patent.

10   Q.    That would be the place where there are people with

11   the appropriate technical expertise.  Right?

12   A.    If the classification unit has gotten it right, then,

13   yes.

14   Q.    So the patents in this case have a primary

15   classification, which is called Class 709.  Isn't that

16   right?

17   A.    Yes.

18   Q.    And according to the Patent Office, Class 709

19   includes the following subject matter:  "process or

20   apparatus for transferring data among a plurality of spatial

21   distributed, i.e., situated at plural locations, computers

22   or digital data processing systems via one or more

23   communications media, e.g., computer networks."

24            Do you see that?

25   A.    Yes.

Shamos - cross

1    Q.    That describes either a distributed computing system

2    or distributed computing, doesn't it, Dr. Shamos?

3    A.    Yes.

4    Q.    And these patents also have sub-classifications

5    according to the Patent Office, one of them is Subclass 201.

6    Do you see that, Dr. Shamos?

7    A.    Yes.

8    Q.    201 is distributed data processing.  It says, "This

9    subclass is intended under the class definition.  Subject

10   matter wherein the separate computers, or digital data

11   processing systems, performing different tasks share data to

12   accomplish an overall goal."

13         That is a definition of computers performing

14   a -- distributed computers working together to perform a

15   task.  Isn't it, Dr. Shamos?

16   A.    It is not a definition of that.  It is a definition

17   of Subclass 201.

18   Q.    And Subclass 201 involves separate computers for

19   digital data processing systems performing different tasks

20   share data to accomplish an overall goal?

21         Right?  That is computers that are distributed

22   working together to perform a task, isn't it?

23   A.    Yes.

24   Q.    That's what distributed computing systems do, isn't

25   it?

Shamos - cross

1   A.      Yes.

2   Q.      There is nothing in any of these classifications

3   about purchasing, is there, Dr. Shamos?

4   A.      The word purchasing does not appear there.

5   Q.      Nothing about --

6   A.      An example, purchasing via electronic customers would

7   fall under the category of a distributed computing task,

8   according to this definition.

9   Q.      Is there anything about e-commerce in any of these

10  Patent Office classifications?

11  A.      Not in the ones that you have put up on the screen.

12  But e-commerce, same answer:  E-commerce would be considered

13  a distributed computing task under this definition.

14  Q.      So distributed computing provides the infrastructure

15  to perform e-commerce.  Right?

16  A.      Yes, it does.

17  Q.      You talked a lot this morning about a lot of standard

18  web technology that I think you introduced yesterday?

19  Things like HTML?

20  A.      Yes.

21  Q.      HTTP?

22  A.      Yes.

23  Q.      Cookies?

24  A.      Yes.

25  Q.      HTML forms?

Shamos - cross

1    A.      I didn't talk about them.  But they were talked

2    about.

3    Q.      You didn't talk about HTML forms today?

4    A.      I don't recall it.

5    Q.      Were you shown some examples of customer review forms

6    that Amazon has, those forms?

7    A.      Yes.

8    Q.      Method equals post, isn't that used with HTML forms?

9    A.      Yes.  I just didn't recall using the word forms.  The

10   subject of HTML forms I did talk about.

11   Q.      Mr. Reed did not invent HTML, did he?

12   A.      No.

13   Q.      Mr. Reed did not invent HTTP, did he?

14   A.      No.

15   Q.      Mr. Reed did not invent HTML forms, did he?

16   A.      No.

17   Q.      Mr. Reed did not invent cookies?

18   A.      No.

19   Q.      Mr. Reed did not invent the use of cookies to

20   identify customers?

21   A.      No.

22   Q.      Mr. Reed did not invent the use of cookies with an

23   HTML form?

24   A.      No.

25   Q.      I am showing you what we have marked, and it's in

Shamos - cross

1   your book, Dr. Shamos, as DTX-80.  You have reviewed the

2   Patent Office file wrapper in this case, haven't you?

3   A.    Yes, I have.

4   Q.    And DTX-80 is a statement filed pursuant the duty of

5   disclosure under 37 C.F.R.  do you see that?

6   A.    Yes.

7   Q.    You are a patent owner, aren't you, Dr. Shamos?

8   A.    Yes.

9   Q.    You are familiar with the duty of disclosure?

10  A.    Yes.

11  Q.    And the duty of disclosure is part of the overall

12  duty of candor?

13           MR. ABRAHAMSEN:  Your Honor, may we have a

14  sidebar, please?

15           (The following took place at sidebar.)

16           THE COURT:  Okay.  What is this question leading

17  to?

18           MR. HADDEN:  Your Honor, Dr. Shamos has taken

19  the position that HTML forms control communications, which

20  is contrary to the position that Cordance took to get its

21  patents in the Patent Office.

22           Our expert agrees with what Cordance told the

23  Patent Office, that HTML forms do not control

24  communications.  And the fact that our expert agrees with

25  what Cordance told the Patent Office on this question of

Shamos - cross

1   fact and that Dr. Shamos's theory is contrary to both is

2   important for the jury to decide who is right about whether

3   HTML forms controls communications.

4          THE COURT:  Okay.  I understand what you are

5   talking about.  But I don't understand why the question was

6   starting off the way it was.  What was your objection?

7          MR. ABRAHAMSEN:  Given that he is going in that

8   direction, that is a claim construction argument.

9          MR. HADDEN:  No, it isn't.

10          MR. ABRAHAMSEN:  He is saying they disclaimed

11   HTML forms.

12          THE COURT:  No.  It is a fact question as to

13   whether or not what he has said is the same thing that

14   Cordance has said.  And it can be asked in that format.

15          MR. ABRAHAMSEN:  What he said during

16   prosecution?

17          THE COURT:  No.  What he has said it is and what

18   Cordance said, whether it was the same thing.  That's all.

19   It's not claim construction if it's put that way.

20          MR. HADDEN:  Thank you, Your Honor.

21          (End of sidebar conference.)

22   BY MR. HADDEN:

23   Q.    Did you review this document in reviewing the file

24   wrapper in this case, Dr. Shamos?

25   A.    Yes.

Shamos - cross

1    Q.      And, in fact, this same information disclosure

2    statement was filed three different times by Cordance in

3    obtaining its patents, wasn't it, Dr. Shamos?

4    A.      I didn't recall that.  But if you say so.

5    Q.      And the purpose for filing this document by Cordance

6    was to explain to the Patent Office how its invention

7    differed from the prior art.  Isn't that right, Dr. Shamos?

8    A.      I think it does that.  I can't speculate on what the

9    purpose was, except to comply with the duty of candor.

10   Q.      So if you read this document and you understand the

11   duty of candor, you would understand that Cordance was

12   distinguishing its invention from the prior art.  Right?

13   A.      I agree that it does that.  The duty of candor does

14   not require the applicant to distinguish its invention from

15   the prior art.

16   Q.      One of the prior art technologies that Cordance

17   distinguished its invention from in this document three

18   times was the worldwide Web.  Right?

19   A.      I am not sure what that means.  The applicant did not

20   claim to have invented the worldwide web.  So I don't think

21   it needed to distinguish itself from the worldwide web.

22   Q.      If you turn forward in this document, Dr. Shamos, the

23   page with the last three Bates digits 541, do you see that?

24   A.      Yes.

25   Q.      And there is a heading at the bottom, Hypertext and

1   Web Browser/Server Technology.  Do you see that?

2   A.     Yes.

3   Q.     Do you understand what that refers to?

4   A.     Yes.

5   Q.     That refers to the standard HTTP and HTML that we

6   have been talking about this morning.  Right?

7   A.     Yes.

8   Q.     And what Cordance told the Patent Office, and this is

9   the second sentence in the paragraph, that "A communications

10  object system as claimed" -- that means claimed in their

11  patents.  Right, Dr. Shamos?

12  A.     Yes.

13  Q.     -- "inherently takes hypertext technologies to a

14  higher level by using objects to define active, intelligent

15  associations between databases rather than static links

16  between documents."

17              Do you see that?

18  A.     Yes.

19  Q.     And Cordance is describing Mr. Reed's invention here

20  as a communications object system.  Is that right?

21  A.     A communications object system can qualify as one of

22  the things that was claimed, yes.

23  Q.     He is saying that his communications object system

24  does a lot of things that hypertext doesn't do.  Right?  It

25  creates these intelligent associations between databases.

Shamos - cross

1    A.       Yes, that's what it says.

2    Q.       So Mr. Reed invented these intelligent communications

3    between databases and he told the Patent Office that they go

4    beyond the web in hypertext and he told the Patent Office

5    that they do this automatic intelligent communicating that

6    the web does not do.

7             Isn't that right, Dr. Shamos?

8    A.       I am not agreeing that the web doesn't do it.  The

9    web by itself sends packets from one place to another.  What

10   you do with those packets is up to you.

11   Q.       Well, what Cordance did, they invented a

12   communications object system, they told the Patent Office

13   they would find active intelligent associations between

14   databases.  Right?

15   A.       That's one of the things they said it did, yes.

16   Q.       And HTML and HTML forms do not find active

17   intelligent associations between databases.  Do they, Dr.

18   Shamos?

19   A.       HTML, if appropriately used, can do that.

20   Q.       Did Amazon create active intelligent associations

21   between databases?

22   A.       You mean in 1-click?  Yes.

23   Q.       What are the databases?

24   A.       The databases are the databases of product

25   information and customer information that are maintained at

Shamos - cross

1    a Amazon.  The other database is the database of cookies

2    stored on the customer's computer.

3    Q.    Isn't what's going on here, Dr. Shamos, that Cordance

4    made an invention, and that the invention goes beyond

5    hypertext, but that Cordance drafted claims to cover the

6    invention, but they also happened to cover things at a lower

7    level than the invention because the claims are drafted

8    generally enough that they are not restricted to Mr. Reed's

9    invention?

10   A.    I agree with part of what you said.  We have to read

11   the highlighted text here, the text in yellow.  It says, "A

12   communications object system as claimed inherently takes

13   hypertext technologies to a higher level."

14          It doesn't say that hypertext technologies can't

15   do these things.  It uses hypertext technologies to go to a

16   higher level.

17          It is also true that the claims that were

18   finally allowed only in the '710 patent, only a couple of

19   them use the word object.  So it is possible to do the

20   things that are claimed without using objects.

21          MR. HADDEN:  I would like to place some

22   deposition testimony up.  Starting at 249, Page 16.

23          "Question:  Those things that he thinks his

24   invention will do are not things that are done by Amazon

25   HTML forms, are they?

Shamos - cross

1           "Answer:  Well, what's going on here is he's

2     made an invention."

3           THE WITNESS:  I didn't fall asleep during the

4     deposition.

5           MR. HADDEN:  Narcolepsy.

6           "Those things that he thinks his invention will

7     do are not things that are done by Amazon's HTML forms, are

8     they?

9           "Answer:  Well, what's going on here is he's

10    made an invention.  The invention goes beyond hypertext.

11    The applicants drafted claims that cover the invention.

12    They also happen to cover things of a lower level than the

13    invention, because the claims were drafted generally enough

14    that they're not restricted to his communications object."

15    BY MR. HADDEN:

16    Q.    What you are testifying to today, Dr. Shamos, is that

17    Amazon's forms are this lower-level stuff that has happened

18    to be captured by the claims that were drafted by Cordance

19    but are not Mr. Reed's invention.  Right?

20    A.    I didn't say that.  I didn't imply that.

21          The Amazon forms, I think the forms that are

22    being talked about here were preexisting, before the

23    invention, not the ones that Amazon is using now.

24    Q.    How are the forms that Amazon is using in its

25    customer review system any different than the forms that Mr.

1  Reed, you understand Mr. Reed to be talking about in his

2  IDS?

3  A.     Well, I don't know much about this, because I don't

4  know much about Amazon's prior art system.  But my

5  understanding is the prior art system didn't use cookies.

6  Q.     Other than cookies, is there any difference that you

7  are aware of between the forms Amazon is using now -- forms

8  are standard on the web --

9  A.     The reason --

10  Q.     Stop, please, let me ask the question.  HTML forms

11  were standard and conventional on the web in 1995, weren't

12  they?

13  A.     Yes.

14  Q.     Given those standard and conventional forms, how are

15  Amazon's forms that you talked about this morning with

16  respect to customer reviews any different?

17  A.     Because the forms that are -- the HTML pages that are

18  used now contain metadata as described and claimed in the

19  patent and make use of cookies that allow association of

20  processes and use of the metadata to retrieve stored

21  information at Amazon that allow automatic completion of a

22  purchase.

23        That wasn't done before at Amazon.

24  Q.     I was asking about the forms that are used in the

25  customer review service.  Try to focus on my question.

Shamos - cross

1   A.     You mean the form as between the web server and the

2   customer computer?

3   Q.     Absolutely.  You are saying that's a control

4   structure for controlling communications?

5   A.     Yes.

6   Q.     Is there any difference between that form and the

7   forms that were completely conventional on the web in 1995?

8   A.     I don't know.  I haven't seen the forms that were

9   used before then and the use of cookies associated with the

10  forms and the processing that was done with that

11  information.

12  Q.     You just testified that forms were conventional.  Do

13  you know what a conventional form was in 1995?

14  A.     Yes.  It's not the issue of the form.  It's the

15  content of the information in the form.

16  Q.     So you are saying it's what information a user types

17  into a text box that matters?

18  A.     No.  It's the information that is supplied by the web

19  server in the HTML page to the customer.

20  Q.     How did that differ between 1995 and what we saw this

21  morning, an HTTP post, which was used in 1995.  Right?

22  A.     I don't know, because no prior art has been developed

23  or exhibited in this case that invalidates these claims.  I

24  don't know the totality of every use anybody ever made of

25  forms prior to this invention.  I can't answer the question.

Shamos - cross

1    Q.     So when you testified that forms were conventional in

2    1995, did you understand that those forms would have a

3    method equals post?

4    A.     The forms would have a method equals post, yes.

5    Q.     So that was absolutely conventional in 1995?

6    A.     That is conventional.

7    Q.     That is what you say is the control structure in the

8    Amazon review forms?

9    A.     That is the control structure, yes.

10   Q.     What else is the control structure?  That is the only

11   thing you identified in the slides this morning.  Is there

12   something else?

13   A.     There is various pieces of metadata that tells the

14   receiving computer what to do with the data.

15   Q.     Every form has action equal, that is absolutely

16   required --

17   A.     It is conventional.

18   Q.     So you haven't pointed to anything that is different

19   than the forms in 1995.  Is there something else?

20   A.     No, it's not in my report.  I haven't done that

21   analysis.

22   Q.     Now, if you look at the same page we were on in this

23   text, there are some patents listed there.  Do you see

24   those?

25   A.     Yes.

1    Q.      Did you review any of those patents?

2    A.      I think I have seen the Lagarde patent.  I don't

3    recall looking at the Stucky patent.

4    Q.      If we look at the discussion of the Lagarde patent,

5    which is on the next page, there Cordance is describing it

6    to the Patent Office.  Right?

7    A.      Cordance is giving a place see what it thinks the

8    Lagarde patent teaches that would be relevant to the

9    examiner.

10   Q.      Right.  It says, "A method for distributing task

11   requests from a web server to other web servers to formulate

12   a response."  Do you see that?

13   A.      Yes.

14   Q.      Then it has got this 1, 2, 3, 4.  Do you see that?

15   A.      Yes.

16   Q.      Do you remember what the 1, 2, 3, 4 mean in this

17   document?

18   A.      No.

19   Q.      If you look forward in this document, Dr. Shamos, to

20   the Page 3, which has the last three digits 532?

21   A.      Yes.  I wouldn't call that looking forward, but, yes,

22   I see, on Page 3, there are Key to Remarks, 1, 2, 3, 4.

23   Q.      Right.

24   A.      Yes.

25   Q.      So this is how Cordance set up this document, so they

Shamos - cross

1  would have the features that it does distinguishing its

2  invention from these prior art references tied to these Nos.

3  1, 2, 3, 4.  Right?

4  A.    Yes.

5  Q.    And if we go through these, the first one says, "No

6  control structure transferred from provider to consumer to

7  control communications."

8          Do you see that?

9  A.    It does say that.

10 Q.    So if we look back, again, at the page with the

11 Lagarde patent, what that means is that Cordance told the

12 Patent Office that Lagarde does not show a control structure

13 that is transferred from provider to consumer to control

14 communication?

15 A.    That's what it says.

16 Q.    And it also did not, No. 3, it says, "No transfer

17 control, or not performed by control structure."

18          Do you see that?

19 A.    Yes.

20 Q.    So again, Cordance was saying that whatever is in

21 Lagarde doesn't show transfer control performed by control

22 structure.  Right?

23 A.    That's what it says.

24 Q.    So if we look at Lagarde, and this is in your binder

25 at DTX-1711, if we look at Figure 3 on Lagarde, do you see

Shamos - cross

1    Figure 3?

2    A.    Yes.

3    Q.    It's an HTML form, isn't it?

4    A.    I can't tell from Figure 3 if it is.

5    Q.    Well, it's got a submit button?

6    A.    Yes.

7    Q.    Does that mean it's a form?

8    A.    I would like to see the underlying HTML.

9    Q.    But somebody skilled in the art, knowing that forms

10   were completely conventional in '95, would see the submit

11   button and know that was part of the form.  Right?

