1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                         - - -

CORDANCE CORPORATION,

4                                  :     CIVIL ACTION
             Plaintiff,            :

5    v                             :
                                   :

6    AMAZON.COM,                   :
                                   :     NO. 06-491 (MPT)

7            Defendant.
                          - - -

8

9                    Wilmington, Delaware
             Monday, August 10, 2009 at 9:00 a.m.
                        *VOLUME F*

10
                          - - -

11

     BEFORE:  HONORABLE **MARY PAT THYNGE**, U.S. MAGISTRATE JUDGE,

12                                      and a jury
                          - - -

13   APPEARANCES:

14

             ASHBY & GEDDES, P.A.

15           BY:  JOHN G. DAY, ESQ.

16               and

17           WOLF GREENFIELD & SACKS, P.C.
             BY:  MICHAEL C. ALBERT, ESQ.,

18               ROBERT M. ABRAHAMSEN, ESQ.,
                 JEFFREY C. O'NEILL, ESQ., and

19               CHELSEA A. LOUGHRAN, ESQ.
                 (Boston, Massachusetts)

20
                     Counsel for Cordance Corporation

21

22           POTTER ANDERSON & CORROON, LLP
             BY:  RICHARD L. HORWITZ, ESQ.

23               and

24

25   Renee Ewing                    Brian P. Gaffigan
     Certified Realtime Reporter    Registered Merit Reporter

1   APPEARANCES: (Continued)

2

3                FENWICK & WEST, LLP
                 BY:  LYNN H. PASAHOW, ESQ.,
4                     J. DAVID HADDEN, ESQ.,
                      DARREN E. DONNELLY, ESQ.,
5                     SAINA S. SHAMILOV, ESQ., and
                      RYAN J. MARTON, ESQ.
6                     (Mountain View, California)

7                        Counsel for Amazon.com

8

9

10

11                          - oOo -

12                   P R O C E E D I N G S

13           (REPORTER'S NOTE:  The following proceedings

14   were held in open court, beginning at 9:00 a.m.)

15           THE COURT:  Please be seated.

16           What were Amazon's plans today regarding the

17   witnesses that they intended to call?

18           MR. PASAHOW:  This morning we'll finish up with

19   Mr. Davis first thing, the cross-examination.  And our next

20   witness is Dr. Vaughn, followed by Mr. Sitar, followed by

21   Mr. Haskin-Fernald.

22           THE COURT:  All right.  So we can get to him

23   later in the day in light of the motion that has been filed;

24   correct?

25           MR. PASAHOW:  Yes, Your Honor.

1    THE COURT:  So we'll deal with his concerns

2    later on.

3    And is it Amazon's plan to file a written

4    response to either of the motions that were filed today by

5    Cordance?

6    MR. PASAHOW:  As to the motion regarding Dr.

7    Alvisi, yes, we would like to file a written response, Your

8    Honor.

9    THE COURT:  And when was it planned for his

10   testimony to occur?

11   MR. PASAHOW:  His testimony will occupy much of

12   tomorrow, I believe.

13   THE COURT:  All right.

14   MR. PASAHOW:  So if we could file that this

15   evening?

16   THE COURT:  We are going to hopefully start off

17   with him tomorrow morning?

18   MR. PASAHOW:  Either him or some deposition

19   testimony, depending how far we get today.

20   THE COURT:  I think we need to address this, and

21   we'll probably need to address it tomorrow morning.  I'll

22   need it by 6:00 o'clock.

23   MR. PASAHOW:  Thank you, Your Honor.

24   THE COURT:  Is counsel ready to proceed

25   otherwise, recognizing that we still have two motions

1    outstanding?  Is counsel ready to proceed?

2                    MR. ALBERT:  Yes, Your Honor.

3                    MR. PASAHOW:  I'm sorry, Your Honor?

4                    THE COURT:  I just asked, recognizing that we

5    have two motions outstanding, is counsel ready to proceed?

6                    MR. PASAHOW:  Yes, Your Honor.

7                    THE COURT:  Let's bring in the jury, please.

8                    (Jury returned.)

9                    THE COURT:  Please be seated.

10                   Good morning to you.

11                   THE JURORS:  Good morning.

12                   THE COURT:  I hope all of you had a pleasant

13   weekend and didn't lose your electricity as a result of the

14   storms.

15                   Is Mr. Davis here?

16                   MR. PASAHOW:  Yes, Your Honor.

17                   THE COURT:  Mr. Davis, come forward and please

18   retake the stand.

19                   (Mr. Paul Davis resumes the witness stand.)

20                   THE COURT:  And, Mr. Davis, I just want to

21   remind you that you remain under oath.

22                   Mr. O'Neill.

23                   MR. O'NEILL:  Thank you, Your Honor.

24                   May I approach Mr. Davis, Your Honor?

25                   THE COURT:  Yes, you may.

Davis - cross

1    (Documents passed out.)

2    CROSS-EXAMINATION

3    BY MR. O'NEILL:

4    Q.    Good morning, Mr. Davis.

5    A.    Good morning.

6    Q.    Last Friday, you explained the operation of Amazon's

7    shopping cart system as it existed in 1996.  And I'd like to

8    ask you some additional questions about your testimony on

9    Friday.

10   Could I please have PD-1?

11   BY MR. O'NEILL:

12   Q.    Is this a slide that you referred to on Friday

13   explaining the operation of the Amazon shopping cart system?

14   A.    Yes, I believe it is.

15   Q.    Now, there are several steps that occurred before a

16   customer arrived at this Web page; isn't that right?

17   A.    That's correct.

18   Q.    For example, before purchasing a book, a customer

19   would have to get information about a book that the customer

20   was interested in purchasing?

21   A.    They would need to view the detail page for them.

22   They would need to view the detail page for that book, yes.

23   Q.    And for the customer to be able to view the detail

24   page, Amazon would have to send the detail page to the

25   customer; is that right?

Davis - cross

1   A.    That's correct.

2   Q.    And if the customer wanted to purchase the book, the

3   customer could then add the book to the shopping cart?

4   A.    Yes, that's correct.

5   Q.    And after the customer adds the book to the shopping

6   cart, Amazon would send a new Web page to the customer?

7   A.    Yes, that's correct.

8   Q.    Then to purchase the book, the customer could then

9   click on a button that would start the checkout process; is

10  that right?

11  A.    I don't recall whether or not it was a button or

12  regular text link, but there would be some entity on the

13  page that they could click and that would begin the checkout

14  process, yes.

15  Q.    And after all these steps that we've just described,

16  the customer would then see a screen like the one we have

17  here?

18  A.    Yes, they would see a screen that was substantially

19  similar to the one that we're looking.

20              MR. O'NEILL:  Can we show PD-1A?

21  BY MR. O'NEILL:

22  Q.    So this is the same screen but we've highlighted a

23  portion of the screen.  As you can see here, Amazon allowed

24  a customer to make a purchase with a credit card; is that

25  right?

Davis - cross

1    A.      Yes, that's correct.

2              MR. O'NEILL:  Can we get PD-1E?

3    BY MR. O'NEILL:

4    Q.      And this is also the same screen but instead we've

5    highlighted this button at the bottom of the screen, so to

6    continue with this purchase, the customer would have to

7    click this button; is that right?

8    A.      I believe that is correct, yes.

9    Q.      And after the customer clicked on this button, the

10   customer would see a new screen where the customer would be

11   able to specify the shipping address for the order; is that

12   right?

13   A.      I don't recall precisely on which page that would be,

14   that would be being collected, but in light of the way that

15   I have described the process previously, yes, I believed on

16   the next page that they would see, that's where they would

17   have an opportunity to enter a shipping address or enter an

18   existing shipping address.

19             MR. O'NEILL:  Can we show the finalizing of the

20   order, please?

21   BY MR. O'NEILL:

22   Q.      And the screen where the customer entered a shipping

23   address, would it look something like this?

24   A.      This is a part of the page that they would have seen.

25   I'm not sure that you could say it's even a majority of the

1336

Davis - cross

1   page but it's what the beginning of the page would have

2   looked like, yes, subject to the substitutions of the

3   various parameters that we see here that I described during

4   my testimony on Friday.

5   Q.     And on this screen, the customer could enter a

6   shipping address, perhaps modify a shipping address that is

7   already on the page and then the customer would clock on

8   another button to go to the next step; is that correct?

9   A.     That's correct.  There would be other -- there would

10  be other possible actions that they could also carry out on

11  this page in addition to the shipping information.  But,

12  yes, once they were done carrying out the verification, the

13  information, they would have clicked another button and

14  would have moved on to a third page.

15  Q.     And after clicking this button, the customer would

16  see a new screen where the customer would confirm the order;

17  is that correct?

18  A.     Yes, that's correct.

19             MR. O'NEILL:  Can we show submitting the order?

20  BY MR. O'NEILL:

21  Q.     And that next screen would look something like this;

22  is that right?

23  A.     Again, this is one part of the page that they would

24  have seen.  So this accurately represents part of what they

25  would have looked at, I believe, yes.

Davis - cross

1   Q.     And then the button that we see, it says, "Press this

2   to submit your order."  The customer would click on that

3   button to submit the order to Amazon?

4   A.     Yes, that's correct.

5             MR. O'NEILL:  Can I get the Amazon 1996 shopping

6   cart?

7   BY MR. O'NEILL:

8   Q.     So, Mr. Davis, this is something that I created to

9   summarize the steps that you have just been describing to

10  get a clear picture of what they are.  So on the left side,

11  we have a customer who could be shopping at Amazon; and on

12  the right side, we have a computer that represents Amazon.

13  Let's go through this to make sure I've accurately

14  represented the steps of the process.

15            So, first of all, Amazon would send information

16  about a book to a customer; is that right?

17  A.     I would have said the first step would actually have

18  been the customer would request information about the book.

19  Yes.  Subsequent to that, Amazon would send information

20  about the book to the customer.

21  Q.     Sure.  And the next step is if the customer wanted to

22  purchase the book, the customer could add the book to his or

23  her shopping cart?

24  A.     Yes, that's correct.

25  Q.     And in response to that, Amazon would send another

Davis - cross

1   Web page to the customer?

2   A.   Yes, that's correct.

3   Q.   And if the customer decided that they wanted to

4   purchase the book that was in the shopping cart, they could

5   click on a button or a link to start the checkout process?

6   A.   Um-hmm.  That's correct.

7   Q.   And in response to that, Amazon would send another

8   Web page to the customer?

9   A.   Yes, they would.

10  Q.   And that Web page, that customer could specify the

11  payment method such as a credit card number?

12  A.   Yes, that was one of the actions that they could take

13  on their page.

14  Q.   And in response to that, Amazon would send another

15  Web page to the customer?

16  A.   Yes, that's correct.

17  Q.   And on this Web page, the customer could specify his

18  or her shipping address?

19  A.   That's correct.

20  Q.   And in response, Amazon would send another Web page

21  back to the customer?

22  A.   Yes.

23  Q.   And on that final Web page, the customer would

24  provide a final confirmation that they were ready to make

25  that purchase?

Davis - cross

1    A.      Yes, that's correct.

2    Q.      So on this slide we have here, do we have five

3    separate actions by the customer in making the purchase?

4    A.      I can see five exchanges that you have identified.  I

5    don't know how you wish to define the action by the customer

6    in terms of mouse clicks or Web pages or what.  I'm not

7    sure.

8    Q.      So this is not a 1-click shopping transaction, is it?

9    A.      No, it is not.

10   Q.      While you were at Amazon, Mr. Davis, did you ever

11   hear anyone discuss the idea of 1-click shopping?

12   A.      There were discussions of ways of how to streamline

13   the checkout process.  There was no discussion of anything

14   called 1-click.

15   Q.      I'd like to get more of an explanation of what

16   happens at Amazon after that final confirmation click.

17            So after that final step, if a customer paid

18   with a credit card, would Amazon check to see if the credit

19   card was valid?

20   A.      Yes, they would.

21   Q.      And was the first step of checking the validity of

22   the computer card, would a computer on Amazon's website

23   write information about orders that had been received from

24   customers to a floppy disk?

25   A.      In response to the request of an Amazon employee,

Davis - cross

1    yes, that would be the first step in that authorization

2    process.

3    Q.     And this information that was written to a floppy

4    disk, that did not include any actual credit card numbers,

5    did it?

6    A.     That's correct.

7    Q.     And then an Amazon employee would physically take

8    that floppy disk from that first computer and walk it over

9    to the second computer?

10   A.     Yes, that's correct.

11   Q.     Now, the second computer had access to credit card

12   numbers; is that right?

13   A.     Yes, it did.

14   Q.     And the second computer would read the information

15   from the floppy disk and then add the credit card numbers to

16   the orders on the floppy disk; is that right?

17   A.     Not precisely.  It would read the credit card

18   identifiers that were on the floppy disk and would generate

19   a new file.  That file does not have any reference to any

20   orders in it.  It's simply a file that can be used to try to

21   establish the validity of the credit card numbers.

22   Q.     So that file would include actual credit card

23   numbers?

24   A.     Yes, it would.

25   Q.     And then would a person take that floppy disk and

Davis - cross

1    carry it over to a third computer at Amazon?

2    A.    Yes, that's correct.

3    Q.    And was the third computer able to contact credit

4    card companies to determine if the credit card numbers were

5    valid?

6    A.    Yes, it was.

7    Q.    And would the third computer read the credit card

8    numbers on the floppy disk to check the validity of the

9    credit card numbers and write back to a floppy disk

10   information indicating whether or not the credit card

11   numbers were valid?

12   A.    Yes, that's correct.

13   Q.    And then would a person physically carry that floppy

14   disk over to a fourth computer at Amazon?

15   A.    They would carry it over to another computer that may

16   have been.  There may have been a fourth computer or may

17   have been the same as the first computer in your diagram.

18   Q.    And the fourth computer would read the information

19   from the floppy disk and store Amazon's computers whether or

20   not each order had a valid credit card number?

21   A.    Yes, it would.

22   Q.    So this process is how the Amazon 1996 shopping cart

23   system validated credit cards?

24   A.    Certainly at the beginning of 1996.  You will recall

25   from my testimony that I left Amazon in March of that year.

Davis - cross

1    And certainly that was how it operated up until that time of

2    my departure.

3    Q.    Mr. Davis, I'd like to move on to the Amazon customer

4    review system that you described as it existed in 1996 on

5    Friday.

6              Can I get PD-2?

7              Is this the slide that you referred to on Friday

8    in explaining Amazon's customer review system?

9    A.    Yes, it is.

10   Q.    And you explained previously that this slide shows a

11   form that allows a customer to enter a review of a book?

12   A.    Yes, that's correct.

13   Q.    Can I get PD-2d?

14             And you explained that, as part of this, a

15   customer would rate a book on a scale of one to 10?

16   A.    Yes.  That's correct.

17   Q.    PD-2e.

18             And you also explained that the customer would

19   enter written text describing what the customer thought of

20   the book?

21   A.    Yes, that's correct.

22   Q.    PD-2f.

23             And you also explained that the customer was

24   allowed to enter an e-mail address into the form?

25   A.    Yes.  That's also correct.

Davis - cross

1    Q.      So, the step of entering an e-mail address into the

2    form was optional, wasn't it?

3    A.      Yes.  As -- and as you can see indicated by the text

4    on the page.

5    Q.      And the e-mail address was the only way Amazon could

6    identify the customer who was entering the review?

7    A.      Yes.  That's correct.

8    Q.      So, if the customer did not enter an e-mail address,

9    Amazon would not know who entered the review?

10   A.      We actually might know at the time that the review

11   was entered who the customer was if they previously -- if

12   they had previously identified themselves.  But it's true

13   that when the review was actually stored, there would be no

14   identifying information that was stored with it if they did

15   not provide their e-mail address.

16   Q.      And, similarly, if the customer had entered his

17   e-mail address incorrectly, Amazon also would not know who

18   had entered the review?

19   A.      Yes.  That's correct.

20   Q.      And if the customer entered someone else's e-mail

21   address, then Amazon might have the wrong author for the

22   review?

23   A.      Yes.  That's also correct.

24   Q.      So I'd like to change the subject and ask you about

25   Web cookies.

Davis - cross

1       You testified a little bit about cookies on

2   Friday; is that right?

3   A.      Yes, I did.

4   Q.      First of all, what is a "cookie"?

5   A.      I could describe it in -- on two levels.  In terms of

6   what it's used for and intended to be for, it's a piece of

7   information that the Web server sends to a user's Web

8   browser and asks the Web browser to restore it, allowing the

9   Web server in the future to ask the user's Web browser to

10  look that information up again and hand it back to the

11  server.  Obviously, there is a wide range of uses that you

12  might put that small piece of information to.  The

13  definition of a "cookie" doesn't actually tell you what

14  information it's for or what it's about.

15          Practically speaking, the cookies, in general,

16  are stored in a file on the user computer that is accessed

17  and modified by their Web browser.

18  Q.      While you worked at Amazon, Amazon never used

19  cookies; is that right?

20  A.      Yes.  That's correct.

21  Q.      But Amazon uses cookies on its website now?

22  A.      I believe they do, yes.

23  Q.      Do you know when Amazon started using cookies on its

24  website?

25  A.      No, I do not.

Davis - cross

1   Q.     Why did Amazon not use cookies on its website at the

2   time you were an employee of Amazon?

3   A.     I believe I addressed this in my testimony on Friday.

4   Cookies had only been introduced fairly close to the time

5   that I started working for Amazon and there was a

6   significant amount of disquiet and unease among the early

7   Web community about what this technology represented,

8   whether it was a possible security problem, whether there

9   were -- whether there were privacy issues and so on and so

10  forth, and that general level of unease that we were aware

11  of made us unwilling to actually base the functionality of

12  the store on that technology at that time.

13  Q.     Can I get Exhibit D4.

14         So, Mr. Davis, is this an e-mail that you sent

15  in 1997 to an Amazon employee?

16  A.     Yes, it is.

17  Q.     And the subject of that e-mail is "1 click"?

18  A.     Yes, it is.

19  Q.     And this is after you were no longer employed by

20  Amazon?

21  A.     That's correct.

22  Q.     Let's highlight the first paragraph.

23         So, in the first paragraph, you stated,

24  "Somewhat disappointed to see this feature" -- which is

25  1-click -- "rely, or be made to appear to rely, on cookies";

Davis - cross

1   is that right?

2   A.      Yes.  That's what it says.

3   Q.      At that time, did you personally believe that cookies

4   were an invasion of privacy?

5   A.      At that time, I still had -- had reservations about

6   using cookies on websites, yes.

7   Q.      And you were uncomfortable at that time with a

8   company like Amazon putting cookies on your computer?

9   A.      Yes.  At that time, I -- I was uncomfortable with

10  that idea.

11  Q.      Mr. Davis, you have been developing software for a

12  long time; is that right?

13  A.      I would say that's correct, yeah.

14  Q.      Can I get Exhibit D6.

15          Is this a copy of your resume?

16  A.      It's a copy of my resume as it existed at some point

17  in the past, yes.  It's not totally current.

18  Q.      Would you turn to page 3 and highlight the bottom

19  portion of the page.

20          So, in December of 1987, you were working for

21  Schlumberger Cambridge Research?

22  A.      Yes, I was.

23  Q.      Were you developing software at that time?

24  A.      I was certainly writing software.  The company is not

25  involved in production of software, or the software that I

Davis - cross

1    worked on would have been used internally, but, yes, I was

2    writing software at this time.

3    Q.    So have you been developing software for at least the

4    last 22 years?

5    A.    Yes, that's correct.

6    Q.    Can you turn to page 2 and highlight the top part of

7    the page.

8              So, Mr. Davis, you started working for Amazon in

9    November 1994?

10   A.    Yes, that's correct.

11   Q.    And you left Amazon in March 1996?

12   A.    Yes, that's correct.

13   Q.    So you didn't work for Amazon for a very long time,

14   did you?

15   A.    No, I did not.

16   Q.    Was it about one year and four months?

17   A.    Yes, it was.

18   Q.    And for at least part of this time, were you working

19   only three days per week?

20   A.    Yes.  That's correct.

21   Q.    And you stopped working for Amazon about 13 years

22   ago?

23   A.    Yes, about 13 years ago.

24   Q.    PD-1.

25             Now, Mr. Davis, on Friday and again this

Davis - cross

1   morning, you explained the operation of the Amazon website

2   using these slides.  And on Friday, you explained that these

3   slides are not actual screen shots of the Amazon website as

4   it existed in 1996; is that right?

5   A.    That's correct.  It's very hard to imagine how there

6   could be any screen shots in existence off a website for

7   that time.

8   Q.    And these slides were created from something you

9   called a "template"?

10  A.    Yes, that's correct.

11  Q.    Can I get PD-1b.

12        For example, it's sort of hard to see in this

13  picture, but in the "my e-mail address is" box, there is

14  some funny symbols in there.  And you explained on Friday

15  that those symbols would be replaced with the actual e-mail

16  address of the customer?

17  A.    If Amazon had that on file, yes, they would replace

18  it with that information.

19  Q.    And these templates are part of Amazon's source code;

20  is that right?

21  A.    I don't think there is a -- I don't think there is a

22  clear answer to that question.  You need to define "source

23  code" first.

24  Q.    These templates are stored in the same file structure

25  as Amazon source code?

Davis - cross

1    A.    They were present on the same disk and they would

2    have been -- they were present on the same disk on the same

3    computer, yes.

4    Q.    And you also explained on Friday that the templates

5    that were used to create these slides were from Exhibit DTX

6    1618?

7    A.    I believe that refers to the 1996 CD, and if so,

8    that's correct.

9    Q.    Amazon told you that the source code in DTX 1618 is

10   dated June 1996?

11   A.    Yes, they did.

12   Q.    You have not independently verified the date of the

13   source code; is that right?

14   A.    I don't believe there would be any way to do that

15   that would be accessible to me.

16   Q.    Now, you stopped working for Amazon in March 1996?

17   A.    Yes, that's correct.

18   Q.    And that was three months before the date of the

19   June 1996 source code?

20   A.    Yes, that's correct.

21   Q.    So you never saw the June 1996 source code while you

22   were an Amazon employee?

23   A.    I would never have seen the exact state of the source

24   code in June of 1996 while I was an employee.  But I would

25   have every reason to -- to believe, based on both my

Davis - cross

1    experience at Amazon prior to my departure on screen shots

2    and other evidence that I have presented, that the system

3    did not change in any really substantive way between my

4    departure and June of 1996.

5    Q.    So the first time that you saw the June 1996 source

6    code was this year?

7    A.    Yes.  Well, the first time since my -- oh, no.  I am

8    sorry, for June of 1996, yes, that would have been the first

9    time that I saw the source code in the state that it was in

10   in 1996, in June of 1996.

11   Q.    And that was after Amazon asked you to assist in this

12   litigation?

13   A.    Yes.  That's correct.

14   Q.    And outside of what Amazon's counsel told you, you

15   don't know the date of the source code?

16   A.    Both Amazon's counsel and an Amazon employee, yes.

17   Q.    And you don't know where and how Amazon found this

18   code that is now 13 years old?

19   A.    I have had the process by which it was retrieved

20   described to me, and I find that process, the description of

21   that process to be utterly credible.

22   Q.    And your basis for that belief is a phone call that

23   you had earlier this year?

24   A.    Yes.  That's correct.

25   Q.    And during this phone call, you talked to several

Davis - cross

1   people?

2   A.      There was several people on the line at that time.

3   The conversation was primarily with one person.

4   Q.      And you are not really sure who was on the phone at

5   that time; is that right?

6   A.      That's correct.  I do not have any precise

7   recollection -- the precise recollection of who participated

8   in that conference call.

9   Q.      You don't know if this June 1996 source code was ever

10  used to run the Amazon.com website, do you?

11  A.      I haven't -- I have no reason to believe that what

12  was presented to me was anything other than what was used to

13  run the website in June of 1996.

14  Q.      Do you have, other than what someone told you, do you

15  have any independent knowledge that the 1996 source code was

16  ever used to operate the Amazon.com website?

17  A.      I know that the source code that I was presented with

18  looks substantively the same as the source code that was

19  used to operate in March of 1996.  There is certainly no way

20  for me to establish whether anything radical or dramatic

21  happened between March and June of 1996, but that seems,

22  frankly, extremely unlikely to me.

23  Q.      If something was added to that source code after you

24  left, you wouldn't know if that was ever in use on the

25  Amazon.com website, would you?

Davis - redirect

1    A.      That's correct.  I would have no way to verify that.

2    Q.      Mr. Davis, while you were an Amazon employee, did you

3    receive or purchase any Amazon stock?

4    A.      Yes, I did.

5    Q.      Have you sold most of the stock?

6    A.      Yes.  As I outlined on Friday, I have a small amount

7    left that, the last time I checked, was worth about $1,000.

8    Q.      What was the value of the stock when you sold it?

9    A.      It was sold over quite an extended period of time, so

10   I am not quite sure what your question is referring to.

11   Q.      What would be about the total value that you received

12   from selling this Amazon stock?

13   A.      Somewhere on the order of $ and-a-half million.

14           MR. O'NEILL:  I have no further questions.

15   Thank you.

16           THE COURT:  Any redirect?

17           MR. PASAHOW:  Yes.  Just a few questions, Your

18   Honor.

19           THE COURT:  You may proceed.

20                   REDIRECT EXAMINATION

21   BY MR. PASAHOW:

22   Q.      Good morning.

23   A.      Good morning.

24   Q.      You were asked about the process of making a purchase

25   at Amazon that went through a series of interactions the

Davis - redirect

1 customer would have.  And then I believe you said at the end

2 there would be a final confirmation click of what was on the

3 screen.  And at that point, what would happen?

4 A.    After you clicked on that button and our Web server

5 received notice they had done so, the contents of their

6 shopping cart would be converted into an order in our

7 system.

8 Q.    And, technically, what was sent from the user's

9 compute to Amazon's computer?  Was that a form?

10 A.    Yes, that was a form.

11 Q.    And was there a command in that form which would

12 cause it to write to the Amazon computer?

13 A.    Like any HTML form, there would have been an action

14 stream present in the form that would have told the Amazon

15 Web server what to do with the information that it was

16 receiving; and what it did with the information was to

17 convert the contents of the shopping cart into an order.

18 Q.    Now, after that went back to Amazon, was there any

19 communication from Amazon back to the customer?  Either a

20 Web page or an e-mail?

21 A.    The customer -- we wouldn't have left the user's Web

22 browser hanging.  They certainly would have had some

23 subsequent follow-up page, the exact contents of which I

24 don't recall.  And I believe that we would have sent them an

25 e-mail -- I'm not sure if -- I don't recollect if there was

Vaughn - direct

1   an e-mail to confirm that they have placed their order.

2   They would certainly receive subsequent e-mails from Amazon

3   indicating one or more stages of the processing of their

4   order.

5   Q.     Now, changing subjects and going to the source code

6   in June of 1996.  Had you written any of that source code

7   that you saw from the June 1996 source code?

8   A.     I had written a very substantial part of it, yes.

9               MR. PASAHOW:  No further questions, Your Honor.

10              THE COURT:  Thank you, Mr. Davis.  You may stand

11  down.

12              (Witness excused.)

13              THE COURT:  And your next witness, please?

14              MR. DONNELLY:  Yes, Your Honor.

15              Your Honor, Amazon calls Dr. Thomas Vaughn.

16              THE COURT:  Dr. Vaughn, please take the stand.

17              THOMAS VAUGHN, placed under oath, was examined

18  and testified as follows:

19              MR. DONNELLY:  May I proceed, Your Honor?

20              THE COURT:  Yes, you may.

21                        DIRECT EXAMINATION

22  BY MR. DONNELLY:

23  Q.     Good morning, Dr. Vaughn.

24  A.     Good morning, Mr. Donnelly.

25  Q.     You are an employee of Amazon.com?

Vaughn - direct

1    A.      Yes, I am.

2    Q.      What is your job title?

3    A.      Senior Manager of Software Development in the

4    Ordering Group.

5    Q.      What does the Ordering Group do?

6    A.      We run a lot of the services for ordering at Amazon:

7    the shopping chart, 1-click and a lot of the processes used

8    when fulfilling orders.

9    Q.      What are your responsibilities?

10   A.      I manage a number of development teams.  So between

11   teams, 23 engineers, two or three teams.  Again, 1-click and

12   the shopping cart.

13   Q.      And when did you start at Amazon.com?

14   A.      I started in November of 2002.

15   Q.      And what were your responsibilities then?

16   A.      I started as a Senior Engineer, Development Engineer

17   on the shopping cart.

18   Q.      And could you explain what the shopping cart was as

19   you were working on?

20   A.      Amazon has two shopping carts.  It's kind of like you

21   go to the grocery store and your browser on the aisles is

22   one shopping cart you use when you are picking stuff up.

23   When you go to check out, there are different shopping cart

24   software there.  I don't know all the reasons why, but that

25   is how it works.  I managed for awhile the shopping cart

Vaughn - direct

1   when you are browsing around on the website.

2   Q.      And did you work on other projects after that?

3   A.      Correct.  I worked in the shopping cart team for

4   about two years, as an engineer and then later manager.

5            Then I managed the customer order work flow

6   team.  This is the process once an order has been placed, it

7   picks it up and pushes it through the process to get it paid

8   for and shipped out to the customer.

9   Q.      Could you describe your educational background,

10  Dr. Vaughn?

11  A.      Sure.  I did my undergraduate degrees at Wright State

12  University (phonetic) in Dayton, Ohio.  A degree in

13  mathematics, and a degree in physics; then went on to the

14  University of Oxford in England.  I did a Ph.D. there in

15  semiconductor physics.

16  Q.      Would you explain about how you came from Oxford to

17  Amazon.com?

18  A.      Sure.  I graduated and finished my thesis defense in

19  early 1996 and went looking for a job in the system

20  semiconductor industry.

21           1996 was not a good year for semiconductors.

22  Nobody was hiring so while I was looking around for jobs, I

23  contracted at Microsoft.  I was doing software engineering

24  programs.  I really enjoyed it so I joined Microsoft

25  full-time in April 1996.

Vaughn - direct

1    Q.     And what did do you after that?

2    A.     I was at Microsoft about three and-a-half years,

3    worked on a couple different teams there as a software

4    engineer.

5           In August of 1999, a friend of Microsoft and I,

6    we left and started our own company, it was the dot com era.

7    We wanted to do a start up.  We worked on it for about a

8    year and-a-half, distributed file technology product.  Great

9    technology, not very good business plan.  So after about a

10   year and-a-half, we folded shop.

11          I went on to another start up in the Seattle

12   area, again doing distributed file system technology.  That

13   was Isilon Systems.  That did a bit better.  I was with them

14   for the first release.  I launched that product, again as a

15   senior software engineer and later manager of some teams

16   there, and then came to Amazon in November of 2002.

17   Q.     And what was Amazon.com like when you started in

18   2002?

19   A.     Still very much in the startup mode.  It was crazy.

20   A lot of projects going on at once.  You know, people

21   running up to you, how do you launch this feature in three

22   months?  How do we do it?  So we did a lot of brainstorming

23   on the features.

24   Q.     And what was the focus of the company during this

25   time period?

Vaughn - direct

1    A.      Well, it was still rowing a lot.  One of the big

2    focuses was increasing product selection.  Amazon was

3    running are awhile, but Jeff really felt like we had to get

4    more products for sale available on the site.

5    Q.      And who was Jeff?  You mentioned that?

6    A.      I'm sorry.  That was Jeff Bezos.

7    Q.      Did you bring something to help us understand what

8    you mean by product selection?

9    A.      Yes, I did.  My presentation.

10   Q.      What are we seeing here, Dr. Vaughn?

11   A.      So this is a chart showing from the early 90s -- or,

12   I'm sorry -- the late 90s through 2004, some of the things

13   we launched.  Again, we're trying to increase product

14   selection so we kept launching stores.  I, myself, the

15   shopping cart team.  And even in the 2002, I helped out with

16   some of the apparel launch, for instance.

17   Q.      How has product selection changed as a factor in

18   e-commerce?

19   A.      Well, I think in the late nineties, Amazon was still

20   getting used to selling the Web to consumers.  Consumers

21   were still getting used to buying on the Web.  So it was a

22   new experience.  So we were trying make it easy for

23   customers, for them to shop on-line.

24           By the 2000s, the customers were used to

25   shopping.  That wasn't as big an issue anymore.  What people

Vaughn - direct

1   really looked for was low prices.  They needed a lot of

2   selection so whatever they were looking for was available

3   there.

4              And they wanted it in stock.  Some of the early

5   days, Amazon was able to say we know about this book.  It

6   will take us five weeks to get it.  Customers had less

7   patience for that.  They wanted products, and they wanted it

8   available immediately.

9   Q.    So was customer satisfaction an important concern?

10  A.    It was a very important concern.  We worked pretty

11  hard on that.

12             There is the American Customer Satisfaction

13  Index.  That is a group that rates different companies

14  across different industries.  They started rating e-commerce

15  in 2000.  And since then, Amazon's been at the top that list

16  five out of the eight years.

17  Q.    And how has Amazon's number of current customers

18  reflected that?

