## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| CORDANCE CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| AMAZON.COM, INC., | ) |
| | ) |
| Defendant. | ) |

C.A. No. 06-491-MPT

**PUBLIC VERSION**

## AMAZON.COM INC'S ANSWERING BRIEF IN OPPOSITION TO
## CORDANCE CORPORATION'S MOTION FOR PERMANENT INJUNCTION

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendant*
*Amazon.com, Inc.*

OF COUNSEL:

Lynn H. Pasahow
J. David Hadden
Darren E. Donnelly
Saina S. Shamilov
Ryan Marton
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Tel: (650) 988-8500

Dated: April 23, 2010
Public Version Dated: May 4, 2010
964803/ 30763

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................................... 1

II.  BACKGROUND ............................................................................................................ 4

    A.   Cordance Failed Before the '710 Patent Issued And That Failure Had
        Nothing to Do With Amazon ...................................................................................... 4

        1.   Cordance's First Product .................................................................................. 4

        2.   Cordance's First Attempt at Digital Identity .................................................. 5

        3.   Cordance's Enterprise Software Offering ....................................................... 6

        4.   Cordance's Second Attempt At Digital Identity ............................................. 7

        5.   Cordance Files For Bankruptcy ....................................................................... 8

        6.   Cordance After Bankruptcy ........................................................................... 10

    B.   Amazon's Purported Infringement Did NOT Cause Cordance to Fail ................. 11

    C.   Cordance Does Not Compete with Amazon and Never Has ................................. 14

    D.   Amazon Payments And Its Implementation of 1-Click Is Irrelevant ................... 15

    E.   Cordance Has No Exclusivity to Protect .............................................................. 17

ARGUMENT ........................................................................................................................ 18

III. A PERMANENT INJUNCTION IS NOT WARRANTED ........................................... 18

    A.   Cordance Has Not Suffered Irreparable Injury ..................................................... 19

        1.   No Credible Evidence Shows Amazon's Purported Infringement
            Has Precluded Or Impacted Cordance's Success In The Relevant
            Market ............................................................................................................ 20

            a.   Cordance Has Failed to Define the Relevant Market .................... 20

            b.   Cordance has Not Shown a Direct Link Between The
               Alleged Infringement and Cordance's Purported Market
               Failings ......................................................................................... 23

        2.   Amazon's Purported Infringement Has Not Interfered With
            Cordance's Exclusive Right To Use Or License Its Technology ............. 27

    B.   Cordance Has Not Shown that Monetary Damages Are Inadequate ..................... 29

        1.   Cordance Has Foregone Its Right To Exclude ............................................. 29

        2.   Amazon Did Not – And Could Not – Exclude Cordance From The
            Market ........................................................................................................... 30

        3.   Amazon Is Entitled To Any Good Will And Reputation That
            Resulted From The Use Of Its Patented Invention ..................................... 31

    C.   The Balance of Hardships Weighs Against Injunctive Relief .............................. 31

    D.   The Public Interest Will Be Best Served by Denying Cordance's Motion .......... 33

**TABLE OF CONTENTS**
**(continued)**

Page(s)

IV.    COMPULSORY LICENSE IS NOT APPROPRIATE.......................................................34

    A.    A Compulsory License is Not Necessary to Adequately Compensate
        Cordance..........................................................................................................34

    B.    Even if it Were Warranted, It is Premature to Impose a Compulsory
        License at this Time.......................................................................................35

V.    CONCLUSION .....................................................................................................35

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Advanced Cardiovascular Sys. v. Medtronic Vascular, Inc.*,
  579 F. Supp. 2d 554 (D. Del. 2008) .................................................................... 20, 25, 29, 30

*Amado v. Microsoft Corp.*,
  No. 03-242, 2007 U.S. Dist. LEXIS 96487 (C.D. Cal. Mar. 13, 2007) .............................. 34

*Callaway Golf Co. v. Acushnet Co.*
  585 F. Supp. 2d 699 (D. Del. 2008) ................................................................................ 26

*Commonwealth Scientific & Industrial Research Organisation v..*
  *Buffalo Tech., Inc.,* , 492 F. Supp. 2d 600 (E.D. Tex. 2007) ................................................ 28

*Cordis Corp. v. Boston Sci. Corp.*,
  431 F. Supp. 2d 461 (D. Del. 2006) ................................................................................ 35

*eBay Inc. v. MercExchange, LLC*,
  547 U.S. 388 (2006) ........................................................................... 2, 19, 29, 34

*i4i Ltd. P'ship v. Microsoft Corp.*,
  598 F.3d 831 (Fed. Cir. 2010) .................................................................................... 26, 27

*IGT v. Bally Gaming Int'l Inc.*,
  675 F. Supp. 2d 487 (D. Del. 2009) ........................................................................... *passim*

*IMX, Inc. v. LendingTree, LLC*,
  469 F. Supp. 2d 203 (D. Del. 2007) ..................................................... 19, 25, 29, 35

*Innogenetics, N.V. v. Abbott Labs.*,
  512 F.3d 1363 (Fed. Cir. 2008) .................................................................................... 18

*Joyal Prods., Inc. v. Johnson Elec. N. Am., Inc.*,
  No. 04-5172, 2009 WL 512156 (D.N.J. Feb. 27, 2009) ................................................ 27, 28

*MercExchange, LLC v. eBay, Inc.*,
  500 F. Supp. 2d 556 (E.D. VA 2007) .............................................................................. 3

*Muniauction, Inc. v. Thomson Corp.*,
  532 F.3d 1318 (Fed. Cir. 2008), *cert. denied*, 129 S. Ct.1585 (2009) ................................ 17

*Paice LLC v. Toyota Motor Corp.*,
  504 F.3d 1293 (Fed. Cir. 2007) .................................................................................... 34

*Praxair, Inc. v. ATMI, Inc.*,
  479 F. Supp. 2d 440 (D. Del. 2007) ......................................................................... 29, 30

*Telcordia Techs. v. Cisco Sys., Inc.*,
  592 F. Supp. 2d 727 (D. Del. 2009) ....................................................................... *passim*

*TruePosition Inc. v. Andrew Corp.*,
  568 F. Supp. 2d 500 (D. Del. 2008) ................................................................................ 19

*z4 Techs., Inc. v. Microsoft Corp.*,
  434 F. Supp. 2d 437 (E.D. Tex. 2006) ......................................................................... 31, 33

## I.   INTRODUCTION

Cordance has had a long and tortuous business history with many plans, failings and purported rebirths, but through this history four things have remained constant: (1) it has never considered Amazon a competitor; (2) it has always been willing to and, indeed, aggressively sought to broadly license its patents for money; (3) it has never had any involvement with a product covered by the claims of the '710 Patent; and (4) patent litigation to extract a money settlement has been one if its primary business strategies – and is, in fact, the business strategy it currently pursues.  Because of these truths, among others, Cordance cannot show that Amazon's purported infringement damaged Cordance's market share, impacted its reputation or harmed its ability to maintain exclusivity.  Thus Cordance has not suffered and does not stand to suffer irreparable harm and its motion must fail.

