## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORDANCE CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 06-491-MPT |
| | : | |
| AMAZON.COM, INC. and, | : | |
| AMAZON WEB SERVICES, LLC, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

Steven J. Balick, Esquire, John G. Day, Esquire, and Tiffany Geyer Lydon, Esquire, Ashby & Geddes, 500 Delaware Avenue, Wilmington, DE 19899.
<u>Of Counsel</u>: Michael A. Albert, Esquire, Robert M. Abrahamsen, Esquire, and Jeffrey C. O'Neill, Esquire, Wolf, Greenfield & Sacks, P.C., Boston, MA.
Counsel for Plaintiff Cordance Corporation.

Richard L. Horwitz, Esquire, David E. Moore, Esquire, Potter Anderson & Corroon LLP, Hercules Plaza, 1313 N. Market Street, Wilmington, DE 19899.
<u>Of Counsel</u>: Lynn H. Pasahow, Esquire, J. David Hadden, Esquire, Darren E. Donnelly, Esquire, Saina S. Shamilov, Esquire, and Ryan J. Marton, Esquire, Fenwick & West LLP, Mountain View, CA.
Counsel for Defendant Amazon.com, Inc.

Wilmington Delaware
July 23, 2010

Thynge, U.S. Magistrate Judge

## I. PROCEDURAL BACKGROUND

This is a patent infringement case. Cordance Corporation ("Cordance") and

Amazon.com, Inc. and Amazon Web Services, LLC (collectively, "Amazon") develop

software and own patents pertaining to on-line internet-based transaction

infrastructures.[1] On August 8, 2006, Cordance filed suit alleging that Amazon's

trademarked "1-Click®" purchasing interface, featured throughout its website, infringed

U.S. Patent No. 6,757,710 ("the '710 patent"). On September 7, 2006, Cordance filed

its first amended complaint. On October 23, 2006 Amazon filed its answer asserting

numerous counterclaims and defenses, including a counterclaim of patent infringement

of its U.S. Patent No. 6,269,369 ("the '369 patent").[2] On November 11, 2007, Cordance

filed its second amended complaint, which alleged that Amazon's information storage

processes infringed U.S. Patent No. 6,044,205 ("the '205 patent") and that Amazon's

systems for collecting, retrieving, and presenting product reviews and buyer and seller

feedback infringe U.S. Patent Nos. 5,862,325 ("the '325 patent") and 6,088,717 ("the

'717 patent").[3] Subsequently, Cordance and Amazon stipulated to a dismissal of claims

and counterclaims relating to infringement of Cordance's '205 patent and Amazon's

'369 patent.[4] As a result, by the time this case was tried, the patents in suit were

---

[1] Amazon.com, Inc. is an internet retailer. Cordance is a software company engaged in the development and commercialization of digital addressing and automated data interchange technology.

[2] On February 2, 2007, the parties consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 72, to conduct all proceedings and enter the order of judgment and the case referred to the magistrate judge on February 6, 2007.

[3] All of the Cordance patents in this case are in the same patent family–three of them have the same specification (the '710, '325, and '717 patents), and one has a shorter specification (the '205 patent).

[4] Additionally, on August 4, 2009, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), the parties stipulated to dismissal with prejudice of Amazon Web Services, LLC as a defendant in this action.

Cordance's '325, '717, and '710 patents.

A jury trial commenced on August 3, 2009.  On August 18, 2009, the jury reached a verdict, finding (1) Amazon does not infringe any of the asserted claims of the '325 and '717 patents or claims 2 and 9 of the '710 patent; (2) the asserted claims of the '325 and '717 patents are not invalid; (3) Amazon infringes claims 1, 3, 5, 7, and 8 of the '710 patent; and (4) claims 1, 2, 3, 5, 7, 8, and 9 of the '710 patent are invalid.  The court entered judgment on September 9, 2009.  On September 23, 2009, Cordance filed a renewed motion for judgment as a matter of law or, in the alternative, for a new trial. On February 22, 2010, the court granted Cordance judgment as a matter of law that, *inter alia*, claims 7 and 8 of the '710 patent are not invalid.[5]  On March 18, 2010, Cordance filed a motion for permanent injunction or, in the alternative, imposition of an ongoing royalty.[6]  On April 23, 2010, Amazon filed its answer to Cordance's motion for equitable relief along with a motion to strike the declaration of Dr. Shamos submitted in support of Cordance's motion.[7]  Cordance's motion for equitable relief and Amazon's motion to strike the declaration of Dr. Shamos are addressed in a separate opinion.  On May 26 and 27, 2010, a bench trial was held on Amazon's inequitable conduct and patent misuse defenses.  On June 2, 2010, Amazon filed its opening brief on those issues.[8]  Cordance answered on June 9, 2010.[9]  Amazon filed its reply on June 16, 2010.[10]  This is the court's decision on Amazon's claims that Cordance is guilty of inequitable conduct and should be precluded from enforcing the '710 patent under that

---

[5] D.I. 515.
[6] D.I. 524.
[7] D.I. 536 (answering brief); D.I. 543 (motion to strike).
[8] D.I. 574.
[9] D.I. 580.
[10] D.I. 584.

doctrine and the doctrine of patent misuse.

## II.  INEQUITABLE CONDUCT

### A.  LEGAL STANDARD

Applicants for patents and their legal representatives owe a duty of candor, good faith, and honesty in their dealings with the United States Patent and Trademark Office ("PTO").[11]  A breach of this duty constitutes inequitable conduct.[12]  And if inequitable conduct is established, then the entire patent is rendered unenforceable.[13]

To successfully prove inequitable conduct, an accused infringer must present "'evidence that the applicant (1) made an affirmative misrepresentation of material fact, failed to disclose material information, or submitted false material information, and (2) intended to deceive the [PTO].'"[14]  A threshold level of each element—materiality and intent to deceive—must be proven by clear and convincing evidence.[15]  Further, even if the requisite clear and convincing showing of both elements has been made, a court may still choose not to invalidate the challenged patent.[16]

The following is the standard for materiality:  "information is material when a

---

[11] *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995); 37 C.F.R. § 1.56(a).

[12] *Molins PLC v. Textron, Inc.*, 48 F.3d at 1178.

[13] *Kingsdown Medical Consultants, Ltd. v. Hollister, Inc.*, 863 F.2d 867, 877 (Fed. Cir. 1988).

[14] *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365 (Fed. Cir. 2008) (quoting *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1363 (Fed. Cir. 2007)).  *See also eSpeed, Inc. v. BrokerTec USA, L.L.C.*, 480 F.3d 1129, 1135 (Fed. Cir. 2007) ("'[I]nequitable conduct includes affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.'") (quoting *Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1373 (Fed. Cir. 2005); *Molins PLC*, 48 F.3d at 1178).

[15] *Star Sci., Inc.*, 537 F.3d at 1366 ("[C]ourts must ensure that an accused infringer asserting inequitable conduct has met his burden on materiality and deceptive intent with clear and convincing evidence before exercising its discretion on whether to render a patent unenforceable.").

[16] *See id.* at 1365 ("[E]ven if [the] elevated evidentiary burden is met as to both elements, the district court must still balance the equities to determine whether the applicant's conduct before the PTO was egregious enough to warrant holding the entire patent unenforceable.") (citing *Monsanto Co. v. Bayer BioScience B.V.*, 363 F.3d 1235, 1239 (Fed. Cir. 2004)).

4

reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent."[17]  With regard to the deceptive intent prong, "'materiality does not presume intent, which is a separate and essential component of inequitable conduct.'"[18]  "'[T]he alleged conduct must not amount merely to the improper performance of, or omission of, an act one ought to have performed.  Rather, clear and convincing evidence must prove that an applicant had the *specific intent* to . . . mislead[] or deceiv[e] the PTO.'"[19]  Such intent can be inferred from indirect and circumstantial evidence,[20] "[b]ut such evidence must still be clear and convincing, and inferences drawn from lesser evidence cannot satisfy the deceptive intent requirement."[21]  Moreover, "the inference must not only be based on sufficient evidence and be reasonable in light of that evidence, but it must also be the single most reasonable inference able to be drawn from the evidence to meet the clear and convincing standard."[22]

    A district court cannot find inequitable conduct unless threshold levels of *both* intent to deceive *and* materiality are established by clear and convincing evidence.[23]

---

[17] *Id.* at 1367 (citing *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1297 (Fed. Cir. 2008)).  *See also McKesson Automation, Inc. v. Swisslog Italia S.P.A.*, No. 06-028-SLR, 2010 U.S. Dist. LEXIS 48742, at *49 (D. Del. May 18, 2010) ("A reference is considered material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.") (citing *Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1578 (Fed. Cir. 1995)); 37 C.F.R. § 1.56(b).

[18] *Star Sci., Inc.*, 537 F.3d at 1366 (quoting *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001)).

[19] *Id.* (quoting *Molins PLC*, 48 F.3d at 1181) (emphasis and alterations in original).

[20] *See id.* ("[B]ecause direct evidence of deceptive intent is rarely available, such intent can be inferred from indirect and circumstantial evidence.") (citing *Cargill*, 476 F.3d at 1364).

[21] *Id.* (citation omitted).

[22] *Id.* (citation omitted).

[23] *Id.* at 1367 ("If a threshold level of intent to deceive *or* materiality is not established by clear and convincing evidence, the district court does not have any discretion to exercise and cannot hold the patent unenforceable regardless of the relative equities or how it might balance them.") (emphasis in original).

