**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| CORDANCE CORPORATION, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 06-491-MPT |
| | : | |
| AMAZON.COM, INC. and, | : | |
| AMAZON WEB SERVICES, LLC, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

Steven J. Balick, Esquire, John G. Day, Esquire, and Tiffany Geyer Lydon, Esquire, Ashby & Geddes, 500 Delaware Avenue, Wilmington, DE 19899.
    <u>Of Counsel</u>: Michael A. Albert, Esquire, Robert M. Abrahamsen, Esquire, and
    Jeffrey C. O'Neill, Esquire, Wolf, Greenfield & Sacks, P.C., Boston, MA.
Counsel for Plaintiff Cordance Corporation.

Richard L. Horwitz, Esquire, David E. Moore, Esquire, Potter Anderson & Corroon LLP, Hercules Plaza, 1313 N. Market Street, Wilmington, DE 19899.
    <u>Of Counsel</u>: Lynn H. Pasahow, Esquire, J. David Hadden, Esquire, Darren E.
    Donnelly, Esquire, Saina S. Shamilov, Esquire, and Ryan J. Marton, Esquire,
    Fenwick & West LLP, Mountain View, CA.
Counsel for Defendant Amazon.com, Inc.

Wilmington Delaware
July 23, 2010

Thynge, U.S. Magistrate Judge

## I. PROCEDURAL BACKGROUND

This is a patent infringement case.  Cordance Corporation ("Cordance") and

Amazon.com, Inc. and Amazon Web Services, LLC (collectively, "Amazon") develop

software and own patents pertaining to on-line internet-based transaction

infrastructures.[1]  On August 8, 2006, Cordance filed suit alleging that Amazon's

trademarked "1-Click®" purchasing interface, featured throughout its website, infringed

U.S. Patent No. 6,757,710 ("the '710 patent").  On September 7, 2006, Cordance filed

its first amended complaint.  On October 23, 2006 Amazon filed its answer asserting

numerous counterclaims and defenses, including a counterclaim of patent infringement

of its U.S. Patent No. 6,269,369 ("the '369 patent").[2]  On November 11, 2007, Cordance

filed its second amended complaint, which alleged that Amazon's information storage

processes infringed U.S. Patent No. 6,044,205 ("the '205 patent") and that Amazon's

systems for collecting, retrieving, and presenting product reviews and buyer and seller

feedback infringe U.S. Patent Nos. 5,862,325 ("the '325 patent") and 6,088,717 ("the

'717 patent").[3]  Subsequently, Cordance and Amazon stipulated to a dismissal of claims

and counterclaims relating to infringement of Cordance's '205 patent and Amazon's

'369 patent.[4]  As a result, by the time this case was tried, the patents in suit were

Cordance's '325, '717, and '710 patents.

---

[1] Amazon.com, Inc. is an internet retailer.  Cordance is a software company engaged in the development and commercialization of digital addressing and automated data interchange technology.

[2] On February 2, 2007, the parties consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 72, to conduct all proceedings and enter the order of judgment and the case referred to the magistrate judge on February 6, 2007.

[3] All of the Cordance patents in this case are in the same patent family–three of them have the same specification (the '710, '325, and '717 patents), and one has a shorter specification (the '205 patent).

[4] Additionally, on August 4, 2009, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii), the parties stipulated to dismissal with prejudice of Amazon Web Services, LLC as a defendant in this action.

A jury trial commenced on August 3, 2009.  On August 18, 2009, the jury reached a verdict, finding (1) Amazon does not infringe any of the asserted claims of the '325 and '717 patents or claims 2 and 9 of the '710 patent; (2) the asserted claims of the '325 and '717 patents are not invalid; (3) Amazon infringes claims 1, 3, 5, 7, and 8 of the '710 patent; and (4) claims 1, 2, 3, 5, 7, 8, and 9 of the '710 patent are invalid.  The court entered judgment on September 9, 2009.  On September 23, 2009, Cordance filed a renewed motion for judgment as a matter of law or, in the alternative, for a new trial.  On February 22, 2010, the court granted Cordance judgment as a matter of law that, *inter alia*, claims 7 and 8 of the '710 patent are not invalid.[5]  On March 18, 2010, Cordance filed a motion for permanent injunction or, in the alternative, imposition of an ongoing royalty.[6]  On April 23, 2010, Amazon filed its answer to Cordance's motion for equitable relief along with a motion to strike the declaration of Dr. Shamos submitted in support of Cordance's motion.[7]  This is the court's decision on Cordance's motion for equitable relief and Amazon's motion to strike the declaration of Dr. Shamos.

## II.  FACTUAL BACKGROUND

Cordance, originally founded as Intermind Corp. in 1994 by Drummond Reed ("Reed"), the '710 patent inventor, focuses on developing technologies that automate internet communications.  In its first three years of existence, Cordance received $13 million in funding for the development of its first product, Intermind Communicator, and employed approximately 75 employees.  From 1998 to present, Cordance focused on

---

[5] D.I. 515.
[6] D.I. 524.
[7] D.I. 536 (answering brief); D.I. 543 (motion to strike).

the development of a technology which Cordance refers to as a "digital identity"–"a persistent digital identifier that allows an individual to access multiple websites using a single name and/or password."[8]  Cordance asserts that a digital identity enables internet users to conduct various online transactions, like banking, shopping, and communicating, and that such transactions can be reduced to a single mouse-click.[9] According to Cordance, Reed conceived of the idea of completing a purchase with a single mouse-click in 1992, "[i]mplementing one-click shopping was a part of many of Cordance's business plans from 1998 to the present," and Cordance actively sought private funding for such implementation.[10]