12   A.    I actually don't know that to be true.  This may not

13   even be an HTML page.  This could be a screen that is

14   presented to the user by some other program that is

15   responding to a submit request button by executing this

16   thing called a DIS capsule.

17          As I am telling you, I can't tell from Figure 3.

18   I am not denying that it's possible.  But Figure 3 does not

19   prove that that is an HTML form.

20   Q.    Haven't you opined in other cases, Dr. Shamos, that

21   Lagarde is an example of a three-tiered web server

22   architecture?

23   A.    Yes.

24   Q.    So you know this is a web interface, don't you, Dr.

25   Shamos?

Shamos - cross

1   A.      I just said that I can't tell from Figure 3.

2   Q.      But when you testified under oath in another case

3   that Lagarde was a three-tiered web architecture, one of

4   those tiers is the web browser that the user used to submit

5   the form.  Right?

6   A.      Yes.

7   Q.      So there is no doubt this is a web form?

8   A.      As I said, it's not impossible that it's a web form.

9   I just can't tell by looking at Figure 3.

10  Q.      Now, if you go to Column 10 in Lagarde, at Line 44,

11  it says that, "If a request is for an order of an item, the

12  actual item requested can be shipped and billed with this

13  information.  Since these functions are hidden, they do not

14  appear in the figure but are included with a request."

15          So Lagarde actually even talks about using one

16  of these HTML forms to order products.  Right, Dr. Shamos?

17  A.      HTML forms were used to order products.  That's

18  correct.

19  Q.      That was all before Mr. Reed's invention.  Right?

20  A.      HTML forms were used to order products before Mr.

21  Reed's invention.

22  Q.      Right.  But Mr. Reed told the Patent Office that

23  HTML forms were not control structures and did not control

24  communications; right?

25  A.      Well, I'm not sure about that.  The reference in

1   the IDS is to claims that were pending at the time and the

2   use of those terms "control structure," "provider" and

3   "consumer" at the time.  I'm not exactly sure who the

4   provider and who the consumer were at the time of the IDS,

5   but the IDS says what it says.  I didn't write it.

6   Q.    Well, if we go back to, Key to Remarks.  I don't see

7   provider, consumer listed there.

8   A.    It says no control.  No. 1:  No control structure

9   transferred from provider to consumer to control

10  communications.  It doesn't say there wasn't one transferred

11  from consumer to provider.  I don't know who the provider

12  and consumer was based on the claims that were pending at

13  the time of the IDS.

14  Q.    How about No. 3, no transfer control, or not

15  performed by control structure; right?

16  A.    Yes.  I actually don't know what no transfer control

17  means.  Is it no control of transfer?  I don't know what it

18  means.

19  Q.    You have opined today that an HTML form controls --

20        MR. ABRAHAMSEN:  Your Honor, can we have another

21  sidebar, please?

22        (The following took place at sidebar.)

23        MR. ABRAHAMSEN:  Objection.  This is beyond

24  the scope of the direct.  This witness testified about

25  infringement, applying the Court's claim construction.  I

1    don't know why they're going into file history.  I don't

2    know why they're going into the IDS.

3              The claims have been defined by the Court.  They

4    cover what they cover and this witness read them on Amazon's

5    system.  I don't understand why they're going into these

6    issues.

7              THE COURT:  I'd like a little bit of explanation

8    because it's not as focused.  That's what my concern is.

9              MR. ABRAHAMSEN:  I'll get it more focused, but

10   it's clear here -- and there is another piece of the

11   prosecution history I'm going to put in -- that Cordance

12   explicitly said that HTML forms, just like he talked about

13   all morning, do not control structures, they control

14   communications, or control the transfer of information.  And

15   both of those are fact issues that he has stated an opinion

16   on that is contrary.  And he testified in his deposition

17   that he disagrees with the statements that Cordance made

18   regarding HTML forms.  Our expert agrees with what Cordance

19   told the Patent Office and I think that is clearly relevant.

20             THE COURT:  I'll give you a little bit of

21   latitude but you have to focus the questions a lot better

22   because I don't know how it's going.  That is part of my

23   problem.

24             MR. ABRAHAMSEN:  We do object.  We think they

25   were trying to argue claim construction in front of the

1    jury.

2                THE COURT:  No, they won't.  That's why I want

3    it to be focused.

4                MR. HADDEN:  I will.

5                THE COURT:  To the extent that he is testifying

6    inconsistent with what the client said, it's not arguing

7    claim construction.  And the jury will not be instructed,

8    probably -- the jury is not going to instructed, I can't

9    imagine, because there isn't anything in the case about

10   giving up something before the PTO.

11               MR. HADDEN:  I'm not going to argue that.

12               MR. ABRAHAMSEN:  When you say "the client said,"

13   if he is testifying inconsistent with the file history?

14               THE COURT:  This is part of the file history.

15   If he disagrees with what -- I think he has a right to show

16   that there is not a consistency between what he is saying

17   and what Cordance said.

18               MR. ABRAHAMSEN:  In the file history?  And

19   that's not a claim construction argument.

20               THE COURT:  No, it's not a claim construction

21   argument.

22               No, no.  Get back here.

23               MR. HADDEN:  Oh, sorry.

24               THE COURT:  It's not a claim construction

25   argument because they're not -- it can be brought in for

Shamos - cross

1    other reasons but the emphasis is not on claim construction

2    because that is not even being brought up with the jury.

3    But that is the reason why I want to focus the questions.

4              MR. HADDEN:  I'll do better.  Thank you, Your

5    Honor.

6              THE COURT:  Not for the purpose it's being

7    brought in.

8              MR. ABRAHAMSEN:  One other point, Your Honor.

9              THE COURT:  Mr. Hadden.  Mr. Hadden.

10             MR. HORWITZ:  David.

11             MR. HADDEN:  Oh, sorry.

12             MR. ABRAHAMSEN:  I just want to be clear this

13   witness did not testify about invalidity issues.  I want to

14   make sure.

15             THE COURT:  No.  See, this is part of the

16   problem.  That is the reason why I want this focused.

17   Because he is reading your questions in part as being -- and

18   I was, quite frankly, wondering are we talk about validity?

19   Are we talking about infringement?  What are we talking

20   about?  And you are walking a real fine line between.  I

21   don't want anything to suggest that they made a

22   misrepresentation to the PTO.

23             MR. HADDEN:  No.

24             THE COURT:  A fine line between infringement and

25   validity.  There is overlap because you can't help it.  You

Shamos - cross

1    can't help it because as you point out, there is a claim

2    construction aspect.  But there has been no evidence there

3    has been any suggestion by question that my court claim

4    construction is wrong or Cordance disagrees with my claim

5    construction.  That argument is not going to be able to be

6    made anyhow.

7              MR. HADDEN:  No.

8              THE COURT:  But they don't agree on what.

9              MR. HADDEN:  How apply that to the device.

10             THE COURT:  That's right.

11             MR. HADDEN:  That's what I'm saying.  That's a

12   fact question.

13             THE COURT:  That's what I'm trying to get at.

14             MR. ABRAHAMSEN:  Why are we talking about prior

15   art on an infringement examination?

16             THE COURT:  Because they're the ones that put

17   it in, and they characterized the technology, and he is

18   distinguishing what was out there before.

19             MR. ABRAHAMSEN:  See --

20             THE COURT:  And I recognize -- that is part of

21   the problem.  He is not -- he has not been your expert

22   for --

23             MR. HADDEN:  He is the expert.

24             THE COURT:  Well, I know he is the expert, but

25   it wasn't brought out.  That's why I want you to try to get

Shamos - cross

1    closer to what the issues are.

2              MR. HADDEN:  I will.

3              MR. ABRAHAMSEN:  What is bothering me is these

4    are arguments made:  During claim construction, during

5    prosecution, certain things were made.

6              THE COURT:  No, there is not going to be any

7    indication that they disclaimed.  It's not going to be

8    suggested that they disclaimed.  I think if you focus the

9    questions, it can show that he and --

10             MR. HADDEN:  Cordance had an difference of

11   opinion.

12             THE COURT:  You are not talking maybe same

13   language.  But the jury is not, from my understanding, is

14   not going to be instructed that Cordance gave up something

15   during claim construction.

16             MR. HADDEN:  No.

17             THE COURT:  I'm unaware of that being an issue

18   in this case.

19             MR. HADDEN:  It's not.  I'm just going to argue

20   that --

21             THE COURT:  So focus the questions better.

22             MR. HADDEN:  Will do.

23             MR. DAY:  I want to throw in one other level of

24   complexity here, Your Honor; and that is at the pretrial

25   conference, they argued that Mr. Reed shouldn't be allowed

1    to provide any expert testimony.  And you sustained that

2    objection.

3           THE COURT:  And I sustained it.  And he, quite

4    frankly, did to some extent because opinion testimony by

5    the inventor has some degree of expert testimony to it.  In

6    fact, he testified about a whole host of things that he

7    wasn't asked questions about.

8           MR. DAY:  Understood, Your Honor.

9           THE COURT:  I don't think -- and I know counsel

10   in this case wants me to do this.  Where the lines can be

11   drawn real hard, I will try to do it.  But you can't divide

12   out these little boxes for here is claim construction that

13   is only claim construction, here is infringement and it's

14   only infringement, here is invalidity and it's only

15   invalidity.  They all have some relationship to one another

16   because they're all related to claim construction.

17          So I know everybody has been trying to piece

18   this, and I'm trying to walk this fine line when it comes to

19   patent misuse, when it comes to inequitable conduct, issues

20   that are not going to go into in front of the jury, but

21   certain things come in for a purpose.  The fact that it may

22   effect something else, I'll watch it, particularly on

23   whether somebody is making a suggestion that my construction

24   is different.

25          But I don't consider, I don't consider what

1    your client, what Cordance said before the PTO as being

2    completely off base to be brought in.  But I'm only going to

3    let you go so far with this.

4                    MR. HADDEN:  Okay.  Thank you.

5                    MR. DAY:  Thank you, Your Honor.

6                    (End of sidebar conference.)

7                    MR. HADDEN:  Let me have DTX-1562 up.

8    BY MR. HADDEN:

9    Q.     Did you review the prosecution history for the

10   original '205 application?

11   A.     Yes.

12   Q.     Okay.  Do you recall, Dr. Shamos, that in that

13   prosecution, the Patent Office initially rejected all of

14   Cordance's claims based on this Lyons patent?

15   A.     I don't recall it, sitting here, but I believe you.

16   Q.     And the Lyons patent is all about HTML forms, isn't

17   it, Dr. Shamos?

18   A.     I'm just quibbling with the word "all," but it's

19   about HTML.

20   Q.     Okay.  Appreciate that.

21                   MR. ABRAHAMSEN:  Your Honor, one more sidebar,

22   please.

23                   (The following took place at sidebar.)

24                   THE COURT:  Okay.  I have a problem with the way

25   the questions were done.

1          MR. HADDEN:  I'm sorry.

2          THE COURT:  If you had said, if you had asked

3    whether or not this is a patent that deals with HTML forms,

4    and he says yes.  And does this patent predate Cordance's

5    patent?  I have less of a problem with the questions like

6    that.  Then you lead into:  What else are you going to be

7    talking about?  But the way the questions were asked was:

8    First of all, the '205 patent was rejected.  And I know it's

9    a spin that is bothering me.

10          MR. HADDEN:  I'm sorry.  If I could try to

11    explain why I did that?  And it may not be helpful or not.

12    The point is that the next exhibit is the Office Action

13    response, and that is where they clearly make the claim HTML

14    forms do not control communications.  That is why this Lyons

15    patent is not relevant.  So that is how they overcame the

16    rejection so I didn't talk about the rejection.  I just

17    talked about this is random prior art.

18          THE COURT:  You are also assuming these people

19    understand all the ins and outs of what happens before the

20    PTO.

21          MR. ABRAHAMSEN:  The more serious problem I had

22    is this is the '205 patent.  These claims were different.

23    It's not just control structure, it's control structure for

24    doing specific things.  It's misleading.  He is talking

25    about a different kind of control structure, something that

1     does other things in the claim.

2            THE COURT:  And then you can cross him on it.

3            MR. HADDEN:  Yes.

4            THE COURT:  But you already brought out, the

5     '205 has been -- wait a minute.  Please let me do my

6     explanation.

7            MR. HADDEN:  Sorry.

8            THE COURT:  The '205 has been brought out.  They

9     understand and have been told ad nauseam about the fact you

10    start off with the '205, the '325 was a CIP or continuation

11    in part of the '205, but everyone knows it stems from the

12    '205.

13           Do it on cross and point out the '205 is the

14    same thing as the '325 and the '717 and the '710.

15           MR. ABRAHAMSEN:  He is bringing out the

16    prosecution history of different claims.  The fact it's a

17    CIP isn't different.  These are --

18           THE COURT:  I understand what you are saying to

19    me is that the '205 is not the same thing as the '710 and

20    the '717 and the '325.  That, I do understand.  But they're

21    aware that the '205 is "the parent" of all of these.

22           MR. ABRAHAMSEN:  Its description, not for its

23    claims, though it's a different invention.

24           MR. HORWITZ:  Your Honor, if he wants to come

25    back and make whatever points he want to make on redirect he

Shamos - cross

1  can do that.  We're wasting a lot of the jury's time here.

2           THE COURT:  And you can do it on redirect.  But,

3  again, it's not something you are going to emphasize.

4           MR. HADDEN:  Okay.  Do you want a break or keep

5  going?

6           THE COURT:  Well, how many questions?  How many

7  questions do you have?

8           MR. HADDEN:  I have several more on Lyons and

9  then some other aspects of the IDS.

10          THE COURT:  Okay.  So how many -- it's going to

11 be something that is going to take longer than 15 minutes?

12          MR. HADDEN:  Yes.

13          THE COURT:  Fine.  We're going to break now.

14          MR. HADDEN:  Thank you, Your Honor.

15          (End of sidebar conference.)

16          MR. HADDEN:  I think I succeeded in getting us

17 to lunch, so ...

18          THE COURT:  Members of the jury, we'll be

19 breaking now for the lunch break.  You will have to return

20 at 2:00 o'clock.  Hopefully, we'll be able to continue then.

21          Thank you.

22          (Jury left courtroom.)

23          THE COURT:  Are you bunched in there.

24          THE WITNESS:  No.  No, I finally figured it out.

25          THE COURT:  All right.  We're in recess.

1                    (The attorneys respond, "Thank you, Your

2          Honor.")

3                    (Luncheon recess taken.)

4                    THE COURT:  Before we bring the jury in, I want

5          to revisit the last sidebar we had.  And I would like for

6          you to explain to me what the relevance is of the '205

7          patent here, that is not part of this litigation, that

8          doesn't have the same specifications of the patents.

9                    MR. HADDEN:  Your Honor, the '205, as we heard,

10         is the parent case and describes the same technology in the

11         pending claims that existed in the '205 application at the

12         time the statements that I am going to ask about were made,

13         and distinguished HTML forms had the same language regarding

14         a control structure that controls communications and a

15         control structure that controls the transfer of information.

16                   And whether or not that information is feedback

17         or updates, the same fact issue exists as to whether or not

18         an HTML form meets that requirement, does that thing.  And

19         Cordance says that it does not.

20                   Obviously, since that patent is the parent of

21         the others, statements made in the prosecution history are

22         relevant to show that.  The claim language is nearly

23         parallel, it's parallel, the parts that they were

24         distinguishing are identical.

25                   THE COURT:  Mr. Abrahamsen.

Shamos - cross

1              MR. ABRAHAMSEN:  The language is not parallel,

2     Your Honor.  What they say is a control structure, this

3     claim says is a control structure is processed for consumer

4     memory to define the process for determining an update and

5     personal information.

6              It doesn't talk about transfer feedback.  It is

7     a different claim.  It is a different invention, relating to

8     update.

9              MR. HADDEN:  May I just look at that?

10              It goes on to say the controlling and

11    communication of said information.

12              THE COURT:  Would you please just, Mr. Hadden,

13    speak up a little bit.

14              MR. HADDEN:  There are other parts of this

15    claim --

16              THE COURT:  Well, which patent are you referring

17    to that is in the lawsuit?  What questions are they going

18    to, which patent?

19              MR. HADDEN:  The patents in the lawsuit that are

20    similar are in particular the '325, Claim 109.

21              THE COURT:  Let me look at Claim 109.  All

22    right.

23              MR. HADDEN:  Also Claim 50, '717.

24              MR. ABRAHAMSEN:  Which is very similar, Your

25    Honor.

Shamos - cross

1           THE COURT:  Between those two.  I know it is,

2    from what I remember.  But I haven't got all of the claim

3    terms memorized.

4           So what claim, what is in the '205 patent that

5    you are saying is similar to the '325?

6           MR. HADDEN:  Sure, because the claims are

7    amended.

8           So the claims that existed said association

9    means for creating metadata -- I am sorry.  I am confused.

10          Here it is.  Association means for creating

11   metadata and storing said metadata in said provided memory.

12   Said metadata describing association of at least a portion

13   of said information defining a control structure.

14          THE COURT:  Please speak louder.

15          MR. HADDEN:  Defining a control structure which

16   is processed at least at the consumer process to define a

17   process to determine an update of a portion of said

18   information in the provider memory associated with said

19   control structure -- here is the important part -- and for

20   controlling communication of said associated portion to said

21   consumer memory.