19  A.    Yeah.  The customer base has definitely grown.  This

20  chart is from our data warehouse.  That is the number of

21  active customers, Amazon customers that have placed an order

22  in the last year.  You can see a couple million in the

23  earlier mid 90s.  And now we have almost 100 million active

24  customers worldwide.

25  Q.    Has Amazon in your ordering team had to respond to

Vaughn - direct

1  getting the books and other items that all these customers

2  ordered to them?

3  A.    Yes.  There have been a lot of software changes,

4  going from customer placing order on the website to actually

5  getting fulfilled and all the electronic messages have

6  always been very challenging.  Also to dramatically increase

7  our physical component network.

8  Q.    What are you illustrating here about the fulfillment

9  network?

10  A.    Well, this is a lot of our fulfillment centers in the

11  United States.

12  Q.    And could you explain what a fulfilment center is?

13  A.    Sure.  Those are like big warehouses.  You can

14  imagine, they have a lot of products, giant racks of

15  shelves, sometimes miles of conveyer belt.  This is where we

16  pull the products.  When orders come in, we pick up the

17  orders, put them in boxes and put them on the trucks to get

18  them delivered and deliver it to the customer.

19  Q.    I'm wondering if you could help folks get a sense of

20  shopping on the Amazon.com website, a general feel of

21  working with the site?

22  A.    Sure.

23  Q.    Did you have something in mind you wanted to walk us

24  through?

25  A.    Yes.  I finally just take a common customer

1  experience in the website, browse around on the site, find I

2  think a book, music CD and a toy, add it to the shopping

3  cart and I check out.

4  Q.    So what is the first thing we're going to see?

5  A.    This is the Amazon.com home page.  It's where a lot

6  of people will start when they're browsing on the site.

7  Q.    And what is this callout that we see here?

8  A.    That's a list of a lot of our product categories.

9  So, again, if you are just browsing, that might be a

10  starting point to see what is available to purchase.

11  Q.    And what in each of those categories represents

12  someone shopping on the site?

13  A.    Those are different product groupings.  You can see

14  music, books, home and garden, electronics, toys, apparel.

15  Pretty much anything we have for sale, we try to categorize

16  to make it easy to find.

17  Q.    So if someone is surfing, they can go to one of those

18  if they want to find items in one of those stores?

19  A.    That's correct.

20  Q.    So what if someone wanted to buy a book as you dated?

21  A.    Well, they would start at the book link up there, in

22  a couple different categories.  They would just click right

23  there in the books.

24  Q.    And what are we seeing here, Dr. Vaughn?

25  A.    This is we call a browse page.  A lot of books out

Vaughn - direct

1    there, we try to categorize them, make them easy to find.

2    We're looking for, this is the main browse page for books.

3    On the left, there is a lot of categories of other kinds of

4    books.  But even on this page, we have best books, best

5    sellers, new notables.  So a collection of books even right

6    there.

7    Q.    So, if someone were to just choose a book from this

8    page, what would they do?

9    A.    Sure.  They can click one of those, pick a Dr. Seuss

10   book.  If they click that link, they go to this page, a

11   detail page.

12   Q.    Could you explain what you mean by a "detail page"?

13   A.    Every product in the website has a detail page.  It

14   would give a bunch of product information, information about

15   who is selling it, for which price, that sort of thing.

16   Q.    And what does the customer do if they are interested

17   in hunches in bunches?

18   A.    If they are interested, they might go to the shopping

19   cart.  The "buy" box is that whole form on the right side.

20   There is a bunch of things you can do with it.  For now, we

21   can just add it to the shopping cart.

22   Q.    Then what happens?

23   A.    You will see an Add to Cart page.  On the right-hand

24   side, that blue section, that's a snapshot of the shopping

25   cart.  It shows an item we just added.  And the left side of

Vaughn - direct

1    the page, the bigger white page, those are recommendations

2    based on what they added so we can help the customer find

3    other products.

4    Q.    So if they wanted to go and add one of those music

5    items, what do they do?

6    A.    One thing they could do is go back to the home page,

7    then they can go and navigate to the music tab.

8    Q.    And what are we seeing here?

9    A.    Again, there is a browse note.  There is lots of

10   different kinds of music, so we have categorized it to try

11   to make it easy to find.  Again, that's the left.

12            The navigation page explains the different kind

13   of music to make it easier.  Even here, the navigation

14   browse title, we have a bunch of different titles there,

15   "More to Explore."

16   Q.    And if we wanted to buy one of those CDs?

17   A.    That's right.  We just picked one of those there.

18   Again, we see the detail page for that CD.

19   Q.    And what else do we see on this detail page that we

20   didn't see on the books detail?

21   A.    One thing this one has more buying choices, so there

22   is possible CDs, there is a lot of other options to buy

23   other than this particular CD.

24   Q.    What are those options?

25   A.    Those third-party sellers, so anyone from companies

Vaughn - direct

1   to small, like, mom and pop companies, they can go to the

2   Amazon website, list their version of the CD for sale.

3   Q.    So if we click on that, what are we seeing as you

4   have shown here?

5   A.    We call this the "offer listing page." So this is

6   all those merchants have their offering listed for the CD

7   there with all their prices and information about the copy,

8   if it's a new version or used or collectible version.

9   Q.    So who are those other merchants?

10  A.    It could be anybody, third-party, anybody out there

11  who wants to sell this.

12  Q.    And do they compete with Amazon right on this page?

13  A.    That's correct. They compete directly with us. I

14  think our price for this one was $10.99 and we have some

15  sellers selling it here for $0.01 plus shipping so they can

16  compete directly.

17  Q.    Why does Amazon allow these other merchants to

18  compete with itself?

19  A.    Again, we want to make sure we have customer product

20  selection and we want to make sure we have the lowest price,

21  so no matter what, when customers come to the website, they

22  can find what they are looking for.

23  Q.    What happens if someone buys from one of these

24  merchants?

25  A.    Well, Amazon would guarantee it, it has a guarantee.

Vaughn - direct

1    If anything goes wrong with the purchase, Amazon would

2    refund the customer and we will deal with the merchant

3    ourselves.  Otherwise, if everything goes well, the merchant

4    gets the sale and the customer gets the product from them.

5    Q.    What should we do with this CD?

6    A.    I like Amazon, so I will go back to the detail page

7    and add that one to my shopping cart.

8    Q.    What are we going to do next?

9    A.    We will go look for the toy now, so back to the home

10   page.  Again, we will browse, go to the toy tab.

11   Q.    Is this another one of those category pages we saw?

12   A.    That's right.  It's another browse page and there is

13   lots of different kinds of toys.  So, again, we will just

14   pick a toy right here off the main browse page.

15   Q.    If the customer adds that to their cart, what's going

16   to happen then?

17   A.    Now we are at the add to the cart again.  On the

18   right-hand side, the cart is getting bigger now, it has all

19   three items that we have added.  On the left, we have got

20   more recommendations based on the toy.  But in this case, I

21   think we will go ahead and proceed to checkout with that

22   shopping cart.

23   Q.    So what's the customer do?

24   A.    The first thing we show is a sign in page.  For

25   security, we want the customer to provide their password.

Vaughn - direct

1    Q.      And if they do that?

2    A.      They have entered their password and then click to

3    sign in.

4    Q.      And what are we seeing here?

5    A.      We call this the "single page checkout."  This is a

6    customer we have seen before and they have a filed shipping

7    address, so we are basically able to fill in a bunch of the

8    order for them.  We knew where they are going to ship it to,

9    how they wanted to pay it for, how they wanted it shipped.

10   So we have filled in all that information for them, so all

11   they have to do is look at the order and if they like it,

12   they can confirm from there.

13   Q.      This is a checkout of the user's shopping cart?

14   A.      That's correct.

15   Q.      So if they hit "Place your order," what's going to

16   happen?

17   A.      Well, we will go ahead and place the order and record

18   it in our database that we have this request and show them

19   this thank you page.

20   Q.      Anything else going to happen?

21   A.      At this point, we show the customer, you know, Thank

22   you, and there is ways to go and change the order.  The

23   order hasn't been fulfilled yet because anything could be

24   changed on it, so they can go to your account and cancel

25   items or change ship options, things like that.

Vaughn - direct

1    Q.      Now, on the right-hand side here it says, We will

2    send you an e-mail confirmation shortly.

3            What are those e-mails again?

4    A.      Again, here is an example.  It's the order

5    confirmation e-mail.  It's not a receipt or anything.  It's

6    notifying the customer that we received the order and we are

7    going to start working on it.

8    Q.      And you mentioned earlier that a customer there

9    interested after they placed the order with the shopping

10   cart could go and make changes.  Could you show us how that

11   would work?

12   A.      Yes.  Sure.

13   Q.      So what are we seeing here?

14   A.      So, this is the "in your account" page.  A bunch of

15   links here to go manage your account.  In this case, the

16   customer will go ahead and view the recent orders and look

17   at that order that they just placed.

18   Q.      What are we seeing here?

19   A.      This is the main page to edit an order.  You can

20   change anything here, from shipping address, payment method,

21   gift options, or cancel items.

22   Q.      So if the user wanted to change, say, where it's

23   going to, they could do it through this page?

24   A.      That's right.  Click that button, we show all the

25   addresses that we have on file for them, they can go pick

Vaughn - direct

1   one, and use that one instead.

2   Q.    What else can they do from this change the order

3   page?

4   A.    Yeah.  Pretty much everything in the order is

5   editable at this point.  I think in this case, we will go

6   ahead and cancel the items.

7   Q.    So, if the user cancels then, they just don't get

8   placed?

9   A.    That's correct.  In this case, we cancelled all the

10  items, so nothing gets fulfilled, and there is nothing else

11  in the order, so the order is cancelled.

12  Q.    Now, we saw that e-mail that would go to the

13  customer.  And if they didn't go through what you just

14  showed us and cancelling the order, would that be the end of

15  the process?

16  A.    No.  At that point, once an order has been placed in

17  the website, the real work is just beginning.

18  Q.    Can you give us an overview of the overall steps for

19  the ordering process?

20  A.    Sure.  There is a long train of things that happen to

21  get orders completed.  We just walk through some of the

22  website steps as the customer experienced in the website

23  actually ordering.  Once we have that order placed, then

24  there is a bunch of other steps that happen to figure out

25  how we are going to ship it to them, which fulfillment

Vaughn - direct

1   center we will ship from, actual physical transportation,

2   which truck or sort of delivery method we will use, and then

3   how it's going to be paid for.

4   Q.    Can you explain what we are going to see when we walk

5   through what you have here shown as the "Website"?

6   A.    Sure.  We did one, like, high level screen shot view

7   that the customer sees browsing through.  I figured we had

8   do another example looking a little bit deeper between

9   client and the server when you are browsing the website.

10  Q.    You mentioned the client and the server.  Can you

11  explain what you meant in showing here?

12  A.    Sure.  By "client," I meant the customer's Web

13  browser, that's there in the left.  And then by a "server,"

14  I meant our Web servers and other systems in Amazon in our

15  data center and that's represented on the left-hand side.

16  Q.    And is this a simplified representation?

17  A.    There is very much simplified.  There is a lot of

18  software services and layers at Amazon, but this is, of this

19  presentation, yeah, we are just focusing on the Web server

20  interaction.

21  Q.    So what happens first?

22  A.    Well, in this case, the customer is at the detail

23  page and they will go ahead and add this item to their

24  shopping cart.  So that results in the standard form post, a

25  standard issued protocol, so as part of the request, the

Vaughn - direct

1    browser sends up the post information, the form information,

2    and the cookies.

3    Q.    And what happens over on the server?

4    A.    The server, we get the request, process it, figure

5    out what to do next and show the customer next.  We send a

6    HTML page, back down, standard HP protocol, send that back

7    to the customer's Web browser so they can see it.

8    Q.    Is this the page that you gave us some info before?

9    A.    That's right.

10   Q.    And then what happens?

11   A.    Well, in this case, we will go ahead and click

12   "proceed to checkout."  Again, it's another standard form

13   post so HP protocol includes the post form information and

14   the cookie.  Again, we process that in the server and send

15   back HTMLs so the customer can see it in their browser.

16   Q.    And if they sign in the way we did before, what's

17   going to happen?

18   A.    Again, that's another form post, so that information

19   is sent back up to the server again, what we processed at

20   the beginning of the checkout request and send back to the

21   HTML to process.

22   Q.    What are we seeing here?

23   A.    Again, a single page checkout.  A review of the

24   entire order.

25   Q.    Could you walk us through some of the information

Vaughn - direct

1  that's on this single page checkout?

2  A.    Sure.  There is a lot of data with an order.  One

3  piece is the shipping address, where it's actually being

4  shipped to, so that's one thing we show.  And then we show

5  how it's going to be shipped, is it fast, next day shipping,

6  or a bit longer, like ground, transport.  So we have all the

7  options for shipping right there.

8  Q.    And what's the -- the line on the bottom there,

9  "Estimated delivery date for this item"?

10  A.    Oh, yeah.  That's -- once the customer has picked a

11  shipping address and the ship method, we do a bunch of

12  computation servers to predict how soon we can get it to the

13  doorstep.  It's a complicated algorithm where we try to

14  figure out based on where we think inventory is, where the

15  customer is, and when and how we can ship to it them.  We

16  come to a date by which we think, at the end of the day, we

17  think it will come to their doorstep.  We call that date the

18  promise date.  We use that date as the promise date.  We try

19  to meet that promise for the customer.

20  Q.    And what else do we see on the single page checkout?

21  A.    We also have how they are going to pay for it in the

22  order.  And then the billing address associated with that

23  credit card.

24  Q.    And besides that promise date that you said was

25  computed with that complicated algorithm, is the data that

Vaughn - direct

1  is shown on this single page checkout as pulled from the

2  customer's default?

3  A.     That's correct.  Based on the customer's defaults, we

4  are able to get where they are going to ship it to, how they

5  are going to ship it, and the payment instrument.

6  Q.     What happens if the user chooses to place this order?

7  A.     In that case, they like what they see or they can

8  click that button, again, the standard form post, back to

9  the server.  As part of processing this request, we actually

10  create a customer order record in our databases.

11  Q.     And what happens with that customer ordering?

12  A.     Now it's in the databases, we can start fulfilling

13  it.  It's available for the customer to edit for a while,

14  but as we start working on it and shipping pieces, we will

15  get pieces shipped out.

16  Q.     What are you showing here with what you mentioned

17  before you worked on the customer order work flow?

18  A.     That's right.  So at this point, the customers place

19  their order and they have walked away or are browsing

20  elsewhere in the site but now our back end systems have to

21  pick up the order, push it through a bunch of different

22  steps to get it actually fulfilled and pay for.

23  Q.     What does that involve?

24  A.     Well, the customer order work flow, that's main piece

25  of software that's responsible for managing the order and

Vaughn - direct

1    getting it all fulfilled.  The first thing, one of the

2    things it does is take that order and give it to our

3    fulfillment engines and they can then model and predict how

4    we are going to ship all these items, where is the best

5    place.

6    Q.     Could you explain what you mean by that?

7    A.     Sure.  At our data centers, our central data centers,

8    we have a global view of all of our inventory across the

9    country.  It knows about all the products sitting in all the

10   warehouses.  So based on what the customer has ordered,

11   where they are shipping to, how they are shipping it, and

12   what the order is, we will try to pick a fulfillment center.

13   Often, we will try pick one that's close to the customer.

14   But if there is no inventory there, or for other reasons,

15   cheaper to ship it from somewhere else, we will do that.

16   Q.     Once the algorithm has figured all this out, what

17   does it create?

18   A.     It will create a fulfillment plan.  That's kind of

19   our best guess of where each item should be shipped from.

20   Q.     And what happens to the fulfillment?

21   A.     Well, then, at this point, our data centers and our

22   headquarters, we know how we want to get it fulfilled.  We

23   will now actually send a message to the particular

24   fulfillment center, in this case, we picked our New Castle

25   fulfillment center, we will send it there so that that can

1   be fulfilled.  They will be responsible for actually picking

2   up those items and putting them on the box and getting them

3   on the truck.

4   Q.    What do they do to figure out if they can meet that

5   fulfillment?

6   A.    There is a lot of, between the fulfillment center and

7   the data centers and our main data center, the services,

8   there is a lot to figure out in order to meet the promise.

9   The main thing for the fulfillment center, one it gets the

10  request, is it will put it in its own workload, figure out

11  when they have to have people actually pick it.  At some

12  point, they will decide that they want to actually pick

13  those items and put them in the box.  Before they do that,

14  they will ask for permission.

15  Q.    And what happens if the fulfillment center says, yes,

16  it can go ahead and ship these items?

17  A.    Well, we will ask for permission.  So we will send a

18  message back to our main data center.  One of the things is

19  then get credit card authorization.  We will verify that it

20  can be paid for.

21  Q.    And what exactly do you mean by "credit card

22  authorization"?

23  A.    It's not actually charging the customer yet.  This is

24  just reserving funds in the credit cards, so we verify we

25  can reserve the funds, and if so, we will send a message

Vaughn - direct

1    back saying this can be shipped out.

2    Q.     And then what does the fulfillment center need to do?

3    A.     There is a bunch of manual work here.  We have folks

4    called "pickers."  They will run around and pick the items

5    off the shelf, and depending on the fulfillment center,

6    either put them on conveyor belts or directly in boxes.  It

7    goes in the boxes, packing slip, it will get weighed,

8    shipping charges applied.  That picture in the right there

9    actually is the back of a truck, so the conveyor belts

10   actually go into the truck and folks then pick up those

11   boxes as they come in, they will scan them and put them on

12   the truck.

13   Q.     And what happens if they put them on the truck and

14   are leaving the fulfillment center?

15   A.     So we have folks watching the loading docks, the

16   fulfillment center, so any time a truck leaves, the, the

17   dock masters will click a button notifying the software the

18   truck has left.  And that triggers a whole bunch of messages

19   that the packages have shipped.  And particularly for this

20   shipment, we then have a message going back to the main data

21   saying this order has now shipped.

22   Q.     And what happens then?

23   A.     One of the steps is that we will actually now charge

24   the credit card.  Before we had the auth. to refer the fund

25   but now the truck has actually left and the package is on

Vaughn - direct

1   way to the customer, we can charge the credit card.

2   Q.      What else happens?

3   A.      One of the things is e-mail the customer.  And then

4   we go through a bunch of other processing, accounting,

5   closing out records, things like that.  And if those were

6   the last items in the order, then we will go ahead and close

7   the order and mark it complete.

8   Q.      And what does that mean, "close the order and mark it

9   complete"?

10  A.      Once every item in the order has been shipped or been

11  cancelled, at that point, there is no work left to do on the

12  order, assuming everything has been paid for, then we just

13  mark it in a special condition, the order, saying, It's now

14  complete, there is no more work to do.

15  Q.      And what do you tell the customers in the e-mail?

16  A.      This is the shipment confirm e-mail.  So we tell

17  which items shipped, and if it happened to be the case, as

18  in this case, that was all the items left, then we will let

19  the customer know that the order is completed as well.

20  Q.      Now, I was hoping you could explain in a little more

21  detail some of the technologies that you use and what you

22  just walked us through.

23  A.      Sure.

24  Q.      Can we start with cookies?

25  A.      Sure.

Vaughn - direct

1  Q.      What are cookies?

2  A.      Again, it's just a bit of data our Web servers have

3  and they ask the browser, please, when you go to Amazon,

4  keep this data, any time you talk to Amazon, send this data

5  back with a request, doesn't matter which request, just any

6  request this browser makes to our Web servers, send this

7  data long.  It's just a way we can keep track of what's

8  going on and it's a way we can give the customer a sense

9  they are browsing in the session.

10  Q.      It's the standard Web cookies?

11  A.      It's a standard HP protocol, standard cookies.

12  Q.      Where are they used on the site?

13  A.      Every singe page on the site uses cookies.

14  Q.      Are they used in the same way throughout all those

15  pages?

16  A.      Correct.

17  Q.      So would you walk us through how that works?

18  A.      Sure.

19  Q.      So what are we seeing here?

20  A.      Here the customer is looking at the browser, looking

21  at search results.  Here the customer has got particular

22  book in mind so we have done a search and this is the search

23  results.  And in this case, though, they will click on one

24  of the search results and go to the detail page.

25  Q.      And walk us through what happens during this.

Vaughn - direct

1   A.     Sure.  So, again, just like any click or request from

2   the browser sends HP requests, that includes the form

3   information and the cookie that we asked the browser to

4   send.

5   Q.     And what happens once it reaches the server side?

6   A.     Yes.  This is a little more break down of what goes

7   on in the server when we get a request.  We have a framework

8   for handling all pages, it's the same framework used for

9   every page on the site.  One of the first things that

10  happens is there is a layer called "accept a cookie" or some

11  of the other information.  There is an example of some of

12  the field in the cookie, session I.D. tracks which is how we

13  keep track of a particular session for the customer.  X-main

14  there, that's the encrypted customer I.D.

15  Q.     And you mentioned dollars this interceptor part of

16  the framework.  What does it do?

17  A.     Its main responsibility is just to, when that request

18  comes in, it intercepts it, pulls some information it needs

19  from the cookie, and gets rid of the cookie.  With that

20  information, it can then contact another service to verify

21  that it's a valid session.

22  Q.     And could you explain what you are showing here with

23  that information, and then that other server is mentioned,

24  you mentioned, "Session storage."

25  A.     Sure.  We have some information that we pulled from

Vaughn - direct

1   the request on the cookie about the customer session, and,

2   so, then we take that information and send it to this other

3   bit of software that's responsible for actually verifying

4   that's its valid information, valid session.

5   Q.    And could you explain what you mean by "valid

6   session"?

7   A.    We want to protect customers, make sure no one is

8   trying to spoof or get into their account.

9           We also want to look out for cases where maybe

10  the customer has just changed browsers and they're, we don't

11  want their browsers to be confused about which session

12  they're looking with.  So we're looking at a different

13  fields and just verifying this is a valid session.

14  Q.    Does this validation happen for every request

15  whenever a user clicks going to the Amazon.com website?

16  A.    Correct.  Every single page, every single request the

17  server gets, they'll run through this validation.

18  Q.    What happens after the session to validate?

19  A.    Once we verify the session is valid, we go to the

20  next level of framework processing.  There, it takes the

21  valid session information, and looks at that.  One of the

22  pieces it will pull out there is the customer ID.

23  Q.    And what does it do with that?

24  A.    We'll use that to do a lookup.  We'll call another

25  service to get customer information.

Vaughn - direct

1    Q.      What happen was that?

2    A.      This is customer information that is generally usable

3    on every page of the site.  Again, this framework

4    interaction happens for every page.  So this is some

5    information the customer is handling for every page.

6    Q.      And you have shown here something labeled "HTML

7    engine" came up.  What does it do?

8    A.      Well, that is one of the framework layers.  It lets

9    people plug in their contents so that at the end of the day,

10   we'll generate that HTML that goes back to the client's

11   browser.

12   Q.      So you mentioned sending the HTML back to the

13   client's browser.  What happens then?

14   A.      Well, once we processed the request to generate the

15   HTML, we'll send the response back down to the browser's

16   HTML and the customer can see the result.

17   Q.      Now, you just walked you through what happens if

18   someone made a search and clicked on a search result page.

19   How does it work if they were going to use 1-click?

20   A.      Sure.  At this level, it works pretty much the same.

21   They go ahead and click on the 1-click button.  Again, that

22   is a standard HTTP request or service.  It includes the form

23   and the cookie information.

24   Q.      And what happens here?

25   A.      Again, the same processing.  The cookie fields pull

Vaughn - direct

1    out some of the information that is needed and get rid of

2    the cookie.  It takes that information, talks to the session

3    storage, will validate the session -- same processing as

4    always -- and then passes the session information to the

5    next layer of the framework.

6    Q.    And what happens with that?

7    A.    Again, it will take the customer ID, use that to look

8    up customer information, and send that back.  So now the

9    framework layer has the session and customer information

10   available to render a page.

11   Q.    Dr. Vaughn, we've been talking about people placing

12   orders with their shopping cart with 1-click.  Could you

13   give us a bit of an explanation about what creating an order

14   involves?

15   A.    Sure.

16   Q.    So how does that work?

17   A.    Well, once a customer decides they want to buy

18   something on the website, we'd like to make it as easy for

19   them as possible to actually get an order placed on our

20   site.

21         An order has a lot of information.  We have

22   simplified it through here; but we obviously need to know

23   what they want to buy, where they want it shipped to, and

24   how it should be shipped and want to know how they're going

25   to pay for it.  So it's a lot of information we need in

Vaughn - direct

1    order to have an order ready to do fulfilled.

2              And a lot of the ways we have to create these

3    orders is basically assembly process, helping the customer

4    gather all this information so we can then fulfill the

5    order.

6    Q.    And how does it work with the shopping cart?

7    A.    Well, the shopping cart is one way to assemble all

8    this information.  We start on the left there with the items

9    you want to buy in your shopping cart.  You click, proceed

10   to checkout and then sign in.  And then we know from your

11   shopping cart the items you wanted to buy.

12             And then we know, if it's a customer we've seen

13   before or they have a default shipping address, we know

14   which address they want to ship to and how they want it

15   shipped there.  And based on their payment options, we know

16   which credit card they want to use to pay for it.

17             So we're able to kind of assemble that all for

18   them, show them on the single page here is the summary of

19   the order, and see if they can click Place Your Order; and

20   then we'll use that information to create a customer order

21   that is ready to be fulfilled.

22   Q.    And that will be that same series of steps,

23   fulfillment, shipping and payment you walked you through

24   before?

25   A.    That's right.  Once there is a customer order in our

Vaughn - direct

1    database, we use that standard fulfillment pipeline.

2    Q.    And how about if they chose to place their order with

3    1-click?

4    A.    Yes, it's a very similar process.  Again, we need

5    assemble the same data.  In this case, we know what product

6    they want because they're on that detail page.  So when a

7    customer clicks Buy Now with 1-click, from that request, we

8    know the product they wanted.

9              Again, because it's a customer where they told

10   us what the 1-click and address payment is, we're able to

11   get the shipping address and credit card, we have all the

12   data available for the order.  We can go ahead and create

13   the customer order without another click.

14   Q.    Dr. Vaughn, is the source code that Amazon uses to

15   run the shopping cart and 1-click related?

16   A.    That's right.  They use the same exact software, same

17   data structures.  We didn't want to duplicate the code

18   paths.  It would be hard to maintained and hard to change,

19   so they use the same underlying code and data structures.

20   Q.    Now, can we walk through in a little more example the

21   shopping cart example, walk through in a little more detail

22   the shopping cart example you have on the top there?

23   A.    Sure.

24   Q.    So what happens when someone is placing an order with

25   the shopping cart?

Vaughn - direct

1   A.      So, again, they'll click Add to Shopping Cart.  The

2   standard HTTP request goes to our servers.

3   Q.      Let me actually ask you, what are you showing here

4   with the cookie?

5   A.      Again, it's the standard cookie like for any page in

6   the site.  Same field, same cookie data.

7               In the HTTP request in the form, one of the

8   fields in the form is the product.

9   Q.      And the ASIN, that's the product ID?

10  A.      That's right.  That is Amazon Standard Identification

11  Number.  So any product we sell has a number, whether it's a

12  book or a TV set or anything like that.  So if we have that

13  number, we know which product it is that the customer wanted

14  to buy.

15  Q.      What happens with the session information?

16  A.      Again, same as any page on the website.  It will be

17  validated.  And then the HTML engine has the session

18  information, uses that to retrieve common customer

19  information.

20  Q.      Now, you showed this gray cylinder here.  What is

21  that supposed to mean?

22  A.      That is supposed to be the shopping cart.  I

23  mentioned that if you're on the website browsing, you have

24  got a shopping cart kind of like a grocery store.  This is

25  meant to represent the shopping cart database.  This is

Vaughn - direct

1    where we store the customers' cards.

2    Q.    So how does that get invoked when someone is going to

3    follow through the steps in placing the order?

4    A.    So once you have got an Add to Shopping Cart request,

5    one of the things we do is find the customer's shopping

6    cart.  So we use a customer ID that identifies the cart.

7                And then from the form posting, we know which

8    product they wanted, so we'll put that in the shopping cart.

9    And we'll go ahead and save that.

10               We'll also use that information to then generate

11   HTML to send back to the browser.

12   Q.    Is that what we're seeing here?

13   A.    That's right.  So the right-hand side there, that's

14   the shopping cart.  There, we showed the item in the cart.

15   And that is also saved on the server in our cart database.

16   Q.    The user proceeds to checkout?

17   A.    That's right.

18   Q.    What happens with that shopping cart in the database

19   as you just explained?

20   A.    Well, we ask the customer to sign in again.  And once

21   they have signed in, we have all that information --

22   standard cookie.  Again, the same processing.  The session

23   information.  We validate the session, and then hand that

24   session information to the framework.  It pulls out the

25   customer data.  And now we're able to actually process that,

1   Proceed to Checkout request.

2   Q.     Can you help us understand what is really going on?

3   A.     Sure.  So when we get that form saying Please

4   Checkout -- Proceed to Checkout, the HTML engine will

5   contact the ordering system.

6          That will then start to create an empty order.

7   We call it a session order.  This is what the customer will

8   use as their changing ship options or payment options.

9   They're interacting with that there.

10  Q.     Let me ask you to explain in a little more detail

11  what you mean by the ordering system and the session are?

12  A.     The ordering system, this is the software that

13  actually knows about orders, how to create orders.  It's

14  responsible for creating this order on the customer's

15  behalf.

16         And the session order, it's like a customer

17  order but it's not real, so at any point the customer could

18  walk away from the browser, they don't have to buy it.  It's

19  kind of a work space, I guess, a scratch pad to create this

20  toward.

21  Q.     And what happens with the cart and the session?

22  A.     One of the first things we do is go to the customer

23  shopping cart.  We pull out the products they want to buy

24  and we put that in the session order.

25  Q.     And what else?

Vaughn - direct

1  A.      Retrieve some customer information, put that in the

2  order.

3          And then based on the customer, again, we know

4  who they are, we've seen them and we know their default

5  address.  So we'll look up their address that they want to

6  ship to and their ship preference, if it's again Next Day Or

7  Ground.

8          And, again, based on the customer, we know how

9  they want to pay for it, their default payment instrument,

10 so we can look up the credit card information.  We'll also

11 store that in the session order.

12 Q.      And what is going to happen next?

13 A.      Well, now, that session order is, it's basically like

14 a customer order.  Here, again, we have that data saved in a

15 separate database.  That's why the separate cylinder there.

16 It's a separate database.  We'll use that data to send that

17 page back to the customer so they can go ahead and review

18 the order.

19 Q.      Is the single page checkout example we saw before?

20 A.      That's right.  This is basically a HTML

21 representation of that order we've got in our database.

22 Q.      And if they place their order, could you explain to

23 us what is going to happen then?

24 A.      Sure.  So if they like what they see here, they can

25 click Place Your Order.  Again, standard HTTP form post with

Vaughn - direct

1  a cookie, just like every page on the site.  We'll process

2  the cookie data, pull out the session information, validate

3  it.  Again, the framework just generically gets the session

4  information, looks up customer information, and now we're

5  actually able to process that Place Your Order request.

6  Q.    And what are we seeing here with the ordering

7  testimony, customer, delivery, payment plan service?

8  A.    Sure.  It's the same system, same software, but now

9  they're processing the place your order request.  So what

10 they -- the first thing they'll do is create a customer

11 order object.

12 Q.    Let me ask you, just so there is no confusion:  We

13 have here:  customer service, delivery service and plan

14 service.  Could you explain a little bit by what you mean by

15 those services?

16 A.    Sure.  Those are remote services at Amazon.  They

17 have interfaces.  You can go and, say, give them this

18 customer ID, other information, return customer data.  We

19 can go to delivery service and say here are the items I want

20 to buy and how to ship them.  Can you give me what options

21 are available?

22          Delivery service is a large collection of

23 services.  They'll do modeling of the fulfillment network,

24 they'll do modeling for transportation option, and they'll

25 tell us, given what the customer options, what they want to

Vaughn - direct

1    buy, where they want to ship to, here are the options for

2    delivery.

3              And, likewise, payment option is a separate

4    service.  Given the information in the order like what

5    they're buying and where they're buying it, they will come

6    back and say here are the valid methods of payment you can

7    use.

8    Q.    And service in the context of websites, that is a

9    bunch of computer hardware and software that does something;

10   is that right?

11   A.    That's correct.  So they're separate machines running

12   software, and then the ordering system runs on one set of

13   machines, and it can talk to these other services that are a

14   different set of machines using interprocess communication

15   or some of the remote procedures calls.

16   Q.    And what is going to happen with the session order

17   now that the customers choose to place the order?

18   A.    Well, now they received a Place the Order request,

19   we'll go ahead and create a empty customer order.  We'll

20   copy the data out of the session order, what they want to

21   buy, how they want it shipped, how they want it paid for.

22   We'll copy that with the customer order, and now we'll have

23   an order they can fulfill.

24             We see there we deleted the session order.  We

25   don't need it anymore.  We remove the items from the cart.