Before the filing of this motion, Cordance never once characterized Amazon as a competitor.  Among the dozens of business plans Cordance has prepared over its long history – virtually all of which include a section describing the competitive landscape – none refers to Amazon as a competitor or a competitive threat.  Equally telling, its own two economic experts, Phillip Green and Terry Musika, ███████████████████████████████. *See* Declaration of J. David Hadden In Support of Amazon's Opposition to Permanent Injunction ("Hadden Decl.") Exh. 1 at p. 27 ("███████████████████████"), Exh. 2 at p. 39 ("███████████████████████████████████████████████████████████████████████████████"). Phillip Green, one of Cordance's economics experts, testified at trial: "The parties are not competitors. *By licensing Amazon, Cordance isn't really losing anything.*" *Id.*, Exh. 3 at 1154:15-16 (emphasis added).  Even Mr. Reed acknowledges that ███████████████

████████████████████████████████████████████ Declaration of

Drummond Reed in Support of Cordance's Motion for Permanent Injunction ("Reed Decl.") at

¶27 (D.I. 526). The only "independent" support Cordance has for its assertion of competition is

a declaration from its technical expert, Dr. Shamos, who is not qualified to provide such an

opinion and who never provided such an opinion in his expert disclosure.

Moreover, Cordance's documents make clear that Cordance was only interested in

Amazon as a litigation target – for money – not as competitor; not as threat to its control of any

market; not as a threat to its reputation; and not as an impediment to its success. As of at least

late 2002, after reducing its roster to two technologists and a lawyer, following the failure of its

attempt at a digital identity business, Cordance directed its focus towards suing Amazon for

money. It contemporaneously filed a bankruptcy reorganization plan ████████████████████

████████████████████████████████████      █████████████████████████

████████████████████████ Neither the plan nor any Cordance document says

anything about obtaining a better market position by enjoining Amazon. Indeed, Cordance never

wanted an injunction, just the threat of one as leverage for more money – implicating the very

concern Justice Kennedy highlighted in his concurring opinion in *eBay*.

Cordance's assertion that Amazon's purported infringement has somehow caused

Cordance to fail is equally unsupported. Beyond baldly asserting that Amazon has "saturated"

the digital identity market, Cordance has done nothing to draw a direct causal connection

between Amazon's purported infringing use of 1-Click® and any of Cordance's failings.

Cordance ignores that it experienced much of its decline (culminating in bankruptcy and an

effective shut down of operations) 1 year before the '710 Patent issued thus necessarily before

any infringement occurred. It similarly ignores that Amazon achieved much of its e-commerce

market strength before the asserted patent issued. Because Amazon's success pre-dates Cordance's patent, it cannot support an injunction. *See MercExchange, LLC v. eBay, Inc.*, 500 F. Supp. 2d. 556, 580 (E.D. VA 2007) (recognizing that market success achieved pre-infringement should not form the basis of a claim of market saturation irreparable harm, particularly where the purportedly infringing offering is a website service as opposed to a tangible good, as is the case here). Furthermore, Cordance fails to define the relevant market in which it has suffered its purported irreparable harm; fails to identify who the relevant market participants are; fails to explain why market forces, rather than Amazon's alleged infringement, are not responsible for its failure; and fails to explain why any of the publicly recognized instances of the market's rejection of Cordance's technology are not the cause of Cordance's failure as opposed to Amazon's purported infringement. This complete failure of proof alone warrants denial of Cordance's motion.

Cordance also never seriously considered exclusivity in any market related to the '710 Patent. For one, Drummond Reed submitted a declaration to the Court in March of 2009 stating: "Cordance has not had any involvement with or licensed any product covered by the claims of its '710 patent." Third Declaration of Drummond Reed in Support of Cordance's Motion for Partial Summary Judgment ("Reed SJ Decl.") at ¶ 7 (D.I. 357). Second, Cordance "traded" the asserted patents to a standards setting non-profit in order to encourage the adoption of its technology. By doing this it gave up control of its patents, invited competition and gave up the ability to exclude. Moreover, throughout its history Cordance consistently sought to license or sell its patents for money rather than maintain exclusivity and, indeed, both of Cordance's economics experts acknowledged that █████████████████████████████████████████████

████████

Each of these facts are expanded on below and supported by irrefutable documents and testimony, making clear that Cordance's claims of harm to market share, reputation, ability to succeed and maintenance of exclusivity are unfounded.

## II.   BACKGROUND

### A.   Cordance Failed Before the '710 Patent Issued And That Failure Had Nothing to Do With Amazon

Cordance has a 15-year-long history of failings, none of which can be attributed to anything done by Amazon.  Indeed, as its business history reflects, Cordance's failures are due to the lack of a viable product and appropriate marketing strategy, inadequate funding and misuse of funds.

#### 1.   Cordance's First Product



Hadden Decl. Exh. 4 at p. 10; Exh. 1 at p. 5.

*Id.*, Exh. 1 at p. 5, Exh. 5 at 67:4-5.

*Id.*, Exh. 5 at 70:8-22, Exh. 6 at CORD023799.

*Id.*, Exh. 7 at CORD044019.

*Id.*,

Exh. 1 at p. 5, Exh. 8 at CORD120205-208. ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████ *Id.*, Exh. 8 at CORD120222, Exh. 9 at CORD043949. ███████████

███████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ *Id.*, Exh. 10 at CORD071183, Exh. 5 at 125:19.

████████████████████████████ *Id.*, Exh. 9 at CORD043947, Exh. 1 at p. 5, Exh. 8

at CORD120205-208. █████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████ *Id.*, Exh. 2 at p. 6, Exh. 4 at p. 10.

At his deposition, Peter Heymann testified that ███████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.*,

Exh. 5 at pp. 80-81.


## 2.    Cordance's First Attempt at Digital Identity

████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████ Hadden Decl. Exh. 8 at CORD120223-258. █

██████████████████████████████████████████████████

██████████████████████████████████████████████████████

█████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████" Reed Decl. Exh. C at CORD121753-54. ████████████████

████████████████████████████████████████████

███████████████████████████ ██████████████████

████████████████████████████████████ Board meeting minutes

from August 1998 reflect:

████████████████████████████████████████

Hadden Decl. Exh. 8 at CORD120233.

█████████████████████████████████████████

██████ *Id.*, Exh. 4 at p. 10. ███████████████████

███████████████████████████████████████

██████████████████████████. *Id.* at p. 11. ███████████

███████████████████████████████████████

████████████████████████ *Id.*, Exh. 2 at p. 6.

     3.    Cordance's Enterprise Software Offering

███████████████████████████████████████

███████████████████████████ *Id.*, Exh. 4 at p. 11████████

████████████████████████████████████████████

████████████████████████████████████████████

sustainable." *Id.*, Exh. 2 at p. 6. ███████████████████████

█████████ *Id.,* Exh. 4 at p. 11. ████████████████████████

████████████████████████████████████████████████████████████

█████████████████████ *Id.*

### 4.    Cordance's Second Attempt At Digital Identity

After its failing in the enterprise software business, Cordance turned back to its digital

identity services plan and explored the idea of leveraging broad adoption of its technology

through incorporation in a standard.  In 2002, Cordance granted XNSORG (which later changed

its name to XDI.ORG), a non-profit organization, an exclusive license to all of its patents and

patent applications █████████████████████████████████████

████████████████████████████████████ Hadden Decl., Exh. 17 at

CORD223264; *see also* Exh. 18, Exh. 19; Exh. 20.  Cordance characterized this arrangement as a

████████████████████████████████████████████████████████████

███████████████████████████████████ *Id.*, Exh. 21 at CORD204408. █

████████████████████████████████████████████████████████████

███████████████████████████ *Id.*, Exh. 17 at CORD223264.  Cordance's

new business model was premised on the idea that through broad adoption of the underlying

technology by businesses and developers which was to be facilitated by XNSORG's opening of

the technology for use by any implementers, the demand to purchase i-names would grow and

Cordance would obtain a revenue stream from registering the i-names.  Thus, ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ *Id.*, Exh. 20 at CORD060458; *see also*

Exh. 22 at CORD140844, Exh. 1 at p. 6, Exh. 18. ███████████████████

███████████████████████████████████ *Id.*, Exh. 20 at

CORD060460-CORD06463. ██████████████████████

████████████████████████████ Under this license to

XNSORG, anyone could use Cordance technology to develop software to the extent such

software conforms to the XRI/XDI technical specifications defining what Cordance hoped would

be the XRI/XDI standards.