"Only after adequate showings are made as to both materiality and deceptive intent may the district court look to the equities by weighing the facts underlying those showings."[24] At this stage in a court's inequitable conduct analysis, the inverse relationship between materiality and intent to deceive comes into play, and a court facing a high level of materiality may find that inequitable conduct has been established despite a lower level showing of intent to deceive.[25]  The Federal Circuit has explained:

> At this second stage, . . .  the question is no longer whether materiality and/or intent to deceive were proven with evidence that is sufficiently clear and convincing.  While the facts of materiality and intent to deceive must be proven by clear and convincing evidence, the district court must balance the *substance* of those now-proven facts and all the equities of the case to determine whether the severe penalty of unenforceability should be imposed. It is this balancing that is committed to the district court's discretion.[26]

## B.  FACTUAL BACKGROUND

The prosecution history of the '710 patent is relevant to Amazon's allegations of inequitable conduct.  The '710 patent application was filed on February 5, 2002.  The '710 patent is a continuation[27] of U.S. Patent No. 6,345,288 filed on May 15, 2000,

---

[24] *Id.*

[25] *See id.* ("'The more material the omission or the misrepresentation, the lower [the] level of intent [is] required to establish inequitable conduct, and vice versa.'") (alterations in original) (quoting *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1256 (Fed. Cir. 1997).

[26] *Id.* (emphasis in original).  *See also McKesson Automation, Inc.*, 2010 U.S. Dist. LEXIS 48742 at *50, where the court provides:

> Once materiality and intent to deceive have been established, the trial court must weigh them to determine whether the balance tips in favor of a conclusion of inequitable conduct.  The showing of intent can be proportionally less when balanced against high materiality.  In contrast, the showing of intent must be proportionally greater when balanced against low materiality.

(citing *N.V. Akzo v. E.I. DuPont de Nemours*, 810 F.2d 1148, 1153 (Fed. Cir. 1988)).

[27] A Continuation Application is a patent application filed during the examination process of an earlier application *which has the same disclosure as the original application* and does not include anything which would constitute new matter if inserted in the original application.

which is a continuation of the '717 patent filed on August 31, 1998, which is a

continuation of the '325 patent filed on September 27, 1996, which is a continuation in

part[28] of the '205 patent filed on February 29, 1996.[29]

In a final office action mailed February 28, 2003, the '710 patent application was

rejected under 35 U.S.C. § 102(e)[30] as being anticipated by Chelliah et al. (the "Chelliah

patent"), U.S. Patent No. 5,710,887.[31]  In response to this office action, on May 6, 2003,

the four then-pending '710 patent claims were amended, two claims were added, and

the '710 patent inventor, Drummond Reed ("Reed"), filed a Rule 131 declaration[32]

purportedly establishing that the Chelliah patent was not prior art to either method

claimed in the '710 patent.[33]  In his Rule 131 declaration (the "131 Declaration") Reed

swore that he conceived of the two claimed methods prior to the August 29, 1995

effective date of the Chelliah patent and diligently worked toward reducing those

---

[28] A Continuation-In-Part (C-I-P) Application is a patent application filed during the application process of an earlier application which repeats some or all of the earlier application and *adds matter not disclosed in the earlier application to support the addition of new patent claims.*

[29] The specifications of the '710, '325, and '717 patents are the same.  They are not the same as the '205 patent, which has a much shorter specification.

[30] 35 U.S.C. § 102(e) provides in relevant part:
A person shall be entitled to a patent unless . . . the invention was described in (1) an application for patent, published under section 122(b) [35 USCS § 122(b)], by another filed in the United States before the invention by the applicant for patent or (2) a patent granted on an application for patent by another filed in the United States before the invention by the applicant for patent . . . .

[31] JX 10 at AMZC122929–32.  The Chelliah patent was filed on August 29, 1995 and issued on January 20, 1998.

[32] 37 C.F.R. § 1.131 provides in relevant part:
(a) When any claim of an application or a patent under reexamination is rejected, the inventor of the subject matter of the rejected claim, the owner of the patent under reexamination, or the party qualified under §§ 1.42, 1.43, or 1.47, may submit an appropriate oath or declaration to establish invention of the subject matter of the rejected claim prior to the effective date of the reference or activity on which the rejection is based.

[33] *See* JX10 at AMZC122954–74 (Reed's Rule 131 Declaration); D.I. 581, Exhibit H (same).

methods to practice.[34]  Attached as Appendix A to Reed's 131 declaration was a

document entitled Access Object Network Disclosure Document (the "Conception

Document") and dated November 1, 1993.[35]

Because Amazon's allegations of inequitable conduct turn on relationships

between representations in Reed's 131 Declaration and the Conception Document, the

court reproduces, with some explication interspersed, select portions of these

documents.  In his 131 Declaration, Reed first declares that his Conception Document

shows conception of each element of the '710 patent's two methods for completing

online purchases, which he terms the "First Method" and the "Second Method."  The

131 Declaration begins:

> I, Drummond Reed, the inventor in the above-identified application [the
> '710 patent application], hereby declare as follows:
>
> 1.  That prior to August 29, 1995, I conceived a computer-implemented
> method (referred to herein as "the First Method") comprising steps of:  (a)
> providing customer data storing information for a customer usable to
> automatically complete an online purchase of an item from a seller; (b)
> providing the customer with information from the seller with respect to an
> item; (c) receiving from the customer an indication to initiate a purchase
> transaction for purchasing the item; (d) in response to the received
> indication, automatically completing the purchase of an item from the
> seller by accessing the customer data to retrieve the information and
> process the retrieved information so as to complete the purchase
> transaction.
>
> 2.  That prior to August 29, 1995, I conceived a computer-implemented
> method (referred to herein below as "the Second Method") comprising
> steps of:  (a) providing information provider data storing information for an
> information provider usable to automatically complete an on-line
> transaction; (b) providing the information provider with information from an

---

[34] *See generally* JX10 at AMZC122954–74; D.I. 584, Exhibit H.
[35] JX10 at AMZC122961–74.

information consumer with respect to a proposed transaction; (c) receiving from the information provider an indication to complete the proposed transaction; (d) in response to the received indication, automatically completing the transaction from the information consumer by accessing the information provider data to retrieve the information and process the retrieved information so as to complete the proposed transaction.[36]

When the 131 Declaration was filed, paragraphs 1 and 2 above related to then-pending claims 2 and 3, respectively.  Those then-pending claims issued (after modification) as claims 1 and 7 of the '710 patent.[37]

The third paragraph of the 131 Declaration, where Reed first references the Conception Document, provides:  "A copy of a document prepared by me and

---

[36] *Id.* at AMZC122954–55, ¶¶ 1–2.

[37] The modifications to then-pending claims 2 and 3 referenced above involve the inclusion of metadata limitations in both claims 1 and 7 as issued.  The added metadata limitations are not relevant to Amazon's allegations of inequitable conduct.  Nevertheless, for the sake of clarity and comparison, claims 1 and 7 as issued are reproduced.  Claim 1 of the '710 recites:

A computer implemented method comprising:
providing a customer data storing information for a customer usable to automatically complete an online purchase of an item from a seller;
providing the customer with information from the seller with respect to an item;
receiving from the customer an indication to initiate a purchase transaction for purchasing the item including metadata associating said customer data with said transaction;
in response to the received indication, automatically completing the purchase of an item from the seller by by [sic] processing said metadata associating said customer data so as to complete the purchase transaction.

'710 patent,144:38–52.
Claim 7 recites:

A computer implemented method comprising:
providing an information provider data storing information for an information provider usable to automatically complete a proposed on-line transaction, including metadata associating said information with said transaction;
providing the information provider with information from an information consumer with respect to a proposed transaction;
receiving from the information provider an indication to complete the proposed transaction;
in response to the received indication, automatically completing the purchase of an item from the information consumer by accessing the information provider data to retrieve the information and process the retrieved information by processing said metadata associating said information with the proposed transaction so as to complete the proposed transaction.

'710 patent,144:65–146:5.

witnessed on a date prior to August 29, 1995 describing each of the First Method and

the Second Method is presented in Appendix A."[38]   The next four paragraphs,

paragraphs 4–7, of the 131 Declaration are not relevant to Amazon's allegations of

inequitable conduct; Amazon alleges no falsity in Reed's declaration that the

Conception Document offers support for the first two elements of both then-pending

claims 2 and 3—steps (a) and (b) in both paragraphs 1 and 2 of the above reproduced

section of the 131 Declaration.   Amazon, however, bases many of its allegations of

inequitable conduct on representations made in paragraphs 8–11 of the 131

Declaration. Those paragraphs provide:

> 8.  Said document describes at least at page 11, entry 1, third paragraph, that once the customer has made up his mind about which product to purchase, ordering may be achieved by clicking a product ordering button. Accordingly, said document describes receiving from the customer, an indication to initiate a purchase transaction for purchasing the item, as described in element (c) of the First Method.

> 9.  Said document describes at least at page 11, entry 1, third paragraph, that once the customer has made up his mind about which product to purchase, ordering may be achieved by clicking a product ordering button. Accordingly, said document describes receiving from the information provider an indication to complete the proposed transaction, as described in element (c) of the Second Method.

> 10.  Said document further describes at least at page 11, entry 1, third paragraph, ordering a product by clicking a product ordering button, such that a screen is produced including all necessary ordering information from the database.  Additionally, said document describes at page 11, entry 1, fourth paragraph, that a customer may click to confirm and order an item.  Accordingly, said document describes automatically completing the purchase of an item in response to the received indication from the seller, by accessing the customer data to retrieve the information and

---

[38] JX10 at AMZC122955, ¶ 3.

process the retrieved information, so as to complete the purchase transaction, as recited in element (d) of the First Method.