Cordance's first digital identity product was released in 2000.  With this product, OneName XNS, online vendors could implement purchasing systems on their websites which allowed consumers to complete transactions using digital identities, thereby avoiding the "cumbersome entry of data, such as billing information and shipping addresses."[11]  Cordance's current digital identity product, called "i-names" was launched in 2006.  Cordance describes its i-names product's utility as follows:

> With an i-name, users can maintain a lifetime digital identity that includes one or more easily-remembered names as a digital address.  i-names come with a standard suite of services, including contact pages (an easy way to be contacted over the internet without exposing the user to spam), forwarding service (an easy way to maintain lifetime links to information on the Web), and OpenID single-sign-on service (an easy way to use your i-name to login

---

[8] D.I. 525 at 3.

[9] *Id.*

[10] *Id.*  The '710 patent issued in 2004, but it is entitled to a priority and effective filing date of September 27, 1996.  It is a continuation of U.S. Patent No. 6,345,288 filed on May 15, 2000, which is a continuation of the '717 patent filed on August 31, 1998, which is a continuation of the '325 patent filed on September 27, 1996, which is a continuation in part of the '205 patent filed on February 29, 1996.  The '710 patent expires on August 15, 2016.

[11] *Id.* at 4.

to any OpenID-enabled website).   i-names are based on the OASIS XRI (Extensible Resource Identifer) open standard for digital identifiers.  Many more services, including one-click payments services, are planned for i-names using the OASIS XDI (XRI Data Interchange) open standard.[12]

Cordance estimates that it currently has approximately 8,000 i-names users. Cordance maintains that, but for Amazon's infringement, it would have widely implemented one-click purchasing across the web via its digital identity products. Cordance contends that it was precluded from doing so because Amazon "aggressively promoted itself as the inventor of one-click shopping," "enforced its own 1-click patent against other companies," and "positioned itself as a clearinghouse for one-click purchasing technology."[13]

## II.  LEGAL STANDARD

In *eBay Inc. v. MercExchange, L.L.C.*, the Supreme Court overruled the Federal Circuit's longstanding "general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances."[14]  The Supreme Court held that "the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards."[15]  Therefore, "[p]ermanent injunctions must be based on

---

[12] D.I. 526 at ¶ 8 (Declaration of Drummond Reed in support of Cordance's motion for a permanent injunction).

[13] D.I. 525 at 5–6.  Amazon launched its one-click shopping system in September 1997. Amazon's one-click patent, U.S. Patent No. 5,960,411 ("the '411 patent"), issued on September 28, 1999. That patent is currently under reexamination before the United States Patent and Trademark Office.

[14] *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391–92 (2006) (vacating and remanding *MercExchange, L.L.C. v. eBay Inc.*, 401 F.3d 1323 (Fed. Cir. 2005)).  The Patent Act provides that courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."  35 U.S.C. § 283.

[15] *eBay Inc.*, 547 U.S. at 394.

a case-by-case assessment of the traditional equitable factors governing injunctions."[16] Accordingly, to be awarded a permanent injunction, "[a] plaintiff must demonstrate:  (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[17]   Cordance asserts that it can demonstrate these four factors and is thus entitled to a permanent injunction.  The court will consider each *eBay* factor *seriatim*.

## III.  DISCUSSION

### A.  PERMANENT INJUNCTIVE RELIEF

#### 1.  Irreparable Harm

"Courts awarding permanent injunctions typically do so under circumstances where plaintiff practices its invention and is a direct market competitor."[18]  Permanent injunctions are often awarded where the effects of the defendant's infringement on the plaintiff are direct and readily apparent from available market data,[19] where a plaintiff's

---

[16] *IGT v. Bally Gaming Int'l Inc.*, No. 06-282-SLR, 2009 U.S. Dist. LEXIS 120065, at *4 (D. Del. Dec. 22, 2009) (citing *eBay Inc.*, 547 U.S. at 391–92).

[17] *eBay Inc.*, 547 U.S. at 391.

[18] *Callaway Golf Co. v. Acushnet Co.*, 585 F. Supp. 2d 600, 619, 619 n.21 (D. Del. 2008), *rev'd on other grounds*, 576 F.3d 1331 (Fed. Cir. 2009).

[19] *Id.* (citing *Muniauction, Inc. v. Thomson Corp.*, 502 F. Supp. 2d 477, 482 (W.D. Pa. 2007) ("Plaintiff and defendants are direct competitors in a two-supplier market.  If plaintiff cannot prevent its only competitor's continued infringement of its patent, the patent is of little value.") (granting permanent injunction); *Johns Hopkins Univ. v. Datascope Corp.*, 513 F. Supp. 2d 578, 586 (D. Md. 2007) (granting permanent injunction where infringing product was plaintiffs' "only competition" and "thus, its sale reduce[d] the [p]laintiffs' market share"); *Transocean Offshore Deepwater Drilling, Inc. v. GlobalSantaFe Corp.*, No. Civ. A. 03-2910, 2006 U.S. Dist. LEXIS 93408, at *13 (S.D. Tex. Dec. 27, 2006) (granting permanent injunction requiring structural modifications to infringing deepwater drilling rigs where "the customer base for deep water drill rigs is small, and [defendant] has not only used [its] rigs equipped with the infringing structure to compete for the same customers and contracts as [plaintiff], but also to win contracts over competing bids from [plaintiff]")).