22          So this is the same control structure for

23   controlling the communication to associate information that

24   is also an element of the '325 Claim 109 and '717 Claim 50.

25          THE COURT:  Are you saying, then, that when we

Shamos - cross

1    look at the third paragraph for the 109, for Claim 109 of

2    the '325, that that's where the relationship is?

3                 MR. HADDEN:  Sure, if you look at the creating

4    metadata step.

5                 THE COURT:  Hold on, Mr. Hadden.  You are

6    talking downward.  I know the court reporter has been making

7    comments.

8                 MR. HADDEN:  I am sorry, Your Honor.  Let me get

9    to the podium.

10                If we look at the creating metadata step, this

11   requires creating metadata describing associations with

12   portions of said information, and defining a control

13   structure which is processed at least at said consumer

14   memory to associate one or more processes for controlling

15   communications of said associating information.

16                So that is essentially identical to what was in

17   the '205 claim about this control structure and this process

18   to control communication of associated information.

19                THE COURT:  How about if you do me a favor.  How

20   about if you give me the '205 patent.

21                MR. HADDEN:  Sure.  Your Honor, I think it may

22   be more helpful, if I could suggest, is that the claims at

23   the time that the rejection was made and the amendment was

24   filed, it's probably the relevant ones.  I could give you

25   the final claims if you would rather.

Shamos - cross

1            THE COURT:  Wait a minute.  I just want to

2   understand this.  You are basing this argument on the

3   representation that they made to the PTO about what --

4            MR. HADDEN:  Was the pending claim language at

5   the time.

6            THE COURT:  And that is not the final claim

7   language.

8            MR. HADDEN:  No.  Though I am not sure it's

9   substantially different.  I think what matters for

10  understanding what they said was the pending claim language

11  at the time.

12           MR. ABRAHAMSEN:  Our position is these are

13  directly to entire different inventions.  One relates to

14  automatic data information.  The other relates to the

15  feedback information.  If you look at the claim, there is --

16  do you want me to hand up the amendment?

17           THE COURT:  We are talking about control

18  structure.  Right?

19           MR. HADDEN:  Yes, control structure, the control

20  communication, associated information and the transfer of

21  either updates or feedback.  It's the same thing.

22           MR. ABRAHAMSEN:  Control structure is a generic

23  term.  You need the context, you need the rest of the claim

24  to see what it has to control.

25           I think questions about a control structure,

1    control communication, are entirely different, are

2    misleading for the jury.  And I think they are relevant for

3    this witness to answer questions on.

4              MR. HADDEN:  Your Honor, I am not going to ask

5    him about control structure, or transfer of communication or

6    communication of transfer from the consumer to the provider.

7    That applies for to only the '325 claims, the '717 and also

8    the '205.

9              THE COURT:  It will be extremely focused.  I am

10   still going to allow it.  But I understand your objection.

11             I understand your concerns.

12             We should probably bring in the jury.

13             (Jury enters courtroom at 2:13 p.m.)

14             THE COURT:  Please be seated.

15             Members of the jury, we will be continuing with

16   the cross-examination of Dr. Shamos.

17             Before we begin, I want to check with you, is

18   the temperature level in here comfortable for you?

19             It is a little chilly, I think that might help.

20   All right.  Mr. Hadden, you may continue.

21             MR. HADDEN:  Thank you, Your Honor.

22   BY MR. HADDEN:

23   Q.    Good afternoon, Dr. Shamos.

24   A.    Good afternoon.

25   Q.    Could I ask you to look in the binders in front of

1    you to Exhibit DTX-146.

2    A.      Yes.

3    Q.      Have you seen this document before, Dr. Shamos?

4    A.      Yes.

5    Q.      So is this the response that Cordance filed with the

6    Patent Office after the rejection over the Lyons patent?

7    A.      It appears to be.  It says, In response to the Office

8    Action dated May 13, 1997.  And I think it discusses Lyons.

9    Q.      Let me ask you to look forward in that document to

10   Page 19.

11   A.      Yes.

12   Q.      In the middle of Page 19, there is a paragraph that

13   talks about Claims 9 through 13.  Then it says in the

14   middle, "None of the cited art suggests transferring a

15   control structure from a provider to a consumer memory which

16   defines processes for providing response information from

17   the consumer memory to the provider memory.  Lyons has a

18   specific HTML form which is completed, but does not transfer

19   any structures to the client."

20           Do you see that?

21   A.      Yes.

22   Q.      Is that statement that Cordance made to the Patent

23   Office consistent with your theory of how Amazon allegedly

24   infringes the '325 patent?

25   A.      I am not sure what you mean by consistent with my

1    theory.

2           My recollection of Lyons is there actually isn't

3    any discussion in Lyons of posts.

4           There were a number of ways that one could

5    submit a form back to a web server.  One of them was simply

6    by using a default get that had all of the material or data

7    from the form listed at the end of the URL, separated by

8    semi-colons, for example.

9           So there is no metadata associated with any

10   process.  There is no control structure.  My recollection is

11   that the Lyons doesn't refer to form posts.

12   Q.    In the Amazon Buyer/Seller Feedback System, is there

13   a post or a get?

14   A.    I don't recall seeing that.

15   Q.    You testified this morning that it infringes Amazon's

16   patents.  Right?

17   A.    An express get is fine.  I was talking about a

18   default get.

19   Q.    Do you know where there is a default get or an

20   express get?

21   A.    I don't recall sitting here.

22   Q.    So you don't know one way or the other whether

23   Buyer/Seller feedback infringes?

24   A.    If you mean do I recall sitting here all of the

25   reasons that it might infringe, along with their

Shamos - cross

1   accompanying proofs, the answer to that is no.  I have done

2   the investigation.  And that was the basis on which I formed

3   my opinion.

4           I don't remember all the bases in there.

5   Q.    Was the basis on which you formed your opinion the

6   fact that it used a post command rather than a get command?

7   A.    I don't recall.  I wrote a very extensive report on

8   this, which had a claim chart, hundreds of pages long, that

9   for each one of the modes of interaction I listed exactly

10  what the metadata was for each mode of interaction.  Sitting

11  here now, I don't remember what's in that hundreds of pages

12  long Excel spread Sleet.

13  Q.    Let me ask you to look at the next page in this

14  exhibit, which is Page 20.  The sentence in the first

15  paragraph begins, "As discussed above, none of the cited art

16  teaches or suggests a control structure defining a process

17  for transfer of information."

18          Do you see that?

19  A.    Yes.

20  Q.    Now, the cited art includes the Lyons patent, that

21  includes a discussion of HTML forms.  Right, Dr. Shamos?

22  A.    Yes.

23  Q.    And is this statement that Cordance made to the

24  Patent Office to distinguish its invention from Lyons

25  consistent with your theory that Amazon infringes by using

Shamos - cross

1   HTML forms?

2   A.    Yes, I think it's substantially the same as the

3   previous statement.

4   Q.    May I get our depo clip, Page 237, Lines 7 through

5   13:

6               "Question:  And that statement that is

7   discussed above, none of the cited art teaches or suggests a

8   control structure defining a process for transfer of

9   information, is inconsistent with the opinions you're

10  offering as to how Amazon's forms infringe this claim?

11              "Answer:  Taken alone it is."

12              You talked this morning a bit about Amazon's

13  back-end system, including the customer review service.  Do

14  you remember that, Dr. Shamos?

15  A.    Yes.

16  Q.    And I think you discussed something you called

17  datagrams.  Is that right?

18  A.    I think Amazon and I refer to them as datagrams, yes.

19  Q.    Sure.  And are Amazon's BSF datagrams a form of

20  remote procedure call?

21  A.    They could be considered.

22  Q.    Do you consider them?

23  A.    I don't have a precise definition of remote procedure

24  call that includes everything that might be one and excludes

25  everything that might not be one.  It is a form of remote

1    invocation of the procedure and hasn't gone out to the

2    procedure.

3    Q.      (Playing dep. clip)  "Are BSF data forms of remote

4    procedure call?

5            "Answer:  They are."

6    Q.      Now, remote procedure calls are a standard way for a

7    program on one computer to use a function in a program

8    running on another computer.  Right?

9    A.      Yes.

10   Q.      Mr. Reed did not invent remote procedure calls, did

11   he?

12   A.      No.  I know the inventor of remote procedure calls.

13   It wasn't Mr. Reed.

14   Q.      If we could look back in your binder, Dr. Shamos, as

15   to Defendant's Exhibit 80, it's the information disclosure

16   statement that was filed three times.

17   A.      Yes.

18   Q.      If you look on Page 8 of that document, there is a

19   heading, Object Transparency and Remote Procedure Calls.  Do

20   you see that?

21   A.      Yes.

22   Q.      To begin, this is a category of existing technology

23   that Cordance told the Patent Office was different than its

24   invention.  Right?

25   A.      Well, it certainly was a preexisting area of

1    technology.  Cordance made statements about it.

2    Q.    If we look at the language that Cordance provided to

3    the Patent Office underneath this section, it says, "This

4    art is directed at a different problem in distributed object

5    systems:  How an object on one node can transparently call

6    the methods of another target object on another node, i.e.,

7    'abstract' the details of knowing how to send and receive a

8    message from the target object."

9          Do you see that?

10   A.    Yes.

11   Q.    Then it continues, and says, "Again, a communications

12   object system accomplishes this function using a novel new

13   control structure, the communications object, which carries

14   the information necessary to perform this abstraction."

15         Do you see that?

16   A.    Yes.

17   Q.    Now, there is a BSF datagram, does that carry the

18   information needed to perform this abstraction?

19   A.    I would say so.

20   Q.    And that would be what datagram, sir?

21   A.    The metadata that identifies the target procedure to

22   be called and identifies the parameters to be passed to that

23   procedure.

24   Q.    Doesn't every RPC message identify a method to be

25   calling on the target?

Shamos - cross

1    A.      I am not ready to say every.  But loads do.

2    Q.      That's what an RPC message is for.  Right?  It has to

3    tell the target computer what method to invoke.  Right?

4    A.      If we ever agreed on the definition that encompassed

5    all RPC, I might be able to say that.  There are many that

6    do that and there were many that existed that did that.

7    Q.      And the RPC message includes both the function to

8    call on the remote computer and the parameters that you

9    would need on the remote computer to call that function.

10   Right?

11   A.      Maybe.  Those things did exist.  I am not ready to

12   say that all RPCs had that.  There might only be one method

13   to invoke.  It might not be necessary to name the method,

14   for example.

15   Q.      Did you read the patents that are listed under this

16   remote procedure call Action?

17   A.      No.  I mean, it's possible I may have seen them at

18   some point.  Upon looking at this document, I didn't go to

19   those documents and look at them.

20   Q.      If you look on the next page of this information

21   disclosure document, there is a heading Communications

22   Transparency and Middleware?

23           Do you see that?

24   A.      Yes.

25   Q.      This lists another set of prior art patents that

Shamos - cross

1   Cordance was distinguishing.  Right?

2   A.    Yes.

3   Q.    And the language here that Cordance provided the

4   Patent Office says, "This art relates to a larger scale

5   version of the proceeding problem, which is to provide a

6   complete transparency layer, commonly referred to as

7   middleware, for abstracting the details of distributing data

8   or sending messages from a communications source to a

9   communications destination."

10        Do you see that?

11  A.    Yes.

12  Q.    And this is a larger scale version of the proceeding

13  problem.  The proceeding problem is the remote procedure

14  call section that we looked at on the prior page.  Right?

15  A.    Object transparency and remote procedure call.

16  Q.    Right.  And this continues, it says, "A

17  communications object system is a novel new approach to this

18  problem by abstracting these details to a control object

19  that completely defines the communications relationship

20  between any two nodes, in both directions, via any network

21  or protocol, using any middleware."

22        Do you see that?

23  A.    Yes.

24  Q.    Now, BSF, a BSF datagram, that does not completely

25  define the communication relationship during any two nodes

Shamos - cross

1   between a protocol.  Right?

2   A.     Certainly not in both directions, no.  Well, not the

3   ones we have seen.  It's possible one may be able to create

4   a BSF datagram that does that.

5   Q.     You are not relying on any such beast in your

6   infringement theory, are you?

7   A.     No.

8   Q.     Now, again, Cordance lists a number of prior art

9   patents here.  Did you read any of those patents?

10  A.     Not that I recall.

11  Q.     Some of these patents list an inventor named Skeen

12  and a company named TIBCO.  Are you familiar with TIBCO?

13  A.     I am vaguely familiar with TIBCO.  I am not familiar

14  with any person named Skeen.

15  Q.     TIBCO is a company that makes messaging software.

16  Right?

17  A.     Yes.

18  Q.     If we go to the bottom of this page, there is a

19  description of one of the patents to Skeen at TIBCO?

20         Cordance says here, this describes a system for

21  decoupling communications between software applications and

22  multi-casting datagrams.

23         Do you see that?

24  A.     Yes.

25  Q.     Do you know whether the datagrams in the Skeen patent

Shamos - cross

1    are any different than the datagrams that Amazon uses in its

2    USX system?

3    A.      I don't know, because I don't recall having seen the

4    Skeen patent.

5    Q.      Did you know that Amazon uses TIBCO software to build

6    the datagrams in its systems?

7    A.      I don't recall knowing that.  I think I did see some

8    mention of TIBCO.

9    Q.      As far as you know, TIBCO datagrams that Cordance

10   distinguished here in this document are identical to the BSF

11   datagrams you received in this case?

12   A.      They can't be identical.  But they could be

13   structurally identical.

14   Q.      Let me ask you -- you can close that exhibit if you

15   would like, Dr. Shamos.

16           I had a question about your with walk through

17   the shopping cart this morning.  I realize when I buy things

18   on Amazon, I don't have to go through that many steps.  Do

19   you have a default shipping address?

20   A.      Yes.

21   Q.      Well, when I do a shopping cart with the default

22   shipping address, it is a lot quicker.  At lunch I bought

23   Butter Batter here.  I start here, and I click add to

24   shopping cart.  I get this screen.  Then if I get that, I

25   proceed to check out.  I have to log in, like I show, then

1    if I connect with the secure server, I get this screen, one

2    more click and I am done.

3    A.      Yes.

4    Q.      Do you know why you took so many more steps?

5    A.      Possibly because at the time, I didn't have those

6    defaults set.

7    Q.      Did you set a default address for 1-click?

8    A.      When you say "did I," by the time I've got to

9    1-click, there was already a default address.

10                   MR. HADDEN:  Could we get Dr. Shamos's third

11   slide?

12                   Actually, the next slide.  Sorry about that.

13   No. 4.

14   BY MR. HADDEN:

15   Q.      So you talked this morning when you were explaining

16   how Amazon infringes the '710 patent, about metadata; right?

17   And you said the metadata is in the cookies; is that right?

18   A.      Yes.  But this metadata is in the cookies.  It's not

19   the only place there is metadata.

20   Q.      All right.  And some of the metadata that you, or

21   the metadata that you did identify that is relevant to the

22   '710 patent claims were these things that are circled here;

23   right?

24   A.      I'm not ready to say they're all relevant to the

25   claims.  I was using them to explain what the metadata was

1   and how the cookies contain the metadata but I think the one

2   that I relied on was x-main.

3   Q.    Oh, x-main.  Now, x-main equals, that would be

4   included in every set cookie command that Amazon sets or

5   sends to any user; right?

6   A.    I think that is true.  I don't --

7   Q.    Right.

8   A.    I don't know what Amazon sends to every user, but it

9   wouldn't be a surprise if they knew who the customer was

10  that they would set that cookie.

11  Q.    Right.  So if x-main equals, it is the metadata that

12  is required in Claim 1 of the '710 patent, that same

13  metadata is on roughly 90 million different customers

14  computers; right?

15  A.    I don't have any reason to quarrel with that number.

16  It sounds rational to me.

17  Q.    So how does x-main equals, if it's on 90 million

18  users computers, identify a particular user or a particular

19  transaction?

20  A.    It doesn't.  It identifies that the string that

21  follows it is an encrypted form of an Amazon customer ID.

22  It describes the customer ID.

23  Q.    Okay.  But is -- just to be clear, you said it's

24  x-main equals that is the metadata?

25  A.    Well, that's the part that describes what follows it.

Shamos - cross

1   Q.     Well --

2   A.     So it's data that describes or associates other data.

3   It describes the data that follows.  It begins PCC, et

4   cetera.

5   Q.     I understand that.  Are you saying that the data that

6   follows it is metadata?

7   A.     The data that follows it, together with it, could

8   also be metadata if it describes it or associates other

9   data.

10  Q.     Well, when you determined and testified this morning

11  that Amazon infringed Claim 1, what was metadata you were

12  relying on?  Was it x-main equals or something else?

13  A.     Okay.  So the string PCC ... by itself is

14  meaningless.  It acquires meaning when it's explained with

15  what x-main equals.  That it is an x-main which, in Amazon

16  parlance, is an encrypted form of the customer ID.

17         That data is then used to go and actually look

18  up the other day that associated with that customer.

19  Q.     That didn't quite answer the question.  The question

20  is, is the metadata that you relied on x-main equals or

21  something else?

22  A.     So the problem is that you can have metadata about

23  metadata, and it gets very complicated to talk about.  And

24  trying to determine exactly which characters in the string

25  are metadata, data, metadata about metadata becomes almost a

Shamos - cross

1    philosopher's exercise.