Vaughn - direct

1        So now we've got the customer order fulfilled,

2    there are some additional validations.  We'll double-check

3    with delivery that the delivery options are still valid,

4    things like that that.  But if everything passes, then that

5    customer order is ready to be fulfilled.

6        And, again, we will use that as a basis to send

7    the HTML back to the customer to say "thank you" and send

8    them the Thank You Page.

9    Q.    Is that customer order going to be like the

10   simplified customer order you showed on the right hand side

11   you that started with?

12   A.    That's right.  It's got a bunch of data, including

13   what the customer wanted to buy, how they want to pay for it

14   and how they wanted it shipped.

15   Q.    Dr. Vaughn, could you explain to us the same general

16   series of steps that you just walked us through in the

17   shopping cart for 1-click?

18   A.    Sure.  So we just walk through the shopping cart

19   example.  1-click is similar.  Again, we're on a detail

20   page.  This time instead of clicking Add to Shopping Cart,

21   we'll click by Buy Now with 1-click.  Standard HTTP request.

22   Same product information.

23       Again, just like any page on the website, we'll

24   pull information for the cookie to validate the session.

25   The framework will get a session information, and then look

Vaughn - direct

1    up customer information.

2    Q.     And what happens with what you are showing here?

3    A.     Yeah.  Well, here for 1-click, again, we use same

4    software.  We're using the cart service and cart software

5    here.  We don't need to actually look at the customer's

6    cart.  This is just, it's a temporary cart we're just using

7    for 1-click.  We create a shopping cart, go ahead and put

8    their product in it.

9           The ordering system then will again create a

10   session order and, just like before, pulls the product

11   information out of the cart.  Puts it in the session order.

12   Pulls out some customer information.  Based on a customer,

13   based on their 1-click preferences, we know which shipping

14   address to use and which shipping option.

15          And, again, based on the customer's payment

16   preferences, we know which payment plan, which credit card

17   to use.  So, again, just like before, we load up that

18   session order so it's basically an order ready to be

19   fulfilled.

20          In this case, because it's 1-click, we'll go

21   ahead and also create a customer order.

22   Q.     And you mentioned customer's 1-click preferences.

23   What are those?

24   A.     You can go to the website, your account section and

25   set up a ship option or, I'm sorry, a ship address and a

Vaughn - direct

1   payment instrument to use as your default 1-click settings.

2   Q.     And what happens with this customer order?  Is it

3   going to be the same type of customer order we saw before?

4   A.     That's right.  It's the same sort of order, same data

5   structure, use the same code to assemble it all together.

6          So at this point, we went ahead and created that

7   customer order.  We copied over.  Just like before, we copy

8   over the product and shipping and payment methods from a

9   session order just like before.  We don't need the session

10  order anymore in the cart so we delete those.

11         And now we've got a customer order in our

12  database ready to be fulfilled.  So based on that, we can

13  then generate the Thank You Page for 1-click.

14  Q.     Now, I'd like to actually switch gears for a second,

15  Dr. Vaughn, and ask you a bit about Amazon's source code

16  control system.

17  A.     Sure.

18  Q.     What is a source code control system?

19  A.     So these are systems we used to keep track of the

20  codes running the websites.  So it allows a lot of

21  developers to work on the same code at the same time.  It

22  keeps track of what changes are being made to the source

23  code, keeps track of who is making the changes and when they

24  made the changes.

25  Q.     And does Amazon.com use them for the code that runs

Vaughn - direct

1    the Website that Amazon.com has been using?

2    A.    That's right.

3    Q.    And what type of information do they report?

4    A.    Again, it has all the source code information.  A lot

5    of details of all the changes.  Any time it makes a change,

6    it will track what the change was, who made the change and

7    on what date they made the change.

8    Q.    And why is it important for the code control systems

9    to track those kind of times and dates?

10   A.    We use them all the time for a lot of reasons.  It

11   can go and go back and look at any time in the past and find

12   what the source history looks like.  If you are curious

13   about a particular change, how did that change get there.

14   You can find out who checked it in there and when.

15              MR. DONNELLY:  Your Honor, may I approach the

16   witness.

17              THE COURT:  Yes, you may.

18              (Documents passed forward.)

19   BY MR. DONNELLY:

20   Q.    Dr. Vaughn, do you recognize this CD?  It should have

21   DTX-1618C on it.

22   A.    Yes, I do.

23   Q.    And what is it?

24   A.    It's a CD that contains a snapshot or source code

25   from June of 1996.

Vaughn - direct

1   Q.      And how do you recognize it?

2   A.      I signed it a couple days ago.

3   Q.      And the source code that is on there, is that source

4   code from the Amazon website?

5   A.      That's correct.

6   Q.      How do you know that?

7   A.      Well, it's from our source code repository.  I talked

8   to the person that assembled the disk and asked him what

9   methods he used to pull the code.  I, myself have a

10  development machine.  So I went to our source code

11  repository and myself checked out the source code as of that

12  date and I verified that the files and sizes and things like

13  that match what is on this disk.

14  Q.      And that was code for the public website?

15  A.      That's right.

16  Q.      And do the files that are on that CD have time stamps

17  from that source code version control system you mentioned?

18  A.      Yes.

19  Q.      And do they show when the files were checked into

20  that system by the developers?

21  A.      Yes.

22  Q.      And are the file dates made at or near the time the

23  files were checked in by that source code control system?

24  A.      Yes.

25  Q.      Are the check-in times made by or transmitted from a

Vaughn - cross

1   person knowledgeable of the code that is being checked in?

2   A.    Yes.  They would have been checked in by the

3   developer making the changes.

4   Q.    And are those entries made as part of the regular

5   business practice at Amazon?

6   A.    Yes.

7   Q.    And are the source code files on DTX-1618C kept in

8   the regular course of Amazon's business?

9   A.    Yes, they are.

10          MR. DONNELLY:  Thank you, Dr. Vaughn.  I don't

11   have any further questions.

12          THE COURT:  Mr. Abrahamsen, are you doing cross?

13          MR. ABRAHAMSEN:  Yes.

14          THE COURT:  You may proceed.

15          MR. ABRAHAMSEN:  At what time would you like to

16   take a break, Your Honor?

17          THE COURT:  I'm thinking probably around 11:00,

18   in that time frame.  Maybe a little bit the later.  I don't

19   know if that will give you enough time to complete your

20   cross-examination but we can come back after the break.

21                  CROSS-EXAMINATION

22   BY MR. ABRAHAMSEN:

23   Q.    Good morning, Dr. Vaughn.

24   A.    Good morning, Mr. Abrahamsen.

25   Q.    Starting with the source code you just discussed, you

Vaughn - cross

1   said this is a snapshot from June of 1996?

2   A.     That's correct.

3   Q.     How do you know whether this code was actually

4   deployed on the commercial website in 1996?

5   A.     That's standard practice that when source code is

6   checked in, we don't deploy it to the production website

7   except from the source code repository.

8   Q.     But is all of the source code in the repository

9   always put on the website?

10  A.     To my knowledge, that was true in 1996.

11  Q.     Were you employed by the company in 1996?

12  A.     No, I was not.

13  Q.     So you don't know whether that was in fact the

14  practice in 1996, do you?

15  A.     Not firsthand, no.

16  Q.     Were you in the courtroom when Dr. Shamos talked

17  about Amazon's shopping cart ordering process?

18  A.     Yes, I was.

19              MR. ABRAHAMSEN:  Dylan, can you please pull up

20  the screen with the buttons from the shopping cart?

21  BY MR. ABRAHAMSEN:

22  Q.     Now, if a customer does not use a single page

23  checkout which you just discussed, does this accurately

24  represent the buttons a user would have to click to order a

25  product using the shopping cart process?

Vaughn - cross

1    A.      I think that looks roughly correct to me.

2    Q.      Okay.  And if the customer did have a default

3    shipping address, what, steps four through six would be

4    skipped; is that right?

5    A.      That's correct.

6    Q.      So a customer would still have to click on a total of

7    at least four buttons to order a product; right?

8    A.      That's right.

9    Q.      Now, when each of the buttons shown here was clicked,

10   a message would be sent from the customer's computer to

11   Amazon; right?

12   A.      That's correct.

13   Q.      And each of those messages would indicate which

14   button was, in fact, clicked?

15   A.      As part of the form posting, the form element,

16   particularly the action and the submit field would say which

17   form it was and which button was clicked.

18   Q.      And each of those messages would cause Amazon's

19   computers to do some processing; right?

20   A.      These are standard HTTP requests that the server gets

21   in response to the form posting.

22   Q.      So the computer would do some processing; correct?

23   A.      That's correct.

24   Q.      Now, when the Proceed to Checkout button is clicked,

25   I think you said Amazon creates what is called a session

Vaughn - cross

1    order; is that right?

2    A.    It happens after sign-in, but, yes.

3    Q.    After sign-in.  Okay.  At some point in this process,

4    a function called Initiate Customer Purchase function is

5    executed; right?

6    A.    If not with that function, then a function with a

7    very similar name, yes.

8    Q.    And which button click here causes that function to

9    be executed?

10   A.    I believe it happens in response to sign-in.

11   Q.    In response to sign-in?

12   A.    That's correct.

13   Q.    Now, let's talk now about when a purchase transaction

14   is initiated in the shopping cart process like this one.

15          You're aware that one of the issues the jury may

16   need to decide in this case is which click in the shopping

17   cart process like this one constitutes an indication to

18   initiate a purchase transaction?  You're aware of that;

19   right.

20   A.    Yes.

21   Q.    So the jury will have to determine whether it's the

22   last click, the Place Your Order click that initiates a

23   purchase transaction or whether it's actually an earlier

24   click in the process; right?

25   A.    Correct.

Vaughn - cross

1    Q.     Now, the Initiate the Customer Purchase function you

2    just mentioned, that is not performed in response to the

3    Place Your Order click, is it?

4    A.     No, it's not.

5    Q.     The Initiate Customer Purchase function you said was

6    performed in response to the sign-in click; correct?

7    A.     That's correct.

8    Q.     The Initiate Customer Purchase function is, in fact,

9    used to initiate the purchasing process; right?

10   A.     Well, again, when we walked through it, it doesn't

11   create a customer order, it creates kind of a scratch pad

12   you can eventually use to create a customer order, but all

13   it does, like I said, is create the scratch pad.

14   Q.     The question was, does the Initiate Customer Purchase

15   function cause Amazon's computers to start the purchasing

16   process?

17   A.     What do you mean by "purchasing process"?

18   Q.     The process of purchasing an item.

19   A.     Well, I want to be clear, it's not the fulfillment

20   process.  The fulfillment process, once we have are the

21   customer order, we go through and figure out where to ship

22   it.  That's not what we're talking about here.  You're

23   talking about the customer's experience on the website if

24   you want to go through the pages.  If you call that customer

25   experience, just on the website with no customer order

Vaughn - cross

1    created, a purchase process, then yes.

2    Q.     So the process of purchasing starts when you click on

3    the Proceed to Checkout button?

4    A.     As I guess you choose to define it, yes.

5              MR. ABRAHAMSEN:  Dylan, can you pull up, Vaughn,

6    just on the screen, 232, 5 through 15, please?

7    BY MR. ABRAHAMSEN:

8    Q.     Do you remember having your deposition taken in

9    December, Dr. Vaughn?

10   A.     Yes, I do.

11   Q.     And you were under oath at that time; right?

12   A.     Yes, I was.

13   Q.     Just like you are here today?

14   A.     That's correct.

15   Q.     And I asked you at that time what the purpose of

16   calling the Initiate Customer Purchase file or I guess the

17   function -- there was some confusion there -- and your

18   response was:

19              "Answer:  I think it's used to start the

20   purchasing process."

21   A.     That's the same definition we used here.  So, again,

22   it's the customer's experience on the website; but, again,

23   if no customer order is created, it has nothing to do with

24   fulfillment.

25   Q.     Did the claims at issue in this case use the word

Vaughn - cross

1    "fulfillment," Dr. Vaughn?

2    A.    I'm not aware.

3    Q.    Doesn't the claim say:  an indication to initiate a

4    purchase transaction for purchasing an item?

5    A.    I would have to look at the claims, but if that is

6    your representation, then I agree.

7    Q.    So they don't say fulfillment; right?

8    A.    I don't remember.

9    Q.    They talk about purchasing an item?

10   A.    I think so.

11   Q.    Dr. Vaughn, if I go to Sears and I need a

12   refrigerator, and I go to Sears and I pick out a

13   refrigerator and tell the salesperson I want to buy that

14   refrigerator and I give the salesperson my credit card, and

15   then the salesperson takes my credit card, and let's say

16   they use one of those old fashioned credit card doohickeys,

17   the sliding things and they run my credit card and they give

18   me a receipt and say your refrigerator will be delivered on

19   Thursday, have I purchased a refrigerator?

20   A.    I think once you have got that credit card swiped,

21   then yes.

22   Q.    Okay.  Now, the refrigerator hasn't been delivered at

23   that point; right?

24   A.    Correct.

25   Q.    But I've still purchased a refrigerator?

Vaughn - cross

1    A.      Correct.

2    Q.      No money has changed hands at that point, right?

3    A.      Well, I think what happened was, it's there is an

4    informal contract you entered into.  You just promised to

5    pay the merchant for the refrigerator and the merchant has

6    promise to deliver it.  So I think given the contract

7    setting, no money has exchanged hands, there is a promise to

8    pay money.

9    Q.      But there has been a purchase; right?

10   A.      I think that contract is a purchase.

11   Q.      A purchase has been completed?

12   A.      No, it's not complete.  You entered into one, but

13   it's not complete until both sides agree the promises were

14   met.

15           MR. ABRAHAMSEN:  Dylan, can you please pull up

16   the testimony of Lorenzo Alvisi, 99:24 through 106?

17           MR. DONNELLY:  Your Honor, may we have a

18   sidebar?

19           THE COURT:  Yes.

20           (The following took place at sidebar.)

21           MR. DONNELLY:  I don't see how the testimony of

22   someone other than the witness is relevant to impeach on

23   cross-examination.

24           THE COURT:  On what basis?  That it's not

25   relevant?  Because this is also one of your witnesses, is it

Vaughn - cross

1    not?

2              MR. DONNELLY:  Correct.

3              MR. ABRAHAMSEN:  It's inconsistent, Your Honor,

4    and used to impeach.

5              THE COURT:  No, it can be used, but not --

6              MR. DONNELLEY:  I think he made my point.

7              THE COURT:  I think what you are asking -- what

8    is your question going to be?

9              MR. ABRAHAMSEN:  Whether a purchase is complete

10   at the time the contract is formed.

11             THE COURT:  Or whether you agree with what is on

12   that, in that deposition?

13             MR. ABRAHAMSEN:  Yes.  Yes.

14             MR. HORWITZ:  Your Honor, if he wants to impeach

15   with another witness's testimony, I think he should show it

16   to the witness on the stand before he publishes it to the

17   jury.

18             THE COURT:  I think so.  I think so, too.  That

19   is the fair point of that argument.  Agree.

20             MR. ABRAHAMSEN:  Okay.

21             (End of sidebar conference.)

22   BY MR. ABRAHAMSEN:

23   Q.    Let's move on to a different topic while he is

24   printing that.  Again, can we pull up the -- the shopping

25   cart?

Vaughn - cross

1          Are you familiar with the term "order pipeline"

2    as that's used as Amazon?

3    A.    There is a couple different usages of the term, but,

4    yes, I am familiar with it.

5    Q.    I am talking about the term that's used in the

6    ordering group which you work in?

7    A.    That's actually -- there is two usages there.  One is

8    the customer experience.  So, we sometimes call it a

9    checkout pipeline, order pipeline if they are going through

10   and creating an order on the website.  There is also order

11   pipeline that's used for the fulfillment process.

12         So which one did you have in mind here?

13   Q.    The checkout pipeline?

14   A.    Okay.  So the user experience in the website.

15   Q.    So, now, the order pipeline starts when the "proceed

16   to checkout" button is clicked; correct?

17   A.    Correct.

18   Q.    And it ends when the user gets a thank you page?

19   A.    Or they leave, I guess.

20   Q.    And that's the ordering process?

21   A.    Well, again, it captures the customer experience on

22   the website when they are creating the order.

23         MR. ABRAHAMSEN:  Dylan, can you please pull up

24   the PowerPoint of the '710, please.

25   BY MR. ABRAHAMSEN:

Vaughn - cross

1    Q.      Dr. Alvisi (sic), what I have here is, it's like a

2    claim chart, it shows claim one of the '710 patent.  I have

3    juxtaposed, in various places, the Court's construction of

4    terms next to the actual terms in the claim.  And I'd just

5    like to step through this with you.

6                This is claim one of the '710 patent.  Is

7    Amazon's 1-click ordering process, is that a computer

8    implementing method?

9    A.      Computer is part of it, certainly.

10   Q.      So it's implemented by computers?

11   A.      The part that creates the customer order, yes.

12   Q.      Does Amazon store customer data -- is Amazon store

13   customer data, storing information for a customer usable to

14   automatically complete an online purchase of an item from a

15   seller?  And here is the Court's construction of that if

16   that helps you.

17                MR. DONNELLY:  Your Honor, may we approach.

18                THE COURT:  Yes, you may.

19                (The following took place at sidebar:

20                MR. DONNELLY:  Your Honor, Dr. Vaughn is not an

21   expert witness.  We had the problem at the pretrial

22   conference where Mr. Reed was going to be offered to testify

23   as an expert witness and he was not allowed.  To ask these

24   questions that are asking for expert opinion from Dr. Vaughn

25   are not appropriate either.

Vaughn - cross

1           THE COURT:  Go ahead.

2           MR. PASAHOW:  Infringement is a question of

3    fact, Your Honor.  This is a fact witness.  This is put on

4    to describe the 1-click order process.

5           THE COURT:  However, you are asking him to

6    interpret the claim terms according to the way I have

7    provided the interpretation and apply it, and that's asking

8    expert opinion.  What they elicited from him were facts or

9    their basis or their condition, precedent, as to what

10   Amazon's process was doing at X time or Y time.

11          He gave no opinion as to whether or not it met

12   the requirements of the claims.  So I don't think you have a

13   right to cross-examine him in this fashion because you now

14   are attempting to make him into an expert witness.  If you

15   want to question him on the facts, that's fine.  But he

16   wasn't -- he wasn't asked to --

17          MR. ABRAHAMSEN:  Actually, Your Honor, the

18   question of infringement is a two-step process.  First, you

19   are presenting the claim that's been done.  I am presenting

20   your instruction to the witness.  The second claim is

21   whether the witness is --

22          THE COURT:  You do that through your expert

23   witness.  No.  No.  You are bypassing.  You are attempting

24   to take what he said, which were facts, to establish

25   whatever the expert is going to potentially testify that are

Vaughn - cross

1    facts as to the existence of what the process does.  And

2    that's all he did.  He didn't give an opinion, nor was any

3    one elicited from him, about comparing the -- what the

4    product does or what the process does to the claim terms.  I

5    am not going to allow you to do it now.

6            MR. ABRAHAMSEN:  We actually have an agreement

7    to allow me to go beyond the scope of their direct, Your

8    Honor, in part of our case in chief.

9            THE COURT:  In what respect?

10           MR. ABRAHAMSEN:  However we think proper to

11   support our case in chief.  We wanted to call --

12           THE COURT:  Let him finish.

13           MR. ABRAHAMSEN:  We wanted to call this witness

14   on our direct rather than reading in his deposition

15   testimony.  Amazon said, How about if you call him when we

16   call him and you can exceed the scope of the direct?

17           MR. HORWITZ:  Your Honor, there was never an

18   agreement to let a fact witness be transported into expert

19   witness status.  That's exactly what they are trying to do

20   when they are asking these questions of Dr. Vaughn.

21           THE COURT:  That's not my concern.  If he was

22   never offered by them, and unless I am unaware, you

23   certainly haven't identified him as an expert in your case,

24   have you?

25           MR. ABRAHAMSEN:  I don't intend to use him as an

Vaughn - cross

1    expert witness.

2              HEARING OFFICER:  That's what you are doing.

3              MR. ABRAHAMSEN:  I am trying to go by the facts

4    and whether they meet the claims limitations, which is a

5    question of fact.

6              THE COURT:  No, it's not.  You are asking him to

7    sit there and give an opinion of what he's testified to, to

8    say whether or not it meets the claim limitations.  He was

9    never identified as an expert witness for that purpose.  You

10   can cross-examine him on how good his facts are and things

11   along those lines.  But you didn't identify him as an

12   expert, Amazon did not identify him as an expert, as far as

13   I know.

14             MR. DONNELLY:  No.

15             THE COURT:  You can't convert him to.

16             MR. ABRAHAMSEN:  I thought I was permitted to

17   ask him questions applying the facts to the Court's

18   construction.

19             THE COURT:  No.  That's asking for an opinion.

20   That's asking for an opinion.  My understanding is he was

21   never proffered for that reason.

22             So even though you can go beyond direct, you

23   can't suddenly convert him into something else that he was

24   never proffered for.

25             (End of sidebar.)

Vaughn - cross

1        MR. ABRAHAMSEN:  Can you please pull up

2   Exhibit 173.

3   BY MR. ABRAHAMSEN:

4   Q.    Now, this is the exhibit that Dr. Shamos has created

5   and this is an Amazon detail page; right?

6   A.    That's correct.

7   Q.    And Dr. Shamos has testified that he clicked the "buy

8   now with 1-click" button on this and he received a thank you

9   page in return.

10       Do you remember that testimony?

11  A.    I think so.

12  Q.    Let's take a look at the message that was actually

13  sent to Amazon when that "buy now with 1-click" button was

14  pressed.

15       MR. ABRAHAMSEN:  Dylan, can you please pull up

16  PX 468 now.

17  BY MR. ABRAHAMSEN:

18  Q.    Now, at the very top -- or the top half of this, this

19  is an http post; right?

20  A.    That's correct.

21       MR. ABRAHAMSEN:  And, Dylan, can you highlight

22  the "a-s-i-n equals" and then the number that follows?  It's

23  about two-thirds of the way down.

24  BY MR. ABRAHAMSEN:

25  Q.    Now, that identifies the Elmo doll that Mr. Shamos

Vaughn - cross

1    has selected for purchase?

2    A.    That's right.

3              MR. ABRAHAMSEN:  And, Dylan, can you highlight

4    the "submit.1-click order" fields a little further down.

5    BY MR. ABRAHAMSEN:

6    Q.    Now, those fields that have been highlighted there,

7    those are what allow Amazon to determine this is, in fact, a

8    1-click order; correct?

9    A.    Correct.  That's the -- where the customer clicked on

10   the 1-click button.

11   Q.    Now, if Amazon sent Dr. Shamos a thank you page, it

12   has information about Dr. Shamos stored in its databases;

13   correct?

14   A.    That's correct.

15   Q.    Now, what is it in this communication that tells

16   Amazon which information of the millions and millions of

17   customers Amazon stores information for is the information

18   that's to be used to complete this 1-click transaction?

19   A.    There is a lot of information here.  There is

20   offering -- an offer listing I.D. there, that's a particular

21   offering that Mr. Shamos because.  Yeah.  It's got the

22   select in the form its got, which address he wanted.  Yeah.

23   There is like any -- any request to the site, there is a

24   cookie as well.

25   Q.    It's the cookie, isn't it?

Vaughn - cross

1   A.     There is some information in the cookie, and for

2   every page in the site, we have that information, but there

3   is other information in the form that's not available in the

4   cookie.

5   Q.     Now, Amazon stores information for millions and

6   millions of customers; right?

7   A.     Correct.

8   Q.     And is it the cookie that allows Amazon to figure out

9   what information is at for Dr. Shamos?

10  A.     When you say "what information," you mean the order

11  as a whole or just some pieces?

12  Q.     In this communication.

13  A.     In this communication, the fact that this request

14  came from Mr. Shamos' computer and that we believe the

15  session is associated with Dr. Shamos, that's through the

16  cookie, just like any page of the site.

17  Q.     So the cookie is the piece of information that allows

18  Amazon to determine which information it should use to

19  complete this 1-click purchase; right?

20  A.     I am uncomfortable with the phrase which information

21  you should use because, then, there could be a lot of

22  merchant offerings.  We don't know which offering he

23  clicked.  That's something else in the form.

24  Q.     Are you saying there is something else in the form

25  that allows Amazon to determine which information to be to

Vaughn - cross

1    use -- which information of Dr. Shamos, that is, to use to

2    complete a 1-click purchase?

3    A.    So -- identifying this as being Dr. Shamos, that's

4    the -- the customer information, which I.D. it is, that's in

5    the cookie.

6    Q.    So the cookie is used to identify historic customer

7    information, it's used to complete this 1-click purchase for

8    Dr. Shamos?

9    A.    Again, I am uncomfortable saying it's the cookie.

10   You saw the processing layers.  One of the layers that can

11   pull information pulls from the cookie, but the actual

12   source code can take a customer I.D. from anywhere.

13   Q.    I thought I asked this, but is there some other

14   information here that is used to identify Dr. Shamos'

15   information?

16   A.    The 1-click form post here, Dr. Shamos' customer I.D.

17   is encoded in the x-main part of the cookie.

18             MR. ABRAHAMSEN:  Would this be a good time to

19   take a break?

20             THE COURT:  That's fine.  Members of the jury,

21   we will take a ten-minute break.

22             (Jury left courtroom.)

23             THE COURT:  Counsel, I will see you in about

24   20 minutes.

25             (Brief recess taken.)

Vaughn - cross

1    THE COURT:  Before we bring in the jury, there

2    was one point that I wanted to briefly discuss.  It deals

3    with one of the motions.  I have a copy now of Mr. Haskin's

4    deposition via the motion that was filed by Concordia this

5    morning.  My understanding is that that deposition is under

6    seal.  Is there any concern about.

7    MR. ABRAHAMSEN:  Your Honor, under the

8    protection period, I think there is a 30-day period where we

9    have to treat it as confidential.  If counsel wants to waive

10   that, that's fine.

11   THE COURT:  I meant to say confidential.

12   MR. PASAHOW:  If I could speak with Mr. Haskin

13   for a moment, I think we might be able to resolve this.

14   THE COURT:  Go ahead.

15   MR. PASAHOW:  Yes, Your Honor.  We don't believe

16   there is any confidentiality involved in the deposition.

17   THE COURT:  Thank you.

18   Is everything all right there?

19   Please bring in the jury.  All stand.

20   (Jury returns.)

21   THE COURT:  Mr. Abrahamsen, you may continue.

22   BY MR. ABRAHAMSEN:

23   Q.    Dr. Vaughn, a little bit earlier when we talked about

24   the purchasing refrigerator at Sears, you said that there

25   had been a purchase but you didn't think it was a complete

Vaughn - cross

1   purchase?

2   A.      That's correct.

3   Q.      Let me show you the transcript of the deposition of

4   Lorenzo Alvisi.  Dr. Alvisi is the expert that Amazon has

5   required in this matter; correct?

6   A.      Correct.

7   Q.      And if you see there at the bottom of page, I think

8   it's 99 in your copy.

9   A.      Yes.

10  Q.      I asked Dr. Alvisi, "So, just to make sure I

11  understand."

12               He responded "yeah."

13               "In your opinion," which is my question, "a

14  purchase is complete when a binding agreement is in effect?

15               MR. DONNELLY:  Your Honor, can we approach.

16               THE COURT:  Yes.

17               MR. DONOVAN:  If he is going to ask the witness

18  about witness deposition testimony, we'd like to be able to

19  read it and follow along and understand what the context is.

20  There is only -- how are we supposed to understand what the

21  question is without a copy of the transcript?

22               MR. ABRAHAMSEN:  Do you have a copy of your own?

23               MR. DONNELLY:  I don't.

24               MR. ABRAHAMSEN:  Your paralegals don't?

25               MR. DONNELLY:  I don't.

Vaughn - cross

1    THE COURT:  I want you to stop questioning.  Why

2    don't you wait until you get a copy.

3    Why don't you continue on with the witness

4    asking the question while we wait and get a copy of the

5    transcript.

6    MR. ABRAHAMSEN:  Dylan, can you please pull up

7    PX 32.

8    BY MR. ABRAHAMSEN:

9    Q.    Now, Dr. Vaughn, this is a document called

10   "OTP/Roadmap 2007"; right?

11   A.    Yes.

12   Q.    What does "OTP" stand for?

13   A.    "Online Transaction Process."  In particular, I

14   believe that refers to our storage team, the people who

15   manage all the databases.

16   MR. ABRAHAMSEN:  Dylan, can you turn to page 2

17   of the document, please.

18   BY MR. ABRAHAMSEN:

19   Q.    Now, this is an important document.  I want to make

20   sure the jury understands what this says.  Let's start out

21   looking at the, let's see, the order lifecycle section; do

22   you see that?

23   A.    Yes.

24   Q.    Now, this describes the lifecycle of an order within

25   Amazon's computers; right?

Vaughn - cross

1   A.    I can't seem to read it here.  Okay.

2         MR. ABRAHAMSEN:  Dylan, can you highlight the

3   section that says "Shopping cart" for us, please.

4   BY MR. ABRAHAMSEN:

5   Q.    Now, it says here that a shopping cart is a set of

6   items a buyer has saved for later purchase.

7         Is that, in fact, what a shopping cart is?

8   A.    We use multiple terms for shopping cart.  Like I

9   said, there is that one for the grocery store and there is

10  one cart you use for going through the aisles.  There is a

11  different cart for checkout.  Any, they are talking about

12  just that shopping cart you use for browsing before you go

13  to proceed to checkout.

14  Q.    And then the next one -- Dylan, if you can blow that

15  one out -- "Checkout order."  This says that the checkout

16  order, whose legacy term is a session order, stores

17  information about a checkout session.

18        Is that the same session order you testified

19  about earlier?

20  A.    I believe so, yes.

21  Q.    And here it says, "A checkout session is the act of

22  collecting information from a buyer about items to be

23  purchased such that an order can be created."

24        Is that what a session order is?

25  A.    Yeah.  I think so.  It acts as a work space we can go

Vaughn - cross

1   and assemble information to create the final order.

2   Q.     And this is the phase after the purchaser has clicked

3   on the "proceed to checkout" but before the purchaser has

4   clicked on the "place your order" button; right?

5   A.     That's correct.

6   Q.     And here it says -- yeah.  "Checkout order stores all

7   this information but is not yet considered to be a

8   contract."

9          So there is not yet a contract at that point;

10  right?

11  A.     Correct.

12  Q.     Now, if we move on down to the "open order."

13         MR. ABRAHAMSEN:  Dylan, can you highlight, that

14  please?

15  BY MR. ABRAHAMSEN:

16  Q.     Here it says, An open order consists of a contract

17  between a buyer and a seller about the items that the buyer

18  has -- that the buyer purchased from the seller.

19         Now, the open order, that's created just before

20  the person gets a thank you page; right?

21  A.     Correct.  It's a customer order and then it's used to

22  generate the thank you page.

23  Q.     So, at that point, there is a contract between the

24  buyer and the seller; right?

25  A.     I think you can call it a contract.

Vaughn - cross

1   Q.      Has there been a purchase at that point, Dr. Vaughn?

2   A.      I think we are arguing the difference between a

3   purchase.   There is a purchase contract that has been

4   created.

5   Q.      When I purchased the refrigerator, that was a

6   purchase; right?

7   A.      You can call it a purchase.   I am not comfortable

8   calling it "complete," but it's a purchase.

9   Q.      So there is a purchase before there has been any

10  fulfillment transaction; is that right?

11  A.      I guess you could determine it that way, sure.

12  Q.      And there has been a purchase before there has been

13  any payment processing; is that right?

14  A.      Yeah.   The contract exists once the customer clicks,

15  confirm you want to place your order.

16          MR. ABRAHAMSEN:   Dylan, can you pull up that

17  slide of claim one, please?

18  BY MR. ABRAHAMSEN:

19  Q.      Now, this is the language I was talking about before,

20  Dr. Vaughn.   This is the language of claim one which

21  requires, Receiving from the customer and indicate to

22  initiate a purchase transaction for purchasing the item;

23  right?

24  A.      Yes, I see that.

25  Q.      That doesn't say it's an indication --

Vaughn - cross

1          THE COURT:  Counsel, I want to talk to you.

2          (The following took place at sidebar:

3          THE COURT:  You may not have understood my prior

4    ruling.  This gentleman was -- has an expertise, obviously,

5    on what they have, what Amazon has regarding its software

6    and the history of its software.  What he was not proffered

7    as is an expert to provide an opinion regarding the facts in

8    this case and how they apply to the claim, claims or the

9    claim construction.

10          I am concerned that your questioning is getting

11   into what I said earlier you couldn't do.

12          MR. ABRAHAMSEN:  The only thing I intend to do

13   is point out what words were in the claim and what words

14   were not into the claim.  I don't intend to have him apply

15   that into any particular system.

16          THE COURT:  What you are suggesting by that is

17   that the language that's contained in this record that he

18   has been asked to look at, which, by the way, from what I

19   can tell, he didn't even author, because there has been no

20   foundation, it just says it's an Amazon record, that somehow

21   the two words mean the same.  That's what I am concerned

22   about.  And that isn't what he based it on.