Cordance hoped that broad use of the technology would result in wide adoption of i-

names and in turn large i-name registration fees to Cordance. In a May 2003 Business Plan,

████████████████████████████████████████████

██████████████████████. *Id.*, Exh. 17 at CORD223286. But, again,

Cordance's anticipated success was not realized. ███████████████████. Reed Decl. ¶ 8,

Hadden Decl., Exh. 24 (████████████████████████████████

████████████████).

5.    Cordance Files For Bankruptcy

In September 2003, Cordance (then OneName) filed for bankruptcy. Once in

bankruptcy, Cordance's forward looking business strategy as outlined in its reorganization plan

included two parts ███████████████████████████████████

████████████████████████████████████████████

████████████████. Hadden Decl., Exh. 4 at pp. 11, 15.

---

[1] ████████████████████████████████████████████
*See* Hadden Decl., Exh. 25 at CORD146742-54. In addition XNSORG which became XDI.ORG
assigned all of its rights to the asserted patents to another standards setting body, OASIS.

With regard to the first prong of this reorganization business strategy, ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*Id.* at pp. 11-12. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at p. 50. The '710 Patent (which was applied

for in 2002) was a significant departure from Cordance's earlier patents, which are directed to

broad communications systems and which are the basis of Cordance's i-names technology.  In

contrast, the '710 Patent is directed to an automated purchasing system, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Reed Decl. at

¶ 27; Reed SJ Decl. at ¶ 7 (D.I. 357).

In its bankruptcy filings ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮ Hadden Decl., Exh. 4 (Reorganization Plan, Exhibit II).  Similarly, ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Hadden Decl., Exh. 21 at CORD204408 ("▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮").  Internal communications from shortly before filing the current lawsuit also show

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Exh. 26.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*, Exh. 27 at

CORD141802 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).

9

Cordance's plan to go after Amazon did not involve stopping Amazon from impacting the digital identity market. Nor did it involve slowing Amazon's progress to enable i-names to succeed. It was designed to extract settlement money. In June 2004, while Cordance was still in bankruptcy, the '710 Patent issued and, ████████████████████████████████████ ████████████████████████, Cordance filed suit against Amazon in 2006.

### 6.    Cordance After Bankruptcy

Since coming out of bankruptcy in 2005, Cordance has had virtually no employees, no office and minimal activities beyond prosecuting this lawsuit. Even Mr. Reed left the company (except as a part time consultant) and joined a company developing competing digital identity services. i-names technology has failed. ████████████████████████████ ████████████████████████████████. Reed Decl. at ¶ 8; Hadden Decl., Exh. 1 at p. 7, Exh. 2 at p. 7. Cordance has failed to obtain acceptance of the XRI/XDI technology as standard. Indeed, the XRI 2.0 specification was rejected by the OASIS XRI Technical Committee in mid-2008, while other digital identity technology such as OpenID have been gaining traction. Hadden Decl., Exh. 40; Declaration of Dr. Lorenzo Alvisi In Support of Opposition to Motion for Permanent Injunction ("Alvisi Decl.") ¶ 18.

To date, Cordance ████████████████████████████████████████ ████████████████████████. Reed Decl at ¶ 27, Hadden Decl., Exh. 31 at 79:5-7. Cordance relies on 10 year old business plans and draft "white papers" to purportedly show that it is on the precipice of launching a broad array of digital idenity services. ████████████████████ ████████████████████████████████ There is absolutely no credible evidence showing that any meaningful progress has been made toward delivering the one-click service Cordance claims Amazon has precluded it from launching. ████████████████████

██████████████████████████████████████████████████

████████████████████ Reed Decl ¶ 27; Hadden Decl., Exh. 31 at 79:5-7.  At this point, there

is no indication that XRI or i-names will ever be adopted and there is no indication that an i-

names one-click service will ever be developed.

Cordance's last hope for any value at all before it once and for all closes its doors ████

████████████████████████ Hadden Decl., Exh. 26.  By this motion it has made clear

that ██████████████████████ by obtaining an injunction as leverage for more money.

### B.    Amazon's Purported Infringement Did NOT Cause Cordance to Fail

Amazon launched its 1-Click feature in 1997 – seven years before the '710 Patent issued.

During those seven years—in which the '710 Patent did not exist and could not have been

infringed—Amazon grew its customer base to more than 40 million.  Hadden Decl., Exh. 3 at

1359:19-24, Exh. 28.  It achieved this success for many reasons – including good customer

service policies, broad product selection and an effective and useable interface.  To the extent 1-

Click was a factor in this success it was because in these early years of e-commerce with slow

dial-up connections it was useful to minimize the number of required web interactions.  In any

case, to the extent 1-Click was a factor in Amazon's success, it was the legitimate non-infringing

use of 1-Click prior to issuance of the '710 Patent that contributed to Amazon's growth and

acquisition of market strength.

To the extent Cordance asserts that Amazon has impeded its success through touting 1-

Click as an Amazon invention and through enforcement of Amazon's own 1-Click patent (the

'411 Patent), Cordance ignores the fact that Amazon received its own patent covering 1-Click in

1999, five years before the '710 Patent issued.  Amazon's patent was reexamined by the PTO

just this year, in which the PTO specifically reviewed the '710 Patent and determined that it did

not impact the validity of Amazon's 1-Click patent.  *Id.*, Exh. 29, Exh. 30.  While some of the

'411 Patent claims were amended during the reexam, the broadest claim was not amended, and

none of the amendments were done in light of the '710 Patent. *Id.* Amazon's enforcement of its 1-Click rights against BarnesandNoble.com in 1999 and assertions of 1-Click inventorship were and are legitimate and could not result in a compensable or remediable harm to Cordance.

Moreover, no single document produced by Cordance in this case, other than the current motion and its supporting declarations, characterize Amazon as the cause for Cordance's failure or as an impediment to its success. To the contrary, at his deposition in this case, Mr. Reed testified that



*Id.*, Exh. 31 at 79:5-80:9. Further, at his deposition, when presented with an email written by

Reed did not testify

that Amazon's purported infringement prevents wide adoption of the i-names standard as he now

claims.  Rather he testified as follows:



*Id.*, Exh. 31 at 439:4-440:4, Exh. 32.  Reed did not explain that Amazon has "saturated" the

market and somehow precluded wide adoption of i-names.                                                 It is only now

that Cordance concocts a story of market harm based on purported competition and market

saturation -- a story which is not only not supported by any credible evidence but is also belied by

history, facts and documents.

  In sum, Amazon's purported infringement of the '710 Patent could not have caused

Cordance's failing in the digital identity business because (1) Amazon achieved its "market

position" before the '710 Patent issued, (2) Amazon's touting of its own invention of 1-Click

was and is legitimate as it has a valid patent on its system and (3) Cordance never once before

the filing of this motion ever stated that Amazon was the cause of its failing.  To the contrary,

█████████████████████████████████████████████████████████ *Id.*, Exh. 5 at pp. 80:7-81:18, Exh.