11.   Said document further describes at least at page 11, entry 1, third paragraph, ordering a product by clicking a product ordering button, such that a screen is produced including all necessary ordering information from the database.  Additionally, said document describes at page 11, entry 1, fourth paragraph, that a customer may click to confirm and order an item.  Accordingly, said document describes automatically completing the transaction from the information consumer in response to the received indication, by accessing the information provider data to retrieve the information and process the retrieved information so as to complete the proposed transaction, as recited in element (d) of the Second Method.[39]

These four paragraphs reference page 11, entry 1, third paragraph of the Conception Document.  Paragraphs 10 and 11 also reference the fourth paragraph of that Conception Document entry.  Entry 1 of the Conception Document describes an "Example Usage Scenario" under the heading "A Software Vendor and Software Consumer."  The referenced third and fourth paragraphs of entry 1 provide:

Once the customer has made up their mind about which product to purchase, ordering the product would be as simple as clicking the product ordering button on the access object.  The resulting screen would already included [sic] all necessary ordering information from the client's global database (name, shipping address, credit card number, sales tax charges, etc.), plus any vendor-specific data from the vendor's own local database (if the customer had purchased other products from this vendor, this might include an account number, product registration, number acquisition date, etc.).

One click to confirm and the order will either be sent immediately, or at the user's option, be stored and uploaded in the next online session with additional messages and/or access object actions.  All the necessary ordering information will be sent to the address specified in the access object, and if necessary, an automated receipt can be generated by a response program (note that a response program is *optional* for order

---

[39] *Id.* at AMZC122956–57, ¶¶ 8–11.

> processing on the vendor's side; the message can just as easily be sent to
> a fax machine or standard e-mail account).[40]

Other sections of the Conception Document and Reed's 131 Declaration are relevant to

Amazon's claims, but such sections will be discussed as the court's analysis requires.

## C. DISCUSSION

Amazon contends that Reed intentionally misled the PTO in his 131 Declaration

when he (1) "falsely declared that his 2-click purchasing example is an example of his

First Method including 'automatically completing' a purchase, which he intended to

mean and cover 1-click purchasing;" (2) "falsely declared that his First and Second

Methods were identically supported by his conception document example, while under

oath at trial, he testified that his First and Second Methods are different and are not both

supported by the example;" (3) "falsely declared that the 'indication' recited in the two

methods is the first click in his 2-click purchasing example that is not received by the

seller while under oath in this litigation he testified that the indication must go from the

customer to the seller;" (4) "falsely declared that storing information at the customer

satisfies the element of the Methods of storing information at the seller;"[41] and (5)

"falsely swore to the Patent Office that he was diligent in reducing his invention to

practice . . . ."[42]

### 1. MATERIALITY

At the outset of its discussion, the court feels compelled to address Cordance's

---

[40] *Id.* at AMZC122971.
[41] D.I. 574 at 5
[42] *Id.* at 13

overarching materiality argument.  Cordance asserts that "none of the [above] purported mis-statements would have been material" to the patent examiner and that they are therefore irrelevant to the court's inequitable conduct analysis.[43]  Cordance argues that, even if Reed incorrectly identified in his 131 Declaration unsupportive sections of his Conception Document as descriptive of his First and Second Methods, such error is immaterial because the patent examiner had the Conception Document before him.[44]  Cordance's argument is unpersuasive.[45]

As explained above, in an inequitable conduct analysis, "information is material when a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent."[46]  Under this standard, it is difficult for the court to acknowledge any immateriality in false statements in a 131 declaration submitted to prove the prior conception and diligence needed to overcome a patent examiner's statutory rejection of a patent application.  Reasonable patent examiners would

---

[43] D.I. 580 at 13.

[44] *Id.*

[45] *See eSpeed, Inc. v. BrokerTec USA, L.L.C.*, 480 F.3d 1129, 1136 (Fed. Cir. 2007) ("False statements are more likely material when embodied in declarations or affidavits submitted to the PTO.") (citing *Refac Int'l, Ltd. v. Lotus Dev. Corp.*, 81 F.3d 1576, 1583 (Fed. Cir. 1996)).  "This court has 'previously found that the submission of a false affidavit may be determined to be 'inherently material.''" *Id.* (citing *Digital Control Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1318 (Fed. Cir. 2006)).  *See also Refac Int'l*, 81 F.3d at 1583 ("Affidavits are inherently material, even if only cumulative.  The affirmative act of submitting an affidavit must be construed as being intended to be relied upon.  It is not comparable to omitting an unnecessary act."); *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 343 F. Supp. 2d 272, 310 (D. Del. 2004) ("Affidavits filed during prosecution are per se material.") (citing *Refac Int'l*, 81 F.3d at 1583).

[46] *Star Sci., Inc.*, 537 F.3d at 1367 (citing *Symantec Corp. v. Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1297 (Fed. Cir. 2008)).  *See also McKesson Automation, Inc. v. Swisslog Italia S.P.A.*, No. 06-028-SLR, 2010 U.S. Dist. LEXIS 48742, at *49 (D. Del. May 18, 2010) ("A reference is considered material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.") (citing *Allied Colloids, Inc. v. American Cyanamid Co.*, 64 F.3d 1570, 1578 (Fed. Cir. 1995)); 37 C.F.R. § 1.56(b).

consider the veracity of arguments in such declarations important in deciding whether to allow patent applications to issue. Cordance nonetheless insists that "[a]ny error in the pointing exercise that Reed was engaged in cannot have been material" because the patent examiner had the opportunity to review the underlying Conception Document attached to the 131 Declaration and reach his own conclusions regarding the support found therein.[47] Taken to its logical end, under Cordance's argument, no arguments for patentability found in 131 Declarations could ever be considered material should the purported support for such arguments be before patent examiners, regardless of whether such arguments for patentability are false. This is not the law.

In support of its argument, Cordance relies primarily on *Akzo N.V. v. U.S. Int'l Trade Comm'n*.[48] In *Akzo*, the Federal Circuit upheld a United States International

---

[47] D.I. 580 at 13.

[48] 808 F.2d 1471 (Fed. Cir. 1986). In its motion for a sur-reply and accompanying sur-reply, Cordance advances additional cases, beyond *Akzo*, in arguing that "Amazon's claim that all affidavits are automatically material is . . . flatly contradicted by the caselaw of the Federal Circuit and this court." D.I. 586-1 at 4 (Cordance's sur-reply). Following the above quoted language, Cordance provides the following string of citations and parentheticals:

> See *Juicy Whip, Inc. v. Orange Bang, Inc.*, 292 F.3d 728, 744 (Fed. Cir. 2002) (misleading affidavit not material); *Purdue Pharma Prods. L.P. v. Par. Pharm., Inc.*, 642 F. Supp. 2d 329, 356 (D. Del. 2009) ("the omissions and misrepresentations in the . . . Declaration, while disturbing, are not clearly and convincingly material"); *Applera Corp. v. Micromass UK Ltd.*, 204 F. Supp. 2d 724, 767 (D. Del. 2002) ("even if a reasonable PTO examiner would have been misled, the discussion was not material").

D.I. 586-1 at 4. Amazon, however, never makes the claim which Cordance attacks. Rather, Amazon claims that the statements Reed made in his 131 Declaration concerning how his Conception Document proved his prior conception of the '710 patent could be material and therefore relevant to this court's analysis of whether Reed misled the PTO, regardless of the fact that the examiner possessed the Conception Document. None of the cases Cordance cites indicate that Amazon is wrong.

In *Juicy Whip Inc.*, it was undisputed that the statements made in the declaration were true statements, and, as the Federal Circuit noted, to the extent the declaration was misleading—to the extent it did not clarify by whom the declarant was employed—the misleading part of the declaration was not material to the declaration or the application. *See Juicy Whip Inc.*, 292 F.3d at 744 ("The relevant inquiry before the examiner was whether the claimed invention solved a long-felt need, not who said the invention solved the long-felt need. While the court is bothered by the Strattons' failure to correct the examiner's misunderstanding, the clarified identity of Boulahanis's employer was immaterial to the issue before the examiner.") *Id.* The court here refuses to draw a strained analogy between this Federal Circuit decision,

Trade Commission finding and conclusion that affidavits submitted to a patent examiner did not contain material misrepresentations.[49]  The affidavits at issue in *Akzo* attempted to distinguish the process of the patent application with those disclosed by two anticipatory prior art references.[50]  The Federal Circuit provided the following:

> The mere fact that [the patent applicant] attempted to distinguish the [application] process from the prior art does not constitute a material omission or misrepresentation.  The examiner was free to reach his own conclusion regarding the [application] process based on the art in front of him.  Nor does [the patent applicant]'s affidavit, advocating a particular interpretation of [the prior art] (albeit favorable to [the patent applicant]'s position), show any intent to mislead the PTO.  [The patent applicant]'s intent was not to mislead, but rather to distinguish prior art from the [application] process and demonstrate to the examiner that the [application] process would not have been obvious in light of [the prior art].  The sum of it is that, because we cannot see either a proved material misrepresentation or a proved intent to mislead, we must conclude that Akzo has not met its burden of proving inequitable conduct before the PTO.[51]

The above paragraph does not support Cordance's position.  The Federal Circuit simply

---

which indicates that nondisclosure of a declarant's employer can, in some instances, be deemed misleading but immaterial and this case, where an inventor's statements in a 131 declaration are directly relevant to whether or not that inventor swore behind a prior art reference in good faith.

    The language Cordance quotes from *Purdue Pharma Prods. L.P.* relates to the nondisclosure of experimental details underlying one submitted declaration—the Malkowska I Declaration.  *Purdue Pharma Prods. L.P.*, 642 F. Supp. 2d at 356.  With regard to that declaration, the court determined that the disclosure made was far from a bastion of scientific prudence, but that it was still not materially misleading for a number of experiment-specific reasons.  *Id.* at 376–77.  In this case, Amazon has not alleged that Reed failed to disclose any methodological flaws or invalid experimental conditions, and thus *Purdue Pharma Prods. L.P.* is inapposite.

    In *Applera Corp.*, the court doubted that any reader of the declaration and application at issue would be misled, but that even if a reasonable patent examiner would be misled, the discussion in the declaration was not material because an amendment to the declaration cleared up any ambiguity and the patent examiner who examined the application was, as a matter of fact, not misled.  *Applera Corp.*, 204 F. Supp. 2d at 767.  Like *Juicy Whip Inc.* and *Purdue Pharma Prods. L.P.*, *Applera Corp.* can be distinguished from the instant case on its face and thus it likewise fails to persuade the court that there is any error in Amazon's insistence that statements in Reed's 131 Declaration could be material.