patented technology is at the core of its business, and/or where the market for the patented technology is still developing.[20]

Cordance argues that it will be irreparably harmed in at least three ways if Amazon is permitted to engage in ongoing infringement of the '710 patent.[21]  Cordance asserts that Amazon's continued infringement (1) has saturated and will continue to saturate, when combined with Amazon's "Amazon Payments" service,[22] the emerging market of digital addressing, which will prevent Cordance from enjoying the competitive advantage of being a first mover in that field; (2) impermissibly interferes with Cordance's right to exclude others from practicing its invention and to enjoy sole and exclusive use of that invention both for itself and for its licensees; and (3) deprives Cordance of the goodwill and reputation for innovation to which it is entitled.[23] Cordance maintains that it and Amazon are the only two competitors in a market for digital identity systems that enable one-click shopping.  Cordance insists that Amazon Payments, which was launched in 2008, is a digital identity system that directly competes with its i-names platform.

---

[20] *See Martek Biosciences Corp. v. Nutrinova Inc.*, 520 F. Supp. 2d 537, 558–59 (D. Del. 2007) (granting permanent injunction where plaintiff was a direct competitor "likely to lose market share that it may not be able to recapture," as plaintiff's patented technology was its primary revenue source, and defendant was plaintiff's only competitor and was "targeting [plaintiff's] customers in that industry"); *Tivo, Inc. v. EchoStar*, 446 F. Supp. 2d 664 (E.D. Tex. 2006) (granting permanent injunction where: (1) parties were direct competitors; (2) "plaintiff [was] losing market share at a critical time in the market's development"; (3) the parties agreed that customers in the relevant market tend to remain customers of the company they first purchased from; and (4) as a "relatively new company with only one primary product," plaintiff's "primary focus is on growing a customer base specifically around the product" competing with the infringing product).

[21] D.I. 525 at 10.

[22] According to Cordance, Amazon's "Amazon Payments" service competes directly with Cordance's digital identity i-names product.  Cordance asserts that "[b]ecause i-names can be used to facilitate one-click consumer purchasing, the i-names platform represents a directly competing system to Amazon's one-click system" and Amazon's sheer size and market dominance have precluded Cordance's i-names platform from gaining meaningful market momentum.  D.I. 525 at 8–9.

[23] D.I. 525 at 10–11.

Amazon asserts that its purported infringement did not cause what it characterizes as Cordance's commercial failings and Cordance therefore cannot show irreparable injury. Amazon maintains that Cordance's failings are attributable only to Cordance's own poor business decisions. Amazon insists that it and Cordance are not, and have never been, competitors; that its "Amazon Payments" service is irrelevant to the present motion;[24] and that Cordance has no exclusivity to protect due to its pre-lawsuit licensing activities.[25]

The court is not convinced that Cordance will suffer irreparable harm if its motion for a permanent injunction is denied. Cordance has neither provided the court with a clear, summary-level overview of the relevant market for the '710 patent technology, specifically one-click,[26] nor persuaded the court that Cordance and Amazon are direct competitors in a market utilizing such technology. Cordance's arguments ignore that it was Amazon's use of one-click purchasing that was found to infringe the '710 patent, not Amazon's commercialization of a digital identity system or activity in or entry into the market for such a system. Further, there is evidence supporting Amazon's assertion

---

[24] Amazon provides the following description of its Amazon Payments service, which it calls Checkout By Amazon ("CBA"):

> When a customer on a website that has utilized CBA (such as DKNY.com) selects an item for purchase and chooses to use CBA, the customer selects the "Checkout With Amazon" button. The customer is then presented with a small window that allows the customer to enter a "Payphrase" or select "Continue Checkout" button. If the customer has 1-Click enabled in its Amazon setttings, upon selection of the Continue Checkout button, the customeris then presented with a "Buy With 1-Click" button. If the customer selects Buy With 1-Click, the order is placed.

D.I. 536 at 15 (citations omitted). Amazon argues that CBA is irrelevant to the instant motion because it was not accused of infringing, was not found to infringe, and does not in fact infringe any claim of the '710 patent. *Id.* Further, Amazon indicates that CBA was launched in mid 2008 and that Cordance fails to explain why it was precluded from offering an i-name one-click service long before CBA's launch. *Id.* at 26.

[25] *Id.*

[26] *See IGT*, 2009 U.S. Dist. LEXIS 120065, at *4 ("The court notes at this juncture that plaintiff has not provided a clear, summary-level overview of the relevant market for the . . . technology at issue.").

that it and Cordance have never been direct competitors in a market for the '710 patent

technology Amazon was found to infringe—one-click online purchasing.  Reed, who as

of January 2007 was Cordance's Chief Technical Officer, unequivocally declared before

this court that "Cordance has not had any involvement with or licensed any product

covered by the claims of the '710 patent."[27]  Cordance's own damages experts also

recognized, when opining as to the reasonable royalty rate that would have resulted

from a hypothetical negotiation between Amazon and Cordance in 2004, that Amazon

and Cordance did not compete for sales related to the '710 patent technology.[28]

Additionally, Amazon argues that "there is a complex and growing digital identity

market, with many sub markets, players and solutions," a market not yet dominated by

one player.[29]  Cordance offers no argument to either rebut Amazon's assertion that

there are other players in the digital identity market or explain why other players were

not the cause of Cordance's failure to gain market share.  Cordance implicitly asks this

court to narrow the "digital identity market" to the two players utilizing the one-click

technology covered by the '710 patent, Cordance and Amazon.  Beyond Cordance and

---

[27] D.I. 537 at ¶ 7 (third declaration of Drummond Reed in support of Cordance's motion for partial summary judgment).
[28] *See* D.I. 540, Exhibit 1 at 37 (Rule 26(a) report regarding damages prepared by Philip Green). In opining that a hypothetical negotiation between Amazon and Cordance for a license to the '710 patent would have resulted in a reasonable royalty rate of 1.5% of Amazon's United States server-based 1-Click sales, Mr. Green provided the following characterization of the commercial relationship between Cordance and Amazon:

> Amazon operates ecommerce websites and related distribution facilities.  As part of its operations it internally develops technologies that are used in it [sic] business.  At the time of the hypothetical negotiation for the '710 patent, Cordance was developing digital addressing applications.  *Accordingly Amazon and Cordance do not directly compete for sales.*

*Id.* (emphasis added).  *See also* D.I. 540, Exhibit 2 at 39 (expert report on damages by Terry L. Musika). Mr. Musika provided, "*The Plaintiff and the Defendants are not competitors.*  It is my understanding that Cordance currently does not offer a competing 1-Click or feedback product, feature or service." *Id.* (emphasis added).
[29] D.I. 536 at 21.

Amazon, however, a market exists in which competitors are addressing identity and access management (IAM) through the development of processes and technologies aimed at managing users' identities and access across multiple systems.[30]  This market exists independent of its players' utilization of one-click technology.  The court therefore refuses to adopt Cordance's narrow conception of the digital identity market.  Finally, Cordance provides no market data or documentary evidence regarding the effects of Amazon's infringement on the digital identity market, regardless of that market's definition, or, more importantly, Cordance.  For these reasons, Cordance has failed to establish that a direct link exists between Amazon's infringing use of one-click technology in online transactions and either Cordance's inability to establish itself in the digital identity market, a loss of goodwill to Cordance, or a change in the digital identity

---

[30] *See* D.I. 539, Exhibit B at 3 (an August 15, 2008 Gartner research report ranking the user provisioning capabilities of various identity and access management vendors based on product capability, market performance, customer experience, and overall vision).  Amazon relies on a number of market studies in arguing that it and Cordance are not players in the digital identity market and that there are a number of other players.  In the one instance in Cordance's briefing where such market studies are mentioned, Cordance argues that the digital identity market is not discussed and that the market studies instead discuss "something called 'user provisioning.'" D.I. 552 at 2.  This argument is meritless.  The fourth page of the research report cited above provides that "User provisioning is part of an overall IAM [identity and access management] technology offering."  D.I. 539, Exhibit B at 4.  The report then explains that there are four major categories of IAM: (1) Identity intelligence, which combines security information and event management, segregation of duties control and other monitoring tools to perform comprehensive activity, event and incident monitoring and reporting for auditing purposes; (2) Identity administration, where user provisioning exists along with role life cycle management and other administrative tools to provide the basic administration capabilities for handling identities and access; (3) Identity verification, which focuses on identity proofing—verifying identities, as well as authentication methods and infrastructure, various single sign-on technologies, identity federation and personal frameworks; and (4) Access management, which focuses on authorization or entitlements management, and delivers Web access management, operating system access management and content access management, as well as network access control capabilities.  *Id.*  Cordance's digital identity product—its i-names platform—can accurately be characterized as an identity and access management technology. This is clear from Cordance's 2005 business plan, which lists four key benefits of Cordance's i-names platform:  (1) "One address for everything" (i.e. Identity intelligence); (2) "One way to control privacy" (i.e. Identity verification); (3) "One way to sign-on" (i.e. Access management); and (4) "One address for life" (i.e. Identity administration).  D.I. 526, Exhibit F at CORD140846.

market's landscape.[31]

Cordance's pre-lawsuit licensing activity also leads the court to conclude that Amazon's infringement has not caused Cordance irreparable harm. A patentee's willingness to forego its patent rights for compensation is not dispositive, but it is one factor the court considers in its irreparable harm analysis.[32] In July 2002, Cordance granted XNSORG, a non-profit corporation, an exclusive license to Cordance's database-linking patents in order to create an open internet standard necessary for widespread adoption. In exchange, Cordance received a 15-year contract to become the primary operator of a global i-name registry service. Under the license, XNSORG was free to grant third parties fully paid-up, royalty-free, worldwide, non-exclusive sublicenses. Amazon asserts that Cordance effectively "gambled away exclusive rights to [its] patents in return for a 15 year contract as the exclusive registrar."[33] Cordance's decision to grant a free license to anyone willing to use its technology supports this court's refusal to grant injunctive relief in defense of Cordance's exclusive right to use such technology.

---

[31] *Cf. IGT*, 2009 U.S. Dist. LEXIS 120065, at *15 ("There is no clear indication of a direct link between defendants' infringing sales . . . and sales of additional products, loss of goodwill to plaintiff or, more broadly, a change in the market landscape.").

[32] *Telcordia Techs., Inc. v. Cisco Sys.*, 592 F. Supp. 2d 727, 748 (D. Del. 2009).
Further supporting the court's conclusion that Telcordia will not suffer (and has not suffered) irreparable harm is the fact that it licensed the patents-in-suit to two other defendants, Lucent Technologies, Inc. and Alcatel USA Inc. Thus, Cisco's infringement of the patents-in-suit has not affected Telcordia's ability to license the patents-in-suit. Telcordia's willingness to forego its patent rights for compensation, while not dispositive, is one factor for the court to consider in its irreparable harm analysis. Here, however, where Telcordia has not pointed to any evidence of irreparable harm, the only evidence that the court has before it suggests that Telcordia will not suffer irreparable harm.
*Id.* (citations omitted).