2              For example, the character "equals," taken by

3    itself, is data.  It doesn't become metadata until you look

4    at the two fields that are, that precede equals and follow

5    equals.  And so the x-main, x-main equals certainly is

6    metadata and it's metadata that describes the data that

7    follows, which is this encrypted customer ID.

8              Now, if the question is, is the customer ID

9    itself, can that be metadata, too?  It can be metadata

10   because it can be used to look up other data.  But it, by

11   itself, isn't metadata until it is identified by x-main, so

12   it's layers of metadata.

13   Q.    So what layers are you relying on in opining this

14   morning that Amazon infringes?

15   A.    Well, x-main equals is metadata that is included in

16   the HTML page that Amazon creates and sends to the user's

17   computer.

18   Q.    So x-main equals, that is what you are relying on?

19   A.    Well, x-main equals, by itself, is also meaningless

20   unless it has something that follows.

21             So I'm not drawing a clear distinction between

22   x-main equals and the whole rest the string, just the x-main

23   equals, the word x-main, it's not -- I don't think it's

24   intellectually feasible to do that.

25   Q.    The jury needs to understand what the metadata is

Shamos - cross

1    that you accuse Amazon of using to infringe its claim.  So

2    is it x-main equals, what you circled on your slide, or is

3    it this whole thing or is it part of that string of

4    characters?  What is it?

5    A.    It's the whole thing.

6    Q.    So it's different than what you showed this morning?

7    A.    No.  X-main equals is metadata.  That doesn't mean

8    that x-main equals, what follows it, isn't metadata also.

9    Q.    Okay.  But you didn't talk about what follows it as

10   being metadata this morning, did you?

11   A.    No.

12   Q.    So do you have a conclusion that Amazon infringes by

13   just having x-main equals being the metadata?

14   A.    I don't think that I formed my opinion based solely

15   on that.

16            MR. HADDEN:  Let me ask, could we turn forward

17   to Slide 18, please.

18   BY MR. HADDEN:

19   Q.    Now, this is one of the elements of Claim 1 that you

20   talked about this morning; right, Dr. Shamos?

21   A.    Yes.

22   Q.    And the last part of this element, it says:  metadata

23   associating said customer data with said transaction.

24   A.    Yes.

25   Q.    Do you see that?

Shamos - cross

1              Now, the Court construed that term but you

2       didn't talk about the Court's construction this morning, did

3       you, Dr. Shamos?

4       A.     Yes, I did.  I listed the Court's construction on a

5       couple of slides.

6       Q.     What construction did you list?

7       A.     Metadata.

8       Q.     Metadata equals, meaning data that describes or

9       associates other data?

10      A.     Yes.

11      Q.     But the Court actually construed this claim, this

12      element, too?

13              MR. HADDEN:  Can we get that up there?

14              Can I approach, Your Honor?

15              THE COURT:  You may.

16              (Document passed forward.)

17              MR. HADDEN:  I wanted to put this up on the

18      screen, but apparently there is a problem with that.  Ladies

19      and gentlemen, if you look at the list of constructions that

20      the Court provided, this is included in them.

21      BY MR. HADDEN:

22      Q.     So if we look at the phrase "metadata associating

23      said customer data with said transaction," Your Honor

24      construed that to mean "data that is used to identify the

25      stored customer data as data to be used in completing the

1    transaction".

2              Do you see that, Dr. Shamos?

3    A.    Yes.

4    Q.    Now, you didn't use that construction this morning,

5    did you?

6    A.    I used it when I formed my opinion.  I didn't state

7    it when I was giving my presentation this morning.

8    Q.    Okay.  So if we go back to your slide with the cookie

9    on it, which I guess is Slide 4, you are focusing on x-main

10   equals; is that right?

11   A.    I circled x-main equals as an example of metadata.

12   And that metadata satisfies this definition.  It's data that

13   is used to identify the stored customer data as data to be

14   used to completing the transaction.  More is needed than

15   just x-main equals but x-main equals is used in that

16   process.

17   Q.    Well, x-main equals may be used in that process but

18   this x-main equals doesn't tell Amazon anything about

19   whether or not this data that is going to be used to

20   complete a purchase, does it?

21   A.    Yes.  It says that the string immediately following

22   x-main equals, when decrypted, will allow you to retrieve

23   the customer value.

24   Q.    But that is not what the Court 's construction

25   requires; right?

Shamos - cross

1    A.     Sure.  It's data that is used to identify the stored

2    customer data as data to be used in completing the

3    transaction.  There is no other way Amazon has of knowing

4    what data to use except through x-main equals.

5    Q.     But where does?

6    A.     X-main equals and the string following it.

7    Q.     Sorry.  I didn't mean to speak over you.

8           Where does x-main equals in this jumble of

9    characters say there is data to be used to complete a

10   purchase transaction?

11   A.     Because Amazon needs the customer data to complete

12   the transaction.  It's looking around for the cookie that is

13   going to tell us where to find that customer value.

14   Q.     Well, Amazon isn't looking around, right?  These

15   cookies get sent, the same cookies, every time a user goes

16   to the Amazon site to do anything; right?

17   A.     Yes, and also --

18   Q.     Let me just finish my question.

19   A.     I'm sorry.

20   Q.     Whether the user is browsing or whether the user is

21   searching, whether the user is going to their own page.

22   This exact information is going to get sent to Amazon;

23   right?

24   A.     Yes.

25   Q.     And there is nothing in this information that says

1    use this for a particular purchase transaction, is there?

2    A.     There is nothing express that says that.  There

3    doesn't have to be.  When it's time for Amazon to complete

4    the transaction, it uses this cookie to look up the customer

5    data.

6    Q.     But that is not what the Court requires, sir; right?

7    A.     It is exactly what the Court requires.  Data is used

8    to identify the stored customer data as data to be used in

9    completing the transaction.  X-main equals is a little arrow

10   that points to the field after that which says this is

11   where -- if you want the customer data, this is where you go

12   to get the customer data.

13   Q.     Right.  And x-main equals gets sent to Amazon in its

14   process independent of any purchase transaction by any

15   customer?

16   A.     Yes, it's there all the time.  It's like I wear a big

17   sign on my head with my name.  Sometimes you are going to

18   need my name for some purposes and sometimes you are not

19   going to need my name.  But when you need it, it's there.

20   It's metadata that describes me.

21   Q.     Right.  And there is nothing in x-main that says I'm

22   to be used to complete the transaction?

23   A.     That is just not right.  There is nothing express in

24   there that says that this cookie is different in any way

25   from the ones that I have sent you before.  In the same

Shamos - cross

1    sense that when I have the sign on my forehead with my name,

2    it doesn't mean that you always have to use it every time

3    you look at me.  But if you look at me and you want to know

4    my name, there it is.  It's right there for you.

5            It is used.  It identifies the stored customer

6    data as data to be used in completing the transaction

7    because the rest of the metadata that is sent to Amazon says

8    this is the indication to initiate.  When you have the

9    indication to initiate, you have to include metadata that

10   identifies the stored customer data, and there it is.

11   Q.    When you said the rest of the metadata --

12   A.    Yes.

13   Q.    -- the only metadata that you described this morning

14   is x-main equals?

15   A.    No.  There is the rest of the metadata.  For example,

16   there is a method, method equals post.  There is other

17   information that tells Amazon that the user has just clicked

18   1-click, and so there is 1-click identification that is also

19   in the metadata on that page.

20   Q.    But you didn't describe any of that metadata this

21   morning as meeting this requirement of the claim, did you?

22   A.    No.

23   Q.    Let me ask you to go --

24           MR. HADDEN:  Can we go forward, Bill, to Slide

25   19, Dr. Shamos's set?

1    BY MR. HADDEN:

2    Q.    You talked about this limitation this morning as

3    well, didn't you, Dr. Shamos?

4    A.    Yes.

5    Q.    But you didn't use the Court's claim construction

6    here either, did you?

7    A.    I'm not sure.  It's right there.

8    Q.    Well, you used one of them.  You used "completing the

9    purchase without human input?"

10   A.    Yes.

11   Q.    But the Court also construed the term "processing

12   said metadata associating said customer data so as to

13   complete the purchase transaction."  Right?  You didn't use

14   the Court's construction in that phrase, did you?

15   A.    I used it in forming my opinion.  I didn't put it on

16   the slide for the jury.

17   Q.    Well, the Court -- and this is, again, in the jury's

18   handouts.  The Court construed this term as well.  And they

19   said that it's "processing the metadata to retrieve the

20   stored customer data, and processing the retrieved customer

21   data to complete the purchase transaction."

22   A.    Yes.

23   Q.    All right.

24   A.    It does that.

25   Q.    It does that?

1    A.      That's how you get the thank you page.  It has to

2    know your e-mail page in order to e-mail you the

3    confirmation of the transaction.  And it gets your e-mail

4    address by looking up your stored customer data.

5    Q.      Well, just to be clear, the stored customer data has

6    to be the customer data that you identified earlier in the

7    claim as being the data that is used to complete the

8    purchase?

9    A.      Yes.

10   Q.      To use the credit card number, for example; right?

11   You identified that.

12   A.      I identified credit card information, and there, of

13   course, are other things:  the customer's name.  The

14   customer's e-mail address.

15   Q.      Right.  But Amazon doesn't use the x-main equals to

16   retrieve the user's credit card number?

17   A.      Yes, it does.

18   Q.      Why do you believe that?

19   A.      I believe that because it can't look up my credit

20   card number unless it knows who I am.  The way it finds out

21   who I am is by decrypting the x-main cookie.

22            MR. HADDEN:  Can we get Shamos Document 1?

23   Shamos Document 1.

24   BY MR. HADDEN:

25   Q.      Do you recognize this, Dr. Shamos?

Shamos - cross

1   A.      I've seen it before.

2   Q.      Yes.  You supposedly created it.  You filed this as

3   part of your summary judgment declaration.

4   A.      Yes.  So I created a skeletonized version of this.

5   Q.      Okay.

6   A.      It was worked over by graphic artists ostensibly to

7   make it look pretty.

8   Q.      But the point is if we look at Step 4, right, Amazon

9   processes metadata to create customer hash.  Do you see

10  that?

11  A.      Yes.

12  Q.      Now, that customer hash doesn't include the user's

13  credit card number, does it?

14  A.      No.

15  Q.      It doesn't include their shipping address, does it?

16  A.      No.

17  Q.      So that is not the information that is needed to

18  complete the purchase, is it?

19  A.      No, that's the way to get the information you need to

20  get complete the purchase.

21  Q.      But the Court claim construction -- right? --

22  requires processing the metadata to retrieve the stored

23  customer information.

24  A.      Yes.

25  Q.      And then processing the retrieved store information

Shamos - cross

1    to complete the purchase.

2    A.    Yes, it does.

3    Q.    Let me just finish, sir.

4          So the Court requires that we process the

5    metadata to retrieve the stored customer data that we're

6    actually going to use to complete a purchase; right?

7    A.    Well, I agree with that except to this extent.  If it

8    takes me five steps to retrieve the customer data, and to

9    get to the first step, I have to process the metadata in

10   order to do that, then that is perfectly satisfactory.  It

11   doesn't have to be an instantaneous step of doing it.  It's

12   a chain of steps.

13   Q.    Let's look at your diagram you prepared previously.

14   We get to Step 9 over here.

15   A.    Yes.

16   Q.    That is where we actually retrieve the stored

17   customer data that we are going to use to complete the

18   purchase; right?

19   A.    Yes.

20   Q.    Now, at that point, the software that is processing

21   Step 9 doesn't know anything about x-main equals?

22   A.    Oh, that's correct.

23   Q.    Right?  It's gone.  There is no metadata in Step 9

24   that you identified earlier, is there?

25   A.    No.

Shamos - cross

1    Q.     Okay.  Thank you.

2           So just to be clear with this diagram up here,

3    this process of actually completing an order at Amazon, Step

4    9 is where information is retrieved from Amazon's database,

5    that includes the customer information like credit card

6    number and shipping address; right?

7    A.     Well, it is the information needed to complete the

8    order.  That is retrieved at Step 9.

9    Q.     Okay.  And in Step 9, there is no longer any cookie

10   or any x-main equals or any of that gobbledegook of

11   characters that we saw earlier; right?

12   A.     It's not there anymore because it was used to get us

13   there.

14   Q.     Right.  So the retrieving of the customer information

15   is done not when you process the metadata, which is way up

16   at Step 4, but it's Step 9.  And by the time we get to Step

17   9, we don't know anything about metadata; right?

18   A.     Well, that is correct, but it doesn't matter.  The

19   Court's construction just says that it's data that is used

20   to identify the stored customer data.  And through a chain

21   of pointers, you go here, and this guy takes you there, and

22   this guy takes you there, and eventually you get to the OMS

23   server.  That is how you get the data.

24   Q.     That is not quite right, sir, because you left off of

25   the last half of the Court's construction.  That is metadata

Shamos - cross

1   that identifies stored customer data and data to be used to

2   complete the purchase.

3            Now when the cookies are processed up there at

4   Step 4, Amazon doesn't know whether there is going to be a

5   purchase or a Web browser or a search.  All those cookies

6   are processed the same way before Amazon knows anything

7   about what the particular page request is.  Isn't that

8   right?

9   A.    Well, I don't agree they're processed the same way.

10  They are received by the Web server and they're held by the

11  Web server in case they need to be passed -- the information

12  needs to be passed on to somebody else, depending on the

13  nature of the request that is being made.  There may be many

14  clicks that I make to Amazon in which one or more cookies

15  are ignored, and then there is the really critical 1-click

16  one where it sure isn't ignored.  It understood the x-main

17  cookie to complete the transaction.

18  Q.    Is that the way you believe Amazon operates?

19  A.    Yes.

20  Q.    If, in fact, Amazon didn't operate that way but in

21  fact every request of a cookie processed by a session

22  interceptor before Amazon knew anything about what the page

23  request was, and all of that processing was identical for

24  every page request, you would have a different opinion?

25  A.    No, I'd have the same opinion.  Because the

1   information -- the x-main information is, as the Court

2   requires, used to identify the stored customer data as data

3   to be used in completing the transaction.

4   Q.      The data as it's received by Amazon has to be data

5   that is used -- data that identifies, it's not as used, it's

6   that identifies the data as data to be used?

7   A.      No, is used.  The Court's construction says "is used

8   to identify."

9   Q.      As data to be used; right?

10  A.      Yes.

11  Q.      Okay.  And when the cookies are processed by the

12  session interceptor, there is no indication that that

13  request is for a purchase or a browse or a search or

14  anything else?

15  A.      Let's suppose that to be true.  It doesn't make any

16  difference.

17  Q.      How can it not make any difference?

18  A.      Because when Amazon needs to know who I am in order

19  to look up my customer data, it's that information from the

20  cookie is what it uses.

21  Q.      But that is not what the Court's claim construction

22  requires.

23  A.      Well, I think it is.

24  Q.      Let me ask you to turn forward.

25          MR. HADDEN:  Let's go forward in the slides to

Shamos - cross

1    Slide 52.

2              Oh.  Before me get there.  Sorry.  Let me ask

3    you to go to Slide 22.

4    BY MR. HADDEN:

5    Q.     Now, Amazon stores customer data in relational

6    databases; right, Dr. Shamos?

7    A.     It stores a lot of it in relational databases, yes.

8    Q.     And when you keep data in a relational database, it

9    is not kept as an object, is it?

10   A.     Well, that is a matter of interpretation.  The only

11   use, according to the testimony of Amazon witnesses, that

12   is made of customer data is that whenever it needs to be

13   accessed, the properties that are stored in the database are

14   wrapped into an object and a method is invoked on the object

15   to obtain the data.  And so the other computer programs that

16   interact with this data only see it as an object.

17   Q.     So what you are testifying is that when the data is

18   accessed, it's accessed using an object; right?

19   A.     Well, that is certainly true.

20   Q.     Right.  But the data as it's stored when it's not

21   being accessed, is not stored as an object?

22   A.     Again, it's a matter of understanding what it means

23   to store something.  There is a door behind here, and I

24   never get to see what is behind the door.  The only thing I

25   get to see is what comes out of the door and what goes into

Shamos - cross

1    the door, and I have complete ignorance about what is going

2    on behind there.  As far as I'm concerned, if what goes in

3    is an object and what goes out is an object, as far as I'm

4    concerned it's kept as an object.

5    Q.    But we know what is behind the door at the Amazon

6    system; right?  It's a relational database.  So let's look

7    at what is in the relational database?

8    A.    We are humans, we're not computer programs.  The

9    computer programs interact with the data.

10   Q.    That is not my question, sir.  You know, I know it's

11   stored in a relational database.  When it's stored in a

12   relational database, is it kept as an object?

13   A.    According to the explanation that I just gave, yes.

14   If you get to peak behind the door and see how it's stored,

15   it's stored as a relationship database behind a door.

16   Q.    And a relational database is not an object?

17   A.    For this purpose, it's safe to say that.

18   Q.    There are object-oriented databases described in the

19   patent.  Relational database is not one of them; right?

20   A.    You don't want me to give a full explanation of this.

21   You can store objects in relationship databases.  I'm not

22   contending that this relational database is used to store

23   the object.  I was trying to avoid having to get into that

24   flip note.