23          MR. ABRAHAMSEN:  The two words mean the same?

24          THE COURT:  I mean that the two, what's

25   contained in the Amazon statement means the same as what's

Vaughn - cross

1   contained in the claims or the claim construction.

2           MR. ABRAHAMSEN:  I don't intend to ask him that

3   question.

4           MR. DONNELLY:  That's exactly what he is

5   attempting to do implicitly if not expressly.  That's the

6   same issue we talked about 20 minutes.

7           THE COURT:  That's what I am having a problem

8   with.

9           MR. ABRAHAMSEN:  I am not going to refer back to

10  the document.  I am going to ask him what words are in the

11  claim or not in the claim and stop there.

12          MR. HORWITZ:  There is no question what he is

13  trying to get to.

14          THE COURT:  It's not going to happen.

15          MR. HORWITZ:  Thank you, Your Honor.

16          THE COURT:  Try another route to get the

17  information that you want to talk about without referencing

18  the claim construction or what --

19          MR. ABRAHAMSEN:  The claim language?

20          THE COURT:  The claim language.  In the way that

21  you are doing --

22          MR. HORWITZ:  I am concerned when you just said

23  "try another route," that Mr. Abrahamsen will try another

24  route that will just as -- will be just as improper.

25          THE COURT:  I can't stop him from trying to get

Vaughn - cross

1   facts.

2            MR. HORWITZ:  I understand.

3            THE COURT:  And cross-examining him on the

4   facts.  It's a term that it comes in for -- there is another

5   approach that is allowable.  But what I am saying is that

6   this approach is not allowable.

7            MR. HORWITZ:  I understand and agree with you

8   completely.  I just want you --

9            THE COURT:  I am sure you did, considering it

10  wasn't an objection raised by Amazon.  But the Court is

11  reiterating what it said before as to what it's going to

12  allow and what it's not going to allow.  Okay?

13            (End of sidebar.)

14            MR. ABRAHAMSEN:  Dylan, you can take down the

15  language of the claim and put back up Exhibit 32, please.

16            And Page 2.

17  BY MR. ABRAHAMSEN:

18  Q.    Okay.  We were talking about the open order and the

19  fact that when there is an open order, that's when the

20  person gets a Thank You Page that there has been a purchase.

21  Do you remember that?

22  A.    Yes.

23  Q.    And there has been a purchase even though there

24  hasn't been fulfillment?

25  A.    You can call it that.  That's fine.

Vaughn - redirect

1   Q.      In fact, at the end of this sentence, it says that

2   some orders may not be fulfilled for months or years; right?

3   A.      Sure.

4   Q.      But there has still been a purchase?

5   A.      You can call it that, sure.

6   Q.      And a customer's credit card hasn't been charged when

7   this purchase exists or is first created, is it?

8   A.      Correct.  We don't charge a customer at the time of

9   the checkout.

10  Q.      But there has been a purchase?

11  A.      If you call it that.

12          MR. ABRAHAMSEN:  I have no further questions,

13  Your Honor.

14          THE COURT:  Any redirect?

15          MR. DONNELLY:  Briefly Your Honor.

16              REDIRECT EXAMINATION

17  BY MR. DONNELLY:

18  Q.      Dr. Vaughn, Mr. Abrahamsen asked you about some of

19  the source code that we asked you about earlier.  I wanted

20  to ask you about Amazon's source code control systems and

21  its live website.  Does the deploy code from the source code

22  control systems to the live website happen regularly?

23  A.      Yes, it does HECK.

24  Q.      Is deploying code from those source code control

25  systems to the live website a regular business practice at

Vaughn - redirect

1   Amazon.com?

2   A.      Yes, it is.  Every deployment we do is from the

3   source code repository.

4   Q.      Has it been that way since you started at Amazon?

5   A.      Yes, it has.

6   Q.      I'd like to ask you a little bit about

7   Mr. Abrahamsen's refrigerator purchase?

8               MR. DONNELLY:  Can you pull up Exhibit 47?

9   BY MR. DONNELLY:

10  Q.      And I'd actually like to ask you about what Amazon

11  actually tells people who shop on the Amazon website.  What

12  is this e-mail again?

13  A.      This is the order confirmation e-mail, just letting

14  the customer know we received their request and we have the

15  order.

16  Q.      And what else does it tell the customer about what

17  they've done?

18  A.      Well, they can change it on-line, make any changes

19  they'd like or cancel it.

20  Q.      And did we see that when we were walking through the

21  steps of the customer after this, going through and

22  cancelling the order?

23  A.      That's right.  We changed the address and we

24  cancelled all the items.

25              MR. DONNELLY:  Bill, could you pull up Slide

Vaughn - redirect

1   130?

2   BY MR. DONNELLY:

3   Q.    And, once again, Dr. Vaughn, what are we looking at

4   here?

5   A.    This is kind of at the end of the fulfillment

6   pipeline.  This is after the truck actually left with the

7   shipments on it, and then a message was sent back to the

8   data center saying the shipment has gone out.  It's at this

9   point that they're in Step 2.  We actually charge the

10  customer's funds.  We e-mail the customer the Shipment

11  Complete e-mail.  And then if that was the final set of

12  items in the order that got shipped, then the order is

13  complete.

14  Q.    And I'd like you to explain in a little more detail

15  what Amazon treats as an order being complete?

16  A.    We call it complete when all the items in the order

17  have shipped or been cancelled.  And it has to have been

18  shipped and gone out and payment closed out and all that.

19  Q.    And then the actual implementation, source code and

20  data at Amazon, how is that reflected?

21  A.    The work flow that manages the orders and shipments,

22  when the last shipment goes out and it's recognized that

23  that is everything left, there is a special condition flag

24  set on the order to mark it as a completed state.

25  Q.    And I'd like to ask you a little bit about also what

Sitar - direct

1   Amazon tells its customers about this.  This is the e-mail

2   we looked at before.  What is this e-mail?

3   A.     That's the Shipment Complete e-mail.  Any time a box

4   goes out and we ship items out, we'll e-mail a customer

5   about those items that just left.

6   Q.     And Mr. Abrahamsen was asking you about what he was

7   determining a purchase.  What does Amazon tell its customers

8   with this e-mail?

9   A.     It's not until everything is shipped that the

10  purchase is complete.  And here, in this case, everything

11  did ship so we tell the customer this completes your order.

12              MR. DONNELLY:  Thank you, Dr. Vaughn.

13              I have nothing further.

14              THE COURT:  Thank you, Dr. Vaughn.  You may

15  stand down.

16              (Witness excused.)

17              THE COURT:  Amazon's next witness, please.

18              MR. DONNELLY:  Yes.  Your Honor, Amazon calls

19  John Sitar.

20              JOHN SITAR, having been first duly sworn, was

21  examined and testified as follows:

22              MR. DONNELLY:  May we proceed, Your Honor?

23              THE COURT:  You may proceed.

24                      DIRECT EXAMINATION

25  BY MR. DONNELLY:

Sitar - direct

1    Q.      Good morning, Mr. Sitar.

2    A.      Good morning, Mr. Donnelly.

3    Q.      Could you tell me a little bit about what you do at

4    Amazon.com?

5    A.      I'm a software development engineer.

6    Q.      And what do you do as a software development

7    engineer?

8    A.      That means I program the software that runs the back

9    end as well as working on the templates that work on the

10   front end of the website.

11   Q.      Could you explain each of those in a little more

12   detail?  What is the "back end," as you just mentioned?

13   A.      Sure.  The back end is the services and all of the

14   various pieces of computer software that run the systems in

15   the back end that actually talk to the database.

16   Q.      And could you maybe just give us a little picture of

17   the database, what you are calling the back end and then

18   what users experience when they are using the site?

19   A.      Sure.  The users are actually interacting with the

20   Web server which what I termed the "front end" earlier.  And

21   the Web servers is responsible for generating HTML that will

22   show them Web pages.

23           The "back end" is a system behind that which is

24   talked to by the Web server and then talks to the database

25   to actually save changes to the data that we're working on.

Sitar - direct

1    Q.      And you mentioned something called "templates."  What

2    are those?

3    A.      Templates are, they're a set of -- really, it's code

4    that creates the actual HTML that is rendered in the front

5    end of the system.

6    Q.      So during this front end doing its job, it looks at

7    these templates and then generates HTML; is that right?

8    A.      That's correct.

9    Q.      And when did you start at Amazon.com?

10   A.      July of 2004.

11   Q.      And what were you doing before that?

12   A.      Before, that I was at school at the University of

13   California-Berkeley.

14   Q.      What did you study?

15   A.      I have a degree in Electrical Engineering and

16   Computer Science.

17   Q.      And what did you work on when you started at

18   Amazon.com full-time in 2004?

19   A.      I was on the seller feedback team.

20   Q.      And what is that team?

21   A.      The seller feedback team is responsible for the

22   feature on the Web site where whenever anyone buys an item

23   from a third-party seller, we allow that buyer to then leave

24   feedback which is about their transaction, just kind of

25   saying how their transaction went, whether they were pleased

Sitar - direct

1   with it and rating overall the seller.

2   Q.    And you have you also become familiar at Amazon with

3   the customer reviews feature on the website?

4   A.    Yes, I have.

5   Q.    And can you explain for us the process of someone

6   creating a review with that customer reviews feature?

7   A.    I can.

8   Q.    Did you bring some materials to help you do that

9   today?

10  A.    Yes, I have a presentation.

11  Q.    So what is the first thing you are going to walk us

12  through?

13  A.    So what we're looking at here is the detail page that

14  we have seen before.  This, as you know, has all of the

15  information about the item in question.

16  Q.    Is there anything special about this particular book,

17  the Butter Battle book?

18  A.    Yes.  Actually, this Butter Battle book was the book

19  that had the very first review left on the Amazon website.

20  Q.    Has Amazon had the same customer reviews on the

21  website since it launched in 1995?

22  A.    Yes, it has.

23  Q.    How do you know that?

24  A.    Because I actually went into the database and looked

25  at the database record for that first review.  And it's

Sitar - direct

1    stored in exactly the same way as modern reviews are.

2    Q.     And did you look at other records reviews that were

3    submitted in early 19 -- or in 1995?

4    A.     Yes, I did.

5    Q.     What did you find?

6    A.     Well, I have a graph here which summarizes what I

7    found when I looked into the database.

8                   You can see that in June of 1995, there was a

9    very small number of reviews, but it quickly grew to close

10   to 100 in July and almost 200 in August, continuing on until

11   there was almost looks like about 750 by December.

12   Q.     So if the person who was on that Butter Battle book

13   detail page wanted to create a review, what would they do?

14   A.     So if you scroll down from the detail page, you will

15   get to the section that is about reviews.  And here you can

16   see there is a chart with the number of reviews had been

17   left with each rating.  And then below that is the actual --

18   an example of a few of the reviews that had been left for

19   this item.

20   Q.     Could you give us a little summary about what we're

21   seeing here with each one of those blocks of reviews?

22   A.     Yes.  So each review has the number of people who

23   found the review helpful.  Then it has the star rating that

24   the user gave it or gave the item, and then the title, the

25   date, and below that whoever the name of the person who left

Sitar - direct

1    of the review, and below that is the main text of the actual

2    review.

3    Q.    And if someone wanted to click on that review, that

4    "by" there, what would that do?

5    A.    If you click on the link next to the name of the

6    person with the review, it will show you all the reviews

7    that person has left on our site.

8    Q.    Is that a popular feature?

9    A.    That link gets about a quarter of a percent as many

10   hits as the detail page.

11   Q.    So if someone were looking at these reviews and

12   decided to make their own, what would they do?

13   A.    They would simply go over to the button on the right

14   that says Create Your Own Review and click that.

15   Q.    And what are you showing here?

16   A.    So this is the actual review form where you enter all

17   of the information that will end up being in your review.

18   Q.    Is this an HTML form?

19   A.    Yes, this is a standard HTML form.

20   Q.    Could you walk us through filling in this form?

21   A.    Sure.  So there is four questions that are the main

22   part of the review.

23         The first one is:  Are you over 13?  This is

24   just because we don't store personal information about our

25   customers who are under 13.

                        Sitar - direct

1            The next one is:  Where do you actually rate?

2    How many stars you give the item?  That is from one to five,

3    and five is the best.

4            And then you enter a title or kind of a summary

5    of your review.

6            And down below there, the main text of your

7    review.

8    Q.    So what would someone do next?

9    A.    So if you're done editing all the fields for review,

10   then you go down to the button at the bottom of the screen

11   that says Preview For Review and click that.

12   Q.    And what are you showing here?

13   A.    So because this is somebody, we're representing

14   somebody who has never left a review before, there is one

15   additional step in the process.  They need to set up their

16   Real Name.

17   Q.    And what is that?

18   A.    So the Real Name is basically just allowing you to

19   choose how you want your name to show up next to all of the

20   reviews that leave on our site.

21   Q.    And what is it that this user filling out their Real

22   Name has to do?

23   A.    So you can see on this form here that he picks the

24   name he wants to use.  And then down below there he can

25   enter his personal signature, which is kind of maybe why you

Sitar - direct

1   think you're qualified to leave a review, just a general

2   signature.  And then below that, you can enter your

3   location.

4   Q.   And if the user wanted to accept those values, click

5   continue, I guess?

6   A.   Yes, that's correct.

7   Q.   And what do they see then?

8   A.   So this is just the preview page that shows you how

9   your real name will show up next to all of your reviews.

10  Q.   Let me ask you one other thing.

11            On this page before, there is something at the

12  bottom that says if you do not want to use your real name

13  attribution, you may create a pen name, with a link.

14            What is a pen name?

15  A.   A pen name is for people who don't want to show their

16  actual real name on the Website.  It's allowing them to

17  create a screen name that shows up next to their reviews.

18  Q.   So what happens after that?

19  A.   So now this is the actual review preview page where

20  it will show you exactly how your review will show up when

21  it's actually on the website.

22  Q.   And what would the user do to publish the review?

23  A.   So at this point, you just hit publish review and it

24  will send it to our server.

25  Q.   And then what happens?

1   A.      So now that they have the Thank You Page, it means

2   that the review has been sent to our server and received

3   successfully, and it will show up on the detail page of the

4   product.

5   Q.      Is it going to show up whether or not it's positive

6   review or negative review of the book?

7   A.      Yes, it will.

8   Q.      And why is it going to do that?

9   A.      We feel like it's a better customer experience for

10  our customers to have an accurate idea of how other people

11  have rated the item.

12  Q.      What you just walked us through for that book had an

13  overall rating number of stars.  Are there any rating

14  categories that are specific to books in the Amazon website

15  reviews?

16  A.      No, there aren't.

17  Q.      Are there products at Amazon where you can't submit a

18  review that have categories specific to the type of product?

19  A.      Yes, there are.  In toys and video games, there is

20  additional rating categories.

21  Q.      Could you walk us through how that would work?

22  A.      Sure.  So we'll start again at the detail page and

23  scroll down to the customer review section, and hit the

24  create your own review button.

25  Q.      Is this another form that uses HTML?

Sitar - direct

1   A.      Yes, this is a standard HTML form.

2   Q.      Could you explain to us some of those kind of toy

3   specific categories you mentioned?

4   A.      Yes.  Sure.  So you can see the form is basically the

5   same as the book.  There is just a few extra questions here:

6                How much fun is this toy?

7                How would you rate this toy's educational value?

8                And, how durable is this toy?

9   Q.      And if you use --

10  A.      So you go through and fill out the form the same way

11  as before, but now you also enter ratings for those extra

12  three questions.

13  Q.      And about what percentage of Amazon's products have

14  these additional product specific categories in the reviews?

15  A.      Less than one percent.

16  Q.      So a Preview This Review again?

17  A.      Yes.  And because we've already set up the real name

18  for this account, we'll just go straight to the review page

19  at this point.

20  Q.      Could you explain to us how this shows up?

21  A.      Yes.  So this is the preview page that we saw before.

22  You can see under where it has his name, it also has those

23  extra ratings we gave on the other screen.

24  Q.      Now, Mr. Sitar, you have explained to us these HTML

25  forms that show up on the website.  I was hoping you could

Sitar - direct

1   give us a little more information about what these things

2   really are.  Is that something you can do?

3   A.     Yes, it is.

4   Q.     And what are you going to walk us through?

5   A.     I thought I would just give a sort of brief tutorial

6   of exactly what HTML looks like and how you would create a

7   simple Web page in the form like we have seen on the review

8   form.

9   Q.     Let me ask you first, what is HTML?

10   A.     HTML stands for hypertext markup language; and really

11   at its core is a way you can specify the formatting of the

12   page you want to display on the Web browser.

13   Q.     So it's what browsers expect from Web servers to make

14   Web pagers for servers?

15   A.     That's right.  There is a standard that all HTML

16   pages really have to conform to or no browser would

17   understand them.

18   Q.     So what would someone do if they wanted to start

19   making a Web page?

20   A.     So all of HTMLs kind of made up of tags which look

21   like what I have here.  It's the name of the tag and then

22   surrounded by these little brackets.  And most tags have

23   start and an end.  You can see here there are two tags.  The

24   first one is just <html>.  And the second one is </html>.

25   The <html> means that's the closing tag.  So effectively

Sitar - direct

1    what this section of HTML means is that this is an HTML page

2    should be interpreted by the browser as such.

3    Q.    So what would someone do if they wanted to actually

4    start having words show up on their Web page?

5    A.    So on these slides, the left side is a representation

6    of what would show on the browser if you opened up the HTML

7    code that is written on the right side.  So here you can

8    see, if you just want to have text show up, it's really

9    easy.  You put it between the HTML tags and it will come

10   straight through.

11   Q.    So what we're seeing on the right is the HTML tags

12   you mentioned before, the text "hello, world" in it.  If you

13   save that file and open it up on the browser, is that what

14   we would see on the left?

15   A.    That's correct.

16   Q.    So are there other types of formatting you can do

17   with HTML?

18   A.    Yes.  So I have an example here of the <p> tag, which

19   stands for paragraph.  And all this tag does is wherever you

20   put it into the document, it will create a new paragraph

21   there by putting in a blank line.

22   Q.    So what do we see on the left with the lines

23   introduced and the <p> tag on the right?

24   A.    So on the left, you can see, because we added that

25   <p> tag, it now says "hello", and there is a space, and then

Sitar - direct

1  "world".  The browser knows because there is a <p> tag

2  there, there should be a space.

3  Q.     And what or kind of formatting can you do in HTML?

4  A.     So there is a variety of other kinds of formatting

5  you can do.  Most of HTML is concerned with, you know, the

6  visual look of the page.

7          So here I have an example of the font tag which

8  is just used to control the font that you want the text to

9  show up in.

10         You can see that the structure of this tag is

11  basically the same.  We have a <p> tag again which has

12  created that space.

13         And then it says <fontColor=red>.  Here is some

14  red text.  And then </font> to close the tag.

15         So what that means is everything in between the

16  opening font tag and the closing font tag will appear in

17  red.

18  Q.     And are those font tags just part of the HTML

19  standard?

20  A.     Yes, they are.

21  Q.     So suppose someone wanted to put a picture on the Web

22  page.  How would they do that?

23  A.     So pictures are also pretty simple in HTML.  Here I

24  have a picture of a dog and the way that I put this into the

25  page is using a tag called image.  You can see on the bottom

Sitar - direct

1   line, the part that is blown out it says <img_src=dog.jpg>.

2            What that means is when the browser hits that,

3   it knows that there is going to be an image, and the source,

4   the thing after the equal sign on the source tells it where

5   to find that image, to put it in the page.

6   Q.    Can you back us through that image tag that you have

7   on the fourth line there on the right?  Just from the start

8   to the finish and tell us what everything is doing?

9   A.    Okay.  So the first part, <img>, is just saying this

10  is an image tag and should be used to insert and image on

11  the page.

12           The next part is the <src> or source which

13  indicates that this is what, where can find the file that

14  has the image in it.

15           And, finally, <dog.jpg.> is the actual image

16  file.

17  Q.    And if someone wanted to use a picture of a dog

18  somewhere else on the Internet, how would they do that?

19  A.    So the way that that was written, it would just be

20  looking for that file <dog.jpg.> on the same directory on

21  the same computer.  So if you want to have an image from

22  somewhere else on the Internet it's basically the same.

23  You just have <img_src=> again.  Now you put a Web address

24  of wherever that image is found on the Internet.

25  Q.    So when the browser is going to look at this HTML,

Sitar - direct

1    you have on the right, what is it going to do?

2    A.     So when the browser hits this, while it's rendering

3    an HTML page, it will see the image tag and know it's

4    supposed to be inserting an image into the page and then it

5    will follow the Web address after source in order to find

6    that image file and then display it on the page.

7    Q.     And is doing all that just part of the HTML standard?

8    A.     Yes.  This is standard HTML.

9    Q.     So, what else would someone do making this Web page?

10   A.     So, I thought I would also show an example of how to

11   create a simple form, like the ones we have seen on the

12   review form.

13   Q.     So, what's a form?

14   A.     A form is basically a way for the browser and the --

15   for the person who is using the browser to interact with the

16   Web page.  It, in this case, I asked the question, "How old

17   are you"?  And the user is able to enter their age there.

18   Q.     Could you just walk us through the lines there up on

19   the right?

20   A.     Sure.  So, at the beginning, we have a <p> tag again,

21   which just makes that space.  Then we have an opening form

22   tag.  The last line is the closing form tab.  So what this

23   tells the browser is everything between that opening tab and

24   the closing tab should be interpreted as a form.

25                 The next line is, "How old are you"?  It's just

Sitar - direct

1   a question which shows up straight through.  And another <p>

2   tag for a space.

3              Finally, there is a tag that's called, Input

4   type = text name = page.  And I will break that down.  Input

5   just means, at this point in the page, there needs to be a

6   control to allow the user to input into the form.  Type =

7   text means that it should be a standard text box so the can

8   put enter that text they want into.  And then name = age

9   allows the browser to tell the difference between different

10  elements of the form if we have more than one.

11  Q.     So input types, are those things that are specified

12  in each e-mail standard?

13  A.     Yes, they are.

14  Q.     And the box that shows up on the left, the browser

15  reads the input type, and if it asks for the right kinds of

16  things, it puts it on the page?

17  A.     That's correct.

18  Q.     And here looks like someone has filled in "26"; is

19  that what someone does when they fill in one of these input

20  type text boxes?

21  A.     Yes.  So because it's an input type = text, you can

22  really put any type of text in there.  Anything you want to

23  type in.

24  Q.     You mentioned name = age.  Can you explain a little

25  bit more about these different names?

Sitar - direct

1   A.     So, the name is -- is how the browser will identify

2   this field in this form.  In this particular example, it

3   doesn't really do a whole lot because the form can't

4   actually be submitted.  There is no -- there is no submit

5   button.

6   Q.     So how would we change this if we wanted to submit

7   it?

8   A.     So, in order to submit it, we have to tell it,

9   basically, where to go, where to send this form when we are

10  done filling it out.  And the way you do that is by adding

11  this action = into the form pad.  In this case, we view

12  action = and then a Web address, a fake Web address, of a

13  form that it would be sent to.  And then the other thing it

14  would do which is create the actual button that submits it

15  is use this input type = submit that we have at the bottom.

16  Q.     So input type = submit, that's the standard way to

17  tell a browser to put a button that users can click to

18  submit a form?

19  A.     That's correct.

20  Q.     So, if they did that, the browser would send that to

21  what you have there in the action address?

22  A.     Correct.

23  Q.     And is that the way that Web forms normally work?

24  A.     That's in the HTML standard.

25  Q.     So, if someone were doing this type of form and they

Sitar - direct

1    actually clicked it on a browser, can you explain what you

2    are showing here for how it relates to that form somehow?

3    A.    Sure.  So, when the form is submitted, it will send

4    an http request to the Web server.  This is the actual text

5    of the http request that's sent to the Web server.  Most of

6    this information has nothing to do with the form.  It's just

7    stuff that's sent along with every http request.  So all of

8    the stuff that's created is standard headers that's sent

9    with every request.

10            The line that's highlighted on top is the actual

11   request and the address that the form is -- is submitting

12   to.

13   Q.    So if the user fills out that form, says the age is

14   26, hits submit, the browser is going to send one of these

15   things over to the Web server?

16   A.    That's correct.  And the way that the form will tell

17   the Web server what was entered into the field is, if you

18   can see on that first line, after it says, "Format HTML,"

19   which is the Web address on the form, there is a question

20   mark, and then it says "age = 26."  And that "age = 26"

21   comes from the form.  If you recall, we had the name of

22   field on the form set to age and they entered 26 into it.

23            So, this is the standard way that a form will

24   submit to a Web server.

25   Q.    And what's the word in front of that, "Get"?

Sitar - direct

1    A.    There is two kinds of http requests that you can do

2    from the form.  This is the default one, "Get," which

3    specifies that the way that it should pass all of the values

4    that were put into form is this way with the question mark

5    and the equals.

6    Q.    And what are those Get things called, if you actually

7    wanted to type it in for them?

8    A.    So, if we actually want to specify the, what way it

9    should use to submit it to the form, they use this method=.

10   So, here, I have added "method=Get" into the form.  And if

11   you fill out the form and submit it, then you can see that

12   the actual request that's created is exactly the same.  It

13   has all the same headers that we saw before and the URL that

14   it's looking for at the top is the same format HTML question

15   mark age = 26.

16   Q.    What else can you do with these method equals things?

17   A.    So the other way you can submit a form is post.  And

18   post is basically the same thing when it submits to the

19   server.  It's just a -- the format is slightly different

20   really.

21          So, here, we fill out the form and we submit it,

22   and you can see now the first line says, "Post," instead of

23   Get, and then it just says formulation HTML.  There is no

24   question mark there.  However, that argument that we had in

25   the form, the age, is now at the bottom as part of the body

Sitar - direct

1    of the request.

2    Q.    Are these "Get" and "Post" as part of the HTML

3    standard?

4    A.    Yes, they are.

5    Q.    So, with this background, could you help us

6    understand how we make a product review arm line the kind

7    Paul Davis testified about and the ones that we saw in the

8    Amazon website?

9    A.    Sure.

10   Q.    How would we start?

11   A.    So, the review form is, basically, just made up of

12   the same kind of http elements, standard http elements that

13   we have seen in this example.  First of all, just cut down

14   an example I had started before, just to form and we cut out

15   all of the other stuff.

16   Q.    So what are we seeing here?

17   A.    So, this, again, is that form we had in the last

18   example, and you can see it says, Form action = some

19   site.com/form.html.  Again, that's telling the browser where

20   to send the form when it's submitted.

21         And it says "method = post," which specifies

22   that it should send it to the Web server as a post, and then

23   it has the questions followed by -- or the question followed

24   by the input type -- or input type = text name = age, which

25   means that it should submit it as the age field.

Sitar - direct

1        And, finally, the last two lines are the input

2   type = submit, which creates the button, and the /form and

3   edit form.

4   Q.    And how does that show up on the browser, both what

5   people are seeing here and then what the browser do if

6   someone filled it in?

7   A.    So you can see here that when this http is rendered,

8   it creates "How old are you"?  And the box and then a button

9   below that to submit it.

10  Q.    So, what else would someone need to add if they

11  wanted to make a form like a product?

12  A.    So in order to create the review form, we should,

13  first of all, change the question.  Instead of, How old are

14  you?, we will have, Please enter a title for your review.

15  And then the name of that input type = text, we will change

16  to title.  So now this box is for putting in the title.

17        Below that, we will have the, "Please enter your

18  review," and for this input, we are going to use the text

19  area, which is basically like the same thing as an input

20  type = text, it's just, as you can see on the left, it makes

21  the box slightly bigger and it has scroll bars on the side

22  so you can actually enter in a little more text.

23  Q.    What else would someone need to add to this form?

24  A.    Well, if you recall, the first question on the review

25  form is:  Are you over 13?  And it's displayed with yes and

Sitar - direct

1   no and little buttons next to those to select which one.

2   The way you create this instead of HTML is by using an input

3   type = radio.

4           Radio button means to create those little round

5   buttons that only one of them can be pressed at a time.  If

6   you press yes, then you press no, yes will become

7   unselected.

8   Q.   So would you walk us through what you have shown on

9   the right?

10  A.   Sure.  So, again, it has the question:  Are you over

11  13?  And then it has:  Yes.  Next to yes, we want the button

12  to show up.  So it says, Input type = radio, which means to

13  create a radio button.  And then name over 13.  Just like we

14  have to with the text, we have to specify the name that we

15  want it to go to the Web server at.  And then the value,

16  yes.

17          Because the user can't really type in, you know,

18  into this button, we specified the value to be sent actually

19  in the tab like this.

20          Below that, we have "no," and then the same kind

21  of code for the "no" selection.  It's just the only

22  difference is the value was no.

23  Q.   And what would happen if someone submitted this kind

24  of form with the radio buttons?

25  A.   Because we specified in the form that it's method =

1    post, it will send a post to the Web server, to the address

2    specifying the action, and, again, you can see that it sends

3    all the same headers that it sent before, and -- to the same

4    address form, the HTML form at the top.

5              Now, down at the bottom, you can see the actual

6    post arguments that are sent along.  The first one is over

7    13 = yes, so that's the value that we got from those radio

8    buttons.  And then there is an "and" sign, and it says,

9    Title = the best yet.  The next is body = my best friend.

10             So what that part is -- actually, I think it

11   would be a little easier to read -- so, what that part is is

12   part of the standard that says that it can't be any spaces

13   in the post.  So it will actually replace the -- or it will

14   -- it will connect together all of the name and value pairs

15   together to -- with ampersands or "and" signs, and it will

16   replace all of the spaces in the text manager with "plus"

17   signs.

18   Q.    So, what we see here on the bottom, that's what the

19   user typed in that review form?

20   A.    That's correct.

21   Q.    So what else would someone add if they wanted to make

22   this review form?

23   A.    So, the next thing we need on a review form is a drop

24   down box to select the number of stars you rate the item.

25   The HTML off of this is a little bit more complicated but

Sitar - direct

1   it's still basically made up of the same kinds of things.

2          In the blown up section here, I have a <p> tag

3   just to create the space, the question, "How do you rate

4   this item"?  And then we use the select tag to indicate

5   there should be a drop down box here.  The select tag, you

6   can see, has an opening and a closing at the end.  And in

7   between those two are all of the options that show up when

8   you click on that drop down box.

9   Q.    So, could you just walk us through what you are

10  calling the select tag or "P" options?

11  A.    Sure.  Where it says, Select, Name equals rating,

12  this is just like where we have the input text equals text,

13  name equals whatever, you have to specify the name that you

14  want, this, whatever the user selects here, to go through to

15  the Web server.

16          Then after that, it has five different option

17  tabs which specify the value that will get sent to the

18  server if that's selected when the user submits the form.

19  Next to each of the option tags is the actual text which we

20  have show up when the drop down box comes down.

21  Q.    And are these select and option type of form inputs

22  part of the HTML standard?

23  A.    Yes, they are.

24  Q.    So, what other kind of form elements can someone use

25  and create?

Sitar - direct

1    A.    So, one of the things that the original creators of

2    HTML thought about is --

3    Q.    Let me actually ask you to explain a little bit more

4    about the rating you just entered, when it goes over to the

5    server.

6    A.    Oh, right.  So here is actually the post that it

7    submitted when we fill out that form of that new drop down

8    box.  You can see it has all of those same arguments we had

9    on the last post, over 13 equals yes, and title equals the

10   best yet, and body equals my best friend, but now there is

11   the second argument, there is rating equals five.

12   Q.    So as we have been building at this form and watching

13   what messages go back to the server, the browser is just

14   going to put what the user enters into the form down in this

15   chunk at the bottom of his post?

16   A.    That's correct.

17   Q.    So, we were talking a bit before bringing up this

18   http message without a different kind of form input.  What

19   was that?

20   A.    I am sorry.  Can you repeat?

21   Q.    Sure.  If someone wanted to use one other kind of

22   form input that the user didn't see, is there a way to do

23   that?

24   A.    Yes.  As I started to say earlier, one of the

25   problems with forms originally that the creators of HTML

Sitar - direct

1   thought of is you might have multiple pages of forms in a

2   row.  And it would be weird for the user to, like, fill out

3   some -- some stuff in a form and then have it, like, appear

4   again on the next page.

5           So they added another type of input called

6   "hidden."  And all this does is acts exactly as if there was

7   an input type equals text with the same name.  But rather

8   than showing the box and letting the user type in what they

9   want, you actually specify the value right in the tag.

10          So, you can see here, I have, Input type equals

11  hidden, name equals ISBN, and a number for the value.  What

12  this means is when this form is submitted, it will send

13  along another argument that's called ISBN and has the value

14  of that.

15  Q.    And before we see what that looks like, could you

16  just maybe walk us through from top to bottom what we have

17  on the left and the right?

18  A.    So, on the left, you can see the, basically, the HTML

19  -- sorry, on the right, you can see the HTML that will

20  create this form.  At the top, you see it asks the question,

21  Are you over 13?  And then we have the two input radio

22  buttons that you can see on the left next to yes and no.