31 at 79:5-80:9 (██████████████████████████████████████████████████████

█████████████████).

### C.   Cordance Does Not Compete with Amazon and Never Has

Cordance cannot credibly claim that it competes with Amazon.  All economics experts in

this case including Amazon's damages expert, Aron Levko, and both of Cordance's damages

experts opined that Cordance and Amazon are not competitors.  Hadden Decl., Exh. 1 (Phillip

Greem Report) at 27 ("████████████████████████████████████████."), Exh. 2 (Terry

Musika Report) at 39 ("████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████"), Exh. 3 (Green Trial Testimony) at 1154:15-16 ("The parties are not

competitors.  By licensing Amazon, Cordance isn't really losing anything."), Exh. 34 (Aron

Levko Report) at 27-28.  Further, Cordance has never had a product, service, or technology to

perform on-line commerce.  Reed SJ Decl.at ¶ 7 (D.I. 357).  ██████████████████████

██████████████████████████████████████████████████████ Reed

Decl. at ¶ 27.

Tellingly, throughout its history, Cordance has prepared many business plans – all of

which include a section describing the competitive landscape – and none describes Amazon as a

competitor.  As an example, ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ *See* Reed Decl., Exh. F at

CORD140863 (emphasis in original).  Similarly, none of its board minutes describes Amazon as

a competitive threat.  *See, e.g.,* Hadden Decl., Exh. 8 at CORD120200-120296.

### D.     Amazon Payments And Its Implementation of 1-Click Is Irrelevant

Throughout its current motion, Cordance attributes the purported market harm it has suffered to Amazon's use of 1-Click in conjunction with Amazon's "Payment Service." *See, e.g.,* Cordance's Memorandum in Support of its Motion for a Permanent Injunction ("Motion"), D.I. 525, at pp. 10-11 ("Amazon's use of its infringing one-click system in combination with its Amazon Payments service has saturated and will continue to saturate the merging market of digital addressing and prevent Cordance from enjoying the competitive advantage in the market place to which it is entitled."). Amazon Payments, and more specifically Checkout By Amazon (CBA), cannot form the basis for a claim of remediable harm because it was not accused, was not found to be infringing and does not in fact infringe any claim of the '710 Patent. *IGT v. Bally Gaming Int'l Inc.*, 675 F. Supp. 2d 487, 490 (D. Del. 2009) (finding no irreparable harm because plaintiff had not demonstrated that defendant's infringing product was the cause of its claimed harm).

CBA is a service that allows other e-commerce sites to utilize Amazon checkout technology and customer payment and shipping information. The service is similar to and competes with PayPal which appears next to it as an alternative payment mechanism on many 3rd party cites. *See* Declaration of Bharath Kumar in Opposition to Cordance's Motion for Permanent Injunction ("Kumar Decl.") at ¶ 5. This feature was launched in mid-2008. From a user perspective it works as follows: When a customer on a website that has utilized CBA (such as DKNY.com) selects an item for purchase and chooses to use CBA, the customer selects the "Checkout With Amazon" button. *Id.* at ¶ 8. The customer is then presented with a small window that allows the customer to enter a "Payphrase" or select a "Continue Checkout" button. If the customer has 1-Click enabled in its Amazon settings, upon selection of the Continue Checkout button, the customer is then presented with a "Buy With 1-Click" button. If the customer selects Buy With 1-Click, the order is placed. Here is a visual of how it works:



**❶** When your customers are ready to checkout, they click the Checkout by Amazon button.

**❷** The button expands into a widget. Customers click the Continue Checkout button.

**❸** The customer clicks the 1-Click button to place their order immediately using their 1-Click settings.



**❹** Customers are returned to a URL that you specify. Amazon Payments sends a confirmation e-mail to you and the customer.

This is very different than 1-Click on the retail Amazon.com website. Most basically, there are three clicks rather than one. Under the covers it is different as well, as it is implemented using a different source code than the source code used for 1-Click on the Amazon.com retail site. In any case, it could not be found infringing because with CBA, Amazon does not provide any information to customers about products. Each claim of the '710 Patent requires "providing the customer with information from the seller with respect to an item" or "providing the information provider with information from an information consumer with respect to a proposed transaction." At trial Cordance's expert, Dr. Shamos, treated these elements as the same and explained that such elements require provision of web pages to a customer with information about items for sale. Hadden Decl., Exh. 3 at 832:5-12, 844:17-25, 858:21-859:15, 861:1-13, Exh. 33. With CBA 1-Click, it is the merchant utilizing CBA that provides customers with information about items to be purchased, not Amazon. For example, for DKNY.com, it is DKNY that provides information about products to customers, not Amazon. Thus, with CBA 1-Click Amazon does not perform every step of the asserted claims and does

not infringe. *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318 (Fed. Cir. 2008), *cert. denied*, 129 S. Ct.1585 (2009) (holding that direct infringement of a process claim requires that a *single* party perform, direct, or control each and every step of the claimed process).

Importantly, this system was never accused, not found infringing and could not be found to infringe, and thus, is entirely irrelevant to the instant motion.  Moreover, were the asserted '710 Patent claims found broad enough to cover such a feature, such claims would be invalid due to lack of written description, as the purported basis of these claims, the "payment partner system" described in the specification, functions very differently, and also due to anticipation by Amazon's prior art system.  Hadden Decl., Exh. 3 at 1775:21-1776:9, 1768:2-1770:14, 1783:2-1785:10, Exh. 43.

### E.    Cordance Has No Exclusivity to Protect

Throughout its motion, Cordance argues it will be harmed absent an injunction because it will be "unable to market the exclusive right to practice its invention." Motion at p. 17.  But Cordance has already given away the exclusive right to control who practices the '710 invention

████████████████████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████  Hadden Decl. ¶ 26, Exh. 25, Exh. 31 at 11:6-12, Exh. 36 at 153:16-154:16.

For example, Parity Communications, Inc., now named Azigo, Inc., the company at which Drummond Reed currently works, offers a digital identity service very similar to i-names in which customers have i-cards (an alternative to i-names developed by Microsoft) that work with software that is an extension to the customers' browser. *Id.*, Exh. 37.  These i-cards contain information about the customer such as personal information, preferences and interests and can be used by customers as they interact with web sites. *Id.*  According to the Azigo website i-cards

"simplify the Web, reducing login and Web site registration to a 'one-click' experience." *Id.*
These are touted as allowing, among other things, "one-click account creation" and reducing
"shopping cart abandonment by eliminating forgotten passwords." *Id.*, Exh. 38. In a C-Net
article from October 2008 regarding Parity, it described i-cards as offering the ability to find "the
perfect gift via Google and then purchasing it in one click without typing in your password or
credit card information." *Id.*, Exh.39. At his deposition, Drummond Reed acknowledged that,

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ *Id.*, Exh. 31 at pp. 11:6-12:17.

To the extent Cordance asserts it has exclusivity in the market for non-XRI/XDI
implementations of the patented technology, Cordance ignores the fact that there is no open
market for 1-Click on-line purchasing technology that Cordance could exploit or compete in
even if it had a product or technology to offer. As explained above, the Patent Office recently
reconfirmed the validity of Amazons 1-Click patent in re-examination over Cordance's patents.
*Id.*, Exh. 30. Amazon therefore continues to have the right to control who practices its 1-click
invention. Thus, to the extent Cordance wanted to license its '710 Patent to a particular company
who wanted to provide one-click purchasing like Amazon's that company would also have to get
a license from Amazon.