[49] *Akzo N.V.*, 808 F.2d at 1482 ("We uphold the Commission's findings and conclusion that Du Pont's affidavit or arguments before the examiner did not constitute material misrepresentations.").

[50] *Id.*

[51] *Id.*

states, *inter alia*, the uncontroversial proposition that, in arguing for patentability, patent applicants are free to distinguish their inventions from and advance their interpretations of the prior art references cited in their applications' rejections.[52]  It does not follow from *Akzo* that false statements made in 131 declarations are legally immaterial as long as the documents or evidence about which such statements are made are before the examiner.  As Amazon correctly states, misrepresentations about information can be material even if that information is provided to, or considered by, a patent examiner.[53]

At this juncture, despite the fact that Cordance's overarching argument regarding materiality—or, more accurately, immateriality—is unpersuasive, and despite Amazon's

---

[52] *See Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1379 (Fed. Cir. 2008), where the Federal Circuit provides:

> The district court correctly concluded that Innogenetics' behavior before the PTO did not constitute a material omission or misrepresentation.  Innogenetics' representation of the Cha PCT application amounted to mere attorney argument and our precedent has made clear that an applicant is free to advocate its interpretation of its claims and the teachings of prior art.  *See Life Techs., Inc. v. Clontech Lab., Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000).  Cases involving affidavits or declarations are held to a higher standard.  *See, e.g.*, *eSpeed, Inc. v. Brokertec USA, LLC*, 480 F.3d 1129, 1136 (Fed. Cir. 2007) (explaining that false statements made by patentees in sworn declarations or affidavits, as opposed to attorney argument, are "inherently material").  Given that the Cha PCT application had been submitted for the patent examiner to examine herself, she was free to accept or reject the patentee's arguments distinguishing its invention from the prior art.

[53] *See e.g.*, *eSpeed, Inc.*, 480 F.3d at 1137 (upholding a district court's determination that false statements in declarations submitted to the PTO were material, despite the fact that the underlying source code about which such statements were made was before the patent examiner).

> We also reject [the patentee]'s second argument that the examiner was on notice regarding the existence of the "new rules" in the Super System because of the submission of source code and functional and design specifications to the PTO with the declarations . . . .  Even though [the patentee] provided the examiner with 1139 pages of material describing Super System and its early modifications, we agree with the district court that the "blizzard of paper" submitted to the PTO in conjunction with the declaration stating that the Super System did not include "new rules," "left the examiner with the impression that the examiner did not need to conduct any further . . . investigation," including an analysis of the portions of Super System source code provided by Cantor to the PTO.  Given the foregoing, the district court's conclusion that the false statements in the declarations submitted to the PTO were material is not clearly erroneous.

*Id.* (citations omitted).

more precise encapsulation of the law on materiality, the court need not delve into

whether Amazon has proven the statements in Reed's 131 Declaration to be material

misrepresentations because, for the reasons set forth below, the court finds that

Amazon has not carried its burden to prove intent to deceive by clear and convincing

evidence.[54]

### 2. INTENT TO DECEIVE

Cordance asserts that Amazon "has identified no evidence, and certainly no clear

and convincing evidence, that Reed intentionally violated his duty [of candor] to the PTO

as he understood it."[55]  Even if Amazon proved some error in Reed's mapping of his

claimed invention in his 131 Declaration to his Conception Document, Cordance argues,

"there is no evidence that any error in this document was part of some intentional plan

to deceive the PTO, nor is such an inference logical under the circumstances," and

"[a]ny inconsistencies in statements made during litigation would not be probative of

whether misrepresentations were made during prosecution, several years earlier."[56]

Amazon argues that Reed took great care in preparing his 131 Declaration,

falsely declared that his 2-click purchasing example on page 11 of the Conception

Document disclosed both his First and Second Methods, and intended the declaration

to hide from the PTO the differences between "what he intended his Methods to

---

[54] As explained *supra* Part II.A., a district court cannot find inequitable conduct unless threshold levels of *both* intent to deceive *and* materiality are established by clear and convincing evidence.  *Star Sci., Inc.*, 537 F.3d at 1367 ("If a threshold level of intent to deceive *or* materiality is not established by clear and convincing evidence, the district court does not have any discretion to exercise and cannot hold the patent unenforceable regardless of the relative equities or how it might balance them.") (emphasis in original).

[55] D.I. 580 at 16.

[56] *Id.*

cover—1-click purchasing—and what his conception document described."[57]
According to Amazon, "[t]his carefully calculated bait and switch with the examiner was
far less the [sic] full disclosure his duty of candor required and shows the applicant
acted with an intent to mislead and deceive the Patent Office."[58]

Amazon insists that the court may properly infer intent to deceive the PTO from
what it characterizes as Reed's repeatedly inconsistent testimony[59]—testimony which
Amazon argues "illustrates that Mr. Reed—whose conception document does not
describe 1-click purchasing—carefully crafted a declaration to convince the examiner to
remove the Chelliah patent as prior art and allow the patent to issue so that Cordance
could sue Amazon for use of its 1-Click™ technology."[60]  Specifically, Amazon sets forth
three purported examples of inconsistent testimony.

First, Amazon asserts the following:

> In his declaration, Mr. Reed swore that his 2-click purchasing example
> supported both the First Method and the Second Method, but in this
> litigation Mr. Reed swore to the contrary by claiming that his First Method
> is 1-click purchasing and his Second Method is 2-click purchasing.[61]

Amazon then cites the following jury trial testimony from Reed:

> Q. So there's a first method and a second method?
> A. Yes.  That's what we're referring to in this [the 131 Declaration].
> Q. One is automatic and one is semiautomatic?
> A. One is 1-click ordering, which is the automatic purchasing that we

---

[57] D.I. 574 at 22.
[58] *Id.*
[59] *See* D.I. 584 at 5, where Cordance argues that "[t]he Federal Circuit is clear . . . that a court can infer an intent to deceive when an inventor later testifies to a different version of events than those sworn to the Patent Office."
[60] D.I. 574 at 6.
[61] D.I. 584 at 6.

described in the specification earlier.  The other one is semiautomatic.
That's 2-click purchasing, as we described in the document earlier.
Q.  Which one is automatic in 1-click?
A.  In Section 7 of the document that we're referring to, right in the first
sentence, it says, Said document describes at least in that place.  Okay?
     Section 7 says, automatic and semiautomatic.
Q.  The question is, is it Method 1 or Method 2, your 1-click?
A.  Okay.  I would like to highlight an indication to initiate a purchase
transaction.
Q.  Sir, no.  The question is, is Method 1 or Method 2 1-click?
A.  Method 1 is 1-click because it says it is indicated to initiate a purchase
transaction.  Method 2 is 2-click because it says to complete the proposed
transaction.[62]

And Amazon cites the following bench trial testimony:

Q.  Now, I believe you testified earlier today that your first method and
your second method are different in that your second method can be
performed with two clicks and your first method can only be performed
with one click; is that right?
A.  Yes.[63]

It is true that Reed swore in his 131 declaration that evidence of his prior

conception of both the First and Second Methods could be found at least in entry 1 on

page 11 of the Conception Document.[64]  And Reed and Cordance have both admitted

that, taken together, the third and fourth paragraphs of page 11, entry 1 describe a

semiautomatic, 2-click purchasing example.[65]  Reed's 131 Declaration, however,

---

[62] D.I. 581 at 598:1–21 (Jury Trial Transcript).
[63] D.I. 588 at 202:23–203:3 (Bench Trial Transcript).
[64] *See supra* Part II.B., reproducing paragraphs 10 and 11 of the 131 Declaration.
[65] *See* D.I. 588 at 193:13–17, where Reed testifies:
Q.  If I did exactly what the words in this paragraph [paragraph 10 of the 131 declaration]
describe, I click once to bring up the product ordering button and then I click to confirm,
am I practicing the first method?
A.  No.
*See also* D.I. 580 at 2–3, where Cordance provides:
Taken together, paragraphs 3 and 4 on p.11 of the Conception Document describe "semi-
automatic" ordering, because after a user clicks on a product ordering button, the user
sees a screen showing certain data and can then click another button to confirm the
order.  Because human input is required to move the process along after the buyer clicks

contrary to what Amazon contends, is not necessarily contradicted by his subsequent

testimony that the First Method describes 1-click purchasing and that the Second

Method describes 2-click purchasing.  In fact, to the court, such testimony appears

consistent with Reed and Dr. Shamos's steadfast insistence that page 11, entry 1

illustrates only one embodiment of Reed's invention and that it and other portions of the

Conception Document make clear that Reed did in fact invent 1-click purchasing.

Amazon advances the following, second purported example of

inconsistent testimony:

> In his declaration, Mr. Reed swore that his 2-click purchasing example
> supported his First Method, but in this litigation Mr. Reed swore to the
> contrary by testifying that the very same 2-click purchasing example did
> not support his First Method. [66]

Amazon then cites the following testimony from Reed:

> Q.  If I did exactly what the words in this paragraph [paragraph 10 of the
> 131 Declaration] describe, I click once to bring up the product ordering
> button and then I click again to confirm, am I practicing the first method?
> A.  No.[67]

Not surprisingly, Amazon fails to cite the testimony immediately following the above

single question-and-answer exchange.  Reed's testimony continues:

> Q.  So what you told the Patent Office in this sworn declaration is false, is
> that right?
> A.  That is not correct.  I'm once again stating you are trying to interpret —
> what you just told me is trying to interpret what that paragraph [paragraph
> 10 of the 131 Declaration] says, and that's not what I meant.
> Q.  Well, this paragraph [paragraph 10 of the 131 Declaration] describes

---

on the product ordering button, the processing of a response in this example is "semi-
automatic."
[66] D.I. 584 at 6.
[67] D.I. 588 at 193:13–17.

two clicks; is that right?