[33] D.I. 536 at 8. In a 2003 business plan, Cordance expressed its belief that its licensing activity would yield between $76,000,000 and $195,000,000 by 2008. D.I. 541, Exhibit 17 at CORD223286.

For the above reasons, the court is not convinced that Cordance is entitled to a permanent injunction based on its purported suffering of irreparable harm.

## 2.  Adequacy of Money Damages

Cordance maintains that the harms it has suffered and will suffer as a result of Amazon's infringement are unquantifiable and therefore no adequate remedy at law exists.  Cordance asserts (1) that its loss of the opportunity to control its one-click technology and related licensing arrangements is unquantifiable and (2) that its effective exclusion from the digital addressing marketplace is also unquantifiable.[34]  The court, however, agrees with Amazon's argument that neither of Cordance's above assertions withstands scrutiny.  First, Cordance's pre-lawsuit licensing activity suggests that money damages will be adequate compensation for Amazon's infringement of Cordance's rights.[35]  Second, as explained above, Cordance's argument that it was excluded from some undefined digital identity/addressing market by Amazon's infringing use of one-click purchasing is unpersuasive.  For these reasons, the court is confident that

---

[34] D.I. 525 at 19–23.

[35] *IMX, Inc. v. Lendingtree, LLC*, 469 F. Supp. 2d 203, 225 n.24 (D. Del. 2007) ("Plaintiff's licensing activities also suggest that plaintiff's injury would be compensable in damages.").  *See also Advanced Cardiovascular Sys. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d 554, 560 (D. Del. 2008) (discussing the adequacy of money damages when faced with a licensor-patentee).

> The court also notes that [the patentee]'s willingness to forego its patent rights for compensation supports the court's conclusion that [the patentee] will not suffer irreparable harm absent an injunction. [The patentee] has licensed [its] patents to both Cordis (in April 2000) and BSC (in May 2000). [The patentee] asserts that it has not licensed its patents simply for money -- to do so would violate its "general policy" -- but in exchange for cross-licenses and to settle litigations.  The fact that [the patentee] was selective regarding its licensing compensation -- exchanging its technology only for other licenses to competing technology -- does not rectify the fact that [the patentee] was willing, ultimately, to forego its exclusive rights for some manner of compensation.  Money damages are rarely inadequate in these circumstances; rather, permanent injunctions are typically granted in two-competitor situations where the patentee has demonstrated an unwillingness to part with the exclusive right.

*Id.* (citations omitted).

Amazon's infringement can be adequately compensated for with a money award.

### 3.  The Balance of Hardships

In considering the "balance of hardships," the court assesses the relative effect of granting or denying an injunction on the parties and weighs several factors, including the parties' sizes, products, and revenue sources.[36]  Cordance's only current product and the focal point of its business is its i-names digital identity product.  Cordance argues that the success of i-names is, in great part, dependent upon its ability to market one-click shopping.  According to Cordance, should the court deny its request for a permanent injunction, Cordance's i-names business will "continue to suffer the same fate moving forward as it has thus far—the inability to capture significant market share due to the infringing dominance by Amazon.com in the one-click shopping sphere of digital identity technology."[37]  Cordance also asserts that Amazon would suffer little hardship from the imposition of permanent injunction because Amazon is an "e-commmerce mega-store" and only a fraction of its business utilizes one-click shopping.[38]

Amazon contends that Cordance will suffer no hardship should the court deny its motion for a permanent injunction because Cordance has no product using the '710 patent technology.[39]  Amazon also argues that it, and more specifically its customers, would suffer hardship given that one-click purchasing has been on Amazon.com for nearly thirteen years and Amazon's customers have become used to it.  This latter

---

[36] *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862–63 (Fed. Cir. Mar. 10, 2010).
[37] D.I. 525 at 26.
[38] *Id.*
[39] D.I. 538 at 31.

argument is better treated under the court's analysis of whether public interest would be disserved by a permanent injunction.  The court agrees with Cordance's assertion that harm to Amazon's customers is "not a cognizable harm" under this *eBay* factor.  The Federal Circuit has explained that the balance considered under this prong of the injunction test is that which exists between the plaintiff and the defendant, without consideration of the effect of an injunction on the defendant's customers.[40] Nonetheless, on the evidence before it, the court is unwilling to accept Cordance's proposition that it "can only implement its business plan through the exclusivity that an injunction confers."[41]  As explained above, the court is unpersuaded that a direct link exists between Amazon's infringement of Cordance's one-click technology and Cordance's alleged prior and continuing exclusion from the digital identity market.  The court is therefore not prepared to find that the balance of hardships significantly favors Cordance.[42]

### 4.  Public Interest

Finally, the court must determine "whether an injunction, both in scope and effect, strikes a workable balance between protecting the patentee's rights and protecting the public from the injunction's adverse effects."[43]  First, Cordance contends

---

[40] *See Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1330 (Fed. Cir. 2008) ("We agree with Acumed that the district court did not abuse its discretion in determining that the balance of hardships tips in favor of Acumed.  As a preliminary matter, the balance considered is only between a plaintiff and a defendant, and thus the effect on customers and patients alleged by Stryker is irrelevant under this prong of the injunction test.").

[41] D.I. 525 at 24.