25              MR. HADDEN:  Can we go to Slide 28?

Shamos - cross

1    BY MR. HADDEN:

2    Q.    So you talked this morning about this Claim 6 which

3    requires that the customer data is retrieved from a

4    third-party's computer.  Do you see that?

5    A.    Yes.

6    Q.    Who is the third-party in that case?

7    A.    Amazon.

8    Q.    So if Amazon is the third-party, who is doing all the

9    other steps of Claim 1?

10   A.    Well, let's go through the steps of Claim 1.

11   Q.    Okay.

12          MR. HADDEN:  Can we get Slide 11?

13   A.    Amazon performs Step [a].  Amazon performs Step [b].

14   Amazon performs Step [c].  Amazon performs Step [d].  And

15   Amazon performs the step in Claim 6.

16   BY MR. HADDEN:

17   Q.    So how can Amazon be a third-party?

18   A.    I don't understand why you can't be a third-party.

19   The man in the moon could perform these steps.  You don't

20   have to identify him as a third-party or not for these

21   steps.

22   Q.    Well, who is the seller?

23   A.    The seller is the outside merchant.

24   Q.    Well, you testified earlier that, in performing Claim

25   6, Amazon gets an order and then sends it off to the seller.

Shamos - cross

1    Right?

2    A.    Yes.

3    Q.    Okay.  So who is automatically completing the

4    purchase of an item?

5    A.    Amazon is.  Amazon sends the thank you page.  When

6    you order something from an outside -- I want to call it an

7    outside merchant because the term third-party is going to

8    get really confusing.  When you order something from an

9    outside merchant, Amazon does all these things and sends you

10   the thank you page that confirms that the order is complete.

11   You don't have to do anything any more from this point.

12   Q.    So your order is complete when Amazon sends you an

13   e-mail, thanks for placing an order?

14   A.    Your on-line purchase is complete.  Yes.

15   Q.    So the seller actually doesn't have to send you

16   anything or charge your credit card or do anything and you

17   say that the purchase is complete?

18   A.    Well, he may default on his obligations, in which

19   case you may have to sue him, but you made a purchase from

20   the third-party, from the outside merchant at that point.

21   Q.    So it's your testimony --

22   A.    Amazon is authorized to make those transactions on

23   his behalf.

24   Q.    So it's your testimony that when Amazon takes an

25   order, just sends it off to the seller, at that point, the

Shamos - cross

1   purchase has been automatically completed?

2   A.      No -- yes.  And then Amazon immediately tells you

3   that your purchase is complete.

4   Q.      So neither Amazon, nor this seller have to take any

5   steps to process the order, charge the customer account or

6   take any steps to actually ship a product to anybody and

7   it's completed?

8   A.      The order is complete when there is an obligation for

9   somebody to send you a product.  The actual physical steps

10  that may be involved in packing and shipping and sending it

11  are not part of the purchase.  They're part of the

12  fulfillment.  And if they default on that, I guess you will

13  have a lawsuit against them but the purchase is complete as

14  far as you are concerned.

15  Q.      Do you think you have a lawsuit against Amazon when

16  you get the thank you e-mail that says thanks for placing

17  your order?

18  A.      No, because nobody has defaulted on anything.

19  Q.      Well, if Amazon doesn't send you anything and doesn't

20  charge you a credit card after that, do you have a lawsuit

21  against them?

22  A.      I haven't formed an opinion about that.

23  Q.      This is one of the detail pages that you pointed to

24  this morning that shows a customer of you.  Right?

25  A.      Yes.

Shamos - cross

1    Q.    And this one has several different sets of stars,

2    durability, fun, education.  Do you see that?

3    A.    Yes.

4    Q.    And, for most products at Amazon, that is not the

5    case.  Right?

6    A.    I don't know what the relative percentage is.  But

7    there are products for which there is only a single star

8    review.

9    Q.    Do you know any category of products other than toys

10   where there is anything but a single star review?

11   A.    Not sitting here I don't.

12   Q.    Now, if you go to the next slide, is the text that

13   the user types in, I forgot, you typed in a review for

14   Monopoly, is that text that shows up on the Amazon site with

15   that customer review, is that a feedback information under

16   the Court's construction?

17   A.    Yes.

18   Q.    It is?

19   A.    Yes.

20   Q.    So if I am reviewing your Elmo doll and I type in "I

21   love Elmo," there is evaluation attributes and corresponding

22   value choices?

23   A.    Yes.  The attribute is how do you feel about this

24   product.  The "I love Elmo" is the value I associate with

25   that product.

1003

Shamos - cross

1   Q.      So any words that the user types in, you say, are a

2   corresponding value choice?

3   A.      I haven't considered outlandish cases in which

4   someone attempts to provide feedback that has no relevancy

5   whatsoever to the product.  But if what you are putting in

6   as a review is related to the product, that is obviously

7   feedback.  Everybody in the world calls it feedback.  Amazon

8   calls it feedback, and its consistent with the Court's

9   construction of feedback.  The evaluation attribute is what

10  do you think of this.  The value is what I think of it.

11  Q.      So the Court's construction, just to be clear -- this

12  is also in the handout that the jurors have -- is valuation

13  attributes and corresponding value choices?

14  A.      That's what I just said.

15  Q.      It's your testimony that any words that a user types

16  in about a product are corresponding value choices?

17  A.      That was not my testimony.  My testimony was that I

18  could imagine weird cases in which what was typed had no

19  relationship to the product and that it would be stretching

20  logic to consider it to be feedback.

21          But, I said, if the review relates to the

22  product, then it is feedback, according to the Court's

23  construction.

24          It's the value choice:  What do you think of

25  this product?

Shamos - cross

1       People have all kinds of ideas about what they

2   think of a product.  We can't say that certain of those

3   ideas are value choices and some of those aren't value

4   choices.  They are value choices.

5   Q.    And the valuation attribute that corresponds to those

6   value choices is what?

7   A.    Is what do you think of this product.

8   Q.    So do the jurors have to read it to figure out

9   whether they are feedback information?

10  A.    Again, I can imagine that somebody could type in

11  random characters that had no relationship to anything, and

12  they weren't really a value choice.

13       I want to exclude the outlandish cases.

14       But where somebody is writing about the product,

15  every one of those reviews is feedback information,

16  according to the Court's construction.

17  Q.    This is one of your slides from the discussion this

18  morning of Claim 109 of the '325 patent.  In the preamble of

19  this claim, it says "a computer-based communication method,

20  comprising operating one or more computers to communicate by

21  performing the steps of."

22       Do you see that?

23  A.    Yes.

24  Q.    I think this morning you testified that, at least

25  with respect to your theory regarding web browsers and web

Shamos - cross

1   servers, that the one or more computers included a web

2   server at Amazon and the customer's computer.  Is that

3   right?

4   A.    Yes.

5   Q.    So it's your opinion, Dr. Shamos, that Amazon is

6   operating their customer's computers?

7   A.    Of course, if Amazon didn't operate it, it wouldn't

8   send information back to Amazon.  It does so because it

9   obeys the instructions that are sent to it by Amazon's web

10  server.

11  Q.    You say on the slide that Amazon sends instructions

12  to the consumer computer to make it communicate with Amazon?

13  A.    To the customer computer.  But I understand in this

14  case, consumer, provider, customer, seller, it's all

15  confusing.  But, yes, the customer computer.

16  Q.    What instructions does Amazon send to its customer's

17  computers to make them communicating with Amazon?

18  A.    It sets HTML pages, and as the HTML page is processed

19  by the browser, the HTML page causes the browser to do

20  certain things.  For example, when it says a 1-click, the

21  browser faithfully sends a message back to Amazon because

22  Amazon told it to.

23  Q.    But Amazon didn't make the customer click the 1-click

24  button to communicate with Amazon?

25  A.    And the phrase make the customer do something is not

Shamos - cross

1    part of the claim language.  Amazon doesn't have to make the

2    customer do it.  It just has to operate the customer's

3    compute.

4    Q.    So when a customer -- I am just trying to understand,

5    this isn't feedback.  This is your customer review claim?

6    A.    Yes.

7    Q.    So in the context of customer reviews, how is Amazon

8    operating my computer if I am a customer and I want to

9    review Elmo?

10   A.    When I write a review, I click Preview Your Review.

11   That causes my computer to communicate with Amazon.  The way

12   it causes it is because my browser is obeying instructions

13   that were sent to it by the Amazon web server.  If Amazon

14   hadn't sent those instructions, there is no way on earth

15   that my computer is going to talk to Amazon.

16   Q.    So under your theory, every website operator controls

17   every customer's computer who ever does that?

18   A.    I didn't say that at all.  I said that -- I think the

19   word I didn't use was the word control.

20          The question is, when a website sends me a web

21   page, the expectation is that my browser is going to execute

22   the instruction on the web page.

23          If one of those instructions is to cause

24   information to be sent back to the website, then the website

25   has operated my computer.  It's operated it with my consent.

Shamos - cross

```
1   But it has operated it.

2   Q.    But Amazon doesn't send any web pages to people's

3   computers that cause them to communicate back to Amazon

4   unless they choose to by clicking on a link.  Right?

5   A.    Yes.  But we are not talking about free will, and who

6   is controlling the human.

7         We are talking about whether or not the

8   instructions that my computer is executing were provided by

9   Amazon.  And they were.

10  Q.    I think we are talking, Dr. Shamos, about whether

11  Amazon is operating its customers' computers, whether its

12  customers are operating their computers.  Right?

13  A.    So there can be joint operation of the computer.

14  There are plenty of things that I do in my computer.  In

15  fact, I often have multiple browsers open.  And one of them,

16  when I am ordering things from Amazon, I am interacting with

17  Amazon.  In other windows I am doing other things.

18        I give Amazon control of my computer when I am

19  interacting with the Amazon window.  I allow Amazon to send

20  my browser stuff and I allow my browser to respond to

21  Amazon.

22        When I am in a different window, it is some

23  other website that is operating my computer for that slice

24  of time that is necessary to process those instructions.

25  There isn't a notion that one person operates a computer.
```

Shamos - cross

1  Q.     Just to be clear, Amazon doesn't cause any customer's

2  computer to send any communications to Amazon unless that

3  customer chooses to and takes some act to click object

4  something to do it.  Right?

5  A.     I am not sure that I considered every possible thing

6  that Amazon sends to a customer.  But for the purposes of

7  the claims that I have discussed here, my recollection is

8  that the user has to click on something, or give some other

9  indication, and when it, the user does that, the user knows

10  or should know that what's going to happen is instructions

11  on the web page are going to get executed that allow Amazon

12  to control the computer for that period of time immediately

13  following when I allow it to.

14         The user certainly doesn't do that.  The user

15  didn't bring the HTML.

16  Q.     This is part of your discussion this morning of the

17  creating metadata step.  Under little (i) in square brackets

18  you say, "Amazon creates metadata such as 'ASIN equals' that

19  describes associations with that data."

20         Do you see that?

21  A.     Yes.

22  Q.     That data is what?

23  A.     Well, if you go back a couple of slides, to Steps (a)

24  and (b).

25  Q.     Is that the one you are looking for?

Shamos - cross

1    A.      Yes.  In a provider memory, information including

2    provider information has to be stored and consumer

3    information has to be stored.  That is the information that

4    is referred to in Step [c].

5    Q.      The consumer information you talked about, that's

6    what you said was the cookie.  Right?

7    A.      Yes, that's an example of it.

8    Q.      What is the provider memory information that Amazon

9    creates metadata such as ASIN controls, is that providing in

10   association with?

11   A.      Yes, provider information is information about the

12   product.  For example, the ASIN identifies the product, and

13   associated with that product is review information.

14   Q.      So what exact metadata does Amazon create to

15   determine here in Slide 56?

16   A.      The metadata is created by Amazon, because the

17   customer doesn't create anything.

18   Q.      As I understand, equals followed by an ASIN

19   identifier identifies a product, and information about that

20   product is stored in provider memory?  You didn't identify

21   any of that in your expert report or your deposition, did

22   you, Dr. Shamos?

23   A.      I actually think I did.  If we pull up my report and

24   look at the multi-hundred page Excel spread sheet, we could

25   probably find it.

Shamos - cross

1   Q.    Let me get 2053.

2         "Question:  So where is the metadata that

3   associates the ASIN?

4         "Answer:  I would have to go look at the whole

5   HTML page.

6         "Question:  Did you identify anything in your

7   report which associates the ASIN?

8         "Answer:  No, but the ASIN is the number of the

9   product being reviewed.  I haven't pulled out this specific

10   metadata that does that, but I say that such metadata

11   includes metadata associating at least an image of the

12   product being reviewed.

13         "Question:  I understand that, but we just

14   confirmed that the image is not said information.  Where is

15   there metadata that you've identified that associates a

16   portion of said information?

17         "Answer:  The portion of said information is

18   through the ASIN.

19         "Question:  But there is no metadata that you've

20   identified that associates an ASIN with anything?

21         "Answer:  I agree that I haven't expressly shown

22   it in the claim chart:

23         "Question:  Right."

24         Would you look back on Slide 56, Metadata -

25   Defining control structure which is processed at least at

Shamos - cross

1  said consumer memory to associate one or more processes for

2  controlling the communications of said associated

3  information.

4            Do you see that?

5  A.    Yes.

6  Q.    What is the said association information whose

7  communication is controlled by the processing and control

8  structure?

9  A.    Well, the associated information that I have

10 identified here is the ASIN.

11 Q.    I thought the ASIN was --

12 A.    The association is that the product review

13 information is being associated with a particular product by

14 ASIN equals followed by the actual ASIN.

15           It's the feedback information being transmitted

16 to Amazon and Amazon knows what to do with it because it has

17 the ASIN.  It knows what products it is to be associated

18 with.

19 Q.    But the control structure has to be processed on a

20 consumer memory.  Right?  That's the easy browser?

21 A.    Yes.

22 Q.    So what metadata did you identify that associates a

23 process with controlling the transfer of an ASIN on the

24 user's browser?

25 A.    Oh, the process is the post and the action equals, or

Shamos - cross

1   the puts or get.  Whichever HTTP command is being used to

2   send the data, that is the control structure.  That defines

3   the process.

4           The information that is transmitted is a review

5   associated with an ASIN.

6   Q.   Is the ASIN in the page that gets sent back to

7   Amazon?

8   A.   I believe it is.

9   Q.   But that's not set information.  Right?  Because it's

10  not stored in either provider memory or consumer memory.

11  Right?

12  A.   What's being associated is, what's stored at all

13  Amazon are reviews.  We are going to take this review

14  information, and we are going to stuff it into that stored

15  information associated with that product.  So it's

16  information associated with the product that's stored at

17  Amazon.

18  Q.   But information about a product that's stored at

19  Amazon, its communication is not controlled by the process

20  or anything --

21  A.   I am sorry.  I wanted to let you finish.

22  Q.   You just said that the associated information is some

23  information that is stored in Amazon.  Right?

24  A.   Yes.  This review that I am creating is going to be

25  stored at Amazon, along with information about a particular

Shamos - cross

1    product.  And that product is being identified by ASIN.

2    Q.    But what is the information that is going -- the

3    communication that is going to be controlled by a process on

4    the user's browser?

5    A.    They will review the ASIN equals metadata.

6    Q.    But the review can't be set information because when

7    the form is processed in the user's browser it's not in

8    provider memory at Amazon, it is it's not in consumer memory

9    at the user computer.  Right?

10   A.    Yes, but metadata describes associations with

11   portions of said information.  Portions of said information

12   stored at Amazon are information about this product.  The

13   ASIN number, for example, stored at Amazon, and reviews are

14   associated with Amazon.

15           Now what we are going to do is we are going to

16   associate this review with that information.

17           That information is going to be sent to Amazon

18   for processing.

19   Q.    The information, the communication that has to be

20   controlled by the control structure while it's being

21   processed when they use this computer -- let me finish this

22   question -- has to be information that is already either

23   stored on the user's computer.  Right?  In consumer memory?

24   Or stored at Amazon?

25           Now, when my browser is providing my review

Shamos - cross

1    form, it is not going to cause anything that is stored at

2    Amazon to come over to me, is it?

3    A.    It doesn't have to.  It just has to control

4    communications of said associated formulation.  And the

5    metadata describes an association between my review and a

6    particular product.

7    Q.    So what is the associated information that is getting

8    communicated?

9    A.    My review and the ASIN.  I have answered that.

10   Q.    But your review is not stored in consumer memory.

11   It's in your browser and RAM?

12   A.    It doesn't have to be stored in consumer memory.  I

13   have to create -- there has to be metadata that describes

14   associations with portions of said information.  It's the

15   said information that has to be stored in memory.

16   Q.    So it's your testimony, just so I am clear, Dr.

17   Shamos, that said associated information does not have to be

18   said information?

19   A.    No, it doesn't.  It's associations with portions of

20   said information.  When you associate there is things on

21   both sides.  A is associated with B.

22   Q.    Let's go forward to Slide 58.  This is another piece

23   of the metadata that has to be created in this step, right,

24   Dr. Shamos?

25   A.    Yes.

Shamos - cross

1   Q.     And this has to include data exchange, metadata

2   associating a process for controlling the transfer of

3   feedback information.  You said feedback information has to

4   include at least a portion of said consumer information and

5   always has to be transferred to the provider memory.  Right?