23  And then next is the drop down box which has the question,

24  How do you rate this item?  And it has five different values

25  for the five different star ratings you can put in.

Sitar - direct

1      Below that, you can enter a title using input

2   type equals text, and below that, you can enter the body of

3   your review using the text area name equals body.

4      At the very bottom, we have a new input type

5   equals hidden, name equals ISBN, and value number.

6   Q.   Now let's look at what the http message would do with

7   that hidden field.

8   A.   So you can see, just as we saw on the last two

9   examples of the post, that it's sending along all of the

10  things that we are going to do with the form connected

11  together with "and" signs and all the spaces changed to

12  plusses.  So from left to right, it's the over 13, the radio

13  buttons, the radio equals five, which is the value selected

14  in the drop down box, the title in the body, and then,

15  finally, at the end, you will see the hidden field ISBN and

16  the number next to it.

17  Q.   So what would this form and the http message look

18  like if it were on Amazon.com and had a cookie?

19  A.   So, if this document was hosted on an Amazon.com,

20  then the browser would know that it should send along any

21  cookies it has that are set for Amazon.com along with the

22  request.

23      You can see here what the actual post request

24  looks like.  Along the bottom is all of those same arguments

25  that we see before.  And then as part of the headers above

Sitar - direct

1    that, there is a line that says, "Cookie," and we have an

2    example of an Amazon x-main cookie here.

3    Q.     So, with this understanding, can you just give us a

4    little move detail walk through of that product review form

5    from the Amazon.com Website that you showed before we

6    started this?

7    A.     Yes, I can.

8    Q.     So how is this going to be built up?

9    A.     So, I am just going to show you a little bit of the

10   HTML that actually goes into making the review form itself.

11   Here we have the representation of the user's computer and

12   the Amazon's computers.  And the user is looking at the

13   "butter battle" page right there.

14   Q.     If they wanted to make a review, what do they do?

15   A.     Just as before, we will scroll down and we will hit

16   the "create your own view" button.

17   Q.     What are we seeing here?

18   A.     Now, this is the HTML form that we saw before.  And

19   if you notice over on the right, there is an image of the

20   cover of the book.  The way that we get this on the Web page

21   is exactly the same as we did in the example.  Here we go.

22   Q.     What are we seeing here?

23   A.     So, here you can see the -- the same image source

24   equals and then a Web address that we saw on the example.

25   This is the, as I said, the standard way that you add an

Sitar - direct

1   image into your website.

2   Q.     And what about the form?

3   A.     So the form on this page is, as I said, just a

4   standard HTML form, uses all of the same kinds of things

5   that we saw on the example that I just showed you.

6           So, here, you can see the actual HTML code,

7   which, on this page, creates that form.  It starts with the

8   form tag and then there is method equals post and action

9   equals and a Web address.

10  Q.     And this says form class equals, and then quotes CR

11  form.  What's that about?

12  A.     The class is actually just a way to make the form a

13  little bit pretty.

14  Q.     So if someone filled in this form and then chose to

15  preview it, how would the http message look?

16  A.     So it's going to look pretty much like what we saw

17  submitting the example form.  It's going to send across the

18  Internet the http post and the cookies that are on the --

19  the user's computers.  Here, we have blown up the post, so

20  you can see it looks basically the same, it's post and then

21  the Web address.  And then down at the bottom, it's going to

22  have all of the values that were entered into the form

23  separated by those "and" signs and with the name and the

24  value and equals sign.

25  Q.     Dr. Vaughn explained a little bit about what would

Sitar - direct

1   happen when the cookie makes it over to what's shown over

2   here on the right.  I won't ask you to repeat that.  But

3   could you just summarize what's going to happen when this

4   preview message makes it over to the Amazon.com website?

5   A.    So, at this point, the Web server has received a

6   request and it has to put into effect what the -- the

7   computer is asking for, which is to preview the form.  So it

8   will use a bunch of the services that I was mentioning

9   earlier to get all of the data it needs to show that preview

10  page.

11  Q.    And if they actually submitted it, would it go into

12  those services as well?

13  A.    Yes.  So when you actually submit it on the -- the

14  Web page, it will go to one of the services that is

15  responsible for saving that data to the database.

16  Q.    Now, we were looking earlier at that butter battle

17  book detail page which had a list of reviews.  Could you

18  explain to us how those end up on that page?

19  A.    I sure can.  So here we are looking at the detail

20  page, and -- just as we have been.  And you can see the link

21  here that says 52 customer reviews.  So if you click on

22  that, it will send an http Get over to the server on the

23  cookie and now the server knows that it needs to create the

24  actual page that shows all of the reviews.

25  Q.    What are we seeing here?

Sitar - direct

1   A.      So, this is the step immediately after all of the

2   cookie interaction with the session interceptor that

3   Dr. Vaughn talked about earlier.  At this time, the HTML

4   engine already has the customer and session information and

5   it's going to actually try and create that review page.

6   Q.      Now, you mentioned services earlier.

7           How do those factor into what were shown with

8   that Amazon Web server in this report?

9   A.      So, the way that the Amazon site is created, there is

10  -- in addition to the HTML engine that puts together all of

11  the pages, there is a large number of services in the back

12  end that are responsible for the data.  So, on this graph,

13  we have represented each service as just a blue circle.  And

14  you can think about each of these services as sort of owning

15  or -- or being responsible for specific kinds of data that

16  was on the page.  So, for example, in the seller feedback

17  sheet, on the service, called the seller feedback service

18  and it was responsible for whenever we needed to show those

19  ratings of sellers that I talked about earlier, the Web

20  server would know to talk to those servers.

21  Q.      Let me ask a little bit about, you know, where these

22  services are?  Different hardware, different software?

23  A.      So these are programs running on separate hardware

24  from the Web server and inside the Amazon network.

25  Q.      So, one of the things we were trying to get are

Sitar - direct

1   reviews from that detail page.  Is there a service for that?

2   A.    Yes.  So, the -- the actual page we are trying to

3   serve here is the page that shows all of the reviews about

4   the butter battle book, and the review service is

5   responsible for that data.

6   Q.    And how is that, the HTML engine that we have been

7   talking about, going to get that information from the review

8   service?

9   A.    So it's going to use something called a remote

10  procedure call.  Here I have kind of a diagram that

11  represents how a remote procedure call works.  Up at the

12  top, you see all of shows shapes, triangle, circle, et

13  cetera, which represent functions that the HTML engine can

14  be called.

15            In the course of creating an HTML page, the HTML

16  engine might follow a whole lot of functions.  It just so

17  happens that these particular functions are related to

18  reviews and they will actually be implemented by review

19  service.

20  Q.    So, could you just walk us through what you are

21  showing with the shapes on the top and the shapes on the

22  bottom?

23  A.    Sure.  So, you can imagine each of those shapes in

24  the top is something like a function that -- that's for

25  getting all of the reviews for a particular item or maybe

Sitar - direct

1    getting all of the reviews that particular customer has

2    left.

3              Down at the bottom, connected by that line which

4    represents the Amazon Network, we can see what the review

5    service looks like.  So this is on a separate piece of

6    hardware, there is a separate computer program that's

7    running that knows how to do each of those things.

8    Q.    So what's going to happen when the HTML engine needs

9    to make that page which includes reviews?

10   A.    So the HTML engine will call one of those functions

11   it knows about and then there is a datagram layer which is

12   responsible for taking that call and kind of packaging it up

13   in the way that can be sent across the network and it will

14   then send it across the network to review service.

15   Q.    And you said the datagram layer packages things up.

16   How does it do that?

17   A.    It uses a technology called TIBCO.

18   Q.    What happens when it makes it down to the review

19   service?

20   A.    So now it goes through the datagram layer which

21   unpacks it and then calls the appropriate method, the review

22   service, that actually implements the -- what we are trying

23   to do here, which is get all of the reviews left for a

24   particular item.

25   Q.    And then what happens?

1    A.      Then after it's gotten all that data from the

2    database, it will send it as a datagram back across the

3    network to the HTML engine.

4    Q.      And what are you showing here?

5    A.      So, I am just showing what I just said, the data

6    coming back from review service, going back to the HTML

7    engine.  At this point, the HTML engine has the reviews, a

8    person will call some other services for other parts of the

9    page, but, overall, it has all the data it needs.  It will

10   create the HTML and send that back across the Internet as

11   the http response.  And then the user's browser displays the

12   page.

13   Q.      Let me ask you to actually step back and explain some

14   of this in a little more detail.

15           On the heading here, "Remote procedure call,"

16   and you explained that when you were showing us this

17   datagram layer, what exactly is "remote procedure call"?

18   A.      So, a remote procedure call is just a way that you

19   can have a function that, like other functions, will perform

20   whatever specific actions it's meant to do, but it happens

21   to be implemented on another computer that's far away.

22   Q.      What does "remote" mean?

23   A.      "Remote" means that it's, as I said, it's far away,

24   it's not on the same computer, it's across the network.

25           MR. DONNELLY:  Could you get 160.

Sitar - direct

1    BY MR. DONNELLY:

2    Q.    I want to ask you one other thing.  We were looking

3    earlier about the user filling in this form and they entered

4    the yes or no and a title for review some text, and then hit

5    preview.  And we saw the cookie and the post would go over.

6    Then we have this flow out of the cookie.

7               Is any of the information that the user put in

8    the form in the cookie?

9    A.    No.

10   Q.    Where is it?

11   A.    It's all in that http post.

12   Q.    Is that what we are seeing here?

13   A.    Right.  You can see down at the bottom where it says,

14   Over 13 equals y and rating equals four, those were all the

15   fields that were in the form.

16               MR. DONNELLY:  Thank you, Mr. Sitar.

17               THE COURT:  Mr. Abrahamsen, are you going to be

18   doing the cross-examination?

19               MR. ABRAHAMSEN:  Yes, Your Honor.

20               THE COURT:  I don't know how long you plan to

21   take, but I do plan to break around 1:00, around that time

22   frame, for lunch.  I also have something at 1:15.

23               MR. ABRAHAMSEN:  Okay.  Why don't we get

24   started.

25               THE COURT:  That's fine.  That's fine.  You had

1    asked the last time.  That's why I wanted to advise you, so

2    you can start your questions appropriately and figure out

3    where you may want to end off, should the witness not be

4    done before lunch.  That's all.

5                        CROSS-EXAMINATION

6    BY MR. ABRAHAMSEN:

7    Q.     Good afternoon, Mr. Sitar.

8    A.     Good afternoon.

9    Q.     Now, you don't work on the review service; right

10   have?

11   A.     That's correct.

12   Q.     You work on the buyer/seller feedback?

13   A.     Actually, no.

14   Q.     I'm sorry?

15   A.     I don't work on buyer/seller feedback anymore, but

16   that's what I did work on.

17              MR. ABRAHAMSEN:  Let's start with, can you pull

18   up PX-516 please.

19   BY MR. ABRAHAMSEN:

20   Q.     I don't know if you were here for Dr. Shamos's

21   presentation on infringement.  Were you in the courtroom

22   then?

23   A.     I wasn't here for this part.

24   Q.     This is a form that was presented to Dr. Shamos to

25   allow him to leave feedback about a seller named

1   ValleyTechToys.  Do you see that?

2   A.     Yes.

3   Q.     Now, there is no place on this form that required

4   Dr. Shamos to type in any information identifying himself;

5   right?

6   A.     In order to get to this form, he would have had to

7   sign in.

8   Q.     But as far as when he requested this form to leave

9   feedback, and he is going to leave feedback, he is not

10  required to type any information into this form to identify

11  himself, is he?

12  A.     No, he is not.

13  Q.     So he doesn't have to enter his e-mail address in the

14  form?

15  A.     That's correct.

16  Q.     Or his name?

17  A.     That's also correct.

18  Q.     But the Web server nonetheless recognized the form as

19  having been submitted by Dr. Shamos; right?

20  A.     Well, presuming he went on to submit this form, then,

21  yes.

22  Q.     And that's because Amazon provided instructions to

23  Dr. Shamos's computer that caused little pieces of

24  information called cookies to be stored on his computer;

25  right?

Sitar - cross

1  A.     Amazon will recognize him as it does on all of our

2  pages using the cookies, yes.

3  Q.     So Amazon is sending instructions to Dr. Shamos's

4  computer to have cookies stored in his computer; right?

5  A.     Yes.

6  Q.     And those instructions told Dr. Shamos's computer to

7  transfer those cookies, along with the information in this

8  form, from Dr. Shamos's computer back to Amazon; right?

9  A.     Not really.  It's part of the HTML or -- I'm sorry --

10  the HTTP protocol, if there are any cookies sent, they will

11  be sent along with every request to the server.

12  Q.     Now, when Amazon sent the instructions to send the

13  cookie, didn't they put a command that said

14  domain=.amazon.com?

15  A.     The domain is a standard part of the cookie.  It says

16  what domain that cookie goes to.

17  Q.     But didn't that instruction tell Dr. Shamos's Web

18  browser that when he submitted this form, it should attach

19  this cookie?

20  A.     I wouldn't call it an instruction.  I would say

21  that's just part of the specification.  When the domain

22  matches the cookie is sent.

23  Q.     But the command sent to Dr. Shamos's computer caused

24  that to happen; right?

25  A.     The command sent to his computer sent the cookie,

Sitar - cross

1   created the cookie on his computer.

2   Q.    And told his computer that communications to

3   Amazon.com should include that cookie?

4   A.    No, I think that is just part of the specification.

5   All HTTP requests work that way.

6   Q.    How does Dr. Shamos's computer know to attach that

7   cookie when it sends another message to Amazon.com then?

8   A.    If the domain matches, then it will send.

9   Q.    And that domain was set by Amazon; right?

10  A.    Yes.

11  Q.    Let's take a look now eat the communication that was

12  transferred from Dr. Shamos's computer back to the Web

13  server when you clicked on the Submit Feedback button, which

14  is right in the middle of the page there.

15          And as you can see, before he did that,

16  Dr. Shamos clicked on, it looks likes, 5 stars to select No.

17  5; is that right?

18  A.    It would appear so, yes.

19  Q.    Now, this example uses these stars whereas the

20  earlier example you had drop-down menus.  Why would that be?

21  A.    This is using JavaScript to make the page look a

22  little pretty.

23  Q.    When did Amazon start using JavaScript for this

24  purpose?

25  A.    On this particular form, JavaScript was added in, I

Sitar - cross

1    think it was May of 2008.  I'm a little fuzzy on the exact

2    time frame.

3    Q.     And what is JavaScript?

4    A.     JavaScript is another standard that goes along with

5    HTML, and it's typically used to just make the display of

6    the page a little slicker or a little more pretty for the

7    user.

8    Q.     Is executable code embedded into the HTML?

9    A.     JavaScript is executable code, yes.

10   Q.     But Amazon didn't start using JavaScript until 1998;

11   is that right?

12   A.     I don't know when Amazon started using JavaScript in

13   general.

14   Q.     For these forms anyway?

15   A.     For this particular form, I think it was in 2008.

16   Q.     Oh.  2008?

17   A.     Yes.

18   Q.     So that's, what, 11 years after Cordance filed its

19   first two patent applications; is that right?

20   A.     I don't know when Cordance filed the patent.

21             MR. ABRAHAMSEN:  Dylan, can you please pull up

22   769, which should be the message that was sent to Amazon

23   when Dr. Shamos clicked on the Preview Review button?

24   BY MR. ABRAHAMSEN:

25   Q.     And this is a HTTP post you were talking about;

Sitar - cross

1   right?

2   A.    Yes, it appears so.

3   Q.    Does this post identify the seller that Dr. Shamos

4   was rating?

5   A.    Give me a second.

6         Yes, it does.

7   Q.    And that is the "sellerID=field"?

8   A.    Correct.

9   Q.    And then there is a number that corresponds to the

10  seller ID?

11  A.    Well, it's actually a string; but, yes, it's right

12  under seller.

13  Q.    Does this post identify the star rating that

14  Dr. Shamos clicked on to rate that seller?

15  A.    Yes, it does.

16  Q.    And which entry is that?

17  A.    That is the "rating=5".

18  Q.    Did it also include the comments that Dr. Shamos

19  entered the form before he clicked on the Preview Review

20  button?

21  A.    Yes, it does.

22  Q.    I'm sorry.  The Submit Feedback button.

23        And this form also includes cookies; right?

24  A.    Well, the form doesn't include cookies.  This HTTP

25  posting includes cookies.

Sitar - cross

1   Q.     Okay.  So the HTTP post includes cookies, and those

2   are what are used to identify Dr. Shamos as the submitter of

3   this form; is that correct?

4   A.     That's correct.

5   Q.     And because of that, Dr. Shamos didn't have to

6   manually type in anything to identify himself; correct?

7   A.     Well, as I mentioned before, on the previous page he

8   would have had to submit his e-mail address and password to

9   log in.

10  Q.     But we're talking about this particular form?

11  A.     On this page, he did not have to enter in that

12  information.

13  Q.     Amazon takes steps to verify the identity of

14  customers that attempt to leave feedback for a seller

15  rating; is that correct?

16  A.     That's true.

17  Q.     In fact, Amazon won't accept feedback unless it is

18  complemented and it knows the identity of the person leaving

19  the feedback; is that correct?

20  A.     That's correct.

21  Q.     Now, when this form was submitted by Dr. Shamos and

22  this communication went to Amazon, Amazon determined a

23  customer ID for Dr. Shamos; right?

24  A.     Yeah.  The Web server will have the customer ID for

25  the customer account.

1   Q.      And it used a cookie to do that?

2   A.      As Dr. Vaughn showed earlier, the session interceptor

3   will use the cookie to find the session and customer

4   information, yes.

5   Q.      And Dr. Shamos's customer ID would have been stored

6   along with the feedback information in a database of the

7   seller feedback server; right?

8   A.      Yes so.  After this request goes into the back end

9   and saves that feedback to the database, there will be

10  Dr. Shamos' customer ID in the database, yes.

11  Q.      So then the database stores Dr. Shamos's customer ID,

12  the feedback and the seller about which the feedback was

13  provided, right?

14  A.      Yes.

15  Q.      Now, Amazon began allowing users to leave feedback

16  about sellers in 1999; right?

17  A.      That's correct.

18  Q.      And that's several years after Cordance filed its

19  first couple of patent applications; right?

20  A.      Again, I don't know anything about Cordance's patent.

21  Q.      And ever since the seller feedback system was first

22  introduced in 1999, cookies have been used to determine the

23  identity of the person leaving the feedback, right?

24  A.      I believe that is correct.

25          MR. ABRAHAMSEN:  Dylan, can you pull up

1    Exhibit 512, please?

2    BY MR. ABRAHAMSEN:

3    Q.    Now, this is called an At a Glance page; right?

4    A.    Yeah.  We call this the seller profile page or the At

5    a Glance page.

6    Q.    Okay.  And this particular page includes, it looks

7    like, five separate feedback entries with respect to the

8    seller?

9    A.    That's correct.

10   Q.    Now, what would happen when Dr. Shamos clicked on the

11   feedback tab near the top of that page?

12   A.    So clicking on the feedback tab would send a HTTP

13   request to our Web server with the URL of that feedback tab?

14   Q.    And in response to that request, the Web server would

15   send us a message to the seller feedback service to retrieve

16   feedback information that corresponds to this particular

17   seller; right?

18   A.    As I outlined before, the HTML engine and the Web

19   server will use a remote procedure to call the feedback

20   service, and that will return all the individual feedback

21   entries you see, or you will see, on the next page.

22             MR. ABRAHAMSEN:  Can you pull up 513, please?

23   BY MR. ABRAHAMSEN:

24   Q.    Now, this is the page that was generated when

25   Dr. Shamos clicked on the feedback tab; correct?

Sitar - cross

1   A.      Are you representing that to be?

2   Q.      Yes, I am.

3   A.      Okay.

4   Q.      Does it appear to be a feedback tab page?

5   A.      Yes.

6   Q.      Now, the purpose of providing customers with feedback

7   about sellers is to allow the customers to make informed

8   purchasing decisions; right?

9   A.      Yeah, that's one of the purposes.

10  Q.      And you want the customers to be confident that they

11  can trust the sellers from whom they're buying products?

12  A.      Well, it's not necessarily that we think that they

13  should be 100 percent confident.  It's more that we want to

14  give them the information so that they can make the decision

15  themselves.  You know, if you are just buying something that

16  is a dollar book, you don't really consider that you need to

17  have the most perfect seller.

18  Q.      Now, if a seller gets too much negative feedback,

19  Amazon will actually terminate the relationship with that

20  seller; right?

21  A.      That's true.

22  Q.      And you talked about the A to Z guarantee -- or maybe

23  that was Dr. Vaughn.  But the A to Z guarantee actually says

24  that you will pay, give buyers their money back if they're

25  not satisfied with a particular seller; right?

Sitar - cross

1    A.      That's correct.

2    Q.      So you need to screen different sellers out of the

3    system; right?

4    A.      Well, we track the performance of all of our sellers

5    through a variety of different kinds of data.  Feedback is

6    one of those.  And if their performance falls below

7    acceptable levels, then we will kick them off the site.

8    Q.      So you only want trustworthy sellers to sell at

9    Amazon.com; correct?

10   A.      That's true.

11   Q.      Now, if a customer has a bad experience, even a

12   single third-party seller, that could impact the customer's

13   perception of the reliability of the Amazon website as well,

14   couldn't it?

15   A.      It could.  I don't know for sure any details of that.

16   Q.      So it's important for Amazon to make sure that the

17   feedback information about third-party sellers they get is

18   as accurate and as reliable as possible; right?

19   A.      Yes, we try to ensure that.

20   Q.      And one of the ways Amazon is able to control the

21   accuracy and reliability of the feedback information is by

22   making sure the person providing the feedback is a

23   recognized customer; right?

24   A.      I don't know that we would consider that a control

25   on the quality of the feedback.  Obviously, we don't want

1   someone totally unrelated to the transaction to be coming

2   and giving feedback or, worse yet, the seller was.  But,

3   yeah, we want it to be the right customer leaving feedback.

4   Q.     And the process for determining whether a customer is

5   recognized uses the cookies that accompany the feedback;

6   right?

7   A.     Again, the cookies -- I just want to be clear -- they

8   come in the HTTP post.  I wouldn't say they actually are

9   part of the feedback.

10  Q.     They're both in the HTTP post; right?

11  A.     Yes, they are.

12  Q.     And they're stored together, or at least the customer

13  ID and the feedback are stored together in the database;

14  right?

15  A.     The customer ID of the buyer as well as the feedback

16  of the -- centered on the feedback form will be stored

17  together in the database, yes.

18  Q.     And that customer ID comes from the domain "x-main"?

19  A.     Well, through the process that Dr. Vaughn outlined

20  for you, we arrived at the customer ID that we wanted to use

21  while rendering the page.  That process does use the x-main

22  cookie.

23  Q.     The x-main cookie contains the customer ID; right?

24  A.     That's correct.

25  Q.     Now, the seller feedback service from which this

1    feedback information was retrieved, that's separate from the

2    Web server; right?

3    A.    Correct.

4    Q.    And the Web server around the seller feedback service

5    communicates with one another by sending messages; is that

6    right?

7    A.    That's right.

8    Q.    And I think you testified those messages are called

9    datagrams within Amazon, right?

10   A.    That's one name they put it, yes.

11            MR. ABRAHAMSEN:  Dylan, can you pull up JX-47,

12   please.

13            And just if you can put a box just around the

14   top section.

15   BY MR. ABRAHAMSEN:

16   Q.    Now, Mr. Sitar, this is an example of a datagram that

17   was sent from Amazon's Web server to the seller feedback

18   service, right?

19   A.    I want to be clear about how this was generated.

20   This datagram, or this is actually a dump of what data the

21   datagram had in it at a particular point during the transfer

22   from the Web server to the seller feedback service.

23            The datagram itself isn't in this form.  This is

24   a format that is put in when it's printed.

25   Q.    Does this datagram consist of a set of e-mails pairs

Sitar - cross

1    like we're showing here?

2    A.    Conceptually, yes.

3    Q.    I don't understand "conceptually".  What do you mean

4    by that?

5    A.    Well, the datagram itself, when its sent across the

6    wire, will be encoded using TIBCO, (phonetic) which is a

7    third-party proprietary software that we licensed.  So I

8    don't know exactly what it would look like during the

9    transmission across the network.

10   Q.    You know for a fact, though, that the datagram

11   includes at least this "method=getFeedbackList" entry?

12   A.    It will have a value of "getFeedbackList" that you

13   can get at by asking what the message is.  Whether it's

14   specified in this particular way, I don't know.

15   Q.    Now, "method=getFeedbackList", that is what you

16   referring to as a named value pair?

17   A.    Sure.

18   Q.    Method is the name?

19   A.    That's correct.

20   Q.    And "getFeedbackList" is the value?

21   A.    Yes.

22   Q.    So the named method indicates that the value

23   "getFeedbackList" is, in fact, the method?

24   A.    Well, when this is received on the server side, it

25   will -- what I had labeled as the datagram layer in my slide

Sitar - cross

1    will look into the datagram and find whatever, whatever is

2    listed as the method, and then it will use that to decide

3    what part of the computer program on the server to run in

4    order to perform that action.

5    Q.    So the service looks at the datagram looks for the

6    "method=" and then executes the process that is identified

7    by the "method=getFeedbackList"?

8    A.    Again, it's not -- I don't, I don't want to say that

9    this is exactly what the datagram is because like the whole

10   specific formatting here is added by the printing that we

11   use to produce this to you guys.  So whatever is the value

12   that goes along with "method" will be used to determine what

13   part or what the service should do.

14   Q.    So the service then will execute some processes that

15   correspond to the "getFeedbackList" value in that named

16   value pair; right?

17   A.    The service will -- I guess -- can you define

18   processes, please?

19   Q.    Functions.

20   A.    Okay.  Yes.  So the service will execute that, the

21   function that correspond to get feedback list, yes.

22   Q.    And that function will cause the seller feedback

23   service to retrieve feedback information corresponding to a

24   particular seller; right?

25   A.    Yeah, that sounds right.

Sitar - cross

1   Q.      And that the seller for which the feedback

2   information is to be retrieved, that's also identified as a

3   datagram text; right?

4   A.      Yes.

5   Q.      It's the encrypted rattee ID?

6   A.      Yeah, that's correct.

7   Q.      So when the seller feedback service receives this

8   datagram, it's going to retrieve that feedback information

9   associated with that seller and it's going to transfer that

10  feedback information back to the Web server; right?

11  A.      I'm sorry.  Can you repeat the question?

12  Q.      When the seller feedback service receives this

13  datagram, it's going to retrieve the feedback information

14  associated with a seller identified by that encrypted ratee

15  ID and it's going to then transfer that feedback information

16  back to the Web server; right?

17  A.      So it will use the -- so the "getFeedbackList"

18  function that gets called here will accept the rattee ID it

19  wants to look for in the database.  And using that rattee

20  ID, it will find the feedback left for that rattee or the

21  seller in this case and then send that back to the browser.

22  Q.      And then the browser will display that feedback on a

23  feedback tab, right?

24  A.      That's correct.

25  Q.      Now, Amazon first introduced a feedback service that

Sitar - redirect

1    operates in this manner we just described in the late 2003

2    to early 2004 time period; right?

3    A.     Yes.  I believe it was December 2003.

4    Q.     And that was approximately seven years after Cordance

5    filed its first two patent applications in 1996; correct?

6    A.     I don't know what date Cordance filed their patent.

7              MR. ABRAHAMSEN:  No further questions.

8              THE COURT:  Any redirect?

9              MR. DONNELLY:  Very briefly, Your Honor.

10             Bill, could you bring up No. 70.

11                    REDIRECT EXAMINATION

12   BY MR. DONNELLY:

13   Q.     So, Mr. Sitar, we're looking at the Preview Your

14   Review button on one of the review forms for like the book

15   we spoke about earlier?

16   A.     Okay.

17   Q.     Is the only way that form is going to be submitted if

18   the user actually clicks the mouse button on his or her

19   machine?

20   A.     That's correct.

21   Q.     And Mr. Abrahamsen asked you about a document I guess

22   you have in your binder there, PX-516.

23   A.     Actually, this is not mine.

24   Q.     Do you have it anywhere up there?

25   A.     No, I don't.

1        MR. DONNELLY:  Could you bring up PX-516?

2        It would just be easier to bring it up on the

3   screen.

4        (Binder passed forward.)

5        MR. DONNELLY:  516.

6   BY MR. DONNELLY:

7   Q.    Do you have it?  Great.  Is that what you have there?

8   A.    Yes, this is the same.

9   Q.    Now, this was something apparently that Dr. Shamos

10  created.  Is the only way Dr. Shamos could have got to this

11  page was after typing in his user name and password?

12  A.    That's correct.

13        MR. DONNELLY:  I have nothing further.

14        THE COURT:  Thank you, Mr. Sitar.  You may stand

15  down.

16        (Witness excused.)

17        THE COURT:  We're getting awfully close to the

18  lunch break.  Unless you can tell me you can put something

19  on and get something done in five minutes, we'll probably

20  break for lunch now.  Is that a fair estimate?

21        MR. PASAHOW:  Yes, Your Honor.

22        THE COURT:  Thank you.

23        Members of the jury, I'll see you back here at

24  2:00 o'clock.  Have a good lunch.

25        (Jury left courtroom.)

1                    THE COURT:  Counsel, we'll be back at 2:00.

2                    MR. PASAHOW:  Yes, Your Honor.  Our next witness

3    is Mr. Haskin-Fernald who was the subject of the motion.

4                    THE COURT: All right.  Yes.  You know what?  We

5    might have to tell the jury they're going to have a little

6    bit longer than 2:00.  Tell them that we won't see them back

7    in the 2:30.

8                    How long do you think his testimony -- if his

9    testimony is allowed for the full length of it, how long

10   would it be?  Because I think there is only part of the

11   testimony that Cordance has requested to be struck or not

12   allowed; is that correct?  Or is it all of his testimony?

13                   MR. O'NEILL:  We request to strike it all.  I

14   don't think there is anything separate.

15                   THE COURT:  From the argument that you presented

16   in your motion, there is nothing there after that?

17                   MR. O'NEILL:  There is no corroboration of the

18   key part of his testimony.  And I don't know if it makes

19   sense to have him only talk about the parts that do have a

20   little bit of corroboration.

21                   THE COURT:  I think that kind of depends.  I

22   don't know.

23                   So we're looking at probably the jury not coming

24   back in the 2:30 or so.

25                   I need you here at 2:00 o'clock to see what you

1    will do.  I have not read everything that has been attached,

2    for example, the 200 and-some-odd pages of one of the

3    reports, nor I have read his entire deposition.

4              MR. PASAHOW:  The reports I believe have to do

5    with the other motion.

6              THE COURT:  They do.  I'm just telling you

7    haven't read everything.  That is all I'm saying.  I haven't

8    had a chance to read everything.

9              All right.  So we'll talk about this at 2:00

10   o'clock.

11             (The attorneys respond, "Thank you, Your

12   Honor.")

13             (Luncheon recess taken.)

14             THE COURT:  Please be seated.

15             I understand that this is a deposition that was

16   taken yesterday?

17             MR. O'NEILL:  That's right, Your Honor.

18             THE COURT:  All right.  Do you want to present

19   your arguments on behalf of Cordance, Mr. O'Neill?

20             MR. O'NEILL:  Thank you, Your Honor.

21             Your Honor, Amazon is asserting a prior art

22   system called Netmarket and prior art to Cordance's '710

23   patent.  And to demonstrate what the Netmarket system did,

24   Amazon would like to use the testimony of a former employee

25   of Netmarket, and his name is Guy Haskin-Fernald.  And we

1    deposed him yesterday afternoon.

2              So I think it was clear from the testimony you

3    have seen so far --

4              THE COURT:  Well, let me tell you, in fairness,

5    are you going to talk about his testimony or the testimony

6    previously?

7              MR. O'NEILL:  I want to talk briefly about what

8    the litigation is about.

9              THE COURT:  That's fine.  That's fine.  I'm

10   sorry.  I tried reading his deposition and couldn't get it

11   done.

12             MR. O'NEILL:  Yes.  It's somewhat technical,

13   Your Honor.

14             THE COURT:  It was kind of hard to read in the

15   middle of a hearing on detention, too.

16             MR. O'NEILL:  I understand.

17             THE COURT:  There wasn't even any overlap.

18             MR. O'NEILL:  So that Claim 1 of the '710 patent

19   recites steps of "after receiving an indication to initiate

20   a purchase transaction," and as construed by the Court, it

21   recites "retrieving customer data to use that data to

22   complete the transaction," and in particular, using the

23   customer data to automatically complete the transaction.

24             So in the Netmarket system, the places where

25   these activities would occur would be after the final click

1    that would occur in the interaction between the customer

2    doing Web pages and sending those Web pages back and forth

3    between Netmarket and customer.

4              So presumably at some point after the final

5    click that a customer performed in the Netmarket system,

6    Netmarket did some kind of processing in order to complete

7    that purchase.  And this processing would be done at

8    Netmarket's computers.  And in yesterday's deposition, I

9    asked Mr. Haskin-Fernald to explain the operation of the

10   Netmarket system.

11             THE COURT:  Do you know where in the deposition,

12   specifically?  What pages?