## ARGUMENT

### III.   A PERMANENT INJUNCTION IS NOT WARRANTED

"An injunction does not necessarily follow a determination that a patent has been
infringed." *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir. 2008). Rather,
Cordance must demonstrate:

> (1) that it has suffered an irreparable injury; (2) that remedies
> available at law, such as monetary damages, are inadequate to
> compensate for that injury; (3) that, considering the balance of
> hardships between the plaintiff and defendant, a remedy in equity
> is warranted; and (4) that the public interest would not be disserved
> by a permanent injunction.

*eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). "[T]he decision whether to grant or

deny injunctive relief rests within the equitable discretion of the district courts, and that such

discretion must be exercised consistent with traditional principles of equity, in patent disputes no

less than in other cases governed by such standards. *Id.* at 394. While the *eBay* Court cautioned

against categorical rules and classifications in this analysis, the most common approach

(especially in this District) is to focus on the nature of the competition between the parties in the

relevant market. *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500 (D. Del. 2008).

Typically permanent injunctions are limited to situations "where the plaintiff practices its

invention and is a direct market competitor" (*Bally Gaming*, 675 F. Supp. 2d at 490) or where

the patented technology is otherwise at the core of the plaintiff's business. *TruePosition Inc.*,

568 F. Supp. 2d at 531. "[I]nfringing one's right to exclude, alone, is insufficient to warrant

injunctive relief." *IMX, Inc. v. LendingTree, LLC*, 469 F. Supp. 2d 203, 225 (D. Del. 2007).

Cordance has failed to meet its burden on any of the four *eBay* factors.

## A.   Cordance Has Not Suffered Irreparable Injury

To support a claim of irreparable injury, Cordance must provide *specific evidence*

showing that allowing the continued infringement to occur will result in a particular type of

injury, such as market harm, loss in reputation, or loss in particular licensing or research and

development opportunities. *See, e.g., Telcordia Techs. v. Cisco Sys., Inc.*, 592 F. Supp. 2d 727,

747 (D. Del. 2009); *LendingTree*, 469 F. Supp. 2d at 225. Mere "attorney argument[s]" that are

unsupported by actual evidence of injury are insufficient. *Telcordia*, 592 F. Supp. 2d at 748.

19

Cordance makes the following two arguments in support of its purported irreparable harm: (1) Amazon's infringement has "saturated" some ill-defined market related to digital identities and thus has prevented and will continue to prevent Cordance from engaging in meaningful competition; (2) Amazon's infringement will interfere with Cordance's exclusive right to use or license its technology. Motion at pp. 10-11. Each of these arguments is unsupported by evidence and is belied by the facts.[2]

> 1.    No Credible Evidence Shows Amazon's Purported Infringement Has
>        Precluded Or Impacted Cordance's Success In The Relevant Market

In order to succeed in showing irreparable harm because of market saturation (as Cordance has asserted has happened here), Cordance must define the relevant market and show with credible evidence that the purported infringing conduct has caused and more importantly will cause it harm in that market. *See, e.g., Bally Gaming,* 675 F. Supp. 2d at 490 (denying injunctive relief where plaintiff has failed to "provide[ ] a clear, summary-level overview of the relevant market for the gaming technology at issue."); *Advanced Cardiovascular Sys. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 559-60 (D. Del. 2008) (denying injunctive relief where the parties defined the markets differently, but concluded that under either definition the plaintiff had not established a direct link between the infringement and the harm). Cordance has failed to meet this burden for several reasons.

> a.    Cordance Has Failed to Define the Relevant Market

Cordance has failed to identify a relevant market in which it and Amazon are purportedly competitors. At times in its briefing and supporting documents, Cordance defines the market

---

[2] The declaration of Dr. Shamos, Cordance's technical expert, submitted in support of Cordance's motion, in addition to being conclusory is beyond the scope of his Rule 26 disclosure and thus is inadmissible. Amazon is filing concurrently with this opposition a motion to strike his declaration.

broadly as the digital identity market. *See e.g.,* Declaration of Michael Shamos in Support of

Cordance's Motion for Permanent Injunction ("Shamos Decl."), D.I. 527, at ¶ 23 ("Because of

Amazon's infringement, Cordance has been denied the ability to gain its proper foothold in the

digital identity market"), Reed Decl. at ¶ 25 ("███████████████████████████

███████████"). At other times Cordance defines the relevant market as services that allow the

use of digital identities to complete one-click purchase transactions. *See, e.g.,* Shamos Decl at ¶

28 ("Amazon and Cordance are direct competitors in providing digital identities that can be used

for 1-click purchasing that is the subject of Cordance's '710 patent"), Reed Decl. at ¶ 29

("████████████████████████████████████████.").

Cordance is intentionally ambiguous about the "relevant market" in order to hide: (1) that

Amazon and Cordance are not, as Cordance's own economic experts recognize, competitors, and

(2) that there are many market forces at play in "digital identity" that have influenced Cordance's

lack of success and that have nothing to do with Amazon. Indeed, as to this latter point, real

market studies show that there is a complex and growing digital identity market, with many sub

markets, players and solutions. Declaration of Aron Levko In Support of Opposition to

Plaintiff's Motion for Permanent Injunction ("Levko Decl.") at ¶¶ 14-18. As an example, a

February 2008 study from Forrester describes the complicated and growing identity access and

management market (IAM) as including "technologies for maintaining a person's complete set of

identity information, spanning multiple business and application contexts. Identity management

unifies a person's disparate identity data to improve data consistency, data accuracy, and data

and systems security in an efficient manner." Levko Decl. at ¶ 16, Exh. C at p. 3. This study

describes the market as made up of distinct but coordinating products including Access

Management, Identity Administration and Identity Data Infrastructure. The market is further

broken down into smaller groups of products and offerings including "web single sign-on" as one of many components within Access Management. The study describes the major management suite vendors as including IBM, Microsoft, Novell, Oracle, SAP and Sun Microsystems. It also identifies vendors of specialty services such as "web single sign on" as including Entrust and RSA security. Gartner studies from August 2008 and September 2009 similarly describe the market. Levko Decl. at ¶ 15, Exh. B.

Absent from any of these studies is any mention of Amazon or Cordance. Indeed, there is no market study that describes Amazon as a player in the digital identity market because Amazon is not now and never has been in the digital identity business. Amazon Payments, or CBA, as described above is not a persistent global identity offering. It cannot be used at any website and it is not used for signing on to a website. CBA is ordering technology. It uses a customer's Amazon information in a purchase transaction. This purchase information is not useable anywhere but on Amazon's secure servers. Kumar Decl. at ¶¶ 5-16.

Cordance's absence from these larger studies is because its technology has not been embraced in the marketplace as a result of Cordance's own failures. Indeed, as discussed above, the XRI 2.0 technology on which i-names is based, was rejected as a standard by OASIS in June 2008. Hadden Decl., Exh. 40. Moreover, there are other digital identity standards achieving wider acceptance such as OpenID, among others. *Id.*, Exh. 41, Exh. 42.

In any case, Cordance has not presented a proper market definition, has not identified the players in the relevant market, and, as discussed below, has failed to show a direct link between Amazon's purported infringement and Cordance's failure in the relevant market. Cordance has, thus failed to meet its burden justifying the relief it seeks. *See, e.g., Bally Gaming,* 675 F. Supp. 2d at 490 (denying injunctive relief where plaintiff has failed to "provide[ ] a clear, summary-

level overview of the relevant market for the gaming technology at issue.").

          b.      Cordance has Not Shown a Direct Link Between The Alleged
                   Infringement and Cordance's Purported Market Failings

      The relevant market must be defined as the market for the patented technology.  Here, the

market for the technology of the '710 Patent, as characterized by Cordance, is the market for

one-click automated online purchasing systems, this is a market Cordance has never entered nor

even shown any concrete efforts toward entering.  Drummond Reed's March 9, 2009

declaration—submitted to the Court in this case—could not have been clearer in disavowing

Cordance's presence in the relevant market: "Cordance has not had any involvement with or

licensed any product covered by the claims of its '710 patent."  Reed SJ Decl. at ¶ 7 (D.I. 357).