A.  The paragraph [paragraph 10 of the 131 Declaration] has references to two paragraphs in an example [the third and fourth paragraphs of page 11, entry 1].

Q.  And the references that you included in this paragraph [paragraph 10 of the 131 Declaration] to describe how to practice the first method includes a user taking two clicks; right?

A.  Those two paragraphs [the third and fourth paragraphs of page 11, entry 1 of the Conception Document] each describe a click, but that's not what this paragraph [paragraph 10 of the 131 Declaration] is communicating.

Q.  Well, if you believe that taking two clicks took you out of your claim, why did you describe two clicks in your sworn declaration to the Patent Office in describing your first method?

A.  All I was doing was what I was supposed to do for the Patent Office, which is describe where in my conception document there was support for Element D in the first method.

Q.  Right.  And you told them there's Element D.  There's support for Element D, the first method, by using clicking in two different paragraphs; is that right?

A.  I didn't say that.

Q.  Well, what does that say?

A.  Do you want me to walk through what I believe it says, or what I was communicating when I tested [sic] to this, what I was swearing to the Patent Office for?

Q.  No.

A.  Excuse me?

Q.  No.[68]

Amazon also cites the following testimony from Dr. Shamos:

Q.  Right.  So the example on page 11 does not describe one-click ordering?

A.  The example is not one-click ordering.[69]

But Amazon again omits the testimony immediately following the above exchange, which provides:

Q.  Right.

---

[68] *Id.* at 193:18–195:1.
[69] *Id.* at 288:4–6.

A.  That does not mean a conception document doesn't disclose one.

Q.  I'm not asking you anything about anything else in the conception document.

    Did you read Mr. Reed's sworn declaration to the Patent Office?

A.  Yes.

Q.  Okay.  And does he cite to anything in his mapping of the claim elements that is not on page 11?

A.  He makes reference to page 11, and every time he does so, he says, at least.

Q.  But he says, if you do what's on page 11, you meet the first method and the second method, doesn't he, Dr. Shamos?

A.  Well, let's look at exactly what he did say.

Q.  Well, I can probably help you with that.

A.  Please do.

[Counsel for Amazon]:  Can we put up slide 3?

Q.  Do you recognize this, Mr. Reed's sword declaration?

A.  Yes.

Q.  And what is he citing here [in paragraph 10 of the 131 Declaration]? Isn't this Paragraphs 3 and 4 on page 11 [of the Conception Document]?

. . .

Q.  Now, if we look at the slide that's up on the screen, which is paragraphs 10 and 11, Mr. Reed's declaration, do you recall these paragraphs, Dr. Shamos?

A.  Yes.  Yes.

Q.  And if we start with Paragraph 10, which is where Mr. Reed is mapping element D of the his first method, he identifies the third and fourth paragraphs from the software vendor example; is that correct?

A.  Yes.

Q.  And in those paragraphs that Mr. Reed identifies as meeting element D of his first method, the user has to click twice to make a purchase; is that right?

A.  Well, again, that's the reading that you urged, but there are two references here.  The first is, said document further describes at least, at page 11, entry 1, third paragraph, ordering a product by clicking a product ordering button.

    Then, the next sentence begins, "Additionally said document describes at page 11, entry 1, fourth paragraph, that a customer may click to confirm and order an item."

    And so a fair reading of those two sentences is that they're two separate pieces of support for the claim.  Otherwise, one would not need the word

"additionally."[70]

The court fails to see where, in the above excerpted testimony, Reed or Dr. Shamos testified that the 2-click purchasing example does not support the First Method, as Amazon alleges.

Finally, Amazon advances the following, third purported example of inconsistent testimony:

> In his declaration, Mr. Reed swore that the "indication" in the two Methods is the first click in his 2-click purchasing example that is not received by the seller, but in this litigation Mr. Reed swore to the contrary that the "indication" of the two Methods must be received by the seller.[71]

Amazon then cites two paragraphs from Reed's second declaration in opposition to Amazon's motion for summary judgment and an excerpt from Reed's deposition testimony in which Reed provided that the "indications" were sent from the customer to the seller.[72]  These excerpts, however, do not prove by clear and convincing evidence that Reed intended to deceive the PTO.

As Cordance asserts, "Amazon makes much of the fact that Reed gave testimony at his deposition that in his recited method, the customer provides an indication *to the seller* to initiate a purchase transaction for an item,"[73] even though Reed swore in paragraphs 8 and 9 of his 131 Declaration that support for element (c) in

---

[70] *Id.* at 288:7–291:10.
[71] D.I. 584 at 6.
[72] D.I. 576, Exhibit 10 at ¶¶ 32–33; D.I. 576, Exhibit 11 at 69:6–14.
[73] D.I. 580 at 6 (emphasis added).

both methods[74] was described at least by "clicking the product ordering button"—the

first click in the page 11, entry 1 Software Vendor example.[75]  Reed, however, explained

that the scenario he discussed at his deposition, in which the indication to initiate is sent

directly to the seller, was only a particular example covered by his methods.[76]  And Dr.

Shamos testified that the Conception Document, in its entirety and where cited by the

131 Declaration, provided support for the "indication" being received by, among other

potential recipients, the seller.[77]

---

[74] Element (c) of the First Method recites "receiving from the customer, an indication to initiate a purchase transaction for purchasing the item."  Element (c) of the Second Method recites "receiving from the information provider an indication to complete the proposed transaction."

[75] See supra Part II.B. (reproducing paragraphs 8 and 9 of the 131 Declaration).

[76] *See, e.g.*, D.I. 581, Exhibit E at 137:23–138:5 (Excerpts from Volume III of Reed's deposition).
Q.  Receiving an indication to initiate a purchase and includes data identifying stored customer information.  That's the seller receiving this, you testified to that this morning.
A.  And I clarified it is the seller or an agent of the seller such as a payment partner server or a third-party server.
*Id.*  And at the bench trial, Reed provided the following testimony:
Q.  Now, Mr. Reed I would like to, briefly before moving on to another subject, there was some testimony from Dr. Alvisi this morning regarding where the indication to initiate is sent.  Do you recall that?  He qualified, he characterized I guess some of your prior testimony.
A.  I believe he did.
Q.  And what do you recall what Dr. Alvisi said about that?
A.  I believe he said it was, had to be sent to the seller.
Q.  Is that a fair reflection of your testimony in this case?
A.  I believe that what he was talking about and what was shown as deposition testimony was part of a conversation, when we were discussing that.  And that, subsequently, that particular example we were talking about, I later pointed out that that was only relevant to that one example and that was not a limitation of the invention of the claims.
Q.  So when he characterized the requirement regarding whether the indication to initiate had to be sent from the seller, that was just one example?
A.  Yes, it was only one example.
Q.  And you indicated that actually later in that self same deposition testimony; is that correct?
A.  Yes, I did.
D.I. 588 at 176:5–177:4.

[77] D.I. 589 at 265:16–267:1 (Dr. Shamos's direct bench trial testimony).
A.  . . .  Okay.  Receiving from the customer an indication to initiate a purchase transaction for purchasing the item.
     Okay.  This is where there's some dispute, as I talked about earlier.  It says, once the customer has made up their mind about which product to purchase, ordering the

24

In support of its assertion that the court may infer intent to deceive from the above examples of allegedly inconsistent testimony, Amazon cites *Frazier v. Roessel Cine Photo Tech, Inc.*[78] and *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*[79]  In *Frazier*, the Federal Circuit affirmed in part a district court's finding of inequitable conduct.[80]  "The district court found that [the inventor]'s claimed lack of intent to mislead was not credible based on his repeatedly testifying to different versions of events under oath" and because "[the inventor] allowed a video to be submitted to the PTO in order to represent the capabilities of the claimed [camera] lens, knowing that portions of the video were shot with a different lens."[81]  The record in *Frazier*, however, reflects extreme dissembling the extent of which far exceeds any this court might strain

---

product would be as simple as clicking the product ordering button.
    Now, statements have been made that this receiving must be done by the seller. It does not say that in the claim.  It does not say that in the specification.  And Dr. Alvisi said that because the resulting screen would already include all the necessary information from the client's global database, the vendor couldn't have known that clicking the product ordering button had occurred.
    Now, I disagree on two grounds.  One is that this receiving does not necessarily have to be receiving by the seller.  Even though we all agree that ultimately, the seller must be notified that you want to buy something or we can't provide it to you.
    The question is, is this receiving step required to be sent?  Is it required to be received by the vendor at this time?  I don't think so.  So even if it's true that clicking the product ordering button is not received by the seller now, it's certainly received by the user's computer now.
    In any case, as I described earlier, because there's information on the screen that is vendor-specific coming from the vendor's own local database, what that says to me is in order for that to happen, the vendor has to know that the product ordering button has been clicked so the vendor can then send that necessary information to the ordering screen.
    And so it's also possible that, indeed, this indication has been received, has been received by the vendor, if, for some reason, that is required . . . .
*Id.*

[78] 417 F.3d 1230 (Fed. Cir. 2005).
[79] 607 F.3d 817 (Fed. Cir. 2010).
[80] 417 F.3d at 1232.
[81] *Id.*

to infer from Amazon's above examples of allegedly inconsistent testimony.[82]  The

record in *Advanced Magnetic Closures*, likewise reflects deception far exceeding any

---

[82] *Frazier v. Roessel Cine Photo Tech, Inc.*, No. CV 99-10425-GAF, 2003 U.S. Dist. LEXIS 19607, at *87–*89 (C.D. Cal. Apr. 9, 2003).