[42] *See z4 Techs., Inc. v. Microsoft Corp.*, 434 F. Supp. 2d 437, 443 (E.D. Tex. 2006) ("z4 argues that it will suffer hardship because Microsoft will be using its intellectual property.  As discussed above, Microsoft 's use of z4's intellectual property is not to the exclusion of z4 in any major sense and, to the extent it is, can be remedied in the form of monetary damages.").

[43] *i4i Ltd. P'ship*, 598 F.3d at 863 (citing *Broadcom Corp. v. Qualcomm Inc.*, 543 F.3d 683, 704 (Fed. Cir. 2008)).

that the imposition of a permanent injunction would best serve the public interest because the public has an interest in the courts' consistent and reliable enforcement of patent rights.  Second, Cordance argues that, should Amazon be enjoined from using its infringing one-click ordering systems, any resultant harm in the form of customer disappointment or inconvenience is not a public harm, but is instead a private harm to Amazon.  Third, Cordance asserts that the public need not be disserved by an injunction or deprived of one-click ordering functionality because Cordance's i-names technology is capable of enabling one-click ordering and Amazon may become a Cordance licensee.

    The court is unpersuaded by Cordance's argument that Amazon need only turn to Cordance's i-names platform if enjoined from utilizing the '710 patent technology. According to Amazon, because Amazon has spent many millions of dollars and thousands of hours building a system of web technology that securely, reliably, and quickly processes transactions on a massive scale, Cordance's i-names technology is not readily adoptable.  Further, Amazon indicates that it has evaluated and rejected other universal digital identity technologies like Cordance's for various reasons, including Amazon's stringent data security requirements.  Cordance offers little to rebut Amazon's position.  Cordance's maintains that "the public need not be disserved or deprived of one-click ordering functionality were Amazon to be enjoined from further infringement of the '710 patent" because "[a]ll Amazon has to do is implement one-click through Cordance's i-names platform so that the value of the one-click shopping system

flows appropriately to Cordance as the owner of the '710 patent."[44]  Cordance, however,

offers little to support this argument.[45]  The court is unconvinced that Amazon's adoption

of Cordance's i-names platform would be as painless as Cordance contends.  That said,

Amazon has done little to show that the public would be disserved by a permanent

injunction.  As Cordance argues, Amazon points only to customer inconvenience in

arguing that an injunction would disserve the public.  And customer inconvenience is not

enough to counter the strong public policy favoring enforcement of patent rights.[46]

Amazon's customers would still be able to purchase items from Amazon.com should

Amazon be enjoined from using the '710 patent's one-click technology.  Accordingly, the

---

[44] D.I. 525 at 28.

[45] Cordance cites only to the declaration of Reed submitted in support of its motion.  In that declaration, Reed provides the following:

> Cordance and Amazon also compete to provide one-click shopping to consumers.  Although Cordance has not yet released a product providing one-click shopping using i-names and XDI, Cordance has been working diligently since 2004 at developing the XDI automated data interchange open standard at OASIS so that it will support one-click shopping at any website.  I personally have co-chaired the Technical Committee since it's [sic] inception in February 2004, and have worked with at least a dozen senior Internet architects in the development of this standard so that it is capable of achieving the highest levels of security, privacy, and trust in automated[] transactions on the Internet, including one-click shopping.  So Cordance not only invented one-click shopping, including one-click shopping in many of its business plans, sought funding to implement one-click shopping, and created documents outlining the development of one-click shopping using its digital identities, but we have advanced the open standards based on our technology to the point where in 2010 Cordance and its market partners are ready to introduce one-click shopping as a major feature of i-name digital identities.

D.I. 526 at ¶ 27.  Reed's summary of the development and present state of Cordance's i-names platform does not demonstrate that Amazon can readily and easily substitute Cordance's i-names platform for the web technology it currently employs to support one-click purchasing.

[46] *See, e.g.*, *Callaway Golf Co. v. Acushnet Co.*, 585 F. Supp. 2d 600, 622 (D. Del. 2008), where, in denying a request for permanent injunctive relief, the court provides:

> Finally, with respect to the public interest, it is true that an injunction would disturb many golfers loyal to the Pro V1(R) brand, including professionals, who have about two months left on their 2008 contracts.  Notwithstanding the inevitable disappointment to such golfers, removing the Pro V1(R) line of balls from commerce after 2008 does not implicate public health or safety concerns.  There is no indication that other three-piece balls on the market could not fill the gap in demand.  In short, there is insufficient evidence to counter the "strong public policy favoring the enforcement of patent rights" recognized by the courts.

(citations omitted), *rev'd on other grounds*, 576 F.3d 1331 (Fed. Cir. 2009).

court agrees with Cordance that the public would not be disserved by entry of a permanent injunction in this case.

### 5.  Conclusion Regarding Injunctive Relief

The court is not persuaded that the balance of the hardships in this case weighs in favor of either party.  The court does agree with Cordance that the public interest would not be disserved by an injunction in this case.  However, because Cordance has not demonstrated that it will suffer irreparable harm in the absence of a permanent injunction, and because the court is confident that any harm Cordance might suffer can be adequately remedied through the recovery of monetary damages, the court finds that a permanent injunction should not issue.  Accordingly, Cordance's motion for a permanent injunction will be denied.

## B.  AN ONGOING ROYALTY

Cordance moves in the alternative for the court to impose an ongoing royalty for Amazon's continuing infringement of the '710 patent.  In some cases, a court may decide that the award of an ongoing royalty is necessary to effectuate a remedy, but the provision of such relief does not follow as a matter of course any time permanent injunctive relief is denied.[47]  Like the decision to grant or deny injunctive relief, it is within the court's equitable discretion to determine whether an ongoing royalty need be imposed.