6   A.     Yes.

7   Q.     We can see that the feedback information includes

8   cookies in the customer's computer that identify the

9   customer as the author of the feedback.  Can you see that?

10  A.     Yes.

11  Q.     If we go forward to Slide 60, we have a diagram here

12  of the information that gets sent to Amazon when a user

13  previews a review.  Right?

14  A.     Yes.

15  Q.     And you show the consumer information, the cookie,

16  and you show the feedback information as other information

17  in that post in a different box.  Right?

18  A.     Yes.

19  Q.     The claim requires that feedback information has to

20  exclude some of this stuff in the consumer information?

21  A.     So, if we recognize that the piece of information

22  could be both consumer information and feedback information,

23  then I will just take this little line right here at the top

24  of this box and I will move it up there.

25           This is all coming together in the same message.

Shamos - cross

1   It was just for clarity for the jury that I was pointing to

2   one as consumer and one as feedback.  But the whole thing

3   goes to Amazon and includes consumer information.

4   Q.     Sure.  So the whole thing goes to Amazon.  But the

5   claim requires that feedback information, which the Court

6   has construed for us as valuation attributes and

7   corresponding value choices, has to include at least a

8   portion of the consumer information.  Right?

9   A.     Yes, it does that.

10  Q.     To make that work, under your theory, some of these

11  cookies have to be evaluating attributes and corresponding

12  value choices?

13  A.     The evaluation attribute is what your identity is and

14  the corresponding value choice is the value of the x-main

15  cookie, which is to figure out who the viewer is, which is a

16  critical part of the evaluation.  Every review that is on

17  Amazon is identified by the name of the viewer.

18  Q.     That is not true, you know that.

19  A.     Many are.  I, after all, am Monopoly Lover.

20  Q.     Which of these cookies is an evaluation attribute?

21  A.     X-main equals PDC...

22         The evaluation attribute is what is your

23  identity?  Who are you?

24         The answer is, I am the customer represented by

25  PCCOK.....

Shamos - cross

1  Q.     But the customer doesn't provide the x-main equals

2  PC.... right?

3  A.     When you say provided?  It gets sent along with this

4  message.  But it was deposited there by Amazon.

5  Q.     So it's not customer feedback?  The customer didn't

6  choose that cookie, did he?

7  A.     I am sorry.  I don't think customer feedback is the

8  term that is used in any of the claims or any of the

9  constructions.

10 Q.     So whose feedback is that cookie?

11 A.     Feedback was the subject of a construction, its

12 evaluation attributes and corresponding value choices.

13        Anything that is an evaluation attribute and a

14 corresponding value choice is feedback information.

15 Q.     How did that cookie relate to a product?

16 A.     It's relating to the product because it itself is the

17 reviewer of the product.

18 Q.     Is there any of those encrypted characters that are

19 evaluating attributes of corresponding structures?

20 A.     It's not the characters themselves.  Just because you

21 encrypt something doesn't mean it loses all its identity.

22 When decrypted, it points to the sequence that we went

23 through, under Step 9, the customer data is retrieved from

24 the server.  And the value choice is information which

25 allows Amazon to know who is presenting this review, which

Shamos - cross

1    is a critical part of the review.

2    Q.    So just so I am clear, your testimony today is that

3    x-main equals in this cookie and this random string of

4    characters that from the encrypting a customer ID's

5    evaluation attributes and corresponding value choices and

6    also data that is used to identify the historic customer

7    data is data to be used in completing the transaction.  Is

8    that right?

9    A.    I don't 100-percent agree with the way you

10   characterized my testimony.

11              Let me re-summarize.

12              It is not evaluating attributes and

13   corresponding value choices.  It's an evaluation attribute

14   and a corresponding value choice, singular.  It can also be

15   used, there is nothing that precludes it from having

16   multiple roles, it can also be used as metadata that is used

17   to identify store customer data to be used in completing a

18   transaction.

19              There is absolutely nothing in these claims that

20   prevents it from being both of those things.

21   Q.    Let's take those one at a time.  First of all, if the

22   Court's claim is put out, it's volume evaluation attributes

23   and corresponding value choices.  Right?

24   A.    Yes.  Syntactically there is that flaw.  I don't

25   think the Court intended that it would be impossible to

Shamos - cross

1   evaluate a product on a single dimension, having therefore

2   only a single evaluation attribute and a single value

3   choice.

4               I agree, syntactically, it's true.

5   Q.    The return of this cookie through Amazon is not

6   controlled by any metadata provided anybody else, is it?

7   A.    I am sorry.  The return of the cookie?

8   Q.    Right.  What you are saying is that this cookie that

9   has this encrypted identifier, is returned based on -- if we

10  go to Slide 58 -- metadata, including data exchange

11  metadata, associating a process for controlling the transfer

12  of feedback information.  Right?

13  A.    But if there weren't a post, then the cookie wouldn't

14  be sent.

15  Q.    That is not true at all, is it?

16  A.    In this message.

17  Q.    Let me finish my question.  If I have Amazon's review

18  form, and I delete method equals post, and I click submit,

19  the cookie is going to get sent back exactly the same way.

20  A.    You mean if you go and deliberately tamper with

21  things?

22  Q.    Yes.

23  A.    I am not accusing the tampered page of infringing.

24  Q.    No.  The point is that post or get or anything else

25  in that form has nothing to do with whether or not cookies

Shamos - cross

1   are returned.  Cookies are returned because that's all the

2   way it is standard and that is the way all browsers are?

3   A.     If you are going to send any message to Amazon it is

4   going to include cookies, that is true.  But you are not

5   going to send a message to Amazon unless Amazon has freely

6   sent you a web page that is going to cause the post when you

7   click on something.

8   Q.     That isn't true, either.  I go to my browser and I go

9   to Amazon.com, my cookies will go to Amazon?

10  A.     Yes, they will.

11  Q.     And that --

12  A.     Not in response to submitting a review.

13  Q.     And it doesn't have anything to do with metadata

14  being set to me by Amazon; right?

15  A.     Correct.  Well, the cookies are the metadata that

16  were sent to you by Amazon.

17  Q.     But the cookies don't control their transfer, the

18  browser, does it?

19  A.     Correct.

20         MR. HADDEN:  Let's go to Slide 71.

21  BY MR. HADDEN:

22  Q.     Now, do you know whether or not the server that is

23  identified in this "source equals URL" is successful by

24  Amazon.com's Web server?

25  A.     Oh, I expect if Amazon.com Web server sent a get to

Shamos - cross

1    that server, that server would respond to the get.

2    Q.     But you have defined the provider memory, Claim 109,

3    to be any memory accessible to Amazon's Web server; right?

4    A.     When you say I define it, I made that statement.  And

5    I think that statement was a generalization.  I think it was

6    probably not specific enough.

7           In doing a mapping between a claim and an

8    accused system, what I have to do is find an association

9    between the elements that are recited in the claim and

10   elements that are found in the accused system that behave

11   according to the behavior listed in the claim.

12          How that association is made can do it any way

13   you want provided that the terms that are used reasonably

14   read on the element that you're looking for in the accused

15   system and the functions that are recited in the claim are

16   performed by those elements.

17          Now, how exactly the boundary is drawn between

18   what is the Web server and what the Web server can access,

19   that is completely up to the party that is asserting

20   infringement.  And so I choose to draw the images server

21   outside of the box of the Web server.  I'm allowed to do

22   that.  Having done that, the correspondence is perfect and

23   all of the steps recited are performed by Amazon.

24   Q.     So your theory on Claim 124 only works because you

25   drew a box to cut out one of the servers that the Amazon's

                          Shamos - cross

1    Web server can access?

2    A.     I think that is the way infringement always works.

3    The patent owner draws the boxes and if the boxes correspond

4    to the claim language, you have got infringement.

5              MR. HADDEN:  Let's go forward to Slide 76.

6    BY MR. HADDEN:

7    Q.     Now, this is the preamble for Claim 50 of the '717

8    patent; right, Dr. Shamos?

9    A.     Yes.

10   Q.     And it begins:  a method for use at a node of a

11   computer based communications system.  Do you see that?

12   A.     Yes.

13   Q.     I think you testified earlier that a node for your

14   purposes is basically a computer; right?

15   A.     I didn't attempt to make a complete characterization

16   of what a node could be, but it's useful in the context of

17   this claim to think of the node as a computer.

18   Q.     And this claim requires that this method is used at a

19   node; right?

20   A.     Yes.

21              MR. HADDEN:  Let's go forward to Slide --

22              THE WITNESS:  Understanding that the word "a,"

23   in a patent claim, is inclusive.  It can be used as more

24   than one node but it has to be at least used at a node.

25   It's an open-ended word.

Shamos - cross

1      MR. HADDEN:  Let's go forward to Slide 78, if we

2  could.

3      Actually, I'm sorry.  One more time back to 76.

4  76.  Sorry.

5  BY MR. HADDEN:

6  Q.    So when you're mapping, doing your box drawing of

7  this claim with respect to Amazon's Web server customer

8  computer system, you said that the node in the preamble is

9  Amazon's Web server; is that right?

10 A.    I don't recall now.

11     THE WITNESS:  Let's look at the next slide.  I

12 can't keep it straight which is the node and which is the

13 second node.

14     So let's look at the next slide where I think I

15 have the -- no, the slide after that.  The preamble slide.

16     No.

17     MR. HADDEN:  The preamble was 76.  Is that the

18 one you want?

19     THE WITNESS:  Is this the first time that '717

20 had shown up?

21     MR. HADDEN:  Yes.

22     THE WITNESS:  Let's go forward then because I

23 remember there is a slide that says what said node is and

24 what said second node is.

25     MR. HADDEN:  Okay.  Do you want to keep going,

Shamos - cross

1    Bill, until he finds it?

2              THE WITNESS:  No.

3              Here.  Said node is the Amazon Web server.  The

4    second node is the customer computer.

5    BY MR. HADDEN:

6    Q.    So the node in the preamble is the Web server; is

7    that right?

8    A.    Yes.

9              MR. HADDEN:  So let's go to Slide 78.

10   BY MR. HADDEN:

11   Q.    Right.  So 78 we have this means-plus-function

12   element; right?

13   A.    Yes.

14   Q.    So we have to have a database?

15   A.    Yes.

16   Q.    There aren't any databases on the Amazon Web servers,

17   are there?

18   A.    So Amazon, again, as I said, I get to draw the line

19   where I want to draw the line provided it maps properly to

20   the claim.

21             It's Amazon's Web server and the databases that

22   Amazon accesses from its Web server.  The database doesn't

23   have to be on that particular Web server.

24             MR. HADDEN:  Well, let's go to Slide --

25   A.    All we have to have, that Amazon provides storage

Shamos - cross

1   means for storing information, and it does.

2   BY MR. HADDEN:

3   Q.    But this claim requires a method that operates on a

4   node.  So how many nodes are we operating on there?

5   A.    When you say it operates on a node, it can operate on

6   more than one node.  "A" is an open-ended term in a patent

7   preamble.  It can operate at 50 nodes.

8           MR. HADDEN:  Let's go to slide 90, please.

9   BY MR. HADDEN:

10  Q.    So this is your slide when you talking about the

11  back-end system.

12  A.    Yes.

13  Q.    And here we have Amazon's Web server and a couple of

14  the databases that it can access; right?  In this box

15  drawing exercise, you are saying these are separate nodes;

16  right?

17  A.    Well, they are separate nodes, and there are even

18  other nodes that are not included in the claim language that

19  the Amazon Web server, for example, communicates with.  For

20  example, the databases that contain purely information about

21  the product, that is neither the CRS server or the feedback

22  server, but those are, for the purposes of the claim

23  analysis, considered to be part of the Amazon Web server.

24  Q.    So you just are slicing and dicing Amazon's system in

25  different ways with respect to different claims and

Shamos - cross

1   different mappings; right?

2   A.    Okay.  So there are three fundamental

3   instrumentalities that are accused with the feedback claims:

4            There is the customer computer and the Web

5   server.  And I get to draw the line the way I want to there.

6   Then, as between the Web server and the CRS server, I get to

7   draw lines the way I want to for that.  And between the

8   Amazon Web server and the feedback server, I get to draw

9   the lines separately for that so long as for one, within a

10  particular claim, I remain consistent.  I don't get to

11  switch the roles in the middle of the claim.

12           But it doesn't have to be the same for all the

13  claims.  I don't have to have inter-claim consistency.

14           MR. HADDEN:  So go back to Slide 78.

15           THE WITNESS:  Yes.

16  BY MR. HADDEN:

17  Q.    So Amazon, as you probably know, has thousands, if

18  not tens of thousands of servers; right?

19  A.    I would expect.

20  Q.    Okay.  So the "a node" in the preamble, which of

21  those computers are you including?

22  A.    Okay.  So what's "a node?"  A node does not have to

23  be an individual computer.  You made the point earlier this

24  is an example of distributed computing.  With distributed

25  computing, I can consider a cluster of computers to be a

Shamos - cross

1    node if I want to.  I doesn't have to be a solitary, unitary

2    computer because, in fact, there isn't any such one thing as

3    the Amazon Web server.  Amazon operates a server farm which

4    has thousands or tens of thousands of servers on them.  And

5    Amazon is free to distribute the load of processing a

6    request as it sees fit among those servers.  There, you

7    would consider the server farm the node.

8    Q.    The server farm?

9    A.    Yes.

10   Q.    And s does that include a CRS server?

11   A.    No.

12   Q.    Why not?

13   A.    Because I didn't draw the boxes that way.

14   Q.    So you just chose to throw that one out?

15   A.    I didn't choose to throw it out.  It wouldn't make

16   any sense for the node to be communicating with itself.  So

17   I have a set of computers that are said node and I have a

18   different computer that is the second node.  There is

19   absolutely nothing improper about doing the analysis that

20   way as long as it fits within the claim language.

21            MR. HADDEN:  Let's go to Slide 79.

22   BY MR. HADDEN:

23   Q.    This step requires associating portions of said

24   information with metadata, said metadata defining a control

25   structure.

Shamos - cross

1    Do you see that?

2    A.    Yes.

3    Q.    Okay.  So in your Web server to browser theory, who

4    is doing this?

5    A.    Okay.  We're going to have to go back to the previous

6    slide, and look at A.  Step [a].

7    Okay.  So here, the storage means are -- it's

8    information about items that can be reviewed and sellers

9    that can be reviewed.

10    Okay.  Now we can step forward to B.

11    Associating portions of said information with

12    metadata, said metadata defining a control structure.

13    So the metadata that associates portions of said

14    information -- and it's actually, it's strangely worded

15    because normally you use metadata to define associations.

16    Here, we have to associate data, information with metadata.

17    So ASIN equals does that.  ASIN equals associates metadata

18    with the actual ASIN that follows that.

19    Now, the control structure, this is part of the

20    control structure that defines the processes to be used for

21    transferring the feedback.

22    Q.    So who creates the ASIN equals metadata that you are

23    talking about?

24    A.    Amazon always does that.  The user doesn't create any

25    metadata.

Shamos - cross

1    Q.      So what node in Amazon does that?

2    A.      The Amazon Web server node.

3    Q.      And where does that metadata exist?

4    A.      That metadata is sent to the customer computer.

5    Q.      How?

6    A.      On a Web page.

7    Q.      Which Web page?

8    A.      Whatever Web page.  All of the metadata is

9    constructed by Amazon and is sent to the user in Web pages.

10   The user and his browser, they don't create any Web pages.

11   Q.      No, I understand that.  I'm trying to understand what

12   Web page are you referring to that has this ASIN equals

13   metadata that describes association?

14   A.      So, for example, in the preview of your product Web

15   page -- I'm sorry -- preview your review Web page, ASIN

16   equals is in there.  In the page on which you submit the

17   review, the ASIN equals is there.  It's in several pages.

18                   MR. HADDEN:  Let's go to the next slide, Slide

19   80.

20   BY MR. HADDEN:

21   Q.      In the middle of this claim element, it again

22   requires one or more processes which execute instructions

23   external to said control structure to control communications

24   of said information.

25                   Do you see that?

Shamos - cross

1    A.    Yes.

2    Q.    So what is the control structure here?

3    A.    Method equals, get method equals post.

4    Q.    What is the associated information?

5    A.    So said associated information, here is that.  What

6    we're going to do is we have to control communication of

7    information that has been associated by metadata.  And the

8    information that has been associated by metadata is an ASIN

9    and a review associated with that ASIN.

10   Q.    So that's the reviewer?  The users submitting their

11   review to preview?

12   A.    Yes.  I mean I think this is what -- we're talking

13   about the interaction between the customer browser and Web

14   server when we're talking about product reviews.  This what

15   happens in product reviews.

16              MR. HADDEN:  Go to the next slide, 81.

17   BY MR. HADDEN:

18   Q.    You do have this get exchange element; right?

19   A.    Yes.  This is included in "at least one of."

20   Q.    Right.

21   A.    And metadata includes data exchange and metadata.

22   Q.    And there is, this last part of this, said feedback

23   information, including at least a portion of said

24   information stored at the receiving node.  Do you see that?

25   A.    Yes.

Shamos - cross

1    Q.      Who is the receiving node here?

2    A.      I think I have text on one slide or another here that

3    defines what the receiving node is, and I'm not even going

4    to pretend to try to remember that sitting here.  So let's

5    look at, what, my identification in these slides of the

6    receiving node:  said node, second node, receiving node.