13             MR. O'NEILL:  I guess throughout his deposition.

14             THE COURT:  Don't tell me the whole deposition

15   but if you have any idea if it was concentrating in a

16   certain area.

17             MR. O'NEILL:  Not really, Your Honor.  I mean

18   the whole deposition was essentially about the operation of

19   the Netmarket system.

20             What I would like to point you to is, Cordance

21   believes that Mr. Haskin-Fernald shouldn't be allowed to

22   testify today.

23             THE COURT:  I understand.

24             MR. O'NEILL:  Because there is no corroboration

25   of his testimony.  I'd like to point you to the deposition

1    testimony that shows clearly that there is no corroboration.

2                THE COURT:  All right.

3                MR. O'NEILL:  In particular, if you go to Page

4    28.

5                THE COURT:  28?

6                MR. O'NEILL:  Yes.  Line 23.

7                THE COURT:  That is one page I actually read.

8                MR. O'NEILL:  And the question asked:

9                "Question:  Do we have any source code right now

10   that was produced as part of this litigation that ran on

11   computers that were at Netmarket?"

12               And his response is:

13               "Answer:  No."

14               THE COURT:  Okay.  So explain to me how that's

15   no corroboration, how you view that is no corroboration.

16               MR. O'NEILL:  That is part of it, Your Honor.

17   It's one way Netmarket or Amazon could corroborate would be

18   to produce the source code that ran on the Netmarket system.

19   If Amazon had that, then perhaps they could use it to

20   corroborate, but there is no such source code.  It appears

21   that that source code has never been retained.  It

22   disappeared sometime over the previous 13 years.

23               And later on in the deposition, if you go to

24   Page 60, Line 8, I asked Mr. Haskin-Fernald:

25               "Question:  Do you know of any documents that

1    describe the process that occurred after the final click by

2    the customer?"

3              And his response was:

4              "Answer:  No."

5              So from his testimony and from the documents

6    that Amazon has produced, it's clear that there are no

7    documents of any kind that describe the kind of processing

8    that Netmarket would do after receiving that final click

9    from the customer.

10             So we have Mr. Haskin-Fernald's testimony but

11   there is absolutely nothing in the record to corroborate the

12   testimony that he gave.  And because there is no

13   corroboration, his testimony is legally insufficient to

14   establish the operations of the Netmarket system, to

15   invalidate and to attempt to invalidate Cordance's '710

16   patent.

17             THE COURT:  Let me understand.  His testimony,

18   though -- his testimony is used to set up that Netmarket

19   system was allegedly prior art.

20             MR. O'NEILL:  In particular, his testimony

21   establishes exactly what Netmarket, or it purports to

22   establish exactly what Netmarket did, not the fact that it

23   existed.

24             In order for Amazon to establish the substance

25   of what Netmarket did, not the fact that it existed but

1   precisely what Netmarket did in terms of receiving a click

2   from a customer and using that click to retrieve customer

3   data, and then somehow using that customer data to create an

4   order, that is the substance of the Netmarket system.  And

5   for the details of that operation, we only have

6   Mr. Haskin-Fernald's testimony, and I don't believe there is

7   a single document in the record anywhere to corroborate any

8   of those operations by the Netmarket computers.

9          I guess the only documents that would be close

10  would be some e-mails that the Netmarket system sent to

11  customers after they made a purchase, but that doesn't

12  establish what Netmarket did at all.  It only establishes

13  that a purchase was made.

14          With the documents that we have without

15  Mr. Haskin-Fernald's testimony, it's entirely possible that

16  the Netmarket system was an entirely manual system and it

17  had no automation at all.  It could be that the Netmarket

18  system stored its customer information in Rolodexes and

19  manually retrieved it to make purchases.  We just don't know

20  from the documents we have in this case.

21          And there is a second issue.

22          THE COURT:  Your argument goes to a

23  corroboration hearsay type of argument.  Right?

24          MR. O'NEILL:  Well, it's not hearsay.  It's the

25  fact there were basically no documents whatsoever.

1          So I guess the second point is that there are

2    some documents that Amazon has produced that we believe are

3    hearsay, but even if those documents are allowed into

4    evidence, they still don't have any corroboration of what

5    Netmarket's computers actually did.

6          THE COURT:  Do you have those documents just in

7    case?  I mean if the documents are allowed by the Court, and

8    you are saying not corroboration, do you have a copy of

9    those documents?  Because I haven't seen them.

10         MR. O'NEILL:  It would be easier if they can

11   show you the documents they intend to use today.  It would

12   probably be easier because they have the documents they plan

13   to try to rely on today.  So I can address the hearsay

14   arguments separately, if you'd like.

15         THE COURT:  All right.  The hearsay goes to the

16   documents, right?

17         MR. O'NEILL:  Right.  I guess since there is no

18   corroboration, I don't think we need to get to the hearsay

19   issue.

20         THE COURT:  Why don't you just cover all bases

21   so we have all the arguments out there.

22         MR. O'NEILL:  Okay.  So Amazon is seeking to use

23   documents with Mr. Haskin-Fernald today.  And these are

24   primary e-mails that were sent.  I think almost all of them

25   are between Netmarket and customers and people who were

1    testing the Netmarket system.  And other documents are

2    newspaper articles.

3            So I don't believe any of these documents will

4    fall under any hearsay exception.  And I think any use of

5    Amazon embodies these documents would be for the truth of

6    what these documents say and, therefore --

7            THE COURT:  Such as?  What truth would they be

8    going to?  Like, for example, what truth the matter

9    asserted would be e-mails be going to?

10           MR. O'NEILL:  Perhaps Amazon would like to say

11   these e-mails corroborate the operation of the testimony.

12   And I don't believe that is true, but if they want to use

13   them for corroboration purposes, they'd have to use e-mails

14   for their truth.

15           THE COURT:  And you don't have a declarant

16   available, is that what you are saying?

17           MR. O'NEILL:  Mr. Haskin-Fernald I believe was

18   said to have to receive some of these e-mails but I don't

19   think that changes the fact the e-mails, themselves are

20   hearsay.

21           THE COURT:  Well, I thought hearsay is by

22   someone other than the declarant.  Isn't it?

23           MR. O'NEILL:  My understanding is hearsay is any

24   out-of-court statement being used for the truth of the

25   matter asserted.

1          THE COURT:  No, I think it's other than the

2     declarant.  Otherwise everybody who testifies would now

3     testify under hearsay, wouldn't they?  Hearsay is under 801,

4     right?  It's the truth of the matter asserted.  I understand

5     what you are saying.

6          A statement other than one made by the declarant

7     while testifying at trial here, offered in evidence to prove

8     the truth of the matter asserted.  That's under Rule 801(c).

9     So it's other than the declarant.

10          MR. O'NEILL:  Right.  But this is a written

11     document that was done outside the trial.  In fact, it was

12     done 13 years ago.

13          THE COURT:  No, no.  I understand.  But were the

14     e-mails the product of this witness?

15          MR. O'NEILL:  I believe most of them were not.

16     It could be that one or two them are e-mails that he wrote,

17     but most of them I believe were not.

18          THE COURT:  All right.  Thank you.

19          What do you do about corroboration?

20          MR. PASAHOW:  Yes, Your Honor.  Can I hand up a

21     book?

22          THE COURT:  Yes.

23          MR. O'NEILL:  Can I get a copy?

24          MR. PASAHOW:  Of course.

25          THE COURT:  Specifically, what do you do about

1   the TypeRight Keyboard Corp. v Microsoft case which was a

2   decision by the Fed Circuit in 2004?

3              MR. PASAHOW:  Unfortunately, I haven't had a

4   chance to read that.

5              THE COURT:  That's one of the cases I asked that

6   you read.

7              MR. PASAHOW:  I think if we go back to the

8   beginning, what the Federal Circuit has said is that

9   corroboration is decided under a rule of reason, taking

10  account of a list of factors.  And those factors are,

11  according to Woodland Trust v Flowertree Nursery, which is

12  148 F3rd 1368, decided in 1998, the relationship between the

13  corroborating witness and the alleged prior user, the time

14  period between the event and trial, the interest of the

15  corroborating witness and the subjects under suit, and the

16  contradiction or impeachment of the witness's testimony, the

17  extent and details of the corroboration, the witness'

18  familiarity with the subject matter of the patented

19  invention prior use, the probability that the prior use

20  could occur considering the state of the art at the time,

21  and the impact of the invention on the industry and the

22  commercial value of its practice.

23             THE COURT:  That goes to the sufficiency of the

24  corroborating evidence and that's -- those quotes that you

25  -- or statements, those eight factors that are used there go

1    to sufficiency of the corroborating evidence.

2              MR. PASAHOW:  Yes.

3              THE COURT:  It doesn't go to the issue of

4    whether the corroboration is needed for Mr. Fernald's

5    testimony.

6              MR. PASAHOW:  We don't dispute that

7    corroboration is needed.  The question is:  What does it

8    mean that corroboration is needed?  Corroboration, then,

9    taking these factors into account, is decided under a rule

10   of reason, that is, whether there is reasonable evidence to

11   corroborate what the witness is going to testify to.

12             Now, our witness is Mr. Haskin-Fernald.  He was

13   the chief programmer at Net Market.  He wrote much of the

14   code that ran the site; in particular, the code that's

15   important to us.

16             So, for corroboration, we begin with what is

17   Exhibit 927, towards the end of this notebook, which is a

18   screen shot of the site showing what was essentially their

19   checkout shopping list.

20             And then in addition to that, there was a series

21   of e-mails relating first to a bated test by beta users, and

22   they start with Exhibit 838, which was inviting the beta

23   users to participate, and then 840, which is an e-mail to

24   the beta users telling them the site is now no longer

25   pretend but is live and they can actually make purchases on

```
 1    it.  And then site -- and then exhibit --

 2              THE COURT:  How does this corroborate his

 3    testimony when it's his e-mail?

 4              MR. PASAHOW:  It corroborates that the site

 5    existed as of live as of that date that they were making

 6    sales.

 7              THE COURT:  He is the one that is testifying to

 8    this to begin with; right?

 9              MR. PASAHOW:  Mr. Haskin-Fernald, yes.  He was

10    then Guy Haskin.

11              THE COURT:  But then you say -- I understand.  I

12    understand it's the same person.  But then you turn to me

13    and say that we are going to corroborate his testimony by an

14    e-mail made by him; right?  Isn't that what you are saying?

15              MR. PASAHOW:  In part, Your Honor, yes.

16              THE COURT:  Do you have the testimony from

17    anybody else to establish -- to corroborate his testimony?

18              MR. PASAHOW:  What?

19              THE COURT:  Like the gentleman who did the

20    e-mail for 838?

21              MR. PASAHOW:  No.  We do not have the testimony

22    of the gentleman who did the e-mail.  We do have response

23    e-mails coming back to the company, however.

24              But what I was going to show Your Honor first

25    was that there are e-mails then about completed transactions
```

1    coming from the system.  One of those is Exhibit 842.

2              THE COURT:  And date of transaction?

3              MR. PASAHOW:  I am sorry.  These are e-mails

4    relating to the beta test.  I am sorry, 842 is then an

5    interchange with one of the beta testers about the site.

6              THE COURT:  Okay.

7              MR. PASAHOW:  And then 845, and similarly, an

8    e-mail from one of the beta testers about the site, and,

9    importantly, it goes through the site essentially screen by

10   screen.

11             THE COURT:  Do you have testimony from any of

12   these individuals?

13             MR. PASAHOW:  I am sorry?

14             THE COURT:  You don't have testimony from any of

15   these individuals?  You just have their e-mails?

16             MR. PASAHOW:  We have their e-mails and they

17   came to, among others, Mr. Haskin-Fernald, and he will

18   testify to that.  But there is no dispute about the

19   authenticity of these e-mails.

20             THE COURT:  Explain to me what corroboration is.

21             MR. PASAHOW:  Corroboration is evidence other

22   than the single witness' testimony that leads a fact finder,

23   in this case, the jury, to conclude that what the witness is

24   saying is true by clear and convincing evidence.

25                  I think what the Federal Circuit case has made

1   clear is it's a factual issue to be decided by the fact

2   finders and decided on appeal as a review of the factual

3   determination.

4           Now, in the absence of any corroboration, you

5   cannot put the testimony on, some courts have said that,

6   within the Federal Circuit.

7           THE COURT:  How are these documents not hearsay

8   documents because they are going to the truth of the matter

9   as a jurist certain, is it not?

10          MR. PASAHOW:  Well, all corroboration is -- all

11  corroborating documents are hearsay necessarily.  That's the

12  nature of corroboration --

13          THE COURT:  You are saying that corroboration

14  can be done by documents alone without the need for

15  confirming testimony?

16          MR. PASAHOW:  Absolutely.  It's done all the

17  time.

18          For example, Mr. Reed needed corroboration of

19  his 1983 document and he corroborated it by showing that it

20  was countersigned by -- his page was countersigned by other

21  people.  They didn't come and testify.

22          His testimony about that 1993 event was

23  corroborated by a piece of paper that the jury will have to

24  decide whether or not it corroborates the testimony he gave.

25          And sending e-mail is no different than writing

```
 1     down on a piece of paper and having it countersigned by two

 2     people who aren't testifying.

 3              THE COURT:  If it's hearsay, what exception does

 4     it fall under to allow it to be used?

 5              MR. PASAHOW:  I beg your pardon?

 6              THE COURT:  If it's hearsay, what exception does

 7     it fall under to allow it to be used?

 8              MR. PASAHOW:  I think the document, itself, is

 9     substantively significant not for what it reports to say but

10     because it corroborates the witness' testimony.

11              It is the document that is, of itself, of legal

12     significance.

13              THE COURT:  Isn't that argument a little bit

14     circular because what we have are documents that you are

15     saying wouldn't be used to corroborate the testimony of this

16     witness?  The documents, themselves, are not confirmed;

17     right?

18              MR. PASAHOW:  The documents, themselves, are not

19     what?

20              THE COURT:  Are not confirmed.  In other words,

21     have they been authenticated?

22              MR. PASAHOW:  There is no objection to

23     authentication of these documents.  There expressly is no

24     objection.

25              THE COURT:  And the documents, though, are being
```

1    used -- the documents that he didn't draft are being used to

2    confirm his testimony?

3                MR. PASAHOW:  Yes, Your Honor.

4                There are two other documents I would like to

5    point out.  They are both part of the first tab here, 837,

6    and we have to go back to page 4166, and then the following

7    page.

8                And these are the order confirmation forms that

9    were generated by the system and have a date and make clear

10   that orders were coming out of the system on those dates.

11   So, if you will, this is simply evidence of a system in

12   operation on that day actually making a sale.

13               THE COURT:  And you are going to use these

14   documents how?

15               MR. PASAHOW:  We are going to use these

16   documents to corroborate the witness' testimony that the

17   business was operating on those dates making a sale and that

18   these were the notifications that were going to customers as

19   a result of that.

20               THE COURT:  There is one case that I'd like to

21   look at.

22               MR. PASAHOW:  And, so, I believe it shows what

23   we have to show, which is that there was a system and that

24   it was reduced to practice.

25               Now, Mr. O'Neill argues, or suggested in his

1    argument, that we have to corroborate each element of the

2    claim.  And there simply is no such requirement in any case.

3    That's where the rule of reason comes in.

4              The witness can fill in and explain the details

5    of the prior art device or system and how it met the

6    elements of the claim.  What he has to do is have sufficient

7    corroboration of his testimony under these factors that a

8    fact finder finds, under the clear and convincing evidence

9    standard, that the system existed and operated in an

10   anticipatory fashion.

11             THE COURT:  All right.  I think I understand

12   what your argument is.

13             Mr. O'Neill.

14             MR. O'NEILL:  I would like to clarify a few

15   things, Your Honor.

16             I guess, most importantly, I believe the

17   corroboration does need to establish not just that the prior

18   art existed but what the prior art was.  And the key thing

19   to determine whether Netmarket anticipates the claims of

20   the '710 patent is not whether it existed, it's pretty much

21   indisputable it did exist, it did do something, but what is

22   important is whether that system shows all the limitations

23   of the claims of Cordance 's patent.

24             For that reason, in order to show the substance

25   of the system, Amazon doesn't need just to show that the

1    system existed, but they need to show that, how the system

2    operated and how that system discloses all the limitations

3    of Cordance's claims.

4         Amazon does not have any corroboration

5    whatsoever as to the substance of what the Netmarket

6    computers did.  And I think under the rule of reason, even

7    if you get to the point where we believe there is some

8    corroboration, which I don't think there is, I think you

9    have to consider the fact that the e-mails that they do have

10   just relate to describing essentially the appearance of Web

11   pages.  And this doesn't explain the process that Netmarket

12   did when it received that final click from the customer.

13        I'd also like to point to a couple of the cases

14   that we cited.

15        THE COURT:  I read through the -- the case that

16   I found was the TypeRight Keyboard Corporation case, which

17   actually dealt with invalidity.  And I was reading through

18   that case and in the process of reading through that case

19   saw another case, Sandt, S-A-N-D-T, which unfortunately I

20   didn't run off, because of what it was cited for it by the

21   Fed Circuit.  And what it was cited for is:  Physical

22   evidence and oral testimony of a disinterested party can

23   serve to satisfy the corroboration requirement.

24        And I'm trying to find the Sandt, the rest of

25   the citation of the Sandt case in here, found at 264 F.3d,

1     but the page that is cited is 1351 which is the page that

2     supposedly supports that statement.  And that goes to the

3     issue directly of corroboration.

4              But what was the other argument?  What other

5     argument did you wish to say.

6              MR. O'NEILL:  One point, Your Honor, is I think

7     the cases show that hearsay cannot be used to corroborate

8     the situation.  We cite the Medichem, S.A. v Rolabo, S.I.

9              THE COURT:  Yes, but you know what bothers me

10    about some of those cases is this.  It goes to corroboration

11    adopting a rule of reason but it does go to the inventor.

12    And it cites the Chen v Bouchard case.  And the whole

13    argument is, for creditability concerns, the undergird is

14    -- concerns the undergird corroboration requirement, the

15    purpose of which is to prevent fraud.  The purpose of

16    corroboration is to prevent fraud by providing independent

17    confirmation of the inventor's testimony.

18             But it, the two cases that you relied on, the

19    Medichem case and the Chen case, both went to the issue of

20    corroboration of the inventor's testimony about conception

21    and/or reduction to practice, and then it goes on to talk

22    about what was the sufficiency of corroboration is.

23             MR. O'NEILL:  I would also like to point out,

24    Your Honor, I believe the corroboration requirement is not

25    just for fraud but I think it's also to address the fact

1   that people's memories may not be entirely accurate.

2             THE COURT:  Well, that was the issue that was

3   brought up in the TypeRight case.  But in that case, the

4   Court had gone to a jury and the Court had decided the

5   motion for summary judgment on obviousness.  What TypeRight

6   said to the Fed Circuit was we don't like what the District

7   Court did below because there were a slew of concerns

8   regarding the Marquardt -- and I don't think I pronounced it

9   correctly -- document, which other individuals, which two

10  witnesses were testifying about.  And what the Court ended

11  up doing was remanding the case back to the District Court

12  to address a couple issues:

13            It said that the creditability issue then arose.

14  That was a genuine issue of material fact which the Court is

15  not allowed to decide.

16            But what it also said was TypeRight is entitled

17  to a trial to determine if this document is prior art.  If

18  the jury finds the testimony of Microsoft's witnesses

19  credible and sufficient to establish that the acquired

20  document was published prior to the critical date, a

21  District Court will still have to address whether the legal

22  requirement corroboration has been met.

23            That's where all my questions were coming from.

24  Corroboration is required of any witness's testimony alone

25  that is asserted to invalidate a patent.  Then it cites to

1       the Texas Digital Texas Digital System v Telegenix case.

2                   Both physical evidence and oral testimony of a

3       disinterested party can serve to satisfy the corroboration

4       requirement.  And that's when it cites the Sandt case.

5                   So this is my problem.  I would really like to

6       look at the Sandt case.  I know the Woodland Trust case was

7       cited by Amazon, but what that really emphasizes is the

8       quality of the corroborating testimony.

9                   The question is the corroborating evidence.  And

10      the question I have is, is the physical evidence alone

11      sufficient to do this?  That's my question.  Because we

12      don't have testimony.

13                  MR. O'NEILL:  A couple of other points, Your

14      Honor.

15                  One other factor I think we need to consider is

16      that during Mr. Haskin-Fernald's deposition yesterday, it's

17      clear he doesn't remember many of the details of the

18      Netmarket testimony and it operated in 1996.

19                  THE COURT:  Doesn't that go more so -- let's

20      assume this for the argument purposes.  Let's assume he

21      testified and let's assume there is corroborating evidence

22      to support his testimony.

23                  That, to me, about what he doesn't remember goes

24      to weight, which may go to prove it wasn't a critical

25      invention, but that is not up to me to decide at this stage

1    now that we're at trial.  That is up to the jury to decide.

2    And that is how I looked at that argument.  The fact that a

3    witness's testimony doesn't meet the clear and convincing

4    standard is something you can bring up on argument on a Rule

5    50 type argument at the close of your evidence or at the

6    close of the case.

7            If I decide against you, then it is put in the

8    hands of the jury and you'll hope they agree with you.  So

9    that's why it goes to weight, unless it overwhelmingly, by

10   the testimony, shows he didn't have enough information to

11   allow this to be clear and convincing, because he didn't

12   know enough about the system or the prior art to be able to

13   testify about it.

14           MR. O'NEILL:  Right.  So, first of all, we don't

15   think there is corroboration to key aspects of this.  You

16   don't even need to get to a rule of reason analysis.  But if

17   you do get to the rule of reason analysis, the Court can

18   consider the fact that the inventor doesn't remember many of

19   the key aspects of the system that is being asserted as

20   prior art.  I just want to make sure I pointed out the

21   Finnigan and GC Web cases.

22           THE COURT:  I'm sorry.

23           MR. O'NEILL:  The Finnigan and GC Web cases,

24   where they're talking about corroboration for particular

25   elements of claims.  I think those are important because I

1    mean the most important part is the Netmarket system or what

2    the Netmarket computers did in response to that final click

3    from the customer.  And for that crucial aspect of the

4    Netmarket system, there are absolutely no documents to

5    corroborate his testimony.

6            Furthermore, Mr. Haskin-Fernald's memory of what

7    happened is also --

8            THE COURT:  A bit foggy?

9            MR. O'NEILL:  Yes.

10           And one last point.  I think it makes sense to

11   compare Cordance's '131 declaration with the situation.

12   That '131 declaration was Cordance's business record that

13   Cordance had maintained over the course of its business.  It

14   was also something that was part of the records of the PTO.

15   So I don't think it makes sense necessarily to compare the

16   corroboration of that declaration with the corroboration

17   issue that we're dealing with now.

18           THE COURT:  Are you talking about the reliability

19   of it versus the reliability of this information?

20           MR. O'NEILL:  It goes to whether the

21   corroborating document is hearsay.  So for Cordance, it was

22   a business record and hearsay, and Amazon didn't object to

23   the documents being hearsay.

24           MR. PASAHOW:  If I might, just two final points,

25   Your Honor.

1           THE COURT:  Certainly, you may do so.

2           MR. PASAHOW:  One is Mr. Haskin is a

3   disinterested witness, of course.  He has no connection to

4   either of the parties in this case.

5           And the second is in reading through the

6   Woodland Trust case, one of the points the Federal Circuit

7   makes is that the corroboration requirement makes sense

8   because, as it says:  This view is reinforced in modern

9   times by the ubiquitous paper trail of virtually all

10  commercial activity.  It is rare indeed that some physical

11  record, e.g., a written document such as notes, letters,

12  invoices, notebooks or a sketch or drawing or photograph

13  showing the device, a model or some other contemporaneous

14  record does not exist.

15          THE COURT:  Where are you reading from?

16          MR. PASAHOW:  This is from Page 1373 I believe

17  in the third version.  It appears on Page 14 of the Lexus

18  version.

19          THE COURT:  I've got Westlaw.

20          MR. PASAHOW:  I'm sorry.  Very near the end.

21  It's just a couple of paragraphs up from the very conclusion.

22          That's all I have.

23          THE COURT:  All right.

24          MR. O'NEILL:  Your Honor, one quick comment.  My

25  understanding of what Mr. Pasahow read is that you can use

1    business records for purposes of corroboration; but I think

2    that doesn't apply in this situation because the documents

3    Amazon is seeking to use for corroboration are not business

4    records.  They're e-mails and newspaper articles which are

5    hearsay.

6              THE COURT:  Give me a few.  I want to look at

7    this one case, and I'll try to come back with my opinion.

8              And please inform the jury that it's taking

9    longer than what we thought.

10             THE DEPUTY CLERK:  Okay, judge.

11             (Brief recess taken.)

12             THE COURT:  Please be seated.

13             First of all, I start off with the TypeRight

14   Keyboard Corporation case, and what I quoted to you

15   previously, which is found at Pages 1159 and 1160, discusses

16   the requirement of corroboration when testimony alone is

17   asserted to invalidate a patent.  And it dovetails to, it

18   has a statement:  Both physical evidence and oral testimony

19   of a disinterested party can serve to satisfy the

20   corroboration requirement.

21             There is no doubt that the gentleman that was

22   being called is a disinterested party to this entire

23   litigation.

24             It also provides the standards which were

25   announced in prior cases by the Fed Circuit as sufficiency

1   of the corroborating evidence and the factors that are used,

2   which were outlined by Amazon in their arguments to me, but

3   it is specifically found at the pages I note in this case.

4              In looking at the Sandt case, which is Sandt

5   Technology Ltd v Resco Metal and Plastics Corporation, which

6   is found at 264 F.3d 1344.  It's a Federal Circuit case

7   decided in 2001.

8              In that case, what had happened was the

9   defendant was alleging one of its prior inventions operated

10  as prior art, invalidating prior art against the plaintiff's

11  invention that was alleged to be involved in this case, and

12  it went summary judgment motion.  Plaintiff took on appeal

13  to the Fed Circuit on a granting of a motion for summary

14  judgment, I think on the basis of anticipation.  I can't

15  remember.  It's either anticipation or obviousness.

16             They did an analysis from the inventor's

17  viewpoint and pointed out that the tribunal was very mindful

18  of the purpose of corroboration, which is to prevent fraud

19  by providing independent corroboration of the inventor's

20  testimony.  A rule of reason analysis is applied to determine

21  whether the inventor's testimony has been corroborated.  In

22  applying the rule of reason test, all pertinent evidence is

23  examined in order to determine whether the inventor's story

24  is credible.  Each corroboration case must be decided on its

25  own facts with the view to deciding whether the evidence as

1    a whole is persuasive.

2         What this Court did, beginning at Page 1351

3    and continuing on to page 1352, is to note that, and

4    analyze, the differences between the Sandt case and the

5    other cases that have been cited previously to me, such as

6    the Woodland Trust case and the Finnigan Corporation v

7    International Trade Commission case.  What they pointed

8    out, that documentary or physical evidence that is made

9    contemporaneously with the inventive process provides the

10   most reliable proof that the inventor's testimony has been

11   corroborated.  Because documentary or physical evidence is

12   created at the time of conception or reduction to practice,

13   litigation inspired fabrication or exaggeration is

14   eliminated.  Circumstantial evidence about the inventor's

15   process alone may also be corroborated.

16        And they again provided the guideline that been

17   discussed previously as whether a witness's testimony

18   provides sufficient corroboration.

19        What the Court allowed and noted that the

20   District Court had relied upon, some of the evidence that

21   the Court found acceptable of corroboration of the position

22   of the defendant was a January 18th, 1991 letter from the

23   defendant in response to the telephone company's request or

24   proposal to solve the telephone theft problem, and a 1992

25   invoice for purchases of security for houses.  There was

1    also an affidavit of a former employee that was used in

2    support of this and also the patent application by the

3    defendant.

4            Sandt noted the difference between the

5    corroborating testimony, corroborating evidence that was

6    produced in Woodland Trust, and that most of the defendant's

7    corroborating evidence in the Sandt case consists of

8    physical records that were made contemporaneously with the

9    defendant's invention, and went through a complete analysis

10   of each of the pieces of evidence.

11           What it doesn't answer, though, for me is

12   where we don't have a patent.  What we have here is an

13   individual's testimony about what the Netmarket system was

14   or was not doing; and the argument made by Cordance is that

15   that is incomplete.

16           That, I find probably goes more to weight than

17   anything else and whether or not this evidence, in the end,

18   after you hear it, is sufficient to meet the clear and

19   convincing standard.  So, as I said before, I think in

20   part it goes to weight.  But certainly the documents

21   that have been produced, that were sent to customers I've

22   got to believe were part of business records that were

23   maintained by the company involved, that is, the Netmarket

24   company.

25           MR. O'NEILL:  Your Honor, these documents, it's

1    my understanding, were not produced by Netmarket.  They were

2    produced by -- some of the documents were produced by a

3    person who was not an employee of Netmarket at the time the

4    documents were created.  This person is a Mr. Joshua Smith.

5    Some of the e-mails were to and from Joshua Smith.

6            THE COURT:  And Mr. Joshua Smith was whom?

7            MR. O'NEILL:  He is a person who is in the

8    e-mails that Amazon has collected here, and he was a tester

9    of the Netmarket website.  At the time he was testing the

10   Netmarket website, I believe he was a college student and,

11   at that time, he had no affiliation with Netmarket.

12           Later on, he actually did become a Netmarket

13   employee, but these e-mails came from his personal files.

14   It's my understanding that none of these documents that

15   Amazon has produced in this case, actually many of these

16   documents are not business records of Netmarket.  They're

17   produced by an individual.

18           THE COURT:  Well, were they sent by Netmarket

19   to other people, or weren't some of those from Netmarket

20   orders?

21           MR. O'NEILL:  Yes, some of the e-mails were from

22   Netmarket to Joshua Smith.

23           THE COURT:  Order for Joshua Smith.  And wasn't

24   there also the record that was from Mr. Hirai, H-I-R-A-I?

25           MR. O'NEILL:  I believe he is an employee of

1    Netmarket.

2                 THE COURT:  Yes.  It has netmarket.com next to

3    him.

4                 MR. O'NEILL:  But there are no witnesses who

5    can testify that these e-mails were taken from Netmarket

6    business.  These e-mails were produced in a previous

7    litigation, and I believe not by Mr. Haskin-Fernald.

8    Perhaps, I believe, a few of these documents were produced

9    by Haskin-Fernald, but not ...

10                MR. PASAHOW:  Your Honor, there is no

11   authentication objection about these e-mails.

12                THE COURT:  I understand there is no

13   authentication objection.  That doesn't mean they don't come

14   out of this e-mail -- I'm sorry.  Finish.  I apologize.

15                MR. PASAHOW:  And so what we have are e-mail

16   messages being sent by the company to beta testers,

17   responses from beta testers.  Those are business records.

18   We've got e-mails automatically being sent by the system to

19   confirm sales.  Those are business records.

20                The problem we have is the company itself didn't

21   keep any of these, but one of its users did.  And if we had

22   an authentication problem, it might matter where we got

23   them, but the fact we got them from the user doesn't change

24   the nature of the underlying record.

25                MR. O'NEILL:  Your Honor, these documents were

1   not from the records of Netmarket or any other company.

2   They were from individuals' personal e-mail files, my

3   understanding.

4           THE COURT:  Who were working with Netmarket,

5   were they not?

6           MR. O'NEILL:  At some time, which for some of

7   these documents, the e-mails were taken from an individual's

8   personal e-mail from the time when he was not a Netmarket

9   employee.

10          THE COURT:  No, I understand that.  But you

11  know, you don't have to be a Netmarket employee to say that

12  the documents aren't business records of Netmarket.

13          MR. O'NEILL:  Right.  I believe to be business

14  records, these documents have to be retrieved from Netmarket's

15  business records, and that wasn't the case -- retrieved I

16  think from an account at Swarthmore University by a person

17  who was a student at the time that the e-mails were sent.

18          I think we need testimony to establish that

19  these documents that we have in front of us are copies of

20  documents that were taken from some company's business

21  records.  And I don't believe we have that.

22          THE COURT:  Well, what authentication?  There

23  was no objection to authentication.

24          MR. O'NEILL:  No, there is no objection to

25  authentication, Your Honor.

1           THE COURT:  What does that mean?

2           MR. O'NEILL:  We're not saying that these

3    documents have been forged, Your Honor.  We think in order

4    for these documents to fall under a hearsay exception, that

5    they need to come from the company's business records.

6           And I think, most importantly, these documents

7    don't establish precisely the substantive operation of the

8    Netmarket business.

9           THE COURT:  What the exception says under 803(6)

10   is that:  if they're basically documents kept in the course

11   of a regular conducted business activity, and if it was

12   the regular practice of that business activity to make the

13   memorandum, report, record or record data confirmation,

14   all as shown by the testimony of the custodian, or other

15   qualified witness, or by certification that complies with

16   Rule 902(11), 902(12), or a statute permitting certification,

17   unless the source of information or the method or circumstances

18   of preparation indicate a lack of trustworthiness.  The term

19   "business" as used in this paragraph includes business,

20   institution, association, profession, occupation, and

21   calling of every kind, whether or not conducted for profit.