The only basis it has now for showing any effort to offer any kind of one-click service are

████████████████████████████████████████████████████████████████

████████████████████████████████████. *See* Reed Decl. at ¶¶ 13-15.  But Cordance

has not developed this offering, it has not marketed this service, and it has not shown any interest

by any potential licensee in developing such a service.  Cordance, thus cannot show it has

suffered any harm in this market and it cannot show Amazon's continued operation of 1-Click

would result in any harm in that market.  Injunctive relieve is an exceptional remedy that cannot

be based merely on speculation that Cordance may be able to enter the one-click market in the

future.  This is particularly true, given Cordance's failure to establish itself in the digital identity

market or any other market over its fifteen year history.

      Relatedly, Cordance's failure to provide market data, and how it and Amazon fit in that

market, reflects a lack of proof on the direct causal connection requirement.  There are many

companies that compete with Cordance in digital identity, such as Reed's current employer,

Azigo, as well as the many other digital identity offerings mentioned in the Gartner and Forrester

reports. Cordance's failure to explain how Amazon's purported infringement, as opposed to that
competition, caused and will continue to cause it market harm reflect a complete failing to meet
its burden and alone warrants denial of this motion.

Additionally, as explained by Bharath Kumar, a member of Amazon's Identity Services
team, Amazon expects that other payment services, such as PayPal, will be placed on third party
merchant websites along side CBA. Kumar Decl. ¶ 5. For example Jockey.com offers three
alternate third-party checkout options:



Cordance has done nothing to explain why it could not offer its theoretical i-names one-click
option along side Amazon's, PayPal's or International Checkout's options. Related to this,
Cordance also fails to explain why Paypal or any other universal payment service is not
responsible for the market harm it has suffered. If Cordance is trying to get into the universal
payment service business with its theoretical i-names one-click it can hardly claim that Amazon
alone has caused it to fail without explaining how Paypal with more than 200 million accounts has
or has not impacted the market. Hadden Decl., Exh. 44.

As judges in this District have repeatedly found, arguments of market harm unsupported

by credible evidence are insufficient to support a finding of irreparable harm. *See, e.g.,*

*Telcordia*, 592 F. Supp. 2d at 747-48; *LendingTree*, 469 F. Supp. 2d at 225. For example, in

*Bally Gaming* Judge Robinson denied a request for permanent injunction where the plaintiff had

failed to provide the court with information about the relevant market.   675 F. Supp. 2d at 492.

The court noted that

> It is most problematic that plaintiff points to no documentary (or
> other) evidence regarding the effects of defendants' infringement
> (on plaintiff). As noted previously, the court has no market data
> before it. Plaintiff brings its motion against a landscape of several
> competitors and several competitive products operating on
> different software platforms.

*Id.* Consequently, the court found that plaintiff had failed to establish the "direct link"

between the infringing conduct and the claimed harm. *Id.*

In *Advanced Cardiovascular*, this district made clear once again that unsupported claims

of harm are not sufficient to support a request for permanent injunction. 579 F. Supp. 2d at 559-

60. Even though the plaintiff had provided the court with the relevant market data, the court still

found a lack of irreparable harm because there was no link between the claimed harm and the

defendant's infringement. *Id.* In particular, the plaintiff had not addressed the other leaders in

the market to explain why they were not the cause of the plaintiff's failure to gain market share.

*Id.* at 560. That court also noted that the plaintiff "has not identified any specific customers it

has lost, or stands to lose, directly as a result of Medtronic's continued sales of infringing stents."

*Id.* As a result, the plaintiff had not met its burden of demonstrating irreparable harm and the

court denied its request for injunctive relief. *Id.*

Here, Cordance's unsupported, entirely speculative arguments must fail for lack of any

credible evidence establishing that Amazon's purported infringement caused any of its alleged

harm. Moreover, as discussed above, even assuming Amazon could be characterized as being in

the digital identity business, which it could not, Amazon achieved its immense customer base well before the issuance of the '710 Patent and thus before its purported infringement.

Cordance's complaints regarding Amazon's use of CBA 1-Click are similarly misplaced. As explained above, that service was neither accused nor found infringing. The impact of Amazon's non-infringing conduct on Cordance is irrelevant to this analysis. *See Bally Gaming,* 675 F. Supp. 2d at 492 (holding that *infringing* conduct must be cause of harm to warrant an injunction). Additionally, CBA was not launched until mid 2008. Cordance has done nothing to explain why launching of this service in 2008 has precluded it from offering an i-name 1-Click which it puportedly has planned to launch since 1998.

Moreover, Cordance's reliance on *i4i* and *Callaway* is entirely misplaced. In *Callaway Golf Co. v. Acushnet Co.*, which Cordance relies upon throughout its Motion, the Court granted injunctive relief where the plaintiff and defendant were two well-established participants in the golf ball market. 585 F. Supp. 2d 600, 621 (D. Del. 2008). Judge Robinson noted that the patent holder was "already a market leader of golf equipment, and was poised to compete in the developing multi-layer ball market" when the infringement occurred. *Id.* As a result, the patent holder's claim that the defendant's infringement prevented it from further succeeding in the market was credible. This is a far-cry from Cordance's claims of irreparable harm, where it cannot claim to have been "poised" to enter into the one-Click market when purported infringement first began (or at any other time). Cordance was in bankruptcy then, had not developed any product covered by the '710 Patent, and other than five year old speculative business plans directed at raising funding, had no plans to launch a one-click service.

Similarly, in *i4i*, the Federal Circuit affirmed the grant of a permanent injunction where the district court had found that the parties were direct competitors in the XML market and that

Microsoft's infringement rendered i4i's product obsolete causing *i4i* to lose market share. *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010). Unlike Cordance, i4i had actual products and ongoing businesses that the courts sought to protect by granting injunctive relief. Further, there were internal Microsoft emails indicating that Microsoft's infringing offering would render i4i's competing offering obsolete. Cordance has no one-Click offering – it never has and made no concrete steps towards offering one. Reed SJ Decl. at ¶ 7 (D.I. 357) ("Cordance has not had any involvement with or licensed any product covered by the claims of its '710 patent."). Accordingly, these cases are inapplicable.

> ### 2. Amazon's Purported Infringement Has Not Interfered With Cordance's Exclusive Right To Use Or License Its Technology

The fact that Cordance has already licensed the patented technology is strong evidence that the purported infringement has not caused irreparable harm. *See Telcordia*, 592 F. Supp. 2d at 748. Cordance's granting of an exclusive license to XDI.ORG for all its patents for the implementation of the XDI and XRI technology specifications reflects a business decision that it would give up exclusivity in the hope that its technology would be adopted as a standard. Indeed, as discussed above, ███████████████████████████████████████████

██████████████████████████████████████████████ Hadden Decl., Exh. 25 at

3 (¶ 5.3). ████████████████████████████████████████████████

███████████████████████ Despite its decision to grant a free license to anyone who would implement its XRI/XDI technology, Cordance would now like the Court to believe that it must grant injunctive relief in order to preserve Cordance's right to exclusive use.