> 112.  . . .  Here it is undisputed that, as the Court has previously noted, when it "comes to [Frazier] describing his work, he's loose with the truth."  Even Frazier concedes his willingness to misrepresent the truth in the interest of promoting his inventions.  The record here discloses, however, that Frazier's penchant for misrepresentations is not limited to his dealings in the business world.  It extends to his willingness to make misrepresentations to, and withhold material information from, Panavision, his patent attorney Solum, the PTO, and - most egregiously - this Court.  One portion of Frazier's testimony in this matter is particularly worth citing as it provides a clear illustration of Mr. Frazier's willingness to employ falsehoods and evasions, even while under oath, to serve his own ends.
>
> 113. On the second day of the evidentiary hearing, Frazier testified under oath that he went to great lengths to keep his Aerial Image Lens secret from professional cinematographers and that he "was always very cautious not to let people take photographs of it."  Defendants, aware that the 1992 documentary film "Close Up on Wildlife", which was broadcast on Australian public television, shows a smiling Frazier at one point placing his hand on his Aerial Image Lens, in full view of the camera, and introducing it to the audience as the "secret in the black box," attempted to confront him with this scene on cross-examination.  Incredibly, Frazier -- rather than claim a lapse of memory or admit making a mistake -- denied outright and under oath that the lens shown in the documentary was his Aerial Image Lens.  Indeed, Frazier continued to maintain this denial even while admitting that the lens shown in the documentary was identical in appearance to his Aerial Image Lens and that the scene in the documentary is followed with a series of images that he had shot with the Aerial Image Lens.  Asked what he called this mystery lens, Frazier testified, "[a] Frazier Device."  Asked why in the film he had referred to the lens as "the secret", Frazier answered, "Because it was a secret."
>
> 114. What Frazier apparently forgot when he set about constructing this elaborate lie concerning the lens depicted in the documentary was that Panavision had included the identical scene from the documentary in the introduction of the "How to Use the Panavision/Frazier Lens" videotape, and that defendants had asked Frazier during his February 22, 2001 deposition to identify the lens shown in that scene. On that date, the answer Frazier gave under oath, without hesitation or equivocation, was: "It's an aerial image lens."
>
> 115. The Court also cannot overlook Frazier's determined efforts to cover-up the existence and extent of Diana Serrano's involvement in the patent prosecution, including Frazier's repeated, unequivocal assertions under oath:  (1) that Serrano was nothing more than a secretary who performed clerical tasks; (2) that he had no knowledge of any of Serrano's activities; (3) that he had no understanding of why Serrano's input into the application process was referenced in contemporaneous correspondence; and (4) that he had no knowledge that Serrano had undertaken any "separate efforts" to procure approval of his application.
>
> 116. Later evidence conclusively demonstrated that Frazier's denials and his feigned ignorance of any role Serrano may have played were outright lies meant to conceal her involvement, which to this day has not been fully disclosed or explained to this Court. The Court concludes that Frazier's concerted effort to conceal Serrano's role indicates that she was involved in using improper means to circumvent the normal patenting process.

*Id.* (internal citations omitted).

evidenced by Amazon's above examples.[83]

For these reasons, the court finds that the purported examples of inconsistent testimony Amazon advances do not prove by clear and convincing evidence that Reed intended to deceive the PTO.

Amazon also contends that Reed's intent to deceive the PTO is evident from the lack of factual support for his declaration to the PTO that he was diligent in reducing his First and Second Methods to practice.[84]   Amazon asserts that in paragraphs 15–23 of the 131 Declaration[85] "Mr. Reed declared that he was diligent in writing the code

---

[83] *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, No. 98 Civ. 7766, 2008 U.S. Dist. LEXIS 54615, at *27–*28 (S.D.N.Y. July 17, 2008).

> The Court found Bauer's [the purported inventor's] testimony regarding his purported invention *completely incredible.* At no point in Bauer's *rambling, often-incoherent testimony* did he offer any scientific or technical explanation for the claimed increase in magnetic attraction caused by the hollow post.  Nor did he present any evidence to substantiate this claim. . . .  *His testimony bore clear indicia of fabrication.*  While voluble--if not responsive--on direct, he was evasive and argumentative on cross examination.  *The Court is convinced beyond a shadow of a doubt* that Bauer could not be the inventor of the '773 snap.

*Id.* (emphases added) (internal citations omitted).

[84] D.I. 574 at 13–16; D.I. 584 at 11–13.

[85] Paragraphs 15–23 provide:

I, Drummond Reed, the inventor in the above-identified application, hereby declare as follows:

. . .

15.  That from a date prior to August 29, 1995 until at least September, 1995, I was interviewing potential members of a development team for Intermind, Inc. [Cordance's predecessor] (assignee) for the purpose of reducing each of the First Method and the Second Method to practice.

16.  That in August 1995, a website was developed and posted on the Internet for the purpose of furthering the recruitment of the development team.

17.  That in September 1995, I began hiring members of the development team and moved into new offices in Seattle, WA.

18.  That from August 1995 through October 1995, I set about finding a patent attorney for the purpose of obtaining patent protection for each of the First Method and the Second Method.

19.  That beginning in October 1995, through November 1995, I interviewed several patent attorneys for the purpose of selecting one to file a patent application for each of the First Method and Second Method.

20.  That, during the course of interviewing patent attorneys, in late November 1995 I contacted Steven J. Henry ("Mr. Henry"), an attorney at the law firm of Wolf Greenfield

implementing the First and Second Methods and worked with a patent attorney to draft a patent application directed to those claims, when in fact he did neither."[86]

Amazon argues that Reed lied when he swore that "on or about November 28, 1995 [he] traveled to Boston, MA to meet with Mr. Henry to discuss with him filing a patent application for each of the First Method and the Second Method" because "[t]he First and Second Methods were drafted years after Mr. Reed met with Mr. Henry in November of 1995, in anticipation of this litigation . . . ."[87] Cordance insists it is irrelevant that the claims ultimately embodying the First and Second Methods were drafted years after Reed met with Mr. Henry because the 131 Declaration advanced only the undisputed fact that Reed met with Mr. Henry and discussed the subject matter

---

and Sacks, P.C. in Boston, MA to discuss filing a patent application for each of the First Method and the Second Method.  On or about November 26, 1995, Mr. Henry reviewed disclosure material pertaining to each of the First Method and the Second Method as a result of my contacting him, in preparation for a meeting with me and other members of my development team.
21.  That on or about November 28, 1995, I traveled to Boston, MA to meet with Mr. Henry and to discuss, with him, filing a patent application for each of the First Method and the Second Method.  That disclosure meeting was followed by activity from late November 1995 to early January 1996 related to the filing of a patent application, including numerous communications.
22.  That on or about January 2, 1996, Mr. Henry commenced writing a patent application directed to each of the First Method and the Second Method, and continued to work on the application, along with his associate Brett N. Dorney, until it was filed on February 28, 1996, resulting in United States Patent Application 08/609,115 (now U.S. Patent No. 6,044,205), a parent application to the present application.  Such activity is supported in billing record from Mr. Henry's firm, which I have not attached due to the potential of losing attorney-client privilege.
23.  That my daily work activities from just prior to August 29, 1995 through at least February 28, 1996 were principally focused on code development for the purpose of producing a product embodying each of the First Method and the Second Method, and getting a patent application therefore on file.  At no time did I digress from these activities for more than a day or two at a time, other than for illness, holidays, and attending to business needs to keep operational matters of the development of First Method and the Second Method running.
JX10 at AMZC122958–59.
[86] D.I. 574 at 16.
[87] D.I. 584 at 11.

28

of those ideas.[88]  Amazon claims that Cordance's position is baseless:

> Although Cordance acknowledges that the First Method and the Second Method were drafted years after the date of Mr. Reed's conception document in order to sue Amazon, Cordance argues that it does not matter because "the declaration was to show that Mr. Reed discussed the . . . **subject matter** of those ideas."  But that is not what Mr. Reed swore to the Patent Office.  In his declaration, Mr. Reed swore that in 1995 he met with Mr. Henry "to discuss, with him, filing a patent application for **each of the First Method and the Second Method**"—not the subject matter of those ideas, but precisely each of the purchasing methods Cordance acknowledges were not conceived until almost 10 years later.[89]

Assuming *arguendo* that Reed affirmatively misrepresented a material fact to the PTO by declaring that he discussed filing a patent application for precisely his First and Second Methods rather than for the ideas or subject matter he maintains he conceived of in 1993 and memorialized in the Conception Document, it does not automatically follow that Reed did so with the intent to deceive the PTO.[90]

In his 131 Declaration, Reed cited his discussions with Mr. Henry and the writing of the '205 patent application as evidence of his diligence in constructively reducing his First and Second Methods to practice.[91]

Reed and Dr. Shamos maintain that support for the '710 patent claims is found in the '205 patent.  Amazon disputes this and characterizes Reed's assertion that such support exists as further evidence of his alleged intent to deceive the PTO.  To support its position, Amazon cites testimony from Dr. Alvisi and this court's August 13, 2009

---

[88] D.I. 586-1 at 5.

[89] *Id.* (emphases in original) (internal citations omitted).

[90] *Star Sci., Inc.*, 537 F.3d at 1366 ("'[M]ateriality does not presume intent, which is a separate and essential component of inequitable conduct.'") (quoting *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1274 (Fed. Cir. 2001)).