Two months ago, Cordance filed a memorandum supporting its proposed schedule for the resolution of issues then outstanding in this case.[48]  In that

---

[47] *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1314–15 (Fed. Cir. 2007).
[48] D.I. 519.

memorandum, Cordance asserted that "[c]ourts typically impose an ongoing royalty as equitable relief where they have declined to enter a permanent injunction."  Cordance cited *Paice LLC v. Toyota Motor Corp.*[49] and *Innogenetics, N.V. v. Abbott Labs.*[50] in support of its assertion.  The court explained in its March 19, 2010 memorandum order why neither case offered the support for which it was cited.[51]  Nonetheless, in the present motion, Cordance once more dips into the *Paice* well, arguing, "[a]s an alternative to imposing a permanent injunction, district courts may order an adjudged infringer to make ongoing royalty payments."[52]  Granted, this statement more accurately reflects the *Paice* decision.  However, Cordance again creatively twists the language of the *Paice* decision in the parenthetical accompanying the citation which follows the above quoted sentence.  There, Cordance advances that the *Paice* court stated, "'[i]n most cases, where the district court determines that a permanent injunction is not warranted,' it is appropriate for the district court to 'step in to assess a reasonable royalty in light of ongoing infringement.'"  The inaccuracies in this attempted encapsulation of the *Paice* decision by Cordance are as apparent today as they were two months ago.  The passage from which Cordance selectively quotes provides in full:

> But awarding an ongoing royalty where "necessary" to effectuate a remedy, be it for antitrust violations or patent infringement, *does not justify the provision of such relief as a matter of course* whenever a permanent injunction is not imposed.  In most cases, where the district court determines that a permanent injunction is not warranted, the district court *may* wish to allow the parties to negotiate a license amongst themselves regarding future use of a patented invention before imposing an ongoing royalty.  Should the parties fail to come to an agreement, the district court

---

[49] 504 F.3d 1293 (Fed. Cir. 2007).
[50] 512 F.3d 1363 (Fed. Cir. 2008).
[51] D.I. 530 at 7–8.
[52] D.I. 525 at 29.

*could* step in to assess a reasonable royalty in light of the ongoing infringement.[53]

Nothing in this passage persuades the court that it is either typical or most appropriate for a court to impose an ongoing royalty when it denies permanent injunctive relief.  In fact, a close reading of the *Paice* decision indicates that the Federal Circuit was concerned with both the existence of an adequate basis for any ongoing royalty imposed and the opportunity courts can provide for the parties in a case to negotiate any such royalty.  In this case, these concerns weigh in favor of the court denying Cordance's request for an ongoing royalty.

In *Paice*, the Federal Circuit remanded to the district court because the district court judge's decision, which imposed an ongoing royalty upon the parties without explanation of the judge's valuation of that royalty, lacked a sufficient basis for the Federal Circuit to review.[54]  The Federal Circuit noted, "[u]pon remand, the [district] court may take additional evidence if necessary to account for any additional economic factors arising out of the imposition of an ongoing royalty," and provided, "[t]his process will also, presumably, allow the parties the opportunity to present evidence regarding an appropriate royalty rate to compensate Paice and the opportunity to negotiate their own rate prior to the imposition of one by the court, as the concurrence suggests."[55]  The

---

[53] *Paice LLC*, 504 F.3d at 1314–15 (emphases added).

[54] *Id.* at 1315.
[T]he district court's order provides no reasoning to support the selection of $25 per infringing vehicle as the royalty rate.  Thus, this court is unable to determine whether the district court abused its discretion in setting the ongoing royalty rate.  Accordingly, we think it prudent to remand the case for the limited purpose of having the district court reevaluate the ongoing royalty.

*Id.*

[55] *Id.* at 1315, 1315 n.15.

18

*Paice* concurrence to which the majority referenced would have *required* that a district court remand the issue of an ongoing royalty to the parties before setting an ongoing royalty rate itself.[56]  Such action, in the concurring judge's opinion, would allow the parties, who are better situated than the courts, to arrive at fair and efficient terms for any ongoing royalty to which they will be bound.[57]

From the court's reading of *Paice* it is clear (1) that a district court is not required to impose an ongoing royalty when it denies permanent injunctive relief[58] and (2) that a court can benefit from, and should therefore at least consider, providing the parties with an opportunity to negotiate the terms of an ongoing royalty prior to one's imposition.  In this case, Cordance has made clear that it will be appealing to the Federal Circuit the jury's finding of noninfringement of the '325 and '717 patents.  Amazon will be appealing at least this court's judgement as a matter of law of non-invalidity of the '710 patent. The court may safely assume, therefore, that any negotiations between the parties concerning the imposition of a reasonable ongoing royalty rate at this juncture, prior to the Federal Circuit's final decisions on infringement and validity, would be an exercise in futility.  Moreover, Cordance will have the opportunity to seek redress for both Amazon's past and continuing infringement when the court addresses the issue of damages in this case.[59]  For the time being, the issue of damages has been bifurcated until further court order, and the court plans to address these issues only after Federal Circuit review of

---

[56] *Paice LLC,* 504 F.3d at 1316 (Rader, J., concurring).
[57] *Id.* at 1317.
[58] *See supra* note 53 and accompanying text.  *See also Paice LLC,* 504 F.3d at 1316 (Rader, J., concurring) ("District courts have considerable discretion in crafting equitable remedies, and *in a limited number of cases,* as here, imposition of an ongoing royalty *may* be appropriate.") (emphases added).
[59] As the court explained above, the court is confident that any harm caused Cordance by Amazon's continuing infringement can be adequately compensated for with an award of money damages.

the jury's and the court's findings regarding infringement and validity.