7                   MR. HADDEN:  Can I approach, Your Honor?

8                   THE COURT:  You may.

9                   MR. HADDEN:  So he can have all the slides.

10                  THE WITNESS:  Those are my slides?  I'll be able

11   to find it.

12                  MR. HADDEN:  Sure.

13                  THE WITNESS:  Thank you.

14                  (Documents passed forward.)

15                  THE WITNESS:  So the court construed or, I'm

16   sorry, the parties have agreed on a construction for

17   receiving node with respect to Claim 50.  The agreed

18   construction is, the node that receives metadata in the

19   transferring step.

20                  So transferring said metadata in at least one

21   direction between said node and a second node.  And so,

22   there, the receiving node would be the customer computer.

23   That's the one that has received the metadata.

24   BY MR. HADDEN:

25   Q.      That is a different theory than you had in your

Shamos - cross

1   expert report, isn't it, Dr. Shamos?

2   A.    I don't recall.  I wrote the expert report because

3   there was an agreed construction on receiving node, for one

4   thing.

5              MR. HADDEN:  Can you blow that up?

6   BY MR. HADDEN:

7   Q.    In your expert report, you said that the receiving

8   node was the Web server; right?

9   A.    Yes.

10  Q.    So you had a different set of stored information at

11  the receiving node; right?

12  A.    Oh.  I think the infringement argument works

13  regardless of which one is the receiving node.  It's just

14  that when I wrote this, I didn't understand whether the

15  parties were going to have an agreement what the receiving

16  node is.  And when you have bidirectional communication,

17  it's easy to believe either node can end up being the

18  receiving node because it both sends and receives.

19  Q.    Let's talk a little bit about your back-end theory.

20  A.    Before we do that, considering the amount of water

21  that I have consumed ...

22              THE COURT:  Do you want to take a break?

23              THE WITNESS:  Yes.

24              THE COURT:  All right.  We'll take a 15-minute

25  break.  Be here at 5:00 at 4:00.

Shamos - cross

```
 1              (Jury left courtroom.)

 2              MR. ALBERT:  Your Honor?

 3              THE COURT:  Yes.

 4              MR. ALBERT:  May we hand up an opposition to the

 5    motion Amazon filed?

 6              THE COURT:  Oh, absolutely.  Has it been filed?

 7    Has it been docketed?  Do you know?

 8              MR. ALBERT:  I don't know, Your Honor.  I don't

 9    think so.

10              THE COURT:  All right.

11              (Document passed forward.)

12              MR. ALBERT:  We will make sure that gets done.

13              THE COURT:  Please make sure it gets docketed.

14    If you have two copies, I would appreciate it.

15              MR. ALBERT:  Yes, I do, Your Honor.

16              Thank you.

17              (Brief recess taken.)

18              THE COURT:  Bring in the jury, please.

19              (Jury enters courtroom at 4:10 p.m.)

20              THE COURT:  Please be seated.

21    BY MR. HADDEN:

22    Q.    Hello again, Dr. Shamos.

23    A.    Hi.

24    Q.    I think you still have your book, I hope, Dr. Shamos,

25    if you need to refer to this.  This is Slide 106 from your
```

Shamos - cross

1    presentation this morning on the back-end theory between the

2    web server and the CRS server.  We are kind of deep in the

3    bowels of Claim 50 here.  If you need to refer to something

4    else, feel free.

5            My question is, on this Element [d], you have

6    "receiving said information, including said metadata

7    defining said control structure, from second node," then it

8    continues.

9            My he question is, what is the said information

10   that you believe is being transferred in this step?

11   A.    Okay --

12   Q.    I will give a hint.  I think second node is the web

13   server here.

14   A.    In the first bullet point here it says the web server

15   is said second node.

16           So, in order to -- I will look at the previous

17   slide to figure out what said information is.

18   Q.    Sure.  Actually, the slide set has disappeared.

19   A.    I lied.  I stole them.

20           MR. HADDEN:  Can I approach, Your Honor?

21           THE COURT:  Yes, you may.

22           THE WITNESS:  Well, the preamble of Claim 50,

23   which is on Slide 100, refers to providing storage means for

24   storing information.  And then, later on, various things are

25   done with said information.

Shamos - cross

1          So said information is information that's stored

2    in the storage means.

3          Then there is steps of associating portions of

4    said information with metadata.

5          Then later on there is another phrase, "said

6    associated information," which is different from said

7    information.

8          And then by the time we get down to Step [d],

9    actually, [c](2), also has a reference to at least a portion

10   of said information.  Now, when we are in [d](2), it is

11   receiving said information.

12         I don't think it's logical for receiving said

13   information to be all of the information that's stored at

14   the storage means.  I think that it is -- so the receiving

15   here is the CRS and feedback service, which receive a

16   request from the web server.  And that request from the web

17   server includes metadata, defining control structure, that

18   is, what method to execute in order to responds to the

19   query.

20         And there has to be in that message information

21   that is stored after the storage means, which is at Amazon's

22   web server, which includes, for example, an ASIN number is

23   stored there because it has just been received from a

24   customer requesting information.

25   Q.    But the storage means is the database.  Right?

Shamos - cross

1    A.    Yes.

2    Q.    So you are saying that Amazon pulls an ASIN number

3    out of a database when the server requests a review from the

4    CRS's service?

5    A.    Yes.  So the storage means was construed to be a

6    database.  But there is no further elucidation of what

7    database is.

8          Basically, database is something, a structure

9    into which information can be stored and information can be

10   retrieved.

11         So a database doesn't have to be a formal

12   database management system, for example.  It can consist of

13   a direct restructure on hard disk.  One can even create such

14   a thing in random access memory.

15   Q.    So you think RAM counts as a database?

16   A.    It can if information is stored there.

17   Q.    What specific information from the web server are you

18   saying is the said information?

19   A.    An ASIN.

20   Q.    An ASIN.  Like in the datagram you showed with that

21   request for review by ASIN?

22   A.    Yes.

23   Q.    It is your testimony that comes out of the database?

24   A.    Yes.  It comes out of the storage means.  The storage

25   means has to be a database.  Database is a structure into

Shamos - cross

1  which I can readily store information and retrieve that

2  which I have stored.

3  Q.    So if the web server gets the ASIN from the HTTP that

4  it receives from the user, and never stores it to disk and

5  just creates the datagram that it sends to the CSR's server,

6  your testimony is that it's nonetheless stored in a

7  database?

8  A.    I don't know why not.  I don't think there is

9  anything about the claim that requires it to be persistent.

10  Q.    Let me ask you to turn forward to Slide 109.  Slide

11  109 is about your back-end theory with respect to Claim 109

12  of the '325 patent.

13  A.    Yes.

14  Q.    Claim 109 of the '325 patent, again, has this

15  procedure and consumer concepts.  Right?

16  A.    Yes.

17  Q.    And in your box drawing exercise with respect to

18  Claim 109, you have identified the consumer as Amazon CRS

19  server.  Right?

20  A.    Yes.

21  Q.    So Amazon CRS server is one of these thousands of

22  computers that Amazon operates that are accessible by the

23  web server.  Right?

24  A.    Might be -- well, it might be more than one.  It

25  might be multiple customer reviewers.

Shamos - cross

1    Q.     Who is the consumer that is associated with the CRS

2    server?

3    A.     Well, the consumer isn't a person.  The consumer is

4    the Amazon CRS server.  And the Amazon CRS server has

5    information that it owns about customer reviews.

6    Q.     How is that a consumer?

7    A.     Because it consumes information.  That's what I said

8    earlier to the jury, was how confusing the terminology is in

9    the patent because consumer, in ordinarily parlance, would

10   be considered as somebody who buys something.  But that's

11   not the way that the terms are consistently used in the

12   patent.  There is an information consumer and an information

13   provider.

14          The provider provides information.  The consumer

15   consumes information.

16          So how we designate this is there is no human

17   consumer associated with either of these.  There is just the

18   words provider and consumer as used in the claim.

19   Q.     I think your testimony earlier was that the consumer

20   is the user of the information.  Right?

21   A.     Yes.

22   Q.     How does the CRS server use information?  It just

23   stores it, doesn't it?

24   A.     It stores it for a purpose.  It stores it for the

25   purpose of using it.  It uses it.  It pulls it out.  It

1    sends it off to other places.  It gets information from

2    other places and sticks it into its memory.  It uses

3    information.

4    Q.    Isn't it true that you didn't give any meaning to the

5    word consumer when you came up with this theory?

6    A.    When you say give any meaning to the word consumer --

7    there is meaning to the word consumer.  It is a consumer of

8    information.  That is explained in the specification.

9    Q.    If we can have the depo Clip, 176, 20 to 24.

10                   (Dep clip played as follows.)

11                   "You just told me that you're applying no

12    meaning to the word consumer.  It could just be B.  Right?

13    Isn't that what you just testified?

14                   "Answer:  Yes."

15                   So what you previously testified to was that all

16    of the servers that are accessible to Amazon's web server

17    and you have shown here with green boxes are part of the

18    provider memory.  Right?

19    A.    No --

20    Q.    When you are drawing the boxes for this mapping, you

21    say no, and you have the dotted red lines and say, no, that

22    is consumer memory.  Is that right?

23    A.    No, that is not right.  With respect to what claim

24    did I say that the consumer memory is memory accessible to

25    all a of Amazon's web service.

Shamos - cross

1    Q.      I think you said that with respect to Claim 1109,

2    didn't you, sir?

3    A.      Yes.  But I think we talked about that earlier, which

4    is I get to draw the box where I want to draw the box

5    provided it maps procedurally to the claim.  Now I am

6    drawing the box so that the consumer memory is separate from

7    other memories that are accessible to the servers.

8    Q.      I am just trying to illustrate for the jury, this is

9    the box that you have drawn.  Right?  And you know what is

10   inside the green box?

11   A.      Well, the CRS server has itself databases that it

12   accesses that have the customer reviews.  So I don't

13   actually know -- I didn't draw the slide and I don't know

14   what's meant by what's in green box -- whether this green

15   box is one computer, a computer and a hard disk, whether it

16   is multiple computers, whether it is multi-computers and the

17   databases that store information about the consumer reviews

18   If it's all of that, then, yes, that is within the dotted

19   red line.

20   Q.      Yes.  That's all I am asking.

21   A.      Okay.

22   Q.      Now, in your infringement theory on the web browser/

23   web server for the feedback claims, you focused on the

24   previewing of the review.

25   A.      I didn't focus on it.  We used that as an example,

Shamos - cross

1   because I happened to have the HTML associated with that as

2   part of the exhibits.

3   Q.      But you never actually identified any claim element

4   with the submitting of the review after its preview, did

5   you?

6   A.      Not in my testimony, no.

7   Q.      So if Amazon just got rid of the previewing step and

8   just committed reviews directly to the database and then

9   submitted, you have no opinion whether or not that would

10  infringe these patents, do you?

11  A.      Well, I think it would have to infringe, because the

12  only way in which the review could get into the database

13  would be by the performance of the steps of the claim.  But

14  I would have to go through the mapping.

15  Q.      That is not true, in fact, is it, Dr. Shamos?

16          We know that there is a difference between what

17  is used by the web service when a review is finally

18  submitted and when it's previewed.  When it's finally

19  submitted, the customer ID is included and the review form

20  is a hidden field.  Right?

21  A.      So there is metadata that associates the customer

22  data with the review.

23  Q.      But there is no use of a cookie in that regard to

24  identify the customer.  Right?  So the hidden field is not

25  consumer information, it would be a part of the feedback

Shamos - cross

1  information as the claim requires.  Right?

2  A.    Well, I haven't considered that.  But that doesn't

3  sound right to me, because the hidden field would constitute

4  metadata.  The purpose of the metadata is to associate this

5  particular review with a particular customer.

6  Q.    But you needed the cookies to be part of the feedback

7  information because that's the only thing that is stored on

8  the user's hard drive.  If you used a hidden field, nothing

9  would be stored on the hard drive that is used to submit the

10  review.  Right?

11  A.    Sorry, what limitation has not satisfied that?

12  Q.    The feedback information includes a portion of the

13  consumer information.

14  A.    So I think this may turn one of your arguments

15  around.

16          I think you got me to admit that in every

17  message that is sent from the consumer computer to Amazon,

18  the cookies are included.  So to the extent that cookies

19  hold feedback information, because they identify the

20  information, there they are.

21          Now, it may be that the cookie is ignored and

22  that the information is obtained elsewhere.  But it's sent.

23  Q.    So in Amazon's prior art review system, where cookies

24  were sent with every request, but not used to associate a

25  customer with a review, that would be invalid?

Shamos - cross

1        MR. ABRAHAMSEN:  Your Honor, sidebar, please?

2        (The following took place at sidebar.)

3        MR. ABRAHAMSEN:  He just asked the witness

4    whether the patent would be invalid.  That is outside the

5    scope of the direct.

6        MR. HADDEN:  He just came up with a new theory,

7    that his contrary to his invalidity report.  In his

8    invalidity report, he said the prior art Amazon system

9    didn't meet the claim requirements even if it had cookies

10   because the cookies were not used to associate the customer

11   information.

12       He just said the opposite thing on the stand.

13   That would still be within the claims.

14       He can't have it both ways.  I only went to

15   invalidity because he is coming up with a new infringement

16   theory that is contrary to his expert report on invalidity.

17       MR. ABRAHAMSEN:  Your Honor, this witness will

18   be presented as a rebuttal witness when they present their

19   invalidity case.

20       At that point, they can question the with

21   witness.  This is outside the scope of the direct

22   examination.

23       THE COURT:  I think what you can do is bring out

24   the fact this is inconsistent with -- it is outside the

25   scope.  Unfortunately, he said something, I don't think you

Shamos - cross

1   can explore it long, but just a couple questions, then we

2   can revisit it on invalidity.  I don't want them to get

3   confused.

4            Keep it in a box.

5            (End of sidebar conference.)

6   BY MR. HADDEN:

7   Q.    Dr. Shamos, just to be clear, under the alternative

8   infringement theory you just sketched out that you could

9   have cookies returned that would satisfy the claim element

10  even if they weren't used to identify the customer with your

11  review, if that theory is right, wouldn't Amazon's prior

12  review system, these HTML forms in cookies but didn't use

13  the cookie to associate the customer with the use, also

14  become claims?

15  A.    Two things.  First, I haven't studied Amazon's prior

16  review system except as necessary to remedy rebuttal.  I

17  don't know with what went on there.  I don't know what the

18  content of the cookie was, I don't know whether the cookie

19  had a customer I had or merely a session I had.  I don't

20  know that.

21            The second thing is the theory that we are

22  talking about is the theory I was asked to make up on the

23  fly during my testimony right here.  It is not a proper way

24  to do it.

25            The proper way to do it is to go off and do

Shamos - cross

1   every claim element and do a proper mapping and demonstrate

2   what's what, and I haven't done that, either.

3   Q.     You don't have an opinion one way or the other?

4   A.     I certainly don't know enough about Amazon's prior

5   art system to have an opinion about that.

6   Q.     Do you believe that people would stop shopping at

7   Amazon if they had to make a second click?

8   A.     I wouldn't.

9   Q.     You would?

10  A.     I wouldn't stop shopping at Amazon if I had to make a

11  second click.

12  Q.     Now, we went back and forth a little bit about

13  whether Amazon is controlling users' computers with their

14  communications.  And in Mr. Reed's --

15  A.     You went on about controlling.  You never used the

16  word controlling.  I used the word operating.

17  Q.     In Mr. Reed's, which these communication objects are

18  exchanged and they call home automatically and talk to each

19  other, in that case there is some controlling of the user's

20  computer, isn't there?

21  A.     If an object is received by a computer, and the

22  computer obeys the instructions provided in the object, then

23  whoever has sent the object is operating the computer, yes.

24             MR. HADDEN:  No further questions.  Thank you.

25             THE COURT:  Redirect, Mr. Abrahamsen?

Shamos - redirect

REDIRECT EXAMINATION

1  BY MR. ABRAHAMSEN:

3  Q.    There were just a couple things I think that were

4  taken out of context that I want to clear up.

5        Can you pull up the '710 patent, please.

6        If you could actually blow up where it says

7  705/26.  Do you remember back at the beginning of your

8  cross-examination, when Mr. Hadden drew a box around one of

9  these classes and subclasses and suggested that perhaps the

10 Patent Office thought the invention related only to

11 distributed computing?

12 A.    Yes.

13 Q.    Does the invention, in fact, relate only to

14 distributed computing?

15 A.    No.  I have my own idea about how it got classified.

16 But, no, it certainly doesn't relate only to distributed

17 computing.

18 Q.    Do you know what the class and subclass is that has

19 been highlighted is here?

20 A.    Alas, I don't.  I know 705 is computer class.  But I

21 don't know what Subclass 26 is.

22 Q.    I would like to show you your expert report and see

23 if that refreshes your recollection.

24        MR. ABRAHAMSEN:  May I approach, Your Honor?

25        THE COURT:  You may approach.

Shamos - redirect

1   BY MR. ABRAHAMSEN:

2   Q.    I will draw your attention to Paragraph 18.

3   A.    Yes.

4   Q.    Now, what is the class that's identified by the No.

5   705?

6   A.    I have in here a quote from the Manual of

7   Classification of the U.S. Patent and Trademark Office.  It

8   says that Class 705 relates to "Data Processing:  financial

9   business practice, management or cost/price determination."