22           (Pause.)

23           THE COURT:  I've got some concerns about this.

24   I've got concerns about his testimony but I was considering

25   letting it in on the basis of these records supported it.

1    And a lot of the argument, as I said, I think from Cordance

2    in certain aspects goes to weight.  Other parts of it goes

3    to:  Are these even admissible?

4              And his testimony, his testimony alone is not

5    going to be sufficient.  And my concern is you have got no

6    evidence to sit there and show these are business records of

7    Netmarket, retained in the ordinary course of business.  You

8    have got some problems.

9              MR. PASAHOW:  If I might, Your Honor.  I think

10   the Sandt case Your Honor was talking about gets to the

11   point, though.  The issue is:  Are there contemporaneous

12   documents that show that the witness isn't making it up?

13   And that's what these e-mail and other documents do.

14             There is no question given the authentication

15   admission that these things were sent on the times they say

16   they were sent by the people who they say they were sent by.

17   There is no doubt about what they say.  And given that,

18   they're exactly the, you know, all pertinent evidence,

19   contemporaneous documents that the Sandt case is talking

20   about.

21             I believe Your Honor said that one of the things

22   the Sandt case talked about was a letter to the telephone

23   company.

24             THE COURT:  A letter to the telephone company

25   from defendant in response to request for proposals.

1           MR. PASAHOW:  Right.  That would not be a

2    business record because it's not a recurring event kind of

3    thing.  And so it would just be a contemporaneous piece of

4    paper that they properly authenticate, and it shows that the

5    person who is testifying that this thing existed as of this

6    date, and the things it was doing, really happened.  Because

7    it was a historic document.  That is what the corroboration

8    requirement is all about, as I understand it.

9           THE COURT:  Mr. O'Neill.

10          MR. O'NEILL:  Your Honor, I didn't hear anything

11   in the portion cited by Mr. Pasahow that states that hearsay

12   may be used for this purpose.  I think that we need to focus

13   on admissible evidence, what can be used to corroborate.

14   And I think for this evidence to be admissible, Amazon has

15   to have some basis for showing that it's not hearsay.  And I

16   don't think they have that.

17          THE COURT:  Well, yes, I understand what you are

18   saying.

19          You pointed out to me they were used in another

20   case?  Were they admitted in another case?

21          MR. O'NEILL:  Your Honor, that case didn't go to

22   trial, but they were used in a previous litigation that

23   Amazon was involved in.

24          THE COURT:  I am not going to allow it.  I don't

25   think there is any support for the corroboration of his

1   testimony.

2            MR. PASAHOW:  Yes, Your Honor.

3            THE COURT:  Where does that leave you now with

4   witnesses today?

5            MR. PASAHOW:  We will be playing some deposition

6   testimony now.

7            THE COURT:  I think we need to bring back in the

8   jury.  And before we do that, though, Mr. Pasahow, I was

9   going to bring back the jury but I didn't know if you are

10  ready for me to do that.  Do you need a little bit of time

11  for organization before I do that so you don't look like you

12  are fumbling around?

13           MR. PASAHOW:  I would appreciate that.

14           THE COURT:  Then I will ask the clerk to advise

15  the jury that we are going to be about 15 minutes, 10 or

16  15 minutes?

17           MR. PASAHOW:  That would be perfect.

18           (Brief recess taken.)

19           THE COURT:  Are we ready for the jury to be

20  brought in?

21           MR. PASAHOW:  Yes, Your Honor.

22           THE COURT:  Please bring in the jury.

23           (Jury enters the courtroom.)

24           THE COURT:  Please be seated.  My apologies to

25  the members of the jury.  There was some important matters

1    that had to be discussed in this case, some matters

2    regarding what further evidence was going to be presented.

3    But we have now resolved those.  And Amazon will be

4    continuing with the presentation of its case.

5              MR. PASAHOW:  Thank you, Your Honor.

6              What we are going to do next, ladies and

7    gentlemen, is play some video deposition excerpts.  And they

8    are of the four co-inventors on the patents.  The first is

9    Peter Heymann.  Mr. Heymann was a cofounder of Intermind,

10   the company that later became Cordance.  He was its chief

11   executive officer and later became the executive chairman of

12   its board of directors.  And he is examined about the value

13   and scope of the patents, or the patent rights.

14             THE COURT:  Did you indicate the questioning,

15   who is examining, who the exam was on, for Cordance or both

16   Cordance and Amazon?

17             MR. PASAHOW:  The questioning, I believe, is all

18   done by Amazon.

19             THE COURT:  Would it be helpful to have the

20   lights turned down for you to see?  Raise your hand if you

21   think it would be helpful to have the lights turned down.

22             Okay.  That's fine.

23             (Peter Heymann deposition designations.)

24   Q. Good morning, Mr. Heymann.

25   A. Good morning.

Heymann - designations

1    Q.  Could you summarize your employment history for me,

2    please.

3    A. I worked in the investment banking field and then

4    at, briefly as an independent consultant and then I worked

5    at Microsoft.  And then I started a non-profit with some

6    other folks and then I became involved in the Intermind

7    project?

8    Q. When did your focus become the Intermind

9    project?

10   A. Well, definitely by September of '95 which is when

11   we incorporated, if I recall correctly.

12   Q. So you earlier testified that the Intermind product

13   launched sometime about a year after the September '95

14   balance sheet we were looking at, right?

15   A. I think it was in October because the actual launch

16   is while I was on my, my honeymoon and one never forgets

17   when one gets married.  That's a bad idea.

18   Q. So what was the Intermind product that launched in

19   October of '96?

20   A. Well, I'm sure there's vast quantities of

21   documentation somewhere that you guys have found on that,

22   but that was called Intermind Communicator and it was

23   designed for people who use the Internet.

24   Q. Can you describe for me how someone would use it?

25   A. The idea was that if you went to a website and you

1    wanted to stay informed or you wanted to receive more

2    information from the company or whoever was on the website,

3    that we could then get it delivered to you.

4    Q. And how would it do that?

5    A. You know, it would -- the information would appear

6    in your computer after you connected to the Internet.

7    Q. What was kind of the user's experience with the

8    Intermind Communicator product?

9    A. Um, they would start their browser, and I can't even

10   really remember how they accessed the information that they

11   would receive.  But basically there was kind of like an

12   inbox and you could receive news or information that was

13   coming from the websites that you had indicated an interest

14   in.

15   Q. And so what was the benefit that the product was

16   providing to users?

17   A. The benefit was that they didn't have to go to a

18   given website to go find out if anything changed.

19              When did you start using the web?

20   A. The web.  You got to be careful because the web was

21   obviously the graphical interface to the Internet.  I can't

22   really say.  I mean certainly by that time I was using the

23   web.  I was using the web and writing HTML in 1995, so.

24   Q. And that was before the -- was that before the

25   founding of Intermind in September of '95?

1    A. Yes.

2    Q. Could Intermind provide the benefits it intended

3    with the Intermind Communicator product for the use of

4    cookies?

5    A. I have no way of knowing about that, but I would

6    have to believe that since we invested an enormous amount

7    of time creating a product that did something that was

8    different from what cookies did, that presumably we

9    couldn't do it with cookies.  I mean I don't know about

10   cookies.  I'm not a cookie guy.

11   Q. Would you please mark that as the next exhibit.  I

12   think that's 3.

13            So what is that exhibit?

14   A. Board meeting minutes.

15   Q. What board?

16   A. Intermind board.

17   Q. And, um, you see you're listed as one of the people

18   present and the date is September 28th, 1996?

19   A. Yes.

20   Q. What was the state of the company in September '96?

21   A. Hopeful.

22   Q. Would you elaborate.

23   A. We had a significant cadre of talented people and we

24   had committed investors and we had a product idea that we

25   were working real hard on, and we were approaching product

Heymann - designations

1    launch and I was about to get married.

2    Q. The minutes under the heading financing issues say,

3    "Mr. Arnold presented information regarding the company's

4    financing plans.  The company will need new funding by

5    December 1st." Do you have any sense of how much funding

6    the company had raised by September 28th, '96?

7    A. You know, plus or minus 5 million I suppose, yeah.

8    I think our first round was for five.  That was the A

9    Series, Series A and that obviously was already complete.

10   And between capital that I had contributed and that of some

11   other folks, you know, it was north of 5 and south of 10,

12   right.

13   Q. What are Exhibits-4 and 5, Mr. Heymann?

14   A. Exhibit-4 is a Confidential Offering Memorandum and

15   Exhibit-5 is a Business Plan Update.

16   Q. And are both of those for Intermind?

17   A. Yes.

18   Q. And you recall in Exhibit-3 there was reference to

19   authorizing additional shares in a Series B offering?

20   A. Right.

21   Q. And is that what Exhibit-4 is?  Is Exhibit-4 a

22   subsequent offering?

23   A. It looks like an offering memorandum.  I mean it is

24   an offering memorandum and it pertains to the Series B and

25   Series C convertible preferred that were in fact sold by

Heymann - designations

1    the company.

2    Q. So I'm trying to figure out what amount the company

3    raised as you recall from the offering memorandum?

4    A. Right.

5    Q. That offering.

6    A. I'm a little sketchy but I'm pretty sure that we

7    ended up doing 2 million Series B and 2 million Series C

8    and the timing of that and so on, I don't remember.

9    Q. Do you believe it was generally around late '96?

10   A. Yeah, that sounds right.  Late '96 or early '97.04 Yeah,

11   somewhere in there.

12   Q. And why was the company trying to raise additional06

13   capital at this point?

14   A. To finish its product and to launch it and to, you

15   know, make money for its investors.

16   Q. Had the product launched by November of '96?

17   A. Yes.

18                (Exhibit No. 6 marked for identification.)

19   Q. Mary just handed you a document she marked as

20   Exhibit-6.  What is that?

21   A. It looks like Intermind board meeting minutes from

22   February 15, 1997.

23   Q. And do you have in that document -- I apologize it's

24   confusing.  It came to us this way.  Do you have the minutes

25   of several board meetings in one --

Heymann - designations

1    A. Say it again.

2    Q. It came to us as one document but they're actually

3    in fact the meeting minutes of several board meetings.

4    A. Right.

5    Q. I'd like to have you flip to the next page, the

6    minutes of the meeting of March 7, '97.  Do you have that?

7    A. Got it.

8    Q. Okay.  If you'd look down in the third full

9    paragraph under the heading New Business, there's the

10   paragraph, "Mr. Arnold offered his resignation and excused

11   himself from the meeting."  Who is Mr. Arnold?

12   A. His name is Dave Arnold and he was I think the CEO

13   at that point.

14   Q. And do you recall why he resigned?

15   A. I think it was over differences of opinion about how

16   to evolve the company.

17   Q. What do you recall of any of those opinions?

18   A. I think contrary to everything that you learn in

19   business school I had initially advocated that we try to

20   grow the company to a significant size, increasing our cash

21   burn, bad idea, if you have an uncertain future, so that we

22   could be credible to corporate customers.  Um, and I think

23   that there emerged a disagreement about the burn rate that

24   we should sustain going forward, and there was a lot of

25   concern that, you know, we were potentially going to run

Heymann - designations

1    out of funds with a huge compliment of people on staff.  So

2    I think that was what the big difference of opinion was.

3    Q. So let me make sure I understand your and

4    Mr. Arnold's respective roles then.  What was your position

5    in March of '97?

6    A. I was an executive chairman and I also was involved

7    in a lot of analysis of strategic challenges or

8    opportunities actually.  I should amend what I said before.

9    So I was trying to describe, I had initially advocated for

10   a high burn rate and then when it became apparent that we

11   really needed to regroup and that we had some product work

12   to do to make it satisfactory to -- I felt like we needed

13   to radically reduce our burn rate, which would be very

14   painful, and I think Mr. Arnold was in favor of kind of a

15   full steam ahead approach.  So that's -- is that clear?

16   Q. Yes.  At this point you were chairman of the board.

17   A. (Nods head).

18   Q. And involved with strategic decisionmaking.

19   A. Uh-huh.

20   Q. In some capacity.  Um, it had become apparent to you

21   that the company should reduce its burn rate and Mr. Arnold

22   disagreed and over that disagreement he resigned as CEO; is

23   that correct?

24   A. Uh-huh.

25   A. Let me just to be super accurate.

1   Q. Please.

2   A. You know, that's my recollection.  This is a very

3   difficult point in time in the company and, you know, that's

4   my recollection.  Whether it was precisely that or something

5   else, but I'm pretty sure I remember a lot of us were very

6   worried about the locomotive with a full collection of cars

7   behind it going off the bridge at high speed kind of thing.

8   That's my recollection.  I can't say with real certainty

9   what the deal was.

10  Q. So at this point in time was the company still

11  selling any of its products?

12  A. I think it was trying to.

13  Q. Was it having success in doing that?

14  A. I think we made one sale that was, you know,

15  non-zero.

16  Q. Do you remember who it was to?

17  A. I do not.

18  Q. So going back to Exhibit-9, the MS term sheet

19  Microsoft -- excuse me -- Intermind was proposing a term

20  sheet for license to Microsoft, right?

21  A. Say that again, I'm sorry.

22  Q. Yeah, the term sheet that is referred to in

23  Exhibit-9.

24  A. Uh-huh.

25  Q. Is a term sheet that Intermind was proposing to04

1    Microsoft for a license, right?

2    A. Okay.  Okay.

3    Q. So who's Greg Stanger, if you know?

4    A. I never met the guy but he's to my recollection sort

5    of a middle level executive over there.

6    Q. So in the term sheet, um, what's your understanding

7    of the basic deal that Intermind was proposing here?

8    A. We were basically, as I recall it, slash, understand

9    it from looking at this thing, how this document, we were

10   basically offering them a license to use whatever

11   intellectual property we thought we owned or might be

12   owning prospectively in their software for a period of three

13   years, I think.

14   Q. Well, if you look at the duration of the agreement,

15   it's the page you were at.  So on the bottom of the term

16   sheet -- so there's the heading on the left-hand side of the

17   term sheet Duration of Agreement?

18   A. Yeah, yeah.  Lot longer than that.  Okay.  Maybe I

19   had said duration.  This e-mail that I wrote apparently

20   referred to an earlier revision.

21   Q. Yep.

22   A. And that earlier revision must have specified three

23   years because I in that e-mail appear to be arguing for

24   less.

25   Q. And what actually was proposed was until the

1    expiration of Intermind's existing patent --

2    A. Uh-huh.  When we say existing patent claims, that's

3    interesting.  What existing patent claims?  I'm trying to

4    remember when were the patents issued?

5    Q. So Microsoft proposed a license for $500,000,

6    Intermind responded with a license throughout the life of

7    all existing patent claims?

8    A. That's what it looks like.

9    Q. For $750,000?

10   A. Right.

11   Q. And do you know if there are any further discussions

12   between Microsoft and Intermind about this possible --

13   A. I don't know why it died.  I think they must have

14   just -- my guess is just they decided to not go forward with

15   it.  They weren't interested in it. I can -- I am recalling

16   now why we thought it was attractive for us.

17   Q. Let's go back to the big stack of board meeting

18   minutes you have as Exhibit-8.

19   A. Exhibit-8?

20   Q. So what was the status of the company as you recall

21   in end of August '97?

22   A. Looks like hard times, yeah.

23   Q. Let me ask you to look at the second paragraph under

24   New Business.  It says, "Mr. Heymann reported that Barry

25   Foreman is continuing his due diligence on the company's

1   intellectual property in great earnestness and may be

2   preparing to make an offer as early as next week."  The

3   question is, is that an offer to acquire the company's

4   intellectual property or licensing?

5   A. I don't know when I made that report to the board

6   whether or not I was indicating to the board that he was

7   preparing to make an offer for the IP or the whole company.

8   I don't know whether or not I knew that or what -- maybe I

9   did but I honestly didn't indicate there and I don't

10  remember which one it was.

11  Q. But was it an offer to buy the property outright,

12  whatever it is, or just license it?

13  A. As I just said, I don't know what I thought it was

14  at this juncture.  Maybe I did know but I don't remember

15  now.  Obviously it's not indicated there.

16  Q. The next sentence is, "Mr. Heymann observed this and

17  will provide another independent indication of the value

18  represented by the company's intellectual property and may

19  add negotiating leverage in proceeding with licensing

20  discussions with Netscape."

21  A. Well, actually, so now that you read that for me, I

22  mean it's pretty clear that I didn't anticipate that he was

23  preparing an offer for the company, right, because otherwise

24  the rest of the conversations would be null, moot and void.

25  Q. So do you recall if people agreed with your

1    assessment there?

2    A. Oh, everybody pretty much always agreed what I said.

3    I don't know.  I think they probably noted it and thought it

4    was interesting, and we continued with discussion about how

5    can we make, make intellectual property licensing revenues

6    flow to this company, so.

7    Q. So I don't know if you remember, I was just trying to

8    figure out -- well, let's start first, what are

9    Exhibits-12 and 13?

10   A. 12 looks like an e-mail from me to Bill W and the

11   subject is Intermind press release and it's dated October 7,

12   '97, about a year after we first shipped the product, first

13   product.  And the second one is a press release from all

14   indications and it is dated October 7, '97.

15   Q. And did you prepare this press release?

16   A. I don't recall.

17   Q. And was this a press release that appeared on

18   Intermind's website?

19   A. I strongly suspect it did since there's a URL here

20   down at the bottom left.

21   Q. There's the sentence, "While details of its plans to

22   license its communications patents are still being

23   finalized, Intermind has promised to support the growth of

24   the marketplace and use of its technology.  Licensing terms

25   will be commercially reasonable and offered on a

1    non-discriminatory basis without preference for specific

2    architectures or product designs."  What was the purpose of

3    including that last part?

4    A. You know, because I did not write this I cannot say

5    for certain, but it sounds to me like a desperate company

6    that needs to start generating licensing revenue right now.

7    Q. So the -- I mean what Intermind was telling the

8    public was that anyone could get a license on commercially

9    reasonable terms?

10   A. Come one, come all.

11   A. The way I read it.

12   Q. And the commercially reasonable terms, those were in

13   the $750 to $1 million range we were talking about, correct?

14   A. No, I don't agree with that statement.

15   Q. What is Exhibit-18, Mr. Heymann?

16   A. It looks like an e-mail.

17   Q. It's a couple, right?  There's the initial -- at the

18   bottom of that there are some comments and then other ones

19   above it, right?

20   A. Uh-huh.

21   Q. Okay.  It says, "Open Market patents."  Do you

22   recall the open market patents?

23   A. Not yet, no. I guess Open Market Corp was another

24   one of these push guys.

25   Q. What caught your attention there?

1   A. You know, they got quotes from all the right

2   analysts.  The same ones we couldn't get to say much.  Also

3   they are under NDA and that's why they couldn't say much

4   presumably because the other guys got there first.  "This

5   seems the right way to announce patent rights.  Lots of

6   analysts, everyone saying you rule."  My son who's eight

7   years old always saying we rule, you know.

8   Q. Let me ask you about what is mentioned there.  "File

9   12/93 really early, some smart people there.  They figured

10  out shopping cart session identifiers, et cetera, way back

11  then."

12  A. Uh-huh.

13  Q. What does that refer to as you understand it?

14  A. It would be my guess because it was Steve who was

15  talking about, obviously -- well, not obviously, but I'm

16  assuming file 12/93 is the filing date for the applications.

17  That seems early given just -- I mean we can make the

18  comment generically because, you know, the web wasn't even

19  happening then, right.  So really early means relative to

20  the evolution of the Internet, and other people's activity,

21  I would assume he's saying.  Some smart people there, if

22  they figured out shopping carts, well, you know, shopping

23  carts is sort of a visual thing that probably didn't occur

24  to many people until you had the visual interface provided

25  on the web, so on and so forth.

1    Q. And were those things that Intermind was working on

2    in 1996 or '95?

3    A. We never did figure having to do with commerce

4    per se.  You know, shopping carts, no, no.

5    Q. So let me direct your attention "seems to include

6    shopping carts, forms of instant payment."

7    A. Oh, okay.

8    Q. What are those?  What's an instant payment there as

9    you understand it?

10   A. I'd just be guessing, but I mean instant payment, I

11   suppose that means you don't have to mail something in.

12   Q. Is that anything that Intermind was also working on

13   after 90 -- after whenever the apparent Open Market effort

14   was?  Let me start again.  Was that ever something that

15   Intermind worked on?

16   A. Forms of instant payments?

17   Q. Yes.

18   A. Not to my knowledge.

19            (Exhibit No. 19-21 marked for identification.)

20   Q. So there are three things that hopefully you have

21   there.  The first is an e-mail from you dated May 1, 1997,

22   in it refers to a document.  The next is a document.  And

23   then the third hopefully should be an e-mail from Mr. Reed

24   I believe responding to your e-mail dated May 2nd, '97.  I

25   think those should be numbered Exhibits-19, 20 and 21

1   respectively.  Is that what you seem to have?

2   A. Yes.  So let me resummarize because I was actually --

3   Q. So let's start with your e-mail from May 1,

4   1997.

5   A. Uh-huh.

6   Q. So you write, "Steve in 'Intermind is doc' I

7   particularly like the differentiation between core

8   technology IP protection and IMC related capabilities on IP

9   protection."  And then if you could sort of read the rest of

10  that, your top e-mail to yourself to familiarize yourself.

11  A. Uh-huh.  Okay.

12  Q. Let me direct your attention to the bullet point

13  there.  "You suggest that our technology/IP protection

14  extends to interobject communications (using CORBA, DCOM,

15  et cetera).  This is a huge fish.  I have to believe, however,

16  that we can't quote, land this one.  Prior art has been in

17  existence on this for 20 years, no?"  So let me ask you what

18  CORBA and DCOM are?

19  A. They are object programming technologies, I guess is

20  my best attempt to describe what they are.

21  Q. You write in the next paragraph, "In my

22  opinion, this is the greatest potential source of confusion

23  regarding our IP story.  We need to clean this up.  When is

24  our technology more than just objects that are

25  communicating.  The answer is when methods are exchanged

1    that allow for communications control.  However, think about

2    it.  People will immediately perceive this as a gray zone."

3    Explain to me what is the gray zone that you expect people

4    to perceive there?

5    A. I think insofar as I can recall --

6    Q. Right.

7    A. -- what I was trying to communicate here, this

8    document is all about trying to help people understand our

9    technology.  And I was concerned that our audience might be

10   inclined to not discern, to fail to discern the difference

11   between object communications, which I think had been

12   around for a while, and our technology.  So this is an

13   attempt to help us communicate better.

14   Q. The confusion that you're trying to clear up here is

15   that because one object invokes the behaviors of another,

16   to say Intermind's technology is objects controlling

17   communications of another object causes confusion because an

18   object is always going to invoke the behaviors of another?

19   A. I think that's --

20   A. -- subject to interpretation those words, right.

21   That's more or less what I was trying to say.  I think we

22   have a meeting of the minds here.

23   Q. So it's clear, to take those one at a time, right.

24   During your tenure at Intermind, did Intermind ever develop

25   any technology in the sense of having written software for

1    it that would allow someone to carry out purchase

2    transaction?

3    A. No, I don't think strict sense of carrying out a

4    business transaction.

5    Q. Let me also ask you about product reviews on

6    Amazon.com's website, right.  Do you know what those are?

7    You go to a page for an item and you can see reviews?

8    A. I do.  Yeah, that's good.

9    Q. Have you ever posted a review?

10   A. Maybe once, yeah.

11   Q. Did you ever believe doing that infringed any of

12   Intermind's intellectual property rights?

13   A. The action of posting, absolutely not.

14   Q. Could you explain why not?

15   A. Because I was merely in my role contributing

16   information to a forum.  Whether or not the technology in

17   some way infringed, I can't opine on that.  But, you know,

18   freedom of speech and expression gave me confidence that I

19   was not violating anything anywhere, so I contributed what I

20   had to say.

21   Q. And I mean, do you perceive any similarity between

22   the functionality of posting a book review or a review of

23   another product on-line and anything that was developed at

24   Intermind during your tenure there?

25   A. I can't opine on that.  You know, is there

1    similarity in it, in the -- no, I can't.

2    Q. Do you think Intermind invented book reviews?

3    A. Or product reviews like the one I wrote?

4    Q. Yes.

5    A. No, they did not invent that.

6    Q. Did they invent putting product reviews like the one

7    you wrote on-line?

8    A. Did Intermind invent putting product reviews like

9    the one I wrote on-line, no. I think that's a safe

10   statement.

11              (Peter Heymann deposition designations end.)

12              MR. PASAHOW:  The next deposition will be a

13   second of the co-inventors, Kevin Jones, and, again, the

14   questioning is by the Amazon attorney.

15              MR. ALBERT:  Your Honor, can we have a brief

16   sidebar?

17              THE COURT:  Yes.

18              (The following took place at sidebar.)

19              MR. ALBERT:  Just so the record is clear, I

20   believe the transition statement that was made both before

21   Mr. Heymann and now, certainly the previous one, suggested

22   that these were all co-inventors on all of the patents.

23              MR. PASAHOW:  I will clarify that.  I don't have

24   any problem with that.

25              THE COURT:  I didn't pick up that.

1    MR. ALBERT:  The '710 patent is only Mr. Reed.

2    (End of sidebar.)

3    MR. PASAHOW:  Cordance asked that I clarify my

4    last statement, and, that is, they are co-inventors on the

5    '325 and '717 patents.  As you have heard, Mr. Reed is the

6    only inventor on the '710 patent.

7    (Jones deposition designations placed in record.)

8    Q Good morning, Mr. Jones.

9    A Good morning.

10   Q Would you state your full name for the record?

11   A Kevin Bernard Jones.

12   Q And what is your home address, Mr. Jones?

13   A 2515 Fourth Avenue in Seattle.

14   Q Are you being paid for your time here today?

15   A My time?

16   Q Yes.

17   A Yes.

18   Q Who are you being paid by?

19   A The firm Wolf Greenfield.

20   Q And how much is Wolf Greenfield paying you?

21   A On an aggregate basis or an hourly basis?

22   Q Let's start with an hourly basis.

23   A One hundred dollars per hour.

24   Q Are they paying for any time beyond what you

25   are going to be here with me today?

Jones - designations

1   A Not to my knowledge.

2   Q Did Intermind invent retrieving data remotely?

3   A Not to my knowledge.

4   Q Is an HTTP request that includes CGI parameters a control

5   structure, as you used that term at Intermind?

6   A Not to my knowledge.

7   Q What's a cookie?

8   A A cookie is information that can be stored in

9   a browser to identify additional information as provided

10   by a web server.

11   Q Did Intermind invent the use of cookies to be

12   stored in a browser to identify additional information

13   as stored by a web server?

14   A It's my understanding that cookies existed in

15   web browsers at some point, but I don't recall the

16   specific time.  I don't recall inventing cookies or

17   anyone inventing cookies at Intermind.

18   Q Did Intermind use cookies as part of the

19   Communicator product?

20   A I don't recall.

21   Q Do you have any recollection of cookies being

22   used or discussed at Intermind?

23   A No, I do not.

24   Q Intermind didn't invent browser bookmarks, did they?

25   A No.

Jones - designations

1    Q While you were at Intermind, did

2    Intermind do anything to automate transactions and

3    payments?

4    A Not to my knowledge.

5    Q Did they do anything to identify buy-sell

6    opportunities?

7    A They may have.

8              (Exhibit No. 10 marked for identification.)

9    Q Good afternoon, Mr. Jones.  Handing you a

10   document I have marked as Jones Exhibit 10.  Jones

11   Exhibit 10 is an e-mail from Drummond Reed dated

12   January 25th, 1997 to a handful of people including

13   K. Jones.  Do you see that?

14   A Yes.

15   Q I think that's you?

16   A Yes.

17   Q This e-mail is titled, thought about our

18   patent rights.  Were you involved in obtaining patent

19   rights for Intermind?

20   A Um-hum.

21   Q You were?

22   A Yes.

23   Q What was your involvement?

24   A My involvement was prior art searches.

25   Helping draft the claims.  Review the claims.  And

Jones - designations

1    reading the patent application itself for review.

2    Q When you were drafting the claims, what did

3    you think that you had invented?

4    A I don't remember.

5    Q How did you go about drafting claims?

6    A In the most general sense, I would sit with

7    typically Drummond and other personnel to outline what

8    we were trying to cover as an invention, and then in

9    subsequent conversations with our patent counsel, work

10   to refine those claims in a way that seemed to make some

11   sense.

12   Q Did you view -- review the final claims that

13   were submitted by your patent counsel?

14   A Yes.

15   Q You say that you also reviewed drafts of the

16   patent specifications, is that right?

17   A Yes.

18   Q Did you make any changes to those drafts?

19   A I may have.

20   Q Did you yourself create the original text for

21   any of the sections of any of the patent specifications?

22   A I may have.

23   Q Do you recall what particular sections or

24   features of the product or the invention that you

25   described in the patent specs?

Jones - designations

1   A No.

2   Q How would the drafting of the patent

3   specifications -- how was that divided among the folks

4   at Intermind?

5   A If I recall, the majority of that work was

6   done by Drummond.  In terms of the body of the patent,

7   the claims were typically Drummond and I with the

8   assistance of our patent counsel.

9   Q Well, Intermind Communicator was not the first

10   software product that allowed people to exchange

11   information, was it?

12   A No.

13   Q Okay.  So what was new about Intermind

14   Communicator and the way that it allowed people to

15   exchange information?

16   A I'd have to refer to the claims.

17   Q So sitting here today, you don't remember

18   anything that was new about Intermind Communicator in

19   the way it allowed people to exchange information?

20   A Specifically, no.

21   Q And when you say you have to refer to the

22   claims, is that because the patent claims describe what

23   was new about Intermind Communicator?

24   A That was the intent.

25   Q I'm going to hand you a document I'm marking

Jones - designations

1    as Jones Exhibit 11.

2    A Yes.

3    Q Jones Exhibit 11 is an e-mail from you to

4    Drummond, right?

5    A Apparently.

6    Q When you wrote in this e-mail, we speak of

7    data, metadata, and code that is specifically associated

8    with said data and metadata, what does that mean?

9    A Not knowing exactly what I wrote at the time,

10   that's an ambiguous statement.  So I would prefer not to

11   speculate on it.

12   Q Do you have any understanding of what you

13   thought was novel or distinguishable about Intermind's

14   use of data, metadata, and associated code?

15   A Could you repeat the question, please.

16   Q Do you have any understanding of what you

17   thought was novel or distinguishable about Intermind's

18   use of data, metadata, and associated code?

19   A With respect to novelty in the marketplace,

20   very few applications would pass data, metadata, and

21   code for use by arbitrary applications at the time.

22   There weren't many examples, if any, that I could recall

23   that did that.

24   Q This e-mail you wrote, you continue, you say, we speak

25   of method associated with data, and then, star, and, star,

Jones - designations

1  metadata not encapsulated with data.  Do you see that?

2  A Yes.

3  Q What does that mean?

4  A All I can see that to mean is that the metadata and data

5  were not encapsulated.

6  Q What does that mean?

7  A They weren't necessarily bound together.

8  Q Is that true in the Intermind Communicator?

9  A I don't recall.

10  Q You go on in the next paragraph and say, the

11  e-mail case is bogus.  The HTML page is contained data

12  with a rule for how to process said data.  It is not

13  metadata.  What did you mean by that?

14  A That the entire content of the HTML page is

15  data to be processed by-- pardon me -- some

16  functionality of the application.

17  Q And that's true as well if the HTML page is

18  data being communicated in a communication object in the

19  Intermind Communicator too, right?

20  A It might be.

21  Q I'm handing you, Mr. Jones, an exhibit I have

22  marked Jones Exhibit 15.  Exhibit 15 is a fax of a

23  presentation to Neil Meyers at Network Associates.

24  Do you recall any dealings with Network

25  Associates when you were at Intermind?

Jones - designations

1    A No, I do not.

2    Q If you turn to the next page of this exhibit,

3    it looks to be a PowerPoint presentation.  The title is

4    pushing push, advancing the features of channel

5    technology.  Do you see that?

6    A Yes.

7    Q Do you recall this presentation?

8    A No, I do not.

9    Q Okay.  Did you prepare PowerPoint presentations with Mr.

10   Reed when you were at Intermind?

11   A I may have.

12   Q If you look on the page with the last three

13   digits 611, there's a heading, what defines a channel.

14   Do you see that?

15   A Yes.

16   Q The first bullet point underneath that says,

17   an exchange of metadata between a publisher and a

18   subscriber.  Do you see that?

19   A Yes.

20   Q Do you understand what that means?

21   A Yes.

22   Q What?

23   A The exchange of metadata between presumably

24   two parties, one of whom is a publisher, and the other

25   of whom who is a scriber.

Jones - designations

1    Q What does that have to do with a channel?

2    A That was the definition that was given here.

3    I don't know that's a particular technical

4    consideration.