Cordance relies upon several cases, largely taken out of context, to argue that its licensing activities are not evidence that it has not suffered irreparable harm. In *Joyal Prods.*, the District of New Jersey granted a permanent injunction following a finding of willful infringement. *Joyal*

*Prods., Inc. v. Johnson Elec. N. Am., Inc.*, No. 04-5172, 2009 WL 512156, at *11 (D.N.J. Feb. 27, 2009). The patentee had ceased all operations and, for that reason, intended to sell its patent. *Id.* The court also noted that, although at one time Joyal had pursued potentially licensing its patent, unlike Cordance, at the time of the court's decision there were *no licenses and Joyal was not actively pursuing licensing. Id.* at 11 ("To the extent that Joyal at one time undertook efforts to license the patent, this occurred several years ago... It is, therefore, not relevant to the Court's analysis. Presently, there are no licenses for the '015 patent nor is Joyal seeking to actively license the patent."). Accordingly, Joyal could actually offer potential purchasers exclusive rights to its patent, unlike Cordance who has already forgone that option. Under those circumstances, the *Joyal* court found that failure to grant injunctive relief would irreparably harm the plaintiff. *Id.*

In *CSIRO*, the Eastern District of Texas granted injunctive relief to a research institution, which relied heavily on licensing revenue to pursue its research. *Commonwealth Sci. & Indus. Research Org. v. Buffalo Tech., Inc.*, 492 F. Supp. 2d 600, 602 (E.D. Tex. 2007) ("*CSIRO*"). The court's finding of irreparable harm largely stemmed from CSIRO's role as a research institution, noting that the harm it would experience by not realizing royalties in the form of "lost research capabilities, lost opportunities to develop additional research capabilities, lost opportunities to accelerate existing projects or begin new projects." *Id.* at 604. Such opportunities were irreparable because "[d]elays in research are likely to result in important knowledge not being developed at all or CSIRO being pushed out of valuable fields." *Id.* Once these opportunities are lost, they already belong to someone else and therefore cannot be remedied by damages. *Id.* Cordance, on the other hand, has not identified any specific opportunities that it has lost or how those opportunities could not be remedied by monetary

damages.

### B.   Cordance Has Not Shown that Monetary Damages Are Inadequate

Cordance also must demonstrate that the alleged harm they have suffered cannot be

remedied by monetary damages. *eBay*, 547 U.S. at 391; *Praxair, Inc. v. ATMI, Inc.*, 479 F.

Supp. 2d 440, 444 (D. Del. 2007) (denying permanent injunction in part because plaintiff had not

demonstrated why it would be unable to calculate damages for lost market share or lost research

opportunities). As discussed above, the fact that the plaintiff has licensed its technology is

strong evidence that monetary damages will be adequate compensation. *See LendingTree*, 469 F.

Supp. 2d at 225 n. 24; *Advanced Cardiovascular*, 579 F. Supp. 2d at 560 (stating that "[m]oney

damages are rarely inadequate" where a party has already licensed the patented technology).

Further, injunctive relief should be denied where the only purpose of the injunctive relief is to

gain leverage in licensing negotiations. *eBay*, 547 U.S. at 396-97 (J. Kennedy, concurring)

(suggesting that a court should deny an injunction to a patent owner who is seeking injunctive

relief only as "a bargaining tool to charge exorbitant fees to companies that seek to buy licenses

to practice the patent.").

Cordance's asserts that the Court will be unable to calculate damages for two reasons –

first, that allowing Amazon to continue using 1-Click will impose on its right to exclude the

value of which is not quantifiable, and second, that Amazon has excluded Cordance from the

digital addressing marketplace which is also not quantifiable. Neither argument can withstand

even superficial scrutiny.

### 1.   Cordance Has Foregone Its Right To Exclude

As a preliminary matter, it is well established that "infringing one's right to exclude,

alone, is insufficient to warrant injunctive relief." *See Telecordia*, 592 F. Supp. 2d at 747-48.

Rather, Cordance must demonstrate why it cannot be compensated with damages – conclusory statements that damages cannot compensate for "lost market share" are insufficient. *Praxair,* 479 F. Supp. 2d at 444 (stating that the plaintiff failed to demonstrate "specific reasons" why monetary damages are inadequate).

Having already licensed the patented technology, there is no reason to believe that money damages would be insufficient to compensate Cordance. ███████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████. *See* Hadden Decl., Exh. 1 at pp. 36-37; Exh. 2 at 39. Under these circumstances, money damages are rarely inadequate. *Advanced Cardiovascular,* 579 F. Supp. 2d at 560 ("The fact that ACS was selective regarding its licensing compensation--exchanging its technology only for other licenses to competing technology--does not rectify the fact that ACS was willing, ultimately, to forego its exclusive rights for some manner of compensation. Money damages are rarely inadequate in these circumstances").

      2.    Amazon Did Not – And Could Not – Exclude Cordance From The Market

Cordance claims it will be difficult to calculate monetary damages because Cordance was never able to gain meaningful market share due to Amazon's purported infringement, yet, as discussed above Cordance has presented the Court with no clear evidence indicating how Amazon's post 2004 (when the '710 Patent issued) use of 1-Click has had any impact on any market within which Cordance participates or seeks to participate. More importantly, Mr. Reed unequivocally swore that Cordance has never been a participant in the market for the patented invention, which is the only market that matters. Reed SJ Decl. at ¶ 7 (D.I. 357).

3.     Amazon Is Entitled To Any Good Will And Reputation That Resulted
       From The Use Of Its Patented Invention

Finally, Cordance, as a last ditch effort to cast doubt on the adequacy of monetary

damages, argues that all of Amazon's good will, related business and reputation should have

flowed to Cordance. Given the Patent Office's recent reaffirmance of the validity of Amazon's

1-Click patent over Cordance's Patent, Amazon was and is entitled to any accolades and

goodwill that flow from its patented invention.

In conclusion, Cordance has provided the Court with no reason to believe monetary

damages are inadequate or will be difficult to calculate.

## C.     The Balance of Hardships Weighs Against Injunctive Relief

Cordance will experience no hardship should the Court deny its request for injunctive

relief as it has no product or business using the patented technology. *See z4 Techs., Inc. v.*

*Microsoft Corp.*, 434 F. Supp. 2d 437, 443 (E.D. Tex. 2006) (noting that it is less likely to find

hardship to the patentee if infringer's use does not exclude the patentee from the marketplace).

Amazon, on the other hand, and more specifically its customers, will suffer hardship

given that 1-Click has been on Amazon.com for nearly thirteen years and thus, customers have

become used to it and a disruption would be felt by its removal.

As explained in more detail in the accompanying declarations of Dr. Lorenzo Alvisi and

Bharath Kumar, Cordance's assertion that Amazon could avoid significant hardship by re-

implementing its 1-Click feature using Cordance's i-names technology is completely untenable.

Alvisi Decl. at ¶¶ 9-25, Kumar Decl. at ¶¶ 23-38. i-names (a form of XRI) and their associated

data transfer protocol (XDS) are designed to add a layer of abstraction and new infrastructure on

top of the existing World Wide Web infrastructure currently used by Amazon. Alvisi Decl. at ¶

11. This new infrastructure requires in addition to a new naming system, a new multi-tiered

31

registry system for name resolution that operates on top of the existing web DNS system, and a new data exchange protocol that operates above HTTP. *Id.* It is not clear whether this required infrastructure actually exisits at all, let alone on the scale that is required for an ecommerce site such as amazon.com. *Id.* at ¶ 12. ███████████████████████, only a handful of i-names services appear to have been implemented and the infrastructure in place to support such services, to the extent there is one, has only at best been tested to address the needs of a minuscule percentage of Internet users. *Id.* at ¶¶ 14-15. There is no historic data of whether any service based on the use of i-names was ever successfully supported on any meaningful scale using this proposed new infrastructure.