[91] *See supra* note 85 (reproducing ¶¶ 21–22 of the 131 Declaration).

decision granting Amazon judgment as a matter of law ("JMOL") that the claims of the '710 patent are not entitled to a conception date of November 1, 1993—the date the Conception Document was witnessed.[92]  With respect to this court's August 13, 2009 decision, as Cordance contends, the court's decision granting Amazon JMOL does not prove that Reed intended to deceive the PTO when he declared in his May 5, 2003 131 Declaration that support for his First and Second Methods could be found in the '205 patent and that the writing of the '205 patent application evidenced his diligence in constructively reducing those methods to practice.  The court ruled that Amazon was entitled to JMOL because Cordance did not present expert testimony at the jury trial that either the Conception Document or the '205 patent supported the claims of the '710 patent.[93]  That decision did not retroactively infuse Reed's 131 Declaration with intent to deceive.  Further, as Cordance argues, "[a]t this stage . . . Amazon has the affirmative burden to prove – by clear and convincing evidence – its case of no corroboration and no support in the '205 specification, and further to show an intent to deceive."[94]

With respect to Dr. Alvisi's testimony, it does reinforce Amazon's contention that the '205 patent specification fails to support the '710 patent claims.  That testimony, however, is directly rebutted by Dr. Shamos's testimony, which reinforces Cordance's assertion that the '205 patent specification supports the '710 patent claims.  In the face of this conflicting but credible expert testimony, the court is not prepared to conclude that Dr. Alvisi's testimony proves by clear and convincing evidence (1) that the '205

[92] D.I. 498 at 2125:20–23.
[93] *See* D.I. 498 at 2099:14–2125:23.
[94] D.I. 580 at 16 (emphases in original).

30

patent specification fails to support the '710 claims and (2) that, to swear behind the

Chelliah patent, Reed knowingly misrepresented the existence of such support with the

intent to deceive the PTO.  Suffice it to say, that is a long walk the court refuses to make

on the record before it.

Amazon also claims that Reed lied to the PTO when he declared that he was

"principally focused on code development for the purpose of producing a product

embodying each of the First Method and the Second Method" from August 29, 1995

through at least February 28, 1996.[95]  Amazon argues that the falsity of this declaration

is evident from Reed's deposition testimony, in which Reed states that the code he was

developing between August of 1995 and February of 1996 to embody his first method

was for Cordance's Intermind Communicator product,[96] and the jury trial testimony of

Cordance's Chief Technical Officer Steven Mark Mushero, in which Mr. Mushero

allegedly explained that the Intermind Communicator product had nothing to do with

automatic purchasing.[97]  Amazon also cites deposition testimony from other Cordance

---

[95] D.I. 574 at 15.
[96] In his deposition, Reed provided the following:
Q.  Let me ask you to look at Paragraph 23 of your declaration [the 131 Declaration]. . . .
    In that paragraph, you say that "My daily activities from just prior to August 29th,
1995, through at least February 28th, 1996, were principally focused on code
development for the purpose of producing a product embodying each of the first method
and the second method and getting a patent application therefore on file."
    Do you see that?
A.  I do.
Q.  What code were you developing to embody the first method between August of 1995
and February of 1996?
A.  We were working on the development of the product that became known as Intermind
Communicator.
D.I. 585, Exhibit B at 186:7–23.
[97] At the jury trial, Mr. Mushero provided the following testimony:
Q.  Did Intermind [Cordance's predecessor] ever -- excuse me.  Did Intermind ever
develop any software that did automatic purchasing?

software developers indicating that 1-click ordering was not something Cordance

worked on or even discussed.[98]

Cordance contends that Mr. Mushero's testimony that Intermind Communicator

did not use automatic purchasing does not contradict Reed's testimony that HCML

(Hyper Communications Markup Language) is the code he was developing that could

be used to implement his two methods.  Cordance maintains that Reed's deposition

---

A.  No, I don't think so.
Q.  In fact, software that did automatic purchasing was not even in Intermind's product plan?
A.  I don't remember.
Q.  Do you remember any plans with all software for automatic purchasing at Intermind?
A.  I don't remember that.  I don't remember the plans.
D.I. 491 at 381:10–18.  In his deposition Mr. Mushero provided the following testimony:
Q.  So would you say that -- let me start again.  So would you say that the initial release of Intermind Communicator does not include the ideas you see in Claim 1 or Claim 7 of the '710 patent?
[Counsel for Cordance]:  Objection.  It calls for a legal conclusion, lacks foundation.
A.  Yeah, not being a patent attorney, I'm not sure I know what these exactly mean, and it's my understanding the judge figures that out.  But it's really hard to know, I don't know. I'm just looking at some of the words, seeing "transaction," automatically purchased something, which I think automatic purchasing was not something that we included in the plan.  I'm not clear if this includes that or not, but I see some of those words here.
D.I. 576, Exhibit 16 at 90:2–17.
[98] In his deposition testimony, Jeffrey Oberlander provided:
Q.  Okay.  Did you ever work on any sort of one-click product ordering while you were at Intermind?
[Counsel for Cordance]:  Objection.
A.  No.
Q.  Okay.  Are you aware of anybody else at Intermind working on a one-click ordering system while you were there?
[Counsel for Cordance]:  Objection.
A.  No.
D.I. 575, Exhibit 2 at 130:18–131:1.  In his deposition testimony, Kevin Jones provided:
Q.  Did Drummond Reed ever tell you he invented one-click ordering?
A.  I don't believe so.
D.I. 576, Exhibit 17 at 187:17–19.  In his deposition testimony, Peter Heymann provided:
Q.  So it's clear, to take those one at a time, right.  During your tenure at Intermind, did Intermind ever develop any technology in the sense of having written software for it that would allow someone to carry out purchase transaction?
A.  No, I don't think strict sense of carrying out a business transaction.
D.I. 576, Exhibit 18 at 202:22–203:3.

testimony is consistent with his 131 Declaration because HCML can be used both to

implement Reed's two methods and to implement Cordance's commercial Intermind

Communicator product.  Cordance argues:

> Amazon also confuses HCML, a programming language, with Intermind
> Communicator, a product using that language, to suggest inconsistencies
> in Reed's statements.  As Reed explained 'HCML is exactly how you
> would carry out what is described in [the conception] document.'  That this
> code supported his Methods is corroborated by PX-849, a January 1997
> document that describes how HCML could 'Carry out any electronic
> transaction instantly' with 'as little as one mouse click.'"[99]

At the bench trial, Reed provided the following testimony:

> Q.  Now, there was some discussion this morning about the diligence with
> which you were working on this project.  Do you recall that?
> A.  Yes, I do.
> Q.  And could you describe what activity you are talking about in
> paragraph 21 [of the 131 Declaration]?  That from late November to early
> January 1996, what sort of activity were you involved with at the company
> related to this invention?
> A.  I was working close to 20 hours a day on two things:  filing the patent
> application and the preparation of our first product, Intermind
> Communicator.
> Q.  Now, did there come a time you worked on something that you
> referred to internally at Cordance or Intermind at the time as it was known
> as HCML?
> A.  Yes, HCML stands for hyper communications markup language.  We
> called it that because the standard on the Internet for the Web, for what
> are called Web pages, is HTML.  That stands for hypertext markup
> language.  And we felt it was a way to communicate one of the core
> differences in what we were developing here based on the underlying
> invention, which was this was a way to control and automate
> communications, not just text and display.
> Q.  Now, were you working on HCML in the 1996-1997 time period?
> A.  Absolutely.  HCML is the name we gave to the language that Intermind
> Communicator processed.  It's the fundamental core backbone of the
> product.

---

[99] D.I. 586-1 at 5 (alterations in original) (internal citations omitted).

. . .
Q.  What exactly was this code designed to do?
A.  HCML was the markup language intended to be the language you could communicate and control what original conception document with access objects.  And one way, when we subsequently filed our patent applications, we changed the name to communication objects.  We felt that was more descriptive.
. . .
Q.  Does HCML have anything to do with one-click purchasing?
A.  HCML is exactly how you would carry out what is described in that document.  In looking at it now, I think you could even see some of the same language from the original conception document:  Exchanging names, addresses, credit card numbers, shoe sizes, paper checks, et cetera, is a thing of the past with HCML.
Q.  So between 1993, when you wrote that conception document, and 1997, when you wrote this document, you were working on the technology that helped implement one-click?
A.  Not only is that true, but I'm still working on that.[100]

Reed's testimony advances a plausible view of the evidence that does not involve intentional deceit.  Therefore, the court is not prepared to find that Amazon has proven intent to deceive by clear and convincing evidence based on the representations Reed made concerning his diligence in reducing his invention to practice.[101]

For the reasons explained above, the court finds that Amazon has failed to prove by clear and convincing evidence that Reed intended to deceive the PTO.  Accordingly, the court will not hold the '710 patent unenforceable due to inequitable conduct.[102]

## III.  PATENT MISUSE

---

[100] D.I. 588 at 173:13–175:24.
[101] *See Purdue Pharma Prods. L.P. v. Par Pharm., Inc.*, 642 F. Supp. 2d 329, 379 (D. Del. 2009) (noting the clear and convincing standard of proof and refusing to find inequitable conduct because "[t]here [was] a plausible view of the evidence that [did] not involve intentional deceit").
[102] Finally, before concluding its inequitable conduct analysis, the court notes that Cordance correctly points out that  "nowhere does Amazon even attempt to address the balancing test that would be required, prior to finding unenforceability, even if the Court were to find some deliberate and material misstatement had been made . . . ."  D.I. 586-1 at 5.  *See supra* Part II.A. (explaining the legal standards for a court's inequitable conduct analysis).

## A.  LEGAL STANDARD

Patent misuse is an affirmative defense which:

> arises from the equitable doctrine of unclean hands, and relates generally to the use of patent rights to obtain or to coerce an unfair commercial advantage.  Patent misuse relates primarily to a patentee's actions that affect competition in unpatented goods or that otherwise extend the economic effect beyond the scope of the patent grant.[103]

To establish the defense "the alleged infringer [must] show that the patentee has impermissibly broadened the physical or temporal scope of the patent grant with anticompetitive effect."[104]  Specific practices have been identified as constituting *per se* patent misuse, for example, "'tying' arrangements in which a patentee conditions a license under the patent on the purchase of a separable, staple good, . . . and arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties . . . ."[105]  The existence of post-expiration royalty obligations, however, does not dictate that a court find patent misuse *per se* or hold a patent unenforceable in its entirety.