For these reasons, and because the decision of whether to impose an ongoing royalty rests squarely within the equitable discretion of the court, the court will deny without prejudice Cordance's request for such relief.[60]

Before concluding, the court feels compelled to address the parties' arguments concerning the *IMX, Inc. v. LendingTree, LLC*[61] case.  Citing *LendingTree*, Amazon asserts that it would be most practical for this court to deny without prejudice Cordance's request for an ongoing royalty and that courts in this district frequently adopt such an approach to requests for ongoing royalties or compulsory licenses.  Cordance argues that *LendingTree* fails to support Amazon's position.  Cordance concedes that, in *LendingTree*, the court deferred a determination of post-judgment damages pending appeal.  However, Cordance contends that the deferred damages accounting related only to a short period of past infringement, not ongoing infringement.  Cordance maintains that, because there was no ongoing infringement, the court in *LendingTree* did not face or decide the issue of whether a determination of an ongoing royalty or compulsory license was appropriate.

The court notes first that neither the denial without prejudice nor the grant of requests for ongoing royalties takes place frequently in this district.  Nonetheless, the

---

[60] By declining to impose an ongoing royalty at this juncture, the court avoids venturing into a legal morass comprised of numerous satellite issues.  The parties already dispute whether and how the court should determine the value an ongoing royalty prior to a jury's damages award, whether a lump sum royalty payment for the life of the '710 patent could fully compensate Cordance, whether inadequacies exist in the parties' damages experts' analyses, and how the court should address these alleged inadequacies.  Efficiency dictates that such issues be resolved following any appeal to the Federal Circuit and a subsequent jury trial on damages.

[61] 469 F. Supp. 2d 203, 226-27 (D. Del. 2007).

court is convinced that denial without prejudice is appropriate here.  Cordance's

arguments to the contrary fail to sway the court.  As the court explained in its March 19,

2010 memorandum order, in *LendingTree*, the court denied a request for a permanent

injunction, deciding not to "effectively impose a ten-year compulsory license on

defendant absent more information, for example, the effects of defendant's infringement

on plaintiff's business and of a potential permanent injunction on the public and the

marketplace."[62]  There is no indication that the *LendingTree* court deferred only

damages for post-verdict infringement which had already ceased.  In fact, the

*LendingTree* decision is replete with references to the defendant's continuing

infringement,[63] and it is clear that the *LendingTree* court was not apprised of any

cessation of infringement until one week past the date of its opinion denying equitable

relief.[64]  Accordingly, the court is unconvinced that Cordance's reading of the

---

[62] *IMX, Inc. v. Lendingtree, LLC*, 469 F. Supp. 2d 203, 226 (D. Del. 2007).

[63] *See id.* at 221–22 ("There is no dispute that defendant has not changed its business practices since the time it learned of the '947 patent and has taken no remedial action following the jury's verdict."). "[D]efendant undertook no remedial action . . ." *Id.* at 222.  "The jury in this case concluded, on January 23, 2006, that the '947 patent is valid and that defendant's LendingTree Exchange infringes the '947 patent.  Since that time, defendant has done nothing to alter the operation of its infringing system."  *Id.* (citation omitted).

[64] Cordance supports its position that the January 10, 2007 opinion deferred only post-verdict damages for infringement which had already ceased by citing the following excerpt from a subsequent opinion in the *LendingTree* case: "I agree with plaintiff, however, that the damages award should take into consideration defendant's admission that it continued the conduct examined during trial until September 14, 2006."  *IMX, Inc. v. LendingTree, LLC*, No. Civ. 03-1067 SLR, 2007 WL 1232184, at *2 (D. Del. Apr. 25, 2007).  This quoted language is drawn from an opinion issued April 25, 2007, over three months after the January 10, 2007 decision denying equitable relief.  And it is clear that the *LendingTree* court did not learn that the defendant ceased its infringement until January 17, 2007, when it received a letter from the defendant's counsel, which provided:

Dear Chief Judge Robinson,

Your Honor's January 10, 2007 Memorandum opinion states that "[t]here is no dispute that defendant has not changed its business practices since the time it learned of the '947 patent and has taken no remedial action following the jury's verdict."  In fact, after the jury verdict of infringement early last year, LendingTree designed, tested and ultimately implemented a change to the operation of the accused system, the LendingTree Exchange . . . . Thus, there is no longer any argument that LendingTree's system permits customers to search and modify a database of pending loan applications, as required by each of the

*LendingTree* decision is accurate, or that it is improper for the court to draw a parallel between *LendingTree* and this case.

## IV.  CONCLUSION

For the reasons contained herein, Cordance's motion for permanent injunction or, in the alternative, imposition of an ongoing royalty will be denied.  In light of that decision, Amazon's motion to strike the declaration of Dr. Michael Shamos in support of Cordance's motion for permanent injunction will be dismissed as moot.  An appropriate order consistent with this memorandum will follow.

---

claims of the '947 patent.  This change was fully implemented September 14, 2006, after months of design work and pilot testing.

D.I. 557, Exhibit B (citation omitted).  It follows that, contrary to what Cordance contends, the January 10, 2007 *LendingTree* decision was issued without the *LendingTree* court's awareness that the defendant had ceased its infringing activities.  Therefore the court's decision to deny without prejudice the plaintiff's request for equitable relief effectively deferred a determination of damages for the defendant's *continuing* infringement.