10              And Subclass 26 relates to, quote, "Electronic

11   shopping, e.g., remote ordering."

12   Q.    Do you still have the binder that Mr. Hadden gave to

13   you?

14   A.    Yes.

15   Q.    Behind Tab 146, do you remember, Mr. Hadden asked you

16   to read a single sentence from Page 20 of that document.

17   A.    I am not sure if he asked me to read it.  But he read

18   it, and he highlighted it.

19   Q.    And he suggested that something you said during your

20   deposition, he suggested that that sentence was inconsistent

21   with your theory of infringement.  Then he played a portion

22   of your deposition testimony where you said, well, standing

23   alone, no.  Do you remember that?

24   A.    Yes.

25   Q.    Can you tell the jury, does the invention that that

Shamos - redirect

1   sentence was describing on the previous page, Claim 4, is

2   that the same invention that is at issue in any of these

3   patents that Cordance is asserting?

4   A.      No, it isn't.  Page 19, the last paragraph begins,

5   "Claim 14 is an independent method for communicating updated

6   information..."

7                   And the patents that are in suit do not relate

8   to the communication of updated information.

9   Q.      In fact, the patent, the prosecution history that you

10  cited, this patent is not even asserted in this litigation,

11  is it?

12  A.      The patent itself is not, no.

13                  MR. ABRAHAMSEN:  No further questions.

14                  (Witness excused.)

15                  THE COURT:  I would like to have a sidebar with

16  counsel, please.

17                  (The following took place at sidebar.)

18                  THE COURT:  I didn't want to discuss this in

19  front of the jury, and I didn't want them to be taken out

20  and then brought back in.

21                  What do you want to do now at 4:30?

22                  MR. ALBERT:  We have a short number of read-ins,

23  much less than yesterday.  I think it's a total of 20

24  minutes.  If you would prefer we do that the first part of

25  the day, that is fine.

```
 1                THE COURT:  I am going to ask your feeling about

 2    where you think the jury is at today.

 3                MR. PASAHOW:  These are not technical read-ins.

 4    Right.

 5                THE COURT:  How technical are they?

 6                MR. ABRAHAMSEN:  They are non-technical.

 7                MR. PASAHOW:  These are people talking about

 8    historic events.

 9                THE COURT:  This is something that you think we

10    can do.

11                MR. ALBERT:  It is relatively short.

12                THE COURT:  I have been informed by counsel that

13    there are some deposition read-ins, but they are not going

14    to be like the depositions that we had yesterday.

15                I understand the one is for background

16    information, it is not dealing with very, very technical or

17    difficult stuff to understand.

18                So I thought that the additional time that we

19    still have today, we should use some of it to try to see how

20    much we can complete of these depositions.

21                Mr. Abrahamsen, are you going to be leading with

22    this?

23                MR. ABRAHAMSEN:  I don't think I will be doing

24    the read-ins, but I will introduce the witnesses.

25                THE COURT:  Fine.
```

1           (End of sidebar conference.)

2           MR. ABRAHAMSEN:  Members of the jury, at this

3   point, we need to read you the testimony of a few more

4   witnesses by deposition.  This testimony will not involve

5   detailed source code.  This testimony will also be much

6   shorter.

7           The next witness you will hear from is Joel

8   Spiegel.  This testimony is also the deposition, or is a

9   deposition taken in 2001 from the previous lawsuit involving

10  Amazon's 1-click technology.

11          Mr. Spiegel was Amazon's vice president of

12  engineering.  He will describe aspects of the operation and

13  processing of Amazon's 1-click ordering system.

14          Mike Thomas will be playing the roam of the

15  witness, Joel Spiegel.  An associate, Chelsea Loughran will

16  be asking the questions.

17          THE COURT:  Who was questioning the witness?

18          MR. ABRAHAMSEN:  Chelsea.  Oh, the actual

19  attorney?

20          THE COURT:  Not the attorney.  No, no.  What

21  we're talking about, was it an Amazon attorney or not?

22          MR. ALBERT:  Sidebar on this issue?

23          (The following took place at sidebar.)

24          THE COURT:  This is not Cordance.

25          MR. ALBERT:  This was from the prior litigation.

1    THE COURT:  Yes, I know it was.  Did you want to

2    say it was from prior litigation and leave it at that?

3    MR. PASAHOW:  Sooner or later the jury has to be

4    told what the litigation was about.

5    MR. ALBERT:  That is not going to come up in

6    this read-in.

7    THE COURT:  The question I asked, was it

8    Amazon's counsel that was doing this examination?

9    MR. PASAHOW:  I doubt it.  It was a deposition.

10   THE COURT:  I don't know.

11   MR. ABRAHAMSEN:  I think Mr. Hadden was actually

12   defending.

13   MR. PASAHOW:  So it was taken by the Barnes &

14   Noble lawyer.

15   THE COURT:  All right.

16   MR. PASAHOW:  We ought to make that clear.

17   MR. ALBERT:  All we're saying is it's prior

18   litigation.

19   THE COURT:  Do you want to make it clear it was

20   the Barnes & Noble attorney that did it, if they don't have

21   a problem?

22   MR. ALBERT:  I don't see a need to bring up who

23   was involved at that time.  It's just this individual gave

24   prior testimony and he was an Amazon employee, or was at the

25   time in any event.

```
1              MR. ABRAHAMSEN:  Litigation by a competitor.

2              THE COURT:  We can say that.  And we can also

3    say as a result, this is not questioning done by either

4    Cordance or Amazon.

5              MR. ABRAHAMSEN:  Sure.

6              THE COURT:  Because that is one issue the jury

7    did ask about -- whatever depositions were read.

8              MR. PASAHOW:  Right.

9              MR. ALBERT:  Thank you.

10             MR. PASAHOW:  Just so it's clear, this was an

11   adverse attorney that was questioning Mr. Spiegel.

12             THE COURT:  Yes.

13             MR. ALBERT:  We can say that.

14             THE COURT:  That's fine.  That's fine.

15             (End of sidebar conference.)

16             MR. ABRAHAMSEN:  Just to be clear, this

17   litigation was brought by a competitor of Amazon.com and was

18   an adversary in this litigation.

19             THE COURT:  I think the correct statement was

20   this involved litigation with a competitor.

21             MR. ABRAHAMSEN:  Yes.

22             THE COURT:  Of Amazon.com.

23             MR. ALBERT:  Not Cordance.

24             MR. ABRAHAMSEN:  It was not Cordance, correct.

25             MR. PASAHOW:  The litigation having been brought
```

Spiegel - designations

1   by Amazon.

2            THE COURT:  By Amazon, yes.  That was a

3   misstatement.  And my understanding is the questioning that

4   was being done was being done by neither Cordance nor Amazon

5   counsel, it was by opposing counsel in that litigation.

6            Ready?

7            MS. LOUGHRAN:  Ready.

8            (Joel Spiegel deposition designations entered

9   into the record.)

10           "Question:  Good morning, Mr. Spiegel.

11           "Answer:  Good morning.

12           "Question:  Would you please state and spell

13   your name for the record?

14           "Answer:  Joel Spiegel.  That's J-O-E-L,

15   S-P-I-E-G-E-L.

16           "Question:  Could you describe for me again sort

17   of an overview of how your duties changed from March of '99

18   until you retired?

19           "Answer:  So initially I was responsible for

20   managing the group that did all of the website technology

21   development.  Eventually switched over to running, to

22   managing business, a line of business or businesses for

23   Amazon.com.  We did not have accountability for engineering

24   deliverables at that time.

25           "Question:  When did that transition occur?

Spiegel - designations

1        "Answer:  I remember right in the winter of '98

2    to '99.

3        "Question:  Going back to your responsibilities

4    as Vice President of Engineering, could you describe for me

5    in a little more detail what your responsibilities were in

6    that role?

7        "Answer:  We were responsible for, let's see,

8    first of all, developing technologies for customer

9    interfacing, technologies on the website.

10       "Question:  How did the customer facing

11   technologies that you developed affect the appearance of the

12   website?

13       "Answer:  They allowed the website production

14   team to display the look and feel that we at Amazon.com felt

15   wag was the right look and feel, and interaction techniques

16   to the user and allow the user to perform, you know,

17   shopping and buying functions on the site.

18       "Question:  Was it your team that developed that

19   look and feel?

20       "Answer:  No.

21       "Question:  What kind of ordering system did

22   Amazon have in place at the time you began working there?

23       "Answer:  Could you clarify that a little bit?

24       "Question:  What can I add to it that would make

25   it more understandable?

Spiegel - designations

1   "Answer:  There were a variety of ordering

2   systems.  There were systems we used for ordering books,

3   there were systems customers used to order books from us, et

4   cetera.

5   "Question:  I understand.  I'm talking about

6   ones that customers used to order books from Amazon.

7   "Answer:  Again, at the time I joined there was

8   one primary order pipeline at Amazon.com, what we would have

9   called the order pipeline, which was a shopping basket-based

10  pipeline.

11  "Question:  Could you describe how that worked?

12  "Answer:  You know, in the simplest view of it,

13  a customer would put items into a basket.  They would then

14  review the contents of the basket and then go through a

15  remaining set of steps to complete their order in terms of

16  adding any information that was still required to put the

17  order together and confirming the order.

18  "Question:  How long had that order pipeline

19  been in place when you started?

20  "Answer:  It was in place when I started.  I

21  don't know precisely how long it had been in place.

22  "Question:  Did Amazon ever look at other

23  people's websites for ideas to incorporate into its own?

24  "Answer:  I'd say it would more be accurately

25  described that we were looking around trying to see what

Spiegel - designations

1  other people were up to.

2          "Question:  Did you ever see what other people

3  were up to and then act on what you learned to make changes

4  to the Amazon website?

5          "Answer:  I believe we did on occasion.

6          "Question:  Can you give me some examples of

7  that?

8          "Answer:  I'm trying to think.  I think most of

9  those would have surrounded the use of things like

10 collaborative filtering systems and what not.

11         "Question:  Can you be more specific about the

12 collaborative filtering example?

13         "Answer:  Thinking about the fact that you could

14 generate recommendations from people based on what other

15 people had been doing and so on.  In general, I mean, I

16 would say the details of what we did tended to be cutting

17 edge.  So, you know, in detail, we tended to do things on

18 our own, but broadly speaking, we might have looked around

19 and see who was doing generally smart things.  I don't

20 remember much in the way of details.

21         "Question:  Was collaborative filtering

22 implemented on the Amazon site when you were involved?

23         "Answer:  Yes, it was.

24         "Question:  Back to the document.  You mentioned

25 that the second e-mail was a compendium of e-mails?

Hartman - designations

1         "Answer:  It would appear to be the case.

2         "Question:  What are those e-mails about?

3         "Answer:  It would appear that Peri was bringing

4  me up to speed on safety correspondence between himself and

5  customer service or, alternatively, between people in

6  customer service and each other that were sent on to Peri or

7  perhaps at his request.

8         "Question:  Is it fair to say that many, maybe

9  most of those e-mails in that compendium say that the

10  ordering process is too long and complicated?

11         "Answer:  A substantial number of them say it is

12  too long and too complicated."

13         (Joel Spiegel designations end.)

14      MR. ABRAHAMSEN:  The next witness you will hear

15  from is Peri Hartman.  This testimony is also a deposition

16  taken in 2001 from the same previous lawsuit involving

17  Amazon's 1-click system.  He was a software developer for

18  Amazon at the time.  He will describe some of the benefits

19  of 1-click.

20         (Peri Hartman designations entered into record.)

21         "Question:  Good morning, Mr. Hartman.  Would

22  you please state and spell your name for the record.

23         "Answer:  Sure.  Peri Hartman.  P-E-R-I,

24  H-A-R-T-M-A-N.

25         "Question:  Who is your present employer?

Hartman - designations

1            "Answer:  Amazon.com.

2            "Question:  And how long have you been employed

3      by Amazon?

4            "Answer:  I don't know.  Four and-a-half years.

5            "Question:  What is your present position at

6      Amazon?

7            "Answer:  Software developer.

8            "Question:  Have you held any other positions at

9      Amazon?

10           "Answer:  No.

11           "Question:  Do you recall what year you started

12     at Amazon?

13           "Answer:  '97.

14           "Question:  I believe you testified earlier

15     today that when you were talking to customer service before

16     you learned of the 1-click idea, they had mentioned to you

17     that customers complained about the ordering process being

18     too long and complicated; is that correct?

19           "Answer:  Yes.

20           "Question:  Did that suggest to you that the

21     ordering process should be made shorter?

22           "Answer:  Made simpler.

23           "Question:  Fewer clicks?

24           "Answer:  It wasn't clear what the right

25     approach was.  There was a lot of disagreement.

1        "Question:  Do you know if anyone at Amazon,

2    including yourself, looked at other websites for inspiration

3    about how to makes changes to the Amazon Website?

4        "Answer:  In regards to 1-click?

5        "Question:  In regards to anything.

6        "Answer:  In regards to anything?  We are always

7    observing what other websites have.

8        "Question:  Do you act on those observations?

9        "Answer:  I don't do that type of work."

10       (Peri Hartman deposition designations end.)

11       MR. ABRAHAMSEN:  That's all we have for these

12   read-ins, Your Honor.  Our next witness will be live.  Shall

13   we call it a day or ...

14       THE COURT:  All right.  Thank you.

15       Thank you for your assistance.

16       Rather than starting with a new witness, you had

17   a long day today.  You had a lot to absorb.  I think we will

18   end it at this time, and we will begin tomorrow again at

19   9:00 o'clock.

20       Please drive carefully.  And, again, please keep

21   my admonition in mind not to read or look at anything

22   concerning this case.  Thank you.

23       (Jury left courtroom.)

24       THE COURT:  Please be seated.

25       What time do you think you will need to start

1    tomorrow?  Obviously, we need to address -- at the very

2    least, the very minimum, we need to address the issue that

3    was raised by Amazon, since you are going to be calling, as

4    I understand, Cordance will be calling their damages expert

5    tomorrow.  Is that correct?

6             MR. ALBERT:  Yes, Your Honor.

7             THE COURT:  In addition to your damages expert,

8    is there any other evidence that you will be presenting at

9    that time?

10            MR. ALBERT:  We will have one more set of read-ins.

11   They're short, and they are three separate portions of

12   deposition testimony, but all together, they don't add up to

13   much more than probably 30 minutes or so, I think.

14            THE COURT:  Now, do you plan to do those first

15   or after you present your damages expert?

16            MR. ALBERT:  After.

17            THE COURT:  Thank you.

18            So what time do we want to begin, counsel?

19   8:15, around that time, to make sure you have enough time to

20   present the arguments?

21            MR. PASAHOW:  That sounds appropriate.

22            THE COURT:  Now, are there going to be any other

23   surprises before tomorrow?  I know there is another issue

24   out there that Cordance has brought.

25            MR. ALBERT:  I'm not aware of any other issues.

```
 1    That's the motion -- Your Honor has two motions.

 2              THE COURT:  I have two motions:  one that was

 3    brought by Amazon that needs my more immediate attention

 4    because it deals with your damages expert.  I'm aware that

 5    Cordance has also brought a motion on the issue of a

 6    gentlemen whose last name --

 7              MR. ALBERT:  Mr. Kulfan.  And that I think is

 8    less urgent.

 9              THE COURT:  Less urgent.  I don't know.  Well,

10    unless, of course --

11              MR. ALBERT:  Unless they -- actually, it may not

12    be because I believe some of the testimony they've

13    designated for Friday may not be at issue; is that correct?

14              THE COURT:  Will you explain?

15              MR. ABRAHAMSEN:  Actually, yes.

16              MR. ALBERT:  I don't know.

17              MR. PASAHOW:  I'm sorry.  I didn't hear.

18              MR. ALBERT:  I think Her Honor is asking whether

19    the Kulfan issue comes up tomorrow.

20              MR. PASAHOW:  It could.  Yes, Your Honor.  We'll

21    be putting on a witness who will be talking about that code.

22              THE COURT:  That witness will be talking about

23    what?

24              MR. PASAHOW:  The 1996 code which is

25    authenticated by this declaration.
```

1    THE COURT:  So that witness will be relying on

2  this gentlemen's authentication to be able to testify?

3    MR. PASAHOW:  That is our preferred way to

4  handle it, yes.

5    THE COURT:  And I think Cordance opposes that

6  this gentlemen's declaration from getting in or, in the

7  alternative, give us enough time to be able to do the

8  deposition.

9    MR. ALBERT:  Yes, Your Honor.  Either one.

10    THE COURT:  So, yes, it's going to be a more

11  immediate issue.  I'll have to deal with it now, so 8:00

12  o'clock.

13    MR. ALBERT:  8:00 o'clock?

14    THE COURT:  8:00 o'clock.  I'll need the

15  additional time.

16    Is there anything else I need to address?  And,

17  counsel, I want to remind you to check with Mr. Looby on the

18  time you have been using.

19    MR. ALBERT:  We are, Your Honor.

20    THE COURT:  He gives me a record every night.

21    MR. PASAHOW:  We get it as well.  Thank you,

22  Your Honor.

23    THE COURT:  All right.  If there is nothing

24  further, we're adjourned for today.

25    (Proceedings adjourn at 4:50 p.m.)