5    Q Okay.  So was -- strike that.  The second bullet point

6    says, this metadata controls the automated delivery and

7    processing of communications.  Do you see that?

8    A Yes.

9    Q Is that what metadata did in the Intermind

10   system?

11   A Yes.

12   Q How did the metadata in the Intermind system

13   control the automated delivery and processing of

14   communications?

15   A I don't recall in any detail.

16   Q Do you know what automated delivery means

17   here?

18   A To deliver in an automated fashion, which

19   means without any specific user action at the time of

20   the delivery.

21   Q Okay.  So that's different than standard use

22   of the web where the user has to request the resource?

23   A If it's automated, and the user doesn't have

24   to make the request, then yes.

25   Q Do you know what a web form is?

Jones - designations

1   A Yes, I do.

2   Q What is that?

3   A A web form is a collection of information

4   where each piece of information is named to be submitted

5   in a request to a web server.

6   Q Intermind didn't invent transferring user

7   input data via web forms, did they?

8   A Not to my knowledge.

9   Q Okay.  And have you written CGI scripts that

10  take user input data from web forms and stored it in a

11  database?

12  A I may have.

13  Q It's a pretty common use of web forms, isn't

14  it?

15  A It is today.  At that time, it was relatively

16  new.

17  Q I'm going to hand you a document which has

18  been previously marked as Mushero Exhibit 14.  Ask you

19  to take a few minutes and look through Exhibit 14 to see

20  if you recognize any of it.

21  A No, I do not.

22  Q I'm going to ask you to turn to page three of

23  this document, which has the last three digits 532 at

24  the bottom.

25  A Yes.

Jones - designations

1   Q And if you look at the top of that page, there

2   is a heading that says, key two remarks.  Do you see

3   that?

4   A Yes.

5   Q And number one says, no control structure

6   transferred from provider to consumer to control

7   communications.  Do you see that?

8   A Yes.

9   Q Do you know what that means?

10  A No, I do not.

11  Q Do you think you wrote that?

12  A I may have.

13  Q The next one says no update determining

14  control or not performed by control structure.  Do you

15  know what that means?

16  A No, I do not.

17  Q Do you think you wrote that?

18  A I may have.

19  Q No transfer control or not performed by

20  control structure.  Do you know what that means?

21  A No, I do not.

22  Q Do you think you wrote that?

23  A I may have.

24  Q No feedback control or not performed by

25  control structure.  Do you know what that means?

Jones - designations

1    A No, I do not.

2    Q Do you think you wrote that?

3    A I may have.

4    Q Is this one of the documents that you prepared

5    for the patent office providing prior art?

6    A I don't know.

7    Q Do you know what a control structure is in the

8    context of your work at Intermind?

9    A A control structure as -- well, with regard to

10   my work at Intermind, it was information containing

11   data, metadata, and code slash instructions.

12   Q So is a control structure the same as the

13   communications object?

14   A Not necessarily.

15   Q How were they different?

16   A I don't know.

17   Q Why do you think they are not necessarily the

18   same?

19   A Because the marketing term communication

20   object at the time of the first implementation of

21   Intermind's technology did not contain code to my

22   knowledge.

23   Q And then in the paragraph below that, it says,

24   a communication object system accomplishes this function

25   using a novel new control structure, a communications

1   object, which carries the information necessary to

2   perform this abstraction.  Do you know what that means?

3   A No.

4   Q Do you have any understanding of how

5   Intermind's inventions are different than existing

6   distributed object systems?

7   A What's your definition of a distributed object

8   system?

9   Q This one that Intermind is describing here to

10   the patent office.  Distributed object system, how an

11   object on one node can transparently call the methods of

12   another target object on another node.

13   Q If you had a system that could do that, what

14   did Intermind do that was new?

15   A The primary means of making that call -- let me

16   back up.  How one object can call another on another

17   target with a -- with a communications object was

18   designed to carry enough information such that when that

19   object was received, with no additional information, it

20   could execute that remote call, as opposed to having

21   hardcoded information on one node or the other.

22   A That was one possible implementation.  We

23   could make use of hardcoded protocols.  In particular,

24   one protocol that was used was TCP, which is what HTTP

25   operates on top of.  We used TIBCO Rendezvous.  We used

Jones - designations

1    many different protocols.

2    Q So you invented TCP?

3    A No. We used TCP to assist with--

4    Q You didn't use it in the way you invented,

5    right?

6    A We didn't invent.  No one invented TCP at

7    Intermind.  I guess I'm a little confused by the

8    question.

9    Q Hand you a document I have marked Exhibit 21.

10             (Exhibit No. 21 marked for identification.)

11   Q Exhibit 21 is an e-mail from Peter Heymann to

12   several folks at Intermind including you.  The subject

13   is Re:  Open market patents.  Do you see that?

14   A Yes.

15   Q Do you know what a session identifier is?

16   A In what context?

17   Q The web.

18   A It's a means by which to maintain some

19   continuity between a series of HTTP transmissions.

20   Q Did Intermind invent session identifiers?

21   A No.

22   Q Did Intermind use session identifiers?

23   A It may have.

24   Q How?

25   A I don't recall.

Jones - designations

1   Q This also talks about shopping carts.  Do you

2   know what a shopping cart is?

3   A Loosely, yes.

4   Q What is it?

5   A It's that thing you use at that grocery store

6   to put your groceries in.

7   Q How about on the web?

8   A In that context, it's a means by which to keep

9   track of items which you intend to purchase.

10  Q Did Intermind invent shopping carts on the web?

11  A Not to my knowledge.

12  Q Do you recall any discussions or communications within

13  Intermind suggesting that Amazon infringed any of its

14  patents?

15  A I don't recall.

16  Q You don't recall any?

17  A Correct.

18  Q Have you ever bought anything off of Amazon?

19  A Yes, I have.

20  Q When was the first time?

21  A I don't recall the date.  But it was while I

22  was working at Intermind at their offices at Third and

23  Pine Street.

24  Q When you used-- did you use Amazon's

25  one-click?

Jones - designations

1   A I don't recall.  I bought a book.

2   Q Have you ever used Amazon's one-click?

3   A I don't recall.

4   Q Do you know what it is?

5   A I have heard of it.

6   Q Did you ever think that it infringed any of

7   Intermind's patents?

8   A Thought never really crossed my mind.

9   Q Did the thought ever cross your mind when you

10  were using Amazon's web site that they were infringing

11  Intermind's patents?

12  A I don't recall.

13  Q So you think the thought might have crossed

14  your mind, but you don't remember?

15  A My focus was on buying the product that I

16  wanted to buy.

17  Q Did you ever read a review of a product on

18  Amazon's web site?

19  A Yes.

20  Q Did you think you were infringing Intermind's

21  patents when you were reading the review?

22  A No, I did not.

23  Q Have you ever posted a review on Amazon's web

24  site?

25  A No, I have not.

Oberlander - designations

1   Q Did Drummond Reed ever tell you he invented

2   one-click ordering?

3   A I don't believe so.

4             (Jones deposition designations end.)

5             MR. PASAHOW:  Shall we continue, Your Honor?

6             THE COURT:  Yes.  How much longer do you think

7   the next one will be, roughly?

8             MR. PASAHOW:  I believe we have about 25 more

9   minutes.

10            THE COURT:  We will complete then.

11            MR. PASAHOW:  The next deposition segments will

12  come from Jeffrey Oberlander, and like the prior witnesses,

13  he was a co-inventor and also former employee of Intermind

14  as Cordance was then named.

15            (Oberlander designations placed in record.)

16  Q Good morning, Mr. Oberlander.

17  A Good morning.

18  Q Could you state your full name for the record?

19  A Jeffrey Todd Oberlander.

20  Q Are you being paid for your time today?

21  A Yes, paid for my time.

22  Q By whom?

23  A The Wolf Greenfield firm.

24  Q And how much are you being paid for your time today?

25  A I believe it's a hundred dollars an hour.

Oberlander - designations

1   Q Are you getting paid for anything else involved in this

2   case?

3   A No.

4   Q Did you think Intermind invented calling up a

5   program on a remote computer over the internet?

6   A No.

7   Q What's a remote procedure call?

8   A It's basically a client server type function

9   where you invoke a function on a -- from a client on a

10   server machine.

11   Q Did Intermind invent invoking a function on a

12   server machine from a client?

13   A No.

14   Q What do you mean by the exchange of user

15   information as well?

16   A So where RPC is executing a function, this is

17   connecting two objects, increment object oriented

18   fashion, and object contains both methods and data.

19   Q You're an inventor of patents, right?

20   A I am listed on the patents, yes.

21   Q Do you think you did anything new or

22   novel when you were at Intermind?

23   A Yes.

24   Q What?

25   A This idea of exchanging objects between

Oberlander - designations

1    machines and having them execute, be able to execute

2    methods on each other and exchange data.  That was new.

3    Q Anything else?

4    A I don't remember.

5    Q Do you recall any discussions about cookies

6    when you were at Intermind?

7    A No.

8    Q My question was, could you have intelligent

9    communication objects with just a web browser, without

10   this extra web server and everything else you built?

11   A At the time, definitely not.

12   Q Why not?

13   A Browsers didn't have -- have, you know, the

14   rich functionality that they have today.

15   Q What functionality do browsers have today that

16   they didn't have then that you would need to have

17   intelligent object communications?

18   A I still don't know that they have it actually.

19   Q So even today, you couldn't do it with just a

20   browser?

21   A Not something that comes to the top of my

22   head.  I don't know how you would do it.

23   Q Did Intermind invent shopping carts?

24   A No.

25   Q Are you aware of e-commerce sites that use

1    cookies to associate a customer ID with HTTP requests?

2    A Yes.

3    Q What sites do that?

4    A Most -- I mean Getty Images where I work now

5    uses that form, uses cookies for that.

6    Q Sorry.  You work where?

7    A Getty Images.

8    Q And what do you do there?

9    A Director of software engineering.

10   Q And what does Getty Images do?

11   A We are a digital stock photography company.

12   Q And how does Getty Images use the customer ID

13   in a cookie to associate a customer record with an HTTP

14   request?

15   A Just as a cookie.  If they are not signed in,

16   then the cookie can contain that information.

17   Q Which information?

18   A The user ID.

19   Q So if a user logs in by identifying himself to

20   the site, you can determine the customer's ID in the

21   database, is that right?

22   A Yeah.

23   Q Okay.  And then once you do that, you send

24   back a set cookie command to write the customer's ID as

25   a cookie to the user's browser?

1   A Yeah.

2   Q Okay.  Does that use intelligent communication

3   objects that you invented at Intermind?

4   A I don't know.  I don't know.  It's not -- a

5   cookie is not really an object.  Doesn't have methods.

6   So I don't know.

7   Q So setting a cookie is not replicating an

8   intelligent communications object?

9   A By itself, probably not.

10  Q Probably not?

11  A Yeah.

12  Q Does that process of using the customer ID

13  from the cookie to identify a customer record and using

14  the stored credit card and billing information in that

15  record to process a transaction, is that using anything

16  you invented at Intermind?

17  A Well, the cookie is used mostly for UI.  You

18  have to log in, which creates a session, and that is --

19  that is what's used for the actual database access.

20  Q Okay.  So when you say creates a session, that

21  associates a session identifier with the HTTP request?

22  A Yeah.

23  Q Where is that session identifier stored?

24  A I don't know if it's stored at all.

25  Q Okay.  Is the session identifier received in

Oberlander - designations

1    the URL with the user's HTTP request or is it written

2    into a cookie?

3    A Yeah, yeah.

4    Q It's in the URL?

5    A It's in the request.  It's a post.  So it's

6    somewhere in the form data, I guess.

7    Q And at some point, that session ID gets

8    associated in the database at the web server with a

9    Customer ID and a customer record, right?

10   A Yeah.

11   Q Okay.  Is that process something that was

12   invented at Intermind?

13   A No.

14   Q So when you at Getty Images receive a customer

15   ID in a cookie and use it to look up a customer's

16   billing and shipping address in your database, you're

17   not using the customer ID as metadata, are you?

18   A Yeah.  I believe, in our case, the customer ID

19   is a -- is an identity generated number, which in this

20   case, an identity is an auto-generated number in rows

21   inserted in a table.

22   Q So it's -- the only property is it's unique?

23   A Right.

24   Q So it's data, right?

25   A Yeah.

Oberlander - designations

1  Q Have you ever bought anything off of Amazon?

2  A Yes.

3  Q When is the first time?

4  A I don't remember the first time.

5  Q Rough year?

6  A Probably in the late '90s.

7  Q When is the last time you bought something?

8  A Probably last week.

9  Q Okay.  So you have an account at Amazon?

10  A Yes.

11  Q Do you -- have you used one-click?

12  A Yes.

13  Q Have you ever read any reviews on Amazon?

14  A On the Amazon, the company?

15  Q Amazon.com, the web site.  They have reviews

16  of the products on the pages that describe them.

17  A Yes.

18  Q Have you read those?

19  A Yes.

20  Q Did you think in reading though reviews you

21  were using any of Intermind's inventions?

22  A In reading the reviews?

23  Q Yeah.

24  A Nothing like that crossed my mind.

25  Q Okay.  Have you ever posted a review on

Oberlander - designations

1    Amazon, product review?

2    A Yes.

3    Q When you posted that product review on Amazon,

4    did you think you were using any of Intermind's

5    inventions?

6    A I didn't think about it.

7    Q Have you ever rated any items on Amazon?

8    A I may have.  But I don't recall it.  I use

9    Amazon a lot, so--

10   Q Did you ever think when you were using Amazon

11   for anything that they were using Intermind's

12   inventions?

13   A I have never really thought of it.

14   Q Did you ever work on any sort of

15   one-click product ordering while you were at Intermind?

16   A No.

17   Q Okay.  Are you aware of anybody else at

18   Intermind working on a one-click ordering system while

19   You were there?

20   A No.

21   Q Let me ask you to turn back in

22   that exhibit, the 325 patent, to column 78.

23   A Okay.

24   Q Okay.  To about line 35, in the middle

25   paragraph talking about cookies.  And you can read as

1    much of that as you like.  Cookies are an attempt to

2    surmount the manual data entry and maintenance

3    requirements of the first approach above.  Do you see

4    that?  And then if you read from there down to line 45,

5    and I'll ask you a couple of questions.

6    A Okay.

7    Q Do you understand that section to be

8    describing the cookies are an existing approach, but

9    that they don't give the user any control over the data

10   that's collected or transmitted by the cookie?

11   A Yes.

12   Q And do you see -- understand that the patent is

13   explaining that in this invention, cookies are replaced

14   by communication objects?

15   A Could be replaced, yes.

16                (Oberlander deposition designations end.)

17                MR. PASAHOW:  And then the final section of

18   deposition is from the fourth co-inventor and former

19   employer, Mr. Banay.

20                MR. ALBERT:  Again, could we just clarify which

21   patents we are talking about?

22                THE COURT:  Yes.  Could you do that, please?

23                MR. PASAHOW:  Sure.  They were co-inventors on

24   the '325 and '717 patent.  Originally on the '710 patent but

25   then withdrawn.  So in the end, only Mr. Reed was the

Oberlander - designations

1    inventor of the '710 patent.

2                (Banay deposition designations placed in record.)

3    Q. Good morning, Mr. Banay.

4    A. Good morning.

5    Q. If you could please state your full name for the

6    record.

7    A. My name is Dan Banay.

8    Q. What is your current employer?

9    A. I work for Pop Cap Games.

10   Q. Can you spell that.

11   A. P-O-P C-A-P games.

12   Q. And what is your position there?

13   A. I'm a software engineer.

14   Q. If you can briefly tell me your education history.

15   A. Education history, I have a bachelor's degree in

16   computer science from the University of Washington.

17   Q. And your bachelor's degree in computer science from

18   University of Washington, when did you get that degree?

19   A. I received it in June of 1989.

20   Q. Intermind did not invent HTTP, correct?

21   A. That's correct.

22   Q. And Intermind did not invent HTTP headers, correct?

23   A. That's correct.

24   Q. Did Intermind invent cookies, web cookies?

25   A. No.

1   Q. I'm going to show you Exhibit-10 to your deposition.

2   This is an e-mail from you to several people, to actually

3   Drummond Reed ccing several other individuals that was sent

4   on May 3rd, 1997.

5   A. Uh-huh.

6   Q. This appears to be your response to either

7   Peter Heymann or Drummond Reed's e-mail, and I'm not sure I

8   understand who wrote the original to what you're replying to.

9   A. Uh-huh.

10  Q. What was the purpose of your response?

11  A. Um, it looks like here I'm just trying to clarify

12  Some details here with COM and DCOM.

13  Q. How did COM, DCOM and CORBA relate to

14  hypercommunications or Intermind Communicator?

15  A. I believe here I was just pointing out it's

16  something that we could use to realize the, you know, an

17  implementation.

18  Q. On the second page the e-mail ends with your paragraph

19  that says, "DCOM/CORBA are infrastructure and

20  what we are doing is building upon that infrastructure to

21  provide intelligent communications.  This is precisely what

22  our IP covers and what we should stick to IMHO."  What is

23  IMHO?

24  A. In my humble opinion.

25  Q. What is this infrastructure that you're referring to?

Oberlander - designations

1   A. Well, that infrastructure would probably be DCOM/CORBA.

2   Q. So hypercommunications or what Intermind was working

3   on was designed to be built upon that existing

4   infrastructure, correct?

5   Q. Is that what you're referring to?

6   A. Well, that's kind of why I have the question mark

7   because, you know, I was kind of -- it looks like I was

8   tossing that out there as, you know, a possibility or more

9   of an opinion, um, so, but --

10  Q. What do you, what do you mean?  You're not sure now

11  whether --

12  A. No. Over there you see I said DCOM/CORBA question

13  mark.

14  Q. Yes.

15  A. I'm just saying it seems to me in my opinion at that

16  time that that was infrastructure that we would build upon.

17  Is the communications object one of the main components of

18  Intermind's IP?

19  Q. Again, I'm asking you in your capacity as an21 inventor.

20  A. Yeah, presumably.  I don't know.

21  Q. The intelligent communications that you were

22  referring to that Intermind Communicator was all about and

23  what Intermind was working on that was based on using

24  communications objects, correct?

25  A. I believe so, yeah.

Oberlander - designations

1    Q. And I believe you already told me this, that

2    intelligent communications was what was novel about

3    Intermind IP, correct?

4    A. Yeah, I think that's one of the things that were

5    novel, but again, I don't remember all the details of it.

6    Q. Besides intelligent communications on a

7    communications object that you think was novel about

8    Intermind IP, was there anything else?

9    Q. To the extent you recall in your capacity as an22

10   inventor.

11   A. I don't remember.

12   Q. This is what's previously been marked as Mushero

13   Exhibit-8 and this is a U.S. patent 5,862,325.  Will you

14   understand what I'm referring to if I refer to it as the

15   '325 patent?

16   A. Yes.

17   Q. And this is entitled Computer-Based Communication

18   System and Method Using Metadata Defining a Control

19   Structure.

20   A. Okay.

21   Q. And lists you as an inventor, correct?

22   A. Yes.

23   Q. When you reach line 15 in column 123, that's where

24   I'd like you to stop.

25   A. Okay.

Oberlander - designations

1  Q. Did you contribute anything that's described in this

2  section?

3  A. Don't believe so.

4  Q. Uh-huh.  The columns that you've just read, does

5  that describe to you how to complete a purchase by using a

6  one click button to that type of feature?

7  A. I don't know if it does or not because the language

8  was incredibly difficult to read.

9  Q. What did you understand those columns describing?

10  A. This seemed to describe a lot of like the back end

11  invisible stuff that happens behind the scenes.

12  Q. Uh-huh.

13  A. Um, but it was --

14  Q. Did anything in those sections describe how a

15  purchase could be complete by a customer clicking one

16  button?

17  A. It's hard to say.

18  Q. Let's see, did you see any other figures besides

19  Figure 17 that are referenced in these few columns you just

20  read?

21  A. Well, these numbers here like 1302 and 1310, what

22  Are those?  Are those claims or are they --

23  Q. No, those are figure references.  And if I can help

24  you, that is in figure 28.

25  A. What's this?

1    Q. So the 1310, 1302 numbers that are referred to in

2    the section you just read, those boxes are illustrated in

3    Figure 28.

4    A. Okay.

5    Q. Does that at all clarify to you what the section

6    describes and whether the section describes one click

7    purchasing?

8    A. Doesn't really clarify anything.  I don't --

9    Q. So as an inventor of these patents reading

10   these five columns you're not sure whether this section

11   describe one click purchasing?  It's not clear to you?

12   A. Yeah, this language is extremely dense.

13   Q. Did Intermind invent one click purchasing?

14   A. I don't know.

15   Q. At the time you were at Intermind, did you remember

16   anyone talking about one click purchasing?

17   A. Never heard anyone talking about it.

18              (Banay deposition designations end.)

19              MR. PASAHOW:  And I should indicate the last

20   answer was changed to read "I don't recall hearing anyone

21   talking about one click purchasing."

22              That concludes the sections, Your Honor.

23              THE COURT:  Thank you.

24              I would like to spend a short conference with

25   counsel.  Sidebar, please.

1               (The following took place at sidebar.)

2               THE COURT:  It's just to discuss with you what

3   is going to happen.  I mean we're going to let the jury go

4   obviously today because you don't have any further witnesses

5   from what I understand.

6               Tomorrow, you are going to call your expert; is

7   that correct?

8               MR. PASAHOW:  Yes, Your Honor.

9               THE COURT:  Then we will need to address the

10  issues that have been raised by Cordance in their motion.

11              Timing on how we get this done.  My

12  understanding I will be receiving a response from Amazon

13  around 6:00 tonight.

14              MR. PASAHOW:  Yes, Your Honor.

15              THE COURT:  What time do we want to get started

16  tomorrow?  And do we want to start with the jury a little

17  bit later than 9:00 o'clock?

18              So these are the points.  And how long do we

19  think your expert -- I'm sorry, I keep forgetting his name.

20              MR. PASAHOW:  Dr. Lorenzo Alvisi.

21              THE COURT:  I keep remembering "Lorenzo."

22              MR. PASAHOW:  You can call him Lorenzo.

23              THE COURT:  If I do that, that wouldn't be too

24  good in front of a jury.  It really wouldn't.

25              How long is it expected that his testimony will

1    take?  Will it be kind of like the testimony of Dr. Shamos,

2    about that length of time?  So we're talking about probably

3    all the morning, probably a chunk of the afternoon, too?

4              MR. PASAHOW:  I would expect us to finish in the

5    morning, but --

6              THE COURT:  Amazon to complete in the morning.

7              MR. PASAHOW:  Yes.

8              THE COURT:  Would you be able to complete in the

9    morning if we didn't start until 9:30 and you had until 1:00

10   o'clock or is that half hour going to --

11             MR. PASAHOW:  That is about the approximate

12   length of the testimony, so if we're not done, we would be

13   very close to done.

14             THE COURT:  All right.  And roughly how long?  I

15   guess it sort of depends on what I allow or don't allow, but

16   you have to work from the assumption that everything is

17   coming in.  But how long do you think your cross is going to

18   be?

19             MR. ABRAHAMSEN:  My best guess is an hour.  I

20   was looking through their documents as we were playing the

21   videos, and it looks like there may be just three pieces of

22   art they're actually relying on.  If that is the case, it

23   will go a lot faster.  I don't know for sure, though.  They

24   identified 17 originally.

25             MR. PASAHOW:  It's definitely cut but I don't

1    know where we are in light of what happened today.

2                THE COURT:  All right.  Okay.  So after we get

3    done with Dr. Alvisi, are there any further witnesses, live

4    or by deposition that Amazon intends to present?

5                MR. PASAHOW:  Yes, we have Diane Lye.

6                THE COURT:  Oh, yes.  I'm sorry.  You have your

7    damages expert.

8                MR. PASAHOW:  Yes, but that is not her.  She is

9    an employee who will explain some of the statistics that's

10   have been coming out of Amazon.

11               And then our damages expert, Mr. Levko.

12               THE COURT:  Okay.  Would that end then, your

13   side, as far as you know standing here?  Is there anything

14   else?

15               MR. PASAHOW:  I believe the evidence, yes.

16               THE COURT:  And rebuttal?

17               MR. ALBERT:  Yes.  Dr. Shamos more than likely

18   will be called in rebuttal.

19               THE COURT:  He is going to be limited to the

20   issue of invalidity.  Correct?

21               MR. ALBERT:  Correct.

22               MR. ABRAHAMSEN:  Correct, and he is not

23   available Thursday afternoon.  Hopefully, that will fit into

24   our schedule, though.  He is available the rest of the week.

25               THE COURT:  He is available on Wednesday, for

1  example.

2         MR. ABRAHAMSEN:  Right.

3         THE COURT:  Which, more likely than not, will be

4  the day he will be called, some time during that day.

5         MR. ABRAHAMSEN:  Or even Thursday morning, if

6  necessary.

7         THE COURT:  All right.  So he could be called

8  Wednesday afternoon to Thursday morning, in that time frame,

9  if need be.

10         MR. ABRAHAMSEN:  Yes.

11         THE COURT:  All right.  Do we want the jury

12  starting at 9:00 or 9:30?  And the reason I'm asking is

13  roughly how long counsel believes it's going to take for

14  this issue concerning Dr. Alvisi to be resolved, if we start

15  at 8:00 o'clock.

16         MR. PASAHOW:  I think if we start at 8:00

17  o'clock, we would definitely be done by 9:00.

18         THE COURT:  It took us a good hour to talk about

19  this issue on evidence.

20         MR. PASAHOW:  I understand.

21         THE COURT:  And Dr. Alvisi's report is a little

22  bit thicker and longer than what I had to read where the

23  cases are concerned, and I'm not going to go through his

24  entire report.  I'll go through highlights of it.

25         MR. ABRAHAMSEN:  It looks like they will not be

1  relying on a lot of the evidence, so I think it will be

2  helpful for everybody if they let us know what art they're

3  going to be relying on.

4           MR. PASAHOW:  We can do that tonight.

5           MR. ABRAHAMSEN:  Okay.  That way, you won't have

6  to look at those sections either.

7           THE COURT:  Considering we've already outlined

8  some of them anyhow.  I don't know what has been done or

9  what hasn't, which is the reason why the law clerk is not in

10  here.  He is sitting listening to trial scrambling every

11  time something is mentioned.

12           MR. ABRAHAMSEN:  Okay.

13           THE COURT:  All right.  So still have them come

14  in at 9:00 o'clock then?

15           MR. PASAHOW:  I believe so, Your Honor.

16           THE COURT:  Okay.

17           MR. PASAHOW:  Could I ask a question about this

18  case?  Do we have an opportunity to respond to Dr. Shamos?

19  I noticed that your post-trial guidelines suggest that we

20  have an opportunity, within the strict parameters of what

21  Dr. Shamos talked about to, to have rebuttal to their

22  opposition.

23           THE COURT:  I can't remember.  I really can't.

24  I just can't remember at this stage.

25           MR. ALBERT:  I'm not sure why there would be

1    rebuttals to rebuttal.

2              MR. HORWITZ:  It's not rebuttal to a rebuttal,

3    it's rebuttal to a response.

4              THE COURT:  Does Dr. Shamos get to testify on

5    infringement again?  They have the burden of proof on

6    infringement.  With respect to with burdens of proof, with

7    invalidity, there is much higher standard, compared to what

8    is infringement, but I'll go back and check on what I have.

9              Was that in my trial management order?

10             MR. PASAHOW:  Yes, Your Honor.

11             THE COURT:  Okay.  I have to go back and look.

12   I really will.  I have to look at the website, because I

13   just can't remember at this stage.  It's a little unusual

14   but I will check it and see if what my directions suggest.

15   Okay?

16             This may be meaning that, counsel, we might

17   actually get through this case by Thursday, potentially?

18             MR. PASAHOW:  That would be my guess, Your

19   Honor.

20             THE COURT:  I'm not going to hold you to it.

21             MR. PASAHOW:  It's closing arguments and such on

22   Friday.

23             THE COURT:  Well, that's my question.  That's my

24   question.  Because we haven't gotten the jury instructions

25   done yet.

1          MR. PASAHOW:  I understand.

2          THE COURT:  And I don't know the timing of when

3    they're going to be done, and I don't know whether you are

4    go to agree because, quite frankly, you haven't agreed to

5    anything on the jury instructions when I first saw them.  So

6    I don't know whether there has been some temperance in that

7    regard.

8          MR. PASAHOW:  I would think that, I would hope

9    that now that we tried the case and understand what the

10   issues have turned out to be, maybe we can do better.

11         MR. HORWITZ:  Some issues will go away, Your

12   Honor.

13         THE COURT:  Yes.

14         MR. HORWITZ:  And there are some issues that are

15   repeated several times.  For instance, how you refer to the

16   burden of proof for invalidity.  And once you decide that

17   once, that covers a lot of pages in dispute.

18         THE COURT:  All right.

19         MR. HORWITZ:  Perhaps we should pick a time.

20         THE COURT:  That's the reason why I was -- why

21   don't we wait until tomorrow to figure out to pick a time as

22   to when we'll be meeting in court and go through that to

23   make sure it's done.  Because if it turns out, for example,

24   that Friday might be the day to do that and have them come

25   back on Monday, I hate doing that to you but I hate doing

1    that to you and to your case.  We can discuss it.  But I

2    don't know, if everything goes to them on Friday, what

3    happens anyhow because you have got the weekend looming

4    either way.  You have got the weekend looming to potentially

5    affect a decision.

6                MR. HORWITZ:  Why don't we see where we are.

7                THE COURT:  That's right.  We'll see where we

8    are.  We'll see where we're at.

9                All right.  Thank you.

10               (End of sidebar conference.)

11               THE COURT:  Members of the jury, you will be

12   excused now.  We'll see you tomorrow at 9:00 o'clock.

13               Please don't talk about this case amongst

14   yourselves, and do not read anything in the media or written

15   by television or on the Internet.  And please drive

16   carefully.

17               (Jury left courtroom.)

18               THE COURT:  Counsel, you can be seated.  All

19   I've done is sit all day.

20               Is there anything besides the fact that we're

21   going to start at 8:00 o'clock tomorrow to deal with the

22   issue concerning the Cordance's motion to limit the scope of

23   the testimony of Dr. Alvisi?  I promised I would learn his

24   last name instead of calling him "Lorenzo."

25               And is there anything else, though, that we need

1    to address besides that we hope to get done in one hour?

2              MR. ALBERT:  Just one procedural question, Your

3    Honor.

4              THE COURT:  Sure.

5              MR. ALBERT:  Is it Your Honor's practice with

6    regard to Rule 50 motions that they may be presented orally

7    to the Court, as I understand, some judges in this court do,

8    or does Your Honor expect full written motions?  And I think

9    generally the way I understand some judges do it, either a

10   short written motion or an oral motion can be made with

11   briefing referred to at a later time.

12             THE COURT:  Either way.  Either way.  My

13   preference is probably a two to three page motion.  Speaking

14   motion, as I will put it.  A speaking motion along those

15   lines.  It's preferred, although I have accepted oral

16   records.  I have also accepted just brief oral statements as

17   to what the motion is based upon.  Obviously, you have to be

18   concerned you cover all the bases in the motion or motions

19   at the time.

20             MR. ALBERT:  Okay.  Thank you, Your Honor.

21             THE COURT:  And, yes, it's not going to happen

22   before it goes to the jury.  I just don't see that

23   happening.

24             MR. ALBERT:  Certainly, Your Honor.  Thank you.

25             THE COURT:  Is there anything else that you wish

1   to discuss with me before we close tonight?

2                MR. PASAHOW:  Nothing from our side, Your Honor.

3                MR. ALBERT:  Nothing from Cordance, Your Honor.

4                THE COURT:  Thank you very much.  Have a good

5   evening; and I look forward to your submission.

6                MR. PASAHOW:  Yes, Your Honor.

7                THE COURT:  Amazon's submission.

8                One thing I do want to bring out, anything that

9   you put in the response to the motion, if it's under seal,

10  obviously I cannot pull it off the Court's website.  So if

11  you want to drop a copy off of anything that would be under

12  seal, that would be appreciated and most helpful.

13               MR. HORWITZ:  At 6:00 o'clock, are we going to

14  be able to, or 6:15?

15               THE COURT:  Are you going to be able to get in

16  here?  You might be.  If you're not -- I'll be here, so just

17  call chambers and somebody will come down and let you in, or

18  let the individual in who is going to drop it off.

19               MR. HORWITZ:  Your Honor, would you like an

20  e-mail sent as well?

21               THE COURT:  You know what?  You can just do an

22  e-mail.  That's right.  It will might save you the problem.

23  He just do it by e-mail.  That would probably be helpful.

24  Thank you for reminding me of that.

25               I can't imagine it's going to be -- like I said,

1    I've got this testimony.  I've now got his report.  So

2    that's the biggest item.  And I'm not a real big fan of an

3    e-mail, running off 200 pages of material.  So that will be

4    fine.  You can do it by way of e-mail, unless you want to

5    drop something huge off to me.  You can do that, too.  Just

6    give me a call.

7              Thank you.

8              (Trial adjourns at 5:05 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25