Further, the technical merits of Cordance's technology have been called into question by leaders in the World Wide Web standards community. Indeed, the proposal to adopt XRI as an OASIS standard was voted down in June 2008. *Id.* at ¶ 18. This rejection is partially based on the intervention of the W3C Technical Architecture Group, which is co-chaired by Sir Tim Berners-Lee, the inventor of the World Wide Web, which recommended against using XRIs or taking the XRI specification forward. *Id.*

An e-commerce site of the scale of Amazon—the largest internet retailer with 70 million customer accounts and more annual revenue than the second, third and fourth largest Internet retailers combined—that requires the highest possible level of performance, reliability, and security for code that implements its 1-click functionality cannot implement 1-click purchasing using i-names, a technology that has not been proven or even completely defined and that has received a vote of no confidence by the technical group charted to define and preserve sound principles of Web architecture by the main international standards organization on the World Wide Web. *Id.* at ¶ 19. Neither Mr. Reed nor Dr. Shamos provide any explanation of when,

how and how well a system of Amazon's size can perform using i-names technology—technology that today has not provided any meaningful measurable successful services, let alone online purchasing services.

Amazon has spent many millions of dollars and thousands of man hours by very talented engineers to architect and build a system using proven web technology for securely, reliably and very quickly processing transactions at a massive scale. Because studies have shown that delays of only a few hundred milliseconds in serving a page or confirming a transaction have very real and large economic consequences and a breach of customer privacy or security would be a highly publicized disaster, the margin for error in designing and implementing a system like Amazon's is tiny, and the results of any error are huge. *Id.* at ¶¶ 20-23. For that reason, engineers at Amazon and other large ecommerce sites will not change a single line of source code without a good reason and careful analysis demonstrating that it will not introduce any unforeseen consequences. *Id.* Amazon has evaluated and rejected universal digital identity schemes that are far more developed and tested than Cordance's, because even those systems do not meet Amazon's stringent data security requriements. Kumar Decl. at ¶¶ 23-38.

In light of the fact that Cordance will suffer no hardship without injunctive relief, while there would be hardship to Amazon and its customers, this factor weighs against entering injunctive relief.

### D.     The Public Interest Will Be Best Served by Denying Cordance's Motion

Finally, Cordance must demonstrate the public interest would not be disserved by a permanent injunction. *eBay*, 547 U.S. at 391. Courts have considered the fact that the defendant's product was widely used by the public in denying injunctive relief. *See z4 Techs.*, 434 F. Supp. 2d at 443-44; *Amado v. Microsoft Corp.*, No. 03-242, 2007 U.S. Dist. LEXIS

96487, at *32 (C.D. Cal. Mar. 13, 2007). Accordingly, given the disruption to Amazon's customers that would occur were an injunction issued, this final factor also weighs in favor of the denying Cordance's request for injunctive relief.

## IV.   COMPULSORY LICENSE IS NOT APPROPRIATE

### A.   A Compulsory License is Not Necessary to Adequately Compensate Cordance

The Federal Circuit has made clear that compulsory licenses are not to be granted as a matter of course following the denial of permanent injunctive relief. *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1315 (Fed. Cir. 2007) ("But, awarding an ongoing royalty where 'necessary' to effectuate a remedy... does not justify the provision of such relief as a matter of course whenever a permanent injunction is not imposed."). Indeed, in its March 19 Order, the Court recognized this, finding that *Paice* does not "indicate that courts typically impose ongoing royalties when permanent injunctions are denied." March 19 Order, D.I. 530, at 7-8. Rather, imposing a compulsory license is only appropriate if *necessary* to adequately compensate the patentee. *Paice,* 504 F.3d at 1315.

Dictating the terms of a compulsory license is not necessary to fully compensate Cordance, and Cordance provides no argument to the contrary. Amazon's expert, Aaron Levko, testified that Cordance was only entitled to a lump sum royalty payment for the life of the patents. Hadden Decl. Exh. 3 at 1947:18-1948:23. In fact, the Court has already recognized the possibility that Cordance can be fully compensated for any infringement with a lump sum payment when it adopted Amazon's version of the verdict form giving the jury the option of a one-time payment. *Id.* at 2176:22-2178:5. Such a remedy is frequently adopted to compensate plaintiffs for future infringement. *See, e.g., Telecordia,* 592 F. Supp. 2d at 747 n. 8. Cordance

34

fails to address, let alone explain, how a lump sum payment taking into account future infringement would somehow be inadequate.

## B. Even if it Were Warranted, It is Premature to Impose a Compulsory License at this Time

Even if the Court determined that a Compulsory license could be appropriate here, despite the fact that Cordance has made no arguments as to why a lump sum royalty would not suffice, Amazon agrees with Cordance that imposing an ongoing, royalty bearing license on Amazon is not appropriate at this point in the case. Motion at 30. Accordingly, Amazon requests that, should the Court determine that a compulsory license is the appropriate remedy, the Court deny Cordance's current request, without prejudice, thus allowing Cordance to raise this matter following a damages jury trial. Indeed, this is the frequent and practical approach adopted in patent cases in this District. *LendingTree*, 469 F. Supp. 2d at 226-27; *see also Cordis Corp. v. Boston Sci. Corp.*, 431 F. Supp. 2d 461, 465 (D. Del. 2006).

## V. CONCLUSION

For the foregoing reasons, Cordance's motion should be denied.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Lynn H. Pasahow
J. David Hadden
Darren E. Donnelly
Saina S. Shamilov
Ryan Marton
FENWICK & WEST LLP
801 California Street
Mountain View, CA 94041
Tel: (650) 988-8500

By: */s/ David E. Moore*
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    Tel: (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com

Dated: April 23, 2010
Public Version Dated: May 4, 2010
964803/ 30763

*Attorneys for Defendant*
*Amazon.com, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David E. Moore, hereby certify that on May 4, 2010, the attached document was electronically filed with the Clerk of the Court using CM/ECF which will send notification to the registered attorney(s) of record that the document has been filed and is available for viewing and downloading.

I further certify that on May 4, 2010, the attached document was Electronically Mailed to the following person(s):

| | |
|---|---|
| Steven J. Balick | Michael A. Albert |
| John G. Day | Robert M. Abrahamsen |
| Tiffany Geyer Lydon | Jeffrey O'Neill |
| Ashby & Geddes | Chelsea A. Loughran |
| 500 Delaware Avenue, 8th Floor | Wolf, Greenfield & Sacks, P.C. |
| Wilmington, DE 19899 | 600 Atlantic Avenue |
| sbalick@ashby-geddes.com | Boston, MA 02210-2206 |
| jday@ashby-geddes.com | malbert@wolfgreenfield.com |
| tlydon@ashby-geddes.com | rabrahamsen@wolfgreenfield.com |
| | jeffrey.oneill@wolfgreenfield.com |
| | cloughran@wolfgreenfield.com |

By:  */s/ David E. Moore* _____
   Richard L. Horwitz
   David E. Moore
   POTTER ANDERSON & CORROON LLP
   (302) 984-6000
   rhorwitz@potteranderson.com
   dmoore@potteranderson.com

757320 / 30763