## B.  FACTUAL BACKGROUND

In 2000, Cordance's predecessor company, OneName, helped form the XNS Public Trust Organization ("XNSORG") for the purpose of creating a global registry service for Cordance's (then OneName's) XRI (Extensible Resource Identifier)

---

[103] *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1372 (Fed. Cir. 1998) (citing *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 703-04 (Fed. Cir.1992)).
[104] *Virginia Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997) (internal quotation marks omitted).
[105] *Id.* at 868 (internal citations omitted).

technology, which is known generically as Cordance's "i-names" technology.[106]  In 2002, Cordance granted XNSORG a license to its database linking patents "in order to create an open Internet standard necessary for widespread global adoption" of Cordance's i-names.[107]  In exchange for this license, Cordance received a 15-year contract to become the primary operator of global i-name registry services.[108]

XNSORG subsequently changed its name to XDI.ORG.  On September 13, 2004, Cordance and XDI.ORG entered into the "XDI.ORG Intellectual Property Rights Agreement" (the "IP Agreement") in which Cordance granted to XDI.ORG "a fully paid-up, royalty-free, worldwide exclusive license to and under the Patent Rights within the Field of Use to make, have made, use, import, sell, offer to sell, and otherwise distribute or dispose of products and services . . . ."[109]  In return, XDI.ORG was obligated to, among other things, perform "its material obligations under the Global Services Provider Agreement between XDI.ORG and CORDANCE . . . ."[110]  Under that Global Services Provider Agreement (the "GSP Agreement"), which, like the IP Agreement, was effective September 13, 2004, Cordance could elect to serve as the primary global service provider for the Global Services[111] subject to the GSP Agreement for three years

---

[106] D.I. 576, Exhibit 19 at CORD140844 (Cordance's 2005 I-Name Registry Business Plan).  For convenience, Intermind and OneName—Cordance's past corporate iterations—are hereinafter referred to as "Cordance."

[107] *Id.*

[108] *Id.*

[109] D.I. 576, Exhibit 20 at CORD 141209 (XDI.ORG Intellectual Property Rights Agreement).  The "Patent Rights" include rights to the '710 patent.

[110] *Id.* at CORD 141210.

[111] "Global Services" is defined in the GSP Agreement as "[t]he set of XDI interactions that shall be offered by XDI.ORG to all members of the XDI Community to facilitate the interoperability of XDI infrastructure, including but not limited to the Designated Global Services."  D.I. 576, Exhibit 21 at CORD 141233.  The GSP Agreement's designated Global Services included the following:  "I-Name Services, I-

from the date any such service was first offered to the public.[112]  Cordance also had the
option of renewing its three-year term as primary global service provider for four
successive three-year terms.  Cordance, as the primary global service provider for i-
names, aimed to act as a global registrar for i-names, collecting registration fees for all
i-names purchased by consumers.

## C.  DISCUSSION

Because, under the GSP Agreement, Cordance has the option of serving as the
primary global service provider for i-names for fifteen years from the commencement of
any XDI.ORG proffered i-name services, and because such a fifteen year term might
extend beyond August 15, 2016—when the '710 patent expires—Amazon contends that
Cordance has committed patent misuse *per se*.  Amazon argues that Cordance's
contractual agreements with XDI.ORG have impermissibly secured for Cordance
"passive royalties for the use of [Cordance's] technology for a term not less than three
years beyond the life of the ['710] patent[],"[113] and that "[a]n *attempt* to extend the life of
a patent beyond the patent term is *per se* misuse,"[114] which renders a patent
unenforceable.  To support its argument, Amazon cites *Brulotte v. Thys Co.*[115] and
*Rocform Corp. v. Acitelli-Standard Concrete Wall, Inc.*[116]

---

Number Services, Directory Services, Reputation Services, and Public Resolver Services . . . ."  *Id.* at
141232.  I-Name services included "[t]he Global Service registering, reserving, reassigning, and resolving
reassignable XRIs via Registries represented by the Global Context symbols as defined by the XRI
specifications."  *Id.* at 141233.
    [112] *Id.* at CORD141227.
    [113] D.I. 574 at 24.
    [114] *Id.* (emphasis in original).
    [115] 379 U.S. 29, 32 (U.S. 1964).
    [116] 367 F.2d 678 (6th Cir. 1966).

In *Brulotte*, the respondent owned various patents relating to hop-picking, sold a machine to each petitioner for a flat sum, and issued each petitioner a license for use of respondent's hop-picking machine.[117]   The licenses issued required royalty payments to continue beyond the date respondent's patents expired.[118]   The petitioners refused to make royalty payments accruing before and after the expiration of the patents, and respondent sued.[119]   At trial, one defense asserted by the petitioners was patent misuse.[120]   The trial court rendered judgment for the respondent and the Supreme Court of Washington affirmed.[121]   The U.S. Supreme Court, noting the importance of guarding against the extension of a patent's monopoly influences into the free market visualized for the post-expiration period, concluded "that a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*."[122]   The *Brulotte* Court, however, reversed the trial court's judgment only "insofar as it allow[ed] royalties to be collected which accrued after the last of the patents incorporated into the machines had expired."[123]   *Brulotte* therefore does not dictate that a patent owner's inclusion of contract provisions for pre- and post-expiration royalties automatically renders a patent unenforceable in its entirety.   To this court, *Brulotte* suggests that, under some circumstances, post-expiration royalty provisions should be held unenforceable, and what courts must be wary of—what the doctrine of patent misuse

---

[117] 379 U.S. at 29.
[118] *Id.*
[119] *Id.* at 30.
[120] *Id.*
[121] *Id.*
[122] *Id.* at 32–33.
[123] *Id.* at 30.

aims to guard against—are coercive attempts to use a patent monopoly as leverage to extend the benefits of patent protection beyond the life of a patent.[124]

In *Rocform*, the Sixth Circuit Court of Appeals affirmed a district court decision finding patent misuse.[125]  The Sixth Circuit faced "a licensing agreement where one important patent (about to expire) [was] grouped with others of a longer duration for 'leverage.'"[126]  In the case at hand, the court faces no such packaging or tying of patents for "leverage."  The court therefore declines Amazon's invitation to read the *Rocform Corp.* case as instructive authority.

In this case, there is no evidence that Cordance improperly leveraged its '710 patent protection into post-expiration benefits.  Cordance's IP Agreement with XDI.ORG was explicitly royalty-free, and the court is not persuaded by Amazon's insistence that Cordance's contractual agreements effectively imposed improper post-expiration period passive royalties.  Cordance provides a service for which it collects registration fees;

---

[124] *See id.* at 33, where the Court provides:
> A patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly.  But to use that leverage to project those royalty payments beyond the life of the patent is analogous to an effort to enlarge the monopoly of the patents by tieing the sale or use of the patented article to the purchase or use of unpatented ones.

[125] *Rocform Corp.*, 367 F.2d at 682.  "We believe that the District Judge was correct in viewing this licensing agreement as an illegal attempt to extend the patent in suit."  *Id.* at 680.

[126] *Id.* at 681.
> We regard this language [an excerpt from the district court opinion not reproduced here] and the District Judge's other findings as holding that plaintiff-appellant employed the patent in suit so as to coerce (or attempt to coerce) this defendant to purchase the Rocform System and thus to purchase other patents and unpatented materials and services.

*Id.* at 680.

Cordance acts as a global service provider for i-names.[127]  If Cordance did not have the

'710 patent, it could still sell i-name registrar services.[128]  Further, even assuming that

Cordance's contractual agreements did constitute patent misuse *per se* under *Brulotte*,

it does not follow that the court need render the '710 patent unenforceable in its entirety.

The court might invalidate only the post-expiration passive royalties.  And here, any final

extension that would put the GSP Agreement beyond the term of the '710 patent has

not yet been and might never be exercised.  For these reasons, the court finds that

Cordance did not misuse the '710 patent when it entered into the IP and GSP

---

[127] At the bench trial, Reed explained:
Q.  All right.  Now, Mr. Reed, if Cordance were to stop providing the services that it provides to XDI under the registry agreement, would it continue?  What would happen?
A.  We would be removed as a registry operator.  We are required -- we only kind of earn that revenue stream for the service we're providing.  If at any point we stop providing that service, we're out.
Q.  So after the patent license terminates, you still have to provide services in exchange for the revenue that they're going to be providing?
A.  Yes.  The registry operation contract is entirely a business deal to provide these services in order to earn registration revenue.  It has nothing to do with patent or royalties at all.  It's to provide a service, which is a registry service . . . .
D.I. 588 at 189:1–16.
[128] In fact, Reed explained that under the terms of the IP and GSP Agreements, any third party wishing to start up its own registry was free to do so, under the terms of the open standard that XDI.ORG was obligated to develop.
Q.  Now, could you describe generally what the patent license [IP Agreement] terms were?
A.  The patent license terms were what was necessary for pretty much any open standard which is an exclusive and royalty-free license so that everyone can practice that technology.  We did require in the patent license terms that XDI.ORG is not just, you know, it's not typical, it's not like we sold the patent to anyone.  They were actually required to serve as a trustee for the open standard and to give a license for everyone practicing that standard.  It's an automatic license to anyone practicing that standard.
Q.  So if another entity wanted to come along and serve as a registry, would they be allowed to do it?
A.  Yes.  Definitely, yes.  In addition, our registry agreement [the GSP Agreement] itself allowed for other registry operators.  We were called the primary because we were the first.  Other registry operators could come in, come to XDI.ORG and say, I, too, want to be a registry operator.
D.I. 588 at 187:25–188:17.

Agreements.

## IV.  CONCLUSION

Before concluding, the court notes that, in rendering its decision, the court considered all of the parties' arguments, including those contained in Cordance's motion for leave to file a sur-reply and Amazon's opposition to that motion.  The court therefore grants Cordance's motion for leave to file a sur-reply (D.I. 586).

Finally, for the reasons contained herein, the court finds that Amazon has failed to prove inequitable conduct or patent misuse.  Accordingly, the court refuses to hold the '710 patent unenforceable on either of those grounds.  An appropriate order consistent with this memorandum will follow.